opposition in Ex. 101 and OSA's claim that OEI has somehow acted in bad faith in attempting to register the OMEGA mark for its scientific and industrial period timers when OSA has not made sales in science and industry and when OSA's own applications and registrations are subject to attack for claiming rights in science and industry when OSA has none.

This partial cancellation of one of the OMEGA registrations on which OSA relies for its opposition in Exhibit 101 against OEI's CTM Application No. 174458 highlights the task that this Court would confront should it consider OSA's claims that OEI has made trademark filings abroad in bad faith. In the case of this CTM application, the EC examining attorney at OHIM already has determined that the mark is available for registration by OEI, which significantly, if not fatally, undercuts any claim of bad faith in filing the application.[5] And, to determine whether the examining attorney is incorrect, and whether OEI's claim to registration is so baseless as to constitute bad faith, this Court must then embark on a country-by-country analysis of OSA's and OEI's respective rights for the 20 OMEGA marks and applications that OSA has asserted provide it with a right to stop OEI's CTM application – the same analysis that is being undertaken at OHIM in the context of the pending opposition. That analysis is further complicated by the fact that there are also litigations ongoing with respect to many of those 20 registrations and applications in the CTM and in European countries, some of which, such as the U.K. proceeding described above, OEI has been winning.

---

[5] There is a threshold legal issue of whether there can ever be bad faith where a trademark examiner initially agreed with OEI that a particular application should be published for opposition. *Cf. T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 33 F. Supp. 2d 122, 126 (D. Conn. 1998) (petitioning activity is not a "sham" where defendant obtained a judgment in its favor) (citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 n.5 (1992)).

The CTM proceedings are not unique in this regard. For example, in Canada, OSA has listed four applications of OEI that it claims were made in bad faith, against three of which OSA has filed opposition proceedings that are currently pending. (Smart Decl. Ex. H at 1, 17). Yet, also in Canada, OEI has obtained cancellation of one of OSA's registrations for an OMEGA mark, and partial cancellation of another OMEGA registration, including cancellation with respect to some goods and services for use in science and industry. (Riggs Decl. ¶ 7 and Ex. C). OSA's claims present an enormously complex and convoluted undertaking that would require this Court to learn the trademark laws of numerous foreign countries, and then second guess those countries' own determinations of the parties' respective right in those foreign jurisdictions.

Finally, the enormity of the undertaking here is further highlighted by OSA's filings with the World Intellectual Property Organization ("WIPO") under the Madrid Protocol. One of the 20 registrations on which OSA relies for the opposition in Exhibit 101 is International Registration No. 631797 under the Madrid Protocol, a registration covering Germany, Spain, France, Italy, Austria, Portugal, and Benelux. (Sauser Rupp. Tr. 510; Smart Decl. Ex. J at 2137). As Ms. Sauser Rupp acknowledged, it is possible to obtain a single registration covering numerous countries through a single WIPO filing. (Sauser Rupp Tr. 541-42). An applicant may obtain such a registration without making any use of the mark. (*Id.* at 545). And, indeed, as Ms. Sauser Rupp acknowledged, OSA has not made use of the vast majority of the products and services listed in International Registration No. 631797 on which it relies in the CTM opposition that we have been examining – even though it is simultaneously accusing OEI of engaging in bad faith registration of the OMEGA mark with respect to goods and services for which OEI allegedly has no use. (Sauser Rupp Tr. 543-549). OEI also has a contingent counterclaim pending, asserting that if the Court concludes that it has subject matter jurisdiction over foreign

trademark filings and the jurisdiction to police OEI's trademark filings abroad, then OSA has engaged in the very behavior of which it accuses OEI. This International Registration filed by OSA is just one of many that the Court and the parties would have to sort through to determine whether OEI is engaged in bad faith filings, or whether OSA's oppositions to OEI's CTM applications have any merit. Similarly, as Ms. Sauser Rupp also acknowledged, OSA has recently filed with WIPO to expand its International Registration to dozens of additional countries for many classes of goods and services, including a number of goods and services in the fields of science and industry, even though it has not made any use with respect to many such goods and services. (Sauser Rupp Tr. 569-70; Smart Decl. Exs. J and K). Again, all the facts and circumstances regarding this application and what OSA has actually done in each of these countries would be necessary to evaluate OEI's contingent bad faith counterclaim and to determine whether OSA or OEI has used the trademark registration process in bad faith.

