# EXHIBIT B

TRADE MARKS ACT 1994



IN THE MATTER OF REGISTRATION NO 1557184
IN THE NAME OF OMEGA ENGINEERING, INCORPORATED
OF THE TRADE MARK:


# OMEGA


AND THE APPLICATION FOR A DECLARATION OF INVALIDITY
THERETO UNDER NO 80762
BY OMEGA SA (OMEGA AG) (OMEGA LTD)

Trade Marks Act 1994
in the matter of registration no 1557184
in the name of Omega Engineering, Incorporated
of the trade mark:

# OMEGA

and the application for a declaration of invalidity thereto under no 80762
by Omega SA (Omega AG) (Omega Ltd)

## BACKGROUND

1) On 19 March 2002 Omega SA (Omega AG) (Omega Ltd) of Switzerland, which I will refer to as Swiss, made an application for the invalidation of United Kingdom Trade Mark registration no 1557184 of the trade mark OMEGA. This trade mark is owned by Omega Engineering, Incorporated of the United States of America, which I will refer to as US. Swiss's application is not in respect of the entire specification but only *period timers*. These goods are qualified in the specification as being *for industrial and/or scientific purposes*. The entire specification of the registration reads as follows:

*scientific apparatus and instruments, electrical apparatus and instruments, all for scientific and/or industrial purposes; optical, thermal, thermo electric, weighing, measuring, signalling and checking apparatus; calculating machines and apparatus; electrical and electronic apparatus and instruments for collecting, processing, assessing and transmitting data, all for scientific or industrial applications; information display systems for scientific or industrial applications; computers for use with information display systems for scientific or industrial applications; electric soldering irons; control apparatus and instruments; automatic temperature regulators; batteries; blowers; insulated cables; instruments for checking, testing and verification; heat measuring and recording instruments for checking, testing and verification; heat measuring and recording apparatus; distance temperature indicators; electric connections; electrical contacts; thermoelectric elements; indicating instruments for use in the control of heat; indicating apparatus and instruments for inspectional control; inspecting instruments; lasers; recording apparatus; adaptors; alarms; ammeters; amplifiers; analysers; anemometers; barometers; baths; boards; cables; calibrators; PII buffer capsules; plug-in cards; cells; handheld leak checkers; heat transfer and release coatings; computers; computer interfaces; computer software being part of computer controlled apparatus or instruments for scientific and/or industrial purposes; signal conditioners; connectors; magnetic contactors; controllers; converters; data acquisition systems; dataloggers; leak detectors; autodialers; telephone dialers; electrodes; power control elements; hermetic feedthroughs; vacuum feedthroughs; compression fittings; tube fittings; flowmeters; bench top muffle furnaces; dial gauges; handheld force gauges; strain gauges; heaters; hot plates; digital thermal hygrometers; indicators; interfaces; isolators; load cell summing junction boxes; irreversible labels; liquid crystal labels; reversible labels; temperature labels; power loggers; manometers; heating mantles; meters; mixers; modems; intelligent control modules; isolation*

modules; loop isolator modules; proportional firing modules; pulse control modules; solid state input/output modules; monitors; electric motors; multimeters; power control panels; printers; conductivity probes; temperature profilers; psychrometers; pumps; pyrometers; receivers; recorders; relays; rotameters; process scanners; temperature scanners; sensors; simulators; pressure snubbers; pressure standards; handheld pressure standards; melting point standards; lab hot plate stirrers; power supplies; switches; communication systems; conductivity level switch systems; tachometers; flexible heating tapes; testers; thermocouples; thermometers; thermostats; period timers; totalisers; transducers; transmitters; tubing, all of metal, of plastic or of rubber; valves; voltmeters; wind tunnels; wire; wires; data carriers with and without recording means; electronic instruments and apparatus for the measurement of process parameters and electrical parameters; data processing apparatus; microprocessor operated apparatus; parts and fittings for all the aforesaid goods; Testing and laboratory apparatus; vibration management apparatus; lenses; filters; mirrors; beam splitters; attenuators; lamps; laser mounts; laser beam directors; optical fibres and cables; mounting hardware; positioners; transducer indicators; transducer simulators; setpoint controllers; digital strain gauge monitor meters; digital monitor meter and/or controller pressure test apparatus; detectors; calibrators; potentiometers; electrical instruments and controls, all for checking, displaying, controlling, measuring, monitoring, warning, recording, data logging and recording variable parameters; apparatus and instruments for calculating, controlling and signal conditioning; thermocouple probes; thermocouple assemblies; thermocouple wells; thermocouple parts and fittings; ice-point reference apparatus; cold-junction compensators; apparatus for testing temperature; thermistor and probe assemblies; thermopiles; feedthrough unions, bushings, sockets, test plugs and insulation, all being electrical; thermistors; accelerometers; brackets; chlorine analysers; barriers; connectors; insulators; tubing and parts, all being ceramic; calibrators; signal conditioners; thermocouple connectors; thermocouple to analog converters; counters; diodes; refractometers; viscometers; scanners; transmitter simulators; slip rings; switches; thermocouple blocks; thermocouple heads; thermowells; transformers; transmitters; valve needles; weather stations; regulation and control apparatus; pH measuring instruments; mechanically operated infra-red pyrometers and thermometers; mechanically operated ammeter tools, current probe tools and watt meter tools; mechanically operated pH/conductivity meter tools; parts and fittings for all the aforesaid goods; all for industrial and/or scientific purposes; all included in Class 9; but not including audio or television apparatus or goods being parts of mass spectrometers or of radio position finders or parts and fittings for plasma etching machines.

The above goods are in class 9 of the "International Classification of Goods and Services".

2) The registration was applied for on 16 December 1993 and the registration procedure was completed on 16 April 1999. It proceeded to advertisement on the

basis of honest concurrent use with trade mark registration nos 484274, 699057, 858074, 909205 and others.

3) Swiss is the owner of the following United Kingdom registered trade marks:

- no 283841 for the trade mark **OMEGA** which is registered for: *watches and parts of watches, but not including watch cases sold separately.* These goods are in class 14 of the "International Classification of Goods and Services".

- no 699058 for the trade mark:



which is registered for: *all goods included in class 14* of the "International Classification of Goods and Services".

- no 699057 for the trade mark:



which is registered for: *nautical, surveying, weighing, measuring, signalling, checking (supervision) and life-saving instruments and apparatus; teaching instruments and apparatus (other than material); and calculating machines. CANCELLED IN RESPECT OF "Calculating machines". CANCELLED IN RESPECT OF instruments and apparatus, all for measuring, signalling and checking (supervision) of heat and temperature for scientific and industrial use.* These goods are in class 9 of the "International Classification of Goods and Services".

- no 283842 for the trade mark:



which is registered for: *watches and parts of watches, but not including watch cases sold separately.* These goods are in class 14 of the "International Classification of Goods and Services".

- no 723200 for the trade mark **OMEGA CONSTELLATION** which is registered for: *all goods included in class 14* of the "International Classification of Goods and Services".

- no 1456848 for the trade mark:



which is registered for: *maintenance and repair of horological and chronometric instruments, jewellery, goods in precious metal or goods coated therewith, weighing and optical apparatus and instruments, and of public information display apparatus and instruments; maintenance and repair of measuring, checking and signalling apparatus and instruments; information services relating to all the aforesaid; all included in Class 37; but not including maintenance and repair of heat and temperature measuring, checking and signalling apparatus and instruments, all for scientific and industrial use.* These goods are in class 37 of the "International Classification of Goods and Services".

- no 1477193 for the trade mark:



which is registered for: *nautical, surveying, weighing, measuring, signalling, checking (supervision) and life-saving instruments and apparatus; teaching instruments and apparatus (other than material); all included in Class 9; but not including calculating machines or instruments and apparatus, all for measuring, signalling and checking (supervision) of heat and temperature for scientific or industrial use.* These goods are in class 9 of the "International Classification of Goods and Services".

All of the above specifications are those on the register at the date of the filing of the application for invalidation.

4) Swiss states that identical and highly similar trade marks and identical or similar products are concerned and that there is a likelihood of confusion on the part of the public between *period timers* sold under US's trade mark OMEGA and products sold under its various OMEGA trade marks. Swiss states that accordingly the registration should be declared invalid in accordance with the provisions of sections 47(2)(a), 5(1), 5(2)(a) and 5(2)(b) of the Trade Marks Act 1994 (the Act).

5) Swiss states that it has passing-off rights in its OMEGA trade marks for watches and time keeping and measuring apparatus. Swiss states that use of US's trade mark for period timers would amount to passing-off and that the registration should be declared invalid by virtue of the provisions of sections 47(2)(b) and 5(4)(a) of the Act.

6) Swiss states that it has used the trade marks OMEGA and $\Omega$ OMEGA in the United Kingdom since 1906 for watches and since 1948 for a range of goods including time-keeping and measuring apparatus. Swiss states that it has sold watches under the trade mark OMEGA CONSTELLATION since 1953. It states that the trade mark OMEGA $\Omega$ SCAN 'O' VISION and device has been used for timing equipment in the United Kingdom since 1991. Swiss states that its products bearing trade marks containing or consisting of OMEGA are particularly known in the sporting field and for public information displays and for watches and other horological and chronometric instruments.

7) Swiss states that its timing equipment was used in the XIVth Olympic Games held in London in 1948. It states that it has provided timing equipment for more that twenty Olympic Games under the trade marks OMEGA and OMEGA $\Omega$. Swiss states that it has built up considerable goodwill in its trade marks which comprise or contain OMEGA.

