## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA, S.A., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMEGA ENGINEERING, INC., | ) |
| OMEGA SCIENTIFIC, INC., and | ) |
| OMEGA PRESS, INC., | ) |
| | ) |
| Defendants. | ) Civil Action No.: |
| | ) 3:01 CV 2104 (MRK) |
| OMEGA ENGINEERING, INC., | ) |
| | ) |
| Counterclaim-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMEGA, S.A. and | ) |
| THE SWATCH GROUP LTD., | ) |
| | ) |
| Counterclaim-Defendants. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE THE TESTIMONY OF JAMES H. FOUSS

Thomas A. Smart (CT 21462)
Paul C. Llewellyn (CT 25417)
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
(212) 836-8000

Of counsel:

Victoria Haje
Michelle R. Tepper

Dated: September 15, 2004

Thomas E. Minogue (CT 06845)
**MINOGUE BIRNBAUM LLP**
237 Elm Street
New Canaan, CT 06840
(203) 966-6916

*Attorneys for Defendants and for
Counterclaim-Plaintiff*

Doc. #30944454_V27.WPD

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE PROFFERED EXPERT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Fouss Surveys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   The Lieberman Critique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    THE DOMAIN NAME SURVEYS ARE WHOLLY IRRELEVANT . . . . . . . . . . . . . 5

II.    FOUSS'S PROFFERED EXPERT TESTIMONY DOES NOT SATISFY
    *DAUBERT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   The *Daubert* Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   The Standards for the Reliability of Consumer Surveys . . . . . . . . . . . . . . . . . . . . 9

    C.   The Fouss Surveys Fail to Satisfy *Daubert* . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   The Surveys Failed to Survey the Proper Universe . . . . . . . . . . . . . . . 12

            a.   Fouss surveyed the wrong target market . . . . . . . . . . . . . . . . . . . 12
            b.   Even assuming the proper universe were consumers,
               Fouss's method of targeting consumers of OSA's
               watches was improper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            c.   Respondents were not representative of Fouss's chosen
               universe of all U.S. higher income households . . . . . . . . . . . . . 15

        2.   The Surveys Failed to Replicate the Marketplace . . . . . . . . . . . . . . . . 16

        3.   Use of Improper, Leading and Ambiguous Questions . . . . . . . . . . . . . . 18

        4.   The Surveys Lacked a "Control" Group . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Albert v. Warner-Lambert Co.,*
   234 F. Supp. 2d 101 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*American Footwear Corp. v. General Footwear Co.,*
   609 F.2d 655 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 16, 17

*American Home Products Corp. v. Johnson & Johnson,*
   654 F. Supp. 568 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*American Olean Tile Co. v. American Marazzi Tile Inc.,*
   9 U.S.P.Q.2d 1145 (E.D. Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Amorgianos v. National Railroad Passenger Corp.,*
   303 F.3d 256 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

*Arche, Inc. v. Azaleia, U.S.A., Inc.,*
   882 F. Supp. 334 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Beneficial Corp. v. Beneficial Capital Corp.,*
   529 F. Supp. 445 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Berkshire Fashions, Inc. v. Sara Lee Corp.,*
   725 F. Supp. 790 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.,*
   1995 WL 731633 (S.D.N.Y. Dec. 8, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,*
   652 F. Supp. 1105 (S.D.N.Y. 1987), *aff'd*, 830 F.2d 1217 (2d Cir. 1987) . . . . . . . . . . 10, 12

*ConAgra, Inc. v. Geo. A. Hormel & Co.,*
   784 F. Supp. 700 (D. Neb. 1992), *aff'd*, 990 F.2d 368 (8th Cir. 1993) . . . . . . . . . . . . . . . 11

*Conopco, Inc. v. Cosmair, Inc.,*
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14, 16

*Cumberland Packing Corp. v. Monsanto Co.,*
   32 F. Supp. 2d 561 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 16

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 6, 7

*Dick's Sporting Goods, Inc. v. Dick's Clothing,*
    188 F.3d 501, 1999 WL 639165 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Exxon Corp. v. Xoil Energy Res., Inc.,*
    552 F. Supp. 1008 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fruit of the Loom, Inc. v. Sara Lee Corp.,*
    674 F. Supp. 1020 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gillette Co. v. Norelco Consumer Products Co.,*
    69 F. Supp. 2d 246 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hutchinson v. Essence Communications, Inc.,*
    769 F. Supp. 541 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Inc. Publ'g. Corp. v. Manhattan Magazine, Inc.,*
    616 F. Supp. 370 (S.D.N.Y. 1985),
    *aff'd mem.,* 788 F.2d 3 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*J&J Snack Foods Corp. v. Earthgrains Co.,*
    220 F. Supp. 2d 358 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*James Borrough, Ltd. v. Sign of Beefeater, Inc.,*
    540 F.2d 266 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Janet International, Inc. v. Promotion in Motion, Inc.,*
    826 F. Supp. 69 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Johnson & Johnson Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,*
    19 F.3d 125 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham Corp.,*
    1991 WL 206312 (S.D.N.Y. Oct. 1, 1991), *aff'd,* 960 F.2d 294 (2d Cir. 1992) . . . . . . . . . 11

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,*
    828 F.2d 1482 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.*,
   817 F. Supp. 1103 (S.D.N.Y. 1993),
   *vacated pursuant to settlement*, 859 F. Supp. 80 (S.D.N.Y. 1994) . . . . . . . . . . . .11, 19, 20, 21

*Marria v. Broaddus*,
   200 F. Supp. 2d 280 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marshall Field & Co. v. Mrs. Fields Cookies*,
   25 U.S.P.Q.2d 1321 (T.T.A.B. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mastercard v. First National Bank of Omaha, Inc.*,
   2004 U.S.Dist. LEXIS 2485 (S.D.N.Y. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . 9, 10, 15

