**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OMEGA, S.A.,

                Plaintiff,

      v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC, INC., AND
OMEGA PRESS, INC.,

                Defendants.

OMEGA ENGINEERING, INC.,

                Counterclaim-Plaintiff,

      v.

OMEGA, S.A. and
THE SWATCH GROUP LTD.

                Counterclaim-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.:
3:01 CV 2104 (MRK)

**DECLARATION OF DR. SEYMOUR LIEBERMAN**

I, Dr. Seymour Lieberman, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the Chairman of The Epsilon Group Inc., a market research consulting organization, and Founder and Managing Director of Lieberman Research Inc., a market research firm and public opinion polling organization located in New York City. A copy of my curriculum vitae, which is attached as Exhibit A, includes all publications I authored in the past ten years.

2.     I have a Ph.D. in social psychology from the University of Michigan and have spent over 40 years in the area of market research. I have supervised more than 1,000

consumer surveys, including the type of market research I conducted for plaintiff's counsel in this litigation. A listing of my testimony within the past four years is attached as Exhibit B.

3.     I have lectured on survey research methods at the University of Michigan, Columbia University, Vanderbilt University, the Baruch School of the City University of New York, the University of California, and Fairleigh-Dickinson.

4.     I have served as a research consultant for the American Cancer Society, the American Lung Association, the President's Committee for Health Education, the United Jewish Appeal, the Presbyterian Church, Major League Baseball, and the University of Michigan.

5.     I am a member of the American Psychological Association, the American Association for Public Opinion Research, the American Marketing Association, the Advertising Research Foundation, and the Market Research Council.

## The Omega Survey Conducted by Fouss Market Research Inc.

6.     I was asked by Kaye Scholer LLP, counsel for defendants in this action, to analyze and evaluate the surveys conducted by Fouss Market Research Inc. ("Fouss") on behalf of Omega S.A. in this case. I am being compensated at my standard rate of $650 per hour for my consulting and testimony.

7.     A copy of my report analyzing and evaluating the Fouss surveys is attached as Exhibit C. As I explain in detail in Exhibit C, the Fouss surveys suffer from numerous methodological and analytical flaws. As a result, it is my opinion that the surveys are not probative with respect to the issues in this case and do not support the key conclusions set forth in the Fouss report.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York,

New York on June 4, 2004.

_____
Dr. Seymour Lieberman

Exhibit A

## About Dr. Seymour Lieberman

Dr. Seymour Lieberman is Chairman of The Epsilon Group Inc., a market research consulting organization, and Founder and Managing Director of Lieberman Research Inc., a market research and public opinion polling organization.

Dr. Lieberman is a social psychologist who received his Ph.D. from the University of Michigan.

From 1948 to 1955, Dr. Lieberman had a research appointment at the Survey Research Center of the University of Michigan. At the Survey Research Center, he served as Senior Study Director in the Human Relations Program where he conducted a series of studies on the structure and functioning of large organizations. The studies dealt with employee morale, productivity, absenteeism, turnover, supervisory practices and union-management relations. The organizations in which studies were conducted included industrial, governmental and voluntary institutions.

In 1956, Dr. Lieberman joined Kenyon & Eckhardt, an advertising agency, as a Research Group Head. He later became Associate Research Director, Communications Group Head, and then Vice President and Director of Research. He was on the agency's Board of Directors and served as a member of the agency's Marketing Plans Board and Creative Review Board.

In 1966, Dr. Lieberman formed Lieberman Research Inc., an organization established to conduct studies in the fields of public opinion research, market research and communications research.

In 1993, Dr. Lieberman formed The Epsilon Group Inc., a market research consulting organization.

Dr. Lieberman has lectured on survey research methods at the University of Michigan, Columbia University, Vanderbilt University, the Baruch School of the City University of New York, the University of California, and Fairleigh-Dickinson.

Dr. Lieberman has served as a Research Consultant for the American Cancer Society, the American Lung Association, the President's Committee for Health Education, the United Jewish Appeal, the Federation of Jewish Philanthropies, the Presbyterian Church, the New York City Youth Board, the Hastings School System, and Major League Baseball.

Dr. Lieberman is a member of the American Psychological Association, the American Association for Public Opinion Research, the American Marketing Association, the Advertising Research Foundation, and the Market Research Council.

DR. SEYMOUR LIEBERMAN

BIBLIOGRAPHY

"The Use of the Role Concept in the Study of Complex Organizations." Journal of Social Issues, Volume 7, 1951.

"An Analysis of Some Determinants of Non-Scale Types." Presented at American Psychological Association, Chicago, Illinois, 1953.

