**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

OMEGA, S.A.,

                    Plaintiff,

    v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC, INC., AND
OMEGA PRESS, INC.,

                    Defendants.

OMEGA ENGINEERING, INC.,

                    Counterclaim-Plaintiff,

    v.

OMEGA, S.A. and
THE SWATCH GROUP LTD.

                    Counterclaim-Defendants.

Civil Action No.:
3:01 CV 2104 (MRK)

**REDACTED**

---

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 56(a)1, defendants Omega Engineering, Inc. ("OEI"),

Omega Scientific, Inc. ("OSI") and Omega Press, Inc. ("OPI") (together, "defendants") submit

this statement in support for their motion for summary judgment dismissing the complaint of

plaintiff Omega S.A. ("OSA") in its entirety, and in support of OEI's motion for summary

judgment on its counterclaim for cancellation, pursuant to 15 U.S.C. § 1064, of OSA's federal

trademark registrations Nos. 708,731 and 1,290,661, and submit that there is no genuine issue to

be tried as to the following facts.

A.    **Defendants' Scientific and Industrial Goods Offered Under Their OMEGA Marks**

1.    OEI was founded in 1962 by Mrs. Betty Ruth Hollander.  OEI's very first products were thermocouples, devices used in scientific and industrial fields (such as factories and laboratories) to measure temperatures.  The name Omega Engineering was selected because an early user of the thermocouples made by Mrs. Hollander at her kitchen table was a company called Alpha Molykote.  Alpha being the first letter of the Greek alphabet, Mrs. Hollander decided to adopt the last letter of the Greek alphabet, Omega, for her company, out of respect for the founder of Alpha Molykote.  (M. Hollander Declaration ("Dec.") ¶ 2).

2.    Although OEI initially used the Greek letter Omega standing alone as a design mark, the company eventually stopped using that design in favor of the so-called "Omega bug," a design mark consisting of the juxtaposed Greek letters Omega ($\Omega$) and Epsilon ($\text{E}$) (the "OEI Bug"), which it has used for nearly 40 years.  (M. Hollander Dec. ¶ 4 & Ex. A).

3.    OEI began to sell its thermocouples to other customers and over the last 42 years OEI has grown as a company.  OEI now markets, distributes and sells over 68,000 different process and control products for use in scientific and industry, under more than 100,000 product numbers, under its OMEGA trademarks.  (M. Hollander Dec. ¶ 3).

4.    The products marketed, distributed and sold under OEI's OMEGA marks include scientific apparatus for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, flow and other variable parameters.  (M. Hollander Dec. ¶ 5).

5.    Because the measurement of time is often a critical aspect of the measurement and control of variable parameters in scientific and industrial applications, some of OEI's apparatus for measuring and controlling variable parameters contain a timing function.  (M. Hollander Dec. ¶ 7).

6.  Since at least as early as 1987, OEI has also marketed, distributed and sold, under its OMEGA marks, time-related goods for science and industry, such as industrial and scientific period timers and industrial and scientific clocks, and similar computer-controlled measurement, timing and display apparatus that are used in the measurement and control of variable parameters in industrial and scientific processes.  (M. Hollander Dec. ¶ 6)

7.  OEI also offers services relating to its products for its scientific and industrial customers.  For example, OEI offers telecommunications services in the form of online and telephonic information services relating to its scientific and industrial products.  (M. Hollander Dec. ¶ 9).

8.  OEI also offers calibration, repair, data collection and data analysis to its scientific and industrial customers, and has done so for many years.  (M. Hollander Dec. ¶ 10).

9.  OEI also offers to its industrial and scientific customers various technical books, software and other publications and printed matter for industrial and scientific uses, including, for example, handbooks for scientists and engineers, charts, posters and "deck cards" (index card type cards with product and technical information) bearing scientific data and technical information, and similar items.  (M. Hollander Dec. ¶ 10 & Exs. B-F).

10. OEI manufactures and sells goods of the highest quality.  Many of OEI's products are certified to meet the stringent "Mil Spec" standards of the United States Department of Defense, and OEI sells many such products directly to the land, sea, air and space divisions of the United States Military.  Furthermore, the return rate for OEI's products is extremely low. (M. Hollander Dec. ¶ 8).

11. OPI is an affiliate of OEI, which has operated as a trade vehicle of OEI for selling scientific and technical books, computer software and other printed matter under OEI's

OMEGA marks. OPI was created in the mid-1980's, and used the trade name and trademark OMEGA and related OMEGA marks in connection with the technical books, computer software and other printed matter relating to the industrial and scientific trades which is offered to its customers. (M. Hollander Dec. ¶ 11).

12. OSI is an affiliate of OEI, which has operated as a trade vehicle of OEI for the sale of scientific and technical instruments to the scientific and industrial trades under OEI's OMEGA marks. OSI was created in the mid-1980's, and used the trade name and trademark OMEGA and related OMEGA marks in connection with the sale of scientific and technical instruments to the scientific and industrial trades. (M. Hollander Dec. ¶ 12 and Ex. G).

## B.    Defendants' Scientific and Industrial Customers and Marketing Channels

13. Defendants do not offer or sell any goods or services under OMEGA marks for use in markets or fields outside of industry and science. (M. Hollander Dec. ¶¶ 13, 15-16)

14. At no time in the over 40-year history of OEI have defendants marketed or sold any goods or services under any OMEGA marks to consumers. (M. Hollander Dec. ¶ 15). (Riggs Tr. 258)

15.    Defendants do not offer or sell any consumer products to consumers. The only time-related devices that defendants sell are marketed for scientific and industrial uses and cannot be used by consumers to tell time and are not offered for sale to consumers or for consumer use. Thus, OEI does not sell any watches or any clocks that can be used in the home to tell time. Rather, the only time-related devices that defendants have offered to sell or sold are period-timers or scientific or industrial clocks and similar apparatus that are used to regulate scientific, research or manufacturing processes in laboratories or factories. (M. Hollander Dec. ¶ 15).

16. At no time have defendants marketed or sold goods or services under any OMEGA marks for use in timing athletic competitions or sports events. (M. Hollander Dec. ¶ 16).

17. Defendants' customers consist solely of companies in science and industry. For example, defendants sell to manufacturers, scientific laboratories, and engineering and science departments of universities. Defendants' purchasers are sophisticated buyers, who are often scientists or engineers themselves, or highly specialized purchasing agents for sophisticated engineering, manufacturing or technical companies, all of whom are extremely knowledgeable regarding technical, engineering and scientific issues and the types of products they are seeking to purchase from OEI. These purchasers exercise great care in making their purchasing decisions and come to OEI specifically for the specialized scientific and industrial devices which OEI sells. (M. Hollander Dec. ¶ 13 & Exhibit H).

18. The scientific and industrial process and control products that OEI sells vary in price from a minimum of a few dollars to a maximum of thousands of dollars. A typical customer order is in the range of several hundred dollars. (M. Hollander Dec. ¶ 14).

19. OEI also advertises and markets its goods and services to the science and industry trades through a large number of specialized trade publications, scientific trade journals and direct mail. For example, OEI advertises in trade journals such as Evaluation Engineering, Compliance Engineering and Water & Wastes Digest. The typical readers of these scientific and industrial trade journals are sophisticated scientists and engineers in specialized industries or the engineering departments of universities, who use OEI's products in connection with their work. Hollander Dec. ¶¶ 17-18 and Exs. I-L).

20. In addition, OEI also advertises its scientific and industrial products and services at numerous scientific and industrial trade shows.   (M. Hollander Dec. ¶ 19 and Ex. M).

