IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

OMEGA, S.A.,

               Plaintiff,

v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC, INC., AND
OMEGA PRESS, INC.,

               Defendants.

OMEGA ENGINEERING, INC.,

               Counterclaim-Plaintiff,

v.

OMEGA, S.A. and
THE SWATCH GROUP LTD.

               Counterclaim-Defendants.

Civil Action No.:
3:01 CV 2104 (MRK)

REDACTED

## DECLARATION OF DR. MILTON B. HOLLANDER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Milton B. Hollander, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a director of defendants Omega Engineering, Inc. ("OEI"), Omega Press, Inc. ("OPI") and Omega Scientific, Inc. ("OSI") (together, "defendants"). I have held a director's position at Omega Engineering for over 42 years. I have a B.S. in mechanical engineering from Purdue University, a M.S. in engineering from M.I.T., and a Ph.D. in mechanical engineering from Columbia University. I have personal knowledge of facts set forth herein, except where, as noted herein, I have relied on business records of Omega Engineering, Omega Press and Omega Scientific kept in the ordinary course of business. I am competent to testify on the matters set forth below if called at trial. I submit this declaration in support of

defendants' Motion for Summary Judgment and defendants' Motion to Preclude the Testimony of James H. Fouss.

### A.  Defendants' Scientific and Industrial Goods Offered Under Their OMEGA Marks

2.  OEI was founded in 1962 by my wife, Mrs. Betty Ruth Hollander. OEI's very first products were thermocouples, which are devices used in scientific and industrial fields (such as factories and laboratories) to measure temperatures. Mrs. Hollander chose the name Omega Engineering because a company called Alpha Molykote, founded by Mr. Sonntag, was an early user of the thermocouples made by Mrs. Hollander at her kitchen table. Mr. Sonntag was the inspiration for the founding of OEI, and OEI's name was chosen out of respect for him – Alpha being the first letter of the Greek alphabet and Omega being the last letter of the Greek alphabet.

3.  As it began to sell the thermocouples to other customers, OEI grew as a company. OEI now markets, distributes and sells over 68,000 different process and control products for use in science and industry under its OMEGA trademarks over the course of the last 42 years, under more than 100,000 different product numbers.

4.  Although OEI initially used the Greek letter Omega standing alone as a design mark, the company stopped using that design in favor of a design which we refer to as the "Omega bug," a design mark consisting of the juxtaposed Greek letters Omega and Epsilon (the "OEI bug"). OEI has used this design mark for nearly 40 years on its products and in its marketing materials. Attached hereto as Exhibit A is a picture of the "OEI bug."

5.  The products which OEI has marketed, distributed and sold under its OMEGA marks include scientific apparatus for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, flow and other variable parameters under the mark OMEGA.

6. Additionally, since approximately 1987, also under its OMEGA marks, OEI has marketed, distributed and sold time-related goods for science and industry – including industrial and scientific period timers and industrial and scientific clocks, and other computer-controlled measuring, timing and display apparatus used in the measurement and control of variable parameters in industrial and scientific processes.

7. Some of OEI's products for the measurement and control of variable parameters have a timing function because the measurement of time is fundamental to the measurement and control of other parameters in scientific and industrial processes. To take an example, a manufacturer often needs to control not only the temperature of a process, but the duration for which a particular temperature is maintained.

8. OEI takes great pride in manufacturing and selling goods of the highest quality. In fact, many of OEI's products are certified to meet the stringent written standards, known as Mil Spec, which are set by the United States Department of Defense, and OEI sells many of its U.S. Mil Spec approved products directly to the land, sea, air and space divisions of the United States Military. OEI's return rate is extremely low.

9. OEI also offers its scientific and industrial customers services relating to its products, including telecommunications services in the form of online and telephonic information services relating to its scientific and industrial products, repair services, technical assistance, calibration of instruments, industrial and scientific data collection and analysis services, and other services, and has done so for many years.

10. OEI also provides its scientific and industrial customers with a number of printed goods including various technical books, software and other publications and printed matter for scientific and industrial uses, including, for example, handbooks for scientists and

engineers, charts, posters and "deck cards" (index-card-type cards with product and technical information) bearing scientific data and technical information. Attached hereto as Exhibit B is a copy of OEI's "Made in the USA Handbook Volume 1." Attached hereto as Exhibit C is a copy of OEI's "Made in the USA Handbook Volume 2." Attached hereto as Exhibit D is a copy of OEI's Temperature Handbook. Attached hereto as Exhibit E is a sample of *Transactions*, a scientific journal published by OEI and offered to its scientific and industrial customers. Attached hereto as Exhibit F are sample "deck cards" sent by OEI to perspective purchasers.

