nothing you need to do about it. It is jewelry. It's just an expanded form. It's like a kit." [*Id.*]

This is not the first time this Court has been asked to address OEI's infringing activities. This Court, on more than one occasion, has already found OEI and its affiliates guilty of bad faith and cybersquatting:

- o *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 497-98 (2d Cir.2000) (OEI's found to have acted in bad faith in violation of APCA);
- o *Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d. 202, 214 (D.Conn.2001) (Acts of Dr. Hollander's company and OEI affiliate to found to most likely be in bad faith.); and
- o *Omega S.A. v. Omega Engineering, Inc.*, 228 F.Supp.2d 112 (D.Conn. 2002.) (OEI's acts are found suspect and indicative of bad faith use and registration of OMEGAWATCH.com and OMEGATIME.com).

OEI's actions caused further damage to the Omega mark when OEI and its Chief Financial Officer were found guilty of violating the Export Control Act, Title 50 of the United States Code, § 2410 for their sale of potentially sensitive nuclear secrets to Pakistan. Such goods were sold in connection with the Omega mark that is at the core of the dispute in this action and thereby negatively impacts and tarnishes the goodwill and associations made with the Omega mark. [Ex. 35, Hearing Tr. dated 9/23/03 in *United States v. Omega Engineering, Inc.*, Civ. No. 3:03CR116 (DJS); Ex. 36, Hearing Tr. dated April 29, 2003 in *United States v. Michel*, Civ. No. 3:03CR116 (DJS).

All as a result of the foregoing, listed below is a representative sample of trademark applications filed by OEI in the United States and abroad, to which OSA, in a diligent effort to discharge its duty to police its marks and maintain its rights, has had to file defensive opposition proceedings against OEI. All of the following OEI applications include goods that are either identical to, or closely related to, the timing and other devices at the core of OSA's business, or include goods for which OEI neither sells nor has a bona-fide intent to sell in the future:

11

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
|---|---|
| OMEGA 1/4/1996 Community Trademark (Europe) | Apparatus and instruments for measuring time; apparatus and instruments for metering in so far as they relate to time/timing; scientific and industrial research service and /or making models and designs in the field of equipment for measuring, controlling and/or regulating time. (000.174.458) (Ex.37) |
| OMEGA 3/21/2001 Community Trademark | Clocking devices; apparatus for checking and measuring time and distance; computer controlled apparatus for checking and controlling the measurement of time and distance. (001.567.684) (Ex. 38) |
| OMEGA 4/17/2001 Community Trademark | All goods claimed, namely precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes jewellery, precious stones horological and chronometric instruments; timers; period timers; all of the foregoing for use in science and industry. (002.180.834) (Ex. 28) |
| Ω 5/21/2001 Community Trademark | Measuring, signaling, apparatus and instruments insofar and they relate to timing; horological and chronometric instruments; timers; period timers; all of the foregoing for use in science and industry. (002.229.169) (Ex.169) |
| OMEGA ΩE 6/30/1997 Canada | Clocks, timers (849.631)(Ex. 40) |
| ΩE 6/30/1997 Canada | Clocks, timers (849.629) (Ex. 41) |
| OMEGA 6/30/1997 Canada | Clocks, timers. (849.630) (Ex. 42) |
| OMEGAMETER 8/10/1998 United Kingdom | Period timers. (2.179.158) (Ex. 43) |
| OMEGA ΩE 6/5/2002 United Kingdom | Period timers. (1.517.303) (Ex 44) |
| OMEGA 12/16/1993 United Kingdom | Period timers. (1.557.184) (Ex. 45) |
| OMEGA 4/18/2001 USPTO (USA) | Paper goods, cardboard, paintbrushes, typewriters. (76-242,073) (Ex. 18) |
| Ω.COM 11/14/2001 USPTO | Fire extinguishing apparatus; apparatus and instruments for metering … timing. (76-337,374) (Ex. 27) |

