In addition, OSA has developed a strong presence in the computer controlled timing business. OSA offers a variety of electronic timing devices for use at swim meets, track and field events, water polo and other sports. CITE to Gibbons and Kayal. These devices require extremely high precision and reliability which OSA has become known for. OSA has also used the OMEGA mark on display boards in public concourses such as train stations. OSA has experienced great recognition as a leader in timing devices. Accordingly, its OMEGA mark is very strong. This factor weighs strongly in OSA's favor.

### ii. Similarity of the Marks

Both OSA and OEI employ an identical word mark OMEGA and the Greek letter Ω. See Registration No. 25,036 and Registation No. 566,370, attached hereto as Exhibit 5. Although OEI has registered a multitude of derivations of the OMEGA mark and Ω design, the core of its trademarks is the word OMEGA. Thus it is also irrefutable that the marks are similar, if not identical.

In particular, in association with OEI improper advertisements which include images of watches, the word OMEGA was present in several locations on the webpages in question. For example, the word OMEGA appears as the second level domain for the webpages, which is located at www.omega.com. See Exhibit 22. This factor weighs in favor of OSA.

### iii. Competitive proximity of the products

This third factor in the *Polaroid* test looks to the similarity of the goods and services of the parties to help determine whether a likelihood of confusion exists. *M. Fabrikant & Sons, Ltd. v. Fabrikant Fine Diamonds, Inc.*, 17 F.Supp.2d 249, 253 (S.D.N.Y. 1998.) It is undisputed that OEI's period timers measure time, as do OSA's wristwatches and other timing goods. Timing is the center of OSA's business. See, *Omega S.A. v. Omega Engineering, Inc.*, 228 F.Supp.2d at

27

132. The goods are similar and they serve very similar purposes. Indeed, Dr. Hollander evidenced the similarity of the products when explaining OEI's choice of using a watch as a size comparison to a period timer. His testimony shows his understaning that watches and timing were related, explaining why he would choose to show a watch instead of a cup or a saucer to show the relative size of its period timer, but rather a wristwatch or stopwatch. [Ex. 14, Dep. Tr. Dr. Hollander at 328-246]. Dr. Hollander's testifmony showed that using a watch to show relative scale was a logical decision because both products measure time. [*Id.*]

OEI's argues that its "limited" trade channels of science and industry somehow diminish the proximity of the parties' goods in the marketplace. This argument is flawed. OEI's trademark registrations disclaim its goods as only use in science and industry. It is OEI's position that this disclaimer is sufficient to identify a specific trade channel. However, the term "industry" can be applied in countless contexts. Indeed even, Dr. Hollander identified many different "industries" including the transportation industry, the racing industry (i.e. sporting industry), the construction industry, the fashion industry, and the entertainment industry. [Id. 232-245]. OSA's sports timing goods may be considered part of the sports and recreation industry, or even a sect of the entertainment industry. Thus, when OEI restricts its goods to science and "industry", it certainly has not effectively created a channel of trade that is separate from OSA's.

In addition, OEI sells goods to NASA and many universities. [Id. at 25, 91, 249, 251]. However, NASA has long been a prestigious and well-publicized customer of OSA. In fact, OSA's OMEGA SPEEDMASTER brand watch is the only watch ever worn on the moon and it is also the official watch of the United States astronauts. [Exhibit 2]. In addition, universities represent an important target market for OSA's goods in the sports industry, such as scoreboards

and timing devices. Cite to Gibbons. Thus, with regard to these consumers, there is no separate channel of trade.

Furthermore, OEI's position that it markets to separate channels of trade, fails to account for post sale confusion. "Confusion need not be limited to the "point of sale" to be actionable under the Lanham Act. The Second Circuit has held that confusion among non-purchasers, arising from use of a mark outside of a retail environment after any sale or purchase of a product has concluded, is actionable under the Lanham Act." *1-800 Contacts, Inc. v. WhenU.com*, 309 F.Supp.2d 467, 491 (S.D.N.Y. 2003.) citing *Clinique Laboratories, Inc.*, 945 F.Supp. at 558 (S.D.N.Y.1996) (use of disclaimers insufficient to address confusion among consumers). In this case, some end users of OEI's timing devices may actually believe that they originated from OSA.

It is also undisputed that any individual consumer with accesss to the internet can access and purchase goods from OEI's website. Finally, in many contexts, OEI's language and the disclaimer of "for use in science and industry" is nonsensical. For example in Community Trademark application for OMEGA (application number 002,180,834), OEI applied for "jewelry for use in science and industry." When confronted with this peculiar description, Dr. Drucker stated that OEI does not sell jewelry, but it makes certain items for use in science and industry that *could* be worn as jewelry, such as platinum wire much the same way that their goods be used in other channels of trade and cause confusion. See Dep. Drucker at 86. Despite the fact that OEI has no intent to sell jewelry, it sought trademark protection for the mark as limited to science and industry. It is plainly clear that this is nothing more than a thinly veiled attempt encroach upon OSA's use of the OMEGA mark on jewelry and watch bracelets. Thus, this factor also weighs in favor of OSA.

