IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

OMEGA, S.A.,

               Plaintiff,

     v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC, INC., AND
OMEGA PRESS, INC.,

             Defendants.

OMEGA ENGINEERING, INC.,

             Counterclaim-Plaintiff,

     v.

OMEGA, S.A. and
THE SWATCH GROUP LTD.

             Counterclaim-Defendants.

Civil Action No.:
3:01 CV 2104 (MRK)

**REDACTED**

DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

30940217.DOC

**Table of Contents**

Page

PRELIMINARY STATEMENT ........................................................................................ 1

THE UNDISPUTED FACTS ........................................................................................... 4

ARGUMENT ................................................................................................................... 19

I.  THE STANDARD FOR SUMMARY JUDGMENT. ..................................................... 19

II.  SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIMS FOR
    TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN. ......... 21

    A.  It Is Undisputed That Defendants Have Not Yet Made Use of the Marks
        Covered by OEI's Challenged Applications. ................................................. 21
    B.  OSA's Claims Relating to Period Timers, Industrial and Scientific Clocks,
        and the '762 and '705 Registrations Are Barred by the *Omega I* Settlement
        and the Release Contained Therein. ............................................................. 22
    C.  OSA's Claims Relating to Period Timers, Industrial and Scientific Clocks,
        Measuring, Timing and Display Apparatus for Science and Industry, and
        Other Devices Sold by OEI to Measure and Control Variable Parameters
        Are Barred by the 1994 Agreement. ............................................................. 24
    D.  OSA's Trademark Infringement and False Designation of Origin Claims
        Fail Because, on the Undisputed Facts, It Is Clear That There Is No
        Likelihood of Confusion. .............................................................................. 25

        1.  The Lack of Proximity of the Products and the Lack of Overlap in
            Customers Favor Defendants. ............................................................. 26
        2.  The Lack of Overlap in Marketing Channels Favors Defendants. ........... 28
        3.  The Sophistication of Buyers Favors Defendants. ................................. 28
        4.  The Lack of Evidence of Actual Confusion Favors Defendants. ............. 29
        5.  OEI's Good Faith in Adopting its OMEGA Marks Favors
            Defendants. ...................................................................................... 30
        6.  The Quality of Defendants' Services Favors Defendants. ...................... 31
        7.  Given the Numerous Third Party Uses of Similar OMEGA Marks,
            OSA's Mark Is Weak Outside of OSA's Specific Product Areas. ........... 31
        8.  The Similarity of the Marks Does Not Alter the Conclusion That
            There Is No Likelihood of Confusion. .................................................. 33

III.  SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIM FOR
     TRADEMARK DILUTION. ..................................................................................... 34

IV.  SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIMS FOR
     ALLEGED UNFAIR "BLOCKING" UNDER CUTPA AND THE LANHAM
     ACT. ..................................................................................................................... 36

Page

A.   OSA's "Blocking" Claims Relating to Foreign Trademark Filings Are
     Barred by *Vanity Fair* and Principles of International Comity, and Its
     Blocking Claims With Respect to All Filings Fail to State a Claim for
     Relief. ................................................................................................... 37

B.   OSA's "Blocking" Claims Fail in Their Entirety Because the Undisputed
     Evidence Shows that All of Defendants' Trademark Filings Constitute
     Protected Petitioning Activity. ........................................................... 37

C.   OSA's "Blocking" Claims Fail Because the Undisputed Evidence Shows
     that OSA Has Not Been "Blocked" or Suffered any Other Purported Injury
     as a Result of Defendants' Alleged Conduct. ...................................... 39

D.   OSA's Blocking Claims Are Barred By the 1994 Agreement and the
     *Omega I* Settlement to the Extent They Relate to Applications to Register
     OMEGA Marks for OEI's Scientific and Industrial Timing Devices. ................. 39

CONCLUSION ................................................................................................... 40

## TABLE OF AUTHORITIES

**CASES**                                                                                            **PAGES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................20

*Arrow Fastener Co. v. The Stanley Works,*
    59 F.3d 384 (2d Cir. 1995) ........................................................................29

*Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.,*
    718 F.2d 1201 (1st Cir. 1983) ..............................................................26, 35

*AutoZone, Inc. v. Tandy Corp.,*
    373 F.3d 786 (6th Cir. 2004) ..........................................................32, 33, 35

*CBS Inc. v. Liederman,*
    866 F. Supp. 763 (S.D.N.Y. 1994), *aff'd,* 44 F.3d 174 (1995) ......................26

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................................20, 21

*Cieszkowska v. Gray Line New York,*
    295 F.3d 204 (2d Cir. 2002) ........................................................................23

*Cognotec Servs. Ltd. v. Morgan Guar. Trust Co.,*
    862 F. Supp. 45 (S.D.N.Y. 1994) ................................................................22

*Dynamics Research Corp. v. Langenau,*
    704 F.2d 1575 (Fed. Cir. 1983) ..................................................................26

*Electronic Design & Sales, Inc. v. Engineering Design & Sales,*
    954 F.2d 713 (Fed. Cir. 1992) ....................................................................26

*Essence Comms., Inc. v. Singh Indus., Inc.,*
    703 F. Supp. 261 (S.D.N.Y. 1988) ............................................................30

*Estee Lauder Inc. v. The Gap, Inc.,*
    108 F.3d 1503 (2d Cir. 1997) ................................................................32, 33

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ........................................................................20

*Gruner & Jahr USA Pub'g v. Meredith Corp.,*
    991 F.2d 1072 (2d Cir. 1993) ......................................................................33

*Haydon Switch and Instrument, Inc. v. Rexnord, Inc.,*
    1987 U.S. Dist. LEXIS 11268 (D. Conn. June 4, 1987) ..............................29

*Knight v. U.S. Fire Ins. Co.*,
    804 F.2d 9 (2d Cir. 1986) ............................................................................20, 21

*Kusek v. Family Circle, Inc.*,
    894 F. Supp. 522 (D. Mass. 1995).....................................................................22

