U.S. at 247-48 (emphasis by the Court); *see Knight*, 804 F.2d at 12; *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985). And even where a genuine factual dispute exists with respect to one element of the nonmovant's claim, a "failure of proof concerning [another] essential element . . . renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

As set forth below, the undisputed facts demonstrate that summary judgment should be entered for defendants on all counts in OSA's complaint.

## II.    SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIMS FOR TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN.

In Count One of the Complaint, OSA alleges that defendants' applications to register, registrations of, and use of the OMEGA marks and certain variations thereof constitute trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1). In Count Five, similarly, OSA alleges that defendants' use of the OMEGA marks and variations of those marks constitutes false designation of origin under Section 43(a) of the Lanham Act.[7] The undisputed record evidence mandates summary judgment for defendants on both of these counts, as to defendants' applications, registrations and alleged uses.

### A.    It Is Undisputed That Defendants Have Not Yet Made Use of the Marks Covered by OEI's Challenged Applications.

First, with respect to the pending OEI applications, the defendants are not yet making commercial use of the marks at issue. The mere existence of a pending trademark application, in the absence of actual use of the subject mark in commerce, does not give rise to a claim for trademark infringement or false designation of origin. "Unless and until [defendant] uses the mark in the course of trade, to identify actual goods for sale or transport, it cannot be

---

[7]    The standard for infringement under Sections 32(1) and 43(a) of the Lanham Act is essentially the same, and, accordingly, defendants treat both of these counts together. *See, e.g., Thompson-Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir. 1985).

subject to suit for trademark infringement." *Macia v. Microsoft Corp.*, 152 F. Supp. 2d 535, 539 (D. Vt. 2001); *see also, e.g., Kusek v. Family Circle, Inc.*, 894 F. Supp. 522, 532 (D. Mass. 1995); (mere registration does not amount to "use" of mark); *Cognotec Servs. Ltd. v. Morgan Guar. Trust Co.*, 862 F. Supp. 45, 50-51 (S.D.N.Y. 1994) (no claim under Lanham Act where no materials were disseminated "in commerce"); *Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*, 402 F. Supp. 838, 847-48 (E.D.N.Y. 1975) (dismissing claim where no sales in commerce took place), *aff'd*, 538 F.2d 314 (2d Cir. 1976). This is because, absent actual use in trade, the mark is not being used "in commerce" as required by 15 U.S.C. §§ 1114(1) and 1125(a).

The applications of OEI identified in OSA's complaint are the '073 Application (for the OMEGA mark with a stylized "E"), the '450 Application (for the Greek letter "Ω") and the '374 Application for the design mark "Ω.COM."[8] These applications are intent-to-use applications filed pursuant to Section 1(b) of the Lanham Act, which have been stayed by the PTO pending resolution of this case. (Riggs. Dec. ¶¶ 7-12). The undisputed record evidence is that defendants have not yet used the marks covered by these applications. (M. Hollander Dec. ¶ 29). Under these circumstances, OSA cannot establish a claim for trademark infringement or false designation of origin under the Lanham Act.

**B.    OSA's Claims Relating to Period Timers, Industrial and Scientific Clocks, and the '762 and '705 Registrations Are Barred by the *Omega I* Settlement and the Release Contained Therein.**

The Complaint also alleges, in Count 1, that OEI's registration of its OMEGA marks in the '762 and '705 Registrations and its associated use of the marks on the goods covered by those registrations – notably including period timers and industrial and scientific

---

[8]    Although the '374 Application is not alleged in the trademark infringement count, the Prayer for Relief does seek relief with respect to that application and the mark it covers, and, accordingly, we have included the application in this portion of our motion.

clocks – constitute trademark infringement, and seeks cancellation of those OEI registrations.

Complaint ¶¶ 31, 32, 35, *Prayer for Relief* ¶ 11. These claims are squarely foreclosed by the

Settlement Agreement in the *Omega I* litigation, pursuant to which, as set forth above, OSA

agreed in the *Omega I* Settlement to, *inter alia*, drop from the complaint in this case its

allegations relating to the '762 and '705 Registrations and its claims relating to defendants'

registration or use of OMEGA marks in connection with period timers and scientific and

industrial clocks. (*See supra*, pp.13-14; Def. 56.1 Stat. ¶¶ 81-88). OSA expressly agreed in the

*Omega I* Settlement that it "will not make claims or assertions in *Omega III* relating to

application to register, registration or use by OEI of the Omega mark or Omega design on period

timers or scientific and industrial clocks." (Riggs Dec. Ex. L at ¶ 4). Moreover, in the *Omega I*

Settlement, OSA expressly "release[s] and forever discharge[s]" OEI and its affiliates from:

> any and all claims, actions and causes of action in the U.S.A. relating to
> the application to register, registration or use of period timers for science
> and industry or industrial and scientific clocks under the Omega mark or
> Omega design, in the Omega I Litigation, Omega III Litigation or the
> Cancellation Proceedings.