In sum, although we only were able to examine Ms. Sauser Rupp on one of the CTM trademark opposition proceedings that OSA says relates to OEI's alleged bad faith, that examination demonstrates graphically (1) the total inadequacy of OSA's document production; and (2) that the Court is being asked to determine the validity of OEI's and OSA's trademark applications and registrations in numerous countries around the world, a task that, as we show below, the Court should not undertake as a matter of law.

## ARGUMENT

### I.   THE COURT SHOULD GRANT DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM FOR RELIEF.

Count Three of the Third Amended Complaint alleges that defendants have violated the Connecticut Unfair Trade Practices Act by, *inter alia*, filing in bad faith and making false statements in connection with trademark applications at the PTO and at the European Trademark

Office and other national trademark offices. (TAC ¶¶ 53-56). Similarly, Count Four alleges that defendants' "business activities" have violated Section 43(a) of the Lanham Act "to the extent that defendants have made "bad faith" trademark filings to "block[] OSA's rights." (TAC ¶¶ 59-60). Both of these counts should be dismissed because (1) under black latter law, this Court does not have subject matter jurisdiction, and as a matter of international comity should not exercise jurisdiction, over claims that implicate the parties' rights and liabilities with respect to currently pending foreign trademark applications that have been approved for publication and that are subject to foreign opposition proceedings; and (2) the plain language of each statute does not extend to filing trademark applications.

> **A. The Court Lacks Subject Matter Jurisdiction to Hear OSA's Allegations Relating to Foreign Trademark Filings, Which Would Require the Court to Determine the Validity of Foreign Trademark Applications and Registrations Currently Pending Before Foreign Trademark Tribunals, in Violation of Settled Principles of Comity.**

As set forth above, adjudication of OSA's claims would require this Court to determine, *inter alia*, the parties' respective rights to the OMEGA marks in foreign countries, the validity of OEI's currently pending trademark applications in those countries (including whether they satisfied the applicable foreign requirements for trademark applications), the merits of OSA's currently pending oppositions to those trademark applications, the validity of the underlying foreign trademark registrations on which OSA's oppositions are based (some of which are themselves in litigation), and whether the goods and services covered in defendants' applications are sufficiently similar to goods in which OSA has rights so that OSA is "blocked" or injured by defendants' applications.

It is black letter law, however, that federal courts will not involve themselves in determining the validity of foreign trademark rights, and that they should avoid determinations regarding such rights that might be inconsistent with determinations by foreign trademark

authorities. As the Second Circuit held in *Vanity Fair Mills, Inc. v. The T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956), in which it declined to exercise jurisdiction over claims that would require evaluation of the validity of foreign trademark registrations, "extraterritorial application of American law . . . is contrary to conflicts-of-laws principles" and "the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." *Id.* at 638, 647. As the Court explained:

> [T]he rights and liabilities of United States citizens who compete with foreign nationals in their home countries are ordinarily to be determined by the appropriate foreign law. This fundamental principle, although not without exceptions, is the usual rule, and is based upon practical considerations such as the difficulty of obtaining extraterritorial enforcement of domestic law, as well as considerations of international comity and respect for national integrity.

*Id.* at 639 (citing *Ingenohl v. Olsen & Co.*, 273 U.S. 541, 544 (1927)).