8) Swiss states that its trade marks which contain or comprise OMEGA feature on the products themselves.

9) Swiss states that at its request US deleted *industrial timers* from the scope of its registration. Due to an oversight no request was made to delete *period timers*

020 7240 7258

although claims to timers of various kinds, including *period timers*, have been deleted from the scope of US's trade marks in a number of jurisdictions at the request of Swiss. Swiss states that US allowed the registration to proceed for *period timers* in bad faith, knowing that this would be contrary to the pattern of conduct it had established for timers in the context of its dealings with Swiss. Swiss states that the registration should be declared invalid for *period timers* in accordance with the provisions of sections 47(1) and 3(6) of the Act.

10) Swiss states that it requested US to delete period timers by 7 March 2002 in a letter dated 20 February 2002 but US did not do so. Swiss requests that the registration should be declared invalid for *period timers* and seeks an award of costs.

11) US filed a counterstatement. It states that United Kingdom registration 699057 had been cancelled in respect of *instruments and apparatus, all for measuring, signalling and checking (supervision) of heat and temperature for scientific and industrial use* pursuant to an agreement between US and Swiss made on 11 April 1984. US states that it has launched revocation actions against United Kingdom registration nos 699057, 1456848 and 1477193.

12) US states that *period timers* in the specification of goods are qualified by the words *all for industrial and/or scientific purposes*. US contends that the question of whether there is a likelihood of confusion is to be determined in the light of all the circumstances of the case, including the qualification of the goods, the true nature and purpose of such goods, the substantial use of the trade mark OMEGA for such goods and other goods within the specification of the registration in the United Kingdom prior to the application date without any confusion occurring so far as US are aware, and in the context of normal and fair manner of use of the trade mark OMEGA for all the other goods within the specification. US also relies upon an agreement between itself and Swiss dated 2 August 1994.

13) US states that Swiss has consented to the registration of US's trade mark for *period timers for industrial and/or scientific purposes*. US contends that the terms of an agreement made on 2 August 1994 (the 1994 Agreement). US states that Swiss agreed by the terms of clause 4c of the 1994 Agreement not to object to the use or registration by it "of any trade mark consisting of or containing the word OMEGA.... in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibrations, electrical conductivity, liquid level, acidity, humidity, strain and flow". US contends that the goods to which objection is made fall within this provision of the 1994 Agreement and that accordingly the applicants for invalidation are precluded from relying upon any ground of invalidation under sections 47 and 5 of the Act.

14) US denies that Swiss has any "passing-off rights". It states that whatever Swiss may establish by way of use of the word OMEGA, US relies upon the fact

7 of 39

that it has made substantial use of the trade mark OMEGA for the goods set out in the specification in the United Kingdom without any deception or confusion occurring and with Swiss's consent. US denies that use of its trade mark for the disputed goods was or is liable to be prevented by virtue of the law of passing-off or any other rule of law.

15) US states that it was required to notify Swiss of the advertisement of the registration for opposition purposes and duly did that. US states that subsequent to this notification it deleted *industrial timers* from the specification of goods at the request of Swiss. US states that in view of the 1994 Agreement and having regard to the qualification of the goods it denies that it allowed the registration to proceed to this status in bad faith and it denies that there was any pattern of conduct that required it to delete *period timers*. US denies the grounds for invalidation under sections 47(1) and 3(6) of the Act.

16) US admits that Swiss's trade mark attorney asked for the deletion of *period timers* from the registration. It states that it has not done so and that it has no intention so to do. US states that, however, the attorney acting for Swiss was contacted on 6 March 2002 with an offer to qualify *period timers* by the words *"computer controlled"* as required by the decision of the Hearing Officer in connection with opposition no 50827.

17) US requests that the application is rejected and seeks an award of costs.

18) Both sides filed evidence. The case was heard on 1 July 2004 when Swiss was represented by Ms Sofia Arenal of Mewburn Ellis and US was represented by Mr Christopher Morcom QC, instructed by Bromhead & Co. Following the hearing Mr Morcom sent in written submissions in relation to *Riviera Trade Mark* [2003] RPC 50. I decided to accept these submissions and allowed Ms Arenal to respond to this matter. Ms Arenal subsequently filed a written response. I have taken the submissions of both sides into consideration in my decision.

## EVIDENCE

**Main evidence of Swiss**

**Witness statement of Sofia Arenal**

19) Ms Arenal is a member of the Mewburn Ellis trade marks department.

20) Ms Arenal comments that she has "the following comments" about the counterstatement of US. Comment is not evidence of fact and so where her "evidence" is comment or submission I will not refer to it here; although I take on board the comments in reaching my decision.

21) In order to demonstrate the use made by Swiss of its trade marks Ms Arenal adopts into the proceedings witness statements made by Peter Stierli and Timothy Edwin Coleman for opposition case no 50827, which was also between Swiss and US. This evidence was summarised by the hearing officer, Mr Reynolds, in his decision of 14 January 2002 - BL 0/013/02. I adopt the summary made by Mr Reynolds and reproduce it below. It is necessary to bear in mind that in this case the material date is some time earlier, 16 December 1993 at the latest, and so parts of the evidence Ms Arenal has brought into the proceedings will not have a bearing upon my deliberations. Ms Arenal states in paragraph 3 of her statement, "However, I have received confirmation that the situation prior to 1993 was not much different from in 2000". This relates to authorised dealers in the United Kingdom, the Channel and Isles and the Republic of Ireland. This is pure hearsay which lacks all indication of its origin and documentary substantiation. I do not see that I can give weight to this statement. However, equally I do not consider that taking into account the other evidence that much turns upon this issue.

"8. The opponents filed witness statements by Peter Stierli, their Vice President and Chief Finance Officer and Timothy Edwin Coleman, the Brand Director of Omega Electronics in the UK.

9. Mr Stierli says the opponents have used the trade mark OMEGA in the United Kingdom since the beginning of the 20th Century in relation to 'watches', and since 1948, that mark and the letter omega for products including watches, time-keeping and measuring apparatus. Watches have been sold in the UK under the trade mark OMEGA CONSTELLATION since 1953. Sports timing equipment has been sold in the UK by the opponents under the trade mark OMEGA (and the corresponding Greek letter) on a continuous basis for over 20 years. He gives a chronology of important events in the life of the brand by reference to a book by Marco Richon entitled the Omega Saga (PS2).

10. The opponents produce and sell a wide range of time-keeping and measuring equipment under their various OMEGA trade marks. This includes, ladies' watches, men's watches, sports watches, including chronographs, divers' watches and equipment used for timing the speed and performance of sports people, particularly athletes in competitions, notably the Olympic games. Literature showing use of the opponents' OMEGA trade marks on a variety of products is attached labelled exhibit "PS3". The opponents association with the Olympic Games goes back to 1932. Because the games are international in character Mr Stierli suggests that this has generated considerable publicity for the company and its marks. Further support for the claim is provided in the documents exhibited at PS4 and PS5 showing the history of the business and the association with the Olympic Games.

11. In terms of activity directed specifically at the UK market Mr Stierli says:

> "8. As well as providing time-keeping and measuring equipment for the Olympic games, the opponents have provided such equipment, bearing their OMEGA trade marks for other major sporting events and stadiums in the UK. This includes the 18th Commonwealth Games held in Scotland in 1986. In addition, more than 200 installations, primarily in the sporting domain, including 4 scoreboards, aquatics timing and scoring systems, photo-finish systems and athletic timing systems bearing the opponents' OMEGA trade marks have been installed over the last 18 years in the UK. This includes equipment installed in public swimming pools in Darlington and Leeds in 1982, in London and Ipswich in 1983, in London and Everton in 1985, in Edinburgh and Macclesfield in 1986, in Stockport in 1991 and in Haslemere in 1998. Some of these are specifically mentioned in a publication from O Omega Electronics called The Last Word in Sports Timing, on page 6. This is attached marked exhibit "PS6". I also attach, labelled exhibit "PS7", a copy of the opponents' newsletter of November 1992 which has an article on page 13 relating to the use of scoreboards in prestigious tennis tournaments in the UK in the early 1990s.
>
> 9. Timing equipment, public information systems and display boards bearing the opponents' OMEGA trade marks also operate in major railway stations and airports such as *Liverpool Railway Station* and *Gatwick Airport*. Two new systems will also be installed in January 2001 in Watford and Milton Keynes railway stations. Furthermore, a public information system was installed this year in the restaurant Smiths of Smithfield, in London.
>
> 10. The opponent's time pieces are sold in the UK via a network of authorised dealers. A list of the current authorised dealers is attached marked exhibit "PS8". This primarily shows UK authorised dealers, but there is a small number of entries relating to the Channel Islands and the Republic of Ireland. It is representative of the range and number of authorised dealers over the past few years."

12. Turnover under the mark in the UK is said to have been

| YEAR | £ |
|------|---|
| 1988 | 5 608 000 |
| 1989 | 6 660 000 |

| | |
|---|---|
| 1990 | 8 951 000 |
| 1991 | 7 233 000 |
| 1992 | 6 899 000 |
| 1993 | 7 774 000 |
| 1994 | 7 866 000 |
| 1995 | 8 350 000 |
| 1996 | 10 070 000 |
| 1997 | 8 770 000 |
| 1998 | 10 099 000 |
| 1999 | 11 077 000 |

This covers all goods, that is to say, watches, time-keeping and measuring equipment and public information systems. No breakdown is given between these main areas of activity.