*Mattel, Inc. v. Azark-Hamway Intern., Inc.*,
   724 F.2d 357 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mennen Co. v. Gillette Co.*,
   565 F. Supp. 648 (S.D.N.Y. 1983),
   *aff'd mem.*, 742 F.2d 1437 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*NFL Properties, Inc. v. Prostyle, Inc.*,
   16 F. Supp. 2d 1012 (E.D. Wis. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*NFL Properties, Inc. v. Prostyle, Inc.*,
   57 F. Supp. 2d 665 (E.D. Wis. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*National Distillers Products Co., LLC v. Refreshment Brands, Inc.*,
   198 F. Supp. 2d 474 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 16, 17

*Novo Nordisk of N. Am., Inc. v. Eli Lilly & Co.*,
   1996 WL 497018 (S.D.N.Y. Aug. 30, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
   86 F. Supp. 2d 305 (S.D.N.Y. 2000),
   *aff'd without opinion*, 234 F.3d 1262 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pittsburgh Press Club v. United States*,
   579 F.2d 751 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*Pugliano v. United States*,
   315 F. Supp. 2d 197 (D. Conn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*,
   33 U.S.P.Q.2d 1669 (S.D. Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iv

*Scott Paper Co. v. Scott's Liquid Gold*,
  439 F. Supp. 1022 (D. Del. 1977),
  *rev'd on other grounds*, 589 F.2d 1225 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Scotts Co. v. United Industrial Corp.*,
  315 F.3d 264 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Simon Prop. Group L.P. v. MySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 17, 19

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
  559 F. Supp. 1189 (E.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Union Carbide Corp. v. Ever-Ready, Inc.*,
  531 F.2d 366 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Cruz*,
  363 F.3d 187 (2d. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Universal City Studios, Inc. v. Nintendo Co.*,
  746 F.2d 112 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12, 13, 14, 18

*Warner-Lambert Co. v. Schering-Plough Corp.*,
  1991 WL 221107 (S.D.N.Y. Oct. 15, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Weight Watchers International v. Stouffer Corp.*,
  744 F. Supp. 1259 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Wells Fargo & Co. v. WhenU.com, Inc.*,
  293 F. Supp. 2d 734 (E.D. Mich. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*WUV's International, Inc. v. Love's Enterprises, Inc.*,
  208 U.S.P.Q. 736 (D. Colo. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Zaremba v. General Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATUTES

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## TREATISES AND ARTICLES

HANDBOOK OF RECOMMENDED PROCEDURES FOR THE TRIAL OF PROTRACTED LITIGATION, 25 F.R.D 351 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

MANUAL FOR COMPLEX LITIGATION, FOURTH (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

P. Welter, TRADEMARK SURVEYS (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (2d ed. Federal Judicial Center 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Defendants submit this memorandum of law in support of their motion to exclude the testimony and expert report of plaintiff's purported expert James H. Fouss on the grounds that the proffered testimony based on the consumer surveys Fouss conducted (the "Fouss surveys") fails to satisfy the requirements for admission of expert evidence under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence ("FRE") 702 and, in all events, is not relevant to the issues in this case (FRE 402).

## PRELIMINARY STATEMENT

Plaintiff Omega S.A. ("OSA") has proffered four surveys conducted by James H. Fouss. According to his report, Fouss was retained by OSA to conduct four consumer surveys to assess (1) what the term "Omega" means to the consumer population (the "OMEGA Interpretation survey"), (2) consumer perception of the website OMEGAWATCH.COM, (3) consumer perception of the website OMEGATIME.COM, and (4) consumer perception of the website OMEGATIME.NET.

As set forth more fully below, three of the surveys – the three that purport to survey consumer perceptions relating to domain names that contain the word OMEGA – are irrelevant to the issues in this case because OSA's causes of action relating to the domain names that are the subject of the surveys were previously dismissed from this case by Judge Underhill on *res judicata* grounds. In addition, each of the four surveys should also be excluded from evidence because each fails to meet the requirements for admission of expert evidence established in *Daubert* and in Rule 702, Fed. R. Evid.

Fouss's surveys should be excluded because each surveyed the wrong "universe," consisting of high income consumers who are purportedly OSA's target market. The proper inquiry is whether or not the target market of Omega Engineering, Inc. ("OEI") – the market to

which OEI's allegedly infringing marks are advertised – is confused by OEI's use of the OMEGA mark in connection with its products. Thus, Fouss should have interviewed likely purchasers of OEI's products, such as engineers and scientists. Second, even assuming that the proper universe to be surveyed was consumers, Fouss did not limit his survey to those consumers who were likely purchasers of OSA's products, but merely selected respondents on the basis of income level. Fouss thereby used income as a poor surrogate for prospective buyers of expensive watches. Third, the method by which Fouss surveyed respondents – an online survey – typically has such a low response rate that it cannot be assumed that eligible respondents are representative of the universe sampled. Fourth, Fouss's surveys are critically flawed because they failed to replicate the marketplace. Lastly, and of equal significance to the other fatal flaws in his report, Fouss asked improper, leading and biased questions and failed to use proper control groups.

## THE PROFFERED EXPERT EVIDENCE[1]

**A.**    **The Fouss Surveys**

Fouss's surveys were based on data collected from 801 respondents - about 200 respondents for each of the four surveys that Fouss carried out. The respondents in all four surveys consisted of consumers who were AOL subscribers, 18 years old or older, who purportedly have annual incomes of $80,000 and higher and who responded to a request to fill out a questionnaire on AOL Opinion Place - AOL's survey operation. No attempt was made to limit the survey respondents to likely purchasers of Omega watches or to likely purchasers of defendant OEI's scientific and industrial process control products. (Fouss Report pp. 3-4).