"The Attitudes and Activities of Physiologists." Survey Research Center, University of Michigan, 1954.

"The Leader Was a Critic." Adult Leadership, Volume 3, 1955.

"The Effects of Changes in Roles on the Attitudes of Role Occupants." Human Relations, Volume 9, 1956.

"Selecting Commercial Spokesmen." Journal of Advertising Research, Volume 1, 1961.

"Effect of Question Wording on Response Distribution." Journal of Marketing Research, Volume 4, 1967.

"How the Public Feels About Annual Physical Check-Ups." Presented at American Cancer Society, New York, New York, 1967.

"Physicians' Attitudes: Key to Patients' Desire for Cancer Check-Ups." Physicians' Panorama, Volume 4, 1968.

"The Relative Effectiveness of Alternative Cancer Education Leaflets." Presented at American Cancer Society, New York, New York, 1968.

"The Relative Effectiveness of Alternative Cancer Education Film Programs." Presented at American Cancer Society, 1969.

"Cigarette Smoking and the Teenager." Presented at American Association of Public Opinion Research, Lake George, New York, 1970.

"The Responsive Consumer: A Study of the Special Marketing Values of Younger Adults in New Product Introductions." American Broadcasting Company, 1970.

"The Annual Crusade for Cancer: Opportunity for Mass Education." Presented at American Cancer Society, Atlantic City, New Jersey, 1971.

## DR. SEYMOUR LIEBERMAN

## BIBLIOGRAPHY

"Uncovering New Product Ideas: How to Get the Consumer to Tell You More Than He Thinks He Can Tell You."  Presented at American Marketing Association, New York, New York, 1971.

"Take Me Out to the Ball Game."  Presented to Major League Baseball, Houston, Texas, 1973.

"Was the Consumer Deceived?"  Presented at American Marketing Association, New York, New York, 1973.

"How to Persuade People to Do the Do-It-Yourself Guaiac Test for Colorectal Cancer." Presented at American Cancer Society, New York, New York, 1974.

"Why Study Public Opinion?" Presented at American Lung Association, Cincinnati, Ohio, 1974.

"The Consumer's Role in New Product Design and Development."  Presented at Industrial Designers Society of America, New York, New York, 1975.

"A Study of Anti-Social and Pro-Social Effects of Television on Children."  American Broadcasting Company, 1975.

"How and Why People Buy Magazines." Presented at Magazine Publishers Association, Hamilton, Bermuda, 1976.

"New Products for New Lifestyles."  Presented at American Marketing Association, Los Angeles, California, 1977.

"The Magazine Buying Habits of People." Folio, 1977.

"Comparative Educational Approaches to Screening for Colorectal Cancer." International Union Against Cancer, Volume 3, 1978.

"The Impact of the Great American Smokeout." Presented at American Cancer Society, New York, New York, 1978.

"Old Demographics, New Demographics and More Demographics."  Presented at National Restaurant Association, Denver, Colorado, 1978.

"Doctors, Patients and Cancer." Presented at Midwest Surgeons Association, Iowa City, Iowa, 1979.

DR. SEYMOUR LIEBERMAN


BIBLIOGRAPHY


"How Receipt of Anti-Smoking Materials Affects Physician Interaction with Smoking Patients."   Presented at American Cancer Society, New York, New York, 1979.

"The New World of Claim Substantiation and Claim Substantiation Research." Presented to American Marketing Association, New York, New York, 1979.

"Product Positioning in the 80's and Beyond."   Presented at Advertising Research Foundation, San Antonio, Texas, 1979.

"The Public Looks at Cancer and Cancer Tests."   Presented at American Cancer Society, San Antonio, Texas, 1979.

"What the American Public Knows and Does About Cancer and Cancer Tests." International Union Against Cancer, Volume 45, 1979.

"A Comparative Study of Public Participation in the 1977, 1978 and 1979 Great American Smokeouts."  Presented at American Cancer Society, New York, New York, 1980.

"Public Attitudes Toward Cancer and Cancer Tests."   Ca Medical Journal, Volume 30, 1980.

"Helping Physicians Help Their Smoking Patients."   Ca Medical Journal, Volume 31, 1981.

"Rural Americans' Awareness and Usage of Cancer Detection Tests." American Journal of Rural Health, Volume 7, 1981.

"Market Segmentation in the Retail Field."  Presented at Southern Retailers Association, Orlando, Florida, 1982.

"The Search for More Sensitive Rating Scales: An Unexpected Solution."  Presented at Market Research Council, New York, New York, 1982.

"Using Market Research for Claim Substantiation."  Presented at Council of American Survey Research Organizations, Washington, D.C., 1982.