21. OEI also advertises its products through direct mailings to targeted purchasers in science and industry in the form of "deck cards," internally produced scientific journals and other brochures and marketing literature.  OEI often uses the well know "Dilbert" comic strips in its marketing materials and product packaging because many of the engineers and technicians are "Dilbert" devotees, thus making these marketing materials more appealing to OEI's scientific and industrial customers.  (M. Hollander Dec. ¶¶ 20-21 and Exs. E, F, N-P).

22. OEI also advertises and markets its goods and services to the scientific and industrial markets through its web site and through a series of "handbooks" published by OEI and OPI, which contain product information as well as technical information of interest to engineers and scientists.  (M. Hollander Dec. ¶¶ 21-22 and Exs. B-D, N-P).

23. OEI emphasizes in its handbooks and marketing materials that it sells products manufactured in the United States.  Most of OEI's products are manufactured in the United States, and OEI's marketing and advertising materials routinely, repeatedly, consistently and prominently emphasize this fact.  (M. Hollander Dec. ¶ 22 & Exs. B-D, Q).

24. For example, OEI's primary handbooks of products are called the "Made in the USA Handbook Volume 1" and the "Made in the USA Handbook Volume 2."  The covers of these handbooks, and OEI's other handbooks, bear variations of paintings by the famous Americana painter Norman Rockwell.  OEI specifically sought and obtained a license from the Rockwell Foundation and Curtis Publishing in order to use these Normal Rockwell paintings to emphasize the Made in the USA message of OEI and the fact that OEI is itself an American company that continues to sell as many  "Made in the USA" products as possible.  Also, a "Made

in the USA" red, white and blue logo or an American flag appears on almost every single page inside the handbooks. (M. Hollander Dec. ¶ 22 & Exs. B-D).

25. In addition to the United States, defendants also market and sell their products abroad, including in Europe, and have done so for decades. OEI products marketed and sold abroad are sold under the OMEGA trademarks by subsidiaries and sales offices of OEI in England, Canada, France, Germany, Czech Republic, the Benelux nations and other countries. The majority of the products that OEI sells in the United States are also sold in Europe and other foreign countries. These products include period timers, which have been sold under the OMEGA marks in Europe and other countries abroad for many years. OEI also distributes sales literature internationally to scientific and industrial customers and accepts purchases from these companies on its omega.com website. (M. Hollander Dec. ¶ 23).

26. Over the years, OEI has spent substantial sums in advertising and marketing costs relating to its OMEGA-branded goods and services in the United States and abroad. For example, in the past five years, OEI has spent in excess of $    million advertising and marketing its scientific and industrial process control products in the United States and abroad, with the majority of these expenditures in the United States and substantial expenditures abroad. (M. Hollander Dec. ¶ 24 and Ex. R).

**REDACTED**

27. Additionally, OEI has achieved substantial sales under its OMEGA marks, selling hundreds of millions of dollars of scientific and industrial process control products since 1962, with sales for the period from 1999 to 2003 amounting to some $     million. (M. Hollander Dec. ¶ 25 and Ex. S).

**REDACTED**

C.    **Defendants' Trademark Registrations and Applications**

28. OEI's earliest United States trademark registration for the OMEGA trademark for industrial and scientific apparatus was issued in 1966. This registration, U.S. Registration

No. 818,251, is a valid, subsisting, existing and incontestable trademark registration.  (Riggs Dec. ¶ 2 & Ex.A).

29. OEI is also the owner of more than 75 other valid, subsisting and existing United States federal trademark registrations for trademarks or service marks that include the word OMEGA, more than 50 of which are incontestable marks.  The United States trademark registrations that Omega Engineering owns for the trademark OMEGA and variations thereof are listed on Exhibit B to the Riggs Dec.; those indicated with an asterisk are incontestable.  (Riggs Dec. ¶ 3 & Ex. B).

30. OEI owns a valid, subsisting and existing federal trademark registration for the mark OMEGA that covers industrial and scientific timers, Registration No. 2,022,762 (the "'762 Registration").  The '762 Registration covers, among other goods, "timers, namely period timers . . . industrially and/or scientifically employed, in Class 9" and "industrial and scientific clocks, in class 14."  (Riggs Dec. ¶ 4 & Ex. C).

31. OEI owns a valid, subsisting and existing federal trademark registration for its omega/epsilon design mark, Registration No. 2,034,705 (the "'705" Registration).  The '705 Registration covers, among other goods, "timers, namely period timers . . . industrially and/or scientifically employed, in Class 9" and "industrial and scientific clocks, in class 14."  (Riggs Dec. ¶ 5 & Ex. D).

32. OEI owns a valid, subsisting and existing federal trademark registration for the mark OMEGA, Registration No. 2,236,657 (the "'657" Registration).  The '657 Registration covers "telecommunications, namely, communications by computer terminals, communications by telephone, computer aided transmission of messages and images; and communications via a global computer information network," in Class 38."  (Riggs Dec. ¶ 6 & Ex. E).

33. OEI owns a pending federal trademark application for the design mark Ω.com – that is, the Greek letter Omega followed by ".com" – Serial No. 76/337,374 (the "'374 " Application). The '374 Application is an intent to use application under Section 1(b) of the Lanham Act, 15 U.S.C. 1051(b). The application covers a variety of goods and services relating to OEI's industrial and scientific products, including many of the industrial and scientific products and related printed materials offered by OEI under other OMEGA marks, as well as a variety of services relating to OEI's products.   (Riggs Dec. ¶ 7 & Ex. F)

34. OEI applied to register Ω.com as a trademark after it OEI learned that it would eventually become possible to reach web sites using domain names containing Greek letters, and learned that such domain names could be registered now. (Many OEI sales are made over the internet and OEI uses and advertises a variety of domain names to connect its scientific and industrial customers to its www.omega.com web site.) OEI registered the domain name Ω.com because it intends to use that domain as an alternative way to reach its homepage, once it becomes possible for internet users to access domain names containing Greek letters. OEI applied to register the trademark Ω.com because it intends to use this trademark to advertise its goods and services in conjunction with the use of the domain name, just as OEI does with its trademark OMEGA.COM and corresponding domain name. (M. Hollander Dec. ¶ 26).

35. The '374 Application was suspended as a result of this litigation. No final decision has been rendered by the PTO and no registration has been issued. OEI has not yet made use in commerce of the mark covered by this intent-to-use application.   (Riggs Dec. ¶ 8 & Ex. F; M. Hollander Dec. ¶ 29).

36. OEI owns a pending federal trademark application for a design mark consisting of the Greek letter Ω, Serial No.76/337,450 (the "'450" Application). The '450

Application is an intent to use application under Section 1(b) of the Lanham Act, 15 U.S.C. 1051(b).  The application covers a variety of goods and services relating to OEI's industrial and scientific products, including many of the industrial and scientific products and related printed materials offered by OEI under other OMEGA marks, as well as a variety of services relating to OEI's products.  (Riggs Dec. ¶ 9 & Ex. G).

37.  The '450 Application  for the Greek letter Omega standing alone was filed in conjunction with the filing of the domain Ω.com as well.  As explained above in Paragraph 2, OEI originally used the Greek letter Ω on its goods but stopped using that design in favor of the "OEI bug."  Because OEI has registered the domain name Ω.com and intends to use that domain name (see ¶ 34, *supra*), it also intends to use the Greek letter Ω as a mark if its application to register that mark is approved.  (M. Hollander Dec. ¶ 27).

38.  The '450 Application was suspended as a result of this litigation.  No final decision has been rendered by the PTO and no registration has been issued.  OEI has not yet made use in commerce of the mark covered by this intent-to-use application.  (Riggs Dec. ¶ 10 & Ex. G; M. Hollander Dec. ¶ 29).