11. OPI is an affiliate of OEI, which has operated as a trade vehicle of OEI for selling scientific and technical books, computer software and other printed matter under OEI's OMEGA marks. OPI was created in the mid-1980's, and used the trade name and trademark OMEGA and related OMEGA marks in connection with the technical books, computer software and other printed matter relating to the industrial and scientific trades which is offered to its customers.

12. OSI is an affiliate of OEI, which has operated as a trade vehicle of OEI for the sale of scientific and technical instruments to the scientific and industrial trades under OEI's OMEGA marks. OSI was created in the mid-1980's, and used the trade name and trademark OMEGA and related OMEGA marks in connection with the sale of scientific and technical instruments to the scientific and industrial trades. Attached hereto as Exhibit G is a 2002 OSI product catalog.

**B.     Defendants' Industrial and Scientific Customers and Marketing Channels**

13. OEI's customers consist solely of companies and entities in the field of science and industry, such as manufacturers, factories, scientific and research laboratories, engineering and science departments of universities, government clients, the military,

the automobile industry, steel mills and other manufacturers. Attached hereto as Exhibit H is a list of OEI's top 100 customers. OEI's products are purchased by sophisticated buyers, who are often scientists or engineers themselves, or by highly specialized purchasing agents for sophisticated engineering, manufacturing or technical companies, all of whom are extremely knowledgeable regarding technical, engineering and scientific issues and the types of products that they are seeking to purchase from OEI. These purchasers exercise extreme care in making their purchasing decisions and come to OEI seeking the highly specialized scientific and industrial devices that OEI offers.

14. The scientific and industrial process and control products that OEI sells vary in price from a minimum of a few dollars to a maximum of thousands of dollars. A typical customer order is in the range of several hundred dollars.

15. Defendants do not offer or sell any products to consumers. The only time-related devices that defendants sell are marketed for scientific and industrial uses and cannot be used by consumers to tell time and are not offered for sale to consumers or for consumer use. Thus, OEI does not sell any watches or any clocks that can be used in the home to tell time. Rather, the only time-related devices that defendants have offered to sell or sold are period-timers or scientific or industrial clocks and similar apparatus that are used to regulate scientific, research or manufacturing processes in laboratories or factories.

16. Defendants have never marketed or sold goods or services under any OMEGA marks for use in timing athletic competitions or sports events.

17. Defendants advertise and market their products and services to the scientific and industrial markets through specialized trade publications, scientific trade journals, direct

mail and the internet. Attached hereto as Exhibit I is the list of journals which OEI has advertised its scientific and industrial products in the past five years.

18. For example, OEI advertises in trade journals such as Evaluation Engineering, Compliance Engineering and Water & Wastes Digest. Attached hereto as Exhibit J is a copy of excerpts from the January 2004 issue of Evaluation Engineering showing an OEI advertisement. Attached hereto as Exhibit K is a copy of excerpts from the May/June 1999 issue of Compliance Engineering showing an OEI advertisement. Attached hereto as Exhibit L is a copy of excerpts from the February 2004 issue of Water & Wastes Digest showing an OEI advertisement. The typical readers of these scientific and industrial trade journals are sophisticated scientists and engineers in specialized industries or the engineering departments of universities, all of whom use OEI's products in connection with their work.

19. Defendants also advertise their scientific and industrial products and services at numerous scientific and industrial trade shows. Attached hereto as Exhibit M is a list of the trade shows and publications in which OEI will advertise in 2004.

20. OEI sends direct mailings to prospective purchasers in the fields of science and industry. The direct mailings include "deck cards," scientific journals produced by OEI and other brochures and marketing literature. *See* Exhibit F hereto (sample "deck cards"); Exhibit E hereto (sample OEI *Transactions* journal). Attached hereto as Exhibit N and O are sample product catalogs sent by OEI to prospective purchasers.