12

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
|---|---|
| Ω<br>11/14/2004<br>USPTO | Apparatus and instruments for metering ... timing. (76-337,450) (Ex. 26) |
| OMEGAWATCH.COM<br>6/4/1996<br>Benelux | Paper, cardboard, newspapers, stationary, artists'materials. (595077) (Ex. 33) |
| OMEGATIME.COM<br>6/4/1996<br>Benelux | Photographic cinematographic, optical and weighing apparatus. (872097) (Ex. 32) |
| OMEGA<br>5/21/2000<br>USPTO | Computers; chronometric and horological apparatus for science and industry industrial and scientific timers; period timers; period timers used in industrial or scientific apparatus to measure and/or control other variable parameters for science or industry; clocking devices and apparatus or measurement or control of time or distance in science or industry. (76-052,828) (Ex 19) |
| OMEGA<br>7/2/1996<br>USPTO | Timers, namely period timers; industrial and scientific clocks. (2,022,762) (Ex. 16) |
| EUROMEGA<br>9/30/2000<br>Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of timing. (001.330.133) (Ex 46 |
| OMEGA.COM<br>4/1/1996<br>Community Trademark | Apparatus and instruments for measuring time; apparatus and instruments for metering (in so far as they relate to time/timing) time; electronic time indicators; transducers for time. (000.174.367) (Ex. 47) |
| OMEGA.CO.UK<br>9/3/2002<br>Community Trademark | Scientific apparatus for the measurement of time; clocking devices apparatus for checking and measuring time and distance; chronometric and horological products for science and industry; period timers. (002.246.718) (Ex. 48) |
| Ω.ORG<br>5/21/2001<br>Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing. (002.226.454) (Ex. 49) |
| Ω.NET<br>5/21/2001<br>Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing. (002.225.126) (Ex. 50) |
| Ω.COM<br>5/21/2001<br>Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; jewelry, precious stones, horological and chronometric instruments; industrial and scientific clocks. (002.232.270) (Ex. A) |
| OMEGA<br>1/21/1994<br>USPTO | Timers, namely period timers; industrial and scientific clocks. (74-480,756) (Ex. B) |

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
|---|---|
| ΩE 1/21/1994 USPTO | Timers, namely period timers. (74-480,755) (Ex. C) |

## II.  DISCUSSION

### A.  STANDARD OF REVIEW

Rule 56 (c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celeotex v. Catrett*, 477 U.S. 317 (1986). The mere presence of small disputed fact will not preclude summary judgment if none of those small issues goes to an issue material to the claims. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986). The burden of demonstrating the absence of a material factual dispute rests on the non-moving party. *See, Nationwide Life Ins. v. Bankers Leasing Assoc., Inc.*, 182 F.3d 157 (2nd Cir. 1999); Fed.R.Civ.P. 56(e).

While the court must "view the inferences to be [drawn] in the light most favorable to the party opposing the motion", *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), *quoting, U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1963), the respondent "must do more than simply show that there is some metaphysical doubt as to the facts. *Id.* at 586.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *U.S. Structures, Incorporated v. J.P. Structures,*

14

*Incorporated*, 130 F.3d 1185, 1188 (6th Cir. 1997). A fact is only material if it effects the outcome of the case. *Kunz v. United Food & Commercial Workers, Local 876*, 5 F.3d 1006, 1009 (6th Cir. 1993).

### B. OEI'S CONDUCT CONSTITUTES UNFAIR COMPETITION UNDER BOTH CUTPA AND THE LANHAM ACT.

The Connecticut Unfair Trade Practices Act dictates that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42-110b(a) (LEXIS 2004). This Court must consider: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as established by statutes, the common law, or established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers, competitors or other businessmen. *Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57, 65 (1987); *New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, 312 F.Supp.2d 195 (D.Conn. 2004).