OEI's advertising and marketing further supports a finding of likelihood of confusion. Several advertisements at OEI's website evidence OEI's intent to assert control over the OMEGA mark within OSA's business line. A search of omega.com for "clocks" reveals several different products. At least two of the search results displayed period timers. [See Ex. 29]. Note that beside the image of am OEI timer is a wristwatch. [*Id.*]. Another OEI timer is displayed next to a stopwatch. [*Id.*]. In addition, OEI presently advertises that its period timers can be used as "Time of Day Clocks" and stopwatches. [Exhibit 22]. Finally, OEI has displayed images of watches and stopwatches at it most popular trade channel, www.omega.com  It would defy any credible explanation that this company acutely aware of OSA's business would take reasonable measures to avoid icons such as watches and stopwatches from appearing in its sales materials..

It is undisputed that OSA has priority to the OMEGA mark with regard to wristwatches. [Ex. 13, Dep. Tr. Riggs at 98; Ex. 1]. OEI's use of a wristwatch alongside one of its period timers cannot possibly be construed to be in good faith. To the contrary, it is another link in the remarkable, unending chain of "coincidences", which even when viewed in a light most favorable to the Defendant are so lacking in any credible or logical foundation, as to erase any doubt as to wrongfulness of such acts.

OEI also offers goods for sale through its website, that it describes as watch batteries. These watch batteries are sold in connection with the Omega marks. [Ex. 30, printout from search results from www.omega.com, visited on 4/15/04; Report *of Brad Cole* 31.] Thus, not only is OEI selling timing devices in connection with the Omega marks, it is also selling parts for watches with the Omega mark

### iv. The Likelihood the Plaintiff will Bridge the Gap.

30

OEI uses the OMEGA mark on computer controlled timing devices. [Ex. 34, Dep. Tr. Dr. Drucker at 280]. It is also undisputed that OSA for many years has used the OMEGA mark for computer controlled timing devices in the sports industry. [Exhibit 9]. Given the opportunity to expand the products, OSA would further extend its products to schools, laboratories and "industry."

With regard to watch batteries, OSA has been selling watch batteries and other watch parts in the United States since as early as 1952. [Exhibit 5]. OEI's sale of watch batteries evidences that there is no gap to bridge between the business of both parties because as shown in this example the goods are exactly the same. This factor favors OSA as well.

### v. The Defendant's Good Faith in Adopting its Mark.

Dr. Hollander stated that he believed it was a goods idea to advertise OEI's period timers and industrial clocks alongside a wristwatch because both products are in timing. This Court on three separate occasions has already found OEI's conduct to constitute bad faith. See, *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d at 497-98; *Omega S.A. v. Omega Engineering, Inc.*, 228 F.Supp.2d 132; *Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d. at 214.

In addition, OEI were all aware of the OMEGA mark for timepieces before OEI was even created and before it adopted the OMEGA mark for period timers and scientific clocks. [Ex. 13, Riggs Dep. Tr. at 98.] This is a significant fact in analyzing whether a party acted in good faith when it adopted a mark. This factor also favors, OSA.

OEI's pattern and practice of continuing to expand the scope of its goods and services to the point where they unmistakably encroach on the long-established rights of OSA, clearly support not only a finding of likelihood of confusion, but also of unfair practices under both the

Lanham Act and CUTPA. This Court should therefore find that such egregious undisputed conduct supports a finding of summary judgment on Plaintiff's Third and Fourth Claims for relief under the Section §1125 of the Lanham Act and CUTPA.

### C. DEFENDANTS' FIRST COUNTERCLAIM FOR CYBERSQUATTING SHOULD BE DISMISSED - OSA PROPERLY OWNS RIGHTS TO THE OMEGA.US DOMAIN NAME

Defendants' First Counterclaim of Cybersquatting regarding Plaintiffs' registration of the domain name omega.us fails as a matter of law. As the undisputed holder of numerous incontestable OMEGA trademark registrations, OSA clearly has legitimate rights to the omega.us domain name. Defendants' allegations, that registration of a .US domain name by a foreign entity is unlawfully misleading, are not supported by any rule or law, and borders on frivolous.

#### 1. The .US Registration Process

On April 24, 2002, the .US domain became available to the general public and registration became possible through its registry NeuStar. NeuStar maintains a growing network of .US-accredited registrars, which are responsible for selling .US domain names to the general public. [Ex. E, 4 NO. 5 E-Commerce L. Rep. 5 (March 2002).]