*La Cibeles, Inc. v. Adipar, Ltd.*,
    2000 U.S. Dist. LEXIS 12676 (S.D.N.Y. Sept. 1, 2000) ...............................29

*Lang v. Retirement Living Publishing Co.*,
    949 F.2d 576 (2d Cir. 1991) .......................................................................26, 32

*Lever Bros. Co. v. American Bakeries Co.*,
    693 F.2d 251 (2d Cir. 1982) .............................................................................30

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................................20

*Macia v. Microsoft Corp.*,
    152 F. Supp. 2d 535 (D. Vt. 2001) ..................................................................22

*Mastercard International Inc. v. Nader 2000 Primary Committee, Inc.*,
    2004 U.S. Dist. LEXIS 3644 (S.D.N.Y. Mar. 8, 2004)...................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................20

*Merriam-Webster, Inc. v. Random House*,
    35 F.3d 65 (2d Cir. 1994) .................................................................................30

*Moore Business Forms, Inc. v. Rite Aid Corp.*,
    1991 U.S. Dist. LEXIS 18599 (W.D.N.Y. 1991)............................................26

*Moseley v. V. Secret Catalogue, Inc.*,
    537 U.S. 418 (2003) .............................................................................3, 35, 36

*Nabisco, Inc. v. PF Brands*,
    191 F.3d 208 (2d Cir. 1999) .............................................................................34

*Nabisco, Inc. v. Warner-Lambert Co.*,
    220 F.3d 43 (2d Cir. 2000)..........................................................................26, 33

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001) ...............................................................25, 26, 30,
                                                                     31

*Pharmacia Corp. v. Alcon Laboratories, Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002)..................................................................35

30940217.DOC

iv

*Playtex Products, Inc. v. Georgia-Pacific Inc.*,
   2003 U.S. Dist. LEXIS 13981 (S.D.N.Y. Aug. 12, 2003)............................36

*Polaroid Corp. v. Polarad Electronics Corp.*,
   287 F.2d 492 (2d Cir. 1961) ...........................................................................25

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
   485 F. Supp. 1185 (S.D.N.Y. 1979) ...............................................................31

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
   508 U.S. 49 (1993) ..........................................................................................37

*Quarles v. General Motors Corp.*,
   758 F.2d 839 (2d Cir. 1985) ...........................................................................21

*Savin Corp. v. The Savin Group*,
   2003 U.S. Dist. LEXIS 19220 (S.D.N.Y. Oct. 28, 2003).............................36

*Streetwise Maps, Inc. v. VanDam, Inc.*,
   159 F.3d 739 (2d Cir. 1998) ...........................................................................33

*TCPIP Holding Co. v. Haar Comms. Inc.*,
   244 F.3d 88 (2d Cir. 2001) .............................................................................35

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
   305 F.3d 894 (9th Cir. 2002) ..........................................................................35

*Thompson Medical Co. v. Pfizer, Inc.*,
   753 F.2d 208 (2d Cir. 1985) ...........................................................................21

*Time, Inc. v. Petersen Pub'g Co.*,
   173 F.3d 113 (2d. Cir. 1999) ....................................................................32, 33

*Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*,
   402 F. Supp. 838 (E.D.N.Y. 1975), *aff'd*, 538 F.2d 314 (2d Cir. 1976).........22

*W.W.W. Pharm. Co. v. Gillette Co.*,
   984 F.2d 567 (2d Cir. 1993) ...........................................................................31

*Waldman v. Village of Kiryas Joel*,
   207 F.3d 105 (2d Cir. 2000) ...........................................................................23

## STATUTES

Conn. Gen. Stat. § 42-110g(a) .............................................................................39

15 U.S.C. § 1051(b) ................................................................................................8

15 U.S.C. § 1114(1) .........................................................................................21, 22

30940217.DOC

v

15 U.S.C. § 1125...........................................................................................21, 22, 34,
                                                                                            37, 39

**MISCELLANEOUS**

H.R. Rep. No. 104-374 (1995), *reprinted in* 1995
     U.S.C.C.A.N. 1029........................................................................................35

Defendants Omega Engineering, Inc. ("OEI"), Omega Scientific, Inc. and Omega Press, Inc. submit this memorandum of law in support of their motion for summary judgment dismissing in its entirety the complaint of plaintiff Omega S.A. ("OSA").

## PRELIMINARY STATEMENT

This is a trademark infringement case where two companies have co-existed for many decades using the same trademark, OMEGA, for their respective and very different markets, products and services, and where defendant OEI owns over 70 federal registrations for the OMEGA mark and related design marks (many of them incontestable). Plaintiff principally sells watches to consumers through retailers. OEI does not sell any goods to consumers, but sells scientific and industrial process measurement and control products directly to sophisticated purchasers such as factories, laboratories, engineers and the like. Moreover, the parties have entered into at least two agreements – a 1994 Agreement and a 2003 Settlement Agreement – expressly permitting their respective uses of OMEGA marks, and the record is devoid of evidence of any confusion between the companies despite the long history of use of the marks by both parties. The undisputed facts show that OSA's claims – some of which are recycled from (and barred by) prior litigation between the parties – are without merit.

Thus, OSA claims that the mere *filing* of intent-to-use trademark applications with the United States Patent & Trademark Office ("PTO"), which have not been issued or approved by the PTO, somehow constitutes trademark infringement and false designation of origin, even though defendants do not yet use the marks applied for. However, there can be no infringement where the defendant has not used the challenged mark on goods or services in commerce.