(*Id.* at ¶ 3). Thus, OSA has agreed not to assert in this case and has expressly released claims

relating to OEI's registration or use of OMEGA marks in connection with period timers for

science and industry or industrial and scientific clocks.[9]

---

[9]  In addition, OSA's claims with respect to period timers, industrial and scientific clocks, and the '762 and '705 Registrations are barred by *res judicata*. In challenging OEI's '762 and '705 Registrations and the uses associated with those registrations, OSA is asking this Court to adjudicate the two trademark cancellation actions that were initially brought in the PTO by OSA and that were the subject of OEI's breach of contract claims in *Omega I*. It cannot be disputed that the lawfulness of the '762 and '705 Registrations, and of OEI's right to register and use OMEGA marks in connection with the goods covered by those registrations, were squarely before Judge Covello in *Omega I*. (*See* Riggs Dec. ¶ 13 & Ex. I). *See, e.g., Cieszkowska v. Gray Line New York*, 295 F.3d 204, 205 (2d Cir. 2002) ("even claims based upon different legal theories are barred provided they arise from the same transaction or occurrence"); *Waldman v. Village of Kiryas Joel*,

C.     **OSA's Claims Relating to Period Timers, Industrial and Scientific Clocks, Measuring, Timing and Display Apparatus for Science and Industry, and Other Devices Sold by OEI to Measure and Control Variable Parameters Are Barred by the 1994 Agreement.**

It also is undisputed that pursuant to the 1994 Agreement, OSA agreed that it would "not object to the use or registration by" OEI of any OMEGA mark "in respect of apparatus industrially or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow." (M. Hollander Dec. ¶¶ 32, 34 & Ex. T ¶ 4.c.). The 1994 Agreement further permits OEI to use, register and apply to register OMEGA marks for "computer controlled measuring, timing and display apparatus" provided such apparatus are intended for science and industry. (*Id.* ¶¶ 32-33 & Ex. T ¶ 4.a.). The undisputed evidence confirms that the period timers and scientific and industrial clocks with respect to which OEI uses its OMEGA marks are apparatus that OEI markets and sells for industrial and scientific use to measure and control variable parameters. (*Id.* ¶ 34). Similarly, it is undisputed that OEI uses its OMEGA marks in connection with a number of other types of apparatus, including computer controlled measuring, timing and display apparatus, that are industrially or scientifically employed to measure and control variable parameters. (*Id.* ¶ 33).

Those descriptions recited in the 1994 Agreement – apparatus industrial or scientifically employed to measure and control variable parameters, and computer controlled measuring, timing and display apparatus for science and industry – cover the majority of the goods that OSA complains are listed in OEI's trademark applications and registrations challenged in this lawsuit. Indeed, as set forth above, the majority of the goods about which

---

207 F.3d 105, 108-11 (2d Cir. 2000) (claims arising out of same "claim" or "nucleus of operative facts" as in prior litigation are precluded).

OSA complains are expressly limited to science and industry. Thus, OSA is barred by the 1994

Agreement from asserting that defendants' registration or use of OMEGA marks in connection

with period timers, industrial and scientific clocks, or other measuring, timing and display

apparatus sold for the measurement or control of variable parameters in science and industry,

constitutes trademark infringement or other wrongful conduct.

> **D.     OSA's Trademark Infringement and False Designation of Origin Claims Fail Because, on the Undisputed Facts, It Is Clear That There Is No Likelihood of Confusion.**

Plaintiff's trademark infringement and false designation of origin claims are

barred for the additional reason that there is no likelihood of confusion between OEI's goods and

services and those of OSA. To the extent that OSA is challenging any actual uses of an OMEGA

mark by OEI, and such uses are not barred by the *Omega I* Settlement Agreement and release or

the 1994 Agreement, OSA's claims should still be dismissed because the undisputed record facts

demonstrate that there is no likelihood of confusion here.

An essential element of OSA's trademark infringement and false designation of

origin claims is likelihood of confusion – to prevail on those claims, OSA must "show a

'probability of confusion, not a mere possibility.'" *Nora Beverages, Inc. v. Perrier Group of*

*Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001). To establish a probability of confusion, OSA must

show that "a large number of purchasers likely will be confused as to the source of the goods in

question." *Id.* Likelihood of confusion is evaluated according to the multifactor test set forth in

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), which considers

"the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity

of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the

reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product,

and the sophistication of the buyers." *See, e.g., Nora*, 269 F.2d at 120.