In so holding, the Court of Appeals considered three factors relevant to the exercise of jurisdiction over claims involving foreign trademark rights: (1) whether the conduct at issue has a "substantial effect" on United States commerce; (2) whether the claim threatens a potential conflict with trademark rights in a foreign jurisdiction; and (3) whether the defendant is a United States citizen. 234 F.2d at 642-43. In *Vanity Fair*, as here, "the crucial issue" was the validity of foreign trademarks. 234 F.2d at 646. Although no one factor was dispositive, the court emphasized that a United States court should not take jurisdiction of claims that turned on the validity of foreign trademarks, holding that "we do not think it the province of United States district courts to determine the validity of trademarks which officials of foreign countries have seen fit to grant." *Id.* at 647.

Thus, courts time and again have refused to exercise jurisdiction over claims that would require determination of parties' foreign trademark rights – including claims against United States residents – particularly where, as here, a decision might conflict with trademark

proceedings currently pending in foreign countries. In *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985), for example, the court refused to exercise jurisdiction with respect to foreign trademarks where a decision in the United States could create conflict with trademark cancellation proceedings pending in the Philippines. In *American White Cross Labs. v. H.M. Cote, Inc.*, 556 F. Supp. 753, 757-58 (S.D.N.Y. 1983), the court declined jurisdiction over Lanham Act and state law claims because the claims, like OSA's claims here, would require the court to sit in judgment of trademark rights in Canada, including defendants' rights in a pending Canadian trademark application. *See also, e.g., Proctor & Gamble Co. v. Colgate Palmolive Co.*, 1998 U.S. Dist. LEXIS 17773, *196-97 (S.D.N.Y. Nov. 9, 1998) ("*Vanity Fair* cautions courts to avoid imposing American competition standards on conduct overseas"; declining subject matter jurisdiction over unfair competition claims that might result in rulings inconsistent with the parties' rights under foreign law). *Accord, Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73, 76 (D. Del. 1993) (declining to exercise jurisdiction over foreign patent claims under principles of international comity).[6]

The reason for the foregoing decisions is that trademarks are territorial, and to second guess or create potential conflicts with the decisions of foreign officials with respect to trademark rights in their countries is inconsistent with international comity. *See Vanity Fair*, 234 F.2d at 639, 647 (refusing to extend jurisdiction over adjudication of the validity of a Canadian

---

[6] *See also, e.g., Stein Assocs., Inc. v. Heat & Control, Inc.*, 748 F.2d 653, 658 (Fed. Cir. 1984) (only a foreign country can determine the validity and infringement of the patents it issues); *Goldberg v. Cordis Corp.*, 1976 U.S. Dist. LEXIS 11895, *5 (N.D. Ill. Dec. 30, 1976) (refusing to retain jurisdiction over a claim where the validity of foreign patents would necessarily be in issue); *Packard Instrument Co., Inc. v. Beckman Instruments, Inc.*, 346 F. Supp. 408, 410 (N.D. Ill. 1972) (declining jurisdiction over claims based on foreign patents because the claims would raise "serious questions of comity," and could lead to conflicting results with foreign authorities).

trademark for reasons of international comity, respect for national integrity, and the importance of avoiding conflicts with the administrative and judicial officers of Canada); *Star-Kist*, 769 F.2d at 1396 (declining jurisdiction so as to avoid "conflict with Philippine patent and trademark law and with pending proceedings in that country"); *Goldberg*, 1976 U.S. Dist. LEXIS 11895, at *5 (determinations by American courts of validity of foreign patents "would invite conflicts with the administrative and judicial officers of those governments"). As the court held in *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, "[t]he concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." 754 F.2d 591, 599 (5th Cir. 1985) (citing *Ingenohl v. Olsen & Co.*, 273 U.S. 541, 544 (1927)). Thus, in *Fuji Photo*, the court held that the district court erred in admitting evidence of parties' foreign trademark practices in a case involving claims of trademark infringement and unfair competition under federal and state law.