13. The opponents products are widely advertised in leading UK newspapers and magazines (paragraph 12 and exhibit PS9) and through posters and similar displays in national jewellery retailers (paragraph 13). Many of these posters etc. feature internationally known celebrities (exhibit PS10).

14. Promotional expenditure is said to have been as follows:

| YEAR | £ |
|---|---|
| 1988 | 670 000 |
| 1989 | 798 000 |
| 1990 | 240 000 |
| 1991 | 868 000 |
| 1992 | 864 000 |
| 1993 | 840 000 |
| 1994 | 798 000 |
| 1995 | 836 000 |
| 1996 | 1 110 000 |
| 1997 | 890 000 |
| 1998 | 1 109 000 |
| 1999 | 1 117 000 |

15. In relation to the specific claim made in the applicants' counterstatement that an agreement exists between the parties Mr Stierli says

"16. I have read the amended counterstatement dated 7 September 2000. It is simply not correct to say that the opponents have consented to registration of the mark OMEGAMETER in relation to period timers, whether for industrial and/or scientific purposes

> or otherwise. Whilst it is true that an agreement was concluded between the parties now in dispute, the relevant parts of that 1994 agreement confirm that the opponents would accept use and registration by the applicants "of any trade mark consisting or of containing the word OMEGA or the Greek letter O .... in respect of "apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force .....".

> In my opinion, time is not a variable parameter. This view is supported by a number of eminent scientists including Dr Hamid Kayal and Dr Rolf Dinger. The first is responsible for Omega Electronics SA, and the second for Asulab SA. Both are Doctors in Physics. Dr Kayal has pointed out that time is not actually a parameter at all, variable or otherwise, since it is in fact a reference (co-ordinate). A copy of his statement is attached marked exhibit "PS11"."

22) Dr Kayal is head of Omega Electronics SA and his "statement" is in fact a "to whom it may concern" letter. Dr Kayal states that time is not a parameter, variable or not.

23) Ms Arenal also relies on evidence of Ms Christiane Sauser Rupp which was part of the above opposition proceedings. Again, I adopt Mr Reynolds' summary of this evidence.

> "24. I have already referred to Dr Kayal's evidence and will return to the detail in due course. The other reply evidence is a witness statement by Christiane Sauser Rupp, a legal counsel of The Swatch Group of which Omega SA is an affiliate. The main points to emerge from her evidence are

>> - she rejects any suggestion implicit in Mr Crouch's evidence that Omega SA's failure to object to the term 'period timers' in No. 1557184 signifies that they do not object to it. The failure to object was 'due to an unfortunate oversight'.

>> - steps have been taken in other jurisdictions to have the terms 'period timers' or 'timers' removed from specifications. Exhibits A and B deal with the position in Australia and the Benelux. Exhibit C deals with two CTM oppositions.

>> - a further example of the applicants agreeing to delete timers at the request of Omega SA is at Exhibit D. There is correspondence between Ms Sauser and Mr Drucker (the US patent attorney) in

1998 in relation to a US trade mark application by Omega Engineering Inc.

- Ms Sauser notes that on page 147 of the transcript exhibited to Mr Drucker's deposition he believes that the word 'timers' was never discussed between himself and a Mr Coutts when the agreement was prepared."

24) Ms Arenal exhibits copies of advertisements and press clippings relating to Swiss's OMEGA trade mark from 1976 to 1991 in the United Kingdom. The evidence is clearly not specifically designed for the job. It relates to international campaigns and includes material in French and Castellano. However, bearing in mind its weaknesses, it shows advertisements in the United Kingdom for wrist watches for men and women.

**Evidence of US**

**Witness statement of David John Crouch**

25) Mr Crouch is a registered trade mark agent.

26) Mr Crouch exhibits at DCJ2 an agreement between US and Swiss dated 1984. The agreement relates to the position throughout the world and in particular in the United Kingdom. US agrees to withdraw its applications to rectify United Kingdom registration nos 699057, 723199 and 891965 in the name of Swiss. US agrees not to use, apply or register any trade mark consisting of or containing the word OMEGA or the Greek letter OMEGA for *temperature measuring instruments or apparatus, incorporating a time of day display function, unless intended for science or industry.* Swiss agrees to cancel from its registration no 699057 the following goods (the excluded goods): *instruments and apparatus intended for a scientific or industrial application in measuring, signalling, checking, displaying or recording heat or temperature (including such having provision to record heat or temperature over a period of time and/or to display the time of day).* Swiss agrees not to use, register, or attempt to register any trade mark consisting of or containing the word OMEGA or the Greek letter OMEGA in respect of the excluded goods. Swiss agrees not to object to the use or registration by US of trade marks consisting of or comprising the word OMEGA or the Greek letter OMEGA in respect of the excluded goods. Swiss agrees to either cancel United Kingdom registration nos 723199 and 891965 or to part cancel them by excluding from them the excluded goods. Both Swiss and US agree that "for the time being" the above provisions will apply solely to the United Kingdom.

27) Mr Crouch exhibits at DJC3 documentation relating to the applications made by US to revoke registration nos 699057, 1456848 and 1477193 of Swiss.

28) Mr Crouch exhibits at DJC5 part of a catalogue from US entitled "OMEGA Universal Guide to Data Acquisition and Computer Interfaces". I cannot see that this has a bearing upon this case as the catalogue emanates from two years after the material date and appears to be for use in the USA, Canada and Mexico. The goods shown are counter timer boards being parts for computers. One of the descriptions states:

> "In addition, three 16-bit counters allow frequency measurement or event counting, such as monitoring the number of times a door opens or items passing on a conveyor belt".

So the goods would appear to count, no doubt for the counting to have any relevance it will be placed in a time frame, hence the "timer board" element.

29) Mr Crouch exhibits at DJC6 an extract from "Omega Temperature Handbook and Encyclopaedia" which he states is the 1992 United Kingdom edition. The extract relates to an industrial timer - model PTC41 - and states:

> "The PTC41 timer provides the user the flexibility to turn loads on or off based on a timing cycle or the time of day. The PTC41 comes standard with count up/down timers, stopwatch, time of day and date. The PTC41 has 8 programmable setpoints with four open collector outputs: each output uses one setpoint for turn-on and a second setpoint for turn off. The combination allows the PTC41 to operate as a sequence controller for up to four loads, turning the loads on or off at the required time. The optional bi-directional serial communications permit remote programming and monitoring of the sequence."

30) Mr Crouch exhibits at DJC7 extracts from publications of US relating to timers sold under the trade mark OMEGA. The extracts appear to have been designed for the USA and Canada and are undated. Consequently, they have little bearing upon this case.

31) Mr Crouch exhibits "typical pages" from the Omega.co.uk website detailing timers sold by US. These pages were downloaded in February 2001. (He has also included an extract from US's USA website.)

32) Mr Crouch exhibits an agreement between Swiss and US dated 1994. This agreement was referred to in the opposition proceedings between the two sides. I quote from Mr Reynolds' decision in relation to this matter:

> "47. From the recitals to the 1994 Agreement it seems that the worldwide Agreement resulted specifically from proceedings entered into or threatened in Hong Kong and Germany. It contains provisions (paragraphs 1 to 3 and 5 to 7) which set out amendments to their respective specifications designed to resolve the disputes in those countries.

14 of 39

Sandwiched between the market specific provisions is paragraph 4 setting out the basis for a worldwide settlement. It reads as follows

"4. Henceforth from the signing of this Agreement and effective in all countries of the World:-

a. OMEGA ENGINEERING INCORPORATED undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter O or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science or industry.

b. OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter O or any element colourably resembling either of those two elements, in respect of

"Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow".

c. OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademark consisting of or containing the word OMEGA or the Greek letter O or any element colourably resembling either of those two elements in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow.""

33) Mr Crouch exhibits a statutory declaration by Ralph S Michel made in connection with the opposition proceedings between the two sides. I again quote from Mr Reynolds' summary of this evidence:

"18. Mr Michel gives evidence as to use of his company's marks in the UK. The mark OMEGA was first used in 1974 and OMEGAMETER, the mark at issue, since at least as early as 1994. He gives information on his company's trade as follows:

"Sales of goods by my company within the United Kingdom bearing the mark OMEGA for goods falling within the range for which this mark is registered in Class 9 under United Kingdom Trade Mark Registration No. 1557184, including sales (albeit relatively low sales) since 1994 of goods by my company within

the United Kingdom bearing the mark OMEGAMETER for goods falling within the range for which registration of this mark is applied for, including timers and timing devices for industrial and scientific use either alone or in conjunction with other products, for the years 1991 to 1998 inclusive are as follows:

| | |
|---|---|
| 1991: | US$ 525,000 |
| 1992: | US$ 1,538,000 |
| 1993: | US$ 1,495,000 |
| 1994: | US$ 1,720,000 |
| 1995: | US$ 2,008,000 |
| 1996: | US$ 1,865,000 |
| 1997: | US$ 2,214,000 |
| 1998: | US$ 1,687,000 |
| (Up to and including September) | |

The total costs incurred in US Dollars in the years 1995 to 1998 (up to and including September) for website development, to promote Omega Engineering Inc.'s goods and services over the Internet within the United Kingdom and elsewhere, under the mark OMEGA.COM, are as follows:

| | |
|---|---|
| 1996: | US$ 336,542 |
| 1997: | US$ 187,365 |
| 1998: | US$ 348,178 |
| (Up to and including September) | |

Throughout the above-mentioned period the trade marks OMEGA and OMEGA.COM appear prominently on the web pages themselves. Produced as exhibit RSM1 are some typical pages from the current website, which typify use in the earlier years.