---

[1]    Facts pertinent to this motion are set forth in the Declaration of Thomas A. Smart dated September 14, 2004 and the exhibits thereto (which includes the Fouss Report that is the subject of this motion), the Declaration of Dr. Seymour Lieberman dated June 4, 2004 and the Declaration of Dr. Milton Hollander dated September 14, 2004.

In the OMEGA Interpretation survey, the respondents were asked how familiar they were with the name "Omega"; what, if anything, the name "Omega" suggested to them; what products, if any, are "manufactured, sold, licensed or available with the name 'Omega' as part of the product or service name"; and whether or not they think the approval of the otherwise unidentified entity "Omega" is required to use the name "Omega" for "watches and timepieces" and for four other products or service fields (financial services, home improvement products, clothing and food). (Fouss Report pp. 19-24).

In the three surveys regarding consumers' perceptions of the websites, the questions that respondents were asked overlapped in some respects and differed in other respects. In the two "Website surveys" that questioned respondents about OMEGAWATCH.COM and OMEGATIME.COM (but not the survey regarding OMEGATIME.NET), the respondents were shown the text from a webpage – with the hyperlinks on the page disabled – and asked whether the two sites mentioned in the webpage are "associated, affiliated or have any relationship with each other" and, if so, why they thought that the two sites are "associated, affiliated or have a relationship with each other." (Fouss Report pp. 11-12, 15-16). In the third Website survey, the respondents were not shown any website or website text, but were asked to indicate the "products, information, literature or services" they would expect to find at a website identified only as "OMEGATIME.NET." (Fouss Report pp. 14, 18). Fouss does not explain why different questions were asked in the three presumably parallel studies.

**B.**    <u>The Lieberman Critique</u>

Defendants' expert, Dr. Seymour Lieberman, submitted a detailed critique of the Fouss surveys.[2] Dr. Lieberman is the Chairman of The Epsilon Group Inc. and Founder and Managing Director of Lieberman Research Inc. and Lieberman Research Worldwide Inc., marketing research consulting organizations, and has over fifty years of experience in market research. He concluded that the surveys are flawed for several reasons and that the surveys do not "provide probative value in the OSA/OEI litigation." (Lieberman Critique p. 7).

Although the Scheduling Order provided for the service of rebuttal expert reports, neither OSA nor Fouss submitted any materials in response to Dr. Lieberman's critique.

As explained below, the Fouss surveys and report should be precluded because, for numerous independent reasons, they fail to meet the stringent standards for admissibility under *Daubert* and FRE 702, and, with respect to the Website surveys, are wholly irrelevant.

<u>ARGUMENT</u>

**I.**    <u>THE DOMAIN NAME SURVEYS ARE WHOLLY IRRELEVANT</u>

First and foremost, at least three of the four Fouss surveys – that is, the three relating to domain names that contain the word OMEGA – are irrelevant, because claims relating to domain names containing OMEGA were previously excluded from this case on *res judicata* grounds. In a prior ruling in this action, (*see* Motion Hearing 4/22/03 Tr. at 61), Judge Underhill granted defendants' motion to dismiss OSA's cybersquatting claims relating to registration of domain names containing OMEGA as barred, under principles of *res judicata*, by the judgment in a prior case between the parties, *Omega S.A. v. Omega Engineering, Inc.*, Civ. No. 3:00 CV 1848 JBA

---

[2]    Attached as Ex. C to the Lieberman Declaration and hereinafter called "Lieberman Critique."

("*Omega II*"). In so holding, Judge Underhill expressly ruled that such registrations were relevant in this case, if at all, solely as purported evidence on intent with respect to OSA's claims of bad faith conduct. The Fouss domain name surveys do not and could not relate to defendants' alleged subjective intent. Rather, they relate to alleged consumer perceptions of the domain names that were at issue in *Omega II* (and the surveys, in fact, appear to have been conducted *for* the *Omega II* litigation). Thus, they are not probative with respect to the only issue for which domain name evidence might even be relevant in this case.

## II.    FOUSS'S PROFFERED EXPERT TESTIMONY DOES NOT SATISFY *DAUBERT*

### A.    The *Daubert* Test

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993), the Supreme Court charged federal courts with a "gatekeeping" role of assessing proposed expert evidence to determine (1) *reliability* – "whether the reasoning or methodology underlying the testimony is scientifically valid"; and (2) *relevance* or *fitness* – "whether that reasoning or methodology properly can be applied to the facts in issue." As the Supreme Court observed, "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* at 595 (citation omitted). As the Court later explained, FRE 702[3], which codified *Daubert*, "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only

---

[3]    FRE 702 ("Testimony by Experts") provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Similarly, as the Second Circuit has explained in excluding expert testimony, "[t]he flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).[4]

"The primary locus of this [gatekeeping] obligation is [FRE 702]," which requires that expert testimony must consist of "scientific, technical, or other specialized knowledge." *Daubert*, 509 U.S. at 589. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590. Thus, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Id.* As the proponent of the expert testimony at issue, OSA has the burden to establish its admissibility "by a preponderance of proof." *Id.* at 593 n.10.

In *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997), the Supreme Court held that "abuse of discretion is the proper standard of review" for a district court's *Daubert* rulings, and elaborated upon the *Daubert* analysis in affirming exclusion of expert medical causation testimony. The Court examined the four epidemiological studies proffered as proof of disease

---

[4]     *See also Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (FRE 702 "'assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand'" (quoting *Daubert*, 509 U.S. at 597); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (When parties seek to introduce expert testimony in accordance with *Rule 702*, a district court "must 'analyze whether [the] proffered expert testimony is relevant, i.e. whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'" and "'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered'") (citations omitted).

causation and determined that the trial court did not abuse its discretion in excluding all of them. *Id*. at 145-46. Even when an expert relies upon a valid scientific study, the Court held, the testimony may still be excluded if the expert draws conclusions from the study that go beyond what the study itself concluded:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. (*Id*. at 146).