"Americans And Their Money."  Published by Money Magazine, 1983.


[SY-BIO (001.07 Ltrs. & Misc.)  -4]

DR. SEYMOUR LIEBERMAN

BIBLIOGRAPHY

"Using Survey Research to Develop and Evaluate Health Communications Programs." Presented at 5th Annual Cancer Communications Conference, Washington, D.C., 1984.

"The Money Boomers."  Published by Money Magazine, 1985.

"Making Psychographic Segmentation Actionable."  Presented at American Marketing Association, Lake Tahoe, Nevada, 1985.

"The Male Food Shopper:  How Men Are Changing Food Shopping In America." Published by People Magazine and Campbell Soup Co., 1985.

"A Study Of The Impact Of A Self-Classification Cancer Risk Assessment Program." Presented at American Cancer Society, New York, New York, 1986.

"The Impact Of Editorial Environment On Brand Acceptance:  A 13-Magazine Analysis." Published by People Magazine, 1986.

"Shopping A La Cart: The Changing Environment Of The Take-Out Food Market." Presented at Supermarket Industry Convention And Educational Exposition, Chicago, Illinois, 1987.

"The Downsizing Of Market Research Departments:  10 Things Suppliers Can Do To Help Out."  Presented at New Jersey AMA Marketing Research Conference,  Atlantic City, New Jersey, 1989.

"Sports Poll '91."  Published by Sports Illustrated Magazine, 1991.

"The American Male '91."  Published by Sports Illustrated Magazine, 1991.

"A Look At the Avid Sports Fan."  The Public Perspective, Volume 2, 1991.

"Market Research: A Strategy Warfare Weapon."  Presented at National Association Of Legal Vendors, Newport Beach, California, 1992.

Exhibit B

CASES IN WHICH DR. SEYMOUR LIEBERMAN
TESTIFIED AT TRIAL OR BY DEPOSITION
IN PAST FOUR YEARS

<u>Kelly Blue Book Company, Inc. v. Primedia Inc. et al.</u>  United States District Court for the
Central District of California.  Case SACV 00-0060.DOC (2000) (deposition).

<u>Coach, A Division of Sara Lee Corporation v. We Care Trading Co., Inc.</u>  United States District
Court for the Southern District of New York.  94 Civil 11672 (2001) (trial).

<u>Kelly Blue Book Company, Inc. v. Orion Publishing Company, Inc.</u>  United States District Court
for the Central District of California.  Case SACV 00-849 DOC (ANx) (2001) (deposition).

<u>Marvin Rosenblum, et al. v. Orwell Productions, Inc., et al.</u>  United States Court for the Northern
District of Illinois, Eastern Division.  Case Number 00 C 5034 (2001) (deposition and
preliminary hearing).

<u>Surfvivor Media, Inc. and Peter S. Deptula v. Survivor Productions L.L.C., CBS Broadcasting,
Inc., CBS Worldwide Inc. and WPC Brands, Inc.</u>  United States District Court for the District of
Hawaii.  Civil No. CV 0100509 HG (LEK) (2002) (deposition).

<u>April Pruitt-Summers et al. v. Pfizer Inc.</u>  Circuit Court of Cook County, Illinois, County
Department, Chancery Division.  99 Civ. 02386 (2002) (deposition).

<u>Vertigo Licensing Group, L.P., et al. v. Succa South Beach, Inc., et al.</u>  American Arbitration
Association, Commercial Arbitration Division.  Case No. 13-1140188202 (2002) (arbitration
hearing).

<u>Millennium Import Company v. Sidney Frank Importing Co., Inc.</u>  United States District Court
for the District of Minnesota.  Civil No. 03-5141 JRT/FLN (2004) (deposition).

Exhibit C

CRITIQUE OF

"CONSUMER PERCEPTIONS OF OMEGA"

FOUR SURVEYS CONDUCTED BY FOUSS MARKET RESEARCH INC.

BY

DR. SEYMOUR LIEBERMAN

CHAIRMAN, THE EPSILON GROUP, INC.

JUNE, 2004

## ASSIGNMENT

I was asked to review and evaluate a series of four surveys conducted by Fouss Market Research Inc. regarding consumers' associations with the name "Omega" and consumers' perceptions of various internet sites which include the name "Omega."

The four surveys – under the general title "Consumer Perceptions of Omega" – were conducted by Fouss in connection with litigation between Omega S.A. (hereafter referred to as OSA), the Plaintiff, and Omega Engineering, Inc. et al. (hereafter referred to as OEI), the Defendants.