39.  OEI owns a pending federal trademark application for the design mark OM€GA – that is, the word OMEGA with the "E" replaced with a stylized "E" that is similar to the "Euro" currency symbol – Serial No. 76/242,073 (the "'073" Application).  The '073 Application is an intent to use application under Section 1(b) of the Lanham Act, 15 U.S.C. 1051(b).  The application covers a variety of goods and services relating to OEI's industrial and scientific products, including many of the industrial and scientific products and related printed materials offered by OEI under other OMEGA marks, as well as a variety of services relating to OEI's products.   (Riggs Dec. ¶ 11 & Ex. H).

40. The business reason for OEI selecting the mark OM€GA was because OEI offers and sells its goods to customers in the United States and throughout the world through direct sales from OEI's offices in Connecticut, and OEI wanted to offer American-made goods to European customers but add a European flavor to them to appeal more to European customers. (M. Hollander Dec. ¶ 28).

41. The '073 Application was suspended as a result of this litigation. No final decision has been rendered by the PTO and no registration has been issued. OEI has not yet made use in commerce of the mark covered by this intent-to-use application. (Riggs Dec. ¶ 12 & Ex. H; M. Hollander Dec. ¶ 29).

42. Although OEI does not yet use the marks that are the subject of the '374, '450 and '073 Applications, it does intend to use the marks in connection with the goods and services covered in the applications once this litigation concludes and the applications are allowed by the Patent & Trademark Office. (M. Hollander Dec. ¶ 29).

43. OEI already markets and sells many of the goods and services covered by the '450, '073 and '374 Applications, but does not yet do so under the marks covered by these applications. For example, OEI already sells many of the industrial and scientific goods and services covered by these applications under other OMEGA marks. It also offers some of the services covered by these applications – for example, advertising services and office administration services – to some of its affiliated companies. (M. Hollander Dec. ¶ 43).

**D.    OSA's Luxury Wristwatches**

44. Omega S.A. ("OSA"), a subsidiary of The Swatch Group Ltd., is a Swiss company that sells luxury watches, jewelry and related-watch products, such as watch bands and spare parts, under the mark OMEGA and a design mark consisting of the Greek letter Omega ($\Omega$). (Sauser Rupp Tr. 41, 63, 65-66, 89-90; Smart Dec. Ex. G; Emmons Tr. 14, 34-35,

40; Rentsch Tr. 104, 119). The only services offered by OSA under the OMEGA marks in the United States are watch repair services. (Sauser Rupp Tr. 66-67).

45. Swatch Group (U.S.) is the United States licensee of OSA that distributes and sells OSA's OMEGA-branded watches and jewelry in the United States. (Emmons Tr. 15-16, 25-26, 30; Rentsch Tr. 104; Sauser Rupp Tr. 69-70). The majority of such sales in the United States are wristwatches, while jewelry sales consist of only a small percent of sales. (Emmons Tr. 215; Rentsch Tr. 108).

46. OMEGA watches are upscale, luxury goods, and the prices of these watches correspond to that class of products. (Emmons Tr. 61-62; Sauser Rupp Tr. 87). The lowest suggested retail price for an OMEGA watch sold in the United States is $1,200, and the highest price is $79,000. (Emmons Tr. 59-60).

47. Swatch Group (U.S.) sells OSA's OMEGA wristwatches in the United States to retail consumers, through jewelers and upscale department stores. (Emmons Tr. 69-70; Sauser Rupp Tr. 89-90; Rentsch Tr. 104-05). Independent jewelers comprise 95 percent of sales and upscale department stores make up the additional 5 percent. (Emmons Tr. 77; Rentsch Tr. 104-05; Sauser Rupp Tr. 89-90). In addition to retail outlets, Swatch Group (U.S.) sells to corporate accounts that may, for example, purchase OMEGA watches for an employee incentive program. (Emmons Tr. 86-87; Smart Dec. Ex. I).

48. A consumer wishing to purchase an OMEGA watch must visit an authorized retailer. (Sauser Rupp Tr. 98). OMEGA watches cannot be purchased from the official Omega website and any sales via the internet are not authorized. (Emmons Tr. 44-45; Sauser Rupp Tr. 80-82; Smart Dec. Ex. H). While consumers may call OSA's toll-free number to find

information about OMEGA watches and authorized retailers, consumers may not purchase OMEGA watches directly over the telephone. (Emmons Tr. 107).

49. Because OMEGA watches are expensive, a consumer of an OMEGA watch will usually not buy on impulse, but rather will spend a significant amount of time deliberating the purchase. (Emmons Tr. 168-69).

50. Swatch Group (U.S.) advertises OMEGA watches in consumer brochures, newspapers, magazines and billboards. (Emmons Tr. 56, 111, 132, 148; Sauser Rupp Tr. 121-23). OMEGA watch advertisements have appeared in *Fortune*, *Forbes*, *Saveur*, *Esquire* and *Golf Digest* and newspaper ads have run in *The New York Times*, *The Wall Street Journal* and *The Los Angeles Times*. (Emmons Tr. 111-17, 133-34; Sauser Rupp Tr. 104-05; Smart Dec. Ex. J). Retail jewelers may also advertise OMEGA watches in their own local ads. (Emmons Tr. 73). This advertising may consist of newspaper ads, radio ads, and television commercials. (Emmons Tr. 73; Smart Dec. Ex. J).

51. OSA attends only two trade shows; one is held in Basel, Switzerland while the other is held in Las Vegas, Nevada. (Emmons Tr. 208-12). Both shows are devoted to watches and jewelry. (Emmons Tr. 208-12).

52. All OMEGA watches are manufactured in Switzerland and are advertised as Swiss-made, a fact that OSA believes provides its watches with prestige and cachet. (Emmons Tr. 40-41; Sauser Rupp Tr. 77; Rentsch Tr. 190-91). Indeed, OSA contends that OMEGA watches are famous for being Swiss-made watches. (Rentsch Tr. 190).

53. OSA sponsors a number of sporting events, such as the Professional Golfer's Association ("PGA") tour and regattas. (Emmons Tr. 151; Sauser Rupp Tr. 124-26). Celebrities and famous personalities are often used to promote OMEGA watches, and OSA advertising has

featured Cindy Crawford, Pierce Brosnan, James Bond, Ernie Els, Anna Kournikova and
Michael Phelps.  (Emmons Tr. 185-192; Sauser Rupp Tr. 105-07, 110-15).

**E.     OSA's Specialized Sports Timing Devices**

54. The only other goods or services sold in the United States under OSA's
OMEGA marks are those of Omega Electronics, a licensee of OSA that sells mainly sports
timing devices in the United States.  (Smart Dec. Ex. G; Rentsch Tr. 109, 111, 118-119; Sauser
Rupp Tr. 163-64; Gibbons Tr. 37, 153).

55. Omega Electronics, through its only authorized distributor, GDG Inc., sells
certain OMEGA-branded products — primarily sports timing devices — in the United States.
(Kayal Tr. 43; Gibbons Tr. 46-7).  Omega Electronics' total United States sales in 2003 were
approximately $175,000.  (Kayal Tr. 143; Gibbons Tr. 131; Smart Dec. Ex. R).  In 2002, Omega
Electronics' sold roughly between $100,000 to $150,000 in the United States, while sales were
still lower in 2001.  (Gibbons Tr. 124; Smart Dec. Ex. R).