21. Defendants also advertise and market their services to the scientific and industrial markets through defendants' web sites and through a series of "handbooks" published by OEI and OPI, which contain product information as well as technical information of interest to engineers and scientists. OEI often uses the well known "Dilbert" comic strips in its

marketing materials and product packaging because many of the engineers and technicians are "Dilbert" devotees, and the use of "Dilbert" makes the marketing materials more appealing to OEI's scientific and industrial customers. Attached hereto as Exhibit P are representative pages from OEI's web site at www.omega.com. *See also* Exhibits N and O hereto (CONTROLCAT and OMEGATEMP brochures featuring the "Dilbert" comic strip); Exs. B, C and D hereto (sample OEI Handbooks).

22. OEI emphasizes in its handbooks and marketing materials that it sells products manufactured in the United States. In particular, most of its products are manufactured in the United States, and defendants' marketing and advertising materials routinely, repeatedly, consistently and prominently emphasize this fact. For example, OEI's primary handbooks of products are called the "Made in the USA Handbook Volume 1" and the "Made in the USA Handbook Volume 2." The covers of these handbooks, and OEI's other handbooks, bear variations of paintings by the famous Americana painter Norman Rockwell. OEI specifically sought and obtained a license to use these famous Norman Rockwell paintings from the Rockwell Foundation and Curtis Publishing in order to drive home the Made in USA message of OEI and its products and to drive home to its customers that OEI is first and foremost an American company that continues to sell as many made-in-the-U.S.A. products as possible. Also, a "Made in the USA" red, white and blue logo or an American flag appears on almost every single page inside the handbooks. *See* Exhibits B, C and D hereto. Attached hereto as Exhibit Q are additional samples of OEI's marketing materials emphasizing the companies' United States association.

23. OEI products have also been marketed and sold abroad, including Europe, for decades. OEI's products are marketed and sold over the internet and abroad by subsidiaries and

sales offices of OEI in England, Canada, France, Germany, Czech Republic, the Benelux nations and other countries under the OMEGA trademarks. The majority of the products that OEI sells in the United States are also sold in Europe and other foreign countries. These products include period timers, which have been marketed and sold under the OMEGA marks in Europe and other countries abroad for many years. OEI also distributes sales literature internationally to scientific and industrial customers and accepts purchases from these companies on its omega.com website.

24. OEI has spent substantial sums advertising, promoting and marketing its scientific and industrial process control products in the Unites States and abroad. For example, in just the last five years alone, OEI has spent in excess of $   million advertising and marketing its scientific and industrial process control products in the United States and abroad, with the majority of these expenditures in the United States and substantial expenditures abroad. Attached hereto as Exhibit R is a chart summarizing OEI's advertising expenses from 1999 through 2003.

25. In addition, OEI has achieved substantial sales under its OMEGA marks, selling hundreds of millions of dollars of scientific and industrial process control products over the last four decades, with sales for the period from 1999 to 2003 coming to some $   million.. Attached hereto as Exhibit S is a chart summarizing the net sales of OEI from 1999 through 2003.

C.   **Defendants' Trademark Registrations and Applications**

26. OEI has filed a pending trademark application with the United States Patent & Trademark Office ("PTO") for the design mark Ω.com – that is, the Greek letter Omega followed by ".com" – Serial No. 76/337,374 ("'374"). OEI has sound business reasons for seeking to register Ω.com as a trademark. OEI makes a large percentage of its sales over the internet and uses and advertises a variety of domain names to connect its scientific and industrial

customers to its www.omega.com web site. OEI learned that it would eventually become possible to reach web sites using domain names containing Greek letters, and learned that such domain names could be registered now. As a result, OEI registered the domain name Ω.com, and intends to use that domain as a faster way (one key stroke) to reach its homepage, once it becomes possible for internet users to access domain names containing Greek letters. OEI applied to register the trademark Ω.com because it intends to use this trademark to advertise its goods and services in conjunction with the use of the domain name, just as OEI does with its trademark OMEGA.COM and corresponding domain name.

27. In conjunction with the filing of the domain Ω.com, OEI also filed a pending trademark application with the PTO for a design mark consisting of the Greek letter Ω, Serial No.76/337,450 ("'450"). As explained above in ¶ 4, OEI originally used the Greek letter Omega on its goods but stopped using that design in favor of the "OEI bug." Because OEI has registered the domain name Ω.com and intends to use that domain (*see* ¶ 26 above), it also intends to use the Greek letter Ω as a mark if its application to register that mark is approved.