A finding of likelihood of confusion establishes a finding of unfair competition under CUTPA. See, *Nabisco Brands, Inc. v. Kaye*, 760 F.Supp. 25, 29 (D.Conn.1991.); *The Dial Corporation v. Manghnani Investment Corp.*, 659 F.Supp. 1230, 1239 (D.Conn.1987). Similarly, a finding of a likelihood of confusion constitutes unfair competition under the Lanham Act. Accordingly, many courts view a violation of the Lanham Act as a per se violation of CUTPA. *Id.*, also see e.g., *Timex Corp. v. Stoller*, 961 F.Supp. 374, 381 (D.Conn.1997); *but see also Sporty's Farm, LLC v. Sportsman's Mkt., Inc.*, No. 3:96CV0756 (AVC), 1998 U.S. Dist. LEXIS 23290, *25 (D.Conn.1998) (Finding of a violation of the Lanham Act does not necessarily obviate the necessity to consider the CUTPA standard).

Because Defendants' conduct violates both CUTPA and the Lanham Act, Plaintiff will jointly address these counts below.

### 1. OEI's Conduct with Respect to Trademark and Domain Name Applications and Registrations Offends Public Policy and Violates the Law.

CUTPA expressly provides protection to consumers, competitors and other business people from the violation of statutes and public policies, including United States and trademark laws as it pertains to domestic and foreign filings. It is undisputed that OSA's use of the OMEGA mark for timing devices dates back over 100 years. Dep. CSR Ex. 1. However, throughout the past decade OEI has systematically encroached upon and or made continued threatening challenges toward OSA's long established trademark rights. This is in part evidenced by the list of OEI's trademark applications recounted above in the statement of facts, pp. 12-14. See, Ex. 26-28, 43-50, A-C.

For example, OEI – which asserts at every turn that it is engaged only in industrial and scientific endeavors; has sought trademark registration for many products that are the same as or similar to OSA's business such as: measuring, signaling, apparatus and instruments insofar and they relate to **timing** (Exhibits 26, 49); **horological and chronometric instruments** (Exhibits 28, 39); **timers** (Exhibits A, 19); **period timers**; (Exhibits 19) **video tapes in the field of measuring time** (Exhibit 46): **apparatus and instrument for timing or relation to timing** (Exhibit 26); **jewelry** (Exhibit 28, A); industrial and scientific **clocks** (Exhibit B); electronic **timer indicators** (Exhibit 47); **clocking** devices (Exhibit 48); apparatus for checking and measuring **time and distance** (Exhibits 38); **clocks** (Exhibits 40-42); and many other items.

In addition to the above-mentioned devices, OEI has also pursued and obtained trademark registrations that swould uggest that OEI is in the watch business. For example, OEI has registered as trademarks in the Benelux OMEGAWATCH.COM and OMEGATIME.COM. Exhibits 32 and 33. However, OEI registered these trademarks for items not within the OEI's usual business, but instead for completely random goods, including paper, cardboard, stationary, artist's materials, and photographic equipment. As part and parcel to its now long history of fighting OEI's continual unfair advancements in this regard, Judge Arterton had this to say of OEI's conduct in registering the domains:

> Then [at the time the 1994 agreement was signed] as now, plaintiff's business was the sale of watches and corresponding accessories. Even so, less than two years after OE inked its name to the 1994 Agreement and having never sold watches under the mark "Omega", OP and OS, OE's "affiliates" and "trade vehicles", sparked the *132 present controversy when they registered and began to use OMEGAWATCH.com and OMEGATIME.com.
> ...
> In selecting OMEGAWATCH.com and OMEGATIME.com ostensibly for the promotion and furthering of their own enterprise, defendants added generic terms to their trademark (an abbreviated form of their business name) that exactly described their old adversary's primary product and that product's primary function, but which bore no relationship whatsoever to either their own products or the products offered for sale on the newly registered websites. It would seem that the strong inference to be drawn from such evidence is that defendants acted in bad faith and not with a bona fide purpose of promoting their own business.
>
> See *Omega S.A. v. Omega Engineering, Inc.*, 228 F.Supp.2d 112, 132.