Prior to the general public registration on April 24, 2002, applications were accepted during an established Sunrise Period beginning on March 4, 2002. During the Sunrise Period, owners of existing or pending trademarks valid in the United States were allowed to submit a claim form for each domain name in which the trademark owner claims rights. The Sunrise Period was limited to owners of trademarks that were either registered or pending on the

32

Principal Register with the United States Patent and Trademark Office ("USPTO") prior to July 27, 2001. The Sunrise Period ended on April 9, 2002. [*Id.*]

Recognizing that there may be more than one qualified applicant for a given domain name during the Sunrise Period, domain names that were sought by more than one qualified party were assigned through the Random Selection Process administered by NeuStar. After the Random Selection Process completed on April 23, 2002, subsequent registrations were accepted on a first-come, first-served basis. [*Id.*]

### 2. Registration Requirement for the .US Domain

The only requirement of a registrant of a .US domain name is that it must be in compliance with the U.S. Nexus Requirement. [Ex. F, printout from Neustar website at www.nic.com, visited September 14, 2004.] For a company claiming a nexus based upon substantial lawful contacts with, or lawful activities in, the United States, factors that should be considered include, without limitation, whether such prospective usTLD domain name registrant regularly performs lawful activities within the United States related to the purposes for which the entity or organization is constituted (e.g., selling goods or providing services to customers, conducting regular training activities, attending conferences), provided such activities are not conducted solely or primarily to permit it to register for a usTLD domain name and are lawful under the laws and regulations of the United States [*Id.*]

### 3. OSA Meets All the Requirements for Registration of Omega.us

During the Sunrise Registration period, Swatch, on behalf of OSA, applied for registration of the domain name omega.us. [Ex. G, Sunrise Application for Omega.us.] Included in this application was a request for other .US domain names administered by Swatch, including swatch.us, longines.us, rado.us, hamilton.us, blancpain.us, and tissot.us. [*Id.*] In support of its

33

application for omega.us, Swatch listed OSA as the trademark holder, identifying OSA's United States Trademark Registration no. 566,370, registered on April 11, 1952. *Id.* Swatch did not seek rights to the omega.us domain name in its own name, nor did it claim any rights in the Omega mark. [*Id.*] Swatch was the administrative agent for OSA.

There can be no dispute that OSA is entitled, and has satisfied every requirement, for registration of the omega.us domain. It is undisputed that OSA is a foreign entity that has a bona fide presence in the United States. OSA regularly sells watches and other goods in the United States, and Omega and its related companies maintain offices and other facilities for lawful business in the United States. In fact, OSA has been selling goods in the United States for many decades before OEI, and its gross sales in the United States may even exceed that of OEI.

OEI's counterclaim alleges that a foreign entity, by registering its mark with the .us domain name is somehow misleading the public into believing that the foreign entity is a United States company. This argument is, simply, absurd. Attached as exhibit H, are numerous domain name dispute decisions that clearly establish a foreign entity's right to register its trademark with a .us domain. In some of these cases, the foreign entity's rights were granted over a U.S. company that had established rights in a similar mark. Ex. H, *Milnot Co. v. Ballard*, Claim No. 117035 (2002); *Societe Generale v. Labanon Index*, Claim No. 118278; *Ferrari S.p.A. v. The Parties Exchange.com, Inc.*, Claim No. 271108 (2004); *Agnona S.p.A. v. Lo Prete*, Claim No. 215369 (2004). Such cases include the confirmation of rights in a .US domain name to companies headquartered in the United Kingdom, Italy and France. [*Id.*]

Moreover, the attached decisions consistently hold that "the addition of the country-code ".US" fails to add any distinguishing characteristic to the domain name." Ex. H, e.g. *Ferrari*, *Agnona*. Thus, for purposes of determining rights in the domain name omega.us, this Court need

34

only determine whether OSA has rights in the OMEGA mark (without the .us). In fact, OEI admitted this very same principle in its first Motion to Dismiss OSA's Complaint. [Def.'s Motion to Dismiss at 25 ("under the law of this Circuit, for purposes of analyzing whether a domain name infringes a trademark, the Court is to disregard the .com or .net designation.")]