OSA also claims that the industrial and scientific goods that defendants sell to scientists and engineers – and that OSA has recognized in a 1994 agreement between the parties that OEI has a right to sell – infringe OSA's rights to the OMEGA mark with respect to

30940217.DOC

wristwatches and devices to time swim meets and foot races. The undisputed evidence, however, shows that the OEI goods and services at issue are entirely different from the goods sold under OSA's OMEGA marks. Thus, OEI sells industrial and scientific process measurement and control devices, which are used in settings such as laboratories and factories to measure and control industrial processes, and in scientific experiments and the like. OSA and its licensee, in contrast, sell luxury wristwatches to consumers and sports timing devices to athletic organizations. It is undisputed that defendants do not offer wristwatches or other products to consumers, and do not offer sports timing devices. It is also undisputed that OSA and its licensee do not sell industrial or scientific products or timing devices under OMEGA marks. Moreover, the parties' goods and services are offered to entirely different customers. Thus, OEI advertises and sells only to the industrial and scientific markets in which OEI has marketed its products for decades, such as sophisticated engineers and scientists, while OSA sells its wristwatches to consumers and its sports timing products to athletic organizations. The parties' marketing channels are similarly distinct: OEI advertises in publications aimed at the scientific and industrial markets and in direct mail to its target purchasers, while OSA's wristwatches are advertised in upscale consumer media and its sports timing devices (to the extent they are advertised at all) in publications aimed at sports organizations. In sum, there is no competitive overlap between the parties. Not surprisingly, then, OSA's Rule 30(b)(6) witnesses identified no publications in which both parties advertised, no products with respect to which both parties competed, and no evidence of actual confusion between the parties.

Moreover, to the extent OSA complains of OEI's use of OMEGA marks on period timers and scientific and industrial clocks, OSA released those claims in the settlement of a prior case between the parties. And, to the extent OSA complains of OEI's use of OMEGA

marks on computer controlled timing, measuring and display apparatus, or apparatus for the measurement and control of variable parameters – and most of OSA's claims relate to such goods – those claims are barred by a 1994 Agreement between the parties in which OSA acknowledged the right of OEI to use OMEGA marks with respect to such goods for industrial and scientific applications – which, again, are the only uses for which OEI offers its products.

The undisputed facts show that OSA's trademark dilution claim is also without merit. OSA has at least twice expressly agreed that OEI can use OMEGA marks on its products; OSA cannot now claim that OEI's use of OMEGA marks dilutes OSA's rights. Indeed, in light of the numerous third party uses of marks containing OMEGA, there is no basis on which to conclude that OMEGA is viewed exclusively as a mark of OSA, and, thus, no basis to conclude that it is capable of being diluted or has been diluted as required under the Lanham Act. In all events, there is no evidence that OSA's mark has suffered "actual dilution" as required by the Supreme Court's decision in *Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 433 (2003).

As for OSA's claims that defendants have violated the Connecticut Unfair Trade Practices Act ("CUTPA") and the Lanham Act by allegedly filing trademark applications in bad faith with the intent to "block" OSA's trademark rights, the undisputed facts show that those claims are equally without merit. First, as defendants have previously shown in their submissions in support of judgment on the pleadings with respect to these claims – submissions that, pursuant to the Court's order, defendants hereby incorporate by reference – it is clear that determination of OSA's claims relating to OEI's foreign filings would require the Court to determine the validity of those filings under foreign law, determinations that the Court does not have jurisdiction to make and under principles of international comity should not make. As also previously shown, the statutes at issue do not extend to filings with trademark authorities.

Second, there is no basis from which a factfinder could conclude that defendants engaged in bad-faith trademark filings (either in the United States or abroad) with the intent to injure OSA, or that OEI's trademark applications are objectively baseless, as required by the *Noerr-Pennington* doctrine and the First Amendment, particularly given OEI's long history of use of and rights in the OMEGA marks and the express agreements permitting OEI to register and use those marks in its areas of trade. Third, OSA has *conceded* that it has *not* been "blocked" or otherwise injured as a result of any United States filings by OEI. Lastly, OSA's claims of bad faith filings are barred in significant part by the parties' prior agreements, which expressly permit OEI to register and use OMEGA marks in its spheres of trade.

## THE UNDISPUTED FACTS[1]

### Defendants' Scientific and Industrial Goods Offered Under Their OMEGA Marks

OEI was founded in 1962 as a manufacturer and seller of thermocouples, devices used in scientific and industrial fields (such as factories and laboratories) to measure temperatures. The name Omega Engineering was selected because an early user of the thermocouples that Mrs. Betty Ruth Hollander, OEI's founder, made at her kitchen table was a company called Alpha Molykote. Alpha being the first letter of the Greek alphabet, Mrs. Hollander decided to adopt the last letter of the Greek alphabet, Omega, for her company. (M. Hollander Dec. ¶ 2). Over the last 42 years, OEI has marketed, distributed and sold

---

[1]    The facts necessary to resolve this motion are set forth more fully in defendants' accompanying Local Civil Rule 56(a)1 Statement and are based on the pleadings; the Declaration ("Dec.") of Thomas A. Smart dated September 14, 2004 and exhibits thereto (which includes relevant deposition testimony and exhibits); the Declaration of Michelle Tepper dated September 14, 2004 and exhibits thereto; the declaration of Dr. Milton Hollander dated September 14, 2004 and exhibits thereto; the declaration of B. Christine Riggs dated September 14, 2004 and exhibits thereto; the previously filed declaration of B. Christine Riggs filed April 1, 2004 and exhibits thereto; and the previously filed declaration of Thomas A. Smart dated March 31, 2004.

thousands of different scientific and industrial products under the OMEGA mark and a design

mark consisting of the juxtaposed Greek letters omega and epsilon. (*Id.* ¶¶ 3-4 & Ex. A).

The products marketed, distributed and sold under OEI's OMEGA marks include

scientific apparatus for measuring or controlling variable parameters such as temperature,

pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain,

flow and other variable parameters. (M. Hollander Dec. ¶ 5). Because time is often a critical

aspect of the measurement and control of variable parameters in scientific and industrial

applications, some of OEI's measurement and control apparatus contain a timing function. (*Id.* ¶

7). Since at least 1987, OEI has sold, under its OMEGA marks, time-related goods for science

and industry such as industrial and scientific period timers and industrial and scientific clocks,

and similar computer-controlled measurement, timing and display apparatus used to measure and

control industrial and scientific processes. (*Id.* ¶ 6). OEI offers over 68,000 different products

under its OMEGA marks, many of which cost hundreds or thousands of dollars. (*Id.* ¶ 3).