Because no single factor is determinative, a likelihood of confusion may not exist even when both parties use the identical mark, if other factors – such as dissimilarity of purchasers or products – indicate a lack of likely confusion. *See, e.g.*, *Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir. 1983) (affirming summary judgment where parties used same mark for different goods); *CBS Inc. v. Liederman*, 866 F. Supp. 763, 769 (S.D.N.Y. 1994) (granting summary judgment where parties used same mark for different services; ), *aff'd*, 44 F.3d 174 (1995); *Moore Business Forms, Inc. v. Rite Aid Corp.*, 1991 U.S. Dist. LEXIS 18599, at *23-24 (W.D.N.Y. 1991) (same).[10]

Courts routinely weigh the *Polaroid* factors to determine that there is no material issue of disputed fact on the issue of a likelihood of confusion, and, in such cases, to grant summary judgment for defendants. *See, e.g.*, *Nora*, 269 F.3d at 125 (affirming summary judgment for defendants where district court found no likelihood of confusion); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47-48 (2d Cir. 2000) (same); *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 584 (2d Cir. 1991) (same). Weighing the *Polaroid* factors with respect to these factors here, it is clear, based on the undisputed evidence, that a finder of fact could not find a likelihood of confusion.

1. The Lack of Proximity of the Products and the Lack of Overlap in Customers Favor Defendants.

Where the same mark is used on differing goods that are not in competition, courts have not hesitated to grant summary judgment to defendants. *See, e.g.*, *Astra*, *supra*; *CBS*, *supra*; *Moore*, *supra*. Here, the undisputed facts demonstrate that OSA and defendants do not

---

[10]    *Accord*, *Electronic Design & Sales, Inc. v. Engineering Design & Sales*, 954 F.2d 713, 719 (Fed. Cir. 1992) (reversing finding of likelihood of confusion where parties sold different goods to different purchasers); *Dynamics Research Corp. v. Langenau*, 704 F.2d 1575, 1577-78 (Fed. Cir. 1983) (affirming dismissal of trademark opposition where parties' goods were different and were sold to different purchasers).

compete, but, to the contrary, sell different goods and services to different purchasers in different markets. Thus, defendants provide goods and services in the fields of science and industry, selling primarily to manufacturers and laboratories. As set forth more fully above, the OEI goods and services of which OSA complains fall into two basic categories – various apparatus sold in science and industry for the measurement and control of variable parameters (that is, process measurement and control apparatus), including such devices with timing functions, and services that OEI offers that are related to such goods and related to OEI's markets of science and industry. (*See* pp. 14-16, *supra*). Indeed, in almost every United States application and registration of defendants about which OSA complains, the goods and services are expressly limited to those intended for science and industry. (*See* Riggs Dec. Exs. A, C-H). The OSA OMEGA-branded goods that OSA offers in the United States and contends are infringed, in contrast, are luxury wristwatches that are sold to consumers, and sports timing equipment that is sold to athletic organizations. (*See* p.17, *supra*).

Moreover, although OSA complains that defendants have applied to register various OMEGA marks for services such as advertising services and retail services, OSA's Rule 30(b)(6) designee confirms that OSA does not provide such services under its OMEGA marks. (Sauser Rupp Tr. 381-86). Similarly, although OSA complains that defendants have registered and used the OMEGA mark for telecommunications services – services which OEI offers to its science and industry customers – the only remotely similar services that OSA allegedly provides relate to the transmission of sports timing data at sporting events, again confirming the competitive gap between the parties. (Sauser Rupp Tr. 304, 308).

In short, the parties' respective goods and services and target purchasers are different and the parties do not compete. OSA's Rule 30(b)(6) designees concede that there is no

evidence that any purchaser has ever substituted an OEI good for an OSA good, or *vice-versa*, or has ever mistakenly purchased one parties' OMEGA-branded products or services instead of the other's. (Sauser Rupp Tr. 140-41, 367, 388, 391-92; Kayal Tr. 255-58; Emmons Tr. 177-78, 221-222). Moreover, the evidence shows that there are no plans by OSA to "bridge the gap" and sell OMEGA-branded process measurement and control apparatus for industry and science in the United States. (Sauser Rupp Tr. 168-69; *see* p.17, *supra*).

2.    The Lack of Overlap in Marketing Channels Favors Defendants.

The parties' advertising and advertising channels similarly favor defendants. As set forth above, there is absolutely no overlap in the parties' advertising channels: OSA advertises watches in upscale consumer publications and media, and sports timing devices in specialized athletic publications, while defendants advertise to their specialized purchasers by direct mail and in specialized science and industry trade publications. The parties' marketing channels are similarly distinct. OSA's watches are sold in retail jewelry stores and department stores and its sports timing devices by direct personal contact, and neither can be purchased over the Internet. Defendants' goods are sold primarily over the Internet and by telephone.