These same concerns regarding comity and conflicts with foreign authorities are present here. As set forth above, OSA's claims would require the Court to determine the parties' respective rights to the OMEGA marks in the EC, the United Kingdom, Canada and Israel, and to determine whether OEI's foreign applications were filed in bad faith or without a valid basis. Many of the applications that OSA alleges were made in bad faith have been published for opposition, so this Court is being asked to second-guess the judgments of foreign trademark authorities. At the same time, this Court's determinations would not bind the foreign trademark authorities. *See, e.g., Stein*, 748 F.2d at 658 ("resolution of the domestic action will not dispose of the British action. Only a British court, applying British law, can determine validity and infringement of British patents."). Thus, the claims pose a very real threat of inconsistent rulings by this Court and foreign authorities, in contravention of principles of international comity.

Dismissal of OSA's claims relating to foreign trademarks is warranted for the additional reason that there is no evidence that defendants' filing foreign trademarks have had a "substantial effect" on United States commerce, another relevant factor under *Vanity Fair*. *See, e.g., Star-Kist*, 769 F.2d at 1396 ("The effect on United States commerce from the alleged illegal use of the trademarks in trade between the Philippines and other foreign countries is relatively insignificant compared to the effect on Philippine commerce"); *Proctor & Gamble*, 1998 U.S. Dist. LEXIS 17773, at * 197; *accord, Baghdady v. Baghdady*, 2003 U.S. App. LEXIS 1439, *4-5 (2d Cir. Jan. 28, 2003) (dismissing CUTPA claim relating to foreign conduct because of, *inter alia*, lack of "a sufficient nexus between the alleged real estate transaction and . . . trade or commerce within Connecticut"). Here, the complaint does not even allege in the counts at issue (Three and Four) that the filing of foreign trademark applications has had any impact on commerce in Connecticut or the United States, and OSA has provided us with no interrogatory responses or documents evidencing such impact. Indeed, the only specific alleged injury in the United States to OSA that Ms. Sauser Rupp could identify that could bear any relation to foreign trademark filings was OSA's attorneys' fees in this matter. (Sauser Rupp Tr. 402-03). Nor would an allegation of impact in the United States make any sense, because the Counts allege trademark *applications*, not *use*, in foreign jurisdictions, which by definition could not have an impact in Connecticut. Indeed, defendants are unaware of a single case holding that the filing of trademark applications in foreign jurisdictions creates a substantial impact on commerce in the United States warranting the extraordinary step of a United States court determining the validity of such applications.

    **B.**    **Counts Three and Four of the Complaint Fail to State a Claim for Relief to the Extent that they Rely on Alleged Bad Faith Foreign Trademark Applications Because the Statutes at Issue Do Not Extend to Trademark Filings.**

        **1.**    **Under its plain language, CUTPA does not extend to the filing of foreign trademark applications.**

CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices *in the conduct of any trade or commerce.*" Conn. Gen. Stat. § 42-110b(a) (emphasis added). The statute defines "trade" and "commerce" to mean "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state.*" *Id.* § 42-110a(4) (emphasis added). By the plain terms of the statute, then, CUTPA simply does not apply to the filing of a trademark application or related documents in a foreign trademark office, none of which constitutes "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state.*"

Thus, not surprisingly, OSA can point to no decision holding that "the conduct of any trade or commerce" includes the filing of trademark applications, let alone the filing of such applications outside Connecticut and the United States. CUTPA simply does not apply to *all* business-related conduct of an entity that happens to be engaged in "trade or commerce" in Connecticut, where the challenged conduct itself does not constitute "trade or commerce" as defined by the statute. To the contrary, whether CUTPA applies depends on whether the challenged conduct itself is "trade or commerce" as defined by the statute.