The amounts spent on advertising of the above-mentioned goods sold under the mark OMEGA, including the (albeit relatively low) amounts spent on advertising of the above-mentioned goods sold under the mark OMEGAMETER since 1994, in the United Kingdom in successive years were as follows:

1991: US$ 192,968
1992: US$ 246,040
1993: US$ 685,746
1994: US$ 196,465
1995: US$ 397,537
1996: US$ 387,763
1997: US$ 127,599
1998: US$ 289,687"

34) Mr Reynolds, in the opposition proceedings, went on to consider the exhibits to the declaration of Mr Michel and again I quote from that earlier decision:

"35. Substantiation of the applicants' claims must therefore rest heavily on Mr Michel's own explanation and the company catalogues in RSM2. There is a selection of catalogues spread over a number of years. They bear titles such as 'The Temperature Handbook', 'Temperature Measurement Handbook', 'The OMEGA Handbook of ph and Conductivity' and 'Control and Instrumentation'. The main points to emerge from this material seems to me to be

    - the applicants have a wide product range centred on but not restricted to measurement of temperature. The full range can be gauged from the indices at the end of a number of the catalogues running in some cases to 10 or more pages of listings of individual items. Volume 29 (it seems to be dated 1995) was referred to at the hearing and serves as a convenient illustration

    - the catalogues generally have US dollar prices and US contact telephone numbers and addresses but I note that a number of the catalogues also have a UK contact address and one in particular (EC Edition Volume 1 No. 1) has an Omega Engineering UK address on the front cover and sterling prices

    - references to timers are few and far between. A number of the catalogues have a reference to timers in their index but this is not universally the case.   Volume 29 is again an example though unfortunately the timer page (P -91) has not been included in what must therefore be an extract only from the catalogue

    - specific examples of timers in the evidence can however be found at pages P-125 and 126 of Volume 29 (industrial timers) and page D3-31 of the Data Acquisition and Computer Interfaces catalogue for 1995/6 (the specific item being a 24 Channel Digital I/O and Counter Timer Board). If there are other examples they are hard to find though there are other references to timers in the indices to some of the catalogues

    - two of the timer products illustrated have no obvious or discernible trade mark on them. The other (on P-126) shows the word OMEGA and stylised (Omega) letter device. The catalogues themselves carry the OMEGA name. The only use of OMEGAMETER appears to be in relation to a thermometer (on page K-89 of Vol 29)."

It is, of course, necessary to bear in mind that the material date in this case is considerably before that of the opposition proceedings.

35) Mr Crouch goes on to exhibit documentation showing that notice was duly issued to Swiss in relation to the advertisement of this registration and the subsequent deletion of *industrial timers* from the specification at the request of Swiss. Exhibited at DJC13 is a letter, dated 5 February 1998, from Mr Crouch to Ms Sauser of Swiss advising of the deletion of the term *industrial timers*. Exhibited at DJC14 is an unsigned and undated note that states:

> "Mrs Fauser (sic) from Omega phoned to acknowledge receipt of fax you sent yesterday, & to say that they are happy with what you said."

Mr Crouch states that the above note was made by his then assistant, Dr Cathrine McGowan.

36) Mr Crouch exhibits a copy of the decision of Mr Reynolds in relation to the opposition proceedings between Swiss and US. Finally Mr Crouch exhibits a copy of a letter from himself to Mewburn Ellis, the agents for Swiss, offering to amend the specification in line with the decision of Mr Reynolds if Swiss did not file an application for invalidity against the registration the subject of these proceedings.

**Second witness statement of David John Couch**

37) Mr Crouch exhibits extracts relating to timers sold under the trade mark OMEGA from the following Omega Engineering publications:

The Data Acquisition Systems Handbook Volume 29 © 1995;
The Flow and Level Handbook Volume 29 © 1995;
The Pressure Strain and Force Handbook Volume 29 ©1995;
The Electric Heaters Handbook Volume 29 © 1995.

It is to be noted that all the copyright dates are from after the relevant date. All the prices in the publications are in dollars and there is no indication that they have been used in the United Kingdom. The goods shown in the publications are counter-timer boards, solenoid valve timers, channel counter/timer interfaces, a solid state timer (which allows for time delays) and industrial timers. Owing to the date of the publications and the lack of association with the United Kingdom these documents can have little bearing upon my deliberations other than further assisting me to know and understand the products which are of interest to US. (However, see below re the statement of Mr Wood in relation to such sales in the United Kingdom.)

38) Mr Crouch exhibits copies of pages from a transcript of a pre-trial discovery deposition of Christiane Sauser Rupp of Swiss in proceedings in the United

States. In the transcript Ms Sauser Rupp states that in her time with Swiss she was not aware of it being involved in selling timing devices for science or industry nor of any plans for Swiss to sell such goods. Ms Sauser Rupp also states that Swiss is prevented from selling computer controlled timing apparatus by a 1994 and a 1992 agreement. Ms Sauser Rupp states that Swiss "accept a timing device which is ancillary to a product for another purpose". Just before this she states, "The main purpose of the apparatus is not timing, it is something else, and timing or timer or product which measured the elapsed time or sets a preset time or have a mechanism for that is doing something else, it is measuring something else and that was what we could accept". The following also comes from the transcript:

"Q   In the 1994 agreement, though, looking at paragraph 4A, would you agree that Omega Engineering was permitted to use the Omega marks or other types of timing apparatus as set forth in paragraph 4 A?

A   Not at all.

Q   But would you agree that it was Omega Engineering was permitted to use register or apply to register the Omega marks in respect of computer-controlled measuring, timing and display apparatus intended for science or industry?

A   Yes, if I read that, yes."

39) Mr Crouch exhibits a copy of a statutory declaration made by Mr Christopher Webb. Mr Webb gives evidence to show that time can be fairly referred to as a parameter in a variety of contexts. Mr Webb states that he found at least twenty websites on the current Internet and at least ten patent specifications referring to time as a parameter. Having found these references he ceased searching but states that he has no reason to believe that he would not have found more references to time as a parameter if he had continued searching. Mr Webb exhibits extracts from four patent specifications and fourteen websites in support of his statement.

40) Mr Crouch finally exhibits a copy of a statutory declaration made by Mr William A Drucker which provides a further copy of the 1994 agreement and statements made by Mr Drucker in connection with that agreement in the course of proceedings in the USA relating to the drafting of the 1994 agreement. Mr Drucker's statements in the proceedings in the USA are quite lengthy and describe in detail his relationship with US and his background in science, intellectual property law and medicine. From page 75 he talks about his understanding of what the words "variable parameters" in the 1994 agreement mean.

## Witness statement of Michael Wood

41) Mr Wood is an employee of Omega Engineering Limited (OEL) of the United Kingdom. At the date of his statement, 29 July 2002, he had been

employed by it for eleven years. OEL is a wholly owned United Kingdom subsidiary of US. Mr Woods states that OEL is the sole United Kingdom distributor of US's goods. He states that these goods comprise apparatus for scientific and/or industrial purposes, measuring, signalling and checking apparatus including timing apparatus, all for science or industry. He states that all the goods of the registration under attack are produced by US.

42) Mr Wood exhibits a copy of an extract from a publication which shows a timer sold under US's OMEGA trade mark and which has been on sale in the United Kingdom since 1992. The extract relates to the industrial timer - model PTC41 - which has been referred to by Mr Crouch and which I have referred to above.

43) Mr Wood exhibits material relating to various timers sold under US's OMEGA trade mark in the United Kingdom since 1995. These goods are: industrial timers, adjustable solid state timers, solenoid valve timers, five channel counter/timer interfaces, five and ten channel counter-timer boards, twenty four channel digital i/o and counter timer boards, five/ten channel counter/timers with sixteen/thirty two i/os and five channel counter/timer interface boards. The material bears prices in dollars.

44) Mr Wood finishes his evidence by stating that he cannot recall any instances of confusion as to the source of the goods of US's registration, including timers.

**Swiss's evidence in reply**

**Witness statement of Sofia Arenal**

45) The majority of Ms Arenal's statement consists of comment and submission rather than evidence of fact. I will only comment on what can be considered as evidence of fact. Although I take on board the comments and submissions made by Ms Arenal.

46) Ms Arenal states that the 1984 agreement referred to by US is no longer in force.

47) Ms Arenal exhibits a copy of a printout from Companies House. She states that this shows that OEL was not incorporated until 30 November 1990 and that there have been various name changes. She states that OMEGA does not feature in the company's registered name until July 1994. Ms Arenal states that the accounts category for the company is shown as "small".

48) Ms Arenal states that in the USA an order for the products of US was sent to Omega Electronics rather than US. She states that Omega Electronics is in the same group of companies as Swiss. She exhibits copies of the order sent from Daktronics, Inc to Omega Electronics and printouts to show that the product

codes are for US's products. The products involved are interface cable with software and humidity and temp logger.

### Witness statement of Christiane Sauser Rupp

49) Ms Sauser Rupp is legal counsel at the legal department of The Swatch Group Limited. She states that the legal department of The Swatch Group is responsible for legal matters concerning Swiss.

50) Much of Ms Sauser Rupp's statement consists of comment and submission rather than evidence of fact. I will only comment on what can be considered as evidence of fact. Although I take on board the comments and submissions made by her.

51) Ms Sauser Rupp comments on the extracts from her deposition in the USA exhibited to the statement of Mr Crouch. She states that in her comments she did not have the United Kingdom position in mind. She exhibits an extract from her deposition in which she gives her view that US's products are for science and industry and that use of products for sports events does not come within her definition of science and industry.