In other words, although "experts commonly extrapolate from existing data," extrapolations that are not shown to be scientifically valid under *Daubert* are inadmissible. *Id. See Amorgianos*, 303 F.3d at 270 (holding that the district court did not abuse its discretion in excluding expert's testimony because the "analytical gap between the studies on which she relied and her conclusions was simply too great and [ ] her opinion was thus unreliable"); *Pugliano v. United States*, 315 F. Supp. 2d 197, 199 (D. Conn. 2004) (excluding expert testimony where the "analytical gap between the professional studies and opinion poll data on which [the expert] relie[d] and the conclusions [the expert] reach[ed] based on those sources" was "simply too great").

  In its most recent pronouncement on the *Daubert* test, the Supreme Court held that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. at 142 (emphasis by the Court). The Court reiterated the principles that "the Rule 702 inquiry [is] 'a flexible one,'" and that the *Daubert* factors "do *not* constitute a 'definitive checklist or test.'" *Id*. at 150 (emphasis by the Court) (affirming, under *Daubert*, exclusion of engineer's testimony regarding the cause of a tire blow-out, and affirming exclusion of that testimony as unreliable). *See also*,

*e.g., Amorgianos*, 303 F.3d at 266 (holding damages expert's testimony inadmissible under *Daubert*).

Consistent with *Kumho*, courts have excluded from evidence consumer surveys that fail to satisfy the *Daubert* standard of reliability and relevance. *See, e.g., Mastercard v. First Nat'l Bank of Omaha, Inc.*, 2004 U.S. Dist. LEXIS 2485, at *20-32 (S.D.N.Y. Feb. 23, 2004); *Albert v. Warner-Lambert Co.*, 234 F. Supp.2d 101,104-07 (D. Mass. 2002)*; J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp.2d 358, 366-72 (D.N.J. 2002); *NFL Props., Inc. v. Prostyle, Inc.*, 57 F. Supp.2d 665 (E.D. Wis. 1999).[5]  As one court explained in rejecting the argument that survey evidence is not to be judged under *Daubert*:

> The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility.  If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.

*Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp.2d 1033, 1039 (S.D. Ind. 2000).

## B.    The Standards for the Reliability of Consumer Surveys

It is well settled that a survey is relevant only to the extent that its methodology is trustworthy and it surveys the proper universe. *See, e.g., Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758-59 (3d Cir. 1978); *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp.2d 242, 253 (S.D.N.Y. 1999).[6]

---

[5]    Other courts have excluded surveys without referring to *Daubert*. *See, e.g., Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296-97 (2d Cir. 1999); *Dick's Sporting Goods, Inc. v. Dick's Clothing*, 188 F.3d 501, 1999 WL 639165, at *5-6 (4th Cir. 1999) (unpublished).

[6]    *See also Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F. Supp. 334, 335-36 (S.D.N.Y. 1995); *Weight Watchers Int'l v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990);

(continued...)

It is elemental that a trademark survey replicate the presentation of the mark at issue in the marketplace. "To have substantial probative value, a survey, in addition to testing the proper universe, must also be designed to examine the impression presented to the consumer by the accused product. Therefore, a survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Conopco, Inc.,* 49 F. Supp. 2d at 253 (citations omitted); *see also American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 660 n.4 (2d Cir. 1979); *National Distillers Products Co., LLC v. Refreshment Brands, Inc.,* 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002); *Cumberland Packing Corp. v. Monsanto Co.,* 32 F. Supp. 2d 561, 576, 578 (E.D.N.Y. 1999).

As courts have made clear, survey evidence is trustworthy only if based on questions that have been "framed in a clear, precise, and non-leading manner." *Mastercard,* 2004 U.S. Dist. LEXIS 2485, at *22 (citation omitted).[7] To that end, courts have credited the results of unaided, non-leading open-ended questions and rejected reliance on leading questions which, by their very nature, "'are inherently suggestive and invite guessing by those who did not get any clear message at all.'" *Johnson & Johnson – Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 134 (3d Cir. 1994) (citing *American Home Prods. Corp. v. Johnson*

---

[6]     (...continued)
*American Olean Tile Co. v. American Marazzi Tile Inc.,* 9 U.S.P.Q. 2d 1145, 1149 (E.D. Pa. 1988); *Inc. Publ'g. Corp. v. Manhattan Magazine, Inc.,* 616 F. Supp. 370, 390 (S.D.N.Y. 1985), *aff'd mem.,* 788 F.2d 3 (2d Cir. 1986); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983).

[7]     *Accord, Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 652 F. Supp. 1105, 1110 (S.D.N.Y. 1987), *aff'd,* 830 F.2d 1217 (2d Cir. 1987) (quoting *Toys "R" Us,* 559 F. Supp. at 1205); *see also Pittsburgh Press,* 579 F.2d at 758-59; *Exxon Corp. v. Xoil Energy Res., Inc.,* 552 F. Supp. 1008, 1022 n.20 (S.D.N.Y. 1981); MANUAL FOR COMPLEX LITIGATION FOURTH § 11.493 (2004); HANDBOOK OF RECOMMENDED PROCEDURES FOR THE TRIAL OF PROTRACTED LITIGATION, 25 F.R.D. 351, 429 (1960).