<u>CREDENTIALS</u>

I am Chairman of The Epsilon Group Inc., a market research consulting organization.  In addition, I am Founder and Managing Director of Lieberman Research, Inc., an East Coast-based market research organization, and Co-Founder and Managing Director of Lieberman Research Worldwide Inc., a West Coast-based market research organization.  (Both Lieberman Research Inc. and Lieberman Research Worldwide Inc. are cited in Honomichl's list of the country's largest market research organizations.)

I have a Ph.D. in Social Psychology from the University of Michigan and have spent more than 40 years in the field of market research.  I have supervised more than 1,000 consumer surveys, including numerous surveys in the areas of perception and communication.

I have lectured on survey research methods at the University of Michigan, Columbia University, Vanderbilt University, the Baruch School of the City University of New York, the University of California, and Fairleigh-Dickinson.

I have served as a survey research consultant for the American Cancer Society, the American Lung Association, the President's Committee For Health Education, the United Jewish Appeal, the Presbyterian Church, and the University of Michigan.

I am a member of the American Psychological Association, the American Association of Public Opinion Research, the American Marketing Association, the Advertising Research Foundation, and the Market Research Council.

## FOUSS'S SURVEYS

1.    Fouss Market Research Inc. conducted four surveys in connection with the litigation between OSA and OEI.

One survey was designed to assess what the term "Omega" means to the consumer population.

The other three surveys were designed to assess consumer perception of three internet web sites – omegawatch.com, omegatime.com and omegatime.net. (One survey was conducted for each of the three site names.)

2.    The surveys were based on data collected from 801 respondents – about 200 respondents for each of the four surveys that Fouss carried out.

The respondents in all four surveys consisted of AOL subscribers, 18 years old or older, who have annual incomes of $80,000 and higher and who responded to a request to fill out a questionnaire on AOL Opinion Place – AOL's survey operation.

3.    In the survey regarding consumers' perceptions of the name "Omega," the respondents were asked how familiar they were with the name "Omega"; what, if anything, the name "Omega" suggested to them; what products, if any, are "manufactured, sold, licensed or available with the name 'Omega' as part of the product or service name"; and whether or not they think the approval of Omega is required for "watches and timepieces" and for four other product or service fields (financial services, home improvement products, clothing and food).

In the three surveys regarding consumers' perceptions of the web sites, the questions that respondents were asked overlapped in some respects and differed in other respects.  In two of the three surveys (but not the third), the respondents were shown a web page and asked whether the two sites mentioned on the web page are "associated, affiliated or have any relationship with each other" and, if so, why they thought that the two sites are "associated, affiliated or have a relationship with each other."  In two of the three surveys (but not the third), the respondents were asked to indicate the "products, information, literature or services" they would expect to find on the web site shown to them.  (Why different questions were asked in the three presumably parallel studies is never made clear in the report that Fouss issued.)

CRITIQUE

1.      In reviewing the four surveys, I'd like to start with some problems that the four surveys have in common and then go on to discuss specific problems with the two basic types of surveys that Fouss carried out – namely, the survey dealing with what the name "Omega" meant to respondents and the surveys dealing with how respondents perceived various websites which included the name "Omega."

General Criticisms

2.      As indicated earlier, the four surveys were all based on responses from higher-income AOL subscribers who filled out a questionnaire that appeared on AOL Opinion Place. This type of internet survey is generally based on a very low response rate – as low as 5% or perhaps even as low as 1% or 2%. Consequently, it is impossible to determine how representative Fouss's respondents were of the universe being sampled. And yet Fouss contends that the respondents being surveyed were representative of all U.S. higher income households. Fouss even goes so far as to project that the responses to Fouss's surveys would differ by a relatively small margin of sampling error (*i.e.*, 6 percentage points in either direction) from what would have been obtained by interviewing all higher-income Internet users in the United States. This represents a highly questionable and speculative projection given the low response rate on which Fouss's surveys were based.

3.      A more severe problem was the fact that Fouss surveyed <u>consumers</u> who purportedly are OSA's market target, rather than the <u>engineers and scientists</u> who are OEI's market target. As I understand it, it is the defendants' universe (OEI), not the plaintiff's universe (OSA), which should have been surveyed. It is no big surprise that <u>consumers</u> interpret "Omega" as referring to watches; it leaves unresolved how engineers and scientists interpret the "Omega" name.

4.      Even if we accept the premise that consumers were the proper group to be interviewed (which I do <u>not</u>), how Fouss did this was flawed. The universe sampled should have consisted of buyers and prospective buyers of the product category in question -- in this case, people who bought an expensive watch in, say, the past two years, or who expected to buy an expensive watch in, say, the next two years. Fouss used income ($80,000 and above) as a surrogate for being a buyer or prospective buyer of expensive watches, but this was at best a crude approximation of OSA's market target. Fouss offers no evidence that any of his respondents owned an expensive watch – and, by Fouss's own acknowledgement, less than half of the respondents in Fouss's surveys expected to buy an expensive watch ($250 or over) in the next two years.