56. OMEGA-branded products sold by Omega Electronics include touch pads
used in swimming events, starting blocks for use in running events and time display devices for
waterpolo matches.  (Kayal Tr. 64, 78-79, 82, 134-35; Smart Dec. Ex. K).  In many cases,
Omega Electronics or GDG Inc. installs the sports timing equipment and may also manage the
timing for a sports event.  (Kayal Tr. 66-67; Gibbons Tr. 159-63).   Omega Electronics' sports
timing services are offered under the name "Swiss Timing."  (Gibbons Tr. 26; Kayal Tr. 66-67).

57. The prices of sports timing devices sold by Omega Electronics are often in the
thousands of dollars and can reach as high as $25,000.  (Gibbons Tr. 100-03).

58. Omega Electronics, though GDG, Inc., sells sports timing devices primarily to
athletic institutions, athletic organizations and athletic leagues.  (Sauser Rupp Tr. 131; Smart

Dec. Exs. S, T, U; Kayal Tr. 163-177; Gibbons Tr. 137-44). To the extent that Omega

Electronics sells sport timing devices to educational institutions, all sales are made to the sports

department within that school or university, such as the pool operations manager or the school's

aquatic center. (Kayal Tr. 168-69; Smart Dec. Ex. T; Gibbons Tr. 139-41, 148-57).

 59. Omega Electronics sport timing devices are most often purchased via personal

contact. While consumers may browse Omega Electronics website to learn more about the

products, a sale cannot be completed over the Internet. (Kayal Tr. 130-33; Sauser Rupp Tr.

443-44). Similarly, while GDG, Inc. maintains a website, a consumer cannot purchase Omega

Electronics products from the website. (Gibbons Tr. 55; Kayal Tr. 175).

 60. Products from Omega Electronics' sports division are always sold with at

least an e-mail or voice communication and more often than not, customers are given a more

lengthy consultation in order to determine their exact needs. (Gibbons Tr. 55-6). Consumers

who purchase Omega Electronics' products that also require installation and timing services

enter into contracts. (Kayal Tr. 70-71).

 61. GDG, Inc. relies primarily on word-of-mouth to promote Omega Electronics

products. (Gibbons Tr. 163). With the exception of mailing brochures to existing and potential

customers, GDG, Inc. does not advertise Omega Electronics' products and, in fact, has only

distributed one Omega Electronics newsletter to a specific customer in the last year. (Gibbons

Tr. 60, 163-4, 168-69). GDG, Inc. spends less than $10,000 annually on advertising Omega

Electronics' products in the United States. (Gibbons Tr. 181-82).

 62. With the exception of one trade show for the American Swim Coaches

Association in 2001, Omega Electronics does not exhibit its products at trade shows in the

United States. (Kayal Tr. 182-83; Gibbons Tr. 171-72).

63. Advertising of Omega Electronics' products in the United States targets the sports timing market. (Gibbons Tr. 182). Omega Electronics advertises its sports timing devices only through promotional brochures, posters, newsletters and trade journals intended for sport stadiums and sports organizations. (Kayal Tr. 115-16, 119, 198; Gibbons Tr. 82, 179-80).

64. In addition to sports timing equipment, Omega Electronics also has sold in the United States, under the OMEGA mark, a small number of large display boards intended for large sports facilities such as baseball stadiums. Omega Electronics has only sold and installed five such scoreboards within the United States, the most recent of which was in 1998. (Kayal Tr. 142-44; Smart Dec. Ex. R; Gibbons Tr. 112-15). All five scoreboards were sold to large sports organizations — specifically, to Fenway Park (home of the Boston Red Sox), the Sun Devil stadium in Phoenix, Arizona, the Indianapolis Track and Field stadium, the Milwaukee Brewers' stadium and the King County Aquatics Center in Seattle, Washington. (Gibbons Tr. 112-15; Kayal Tr. 142-44; Smart Dec. Ex. R).

65. Omega Electronics also sells passenger information display systems and Radio Frequency Identification Devices ("RFIDs") outside of the United States under the OMEGA marks. (Kayal Tr. 98-102, 246-47).

66. Passenger information display systems are not available for sale in the United States and none have been sold within the United States. (Kayal Tr. 98-100, 246-47; Rentsch Tr. 111-14). Nor are they advertised or marketed in the United States. (Gibbons Tr. 85, 110, 119-20). Passenger information display systems are used in railways, bus stations and airports to display travel-related information, such as arrival and departure times. (Kayal Tr. 95-97). These systems are expensive and can range from $10,000 to millions of dollars for larger projects. (Kayal Tr. 93-94). Consumers who have purchased these systems abroad are sophisticated and

tend to engage in lengthy negotiation processes before entering into a contract with Omega

Electronics. (Kayal Tr. 72, 94).

      67. RFIDs are devices that can be used for access control as a security measure.

(Kayal Tr. 207-212). For example, an RFID can be used for network access to employees'

computers or for access control to a building. (Kayal Tr. 207-08). OMEGA-branded RFIDs are

only advertised and marketed abroad; they are not offered for sale in the United States. (Gibbons

Tr. 119-20; Kayal Tr. 212). The only OMEGA RFID system that has been sold in the United

States was sold to Omega S.A.'s affiliated company, Swatch Group (U.S.). (Kayal Tr. 102-104,

106).

**F.**    **The Lack of Competitive Overlap Between OSA and Defendants**

      68. OSA and Omega Electronics have not made any sales of OMEGA goods for

scientific investigation or industrial application or for use in scientific or industrial fields. (Kayal

Tr. 244-45; Gibbons Tr. 142-45, 153; Rentsch Tr. 120-21, 124, 128-31, 133-34, 138; Sauser

Rupp Tr. 251-52, 270-71). Furthermore, OSA does not have any plans to sell any timing devices

to science or industry. (Sauser Rupp Tr. 168-69). With the exception of the one sale of an RFID

system to an affiliated company, Omega Electronics has sold in the United States only products

that are used for sporting events. (Rentsch Tr. 115-17, 130-31; Kayal Tr. 102-04, 106-07, 250-

51; Gibbons Tr. 54-55).

      69. OSA and Omega Electronics do not sell period timers. (Kayal Tr. 218;

Rentsch Tr. 108, 271; Sauser Rupp Tr. 66). Indeed, when shown OEI period timers at their

depositions, OSA's witnesses did not even recognize the devices as period timers. (Rentsch Tr.

272; Sauser Rupp Tr. 222-23;, 234-35; Gibbons Tr. 191-92; Kayal Tr. 229-32). None of OSA's

or Omega Electronics' products measure and control temperature, humidity, pressure, stain,

force, flow, level, pH or conductivity (Kayal Tr. 225-229).

70. OSA does not sell publications or offer advertising or retailing services in the United States under the OMEGA marks. (Sauser Rupp Tr. 381-386).

71. OSA's and Omega Electronics' marketing channels do not overlap with those of OEI. OSA's Rule 30(b)(6) witnesses concede that neither OSA nor Omega Electronics has ever advertised its products in the same publications as OEI. (Emmons Tr. 175; Sauser Rupp Tr. 214-15; Kayal Tr. 180-81, 186; *see also* Gibbons Tr. 170-71). Omega Electronics does not advertise its OMEGA products in the United States for applications other than sporting events; no OMEGA products are advertised in the United States for use in science and industry. (Kayal Tr. 84-85, 221, 224; Gibbons Tr. 55).