28. OEI has also filed a pending trademark application with the PTO for the design mark OM€GA – that is, the word OMEGA with the "E" replaced with a stylized "E" that is similar to the "Euro" currency symbol – Serial No. 76/242,073 ("'073"). The business reason for selecting the mark OM€GA was because OEI offers and sells its goods through direct sales from OEI's offices in Connecticut to its customers in the United States and throughout the world, and OEI wanted to offer U.S. made goods to European customers but add a European flavor to them to appeal more to European customers.

29. The '374, '450 and '073 Applications were filed as intent-to-use applications, and OEI has not yet sold any goods under these proposed marks. Moreover, as explained in the

declaration of B. Christine Riggs in ¶¶ 8, 10 and 12, the applications have been suspended by the PTO because of this lawsuit and have not been approved by the PTO. OEI intends to use the marks on the goods and services listed in the '374, '450 and '073 Applications in the future, once this litigation concludes and the applications are allowed by the PTO. OEI already markets and sells many of the goods and services covered by these applications. Thus, OEI already offers most if not all of the industrial and scientific goods in those applications under its other OMEGA marks, but does not yet do so under the marks covered by the '450, '073 and '374 Applications. OEI also offers, for example, advertising services, office administration services and some of the other services covered by the applications to some of its affiliated companies.

D.    **The 1994 Agreement Between Omega Engineering and Omega S.A.**

    30.  Throughout the 1980's, Omega Engineering and OSA had a history of disputing the scope of their respective trademark rights. The two parties signed several agreements in the 1980's limited to certain countries and trademark registrations. In an effort to end such disputes once and for all, in 1992 Omega Engineering entered into a worldwide agreement with OSA; in 1994 the agreement was replaced by a new worldwide agreement, which was executed for and on behalf of OSA on May 3, 1994, and which was executed for and on behalf of Omega Engineering on August 2, 1994 (the "1994 Agreement"). Attached hereto as Exhibit T is a copy of the 1994 Agreement.

    31.  The 1994 Agreement states, in part, that "[b]oth parties hereto are desirous of coming to an arrangement for the avoidance of future interference Worldwide between their respective fields of commercial operation under their Rights in respect of Trademarks consisting of or including the word OMEGA and/or the Greek letter Ω or containing elements colourably resembling either or thos[e] two elements." (Exhibit T, p. 1). The 1994 Agreement settled

various contested matters around the world involving Omega Engineering's and OSA's trademarks. Among other things, Omega Engineering agreed to withdraw certain oppositions against OSA and amend certain definitions of goods in Omega Engineering's trademark applications and OSA agreed to amend certain definitions of goods in OSA's trademark applications.

32. The 1994 Agreement further provides in Paragraph 4 that:

Henceforth from the signing of this Agreement and effective in all countries of the World:

a. OMEGA ENGINEERING INCORPORATED undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter Ω or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science or industry.

b. OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter Ω, or any element colourably resembling either of those two elements, in respect of.

*"Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow."*

c. OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademark consisting of or containing the word OMEGA or the Greek letter Ω or any element colourably resembling either of those two elements in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow.
(Exhibit T, p. 2, emphasis in original).

33. The 1994 Agreement refers in Paragraph 4(a) to timing apparatus with which the parties have expressly agreed that Omega Engineering may use and register the OMEGA and stylized omega trademarks. Specifically, this paragraph recites that Omega Engineering will not

use, register or apply to register the OMEGA or stylized omega trademarks for, among other things, computer controlled timing apparatus, *unless intended for science or industry*. Omega Engineering does in fact sell industrial and scientific computer controlled timing apparatus under the OMEGA or stylized omega trademarks to the industrial and scientific markets.

34. The 1994 Agreement goes on to state in Paragraph 4(c) that OSA will not object to the use or registration by OEI of the OMEGA or stylized omega trademarks for apparatus industrially and/or scientifically employed for measuring or controlling variable parameters. The term "variable parameters" as used in the 1994 Agreement, including paragraph 4(c), is illustrated by, but not limited to, the examples of variable parameters given "such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow." These "variable parameters" are ones that OEI's industrial and scientific products measure and control. Thus, for example, OEI's industrial and scientific period timers and clocks are used to both measure and control variable parameters such as flow and temperature in industrial and scientific settings.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness, I could and would completely testify thereto.

Executed this 14th day of September, 2004, at Stamford, Connecticut.

_____
Dr. Milton B. Hollander