Although OEI offered its BENELUX trademark registrations for the proposition that these somehow evidence their legitimate intentions, Judge Arterton concluded otherwise:

> Defendants also offer evidence of Benelux (Belgium, Netherlands, and Luxemborg) trademark registrations of "OMEGAWATCH.COM" and "OMEGATIME.COM" owned respectively by OP and OS. *See* Riggs Declaration ¶¶ 7-8 and Exhibits Q and R. The former is for paper, books, and generally other printed matter, and the latter for scientific apparatus, although not timers. Curiously, both were filed and registered on June 4, 1996, roughly six weeks subsequent to plaintiff's warning of litigation over the identical domain names. Although the fact of these registrations would appear to provide defendants with

17

evidence of good faith under Factor (I), the substance and timing of these trademark registrations is suspicious. Defendants have merely trademarked the offending domain names for the general categories of products that first appeared on those pages. As set forth above, neither those products nor their allegedly accompanying slogans appear to bear any rational relationship to the generic portion of the domain names. Further, defendants made these foreign registrations in the face of possible litigation over identical subject matter.
*Id.*

Similar to the disingenuous tactics employed in this case (see discussion related to "jewelry for science and industry," page 20 below), OEI submitted evidence of "goods" being offered over these websites; Judge Arterton saw through this thin veil:

Although defendants ostensibly offered goods at both OMEGAWATCH.com and OMEGATIME.com, on the evidence discussed above, they will likely have an uphill battle to persuade a jury that such offering was either "legitimate" or, in the language of the statute, "bona fide," and part of an "advertising campaign" to advance the offering of goods as opposed to an ad hoc creation to disguise illegitimate conduct directed against an adversary.
...
Therefore, as set forth above, defendants' registration and use of domain names containing generic terms exactly describing plaintiff's principal product and its chief function but not descriptive of any product sold by defendants or offered at the offending websites constitutes strong evidence of defendants' intent to divert customers from plaintiff's online location by creating a likelihood of confusion.
*Id.*

Not surprisingly, and consistent with its true *modus operandi*, OEI immediately following Judge Arterton's ruling transferred the domains to OSA and sought a stipulated dismissal in *Omega II*, rather than, as Judge Arterton put it, let a jury test Dr. Hollander's credibility. *Id.*, at 137. Mrs. Hollander testified that the whole *Omega II* was a simple mistake, which she promptly rectified,[2] the reality is quite different as OEI's actions required "protracted

---

[2] "As soon as it was brought to our attention, it was wrong, and it was given to Omega, S.A." Ex. ___, Dep. Tr. of Mrs. Hollander at 78-79. Mrs. Hollander also characterizes this as yet another "mistake." *Id.* at 79. And, further that even OEI recognizes that there is another OMEGA in photography, and testifies that OEI "wouldn't do their trademark." *Id.*, at 173-174. However, OEI, in fact, in this very OMEGATIME.NET BENELUX registration includes the following goods: "Photographic cinematographic, optical and weighing apparatus," even though OEI does not trade in or have any bona fide intent to use such goods. *Id.*, at 173-174.

18

discovery requiring multiple rulings from Magistrate Judge Joan G. Margolis" forcing OSA to incur significant expense and effort over more than 12 months. *Id.,* at 114.

OEI's trademark application policy, pursuing products in which it repeatedly professes to have no interest, is designed to systematically forces OSA (and others) to perpetually police OEI's activities. As a result, OSA has already been forced to commence over a dozen opposition and cancellation proceedings against OEI around the world, and two lawsuits in the United States simply to protect its OMEGA mark on timing equipment, the rights in which OSA acquired over 100 years ago. These proceedings cost OSA enormous amounts of money, and an incalculable number of hours of OSA employees, and further have subjected the marks to the repeated strain and continuous litigation and dispute.