### 4. There is No Evidence of Bad Faith

The governing statute, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(d), sets forth the standard for a claim of cybersquatting. *Sporty's Farm LLC v. Sportsman's Market Inc.*, 202 F.3d 489, 495-96 (2d Cir. 2000). The relevant parts of this statute hold:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that is identical or confusingly similar to or dilutive of that mark.
>
> (B)(i) In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to
>
>> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

35

>(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.
>
>(ii) Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

Considering all of the factors listed above, there is no material issue of fact to support OEI's allegation that OSA registered the mark improperly. OSA's rights to the OMEGA trademark are clearly documented and include trademark registration no. 25,036; and 566,370. [Ex. 1 and 5.] OSA has used the Omega mark and its Omega website for numerous years to promote the sale of its goods. There is no evidence of OSA's intent to divert customers, or to profit from the registration of the domain name at the expense of OEI. There is also no evidence of false statements to the registrar or of any OSA pattern or practice of acquiring numerous confusingly similar domain names.

Section 1125(d)(2) as noted above provides further support that OEI's cybersquatting claim must be dismissed. Based on OSA's undisputed rights in the OMEGA mark, its legitimate presence in the Untied States, and its unmistakable compliance with the registrar's nexus requirement as noted above, this Court could only conclude that OSA believed it had reasonable grounds to believe that the use of the domain name was a fair use and otherwise lawful. 15 U.S.C. § 1125(d).

Not only is there no evidence of bad-faith relating to OSA's registration of omega.us, but OEI itself owns, has applied for, and maintains registrations to numerous domain names containing foreign country codes. For example OEI maintains the following registrations: omega.be (Belgium); omega.ca (Canada); omega.co.il (Israel); euromega.com.fr, omega-com.fr, omega1.fr (France); omega.com.mx (Mexico); iomeganet.co.uk and omega.co.uk (United Kingdom). Ex.I at 1. OEI has also registered for marks containing European symbols such as its registration for the mark OM€GA, with the letter "E" in OMEGA replaced with the sign for the new European currency symbol, the "Euro." Ex.K.

### 5. OEI's Claim to be *the* "US OMEGA" or "OMEGAUS" is Baseless

Notwithstanding the fact that a top level domain such as ".US" has no bearing on a party's rights in a particular mark, OEI makes the astonishing allegation that somehow they have acquired rights as *the* "US Omega" or "Omega US". To support this argument, OEI explains that its customers have come to recognize it as a United States-based company, and therefore, they are know as "U.S. Omega" or "Omega U.S." [*See*, OEI's Answer and Counterclaims to the Third Amended Complaint, Docket No. 56 at 20.] While this argument may score some points for creativity, it certainly provides no support for OEI's cybersquatting claim.

Attached as exhibit J, are the search results from a website operated by thomasregister.com, from April 12, 2004.[3] The thomasregister.com search results show 59 companies in the United States with Omega in their names. Each of these companies is in the science and manufacturing field. Attached as Exhibit K, is further information about these other U.S. Omega companies, some of which have been in operation longer than OEI, some of which

---

[3] Thomas Register is recognized as the most comprehensive source for finding companies and products in the manufacturing and industrial fields. See www.thomasregister.com.

have more employees than OEI, and some of which have greater assets than OEI. *Id, e.g.* Omega Optical Co., Inc., with between $100-250 million in assets and between 500-999 employees; Omega Power Systems, Inc. with between $25-50 million in assets and 100-249 employees; Omega Laboratories, Inc., founded in 1952; Omega Heater Co., Inc. over $1 million in assets, founded in 1970; Omega Precision Corp. over $1 million in assets and founded in 1973. In light of the countless other prevalent Omega companies in the United States, it is simply incredible that OEI can maintain that it is exclusively known, and somehow has acquired exclusive rights as the US Omega, in the science and manufacturing field, let alone the entire United States marketplace. To then extrapolate this to claim, as a general proposition of US customer recognition (and noting OEI's undying drumbeat that they are in different trade channels from OSA) that OEI has rights throughout the USA as "the US Omega" or more precisely "Omega.US", is absurd. OEI's claims for cybersquatting must be dismissed.

### IV.    CONCLUSION

Plaintiff has established that there are no genuine issues of material fact with regard to the predicate elements necessary to establish OEI's liability under the Connecticut Unfair Trade Practices Act and Unfair Competition under the Lanham Act. Accordingly, Plaintiff requests that the Court grant summary judgment on Plaintiff's Counts 3 and 4 in their entirety. Plaintiff has also established that there are no genuine issues of material fact with regard to the absence of elements necessary to establish liability under the Anticybersquatting Consumer Protection Act. Accordingly, Plaintiff respectfully submits that the Court dismiss OEI's First Counterclaim.

Respectfully submitted
for Plaintiff,

By: _____
Jess M. Collen (JC-2875)
Matthew C. Wagner (MW-0204)
COLLEN *IP*
THE HOLYOKE-MANHATAN BUILDING
80 South Highland Avenue
Ossining, New York 10562
(914) 941-5668
(914) 941-6091 (facsimile)
jcollen@collenlaw.com (email)