OEI also offers services relating to its products for its scientific and industrial

customers. For example, OEI offers telecommunications services in the form of online and

telephonic information services relating to its scientific and industrial products. (M. Hollander

Dec. ¶ 9). OEI also offers calibration, repair, data collection and data analysis services to its

scientific and industrial customers, and has done so for many years. (*Id.* ¶ 9). In addition, OEI

also offers its industrial and scientific customers various technical books, software and other

publications and printed matter for industrial and scientific uses, including, for example,

handbooks for scientists and engineers, charts, posters and "deck cards" bearing scientific data

and technical information, and similar items. (*Id.* ¶ 10 & Exs. B-F).

**Defendants' Industrial and Scientific Customers and Marketing Channels**

Defendants' customers consist solely of companies and other entities in the fields

of science and industry. For example, defendants sell to engineers, manufacturers, scientific

laboratories, and engineering and science departments of universities. Defendants' purchasers

are sophisticated buyers seeking the highly specialized industrial and scientific devices that

defendants sell. (M. Hollander Dec. ¶ 13 & Ex. H). Defendants do not offer or sell any goods or

services under OMEGA marks for use in markets or fields outside of industry and science. (*Id.*

¶¶ 13, 15-16). Thus at no time in the over 40-year history of OEI have defendants marketed or

sold any goods or services under any OMEGA marks to consumers. (*Id.* ¶ 15). Defendants do

not sell watches or clocks or other devices that can be used by consumers to tell time. (*Id.* ¶ 15).

Nor have defendants ever marketed or sold goods or services under any OMEGA marks for use

in timing athletic competitions or sports events. (*Id.* ¶ 16).

Defendants advertise and market their services to the science and industry

markets through specialized trade publications and direct mail. (M. Hollander Dec. ¶¶ 17-18, 20

& Exs. E, F, I-L). Defendants also advertise and market their services to the scientific and

industrial markets through defendants' web sites and through a series of "handbooks" published

by OEI, which contain product information as well as technical information of interest to

engineers and scientists. (*Id.* ¶¶ 21 & Exs. B-D, N-P). OEI also advertises its scientific and

industrial products and services at numerous scientific and industrial trade shows. (*Id.* ¶ 19 &

Ex. M).

OEI's identity as an American company selling products made in the United

States has been emphasized in OEI's marketing for many years. Thus, most of defendants'

products are manufactured in the United States, and defendants' advertising materials routinely

and prominently emphasize that fact, using, for example, the phrase "Made in the U.S.A.,"

variations of Americana paintings by Norman Rockwell, and the American flag. (M. Hollander

Dec. ¶ 22 & Exs. B-D, Q). In addition to the United States, defendants also have marketed and sold their OMEGA products, including period timers and similar devices, abroad for many years. Most of OEI's products that are sold in the United States also are sold abroad under the OMEGA marks, by subsidiaries and sales offices of OEI in England, Canada, France, Germany and many other countries. OEI also distributes sales literature internationally to scientific and industrial customers and accepts purchases from these companies on its omega.com website. (*Id.* ¶ 23).

Over the years, OEI has spent millions of dollars in advertising and marketing costs for its OMEGA-branded goods and services, including over $    million in the last five years. (M. Hollander Dec. ¶ 24 & Ex. R). It has made hundreds of millions of dollars of sales of scientific and industrial process control products under OMEGA marks in the U.S. and abroad over the last 40 years, with sales from 1999-2003 totaling over $    million. (*Id.* ¶ 25 & Ex. S).

**Defendants' Trademark Registrations and Applications**

OEI's earliest United States trademark registration for the OMEGA trademark for industrial and scientific apparatus was issued in 1966. This registration, U.S. Registration No. 818,251, is a valid, subsisting, existing and incontestable trademark registration. (Riggs Dec. ¶ 2 & Ex. A). OEI is also the owner of more than 75 other valid, subsisting and existing United States federal trademark registrations for trademarks or service marks that include the word OMEGA, more than 50 of which are incontestable marks. (*Id.* ¶ 3 & Ex. B).

OEI owns two registrations covering period timers that are challenged in this action. Thus, OEI owns a federal trademark registration for the mark OMEGA, Registration No. 2,022,762 (the "'762" Registration), that covers, among other goods, "timers, namely period timers . . . industrially and/or scientifically employed, in Class 9" and "industrial and scientific clocks, in class 14." OEI also owns a federal registration for its "OMEGA bug" design mark, Registration No. 2,034,705 (the "'705" Registration), which covers, among other goods, "timers,

namely period timers . . . industrially and/or scientifically employed, in Class 9" and "industrial and scientific clocks, in class 14." (Riggs Dec. ¶¶ 4-5 & Exs. C, D).  OEI also owns a federal registration for the mark OMEGA, Registration No. 2,236,657 (the "'657" Registration), which covers "telecommunications, namely, communications by computer terminals, communications by telephone, computer aided transmission of messages and images; and communications via a global computer information network," in Class 38." (*Id.* ¶ 6 & Ex. E).

In addition, OEI owns three pending intent-to-use trademark applications that are challenged in this action.  OEI owns a pending application for the design mark Ω.com – that is, the Greek letter Omega followed by ".com" – Serial No. 76/337,374 (the "'374" Application), a pending application for a design mark consisting of the Greek letter Ω, Serial No.76/337,450 (the "'*450*" Application), and a pending federal trademark application for the design mark OMЄGA – that is, the word OMEGA with the "E" replaced with a stylized "Є" – Serial No. 76/242,073 (the "'*073*" Application).  The '374, '450 and '073 Applications are intent to use applications under Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b).  Each application covers a variety of goods and services relating to OEI's industrial and scientific products, including many of the industrial and scientific products and related printed materials offered by OEI under its other OMEGA marks, as well as a variety of services relating to OEI's products.  (Riggs Dec. ¶¶ 7, 9, 11 & Exs. F-H; M. Hollander Dec. ¶¶ 26-29).  Each intent to use application has been suspended as a result of this litigation, and the PTO has not taken final action with respect to the applications.  It is undisputed that OEI has not yet used in commerce of the marks covered by these intent-to-use applications. (Riggs Dec. ¶¶ 8, 10, 12 & Exs. F-H; M. Hollander Dec. ¶ 29).