3.    The Sophistication of Buyers Favors Defendants.

This factor takes into account the care that prospective purchasers will take in exercising purchase decisions. The undisputed evidence shows that both parties' prospective customers are extremely discriminating, careful purchasers, a fact that further reduces any possibility of confusion. As OSA's witnesses have conceded, OSA's OMEGA watches are expensive luxury items that are purchased after careful consideration, and purchasers of OMEGA sports timing equipment often spend thousands of dollars and consult with Omega Electronics' distributor before completing the purchase. (Sauser Rupp Tr. 87; Emmons Tr. 61-62, 168-69; Gibbons Tr. 55-6, 100-03). As for defendants, it is undisputed that their

purchasers are sophisticated industrial and scientific buyers, such as factories and scientific

laboratories, who exercise care in making purchase decisions. (M. Hollander Dec. ¶ 13 & Ex.

H). In similar circumstances involving a defendant who sold highly specialized equipment for

industrial use, the Second Circuit has held that purchasers were sophisticated and not likely to be

confused. *See Arrow Fastener Co. v. The Stanley Works*, 59 F.3d 384, 399 (2d Cir.

1995) (reversing finding of likelihood of confusion after bench trial); *see also, e.g., Haydon*

*Switch and Instrument, Inc. v. Rexnord, Inc.*, 1987 U.S. Dist. LEXIS 11268, at *27 (D. Conn.

June 4, 1987) (finding no likelihood of confusion where it was "evident that the sophisticated

purchasers of the [parties' products] enter the marketplace in search of specific products for

specific industrial purposes. The sophistication of these purchasers makes the likelihood of

confusion remote"). Thus, this factor favors defendants.

> 4.    The Lack of Evidence of Actual Confusion Favors Defendants.

This factor weighs strongly in defendants' favor. The undisputed evidence is that

the companies have co-existed for over 40 years, with hundreds of millions of dollars of sales

under defendants' OMEGA marks, without any evidence in the record of actual confusion.

Thus, OSA's Rule 30(b)(6) witnesses, and other witnesses, conceded that they could not identify

any instances in which anyone purchased from or otherwise did business with defendants under

the mistaken belief that defendants were affiliated with OSA, or *vice-versa*. (Sauser Rupp Tr.

140-41, 367, 388, 391-92; Kayal Tr. 255-58; Emmons Tr. 177-78, 221-222). There is no record

evidence of "actual purchases made by confused consumers as a result of their confusion." *La*

*Cibeles, Inc. v. Adipar, Ltd.*, 2000 U.S. Dist. LEXIS 12676, at *31-32 (S.D.N.Y. Sept. 1, 2000)

(where there was no evidence that anyone actually purchased defendant's product based on

confusion, "no reasonable trier of fact could conclude that there is evidence of actual confusion";

granting summary judgment). Nor is there any evidence that OSA has suffered any injury to its

business or reputation as a result of defendants' use of their OMEGA marks. (Sauser Rupp

Tr. 402-03; Gibbons Tr. 195). Such a lack of actual confusion where the parties' marks that have

been in use for many years is "significant" evidence of a lack of likelihood of confusion. *Lever*

*Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 258 (2d Cir. 1982).

      Moreover, while OSA has proffered consumer survey evidence that it apparently

contends is evidence of confusion, that survey, for the reasons set forth more fully in defendants'

Motion to Preclude the Expert Testimony of James Fouss, is irrelevant and is fatally defective

under *Daubert*. OSA has provided no survey probative of likely confusion, and, as the Second

Circuit has repeatedly held, the "lack of survey evidence counts against finding actual

confusion." *Merriam-Webster, Inc. v. Random House*, 35 F.3d 65, 72 (2d Cir. 1994); *accord,*

*Nora*, 269 F.3d at 124; *Essence Comms., Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269

(S.D.N.Y. 1988) ("failure to offer a survey showing the existence of confusion is evidence that

the likelihood of confusion cannot be shown").

    5.    <u>OEI's Good Faith in Adopting its OMEGA Marks Favors Defendants.</u>

      This factor "looks to whether the defendant adopted its mark with the intention of

capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior

user's product." *Nora*, 269 F.3d at 124. Here, there is no evidence of an intent to capitalize on

OSA's reputation or goodwill. It is settled that "the mere incantation of intent or state of mind"

cannot "defeat an otherwise valid" summary judgment motion. *Id.* at 125 (affirming summary

judgment for defendant). Moreover, the evidence negates any suggestion of bad intent. The

undisputed evidence is that OEI first selected "Omega" for its name more than 40 years ago

because its first customer was named "Alpha Molykote" – alpha being the first letter in the

Greek alphabet, and omega the last. Defendants' lack of intent to trade on OSA's name is

confirmed by OEI's marketing strategy, which emphasizes its U.S. affiliation and the fact that

most of its products are made in America, in contrast to OSA's emphasis on its Swiss origin.

6.    The Quality of Defendants' Services Favors Defendants.

This factor recognizes that a trademark owner "should not be subjected to the risk

that the public perception of his product will suffer if it is associated with a product of inferior

quality." *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1202 (S.D.N.Y.