Accordingly, courts have repeatedly held that "a CUTPA violation may not arise out of conduct that is *merely incidental* to the performance of one's trade or commerce." *Cornerstone Realty, Inc .v. Dresser-Rand Co.*, 993 F. Supp. 107, 113 (D. Conn. 1997) (emphasis added) (dismissing CUTPA claim relating to defendant's sale of real estate that had been used in defendant's business, because real estate was not defendant's primary business or trade). *See,*

*e.g., Bernbach v. Timex Corp.*, 989 F. Supp. 403, 409-410 (D. Conn. 1996) ("the statute plainly requires that the acts complained of be committed 'in the conduct' of trade or commerce"; granting motion to dismiss CUTPA claim based on conduct incidental to defendants' primary activities); *Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 81 (D. Conn. 1994) ("no viable claim under CUTPA when the practice complained of is incidental to the true trade or business conducted"); *Mantie v. The Inn at Manchester, Inc.*, 1997 Conn. Super. LEXIS 98, *38 (Jan. 9, 1997) (same); *Carloni v. Palumbo*, 1992 Conn. Super. LEXIS 2236, *10 (July 1, 1992) (negotiation of a settlement related to a lease does not constitute the conduct of "trade or commerce" under CUTPA; granting motion to strike).[7]

Here, there is no allegation or evidence that defendants' "trade or business" is the filing of trademark applications. Rather, OSA alleges that defendants are engaged "in the manufacture and sale of process control measurement and control goods and services." (TAC ¶ 17). Defendants' filing of trademark applications, which does not constitute "the advertising, sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property," is not the "conduct of trade or business" within the meaning of CUTPA. For this reason, Count Three should be dismissed to the extent it relates to foreign trademark applications.

Moreover, in addition to not constituting "trade or commerce" under CUTPA, the conduct complained of is not taking place "in this state," as CUTPA requires. On the face of the complaint, the foreign applications complained of are being filed in foreign trademark offices, outside both Connecticut and the United States, and not in the "conduct of trade or commerce"

---

[7] *See also, e.g., Arawana Mills Co. v. United Technologies Corp.*, 795 F. Supp. 1238, 1253 (D. Conn. 1992) (even though "trade or commerce" under CUTPA includes "leasing" property, no CUTPA claim where leasing is incidental to plaintiffs' business); *Sealy Connecticut, Inc. v. Litton Indus., Inc.*, 989 F. Supp. 120, 127 (D. Conn. 1997) (same).

"in this state" as required by the statute. Indeed, as shown above, trademark rights are inherently territorial. Thus, even assuming trademark filings amounted to trade or commerce – which they do not – there is no basis to conclude that the making of such filings abroad constitutes the "conduct of trade or commerce" in this state. *See Baghdady, supra*, 2003 U.S. App. LEXIS 1439, at *4-5 (dismissing CUTPA claim relating to transaction that took place in Lebanon).

### 2. The filing of foreign trademark applications is not "commercial advertising or promotion" under Lanham Act § 43(a).

OSA appear to allege in Count 4 that defendants have engaged in unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by filing trademark applications in foreign jurisdictions "in bad faith." (TAC ¶¶ 59, 60). However, the plain language of Section 43(a) does not extend to such conduct. That provision makes unlawful, *inter alia*:

(1) the use "in commerce" of false statements of fact or false descriptions of origin "on or in connection with any goods or services, or any container for goods" which are "likely to cause confusion" as to origin, sponsorship or approval of goods or services (*see* 15 U.S.C. § 1125(a)(1)(A)); and

(2) the misrepresentation "in commerce," *and* in "commercial advertising or promotion," of "the nature, characteristics, qualities, or geographic origin" of goods or services (*see* 15 U.S.C. § 1125(a)(1)(B)).

OSA's allegations relating to filing foreign trademark applications do not state a claim under either prong of Section 43(a). First, both prongs require proof of the "use" of a false statement of fact or designation of origin "in connection with any goods or services" "in commerce." Defendants are aware of no cases holding that the filing of a trademark application (whether in the United States or abroad) constitutes the "use" of a false statement of fact or designation of origin "in connection with any goods or services" "in commerce" as required by

Section 43(a). Moreover, the Second Circuit has stated that the proper statute to seek damages for a "false or fraudulent registration" at the United States Patent and Trademark Office ("PTO") is Section 38 of the Lanham Act, 15 U.S.C. § 1120. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270-71 (2d Cir. 1974). Plainly, if Section 43(a) does not encompass claims of filing false and fraudulent registrations in the United States, it does not extend to claims of such false or fraudulent registrations abroad.