52) Ms Sauser Rupp exhibits a witness statement made by Dr Hamid Kayal, this was furnished in the opposition proceedings between the two sides. Dr Kayal is head of Omega Electronics SA. He states that time is not a parameter, variable or not.

## DECISION

### Preliminary issues

### Claim of consent

53) Elements of this case have been taken over by events. The 1994 agreement has been considered by Pumfrey J in an appeal from Mr Reynolds' decision ([2002] EWHC 2620 (Ch)). In his judgment Pumfrey J held that time was not a variable parameter and that the agreement did not prevent Swiss opposing the application of US. I consider that this matter is settled. Just as Swiss could oppose an application by US in relation to period timers so it could make an application for invalidation in relation to these goods.

54) Mr Morcom submitted that the correspondence and telephone call record referred to in paragraph 35 above represent consent. The communications with Swiss were commenced as the result of US having to "give notice" of the advertising of the application, as required by the 1938 Act. Swiss requested the removal of *industrial timers*, these were removed. The note simply indicates that Swiss were content with this removal. It does no more and no less. It is in no way a form of consent in relation to *period timers*. As Swiss has stated the

absence of an objection to *period timers* was the result of an oversight. Consent, in my view, must represent a positive act; Mr Morcom is trying to turn an absence of objection into an act of consent. It would make for a very complicated world if everything had to be objected to, so as not to appear as if there were consent. Taking into account the length of the specification of the registration the oversight by Swiss is hardly surprising.

### Section 3(6) of the Act

55) Ms Arenal did not pursue this ground of invalidation at the hearing.

### Section 47(2) of the Act

56) Section 47(2) of the Act states:

"(2) The registration of a trade mark may be declared invalid on the ground— —

(a) that there is an earlier trade mark in relation to which the conditions set out in section 5(1), (2) or (3) obtain, or

(b) that there is an earlier right in relation to which the condition set out in section 5(4) is satisfied,

unless the proprietor of that earlier trade mark or other earlier right has consented to the registration.

(3) An application for a declaration of invalidity may be made by any person, and may be made either to the registrar or to the court, except that—

(a) if proceedings concerning the trade mark in question are pending in the court, the application must be made to the court; and

(b) if in any other case the application is made to the registrar, he may at any stage of the proceedings refer the application to the court.

(4) In the case of bad faith in the registration of a trade mark, the registrar himself may apply to the court for a declaration of the invalidity of the registration.

(5) Where the grounds of invalidity exist in respect of only some of the goods or services for which the trade mark is registered, the trade mark shall be declared invalid as regards those goods or services only.

(6) Where the registration of a trade mark is declared invalid to any extent, the registration shall to that extent be deemed never to have been made:

Provided that this shall not affect transactions past and closed."

Section 48 of the Act states:

"48. - (1) Where the proprietor of an earlier trade mark or other earlier right has acquiesced for continuous period of five years in the use of a registered trade mark in the United Kingdom, being aware of that use, there shall cease to be any entitlement on the basis of that earlier trade mark or other right-

(a) to apply for a declaration that the registration of the later trade mark is invalid, or

(b) to oppose the use of the later trade mark in relation to the goods or services in relation to which it has been so used,

unless the registration of the later trade mark was applied for in bad faith.

(2) Where subsection (1) applies, the proprietor of the later trade mark is not entitled to oppose the use of the earlier trade mark or, as the case may be, the exploitation of the earlier right, notwithstanding that the earlier trade mark or right may no longer be invoked against his later trade mark."

Sections 5(1), 5(2) and 5(4) of the Act state:

"5.— (1) A trade mark shall not be registered if it is identical with an earlier trade mark and the goods or services for which the trade mark is applied for are identical with the goods or services for which the earlier trade mark is protected.

(2) A trade mark shall not be registered if because- ——

(a) it is identical with an earlier trade mark and is to be registered for goods or services similar to those for which the earlier trade mark is protected, or

(b) it is similar to an earlier trade mark and is to be registered for goods or services identical with or similar to those for which the earlier trade mark is protected,

there exists a likelihood of confusion on the part of the public, which includes the likelihood of association with the earlier trade mark.

020 7240 7258

.....................................

(4) A trade mark shall not be registered if, or to the extent that, its use in the United Kingdom is liable to be prevented——

(a) by virtue of any rule of law (in particular, the law of passing off) protecting an unregistered trade mark or other sign used in the course of trade".

Section 6(1)(a) of the Act states:

"(1) In this Act an "earlier trade mark" means—

(a) a registered trade mark, international trade mark (UK) or Community trade mark which has a date of application for registration earlier than that of the trade mark in question, taking account (where appropriate) of the priorities claimed in respect of the trade marks,"

The trade mark registrations upon which Swiss relies are all earlier trade marks as defined by section 6(1)(a) of the Act.

57) As stated in paragraph 3 the specifications quoted represent those on the register at the time of the filing of the application for invalidation. In its counterstatement US states that it has launched revocation actions against United Kingdom registration nos 699057, 1456848 and 1477193. These revocation actions are now final. The specifications are now as follows:

- 699057: *measuring and signalling apparatus and instruments, all for use in sport; but not including calculating machines nor instruments and apparatus for measuring, signalling and checking (supervision) of heat and temperature for scientific and industrial use;*
- 1456848: *maintenance and repair of measuring, checking, optical and signalling apparatus and instruments, all the goods being maintained and repaired being for use in sport; maintenance and repair of horological and chronometric instruments and of public information display apparatus and instruments; information services relating to all the aforesaid; all included in Class 37; but not including maintenance and repair of heat and temperature measuring, checking and signalling apparatus and instruments, all for scientific and industrial use;*
- 1477193: *sports timing equipment; all included in Class 9; but not including calculating machines or instruments and apparatus, all for measuring, signalling and checking (supervision) of heat and temperature for scientific or industrial use.*

The partial revocation of the specifications all take place with effect from 14 September 2001, the date upon which the applications for partial revocation were

made. It was Mr Morcom's submission that the conflict between the registration and the above three earlier trade mark registrations should be considered upon the basis of the specifications following partial revocation.

58) Mr Morcom based this submission on the use of the present tense in section 47(2) of the Act:

"(2) The registration of a trade mark may be declared invalid on the ground— —

(a) that there is an earlier trade mark in relation to which the conditions set out in section 5(1), (2) or (3) obtain, or

(b) that there is an earlier right in relation to which the condition set out in section 5(4) is satisfied,"

He submitted that it was necessary to look at the objections at the date of the application for invalidation, 19 March 2002. This was a point that was argued before me, in relation to section 5(4)(a) of the Act, some time ago in BL 0/157/02. In that decision I stated:

"In relation to section 47 Mr St Ville argues that this is directed to the time of application for invalidity as the wording states: "that there is an earlier right in relation to which the condition set out in section 5(4) is satisfied". In relation to this matter I consider that one must look to the Directive. Article 4(4)(b) states:

"rights to a non-registered or to another sign used in the course of trade were acquired prior to the date of application for registration of the subsequent trade mark, or the date of priority claimed for the application for registration of the subsequent trade mark and the non-registered trade mark or another sign confers on its proprietor the right to prohibit the use of a subsequent trade mark."

51) On my reading of the Directive the only requirement is that the right existed at the time of the application of the registration of the subsequent trade mark; that at that time the proprietor had the right to prohibit use of a subsequent trade mark. I do not read "confers" in the present tense as stipulating that the right must subsist at the time of the application for invalidity. If I took Mr St Ville's reading of this it would not be just a matter of when the application was made but also when the decision was made; so the result could be hostage to fortune of when the decision was made. The issue is whether at the time of the application there was something that debarred registration. The rights of the proprietor accrue from the date of application and he cannot benefit from this if at that date the registration was invalid. I, therefore consider that there is a sole

relevant date in the instant proceedings, that of the date of application of the registration in suit. I am fortified in my view by Kerly's Law of Trade Marks and Trade Names Thirteenth Edition at 8-106:

> "It is suggested that the issue must be determined as at the date of the application for the mark in issue. The question is whether or not use of the mark applied for is liable to be prevented as at that date. If, however, the mark the subject of the application is already in use then this may require consideration of the position at an earlier time too. The relevant date for proving reputation and goodwill in claiming for passing off is the date of the commencement of the activities complained of.""

The issue of the relationship between revocation and invalidity actions was dealt with by the hearing officer in *Riviera Trade Mark* [2003] RPC 50, where he stated:

> "12 Stella's trade mark was registered on March 22, 2000 when Franco applied to register its trade mark. It was still registered on April 23, 2001 when Stella sought a declaration that Franco's registration was invalid. The matter in dispute is whether the subsequent revocation of Stella's registration with effect from May 21, 2001 has the effect of either retrospectively extinguishing the earlier trade mark right or else preventing or limiting the proprietor's ability to continue to rely upon it.

13 Section 46(6) of the Act states that:

"Where the registration of a trade mark is revoked to any extent, the rights of the proprietor shall be deemed to have ceased to that extent as from—

(a) the date of the application for revocation, or
(b) if the registrar or court is satisfied that the grounds for revocation existed at an earlier date, that date."

14 This appears to me to make it clear that the rights of the proprietor of a revoked registration continue to exist up until the date of the application for revocation, unless the registrar is satisfied that the grounds for revocation existed at an earlier date. It is difficult to see how the registrar could be so satisfied in the absence of a pleaded request from the applicant for the registration to be revoked at an earlier date. Failing this the registrar is in most cases likely to be unsure as to whether, if challenged, the proprietor could have produced evidence of use of the trade mark in the five year period preceding the earlier date.