& *Johnson*, 654 F. Supp. 568, 581 (S.D.N.Y. 1987)).[8] Questions that inappropriately suggest and frame the issue for interviewees are "fatally defective and untrustworthy." *Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 652 (S.D.N.Y. 1983), *aff'd mem.*, 742 F.2d 1437 (2d Cir. 1984); *see also Universal City Studios, Inc.*, 746 F.2d at 118 (survey which employed leading questions and utilized an improper universe was "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion).[9]

Lastly, a consumer survey should also use controls to avoid counting, as evidence of confusion, "background noise" and preexisting bias among respondents. *Pittsburgh Press*, 579 F.2d at 758-59; *Cumberland Packing Corp.*, 32 F. Supp.2d at 575; *ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F. Supp. 700, 728 (D. Neb. 1992), *aff'd*, 990 F.2d 368 (8th Cir. 1993); *NFL Props.*, 57 F. Supp.2d at 669-72.

### C.    The Fouss Surveys Fail to Satisfy *Daubert*

In addition to the irrelevance of three of the four Fouss surveys, all four surveys failed to survey the relevant "universe," failed to replicate the marketplace, used biased, leading and

---

[8]    *See also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280-81 (4th Cir. 2002); *Universal City Studios*, 746 F.2d at 118; *Warner-Lambert Co. v. Schering-Plough Corp.*, 1991 WL 221107, at *2-3 (S.D.N.Y. Oct. 15, 1991); *Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham Corp.*, 1991 WL 206312, at *8 (S.D.N.Y. Oct. 1, 1991), *aff'd*, 960 F.2d 294 (2d Cir. 1992); *Fruit of the Loom, Inc. v. Sara Lee Corp.*, 674 F. Supp. 1020, 1021-22 (S.D.N.Y. 1987); *Inc. Publ'g*, 616 F. Supp. at 393-94; *Scott Paper Co. v. Scott's Liquid Gold*, 439 F. Supp. 1022, 1042-44 (D. Del. 1977), *rev'd on other grounds*, 589 F.2d 1225 (3d Cir. 1978); *Gillette Co. v. Norelco Consumer Prods. Co.*, 69 F. Supp.2d 246, 259 (D. Mass. 1999).

[9]    *See also, e.g., Pittsburgh Press*, 579 F.2d at 758-59; *Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1122-23 (S.D.N.Y. 1993), *vacated pursuant to settlement*, 859 F. Supp. 80 (S.D.N.Y. 1994).

ambiguous questions, and failed to use controls.  Accordingly, the surveys fail to meet the reliability standards of *Daubert* and should be precluded.

      1.    **The Surveys Failed to Survey the Proper Universe**

      a.    ***Fouss surveyed the wrong target market***

First, Fouss's report is fatally flawed because he surveyed the wrong universe.  Fouss surveyed consumers who purportedly are OSA's target market, rather than engineers and scientists who are OEI's target market. (Lieberman Critique p. 5).  It is well settled that, in order to be of any value, "[a] survey must use the right frame of reference, that is, the group whose associations or attitudes are at issue." *Centaur Communications, Ltd. v. A/S/M/ Communications, Inc.*, 830 F.2d 1217, 1223 (2d Cir. 1987) (citing *Universal City Studios, Inc.*, 746 F.2d at 118).  Here, the defendant's target market, not the plaintiff's, is the relevant market to be surveyed. *See, e.g.*, 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:159 (June 2002)) ("In a traditional case claiming 'forward' confusion, . . . the proper universe to survey is the potential buyers of the *junior user's* goods or services"); *Hutchinson v. Essence Communications, Inc.*, 769 F. Supp. 541, 559-60 (S.D.N.Y.) (holding that "[i]t is well-settled in this circuit that the universe of the survey must include potential purchasers of the junior user's product"); *Paco Sport, Ltd. v. Paco Rabanne Parfums,* 86 F. Supp. 2d 305, 322 (S.D.N.Y. 2000), *aff'd without opinion*, 234 F.3d 1262 (2d. Cir. 2000) (same).

Fouss made no attempt to survey likely purchasers of OEI's product which, as mentioned above, is the pertinent target audience. (Fouss Report pp. 3-4).  The undisputed evidence is that OEI sells highly specialized industrial and scientific process measurement and control instruments to sophisticated purchasers, such as scientists and engineers, and OEI advertises its products in specialized trade journals specifically directed to these types of purchasers.

(M. Hollander Decl. ¶¶ 17-18 & Exs. I-L). Furthermore, it is similarly undisputed that defendants do not market or sell any products to consumers and do not advertise their products or their OMEGA marks to consumers. (M. Hollander Dec. ¶¶ 13, 15-17). Fouss's surveys incorrectly surveyed consumers and thus, they fail to answer the only relevant question: What is the impact on prospective purchasers of defendants' products, such as engineers and scientists – that is, the market at which defendants' advertising and marks are directed – of defendants' use of the OMEGA mark?

> **b.** ***Even assuming the proper universe were consumers, Fouss's method of targeting consumers of OSA's watches was improper***

Even if consumers were the proper group to be interviewed, Fouss's universe was still flawed. As described above, Fouss surveyed consumers who have household incomes of $80,000 and higher. (Fouss Report p. 3). Even assuming, *arguendo*, that OSA's prospective customers were the appropriate survey universe, the universe sampled should have consisted of prospective buyers of the product in question – in this case, people who expected to buy an expensive watch in the near future. *See Universal City Studios, Inc.,* 746 F.2d at 118 ("'To be probative and meaningful . . . surveys . . . must rely upon responses by potential consumers of the products in question.'") (citations omitted); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (excluding survey evidence because the universe tested did not include potential consumers of the product in question). Fouss used apparently used income ($80,000 and above) as a purported surrogate for being a prospective buyer of expensive watches. There is no evidence in the record, however, of the degree to which that income level correlates to the likelihood of future purchasers of the type of luxury wristwatch sold by OSA. (*See* Lieberman Critique p. 5).