5.      None of the Fouss studies had a "control" group, so there is no way of evaluating the extent to which the data reflected "noise" or "guessing" on the part of respondents.

6.      Several of the questions called for open-ended responses, but I did not have access to Fouss's data so I could not determine the extent to which the open-ended responses were accurately coded.

How the Name "Omega" Is Interpreted

7.    Now let's turn to the survey which asked consumers what the name "Omega" meant to them. As I indicated earlier, it was not at all surprising – considering the fact that <u>consumers</u>, not engineers and scientists, were surveyed – that watches were the product that respondents most often associated with the name "Omega." At the same time, a considerable minority gave "wrong" associations (such as cars and computers) with the name "Omega." These "wrong" associations can be viewed as "noise" and perhaps subtracted from the percent who gave – from OSA's perspective – "right" associations.

8.    When Fouss's respondents' were asked what the name "Omega" suggests to them, watches was the response given most often – mentioned by 28%. But almost as many respondents said that "Omega" meant the Greek letter (14%) or The End (12%). ("Omega" is the last letter of the Greek alphabet.) This probably reflects the fact that, according to Fouss's report (page 20), a sizeable 46% acknowledged that the name "Omega" was not particularly familiar to them.

9.    In the same survey, Fouss asked respondents what I regard as a highly leading and ambiguous question – *i.e.*, whether or not the approval of "Omega" was needed for the following items: "watches and timepieces, financial services, home improvement products, clothing, and food products." There are several glaring problems with this question. First, it is unclear which "Omega" the respondents had in mind. Second, the question itself was leading because it implanted the idea of approval in respondents' minds, without any "control" safeguards. Third, the respondents were asked whether Omega's approval is required for the compound phrase "wristwatches and timepieces." Consumers don't think in these compound terms; moreover, the term "timepieces" may be alien to them. (When asked what products are made with the name "Omega," watches were mentioned by 54%, while timepieces were mentioned by only 2%. Page 22 of Fouss's report. Similarly, when asked what the name "Omega" suggests to them, watches were mentioned by 22%, while timepieces were mentioned by only 2%. Page 21 of Fouss's report.) The way the question was worded might be a thinly disguised attempt to tie "wristwatches" and "timepieces" together.

10.    While 66% said that Omega's approval was required for the compound term "wristwatches and timepieces," 15%-24% also thought that Omega's approval was required for various other product categories – ranging from financial services to food products – as well. Fouss interprets this as meaning that the Omega name has value beyond the watch field. An alternative interpretation is that this was "noise" and reflects the leading nature of the approval question. A third interpretation might be that some consumers relate the term "Omega" to other product categories, not watches.

How OEI Web Sites Are Interpreted

11.    Now let's turn to the three surveys dealing with the internet pages which mentioned two alternative web sites. After being shown the references to the two web sites, the respondents were asked whether they thought that the two web sites are "associated, affiliated or have any relationship with each other." Once again, we are dealing with a leading and ambiguous

question. Fouss did not even include the phrase "or not" in the question (as Fouss did when asking the approval question in the other survey that Fouss carried out). Moreover, the term "any relationship with each other" added ambiguity to the question. (Some respondents apparently only interpreted this as meaning that "Omega" is in both web pages names, rather than that the two entities had a positive business relationship with each other. Pages 12 and 16 in Fouss's report.)

12.     As with the other survey, Fouss's "findings" in the web page surveys are likely distorted by the fact that <u>consumers</u>, rather than engineers and scientists, were being surveyed. Consumers were probably only aware of Omega as a consumer watch company and this might have led some of them to believe that the two Omegas were affiliated with each other. On the other hand, engineers and scientists (who are OEI's target market) might have been more aware of both Omegas and, being more sophisticated and more knowledgeable, they might have been aware that the two Omegas were <u>not</u> affiliated with each other.

13.     For the above-stated reasons, I do <u>not</u> believe that the four Fouss surveys provide probative value in the OSA/OEI litigation.


Dr. Seymour Lieberman
Chairman, The Epsilon Group Inc.
June 4, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2004, I caused the foregoing Declaration of Dr. Seymour Lieberman and exhibits thereto to be served by Federal Express overnight delivery upon the following counsel for Omega, S.A. and The Swatch Group Ltd:

Jess M. Collen, Esq.
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Ossining, NY 10562

Paul C. Llewellyn

Doc # 30658163