72. Unlike OEI, neither OSA nor Omega Electronics advertises its products as being made in the United States. (Sauser Rupp Tr. 180, 468-71; Kayal Tr. 188-90). This is so because, as mentioned above, all OSA watches are manufactured in Switzerland and nearly all of Omega Electronics' products are assembled in Switzerland. (Emmons Tr. 40-41; Sauser Rupp Tr. 77-79; Rentsch Tr. 190-92; Kayal Tr. 190-91). Indeed, as mentioned above, Omega Electronics' markets it sports timing services under the name Swiss Timing. (Gibbons Tr. 26).

73. With the exception of sales to a few educational institutions (which are made to different departments than those to which OEI sells), OSA and Omega Electronics do not share any customers with OEI. (Gibbons Tr. 143-45,193-94; Kayal Tr. 176-78). There is no evidence that OSA or Omega Electronics has sold any products under the OMEGA marks to the government, the military, research laboratories, the automobile industry, steel mills or other manufacturers in the United States. (Sauser Rupp Tr. 142; Kayal Tr. 171-73, 177; Gibbons Tr. 144-45).

74. Unlike OEI, neither OSA nor Omega Electronics regularly attends trade shows. (Kayal Tr. 182-84; Gibbons Tr. 171-72; Emmons Tr. 212-13; M. Hollander Dec. ¶ 19 & Ex. M). To the extent Omega Electronics and OSA have attended trade shows, they have not been shows at which OEI was also in attendance. (Kayal Tr. 184; Gibbons Tr. 173, 178-79; Emmons Tr. 212-13).

## G.    The 1994 Agreement Between OEI and OSA

75. Throughout the 1980's, Omega Engineering and OSA had a history of disputing the scope of their respective trademark rights. The two parties signed several agreements in the 1980's limited to certain countries and trademark registrations. In an effort to end such disputes once and for all, in 1992 Omega Engineering entered into a worldwide agreement with OSA; in 1994 the agreement was replaced by a new worldwide agreement, which was executed for and on behalf of OSA on May 3, 1994, and which was executed for and on behalf of Omega Engineering on August 2, 1994 (the "1994 Agreement"). (M. Hollander Dec. ¶ 30 & Ex. T).

76. The 1994 Agreement states, in part, that "[b]oth parties hereto are desirous of coming to an arrangement for the avoidance of future interference Worldwide between their respective fields of commercial operation under their Rights in respect of Trademarks consisting of or including the word OMEGA and/or the Greek letter Ω or containing elements colourably resembling either or thos[e] two elements." (M. Hollander Dec. ¶ 31 & Ex. T at ¶ (F)).

77. The 1994 Agreement settled various contested matters around the world involving Omega Engineering's and OSA's trademarks. Among other things, Omega Engineering agreed to withdraw certain oppositions against OSA and amend certain definitions of goods in Omega Engineering's trademark applications and OSA agreed to amend certain definitions of goods in OSA's trademark applications. (M. Hollander Dec. ¶ 31 & Ex. T)

78. The 1994 Agreement further provides in Paragraph 4 that:

Henceforth from the signing of this Agreement and effective in all

countries of the World:

a. OMEGA ENGINEERING INCORPORATED undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter Ω or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science or industry.

b. OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter Ω, or any element colourably resembling either of those two elements, in respect of.

*"Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow."*

c. OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademark consisting of or containing the word OMEGA or the Greek letter Ω or any element colourably resembling either of those two elements in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow.

(M. Hollander Dec. ¶ 32 & Ex. T)

79. The 1994 Agreement refers in Paragraph 4(a) to timing apparatus with which the parties have expressly agreed that Omega Engineering may use and register the OMEGA and stylized omega trademarks. Specifically, this paragraph recites that Omega Engineering will not use, register or apply to register the OMEGA or stylized omega trademarks for, among other things, computer controlled timing apparatus, *unless intended for science or industry*. Omega Engineering does in fact sell industrial and scientific computer controlled timing apparatus under

the OMEGA or stylized omega trademarks to the industrial and scientific markets. (M. Hollander Dec. ¶ 33 & Ex. T)

80. The 1994 Agreement goes on to state in Paragraph 4(c) that OSA will not object to the use or registration by Omega Engineering of the OMEGA mark or stylized OMEGA trademarks for apparatus industrially and/or scientifically employed for measuring or controlling variable parameters. The term "variable parameters" as used in the 1994 Agreement, including paragraph 4(c), is illustrated by the examples of variable parameters given "such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow." These "variable parameters" are some of the same variable parameters that Omega Engineering's industrial and scientific products measure and control. Thus, for example, OEI's industrial and scientific period timers and clocks are used to both measure and control variable parameters such as flow and temperature in industrial and scientific settings. (M. Hollander Dec. ¶ 34 & Ex. T)

**H.     The Omega I Litigation and the 2003 Agreement Between OEI and OSA**

81. In December 1998, OEI commenced an action in this Court, *Omega Engineering, Inc. v. Omega, S.A.*, 3:98 CV 2464 AVC ("*Omega I*"), alleging that OSA had breached the 1994 Agreement by filing with the PTO two petitions to cancel OEI's '762 and '705 Registrations, and a notice of opposition to the application for what became OEI's '657 Registration. OEI asked the Court to enjoin OSA from "maintaining its opposition and cancellation actions against plaintiff in the [PTO]." (*Omega I* Complaint Prayer ¶ 4, Riggs Dec. Ex. I). On OEI's motion, the PTO stayed OSA's opposition and cancellation proceedings "pending final disposition of the civil action between the parties." (2/25/99 Order of Trademark Trial and Appeal re: Cancellation No. 27,575, Riggs Dec. Ex. J); 12/22/99 Order of Trademark Trial and Appeal re: Cancellation No. 27,612, Riggs Dec. Ex. K). The PTO concluded that its

"review of the complaint in the civil case indicates that a decision by the district court could be dispositive of, or have a bearing on, the issues in the cancellation proceedings." (*Id*.). (*See* Riggs Dec. ¶¶ 13-14).

      82. At a Court-sponsored settlement conference in Magistrate Judge Smith's chambers on May 19, 2003, the parties negotiated a Settlement Agreement ("Settlement Agreement") in *Omega I* which provides, *inter alia*:

> 2. OEI will include a reference to Omega Engineering, Inc. Stamford, Conn., or Omega Engineering Inc. and its location, on the shipping boxes for all Omega Engineering timers. If OEI uses the name Omega Engineering or any Omega trademark on the goods themselves, Omega Engineering will include a reference to Omega Engineering, Inc. Stamford, Conn., or Omega Engineering Inc. and its location. Any use of the word Omega in conjunction with other words and phrases as provided in this paragraph shall not be used on the Omega Engineering timers in any larger or more prominent typestyle than that used for "Engineering, Inc., Stamford, Conn." or "Engineering, Inc. and its location." Omega Engineering's obligations for marking each timer under this paragraph shall commence upon exhaustion of existing inventory for such timer. In addition to deletion from trademark registration Nos. 2,022,762 and 2,034,705, OEI will not in the future use the wording "industrial and scientific clocks" to describe its products/ As long as OEI is in compliance with the terms of this Settlement Agreement, OSA will no bring a lawsuit against OEI for use or registration of the Omega mark and/or Omega design on period timers.

> 3. Except for any breach or violation, or claim of breach or violation, of this Settlement Agreement, OSA, on the one hand, and OEI, on the other hand, release and forever discharge each other, and, their respective officers, directors, agents, servants, employees, attorneys, successors and assigns and others controlling, controlled by or affiliated with them, from any and all claims, actions and causes of action in the U.S.A. relating to the application to register, registration or use of period timers for science and industry or industrial and scientific clocks under the Omega mark or Omega design, in the Omega I Litigation, Omega III Litigation or the Cancellation Proceedings.