In addition to these costs and efforts OSA's potential bona fide uses of the OMEGA mark are severely encroached due to OEI's Benelux registrations for OMEGAWATCH.COM and OMEGATIME.COM. These registrations interfere with OSA and are designed to prevent it from exercising its undisputed right to use these marks in connection with these products in Holland, Belgium or Luxembourg. Contrary to United States law, use of goods in commerce or even an intent to use goods in commerce is not necessary for a trademark registration in Benelux. Ex. 34, Tr. of Dep. Dr. Drucker at 126. Because OEI did not have any intent to use these marks in the Benelux on the goods described, their motive seems clear – infringe the rights of OSA. See *Omega S.A. v. Omega Engineering, Inc.,* 228 F.Supp.2d at, 132. Ex. 15, Dep. Tr. of Mrs. Hollander at 173-174. This is bad faith.

Even more critical is when OEI actually ventures into OSA's line of business. For example, OEI sought a European Community Trademark (CTM) for the mark OMEGA *for precious stones, jewelry, and horological and chronometric instruments for use in science and*

19

*industry*. Exhibit 28. There is no dispute that OSA trades in jewelry and watch bracelets. Dr. Drucker testified that jewelry for science and industry is similar to a "jewelry kit" Ex. 34 Dep. Tr. of Dr. Ducker at 82. Yet he says that OSA has no interest in such goods. *Id.* Such actions by OEI are patently unfair.

Indeed, OEI's unfair pattern of trademark filings are illustrated by OEI's consistent effort to register "period timers" and "industrial clocks," the latter being a nonsensical term that even the company's ownership and management cannot explain. Ex. 34 Dep. Tr. of Dr. Drucker at 81-83. It is undisputed that OSA has been in the timing business for over a century. A significant portion of OSA's business is the sports timing industry. OSA's registration for the OMEGA mark for electronic time recorders for automatic precision timing in science and industry predates OEI's very existence. Yet, OEI includes such goods in its applications in an unfair attempt to interfere with OSA's rights. Exhibit 47.

The sheer multitude of OEI's acts of trademark filings in the U.S. and abroad, targeted to contain a reference to time OEI has unfairly sought to control rights in the OMEGA mark for reasons unrelated to its own business needs, but rather, with the intention of preventing access to registration by OSA, and to multiply the cost and difficulty in pursuing registrations to a point where OSA would be discouraged (i.e., unfairly and competitively disadvantaged) from maintaining that to which it is entitled. As in Omega II, the timing of these acts, this strategy and campaign, is so clear that it cannot be interpreted in any other way.

Further, Defendants' patterns and practices of unlawfully filing applications for goods they have no intent to use explicitly violates United States trademark law. In the United States an intent-to-use trademark application is one in which the applicant is not using the mark in commerce, but intends to use the mark in the near future. Filing such an "intent-to-use"

20

application establishes priority as of the date of filing (except as against those already using the mark), provided use is later proven. 15 U.S.C. § 1051(b). "'[U]se in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127." *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 186 F.3d 311, FN1 (3rd. Cir. 1999).

Examples of Defendants' unlawful trademark filings are OEI's filed three intent-to-use applications in the United States for OMEGA (application number 76/242,073), Ω (application number 76/337/450), and Ω.com (application number 76/337,374). [Ex. 18, 26, and 27 respectively] As discussed below, OEI's in clear violation of the Lanham Act, and had no bona fide intent to use the goods listed in the applications.

Dr. Drucker, outside counsel for OEI, not only submitted these applications as the filing attorney of record, but also executed the sworn declaration/verification required under 15 U.S.C. § 1051(b)(3), swearing factual personal knowledge as to OEI's bona fide intent to use, are mark on each and every listed good, including literally hundreds of entries, ranging from times to ___ for extinguishes. Ex 18, 26, 27.

Dr. Drucker further swore that: "No other person, firm, corporation or association has the right to use said mark in commerce, either in identical form or in such near resemblance thereto as maybe likely when applied to the goods of such person to cause confusion or to cause mistake or to deceive." Exhibits 18, 26, and 27.