**OSA's Luxury Wristwatches**

Omega S.A. ("*OSA*"), a subsidiary of The Swatch Group Ltd., is a Swiss company that sells luxury watches, jewelry and related-watch products, such as watch bands and spare

parts, under the mark OMEGA and a design mark consisting of the Greek letter Omega (Ω).

(Sauser Rupp Tr. 41, 63, 65-66, 89-90; Smart Dec. Ex. G; Emmons Tr. 14, 34-35, 40; Rentsch

Tr. 104, 119).[2]  The only services offered by OSA under the OMEGA marks in the United States

are watch repair services.  (Sauser Rupp Tr. 66-67).  OSA's OMEGA watches are upscale,

luxury goods that range in prices from $1,200 to $79,000.  They are made in Switzerland and are

advertised as Swiss-made, a fact that OSA believes provides its watches with prestige and

cachet. (Emmons Tr. 40-41, 59-62; Sauser Rupp Tr. 77, 87; Rentsch Tr. 190-91).

OSA's OMEGA wristwatches are sold in the United States to retail consumers,

through authorized retail jewelers and upscale department stores. (Emmons Tr. 69-70; Sauser

Rupp Tr. 89-90; Rentsch Tr. 104-05).  A consumer wishing to purchase an OMEGA watch must

visit an authorized retailer; OMEGA watches *cannot* be purchased from the official OSA website

and any sales via the internet are not authorized. (Emmons Tr. 44-45; Sauser Rupp Tr. 80-82,

98; Smart Dec. Ex. H).  OSA advertises its OMEGA watches in consumer brochures,

newspapers, magazines and billboards.  (Emmons Tr. 56, 111, 132, 148; Sauser Rupp Tr. 121-

23).  OMEGA watch advertisements typically appear in upscale consumer magazines such as

*Fortune*, *Esquire* and *Golf Digest* and newspapers such as *The New York Times* and *The Wall

Street Journal*.  (Emmons Tr. 111-17, 133-34; Sauser Rupp Tr. 104-05; Smart Dec. Ex. J).  OSA

also sponsors sporting events, such as the Professional Golfer's Association tour, and often uses

celebrities such as models and movie stars to promote OMEGA watches.  (Emmons Tr. 151,

185-92 ; Sauser Rupp Tr. 105-07, 110-15, 124-26).  OSA attends only one trade show in the

United States, which is devoted to watches and jewelry. (Emmons Tr. 208-12).

---

2      "Tr." citations refer to deposition testimony, pertinent excerpts from which are attached
to the Smart Declaration.

**OSA's Specialized Sports Timing Devices**

The only other goods or services sold in the United States under OSA's OMEGA marks are those of Omega Electronics, a licensee of OSA that sells sports timing devices in the United States. (Rentsch Tr. 109, 111, 118-119; Sauser Rupp Tr. 163-64; Gibbons Tr. 37, 153; Smart Dec. Ex. G). These products include, for example, touch pads used in swimming events, starting blocks for use in running events and time display devices for water polo matches. (Kayal Tr. 64, 78-79, 82, 134-35; Smart Dec. Ex. K). Omega Electronics' U.S. customers are athletic organizations, athletic leagues and the sports department within schools and universities. (Sauser Rupp Tr. 131; Smart Dec. Exs. S, T, U; Kayal Tr. 163-177; Gibbons Tr. 137-44, 148-57). The prices of Omega Electronics' sports timing devices are often in the thousands of dollars and can reach as high as $25,000. (Gibbons Tr. 100-03). The products cannot be purchased over the Internet, and are often purchased via personal contact, with a lengthy consultation. (Kayal Tr. 130-33, 175; Sauser Rupp Tr. 443-44; Gibbons Tr. 55-56). Omega Electronics' total U.S. sales are less than $200,000 annually. (Kayal Tr. 143; Gibbons Tr. 124, 131; Smart Dec. Ex. R).

Omega Electronics relies primarily on word-of-mouth to promote its products in the United States, and its exclusive United States distribution spends less than $10,000 annually on advertising Omega Electronics' products in the United States. (Gibbons Tr. 60, 163-64, 168-69, 181-82). The little advertising Omega Electronics does in the United States targets the sports timing market, by way of promotional brochures, posters, newsletters and trade journals intended for sport stadiums and sports organizations. (Kayal Tr. 115-16, 119, 198; Gibbons Tr. 82, 179-80, 182). With the exception of one trade show for the American Swim Coaches Association in 2001, Omega Electronics' products are not exhibited at trade shows in the United States. (Kayal Tr. 182-83; Gibbons Tr. 171-72).

Other goods that Omega Electronics sells abroad, such as passenger display

30940217.DOC                              10

systems and radio frequency identification devices, are not advertised or sold in the United

States. (Kayal Tr. 98-102, 212, 246-47; Rentsch Tr. 111-14; Gibbons Tr. 85, 110, 119-20).

**The Numerous Third Party Uses of OMEGA Marks**

Numerous third party businesses and websites use trade names and marks that

include OMEGA. (Tepper Dec. ¶¶ 2 - 9 & Exs. A-G). For example, Alpha Omega is a Boston,

Massachusetts based watch retailer with four stores that is also an authorized OSA reseller, and

that advertises in some of the same consumer publications as OSA. (Emmons Tr. 104, 132;

Rentsch Tr. 233-34, 240-44; Sauser Rupp Tr. 104-05, 426-28; Tepper Dec. ¶ 3 and Ex. A; Smart

Dec. Exs. J, P, V, W). OSA and its affiliates have been selling OMEGA watches to Alpha

Omega for approximately ten years, despite the fact that there is no license granting Alpha

Omega the right to use the OMEGA mark in its trade name. (Emmons Tr. 104-06; Rentsch Tr.