1979). There is no evidence that OEI's products are of inferior quality. Rather, the evidence is

that OEI's goods are of high quality, many of them are certified pursuant by the United States

Department of Defense, and OEI's return rate is extremely low. (M. Hollander Dec. ¶ 8).

7.    Given the Numerous Third Party Uses of Similar OMEGA Marks, OSA's
      Mark Is Weak Outside of OSA's Specific Product Areas.

"The strength of a particular mark is measured by the degree to which it indicates

source or origin of the product" and should be analyzed "from the vantage point of the product's

commercial setting." *Nora*, 269 F.3d at 123. "Even an inherently distinctive mark can, in its

commercial context, lack strength as a mark." *Id.*; *see also W.W.W. Pharm. Co. v. Gillette Co.*,

984 F.2d 567, 572-73 (2d Cir. 1993) (strength of mark factor considers both inherent

distinctiveness and strength of mark in marketplace).

The essence of OSA's trademark infringement and false designation of origin

claims is that prospective purchasers who encounter defendants' OMEGA marks will be

confused into believing that defendants are in some way affiliated with OSA. The undisputed

evidence, however, is that defendants' customers and OSA's customers do not overlap, and that

defendants market and sell their OMEGA-branded products to sophisticated purchasers in the

fields of science and industry. There is no evidence that OSA's OMEGA marks are recognized

as identifying a source of scientific or industrial products, or are recognized among the

sophisticated science and industry purchasers at whom defendants' marketing and sales are

exclusively directed – which is not surprising, because the undisputed evidence is that OSA has

not made any sales to these purchasers or these fields.

In addition – putting aside the OSA wristwatches, which are consumer goods that

are very different from the industrial and scientific products sold by defendants – there has been

very little advertising in the United States of OSA's OMEGA marks in connection with the

sports timing devices sold under those marks. Thus, it is undisputed that annual advertising

expenditures for OSA's sports timing goods have been extremely low, and that sales of such

goods have been under $200,000 per year. (Kayal Tr. 143; Gibbons Tr. 124, 131, 181-82; Smart

Dec. Ex. R). Such advertising and sales figures indicate that the OMEGA mark is not

particularly strong with respect to non-wristwatch products.

Moreover, it is settled that third party registrations and uses of similar marks are

relevant to any determination of the strength of a plaintiff's mark and the likelihood of purchaser

confusion. *See, e.g., Time, Inc. v. Petersen Pub'g Co.*, 173 F.3d 113, 118 (2d. Cir. 1999) ("The

use of part or all of the mark by third parties weakens its overall strength."); *Estee Lauder Inc. v.*

*The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997) (holding that plaintiffs' mark had weak

trademark significance in view of numerous third party uses of similar marks); *Lang*, 949 F.2d at

581 ("extensive third party use of the words 'Choice' and 'Choices' weighs against a finding that

Lang's trade name is strong"); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794-95 (6th Cir.

2004) (same). As Professor McCarthy explains in the leading treatise on trademark law:

> The ultimate test of relative strength is the distinctiveness of a mark in the
> mind and perception of the relevant customer group. But a mark that is
> hemmed in on all sides by similar marks on similar goods cannot be very
> "distinctive." It is merely one of a crowd of marks. In such a crowd,
> customers will not likely be confused between any two of the crowd and
> may have learned to carefully pick out one from the other. (J. Thomas
> McCarthy, MCCARTHY'S ON TRADEMARKS § 11:85 (4th ed. 2003)).

The undisputed evidence shows that numerous third parties use similar OMEGA

marks and trade names for a wide variety of goods and services. For example, a retailer sells

watches under the name Alpha Omega; another company sells electronics goods under the name

Omega Electronics. (*See* Tepper Dec. ¶¶ 3-9 and Exs. A-G). It is undisputed that, not counting

OSA's and OEI's filings, there are over than 325 pending federal trademark applications and

registrations for marks containing "omega." (*Id.* ¶ 10 & Ex. H). Faced with similar evidence of

extensive third party use, numerous courts have concluded that the mark at issue was "hemmed

in" on all sides and that, as a result, confusion was not likely. *See, e.g., Time*, 173 F.3d at 119;

*Estee Lauder*, 108 F.3d at 1511; *AutoZone*, 373 F.3d at 800-01.

8.    The Similarity of the Marks Does Not Alter the Conclusion That There Is
No Likelihood of Confusion.

As set forth above, even identical marks do not give rise to a likelihood of

confusion where, as here, the parties' goods are different, the parties' marketing channels and

customers are different, and there are numerous third party uses of similar marks. Here, the

overwhelming weight of *Polaroid* factors – including lack of competitive overlap, lack of

overlapping customers, lack of overlapping trade and marketing channels, sophistication of both

parties' purchasers, and absence of actual confusion – indicates no likelihood of confusion.