In addition, the first prong of Section 43(a), 15 U.S.C. § 1125(a)(1)(A), requires proof of likelihood of confusion as to origin, sponsorship or approval of goods or services, but there is no allegation that OEI's foreign applications are likely to cause such confusion.

Nor does the filing of foreign trademark applications satisfy the "in commercial advertising or promotion" requirement of 15 U.S.C. § 1125(a)(1)(B). In this Circuit, to constitute "commercial advertising or promotion under the Lanham Act, a statement must be: (1) 'commercial speech,' (2) made 'for the purpose of influencing customers to buy defendant's goods or services,' and (3) 'although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.'" *Galerie Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (*citing Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56, 57-58 (2d Cir. 2002))..

The filing of trademark applications meets none of these requirements. As an application to register a trademark with a government authority, a trademark application does not constitute "commercial speech." *See Galerie Gmurzynska*, 355 F.3d at 210 ("Commercial speech is 'speech which does no more than propose a commercial transaction.'"). Nor is a trademark application, or any statement therein, made "for the purpose of influencing consumers." Lastly, there is no allegation here that any of defendants' trademark applications were "disseminated" to

members of the "relevant purchasing public." *Id.* As such, defendants' alleged foreign trademark filings were not made in "commercial advertising and promotion."

### C. The "Law of the Case" Doctrine Does Not Prevent the Court From Dismissing OSA's Allegations Regarding Foreign Trademark Filings.

This Court is not bound by Judge Underhill's previous ruling, made on the basis of the bare pleadings and without the benefit of the recent discovery that clarifies OSA's allegations and confirms that these claims will require determination of the parties' foreign trademark rights and pose a conflict with foreign trademark proceedings. The Court of Appeals has held that the "law of the case" doctrine is "admittedly discretionary and does not limit a court's power to reconsider" its decisions prior to final judgment. *DiLaura v. Power Auth. of New York*, 982 F.2d 73, 76 (2d Cir. 1992); *accord, Casey v. United States*, 161 F. Supp. 2d 86, 91 (D. Conn. 2001). Thus, courts have declined to apply the doctrine when, for example, "a more complete record was developed," further information relating to plaintiff's claims is presented, "new evidence has surfaced," the court's original ruling was "erroneous," or there has been a change in applicable law. *E.g., DiLaura*, 982 F.2d at 77; *Casey*, 161 F. Supp. 2d at 91-92; *Harris v. Key Bank Nat'l Ass'n*, 193 F. Supp. 2d 707, 711 (W.D.N.Y. 2002); *Pineiro v. Pension Benefit Guar. Corp.*, 1999 U.S. Dist. LEXIS 4691, *2 (S.D.N.Y. April 7, 1999); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 955 F. Supp. 203, 209 (S.D.N.Y. 1997) (rulings made at the pretrial stage may often be subject to reconsideration as a case progresses, and "'a trial judge . . . should be particularly sensitive to the advantages of correcting mistakes so as to avoid a taint that might infect'" further proceedings).

Applying the foregoing considerations, it is evident that the Court is not bound to the prior refusal to dismiss OSA's claims relating to alleged bad faith foreign trademark filings.