15 The "rights of the proprietor" cannot be deemed to have ceased only at the date of the application for revocation if the rights of the trade mark

become unenforceable for any period following the act of revocation. Consequently, the trade mark remains enforceable in respect of matters arising at any time prior to the date at which the rights of the proprietor cease to have effect.

16 The position appears to be different when it comes to trade marks which lapse due to non-renewal or surrender. Unlike revocation, both of these situations stem from decisions of the trade mark proprietor himself. I do not find it surprising that the consequences of allowing a registration to lapse or to surrender it, might be different from the consequences of revocation forced on the proprietor by an application made by a third party.

17 As the Hearing Officer in TRANSPAY pointed out, s.6(3) of the Act expressly provides that:

> "A trade mark within subs.(1)(a) or (b) whose registration expires shall continue to be taken into account in determining the registrability of a later trade mark for a period of one year after the expiry unless the registrar is satisfied that there was no *bona fide* use of the mark during the two years preceding the expiry."

18 It is noticeable that, unlike s.46(6), this provision does not specify a date from which the rights of the proprietor of the earlier trade mark are deemed to have ceased to have effect. Instead the provision governs the period within which the expired registration must "continue to be taken into account". After that period has passed the expired registration need not be taken into account irrespective of the date of expiry. I agree with the hearing officer in TRANSPAY in this respect.

19 The Act is silent on the consequences of surrender of a registration, although as the hearing officer in SUNDIP pointed out, there are strong equitable grounds for holding that a proprietor who surrenders a registration (and thus shields the registration from subsequent revocation proceedings) should not thereby find himself in a stronger position than a proprietor who faces an application for revocation, which carries with it the possibility of a back dated revocation of the proprietor's trade mark. I agree with the hearing officer in SUNDIP that a registration should no longer be taken into account once it is surrendered. To find otherwise would be to provide proprietor's with a means of frustrating applications, or potential applications, for revocation under the terms of s.46(6)(b) of the Act.

20 The net result of this is that it is vital for a party seeking to revoke an earlier trade mark in order to clear the way for its own application, or to resist an application to have its own registration declared invalid on the

basis of the earlier trade mark, to make a request in its application for the conflicting earlier trade mark to be revoked with effect from a date which precedes the date of its own application for registration."

In the above case the date of revocation was later than the date for the application for invalidation, unlike in this case. However, if Mr Morcom is correct in regard to the present tense why should the issue be restricted to the date of application? Why should it not be restricted to the date of trial/hearing for instance? In relation to applications for invalidation safeguards and balances are built into the Act. A proprietor can claim protection from distinctiveness acquired after the date of registration. The view I expressed in BL O/216/03 was that a proprietor could pray in aid to use up to the date of a hearing. This, however, related to the specific provision that the Act allowed in relation to factual distinctiveness. Section 48 of the act deals with the safeguard that a proprietor can claim from acquiescence.

59) Section 46(6) of the Act means that Swiss clearly had rights in the breadth of the specifications of its partially revoked trade mark registrations up to and including 13 September 2001. At the date of the application for registration by US these rights were and are enforceable. The question at the heart of section 47(2) is whether the trade mark at the date of application was invalid. The declaration of invalidity goes back to this date. The declaration of invalidity treats the registration or part of the registration as never having been made. It is to be borne in mind that the date of registration is the date of application, not the date of the completion of the registration process (section 40(3) of the Act). The rights of US go back to the date of registration and I cannot see how it can claim those rights whilst denying Swiss's rights in relation to its earlier trade marks. It is claiming rights at the same time as Swiss had existing rights that might invalidate part of the registration. It is not as if US did not have the opportunity or option to apply for revocations at an earlier date. On being served notice of the application for invalidation US could have filed further revocation actions with different dates or have requested to amend the grounds of its existing revocation actions. It chose the basis for its revocation and cannot complain now if those actions do not have the effects that it wished. Mr Morcom's submission is based upon an interpretation of the effect of the tense that section 47(2) is written in outweighing a clear statement of the effect of revocation in section 46(6). If there is doubt in relation to this matter then the benefit of must favour the clearly and positively expressed statement of the legislator.

60) The problems with revocation dates and applications for invalidation and oppositions will probably disappear in the future, owing to the implementation of The Trade Marks (Proof of Use, etc) Regulations 2004. However, this case is not governed by those regulations and I do not consider that the position can be viewed upon the basis of those regulations. It is also the case that those regulations do not replace section 46(6) of the Act. They stand apart and cannot be used as an interpretation of the effect of section 46(6) of the Act. Nor do I

think that it is appropriate to look to the Community Trade Mark (CTM) regulations, as suggested by Mr Morcom in his late, written submissions. The CTM regulations are a very different beast and have set up a very different regime. As the hearing officer stated in *Riviera Trade* it is vital for the side seeking a revocation to make sure the effective date precedes the date of its own application for registration.

61) Taking into account the above I will consider the specifications of the earlier rights as they were at the date of the filing of the registration, 16 December 1993.

**Sections 5(1) and (2) of the Act**

62) I consider that I can leave section 5(1) to one side and consider the matters under section 5(2) of the Act. In determining the question under section 5(2), I take into account the guidance provided by the European Court of Justice (ECJ) in *Sabel BV v Puma AG* [1998] RPC 199, *Canon Kabushiki Kaisha v Metro-Goldwyn-Mayer Inc* [1999] RPC 117, *Lloyd Schuhfabrik Meyer & Co. GmbH v Klijsen Handel BV* [2000] FSR 77 and *Marca Mode CV v Adidas AG and Adidas Benelux BV* [2000] ETMR 723. I will base my deliberations upon registration no 699057.

63) The specification of 699057 includes *measuring instruments and apparatus*. Pumfrey J stated in the appeal against the decision of Mr Reynolds:

> "The generality of the words "measuring instruments and apparatus" is such that it can hardly avoid covering period timers. In those circumstances, I think that it is clear that the conclusion reached by the Hearing Officer in paragraph 43 of his decision is the correct decision."

I do not think that there is any argument that identical goods are involved, the qualification of the goods of the registration being *all for industrial and/or scientific purposes* in no way affects the issue.

64) The trade marks to be compared are:

**Registration:**                          **Earlier registration:**
**OMEGA**



65) The average consumer normally perceives a mark as a whole and does not

proceed to analyse its various details (*Sabel BV v Puma AG* page 224). The visual, aural and conceptual similarities of the marks must, therefore, be assessed by reference to the overall impressions created by the marks bearing in mind their distinctive and dominant components (*Sabel BV v Puma AG* page 224). I take into account the matter must be judged through the eyes of the average consumer of the goods/services in question (*Sabel BV v Puma AG* page 224) who is deemed to be reasonably well informed and reasonably circumspect and observant - but who rarely has the chance to make direct comparisons between marks and must instead rely upon the imperfect picture of them he has kept in his mind (*Lloyd Schuhfabrik Meyer & Co GmbH v Klijsen Handel BV* page 84, paragraph 27). In *Succession Picasso v OHMI - DaimlerChrysler (PICARO)* Case T-185/02 the Court of First Instance (CFI) held that the issue of the relevant public was to be taken into account in the assessment of the similarity of signs:

> "53 It must therefore be examined whether the degree of similarity between the signs in question is sufficiently great for it to be considered that there exists a likelihood of confusion between the marks. As follows from consistent case-law, the global assessment of the likelihood of confusion must, as far as concerns the visual, phonetic or conceptual similarity of the marks in question, be based on the overall impression given by the marks, bearing in mind inter alia their distinctive and dominant components (Case T-292/01 Phillips-Van Heusen v OHIM – Pash Textilvertrieb und Einzelhandel (BASS) [2003] ECR II-0000, paragraph 47 and the case-law cited). In this respect, the applicants' argument that the similarity between two signs is to be assessed without taking the composition of the relevant public into account, that being relevant only at the stage of the global assessment of the likelihood of confusion, must be rejected. The analysis of the similarity between the signs in question constitutes an essential element of the global assessment of the likelihood of confusion. It must therefore, like that assessment, be done in relation to the perception of the relevant public."

Mr Morcom submitted that the relevant public for the goods in question will be making a careful and sophisticated decision. Taking into account that the goods are *all for industrial and/or scientific purposes* he is probably correct. The nature of this public, especially the scientific public, will mean that they will very likely be aware of the Greek letter Ω. The "device" element of Swiss's trade mark will be very much seen as a representation of OMEGA to this public. OMEGA does not relate to the nature of the goods in question and as such, in my view, enjoys a good deal of inherent distinctiveness. Taking into account that the trade mark of Swiss is likely to be referred to as OMEGA and the distinctiveness of this element, OMEGA is the distinctive and dominant element of the earlier trade mark (see *Grupo El Prado Cervera SL v Office for Harmonisation in the Internal Market (Trade Marks and Designs) (OHIM)* Case T-117/02 paragraph 53). The OMEGA element of the earlier trade mark and the trade mark of US are identical. I do not see that the sophistication of the purchasing decision will assist US. A

careful and educated purchasing decision can highlight differences between trade marks and so in the perception of the relevant public make them not similar. However, in this case the trade marks are so similar, and the OMEGA symbol a reinforcement of the "message" of the earlier trade mark to part of this sophisticated audience, that any degree of care and caution is not likely to lead the relevant consumer to consider that the signs are not similar.