Moreover, even if Fouss had limited respondents to those who presently own a wristwatch or who have purchased a wristwatch in the past, it would not be sufficient because it is *prospective* purchasers, not *past* or *present* purchasers, who are relevant.[10] *See Universal City Studios, Inc.*, 746 F.2d at 118 (survey "utilized an improper universe in that it was conducted among individuals who had already purchased or leased Donkey Kong machines rather than those who were contemplating a purchase or lease"); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 (2d Cir. 1979) (affirming district court's rejection of survey evidence because "the survey participants, although former purchasers of hiking boots, did not necessarily have any present purchasing interest concerning the particular matter being surveyed"). By Fouss's own acknowledgment, less than half of the respondents in Fouss's surveys expected to buy a watch that cost at least $250 in the next two years, but all of the respondents were included in the surveys. (Fouss Report p. 5). Moreover, $250 is an inadequate surrogate for Omega watches given the fact that OSA's watches range in price in the United States from $1,200 to $79,000. (Emmons Tr. 59-60)[11].

---

[10]     Although Table 13 of Fouss's Report presents the results from survey questions regarding "Wristwatch Ownership and Future Purchase Likelihood," Fouss did not use wristwatch ownership or expectations of purchasing expensive watches to limit the survey universe. (Fouss Report p. 26). As for the fact that Fouss's results in Table 13 suggest that 94% to 96% of the respondents owned a wristwatch, that is inconsequential because OSA sells luxury watches (thus making the more general category of wristwatch ownership over-inclusive). *See, e.g., Conopco, Inc.,* 49 F. Supp. 2d at 253; *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990). In all events, as set forth above, the appropriate universe is not past purchasers, but prospective purchasers.

[11]     Attached as Ex. B to the Smart Declaration.

      **c.**      ***Respondents were not representative of Fouss's chosen universe of all U.S. higher income households***

Even assuming that Fouss surveyed the appropriate universe and that respondents from higher income households best represented those consumers who were likely to buy an expensive watch – neither of which, as shown above, is a fair assumption – the respondents surveyed were likely not representative of all U.S. higher income households.  (Lieberman Critique p. 5).  The Fouss surveys were all based on responses from higher income AOL subscribers who filled out a questionnaire that appeared on AOL Opinion Place.  Although Fouss states that  "[d]ata can [ ] be projected to all 20.3 million U.S. households that have incomes of $80,000 and above and use the Internet," (Fouss Report p.3), the type of internet survey that Fouss conducted likely generated a very low response rate such that Fouss's projection is "highly questionable and speculative."  (Lieberman Critique p. 5).  *See Marria v. Broaddus*, 200 F. Supp. 2d 280, 290 (S.D.N.Y. 2002) (noting that survey results "might be skewed based on the failure of over half of those surveyed to respond"); *Mastercard*, 2004 U.S. Dist. LEXIS 2485, at *28 (noting that the low response rate "is compounded by the Report's failure to address the issue of non-response bias, or whether the 52 individuals who chose to complete the Survey were representative of the group of qualified respondents").

Internet surveys of the type conducted by Fouss, in which information is collected from end-users of AOL's Opinion Place, are generally based on a very low response rate - as low as 5% or perhaps even as low as 1% or 2%.  (Lieberman Critique p. 5).  As stated in S. Diamond, *Reference Guide on Survey Research, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (2d ed. Federal Judicial Center 2004) ("SURVEY REFERENCE GUIDE"):

>According to the[ ] guidelines [for statistical surveys issued by the former U.S. Office of Statistical Standards], response rates of 90% or more are reliable and generally can be treated as random samples of the overall population. Response rates between 75% and 90% usually yield reliable results, but the researcher should conduct some check on the representativeness of the sample. Potential bias should receive greater scrutiny when the response rate drops below 75%. *If the response rate drops below 50%, the survey should be regarded with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn.* (at 245) (emphasis added).

Consequently, given the type of survey Fouss conducted and its typical extremely low response rate, there is no basis to conclude that the respondents surveyed were representative of all U.S. higher income households. (Lieberman Critique p. 5).

### 2.   The Surveys Failed to Replicate the Marketplace

Although OSA has contended in discovery responses that the Fouss report provides evidence of alleged consumer confusion in the marketplace, assessment of likelihood of confusion between OSA's marks and OEI's marks is not even one of the stated objectives of Fouss's surveys. (*See* Fouss Report p. 3). Even if it were an objective, however, all four of Fouss's surveys are critically flawed because they did not reflect the essential characteristics of the marketplace in which the parties' marks are used. In order for a survey to be of probative value as an evaluation of consumer confusion, it must faithfully replicate market conditions. *See, e.g., American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979); *National Distillers Products Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002); *Conopco, Inc.*, 49 F. Supp. 2d at 253; *Cumberland Packing Corp.*, 32 F. Supp. 2d at 576, 578; *Simon Prop. Group,* 104 F. Supp.2d at 1038.

Fouss's surveys did not come close to replicating marketplace conditions and thus are fatally flawed, whether proferred for evidence of likelihood of confusion or any other purpose. In the Omega Interpretation survey, the OMEGA marks were never shown in context and only appeared in black 12-point font on the survey questionnaires.  (Appendix to Fouss Report).  At no point during the survey were the respondents shown OSA's or OEI's advertising materials or products.  Furthermore, the OMEGA symbol never accompanied the word OMEGA, as it often does in the marketplace.  In similar circumstances, courts have repeatedly rejected surveys that did not replicate market conditions.  *See, e.g., American Footwear Corp.*, 609 F.2d at 660 n.4 (where interviewees were shown the plaintiff's promotional poster for the product in question, the court found "the critical defect in the survey was the failure to conduct it under actual marketing conditions" because surveyor did not display plaintiff's poster as it was always shown -- "in an environment replete with references to [plaintiff] as the seller of the [product in question]"); *National Distillers Products Co.*, 198 F. Supp. 2d at 484 (survey used improper methodology because "respondents were shown the [ ] label on a card, rather [than] on a bottle, [which is how] they would encounter the label in the marketplace").