> 4. OSA shall file a third amended complaint in Omega III in which it drops the allegations of paras. 31 and 32 relating to cancellation action no. 27,575 against OEI's Registration No. 2,022,762 and cancellation no. 27,612 against OEI's Registration NO. 2,034,705 and the references to cancellations of OEI's Trademark Registration No. 2,022,762 and 2,034,705 in the Prayer for Relief. OSA will not make claims or assertions in Omega III relating to application to register, registration or use by OEI of the Omega mark or Omega design on

period timers or industrial and scientific clocks. OEI agrees not to make any claims or assertions in Omega III that OSA breached the 1994 Agreement by filing the Cancellation Proceedings.

(Riggs Dec. ¶ 15 & Ex. L).

83. Paragraph 2 of the Settlement Agreement, OSA consented to OEI's use of the OMEGA marks on timers provided that OEI also includes on such devices (once existing inventory is sold off) a reference to "Omega Engineering, Inc., Stamford, Conn." OSA agreed that it would not bring any lawsuit against OEI for the use or registration of OMEGA marks with respect to such products. (Riggs Dec. Ex. L at ¶ 2).

84. The Settlement Agreement refers in paragraph 3 to OSA's requirement to release OEI of all claims brought in the United States relating to registration to use or use of OMEGA trademarks on period timers and specific industrial clocks. Specifically, in this paragraph OSA agreed to "release and forever discharge" OEI and its affiliates from "any and all claims, actions and causes of action in the U.S.A. relating to the application to register, registration or use of period timers for science and industry or industrial and scientific clocks under the Omega mark or Omega design, in the Omega I Litigation, Omega III Litigation [i.e. this case] or the Cancellation Proceedings." (Riggs Dec. Ex. L at ¶ 3).

85. Pursuant to paragraph 4 of the Settlement Agreement, OSA agreed to withdraw its claims in this action relating to OEI's '762 and '705 registrations, including, specifically, Paragraphs 31 and 32[1] of the complaint in this action and the request for cancellation of these registrations. OSA agreed that it "will not make any claims or assertions in

---

[1]     At the time of the drafting of the Settlement Agreement, the Third Amended Complaint had not yet been filed by OSA and the Settlement Agreement referred to Paragraphs 31 and 32 of the Second Amended Complaint. The same paragraphs appear under the same numbering in the Third Amended Complaint.

Omega III relating to application to register, registration or use by OEI of the Omega mark or Omega design on period timers or industrial and scientific clocks." (Riggs Dec. Ex. L at ¶ 4).

86. In June, 2003, after OSA refused to execute the parties' Settlement Agreement in *Omega I* without changes to its terms, OEI filed a motion to enforce the parties' Settlement Agreement. Magistrate Judge Smith held an evidentiary hearing on OEI's motion on February 18, 2004, and, on March 24, 2004, issued a Recommended Ruling in which he found that the parties had entered into a binding Settlement Agreement and in which he recommended that Judge Covello grant OEI's motion to enforce the Settlement Agreement. (Riggs Dec. ¶ 16 and Ex. M).

87. On August 11, 2004, Judge Covello issued an order in Omega I adopting and ratifying Magistrate Judge Smith's Recommended Ruling that the parties' Settlement Agreement be enforced, and judgment was entered in *Omega I* on August 11, 2004 enforcing the Settlement Agreement. (Riggs Dec. ¶17 & Exs. N, O).

88. Defendants recently requested that OSA amend the complaint in this action to comply with its obligations under the *Omega I* Settlement Agreement. As of this writing, notwithstanding the entry of judgment by Judge Covello enforcing the settlement agreement and a letter by OEI's counsel reminding OSA of its obligation to file an amended complaint, OSA has not done so. (Smart Dec. ¶ 26 & Ex. Y).

I.   **The Numerous Third Party Uses of OMEGA Marks**

89. Numerous third party businesses and websites use trade names and marks that include OMEGA. (Tepper Dec. ¶¶ 2-9 and Ex. A-G). In addition, a number of third parties use and have registered or applied for marks containing OMEGA for a variety of goods and services. (Tepper Dec. ¶¶ 10-20 and Exs. H-S).

90. For example, Alpha Omega is a Boston, Massachusetts based watch retailer with five stores which is an authorized OSA reseller and also sells competing watches such as TAG Heuer, Baume & Mercier, Ebel, Montblanc, and Gucci. (Emmons Tr. 104; Rentsch Tr. 240-42; Sauser Rupp Tr. 426; Tepper Dec. ¶ 3 and Ex. A; Smart Dec. Exs. P, V, W). OSA and its affiliates have been selling OMEGA watches to Alpha Omega for approximately ten years, despite that there is no license granting Alpha Omega the right to use the OMEGA mark in its trade name. (Emmons Tr. 104-06; Rentsch Tr. 242-43; Sauser Rupp Tr. 426-27). In fact, Alpha Omega advertises in some of the same consumer publications as OSA, such as *The Wall Street Journal*. (Sauser Rupp Tr. 104-05, 427-28; Emmons Tr. 132; Rentsch Tr. 233-34, 243-44; Smart Dec. Exs. J, P, V).

91. OSA concedes it is "confusing" to have a retailer selling watches under the trade name Alpha Omega, and concedes that there have been instances of actual consumer confusion. (Rentsch Tr. 240, 248; Emmons Tr. 105). Indeed, only a few weeks before his deposition in this case, Mr. Robert Emmons of OSA's United States affiliate learned of a confused consumer who thought that the maker of OMEGA watches owned the Alpha Omega chain of stores. (Emmons Tr. 105). Despite the clearly related nature of Alpha Omega's watch stores and OSA's watches, and the admitted evidence of actual confusion, OSA has never attempted to stop Alpha Omega from using OMEGA in its name, but, instead, has continued to do business with it. (Emmons Tr. 106; Rentsch Tr. 240-42, 248; Sauser Rupp Tr. 427).

92. A company called Omega Electronics – a name identical to OSA's subsidiary Omega Electronics – operates a website located at http://omegaelectronic.com. Its website offers for sale various electronics devices including portable Mp3 players, portable CD players, home stereo systems, cameras, car stereos, dvd players, and digital cameras. (Tepper Dec. ¶ 4 and Ex

B). Despite the use by Omega Electronics of the mark OMEGA in its name, Ms. Sauser Rupp –

OSA's 30(b)(6) designee on the issue of strength of OSA's mark – admitted that she was not

aware of any efforts by OSA to sue Omega Electronics over their use of the OMEGA name.

(Sauser Rupp Tr. 441-42).

      93. A company called Omega Technologies, Inc. operates a website located at

www.omega-its.com.  The website advertises telecommunications and broadband internet

services and other management support services which it sells to government and commercial

customers, both nationally and internationally.  (Tepper Dec. ¶ 5 and Ex C).  Despite the use by

Omega Technologies, Inc. of the mark OMEGA in its name in conjunction with the offering of

telecommunications services, Sauser Rupp, OSA's 30(b)(6) designee on the issue of strength of

OSA's mark, could not say that OSA had ever threatened to sue Omega Technologies, Inc. over

their use of the OMEGA name.  (Sauser Rupp Tr. 430-32).

      94. Omega Pacific is a company that sells rock climbing and rescue gear.

Consumers can purchase and read about products on its website at www.omegapac.com.

(Tepper Dec. ¶ 6 and Ex D).

      95. Omega One LLC is the name of a company that offers various software

programs for the Pocket PC and Handheld PC.  Consumers can learn about and purchase Omega

One LLC's software products at Omega One's website at www.omegaone.com..  (Tepper Dec. ¶

7 and Ex. E).