No one at OEI completed an inquiry as to whether or not every one of the several hundred goods in the application were actually intended to be used by OEI. When Christine Riggs, General Counsel of OEI and manager of OEI's trademark portfolio was confronted with these applications, she deferred to Dr. Drucker. When Dr. Hollander was confronted with these

21

applications, at whose direction these applications were purportedly submitted, he could not explain how the goods were selected:

> I told him [Dr. Drucker] what I wanted and I don't know—I know I didn't personally write this down. I told him what I wanted on this page [listing of goods.] And I don't know where these particular products came from because I'm not familiar with some of them, so I know I would not have given it to him.

[Ex. 14, Dep. Dr. Hollander at 361]. Dr. Hollander further testified that no one else at OEI would have provided this list to Dr. Drucker. [Id at 362]. Dr. Drucker tried to sidestep and evade this issue:

> Q. Dr. Drucker did you do any independent investigation with regard to Omega Engineering's bona fide intent to use its mark in commerce for the goods and services listed in this application, prior to signing the declaration on April 15, 2001?
> A. I don't understand the word "independent." Independent from what?
>
> Q. Do you have an understanding of what the word independent means?
> A. In the context you are using it, nothing at all.
>
> Q. Dr. Drucker, do you have any understanding of what investigation would be?
> A. I do.
>
> Q. Did you, on your own, undertake any investigation as to Omega Engineering's bona fide intention to use the Omega mark set forth in this application on the goods and service?
> A. I don't understand what "on your own' means, not in that context.
>
> Q. How about by yourself, did you undertake an investigation by yourself?
> A. I don't really—the concept escapes me completely....
>
> Q. Did you prior to executing this application have knowledge of facts of Omega Engineering's business plans with regard to each and every product listed in the application?
> A. It's a complicated question for me to understand...[Ex. 34, Dep. Tr. Drucker at 25]

Dr. Drucker later described how he listed the goods. He testified that from time to time OEI gives him general instructions as to the nature of the business it practices and what it proposes to accomplish with a trademark application. He takes these general instructions and

22

creates a listing of goods that are illustrative of the classes provided. He chooses these goods based on those listed in the Nice Treaty [on Trademarks] as exemplary types of goods within each class. [Ex. 34, Dep. Tr. Dr. Drucker at 19, 56]. Despite Dr. Drucker's protestations that this is an accepted trademark practice, this procedure violates the Lanham Act, which unequivocally states that an actual bona fide intent to use the mark on the goods is mandatory, and a party cannot simply list a broad range of good's with the expectation that the PTO will properly limit such goods to those actually being used or intended to be used.

The PTO's Trademark Manual of Examining Procedure ("TMEP") clearly states that as a matter of examination policy the trademark examiner will not question the good faith of the applicant. TMEP § 1102. The PTO's establishment of the honor system is a far cry from condoning Dr. Drucker's practices. The PTO simply, for administrative convenience, leaves letters and questions of intent to be raised by competitors or the public. In the meantime, OEI has been slowly but very surely attempting to claim trademark rights in OSA's established line of business and otherwise attempting to thwart OSA's rights to pursue a normal, businesslike path to registering its OMEGA mark.

In the OMEGA application (number 76/242,073) Dr. Drucker verified under oath that OEI had an intent to use the OMEGA mark on office furniture and supplies. Exhibit 18. Yet he has testified that he does not recall any such intent of the OEI. [See Ex. 34, Dep. Tr. Dr. Drucker at 40].

Similarly when asked about the Ω.com application (number 76/337,374), Dr. Drucker expressly stated that he did not create the list of goods on that application. Rather, he simply copied that list of goods from a "CTM" application filed in the European Office for Harmonization of the Internal Market (the European Union's equivalent of the PTO, "OHIM").

The language was drafted by OEI's British IP counsel, David Crouch, and Dr. Drucker did not complete the requisite independent investigation to determine if the each of the goods listed in the CTM application were supported by mandated bona fide intent to use. Nor could Dr. Drucker testify as to the meaning of the words in the application because he did not did not author the words himself, despite having used the same language in the '374 application.