242-43; Sauser Rupp Tr. 426-27). OSA *concedes* it is "confusing" to have a retailer selling

watches under the trade name Alpha Omega, and concedes that there have been instances of

actual consumer confusion. (Rentsch Tr. 240, 248; Emmons Tr. 105). Indeed, only a few

weeks before his deposition in this case, Mr. Emmons of OSA's OMEGA division in the United

States learned of a confused consumer who thought that the maker of OMEGA watches owned

the Alpha Omega chain of stores. (Emmons Tr. 105). Despite the clearly related nature of

Alpha Omega's watch stores and OSA's watches, and the admitted evidence of actual confusion,

OSA has *never* attempted to stop Alpha Omega from using OMEGA in its name, but, instead,

has continued to do business with it. (Emmons Tr. 106; Rentsch Tr. 240-42, 248; Sauser Rupp

Tr. 427). Nonetheless, in this case, OSA takes the wholly inconsistent position that OEI's use of

OMEGA on industrial process and control instruments, advertised and sold to sophisticated

scientists and engineers, will somehow cause confusion.

30940217.DOC                              11

A number of other companies also operate under names that include OMEGA, such as Omega Electronics, Omega Technologies, Inc., Omega Pacific, Omega One LLC, Omega Products International and Omega World Travel. (*See* Tepper Dec. ¶¶ 4-9 & Exs. B-G). In addition, a number of third parties use and have registered marks containing OMEGA for a variety of goods and services. (Tepper Dec. ¶¶ 10-20 & Exs. H-S). As of March 8, 2004, the PTO database reports 327 registrations and pending applications for marks containing OMEGA other than registrations and applications of OSA and OEI. These include a number of marks for a variety of goods and services. (Tepper Dec. ¶ 10 & Ex. H). There is no evidence that OSA has sought to stop any of these third parties from using the word OMEGA in their marks or trade names in the United States. (*See* Sauser Rupp Tr. 428-46).

**The 1994 Agreement Between OEI and OSA**

Throughout the 1980's, OEI and OSA had a history of disputing the scope of their respective trademark rights. In 1994 the parties entered into worldwide agreement that was executed by OSA on May 3, 1994, and by OEI on August 2, 1994 (the "1994 Agreement"). (M. Hollander Dec. ¶ 30 & Ex. T). In particular, the 1994 Agreement provides:

> Henceforth from the signing of this Agreement and effective in all countries of the World:
>
> a. OMEGA ENGINEERING INCORPORATED undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter $\Omega$ or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science or industry.
>
> b. OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter $\Omega$, or any element colourably resembling either of those two elements, in respect of:
>
> "Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load,

vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow."

c.  OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademark consisting of or containing the word OMEGA or the Greek letter Ω or any element colourably resembling either of those two elements in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow.  (M. Hollander Dec. ¶ 32 & Ex. T)

**The Omega I Litigation and the 2003 Agreement Between OEI and OSA**

In December 1998, OEI commenced an action in this Court, *Omega Engineering, Inc. v. Omega, S.A.*, 3:98 CV 2464 AVC ("*Omega I*"), alleging that OSA had breached the 1994 Agreement by filing with the PTO two petitions to cancel OEI's '762 and '705 Registrations, and a notice of opposition to the application for what became OEI's '657 Registration.  OEI asked the Court to enjoin OSA from maintaining its cancellation actions against plaintiff in the PTO. (Omega I Complaint Prayer ¶ 4, Riggs Dec. ¶ 13 & Ex. I).  On OEI's motion, the PTO stayed OSA's cancellation proceedings, concluding that a decision by the district court could dispose of or bearing on the issues in the cancellation proceedings.  (Riggs Dec. ¶¶ 13-14 and Exs. J, K).

At a Court-sponsored settlement conference in Magistrate Judge Smith's chambers on May 19, 2003, the parties negotiated a Settlement Agreement ("*Settlement Agreement*") in *Omega I* which provides, *inter alia*, that (1) OSA will not bring a lawsuit against OEI for use or registration of the Omega mark and/or Omega design on period timers; and (2) OSA will drop in this case its allegations relating to the '762 and '705 Registrations, and will not make claims or assertions in this case relating to application to register, registration or use by OEI of the Omega mark or Omega design on period timers or industrial and scientific clocks. The Settlement Agreement contains the following release:

Except for any breach or violation, or claim of breach or violation, of this Settlement Agreement, OSA, on the one hand, and OEI, on the other hand, release and forever discharge each other, and, their respective officers, directors, agents, servants, employees, attorneys, successors and assigns and others controlling, controlled by or affiliated with them, from any and all claims, actions and causes of action in the U.S.A. relating to the application to register, registration or use of period timers for science and industry or industrial and scientific clocks under the Omega mark or Omega design, in the Omega I Litigation, Omega III Litigation or the Cancellation Proceedings.

(Riggs Dec. ¶ 15 & Ex. L).  Moreover, in Paragraph 2 of the Settlement Agreement, OSA

expressly consented to OEI's use of the OMEGA marks on timers provided that OEI also

includes on such devices (once existing inventory is sold off) a reference to "Omega

Engineering, Inc., Stamford, Conn." OSA agreed that it would not bring any lawsuit against OEI

for the use or registration of OMEGA marks with respect to such products.  (*Id.* Ex. L ¶ 2).