Moreover, comparison of marks cannot be done in the abstract, but must take

place in context. "In determining whether two marks are confusingly similar, we must 'appraise

the overall impression created by . . . the context in which they are found." *Nabisco*, 220 F.3d at

47 (affirming summary judgment for defendant); *accord, Streetwise Maps, Inc. v. VanDam, Inc.*,

159 F.3d 739, 744 (2d Cir. 1998) ("While the two names sound similar, the trademarks

themselves are not confusingly similar, given the context in which a purchaser sees them");

*Gruner & Jahr USA Pub'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993). The

30940217.DOC                        33

undisputed evidence shows that OEI's marks are used in materials directed at a scientific and

technical audience, and frequently are accompanied by references to "Made in the U.S.A.,"

images of Americana paintings, and the decidedly unsophisticated "Dilbert" comic strip. (See

p.6, *supra*).  OSA's products, in contrast, are marketed as Swiss-made, frequently in

advertisements that feature movie stars and other celebrities.  (*See* p.9, *supra*).  The commercial

impression of the parties' marks is therefore quite different.

## III.     SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIM FOR TRADEMARK DILUTION.

The undisputed evidence also mandates summary judgment for defendants on

Count Two of OSA's complaint, which alleges that OEI's use of OMEGA marks constitutes

trademark dilution under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c).

First, the undisputed evidence is that in at least two separate agreements, OSA has *consented* to

OEI's use of its OMEGA marks on various goods, including the period timers covered by the

*Omega I* Settlement and the "apparatus industrially or scientifically employed for measuring or

controlling variable parameters" and "computer controlled measuring, timing and display

apparatus" for science and industry covered by the 1994 Agreement.  (Riggs Dec. Ex. L; M.

Hollander Dec. Ex. T).  Having expressly consented to OEI's use of OMEGA marks, OSA

cannot now argue that defendants' use of OMEGA marks unlawfully dilutes OSA's marks.

Second, there is insufficient evidence for a factfinder to conclude that OSA's

OMEGA mark is distinctive and famous so as to be subject to protection from dilution under the

Lanham Act, and, indeed, the record evidence is to the contrary.  A dilution claim arises only

when there is a reduction in the ability of a unique mark to clearly distinguish or identify a

source.  Accordingly, the Second Circuit has held that to be protected from dilution, a mark must

be both "distinctive" and "famous." *Nabisco, Inc. v. PF Brands*, 191 F.3d 208, 216 (2d Cir.

1999).[11] Here, there is no evidence that OSA is viewed as the exclusive user of the OMEGA

mark or that its mark is famous or distinctive as a unique or singular indicator of source, such

that it is entitled to protection from dilution. To the contrary, the undisputed evidence shows that

numerous third parties use the OMEGA mark and similar marks for a wide variety of goods and

services. This widespread use of OMEGA demonstrates that the mark is not regarded as

indicating a single source, and, thus, is not capable of being diluted. *See, e.g., Astra Pharm.*

*Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1210 (1st Cir. 1983) (affirming

summary judgment dismissing dilution claim for mark ASTRA where defendant used the same

mark, because "there are over 100 registrations of the mark 'ASTRA'" and that "[i]f the other

registrations and uses of the "ASTRA" mark have not already diminished the uniqueness of

[plaintiff's mark], [defendant's] use of it on its analyzer will not diminish it, either"); *Pharmacia*

*Corp. v. Alcon Laboratories, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002) (rejecting dilution

claim for mark XALTAN based on defendant's use of TRAVATAN mark, because "there are

many other drug names that end in 'AN,' 'TAN' and 'ATAN'").

      Finally, OSA's dilution claim must fail for the separate reason that there is no

evidence of "actual dilution" resulting from defendants' use of their marks. In *Moseley v. V.*

*Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003), the Supreme Court held that proof of "actual

dilution" of the distinctiveness of plaintiff's mark, and not merely "likelihood of dilution," is

required to establish a violation of the FTDA. *See also, e.g., AutoZone*, 373 F.3d at 804-05

---

[11]    Thus, the legislative history of the FTDA explains that dilution occurs "when the
unauthorized use of a famous mark reduces the public's perception that the mark signifies
something *unique, singular or particular.*" H.R. Rep. No. 104-374, at 3 (1995),
*reprinted in* 1995 U.S.C.C.A.N. 1029, 1030 (emphasis added). *See TCPIP Holding Co.*
*v. Haar Comms. Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) (famous marks "are marks that for
the major part of the century have been household words throughout the United States,"
such as Buick and Kodak); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 912 (9th
Cir. 2002) (to be famous, a mark must be "part of the collective national consciousness").