First, the prior decision was based on the bare allegations of the complaint, which provided no details regarding the purported bad faith trademark filings alleged by OSA. For example, the prior ruling was premised on the understanding that the Court was not being asked to question the validity of any foreign trademark rights. *See, e.g,* 4/22/03 Tr. at 36 ("Obviously I think defendant is correct that this court is not going to be looking behind foreign trademarks.") Indeed, OSA itself argued in opposing the prior motion that foreign trademark registrations had "nothing to do" with OSA's claims. (*See* OSA 2/24/03 Opp. Mem. at 9). As shown above, however, OSA now has supplemented its allegations by identifying some 25 foreign trademark applications filed by OEI in various countries that are currently pending, including 20 that have been preliminarily approved by the foreign authorities and are subject to pending foreign opposition proceedings, and the validity of the parties' respective foreign registrations, and scope of their respective foreign trademark rights, is central to the resolution of OSA's claims. It is now clear that a finding by this Court as to whether a foreign trademark filings were made in bad faith poses a conflict with proceedings in foreign jurisdictions. This "more complete record" warrants disregard of "law of the case." *See, e.g., Harris*, 193 F. Supp. 2d at 711 (the "parties have submitted materials obtained during discovery that shed additional light on the issues involved here"); *Casey*, 161 F. Supp. 2d at 92 (law of the case doctrine "inapplicable" in light of "more complete record"); *Pineiro*, 1999 U.S. Dist. LEXIS 4691, at *4 (taking "fresh look" at prior decision after further information was presented in amended complaint).

Second, this Court should not be bound under the "law of the case" doctrine because the defects with OSA's foreign trademark claims, premised on comity concerns and the extraterritorial application of American law, relate to the Court's subject matter jurisdiction, which is "particularly suited for reconsideration." *DiLaura*, 982 F.2d at 77.

Third, defendants respectfully submit that the prior ruling as to OSA's foreign filing claims, particularly when viewed in light of new information obtained since that ruling, was erroneous. As shown above, there is absolutely no basis for this Court to sit in judgment of defendants' conduct before trademark authorities, especially where, as here, OEI's allegedly bad faith foreign applications are pending before foreign trademark tribunals that are considering the application and (in most instances) related opposition proceedings, all under foreign law. OSA can point to no case finding liability under CUTPA or Lanham Act Section 43(a) for filing trademark applications abroad, or applying those statutes in a manner that would cast doubt on the validity of foreign trademark rights. It would be error and a manifest injustice to force defendants to continue to defend such claims. For this reason, the Court should not be bound by law of the case. *E.g., DiLaura*, 982 F.2d at 77; *Casey*, 161 F. Supp. 2d at 93.

## II.  OSA SHOULD BE PRECLUDED FROM RELYING ON EVIDENCE RELATING TO FOREIGN TRADEMARK FILINGS BECAUSE OF ITS ABUSE OF THE DISCOVERY PROCESS AND ITS DISREGARD OF THE COURT'S DISCOVERY ORDERS.

Rule 37(b)(2) provides the Court with broad discretion to preclude evidence when a party has failed to obey an order to provide discovery, including the power to issue:

> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party; . . . .

"A district court has wide discretion in imposing sanctions, including severe sanctions, under Rule 37(b)(2), and will only be reversed if its decision constitutes an abuse of discretion."

*Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991). As the Second Circuit explained in *Daval*:

> "The discovery provisions of the Federal Rules . . . are 'designed to achieve disclosure of all the evidence relevant to the merits of a controversy.' . . . When a party seeks to frustrate this design by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate." *Id.*

Thus, where a party has failed to produce responsive documents pursuant to a Court's order, it is appropriate to preclude the party from relying on any documents that were the subject of the discovery order. *See, e.g., id.*, 951 F.2d at 1368 (precluding defendants' evidence regarding alter ego liability when they failed to obey court order requiring production of witness and documents at deposition); *Nike, Inc. v. Top Brand Co.*, 216 F.R.D. 259, 274 (S.D.N.Y. 2003) (precluding defendants, who had withheld information regarding damages, from introducing any evidence on the issue of damages); *Forum Ins. Co. v. Keller*, 1992 U.S. Dist. LEXIS 15231, *7 (S.D.N.Y. Oct. 8, 1992) (precluding evidence relating to issue with respect to which documents had not been produced, and deeming issue established under Rule 37(b)(2)(A)); *Conway v. Dunbar*, 121 F.R.D. 211, 212-14 (S.D.N.Y. 1988) (precluding defendants' evidence of liability where they violated court order compelling compliance with two notices to produce documents).