66) The goods are identical. I consider that the earlier sign is highly distinctive. I also consider, something I will deal with again below, that Swiss at 16 December 1993 had a reputation in relation to both watches and sophisticated timing apparatus for sporting activities. The reputation is not for timing apparatus for industrial or scientific purposes but is a reputation which, in my view, will accrue to any timing equipment; and period timers are timing equipment. All these factors according to the jurisprudence of the ECJ stack up in favour of finding for Swiss. In addition I consider that the respective trade marks are highly similar. I do not consider that the difference in the presence of the Greek letter Ω will affect the perception of the purchaser. **I have no hesitation in finding that there is a likelihood of confusion and registration of the trade mark for period timers (all for industrial and/or scientific purposes) is contrary to section 5(2)(b) of the Act.**

67) In the event that I am wrong in relation to the effects of the partial revocations of registration nos 699057, 1456848 and 1477193, I will consider the section 5(2) issues on the basis of their partially revoked specifications. The key issue here is in respect of the similarity of goods and/or services. The partially revoked specification for 699057 includes *measuring apparatus and instruments for use in sport.* Following from what has been said above, this part of the specification must include period timers for use in sport.

68) In *British Sugar Plc v James Robertson & Sons Limited*, Jacob J considered that the following should be taken into account when assessing the similarity of goods and/or services:

> "(a) The respective uses of the respective goods or services;
> (b) The respective users of the respective goods or services;
> (c) The physical nature of the goods or acts of service;
> (d) The respective trade channels through which the goods or services reach the market;
> (e) In the case of self-serve consumer items, where in practice they are respectively found or likely to be found in supermarkets and in particular whether they are, or are likely to be, found on the same or different shelves;
> (f) The extent to which the respective goods or services are competitive. This inquiry may take into account how those in trade classify goods, for instance whether market research companies, who of course act for industry, put the goods or services in the same or different sectors."

31 of 39

69) In *Canon Kabushiki Kaisha v Metro-Goldwyn-Mayer Inc* [1999] RPC 117, the European Court of Justice held in relation to the assessment of the similarity of goods and services that the following factors, inter alia, should be taken into account: their nature, their end users and their method of use and whether they are in competition with each other or are complementary. I do not consider that there is any dissonance between the two tests. However, taking into account the judgment of the European Court of Justice, it may be necessary to consider whether the goods and services are complementary.

70) All the goods potentially serve the same purpose, the timing of periods. Although the spheres of activity are different, the physical nature of the goods could be the same. Indeed, the very goods could be identical; they are defined by for what they are used, rather than for what they are. There is no clear evidence as to the trade channels that the respective goods would be in. However, it seems to me that they could both follow the same and different routes. The sports purchaser could look to sports trade channels and the scientific/industrial purchaser could look to scientific/industrial trade channels. However, each type of purchaser might equally go to a trade channel that specialised in timing apparatus at large. The users of the goods would be differentiated by the place that they are used. I do not consider that the user in a strip mill can be considered the same as the user on an athletics track. As the goods could be identical in all aspects, it is only their end use that is different, they could potentially be in competition with each other. However, if they follow discrete trade channels they are unlikely to be in competition. In the end this is a question of period timers for two general purposes and a specification that includes period timers for another sphere. As I have stated earlier everything about them could be the same other than for what they are used. I consider that *measuring apparatus and instruments for use in sport* are similar to *period timers (all for industrial and/or scientific purposes)*.

71) I have already dealt with the issues arising from the signs. The respective signs are highly similar and the trade mark of the earlier registration enjoys a good deal of inherent distinctiveness. I have also mentioned the reputation that Swiss had as of 16 December 1993 in relation to both watches and sophisticated timing apparatus for sporting activities, which I will deal with in more detail below. I consider that taking into account the similarity of the respective signs, the similarity of the goods, the reputation of the trade mark in relation to timing apparatus, that there is a likelihood of confusion. There are potentially the same goods being sold under the OMEGA and $\Omega$ omega signs, the difference between them on being their end purpose. In considering the specification of the registration it is necessary to consider the goods in question in notional and fair use for everything that they could encompass (see *Compass Publishing BV v Compass Logistics Ltd* [2004] EWCA 520 (Ch) re this issue). The alleged use made by US should not be conflated with the potential use. In considering the respective goods I have borne in mind that Neuberger J in *Beautimatic International Ltd v*

*Mitchell International Pharmaceuticals Ltd and Another* [2000] FSR 267 stated that the words in a specification should not be given "an unnaturally narrow meaning simply because registration under the 1994 Act bestows a monopoly on the proprietor." I also have been conscious that Jacob J in *British Sugar Plc v James Robertson & Sons Limited* [1996] RPC 281 stated:

> "When it comes to construing a word used in a trade mark specification, one is concerned with how the product is, as a practical matter, regarded for the purposes of trade. After all a trade mark specification is concerned with use in trade."

**72) I find that there is a likelihood of confusion in relation to the partially revoked specification of 699057and registration of the trade mark for period timers (all for industrial and/or scientific purposes) is contrary to section 5(2)(b) of the Act.**

**Section 5(4)(a) of the Act – passing-off**

73) Section 5(4)(a) of the Act states:

> "4) A trade mark shall not be registered if, or to the extent that, its use in the United Kingdom is liable to be prevented—
>
> (a) by virtue of any rule of law (in particular, the law of passing off) protecting an unregistered trade mark or other sign used in the course of trade,"

74) I intend to adopt the guidance given by the Appointed Person, Mr Geoffrey Hobbs QC in the *Wild Child case* [1998] 14 RPC 455. In that decision Mr Hobbs stated that:

> "A helpful summary of the elements of an action for passing off can be found in Halsbury's Laws of England 4th Edition Vol 48 (1995 reissue) at paragraph 165. The guidance given with reference to the speeches in the House of Lords in Reckitt & Colman Products Ltd v Borden Inc [1990] RPC 341 and Erven Warnink BV v J Townend & Sons (Hull) Ltd [1979] ACT 731 is (with footnotes omitted) as follows:
>
> "The necessary elements of the action for passing off have been restated by the House of Lords as being three in number:
>
> (1) that the plaintiff's goods or services have acquired a goodwill or reputation in the market and are known by some distinguishing feature;
>
> (2) that there is a misrepresentation by the defendant (whether or not intentional) leading or likely to lead the public to believe that goods or

services offered by the defendant are goods or services of the plaintiff; and

(3) that the plaintiff has suffered or is likely to suffer damage as a result of the erroneous belief engendered by the defendant's misrepresentation."

......Further guidance is given in paragraphs 184 to 188 of the same volume with regard to establishing the likelihood of deception or confusion. In paragraph 184 it is noted (with footnotes omitted) that; "To establish a likelihood of deception or confusion in an action for passing-off where there has been no direct misrepresentation generally requires the presence of two factual elements:

(1) that a name, mark or other distinctive feature used by the plaintiff has acquired a reputation among a relevant class of persons; and
(2) that members of that class will mistakenly infer from the defendant's use of a name, mark or other feature which is the same or sufficiently similar that the defendant's goods or business are from the same source or are connected.

While it is helpful to think of these two factual elements as successive hurdles which the plaintiff must surmount, consideration of these two aspects cannot be completely separated from each other, as whether deception or confusion is likely is ultimately a single question of fact. In arriving at the conclusion of fact as to whether deception or confusion is likely, the court will have regard to:

(a) the nature and extent of the reputation relied upon;
(b) the closeness or otherwise of the respective fields of activity in which the plaintiff and the defendant carry on business;
(c) the similarity of the mark, name etc. used by the defendant to that of the plaintiff;
(d) the manner in which the defendant makes use of the name, mark etc. complained of and collateral factors; and
(e) the manner in which the particular trade is carried on, the class of persons who it is alleged is likely to be deceived and all other surrounding circumstances.

In assessing whether confusion or deception is likely, the court attaches importance to the question whether the defendant can be shown to have acted with a fraudulent intent, although a fraudulent intent is not a necessary part of the cause of action.""

75) The first matter that I have to decide is the material date. It is well established that the material date for passing-off is the date of the behaviour complained of (see *Cadbury Schweppes Pty Ltd v Pub Squash Co Pty Ltd* [1981] RPC and *Inter Lotto (UK) Ltd v Camelot Group PLC* [2004] RPC 8 and 9). Section 5(4)(a) is

derived from article 4(4)(b) of First Council Directive 89/104 of December 21, 1998 which states:

> "rights to a non-registered trade mark or to another sign used in the course of trade were acquired prior to the date of application for registration of the subsequent trade mark".

76) Mr Morcom submitted that US had used the trade mark for the goods in question in around 1990. There is evidence to show that certain goods which fall into this category were advertised by US prior to 16 December 1993 eg at DJC6 an extract from "Omega Temperature Handbook and Encyclopaedia", which it is stated emanates from 1992. However, this evidence is remarkably thin. There are no sales invoices, no indications of actual clients, no indications as to where any goods have been sold. Effectively, the exhibited evidence shows an offer for sale. This could, of course, in itself represent the behaviour complained of. However, this is based on the premise of conflating the trade mark of the registration and the goods of the registration with the claimed use. The period timers which US has shown do not cover all period timers for industrial and/or scientific purposes. Indeed, there is nothing that indicates that they have supplied any for scientific purposes. There is no indication that goods have been used across industry or are appropriate for all of industry. There is a great deal of difference in that nature of the process of the microprocessor plant and the strip mill. US's own publicity describes them as supplying instrumentation for process management and control, a very limited field of activity. It is also the case that there is no indication of US using the sign OMEGA simpliciter before 16 December 1993 for the relevant goods. It has used the sign OMEGA in catalogues but within the context of its company name, its logo and numerous other elements that identify the goods as being those of US and not Swiss. There is no way that the limited and different nature of usage for goods and sign can be conflated with the sign OMEGA with no other matter and the goods at large. Mr Morcom's argument requires the decontextualisation of the use. He referred to the use shown being enough to save a registration from revocation for non-use. I consider that that is another issue and brings forward other questions. I do not see that there is a parallel. To follow that course would be to trawl for red herrings.