The Website surveys suffered from the same flaw.  In all three Website surveys, Fouss showed respondents an artificial sample of one screen printed from a webpage.  (Appendix to Fouss Report).  The entire look, feel and browse-ability of the website was lost.  *See, e.g., Simon Prop. Group*,104 F. Supp.2d at 1043 (rejecting a survey designed to determine the likelihood of confusion between plaintiff's and defendant's home pages because it only showed respondents the two parties' home pages and did "not ask respondent[s] to view actual search engine results containing hyperlinks to these sites in a way that might actually occur in the marketplace"; the ability to view search engine results with hyperlinks was "critical for fairly gauging the danger of

confusion" and therefore, the survey was flawed because it bore "no relationship to the marketplace"). *Accord, Janet International, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73 (E.D.N.Y. 1993) (finding a survey inadmissible because "survey interview procedures [must] approximate 'actual market conditions' through which the disputed products are sold in order to be of probative value on the issue of confusion") (citing *Mattel, Inc. v. Azark-Hamway Intern., Inc.*, 724 F.2d 357, 361 (2d Cir. 1983)); *Berkshire Fashions, Inc. v. Sara Lee Corp.*, 725 F. Supp. 790, 797-98 (S.D.N.Y. 1989) (rejecting survey which was "not in accordance with . . . reality in the marketplace"). Quite clearly, one of the distinctive features of the internet is that it is interactive. Web browsers jump from webpage to webpage by clicking on whatever page links appeal to them. However, in Fouss's Website surveys, respondents were only shown the text from a webpage, with the hyperlinks on the web page disabled, rather than a fully functional webpage. (Appendix to Fouss Report). In Fouss's surveys, respondents were not able to actually "surf" the websites Fouss presented (even though such functionality could have easily been provided, given that the surveys were conducted on-line).

### 3.    Use of Improper, Leading and Ambiguous Questions

As set forth above, a survey based on leading questions is of little probative value. *Universal City Studios*, 746 F.2d at 118. As Professor McCarthy states, "It is improper to suggest a business relationship where the respondent may previously have had no thought of any such connection." MCCARTHY'S § 32:172. The Second Circuit has expressly rejected the type of questions asked in Fouss's surveys. In *Universal City Studios,* a survey asked, "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" 746 F.2d at 118. The Second Circuit held that this "was an obvious leading question in that it suggested its own answer" and that a "survey

question which begs its answer cannot be a true indicator of the likelihood of consumer confusion." Similarly, in *Major League Baseball Props., Inc.*, the court held a survey to be fatally flawed because the question, "[D]o you believe that the restaurant had to get authorization, that is, permission to use the name, "'The Brooklyn Dodger,'" was leading. 817 F. Supp. at 1122-23. Time and again, courts have rejected such leading questions which suggest to respondents the idea of an affiliation.[12] Additionally, the lack of controls in *Major League,* as

---

[12]  *Compare Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1488 (10th Cir. 1987) (rejecting question asking whether respondents thought that the parties' products "were produced by the same manufacturer"); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp.2d 734, 767-68 & n.22 (E.D. Mich. 2003) (rejecting questionnaire that "repeatedly suggested to respondents a link between [defendant's] pop-up ads and [plaintiff's] websites"); *Simon Prop. Group,*104 F. Supp.2d at 1041, 1048(rejecting survey question "Do you believe that the two webpages just shown to you are put out by (a) Two unrelated sources, companies, or organizations; (b) The same source, company, or organization; (c) Related but different sources, companies, or organizations; or (d) Don't know" on ground that it "implicitly suggest[ed] to the respondent the possibility of a business connection between [plaintiff's and defendant's] home pages that the respondent may not have made on his or her own"); *Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*, 33 U.S.P.Q.2d 1669, at *10 (S.D. Tex. 1994) (holding that the question "Do you think the weight loss product 'Sweet Success' and 'Success Rice' are more likely made by the same company or more likely made by different companies?" to be "leading" because it "creat[ed] an association between the two products where none may have existed previously"); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450 (S.D.N.Y. 1982) (holding that the question "Do you think there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" was a leading question "not well suited to eliciting an uninfluenced reaction from the persons questioned"); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q. 2d 1321, 1334 (T.T.A.B. 1992) (holding the question whether two stores "have a business connection or a business association with one another, or not?" impermissibly leading on the grounds that it "tends to deliberately plant in the respondent's mind the idea that there is a connection between the stores."); *WUV's Int'l, Inc. v. Love's Enterprises, Inc.*, 208 U.S.P.Q. 736 (D. Colo. 1980) (finding the question "What company or person do you believe owns or operates this restaurant?" was "valid," but the subsequent question "Do you believe that this restaurant is connected with or related to any other restaurant?" was "leading and unnecessarily suggestive"); *with Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976), *superceded by statute on other grounds*, (holding district court "clearly erroneous" in not crediting consumer survey asking respondents:

(continued...)

here, served as further grounds for rejecting the survey. *Id.* at 1123. The expert concluded, and the court agreed, that the surveys "have no measure of what percentage of respondents are reacting to the particular stimuli and what [percentage] would be confused no matter what they were asked. Thus the interpretation of their data is impossible, and any conclusions drawn from their data must be seen as meaningless." *Id.*

As in *Universal City Studios*, *Major League Baseball*, and the many other cases cited above, Fouss's OMEGA Interpretation survey uses a highly leading and ambiguous question – *i.e.*, whether or not the "approval" of "Omega" was needed for the following items: "watches and timepieces, financial services, home improvement products, clothing, and food products." (Fouss Report p. 23). This question unnecessarily implanted the idea of approval in respondents' minds, without any "control" safeguards. (Lieberman Critique p. 6). The question suggests to the respondent the possibility that approval or authorization of some unidentified entity called "Omega" is required, even when the respondent may not have thought so on his or her own. The absence of any control groups further magnifies the bias of the question.