      96. Omega Products International is the name of a company that offers for sale

commercial and residential exterior and interior stucco wall systems.  Consumers can learn about

these products and obtain purchasing information at Omega Products' website www.omega-

products.com.  (Tepper Dec. ¶ 8 and Ex. F).

97. Omega World Travel is the name of a company that advises on and sells travel reservations to consumers and business clients. Online booking and further information about Omega World Travel locations and services can be found at its website at www.owt.net. (Tepper Dec. ¶ 9 and Ex. G).

98. As of March 8, 2004, the PTO database reports 327 registrations and pending applications for marks containing OMEGA other than registrations and applications of OSA and OEI. These include a number of marks for a variety of goods and services. (Tepper Dec. ¶ 10 and Ex. H).

99. For example, the mark OMEGA-FRAME, Reg. No. 2759432, is registered to Novotec Products LLC for a "computer workstation organizer for attaching around a computer monitor." (Tepper Dec. ¶ 11 and Ex. I).

100.    The mark OMEGA STUDIOS, Reg. No. 2645256, is registered to Heritage Preservation Corporation for "conventional and digital photography services, namely, photographic concept development and page layout." (Tepper Dec. ¶ 12 and Ex. J).

101.    The mark OMEGA-RX, Reg. No. 2069444, is registered to Owen Healthcare, Inc. for "computer software for use in pharmacy management and industrial manuals provided together." (Tepper Dec. ¶ 13 and Ex. K).

102.    The mark OMEGA WEDGE, Reg. No. 2455637, is registered to Active Industries, Inc. for "electrical, thermal, and mechanical insulators, for electrical, electronic, electronic, electro-mechanical, mechanical or thermal environments." (Tepper Dec. ¶ 14 and Ex. L).

103.    The mark ALPHA-OMEGA VISION SYSTEMS, Reg. No. 2203242, is registered to Melvin Williams for "hosting the web sites of others on a computer server for a global computer network." (Tepper Dec. ¶ 15 and Ex. M).

104.    The mark ALPHA DOG OMEGA CAT, Reg. No. 2189212 (as a design mark plus words) and Reg. No. 2169652 (as a typed drawing), is registered to Centuries, Inc. for "retail store and mail order services featuring general merchandise, gifts, and pet supplies." (Tepper Dec. ¶ 16 and Exs. N, O).

105.    The mark OMEGATREK, Reg. No. 2762110, is registered to Iwatsu Electric Co., Ltd for "Digital voice-data mobile communication equipment, namely, cordless telephone set, cordless key telephones, electric switch modules, and base station." (Tepper Dec. ¶ 17 and Ex. P).

106.    The mark ALPHA AND OMEGA SOLUTIONS, Reg. No. 2546315, is registered to Dwight Curtis Jackson for "business consultation, accounting auditing, business auditing, tax preparation and filing for others, designing and planning business plans for others." (Tepper Dec. ¶ 18 and Ex. Q).

107.    The mark OMEGAPURE, Reg. No. 2787500, is registered to Noveautech, Inc. for "water treatment equipment, namely water treatment units for usage in process and laboratory applications that utilize membranes, electrodeionization, filtration and similar technologies." (Tepper Dec. ¶ 19 and Ex. R)

108.    The mark OMEGA TREND, Serial No. 79/000,390, is applied for by Omegatrend International Pty Ltd. Corporation for, *inter alia*, "key rings, jewellery and watches." (Tepper Dec. ¶ 20 and Ex. S).

109.    There is no evidence that OSA has sought to stop any of these third parties from using the word OMEGA in their marks or trade names in the United States.  (*See* Sauser Rupp Tr. 428-46).

## J.    The Lack of Evidence of Actual Confusion or of Injury to OSA

110.    OSA's 30(b)(6) witness on actual confusion, Ms. Sauser Rupp, as well as the general manager of Omega Electronics and the general manager of Omega S.A. in the United States, conceded that they were unaware of any instance of actual confusion by actual or potential purchasers regarding an affiliation between Omega Engineering and Omega S.A. or Omega Electronics.  (Sauser Rupp Tr. 367, 388, 391-92; Kayal Tr. 255-58; Emmons Tr. 177-78, 221-222). Furthermore, there is no evidence that anyone has done business with OEI thinking that OEI was Omega S.A. or Omega Electronics.  Nor can OSA point to any instances where a customer did business with Omega S.A. or Omega Electronics under the mistaken belief that they were doing business with OEI.  (Kayal Tr. 255-58; Emmons Tr. 177-78, 221-222).

111.    Ms. Sauser Rupp also admitted that she was not aware of any customer who has ever substituted an OEI product for a product manufactured by OSA or Omega Electronics.  (Sauser Rupp Tr. 140-41).

112.    There is no evidence that anyone has ever brought a product manufactured or sold by OEI to OSA's service center for repair.  (Emmons Tr. 185).

113.    No customer has ever asked Mr. Robert Emmons, the senior vice president of the mid-Atlantic region for Swatch Group (U.S.) and the general manager of the Omega division of the Swatch Group in the United States, about Omega Engineering in the twenty two years that he has worked for Omega.  Mr. Emmons first heard of Omega Engineering when he attempted to register the omega.com domain name and learned that OEI owned the domain.  He

has never encountered any mention of Omega Engineering in any other context.  (Emmons Tr. 14-15, 192).

114.    Ms. Sauser Rupp, OSA's Rule 30(b)(6) designee on the issue of injury, admitted that she was not aware of any injury that OSA has suffered to its business or reputation as a result of defendants' use of their OMEGA marks.  (Sauser Rupp Tr. 402-03; *see also* Gibbons Tr. 195).

115.    Furthermore, Ms. Sauser Rupp, as OSA's Rule 30(b)(6) witness, could not identify any actual or potential OSA customers who are aware of the existence of OEI's pending trademark applications or existing trademark registrations about which OSA complains in this action; nor is there any other such evidence in the record.  (Sauser Rupp Tr. 313, 367, 388, 391-92, 416-17).

116.    OSA's Rule 30(b)(6) witness also could point to no evidence that OSA has suffered any injury to its business or reputation as a result of defendants' filing any trademark applications or registrations; nor is there any other such evidence in the record.  (Sauser Rupp Tr. 363-64, 389, 416).

117.    Still further, OSA's 30(b)(6) designee on the issue of whether OSA had been blocked in registering any trademarks admitted that she knew of no instance in which any OSA trademark application or registration had been blocked as a result of any trademark filing in the United States by defendants.  (Sauser Rupp Tr. 363-64, 389, 416).

**K.     OSA's Fraudulent Renewals of Trademark Registration Nos. 708,731 and 1,290,661**

118.    United States Trademark Registration No. 708,731 was registered to OSA on December 20, 1960 for the word OMEGA and the OMEGA symbol for use with "electronic time recorders for automatic precision timing in science and industry."  (Smart Dec. Ex. M). Registration No. 1,290,661 was registered to OSA on August 21, 1984 and is for the word

OMEGA and the OMEGA symbol for use with, among other products, "computer apparatus for checking and controlling the measurement of time and distance for . . . scientific investigation, and industrial application, including the acquisition, transmission, and management of information intended for transportation, publicity, and financial use; computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form." (Smart Dec. Ex. L).

119.    OSA renewed both registrations and in doing so claimed they were using OMEGA on the goods listed in each registration for "science and industry" and "scientific investigation and industrial application" in the United States. (Smart Dec. Exs. N & O; Rentsch Tr. 126-38).