Furthermore, OEI explained that it its trademark practice to include an expansive list of goods in trademark applications. This is based in part on the stated belief that it is very difficult to expand a listing of goods in an application once the application is filed.

> "You will understand that its possible to reduce the scale or scope of the list of goods or services after you have filed a trademark application, but it is not in accordance with the practice of the US Trademark Office to expand or enlarge the scope of the goods by adding new goods... Therefore, to give myself working room, I used the Nice Treaty wording. I didn't make it up or try to find funny words. These are words I use in many applications. It's a normal practice of mine."

[Ex. 34, Dep. Tr. Dr. Drucker at 19, 22].

This practice has unfairly shifted the burden to OSA (or other competitors) to complain about the overbroad list of goods and services, rather than having the applicant meet its initial duty to have a bona fide intent to use the goods in commerce.

OEI has engaged in these same unfair practices before foreign trademark tribunals as well. For example, on at least four CTM applications, OEI voluntarily withdrew certain goods from its applications, including jewelry and precious stones which it would claim were inserted "in error." Exhibit 20. But OEI's clear testimony contradicts this and instead, shows that the expansive list of goods in both the United States and abroad is not coincidental but strategic and deliberate. This practice reflects OEI's direct strategy to include terms which are key to OSA in its trademark applications, while leaving it up to OSA to bring these issues to the attention of the

trademark examiners. Indeed since 1996, OSA necessarily filed at least 14 opposition proceedings in foreign trademark offices in order to police OEI's use of the OMEGA mark. [See Cover sheets and filing receipts for opposition proceeding, Ex. D].

OEI's practice is wrongful and unfair. OEI purposefully includes a list of goods that is expansive, regardless of OEI's actual intent, violating the Lanham Act, 15 U.S.C. § 1051. OEI has knowingly filed false declarations under oath in support of these applications. [Ex. 18, 26, and 27].

    **2.    OEI's Advertising and Marketing Practices Create a Likelihood of Confusion in the Marketplace and Violate CUTPA and the Lanham Act.**

A finding of likelihood of confusion establishes a finding of unfair competition under CUTPA. See, *Nabisco Brands, Inc. v. Kaye*, 760 F.Supp. 25, 29 (D.Conn.1991.); *The Dial Corporation v. Manghnani Investment Corp.*, 659 F.Supp. 1230, 1239 (D.Conn.1987). Similarly, a finding of a likelihood of confusion constitutes unfair competition under the Lanham Act. Accordingly, many courts view a violation of the Lanham Act as a per se violation of CUTPA. *Id.*, *also see e.g.*, *Timex Corp. v. Stoller*, 961 F.Supp. 374, 381 (D.Conn.1997); *but see also Sporty's Farm, LLC v. Sportsman's Mkt., Inc.*, No. 3:96CV0756 (AVC), 1998 U.S. Dist. LEXIS 23290, *25 (D.Conn.1998).

    a.    <u>**Polaroid Analysis**</u>

The Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.15 U.S.C. § 1125(b).

To evaluate the likelihood of consumer confusion, Courts apply the multi-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). This test requires analysis of several non-exclusive factors, including: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir.1987) (citing *Polaroid*, 287 F.2d at 495); *Gruner*, 991 F.2d at 1077. No single factor is dispositive, nor is a court limited to consideration of only these factors. *Polaroid*, 287 F.2d at 495. Further, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986).

i.  Strength of the Mark

It is undisputed that OSA has used the OMEGA mark in the United States for at least a century as reflected in United States trademark registration number 25,036. Since then, OSA has spent millions in marketing and brand development (CITE TO CSR). Most recently, the OMEGA mark was displayed prominently throughout the 2004 Olympic Summer Games which was broadcast nationally in the United States. It is irrefutable that OSA's OMEGA mark is strong with regard to timepieces, especially timing devices, watches and parts thereof.