In June, 2003, after OSA refused to execute the parties' Settlement Agreement in

*Omega I* without changes to its terms, OEI filed a motion to enforce the parties' Settlement

Agreement.  On August 11, 2004, Judge Covello issued an order in *Omega I* adopting and

ratifying Magistrate Judge Smith's Recommended Ruling that the parties' Settlement Agreement

be enforced, and judgment enforcing the Settlement Agreement was entered in *Omega I* on

August 11, 2004.  (Riggs Dec. ¶¶ 16-17 & Exs. M-O).  Defendants recently requested that OSA

amend the complaint in this action to comply with its obligations under the *Omega I* Settlement

Agreement.  As of this date, OSA has not done so.  (Smart Dec. ¶ 26 & Ex.Y).

**The Lack of Competitive Overlap Between OSA and Defendants**

The undisputed evidence shows that there is a complete absence of competitive

overlap between OSA and defendants.  The goods and services listed in OEI's trademark

applications and registrations and offered by OEI of which OSA complains in this case constitute

(1) apparatus (including timing apparatus) that OEI sells in science and industry for the

30940217.DOC                                    14

measurement and control of variable parameters, and (2) services that OEI offers that are related

to such scientific and industrial goods. Thus, OSA's Rule 30(b)(6) witness, Ms. Sauser Rupp,

identified the specific goods and services listed in OEI's '073 and '450 Applications in

connection with which OSA objects to defendants' use of OMEGA marks, underlining the

allegedly infringing goods and services in Defendants' Exhibits 73 and 74 at her deposition.

(Sauser Rupp Tr. 317-38, 367-89; Smart Dec. Exs. AA & BB).  A review of her notations on

Exhibits 73 and 74 confirms that the objected-to goods or services set forth in OEI's trademark

applications are intended for use solely in science and industry, or, in a few instances of goods or

services not expressly limited to science and industry, are goods and services that OSA

indisputably does not offer.  (*See* Smart Dec. Exs. AA & BB).

In particular, in the '073 and '450 Applications, Ms. Sauser Rupp identified such

goods as apparatus and instruments, namely apparatus for recording, transmission or

reproduction of sound or images; data processing equipment and computers; apparatus and

instruments for measuring; apparatus for displaying and timing; time and timing apparatus;

apparatus and instruments for displaying and timing variable chemical and physical parameters,

such as timing and data display; anemometers; gauges; wind stations; indicators; timers;

computer hardware and software; data acquisition systems; microprocessor operated data

processing apparatus; microprocessor operated apparatus including indication and display

apparatus, data recording apparatus, data storing apparatus and data registering apparatus;

electronic measurement indicators; electronic time indicators; distance indicators; video tapes in

the fields of indicating and displaying variable parameters, such as speed, timing and display;

printed matter; advertising services; retailing services in the field of measurement. *All of these*

*goods and services, however, are expressly limited to those intended for scientific and industrial*

*application.* (Sauser Rupp Tr. 317-38, 367-89; Smart Dec. Exs. AA & BB). Moreover, as set forth above, they largely comprise the core scientific and industrial process measurement and control goods that OEI has offered to its customers for many years.

Similarly, with respect to the '762 and '705 Registrations, the only goods that OSA identifies as infringing are for use in science and industry, as specified in the registrations. Specifically, in supplemental interrogatory responses, OSA identified the allegedly infringing OEI goods in the '762 and '705 Registrations as computers; computer software; data acquisition software, data analysis software, graphic presentation software; event recorders; timers, namely period timers; industrial and scientific clocks; and printed matter, namely catalogs and reference guides containing product, engineering and/or technical data. (*See* OSA Supp. Answers to Interrog. No. 3 (Smart Dec. Ex. X); Smart Dec. Exs. CC & DD). As with OEI's applications, however, the registrations explicitly limit the goods to those intended for use in science and industry. (*See* Smart Dec. Exs. CC & DD). The only exception is "printed matter," but the qualification for those goods – "namely catalogs and reference guides containing product, engineering and/or technical data" – makes clear that such goods relate to OEI's scientific and industrial goods and customers. (Smart Dec. Ex. CC). Moreover, as with the goods in the above applications, these complained-of goods comprise the scientific and industrial products that OEI offers to its customers.[3]

These scientific and industrial goods and services are wholly different than OSA's OMEGA goods. Thus, the undisputed evidence is that OSA and its licensee Omega Electronics

---

[3]      OSA also complains of OEI's '657 Registration for various telecommunications services. The only services covered by that registration that OSA contends infringe its rights are "computer-aided transmission of messages and images." (Sauser Rupp Tr. 304, 308). However, OSA concedes that to the extent it provides such services, they are limited to sports timing, while the undisputed evidence is that OEI only provides such services in the fields of science and industry. (Sauser Rupp Tr. 304; M. Hollander Dec. ¶ 9).

do not advertise or sell OMEGA-branded goods for scientific investigation or industrial

application, do not sell period timers (indeed, OSA's witnesses could not even identify OEI's

period timers as period timers at their depositions), and do not sell any OMEGA-branded goods

to the scientific or industrial market, and there are no plans to do so in the United States.[4] (Kayal

Tr. 218, 229-32, 244-45; Rentsch Tr. 108, 120-21, 124, 128-31, 133-34, 138, 271-72; Sauser

Rupp Tr. 66, 168-69, 222-23, 234-35, 251-52, 270-71; Gibbons Tr. 142-45, 153, 191-92).

Rather, as shown above, OSA sells luxury watches, and the U.S. sales of its Omega Electronics

are limited to sports timing devices for use by athletic organizations in sports events (with the

exception of one RFID system sold to OSA's United States affiliate for use in its own office

building). (Rentsch Tr. 115-17, 130-31; Kayal Tr. 102-04, 106-07, 250-51; Gibbons Tr. 54-55).

Nor does OSA sell publications or offer advertising or retailing services in the

United States under the OMEGA marks, and its Rule 30(b)(6) witness concedes that it does not

offer any such services to the science and industry markets. (Sauser Rupp Tr. 381-86).

Consistent with this evidence, the only goods with respect to which OSA even

claims rights that are infringed in the United States are watches and sports timing devices. Thus,

in response to Defendants' Interrogatory No. 2, OSA identified watches and sports timing

devices almost exclusively as the goods that are being infringed. (*See* OSA's Second Supp.