(affirming summary judgment where no evidence of actual dilution); *Mastercard International Inc. v. Nader 2000 Primary Committee, Inc.*, 2004 U.S. Dist. LEXIS 3644, at *29 (S.D.N.Y. Mar. 8, 2004) (same); *Playtex Products, Inc. v. Georgia-Pacific Inc.*, 2003 U.S. Dist. LEXIS 13981, at *27-28 (S.D.N.Y. Aug. 12, 2003) (same). To meet this burden, it is not enough to show that defendant's mark reminds purchasers of plaintiff's mark; rather, proof is required that defendants' mark causes an "actual" lessening of the capacity of plaintiff's mark to identify plaintiff's goods. *Moseley*, 537 U.S. at 433; *see also Savin Corp. v. The Savin Group*, 2003 U.S. Dist. LEXIS 19220, at *43-45 (S.D.N.Y. Oct. 28, 2003) (no evidence of actual dilution where parties used same mark; granting summary judgment). Here, there is no such evidence, and OSA admits that it has no evidence that it has suffered any damage to its mark's reputation as a result of defendants' use of OMEGA marks. (Sauser Rupp Tr. 402-03; Gibbons Tr. 195).

## IV.    SUMMARY JUDGMENT IS WARRANTED ON OSA'S CLAIMS FOR ALLEGED UNFAIR "BLOCKING" UNDER CUTPA AND THE LANHAM ACT.

Counts Three and Four of OSA's complaint are premised on alleged bad faith conduct by defendants in applying for and registering OMEGA marks in the United States and in foreign countries, and in thereby purportedly "blocking" OSA's own trademark applications or rights in those countries. Thus, Count Three asserts that defendants have violated CUTPA by "embark[ing] upon a systematic process of applying to gain registration of the OMEGA trademark not only with the [PTO], but also with the European Community Trademark Office and . . . other national trademark offices, with the intended purpose of, *inter alia*, precluding [OSA] from gaining registration of the mark OMEGA for its legitimate and bona fide business purpose," and making fraudulent statements to the PTO and foreign trademark offices that defendants "intend[ed] to use the OMEGA trademark upon goods for which they had no such intention, and/or on goods that are confusingly similar" to those of plaintiff. (Complaint ¶¶ 53-

56).  Count Four claims that defendants have violated Lanham Act § 43(a), 15 U.S.C. § 1125(a),

by "deliberately fil[ing] trademark applications under oath with the express purpose of blocking

OSA's rights all the while lacking the statutorily mandated good faith intention to use the mark

with respect to at least some of the goods and services recited in their trademark applications,"

and that defendants have acted "in bad faith" in filing such applications.  (Complaint ¶¶ 59, 60).

> **A.    OSA's "Blocking" Claims Relating to Foreign Trademark Filings Are Barred by *Vanity Fair* and Principles of International Comity, and Its Blocking Claims With Respect to All Filings Fail to State a Claim for Relief.**

For all the reasons set forth in support of defendants' previously filed Motion for

Judgment on the Pleadings with respect to OSA's claims relating to foreign trademark filings

("Def. 12(c) Mem."), summary judgment should be granted dismissing such claims.  Moreover,

for the same reasons that, as shown in that prior motion, the statutes at issue do not extend to the

filing of trademark applications with foreign government authorities, they also do not extend to

domestic trademark filings, and all of "blocking" claims should be dismissed on that ground.

Pursuant to the Court's August 19, 2004 Order denying without prejudice defendants' Motion for

Judgment on the Pleadings and for an Order of Preclusion, defendants hereby incorporate by

reference the arguments and evidentiary submissions previously made in support of that Motion.

> **B.    OSA's "Blocking" Claims Fail in Their Entirety Because the Undisputed Evidence Shows that All of Defendants' Trademark Filings Constitute Protected Petitioning Activity.**

Summary judgment should be entered dismissing OSA's claims with respect to

both United States and foreign trademark applications for the separate and independent reason

that the undisputed facts demonstrate that the challenged conduct evidenced in the record

constitutes protected petitioning activity.  As defendants have previously argued in connection

with their motion relating to foreign filings, and as OSA has not disputed, under *Professional

Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993), OSA must prove

that the filings of defendant that OSA challenges not only were undertaken in bad faith but were

"objectively baseless." This same requirement applies to claims based on U.S. filings.

    The undisputed factual record, however, shows that the challenged filings by

defendant were neither done in bad faith nor were "objectively baseless," and, in all events, there

is no evidence in the record by which a factfinder could find that the filings were made in *bad*

faith and were objectively baseless. For example, the vast majority of filings about which OSA

claims are filings relating to timing apparatus for science and industry and to computer

controlled measuring, timing and display apparatus for science and industry. Thus, the

complaint identifies goods such as "apparatus and instruments for timing" and "computer and/or

microprocessor controlled measuring, timing and/or display apparatus" as the goods and services

in the '374 application at the PTO to which OSA objects, and Ms. Sauser-Rupp testified that

OSA largely objects to OEI's application to register OMEGA marks for timing devices. (Sauser

Rupp Tr. 154-59). Similarly, a review of the foreign goods and services to which OSA objects

reveals that the vast majority of them relate to timing devices for science and industry, or to other

apparatus sold by OEI for the measurement and control of variable parameters in industrial and

scientific applications. (*See* Riggs Dec. Ex. P). Indeed, in virtually every one of defendants'

applications and registrations challenged by OSA, the goods and services are expressly limited to

those intended for use in science and industry, which is defendants' historical area of operation.