Indeed, courts in this Circuit have *dismissed* complaints for failure to comply with discovery orders where there was no lesser sanction available. *See, e.g., Baba v. Japan Travel Bureau Int'l, Inc.*, 111 F.3d 2, 5 (2d Cir. 1997) (affirming dismissal based on plaintiff's willful disregard of the discovery orders); *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49-50 (2d Cir. 1994) (affirming dismissal of a *pro se* plaintiff's complaint based on plaintiff's willful intransigence despite the court's warnings that failure to appear at deposition would result in dismissal); *Levene v. City of New York*, 1999 U.S. Dist. LEXIS 9031, *16-17 (S.D.N.Y. June 15,

1999), *aff'd,* 2000 U.S. App. LEXIS 12483 (2d Cir. 2000); *see also National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976) (affirming dismissal of action for failure to comply with discovery requests). Here, the requested sanction – an order precluding evidence relating to foreign trademark filings – is narrowly tailored to OSA's specific discovery failures with respect to that same evidence.

### A. OSA's Document Production and Discovery Responses Were Incomplete, Inadequate and Affirmatively Misleading

Preclusion of evidence relating to foreign filings clearly is warranted. As set forth above, defendants sought, in documents and interrogatory responses served in November, 2003, discovery relating to OSA's allegations that defendants had engaged in bad faith trademark filings in foreign countries. OSA's initial Rule 34 responses (which purportedly were served on January 16, 2004, but not postmarked until January 20, 2004, and not actually received by defendants until January 22, *see* Smart Decl. ¶ 5) provided absolutely no documents relating to foreign trademark filings, and OSA's initial interrogatory responses only identified *two* foreign trademark filings, in the Benelux, that OSA asserted were made by defendants in bad faith. Despite the Court's order that OSA was obligated to provide documents relating to its foreign claims, OSA produced no documents prior to the Sauser Rupp deposition except a list of 26 of defendants' foreign trademark applications and registrations that, while consisting of approximately 143 pages, amounted to nothing but the basic filing details of some of the identified applications, translated into a variety of foreign languages.

Moreover, the limited production that OSA made midway through Sauser Rupp's deposition, late in the day on March 16, was obviously inadequate for a variety of reasons.

First, the documents that OSA finally did produce on March 16 were limited to notice of opposition forms for some of the challenged CTM applications, and did not relate at all to many of the foreign filings identified by OSA on March 8.

Second, even with respect to applications for which OSA provided its notice of opposition forms, Sauser Rupp's own testimony confirms that the documents belatedly provided by OSA are only a fraction of the documents relating to each CTM application, and did not contain any of the filings of OEI that OSA asserts were made in bad faith.

Third, each Notice of Opposition form provided by OSA – and, presumably, the many foreign trademark oppositions for which OSA has provided no documents – relies and bases its opposition upon alleged foreign trademark applications and registrations purportedly owned by OSA, yet OSA has provided no documents relating to the status of those purported OSA applications and registrations, even though some have been cancelled and OEI specifically asked for documents relating to such cancellations in Document Request No. 27.  Plainly, if a registration on which OSA is relying for its claim to prior rights has been cancelled, that fact is pertinent to a determination of whether OEI's filing was made in bad faith.

Fourth, although OSA alleges that OEI's purportedly bad faith filings have "blocked" OSA's own trademarks in foreign countries, OSA produced no documents relating to any foreign applications by OSA, if any, which have been blocked as a result of OEI's alleged bad faith filings, nor any documents relating to any alleged impact on commerce in the United States allegedly resulting from defendants' conduct.

Thus, OSA appears to have belatedly produced a handful of documents that it presumably regards as helpful to its claims, and nothing else.  All responsive documents in the possession,