77) I consider that the material date for section 5(4)(a) purposes has to be the date of the application for registration, 16 December 1993. This in itself could raise an issue, owing to the period between this date and the date of application for invalidation, 19 March 2002. In relation to passing-off under section 5(4)(a) I have to effectively decide whether Swiss would be successful, on the basis of the facts before me, in preventing use in the court. The court would be likely to take into account any delay between the behaviour complained of and the beginning of the action. This is an issue that was dealt with by Pumfrey J in *Daimlerchrysler AG v Javid Alavi (T/A Merc)* [2001] RPC 42:

> "67 Against these findings of fact, it is possible to deal with the complaint

of passing-off shortly. It must fail. Mr Alavi has been trading under the style complained of since at least 1985. He had entered the market by 1978. He did not make any relevant misrepresentation then and he had not, down to 1997 essentially changed the manner of his trading. As Oliver L.J. (as he then was) said in Budweiser (Anheuser-Busch v. Budejovicky Budvar [1984] F.S.R. 413 at 462):

> "The plaintiffs' primary submission is that the learned judge was wrong in regarding the material point of time at which he should consider the matter as the date of the writ. Obviously the plaintiffs must, to succeed, have a cause of action at that date, but Mr Kentridge submits, and Mr Jeffs does not contest, that it cannot be right to look simply at that date to see whether a passing off is established. In particular to test by reference to that date whether plaintiff and defendant have concurrent reputations would simply mean that no remedy lay against a defendant who had successfully passed off his goods as the plaintiffs', so as to establish a reputation for himself."

This is consistent with what was said by Lord Scarman, giving the opinion of the Board in Cadbury-Schweppes Pty Ltd v. The Pub Squash Co. Pty Ltd [1981] R.P.C. 429 at 494: the relevant date in law is the date of the commencement of the conduct complained of. I should just add that there must come a time after which the court would not interfere with a continued course of trading which might have involved passing off at its inception but no longer did so: logically, this point would come six years after it could safely be said that there was no deception and independent goodwill had been established in the market by the protagonists. There must also be doubt as to the availability of injunctive relief if there is no passing-off at the date the action is commenced."

Would the claim of Swiss be lost in court because of the time between 16 December 1993 and 19 March 2002? If any use that US had showed could be conflated with the specification of the registration and the sign of the registration, this would be an issue. However, the evidence shows that no such conflation can be made. The best that US's evidence can show is putting a limited number of goods up for sale within the context of use of a clear identification with its logo and company name. The decontextulisation that Mr Morcom advanced can be illustrated by exhibit MW2. The goods are of a very limited and specific type. The US logo appears with the word OMEGA. The exhibit represents one page in a catalogue, page 115. I have no idea how many other pages are in the catalogue. However, the use has to be placed in a context of a catalogue. Where are the other pages of the catalogue so this use can be contextualised? The website evidence at DJC8 shows use of a logo and reference to Omega Engineering Limited. Again it does not show use across the gamut of period timers for science and industry. More importantly it does not show the whole picture of the website.

36 of 39

The home page is not reproduced for instance. This evidence would have real relevance if one could see the real context in which the viewer would see it. In this action the potential behaviour of which Swiss is complaining is use for all types of period timers for industrial and/or scientific purposes and with no other sign than OMEGA.

78) Mr Morcom also argued that Swiss had acquiesced in the use of the trade mark for the sign. Again this is dependent on what I would consider a false conflation with the registration and the nature of the use of US. He referred me to *Habib Bank Limited v Habib Bank AG Zurich* [1982] RPC 1. The facts of that case were very different, dealing with the shared goodwill owing to the existence of an international business and the national subsidiary that it had set up. It is also the case that there is an absence of evidence to show that Swiss had acquiesced in the use of the trade mark OMEGA simpliciter for use in period timers for industrial and/or scientific purposes at large. I certainly do not see the 1994 agreement as an indication of acquiescence. As was decided by Pumfrey J, Swiss was left the right to attack the use to which Mr Morcom claims it had acquiesced.

79) Swiss has to establish goodwill in a business related to a sign. Mr Morcom attacked the evidence of Swiss in relation to its class 9 business. Swiss has shown that by the material date it was supplying complex timing apparatus to sports venues and events in the United Kingdom. The name OMEGA with and without Ω was used in relation to sports timing equipment for the Commonwealth Games in Scotland in 1986 and the European Indoor Athletics Championships in Scotland for instance. It would also have been seen by many television viewers of the Olympic games, even if this represents reputation rather than goodwill owing to all but one of them taking place outside the United Kingdom. Of course, Swiss did supply timing apparatus for the London Olympics. Swiss also clearly enjoyed a reputation in relation to watches. The use of OMEGA in relation to sporting activities as well as representing a business for Swiss also acts as a very effective form of promotion for its watches. The association of the word OMEGA with sports timing, where accuracy and detail is essential, must enhance the reputation of its watches. At the material date Swiss enjoyed a goodwill and reputation in relation to timing equipment and watches. A reputation in both the qualitative and quantitative sense. OMEGA in relation to timing meant Swiss. I consider that use of the word OMEGA in relation to timing apparatus would lead the concerned public to consider that Swiss was responsible for the goods. Claims that there has not been confusion, other than the one incident in the USA, do not have a bearing upon this. The relevance of this is again based on the false conflation of the registered sign and the goods it covers with the use made by US; again it rests upon decontextualisation of the use. Consequently, the use of OMEGA for period timers (all for industrial and/or scientific purposes) would amount to a misrepresentation or deception.

80) Adopting the criteria of *Habib Bank Limited v Habib Bank AG Zurich* [1982] RPC 1, damage to the goodwill of Swiss could occur for the following reasons:

- Diverting trade from Swiss to US;
- Potentially injuring the trade reputation of Swiss if the goods provided by US were of a poorer standard;
- By the injury which is inherently likely to be suffered by any business when on frequent occasions it is confused by customers or potential customers with a business owned by another proprietor or is wrongly regarded as being connected with that business.

81) I find that Swiss has established its case in relation to section 5(4)(a) of the Act and the law of passing-off.

**82) Registration of the trade mark for period timers (all for industrial and/or scientific purposes) is contrary to section 5(4)(a) of the Act.**

### Acquiescence and sections 5(2) and 48 of the Act

83) I deal with this here as the case submitted by Mr Morcom in relation to the passing-off issue made me deal with the issue of acquiescence in some detail. That acquiescence was considered within the parameters of the law of passing-off. Here I will deal with it in the parameters of section 48. Section 48 requires the use of the registered trade mark for at least five years; that is use of the registered trade mark not the trade mark per se. The date of the completion of the registered trade mark was 16 April 1999 and the application was made on 19 March 2002. As a period of five years had not passed US cannot pray in aid to section 48 of the Act. Even if the trade mark had been registered for five years prior to the date of the application it would not have benefited US as I have already decided in relation to the passing-off issue that there was no acquiescence.

### Conclusion

84) Swiss has succeeded in relation to section 5(2)(b) of the Act in relation both to the original and the revoked specifications. It has also succeeded under section 5(4)(a) of the Act. Mr Morcom submitted that there were equally bad parts of the specification if Swiss were concerned with period timers. Swiss has chosen the grounds to apply for invalidation and I do not consider whether it might have challenged other elements of the specification relevant. It clearly feels concern over the presence of period timers. Owing to the reputation of Swiss I can well understand this. In the realities of their respective trades there might be no current conflict between Swiss and US. However, trading patterns change and trade mark registrations are items of property that can be sold. No doubt Swiss feels more than a frisson of concern that one of its rivals could purchase this trade mark or part of it, through division, and have rights in the word OMEGA for period timers for scientific and/or industrial purposes. The measurement and recoding of time is the very core of the business of Swiss.

85) Under sections 47(2)(a) and (b) of the Act I find that registration no 1557184 is invalid in respect of period timers on the grounds that it was registered in breach of sections 5(2)(b) and 5(4)(a) of the Act. The registration is to be cancelled in respect of period timers. In accordance with section 47(6) the registration in respect of period timers is deemed never to have been made.

## COSTS

86) Omega SA (Omega AG) (Omega Ltd) is successful in its application. It is entitled to a contribution to its costs. I have taken into account that the grounds of invalidation under section 3(6) of the Act were not pursued at the hearing. I do not consider that this ground gave rise to discrete evidence of fact. The main cost implication was in relation to the preparation for the hearing by Mr Morcom and his skeleton argument. I have reduced the award by £100 to take this into account. I have also taken into account that parts of the evidence had been presented into other proceedings and were adopted into this case. I order Omega Engineering, Incorporated to pay Omega SA (Omega AG) (Omega Ltd) the sum of £1600. This sum is to be paid within seven days of the expiry of the appeal period or within seven days of the final determination of this case if any appeal against this decision is unsuccessful.

**Dated this 15th day of July 2004**

David Landau
For the Registrar
the Comptroller-General