Furthermore, the question is fatally ambiguous because it is unclear to what "Omega" the question refers, or which "Omega" entity (if any) the respondents had in mind when answering the question. Fouss never defines "Omega" or indicates that "Omega" might stand for Omega S.A., Omega Engineering, Inc. or some other entity called "Omega." As a result, it is impossible to tell what "Omega" meant to each respondent.

---

[12]    (...continued)
"Who do you think puts out the lamp shown here; What makes you think so; Please name any other products put out by the same concern which puts out the lamp shown here."); *James Borrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (approving the question as not "slanted or leading").

The question whether the "approval" of "Omega" approval is required for "wristwatches and timepieces" also improperly asks for the respondent's legal conclusion, which, of course, is irrelevant. A respondent who answered affirmatively to whether "the approval of 'Omega' is required" for various types of products or services may have believed that the company "required" approval because of the respondent's view of the law, but may not have any opinion as to whether the company actually had an affiliation with the (undefined) entity "Omega." For this additional reason, time and again courts have rejected the very question that Fouss asked in the OMEGA Interpretation survey.[13]

Another problem with this question lies in the fact that respondents were asked whether Omega's approval is required for the compound phrase "wristwatches and timepieces." This compound answer is defective because it did not permit respondents to choose either wristwatches *or* timepieces, and because there is no evidence that consumers think in the compound term "wristwatches and timepieces." In addition, the question is vague, ambiguous and leading because the term "timepieces" likely is not familiar to most respondents. (Lieberman Critique p. 6). This is confirmed by the fact that when consumers were asked what products are made with the name "Omega," "watches" were mentioned by 54%, while "timepieces" were only mentioned by 2%. (Fouss Report p. 22). Similarly, when asked what the name "Omega" suggests to them, watches were mentioned by 22%, while timepieces were mentioned by only 2%. (Fouss Report p. 21). Fouss, however, misleadingly tied "watches and timepieces" together

---

[13]    *See, e.g., NFL Props., Inc. v. Prostyle, Inc.*, 16 F. Supp.2d 1012, 1018 (E.D. Wis. 1998); *Novo Nordisk of N. Am., Inc. v. Eli Lilly & Co.*, 1996 WL 497018, at *6 n.24 (S.D.N.Y. Aug. 30, 1996); *Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, 1995 WL 731633, at *8-9 (S.D.N.Y. Dec. 8, 1995); *Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1122-23 (S.D.N.Y. 1993), *vacated pursuant to settlement*, 859 F. Supp. 80 (S.D.N.Y. 1994).

in one compound answer that was presented to respondents in the "approval" question, despite that the vast majority of respondents did not identify the word "Omega" in any way with "timepieces." (Lieberman Critique p. 6).

The two surveys that questioned consumers about the OMEGAWATCH.COM and OMEGATIME.COM websites are also tainted with leading and ambiguous questions. (Lieberman Critique p. 6-7). After being shown the text of the two websites, the respondents were asked whether they thought that the websites are "associated, affiliated or have any relationship with each other." (Fouss Report pp. 11-16; Appendix to Fouss Report). This, for the same reasons as discussed above, is a leading and ambiguous question. As in *Universal City Studios* and *Major League Baseball*, the questions implanted the idea of "associations" and "affiliations" in respondents' minds when no such connections had existed, thus exaggerating the extent to which respondents reported seeing "associations" or "affiliations" between the two websites. Courts have repeatedly rejected such leading questions. *See, infra* pp. 18-19 & n. 11).

Lastly, the term "any relationship with each other" in this question is very ambiguous. (Lieberman Critique p. 7). Thus, it is impossible to determine the extent to which respondents only interpreted "any relationship" as meaning that the word "Omega" appears in both of the webpages' names or, for example, that the page has links to both entities' websites, rather than that the two entities had a business relationship with each other. (Fouss Report pp. 12, 16). This ambiguity renders the responses to the question meaningless.

### 4. The Surveys Lacked a "Control" Group

It is elemental in survey research to provide for control groups to provide a measure of the "noise" which exists in the test group data. P. Welter, TRADEMARK SURVEYS § 6.01[4][a]. As mentioned above, courts often cite the lack of a control element to show what proportion of

the data is due to "noise" as a major survey flaw rendering the survey meaningless and of no evidentiary value. *See, infra* p. 10. Here, none of the Fouss studies had a "control" group. There is no way of evaluating the extent to which the data reflected "noise" or "guessing" on the part of respondents, or reflected respondents' awareness of *other* companies using the name OMEGA. This failure to account for noise clearly skewed the results of the OMEGA Interpretation survey, as demonstrated in the survey results themselves. Thus, a considerable number of Fouss's respondents gave clearly "wrong" -- from OSA's perspective -- associations (such as cars and computers) with the name "Omega." Unquestionably, these "wrong" associations are "noise" or were references to entities other than OSA, and should have been subtracted from the percent who gave – from OSA's perspective – "right" associations. (Lieberman Critique p. 6). There is no indication that Fouss made any efforts to account for this "noise" or otherwise to provide adequate controls for his surveys.

## CONCLUSION

For the foregoing reasons, the Court should preclude the proffered expert testimony and report of James H. Fouss.

Dated:  September 15, 2004
New York, NY


Of counsel:

Victoria Haje
Michelle R. Tepper

Respectfully submitted,

_____
Thomas A. Smart (CT 21462)
Paul C. Llewellyn (CT 25417)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
(212) 836-8000

Thomas E. Minogue (CT 06845)
MINOGUE BIRNBAUM LLP
237 Elm Street
New Canaan, CT  06840
(203) 966-6916

*Attorneys for Defendants and for
Counterclaim-Plaintiff*