120.    OSA filed a trademark renewal application for the mark OMEGA (and design) for Registration No. 708,731 on December 20, 2000. (Smart Dec. Ex. N). OSA submitted a Combined Section 8 and 9 Declaration in accordance with Sections 8 and 9 of the Lanham Act for the trademark renewal application, which was signed by Hanspeter Rentsch, senior vice president and general counsel for The Swatch Group Ltd. The Combined Section 8 and 9 Declaration stated, in pertinent part, "[t]hat registrant owns Registration No. 708,731, that the mark shown therein is in use in commerce on each of the goods recited in the registration, with the attached specimen showing the mark as currently used." (*Id.*). OSA thus represented that the OMEGA mark was in use in commerce on "electronic time recorders for automatic precision timing in science and industry" – that is, the goods covered by the registration. (Smart Dec. Exs. M & N; Rentsch Tr. 134-38).

121.    In accordance with Sections 8 & 15 of the Lanham Act, OSA submitted a specimen in support of renewal for Registration No. 708,731 which was a brochure for an

Omega Electronics aquatic starting system -- that is, a system used to signal and time the start of swimming competitions. (*See* Smart Dec. Exs. M & N; Kayal Tr. 251-52; Sauser Rupp Tr. 288-89).

122.    OSA also filed a trademark renewal application for the mark OMEGA (and design) for Registration No. 1,290,661 on August 14, 1990. (Smart Dec. Ex. O). OSA submitted a Combined Section 8 and 9 Declaration in accordance with Sections 8 and 9 of the Lanham Act for the trademark renewal application, which was signed by OSA's authorized representatives. The Declaration Under Sections 8 and 15 for Registration No. 1,290,661 stated, in pertinent part, that the OMEGA mark "has been in continuous use in commerce with the United States for five consecutive years from the date of the registration to the present, on or in connection with all of the goods of Classes 9 and 14 . . . recited in the registration." (*Id.*). The goods of class 9 recited in Registration No. 1,290,661 include "computer apparatus for controlling the measurement of time and distance for . . . scientific investigation, and industrial application." (Smart Dec. Exs. L & O).

123.    The specimen of use that OSA submitted in support of renewal for Registration No. 1,290,661 with respect to the Class 9 goods recited in that registration was a computer which measures and displays the times attained during athletic competitions; both Mr. Rentsch and Ms. Sauser Rupp conceded that the computer is a timing system for a sporting event. (*See* Smart Dec. Ex. O; Rentsch Tr. 126-31; Sauser Rupp Tr. 292-93).

124.    By its own admission, OSA and its affiliates do not sell any OMEGA-branded goods for "science and industry" or for "scientific investigation and industrial application" in the United States and did not do so at the time the above-referenced Section 8 and 9 Declarations for Registration No. 708,731 and Registration No. 1,290,661 were filed.

(Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45; Emmons Tr. 10-12; Sauser-Rupp Tr. 252, 270-71; Gibbons Tr. 142-45, 153).

125.    Mr. Rentsch, who signed the renewal application relating to Registration 708,731, admitted that he knew of no sales in the United States of electronic time recorders for automatic precision timing in science and industry.  (Rentsch Tr. 138).  Furthermore, Mr. Rentsch knew of no goods sold by OSA in the United States for "scientific investigation" or "industrial application" as recited in Registration No. 1,290,661.  (Rentsch Tr. 129).

126.    There is no evidence in the record that any goods intended for use in science or industry or scientific or industrial use, as those terms are used in registration nos. 708,731 and 1,290,661, are sold in the United States under OSA's OMEGA marks.  (Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45; Emmons Tr. 10-12; Sauser-Rupp Tr. 252, 270-71; Gibbons Tr. 142-43, 153).

127.    OSA has no current plans to offer OMEGA-branded goods for scientific or industrial use in the United States.  (Sauser Rupp Tr. 168-69).

**L.    Additional Facts Relating to OSA's Foreign Trademark Filings Claims**

128.    On March 8, 2004, pursuant to an order of this Court, counsel for OSA provided defendants with a list of 25 pending OEI trademark applications in the European Community, Israel, Canada and the United Kingdom, as well as one United Kingdom registration owned by OEI, which were foreign filings that OSA contended were filed in bad faith by OEI.   (Riggs Dec. ¶ 18 Ex. P).

129.    Twenty of the 25 applications on OSA's March 8, 2004 have been approved by the applicable foreign trademark authorities and are now subject to pending opposition proceedings brought by OSA.  Five other applications on the list are pending approval before the respective foreign trademark authorities.  The single United Kingdom registration

identified by OSA is the subject of a pending invalidation proceeding by OSA. (Riggs Dec. ¶ 18 & Ex. P).

130.    In addition, many of the trademark applications and registrations on which OSA relies in its oppositions to OEI's foreign trademark filings are themselves subject to attack by OEI. For example, when deposed with respect to one European Community Trade Mark ("CTM") notice of opposition filed by OSA against a foreign OEI trademark application, OSA's Rule 30(b)(6) witness Ms. Sauser Rupp acknowledged that there are existing trademark oppositions and cancellations ongoing with respect to many of the applications and registrations on which OSA itself relies in that CTM opposition. (Sauser Rupp Tr. 513-16, 518-19, 539-40, 563-64; Smart Dec. in Support of Defendants' Motion for Judgment on the Pleadings, filed March 31, 2004 ("Smart 3/31/04 Dec."), Ex. J). In particular, the first two CTM applications on which this particular OSA CTM opposition is based are themselves subject to two other opposition proceedings brought by OEI against OSA. (Sauser Rupp Tr. 516).

131.    As Ms. Sauser Rupp also acknowledged, OSA does not own any CTM registrations covering goods for "checking, measuring time and distance" for use in either the fields of sports or science and industry. (Sauser Rupp. Tr. 514).

132.    As with OEI's foreign trademark applications and registrations at issue in this case, a number of OSA's foreign trademark applications and registrations for OMEGA marks are themselves subject to pending litigation. Thus, OEI has successfully challenged OSA's trademark registrations for the OMEGA mark in some foreign proceedings. (Riggs Dec. in Support of Defendants' Motion for Judgment on the Pleadings, filed April 1, 2004 ("Riggs 4/1/04 Dec."), ¶ 5).

133.    For example, OEI successfully obtained a partial cancellation last year of one of plaintiff's United Kingdom OMEGA registrations, U.K. Trademark Registration No. 669057, on grounds of non-use.  (Riggs 4/1/04 Dec. ¶ 5 & Ex. A).

134.    In a proceeding before the European Community trademark authorities, OEI succeeded in blocking plaintiff's attempt to obtain a CTM registration for the mark OMEGA ELECTRONICS covering, among other goods, goods for the measurement of time and distance in science and industry, because of OEI's prior application to register the mark OMEGA for similar goods.  (Riggs 4/1/04 Dec. ¶ 6 & Ex. B).

135.    Similarly, in Canada, OEI has obtained partial cancellation of one of plaintiff's OMEGA registrations, including cancellation with respect to some goods and services for science and industry, and has successfully petitioned to cancel in its entirety plaintiff's Canadian registration for the mark OMEGA FLIGHTMASTER.  (Riggs 4/1/04 Dec. ¶ 7 & Ex. C).

Dated: September 15, 2004
    New York, NY

Of counsel:

Victoria Haje
Michelle R. Tepper

Respectfully submitted,

Thomas A. Smart  (CT 21462)
Paul C. Llewellyn   (CT 25417)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

Thomas E. Minogue (CT 06845)
MINOGUE BIRNBAUM LLP
237 Elm Street
New Canaan, CT  06840
(203) 966-6916

*Attorneys for Defendants and for Counterclaim-Plaintiff*