Answers to Interrog. No. 2; Kayal Tr. 144-54). Although the response made a few references to

RFID components and passenger information systems, the testimony is clear that those goods are

not advertised or sold in the United States. (Kayal Tr. 98-102, 212, 246-47; Rentsch Tr. 111-14;

---

[4]      For this reason, OEI is simultaneously moving for summary judgment granting its
counterclaim to cancel two of OSA's registered trademarks covering goods in science
and industry, on the grounds that (1) OSA falsely stated to the PTO that it offers such
goods under its OMEGA marks when the undisputed evidence shows that it does not; and
(2) even if it had previously used its marks in connection with such goods, it has now
abandoned the mark with respect to such goods.

Gibbons Tr. 85, 110, 119-20). [5]  It is therefore apparent that OSA is complaining here of defendants' conduct with respect to goods and services that OSA does not offer and with respect to which OSA does not even claim rights in the OMEGA marks.

Nor do OSA's and Omega Electronics' marketing channels overlap with those of OEI. Neither OSA nor Omega Electronics advertises its products in the same publications as OEI. (Emmons Tr. 175; Sauser Rupp Tr. 214-15; Kayal Tr. 180-81, 186; Gibbons Tr. 170-71). To the extent Omega Electronics and OSA have attended trade shows, they have not been shows at which OEI was also in attendance. (Kayal Tr. 184; Gibbons Tr. 173, 178-79; Emmons Tr. 212-13; M. Hollander Dec. ¶ 19 & Ex. M).

With the exception of sales of sports timing devices to athletic departments at some colleges and universities, OSA and Omega Electronics do not share any customers with OEI; and, of course, OEI sells industrial and scientific process measurement and control devices to the *engineering* departments at colleges and universities, not to the athletic departments. (Gibbons Tr. 143-45,193-94; Kayal Tr. 176-78; M. Hollander Dec. ¶ 13 & Ex. H).  The evidence also shows that OSA or Omega Electronics have not sold any products under the OMEGA marks to the government, the military, research laboratories, the automobile industry, steel mills or other manufacturers in the United States to which OEI sells its products.  (Sauser Rupp Tr. 142; Kayal Tr. 171-73, 177; Gibbons Tr. 144-45).

**The Lack of Evidence of Actual Confusion or of Injury to OSA**

Consistent with the lack of competitive overlap between the parties, there is no evidence in the record of any actual confusion by actual or potential purchasers regarding an affiliation between Omega Engineering and Omega S.A. or Omega Electronics.  OSA's Rule

---

[5]     It is undisputed that OSA has had only one sale of an OMEGA RFID device within the United States, and that was to an affiliated company.  (Kayal Tr. 102-04, 106, 148-49).

30(b)(6) designees concede that there is no evidence that anyone has done business with OEI

thinking that OEI was Omega S.A. or Omega Electronics, or that anyone has done business with

Omega S.A. or Omega Electronics under the mistaken belief that they were doing business with

OEI, or substituted an OEI product for a product manufactured by OSA or Omega Electronics.

(Sauser Rupp Tr. 140-41, 367, 388, 391-92; Kayal Tr. 255-58; Emmons Tr. 177-78, 221-222).

Indeed, the general manager of OSA's OMEGA division in the United States, Mr. Robert

Emmons, had not even heard about Omega Engineering in the twenty two years that he worked

for OSA, until he attempted to register the omega.com domain name and learned that OEI

already owned it.  (Emmons Tr. 14-15, 192).

OSA's Rule 30(b)(6) designee on the issue of injury, Ms. Sauser Rupp, *conceded*

that she could *not* identify a single trademark application or registration of OSA that was

"blocked" by any trademark application or registration filed in the United States by defendants.

(Sauser Rupp Tr. 363-64, 389, 416).  She also could not point to any evidence that OSA has

suffered any injury to its business or reputation as a result of defendants' filing any trademark

applications or registrations or defendants' use of their OMEGA marks.  (Sauser Rupp Tr. 363-

64, 389, 402-03, 416; *see also* Gibbons Tr. 195).  Similarly, she could not identify any actual or

potential OSA customers who even are aware of the existence of OEI's pending trademark

applications or existing trademark registrations about which OSA complains in this action.

(Sauser Rupp Tr.313, 367, 388, 391-92, 416-17).

## ARGUMENT

## I.    THE STANDARD FOR SUMMARY JUDGMENT.

Both the Supreme Court and the Court of Appeal have emphatically endorsed

summary judgment as a "principal" means of "isolat[ing] and dispos[ing] of factually

unsupported claims."[6]  As Chief Justice Rehnquist emphasized in *Celotex*:

> Summary judgment procedure is properly regarded not as a disfavored
> procedural shortcut, but rather as an integral part of the Federal Rules as a
> whole, which are designed "to secure the just, speedy and inexpensive
> determination of every action." (477 U.S. at 327).

To that end, the Supreme Court has prescribed specific summary judgment

principles, which, as the Second Circuit has explained, "permit[] a court to streamline the

process for terminating frivolous claims and to concentrate its resources on meritorious

litigation." *Knight*, 804 F.2d at 12.  Thus, there is no requirement that the moving party "support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*,

477 U.S. at 323 (emphasis by the Court).  Rather, "the burden on the moving party may be

discharged by 'showing' – that is, pointing out to the district court – that there is an absence of

evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has satisfied this initial burden, the nonmoving party must

"go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'" *Celotex*, 477 U.S. at 324.  Neither "some metaphysical doubt as to the material

facts" nor "the mere existence of a scintilla of evidence in support of the plaintiff's position" will

suffice. *Matsushita*, 475 U.S. at 586; *Anderson*, 477 U.S. at 252; *Fletcher v. Atex, Inc.*, 68 F.3d

1451, 1456 (2d Cir. 1995).  In addition, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477

---

[6]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249-50 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
U.S. 574, 585-88 (1986); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-89 (1990);
*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986).