(*See id.*). As set forth more fully above, moreover, OEI is *permitted*, by the parties' 1994

Agreement, to register OMEGA marks for computer controlled measuring, timing and display

apparatus for science and industry and for apparatus industrially or scientifically employed for

measuring or controlling variable parameters, devices which OEI has long sold to its industrial

and scientific customers for the measurement and control of variable parameters in factory and

laboratory settings. (M. Hollander Dec. ¶¶ 32-34 & Ex. T). Under these circumstances, a fact finder could *not* find that defendants' applications to register such goods and related services for science and industry were made in bad faith and were objectively baseless.

**C.    OSA's "Blocking" Claims Fail Because the Undisputed Evidence Shows that OSA Has Not Been "Blocked" or Suffered any Other Purported Injury as a Result of Defendants' Alleged Conduct.**

OSA's "blocking" claims fail for the additional reason that the undisputed evidence demonstrates that OSA has suffered no cognizable injury as a result of defendants' trademark filings. Such injury is an essential prerequisite to OSA's claims. CUTPA requires that a plaintiff prove it has suffered an "ascertainable loss" as a result of a defendant's alleged unlawful conduct, Conn. Gen. Stat. § 42-110g(a), and the Lanham Act requires injury in the form of, at a minimum, actual or likely purchaser confusion or deception. 15 U.S.C. § 1125(a).

It is undisputed, however, that OSA can identify no such cognizable injury arising from its "blocking" claims. Thus, the evidence shows that *no* OSA trademark application or registration has been suspended, delayed or in any other way obstructed as a result of any trademark filing by defendants in the United States. (Sauser Rupp Tr. 363-64, 389, 416). As for the foreign filings, defendants' applications and OSA's related oppositions are still pending, and the resolutions by foreign trademark agencies will determine whether defendants' filings will in any way obstruct OSA's applications or trademark rights. (*See* Riggs Dec. ¶ 18 & Ex. P).

**D.    OSA's Blocking Claims Are Barred By the 1994 Agreement and the *Omega I* Settlement to the Extent They Relate to Applications to Register OMEGA Marks for OEI's Scientific and Industrial Timing Devices.**

As set forth above, the vast majority of goods and services recited in defendants' challenged trademark applications and registrations (both United States and foreign) constitute period timers, scientific and industrial clocks, timing apparatus for science and industry and other apparatus to measure and control industrial parameters. As set forth above, however, the

parties' 1994 Agreement expressly permits OEI to register and use OMEGA marks in connection with "computer controlled measuring, timing and display apparatus" intended for science or industry, and further expressly provides that OSA will not object to the use or registration by OEI of any OMEGA marks for "apparatus industrially and/or scientifically employed for measuring or controlling variable parameters." (M. Hollander Dec. ¶¶ 32-33 & Ex. T).

        In addition, the *Omega I* Settlement expressly provides that OSA release OEI and its affiliates from "any and all claims, actions and causes of action in the U.S.A. relating to the application to register, registration or use of period timers for science and industry or industrial and scientific clocks under the Omega mark or Omega design, in the Omega I Litigation, Omega III Litigation or the Cancellation Proceedings," and further provides that "OSA will not make claims or assertions in *Omega III* relating to application to register, registration or use by OEI of the Omega mark or Omega design on period timers or industrial and scientific clocks." (Riggs Dec. ¶ 15 & Ex. L). Moreover, although the foregoing language is limited to claims and actions in the United States or to claims in this lawsuit, it is *not* limited to claims concerning *applications* in the United States; to the contrary, there is no geographical limitation on the subject matter of the prohibited claims. Thus, the undisputed evidence is that the majority of defendants' challenged trademark filings – those covering period timers, industrial and scientific clocks, computer controlled measuring, timing and display apparatus for science and industry, and other apparatus industrially and/or scientifically employed for measuring or controlling variable parameters – either are *expressly permitted* by the parties' 1994 Agreement, and/or are released pursuant to the *Omega I* Agreement.

## CONCLUSION

        For all of the foregoing reasons, defendants' motion for summary judgment should be granted.

Dated:  September 15, 2004                    Respectfully submitted,
        New York, NY


Thomas E. Minogue (CT 06845)                 Thomas A. Smart (CT 21462)
MINOGUE BIRNBAUM LLP                         Paul C. Llewellyn (CT 25417)
237 Elm Street                               KAYE SCHOLER LLP
New Canaan, CT  06840                        425 Park Avenue
(203) 966-6916                               New York, NY  10022
                                             (212) 836-8000

                                             Of counsel:
                                             Victoria Haje
                                             Michelle R. Tepper

                                             *Attorneys for Defendants*