**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

_____

OMEGA, S.A.,

                     Plaintiff,

        v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC, INC., AND
OMEGA PRESS, INC.,

                     Defendants.

OMEGA ENGINEERING, INC.,

                     Counterclaim-Plaintiff,

        v.

OMEGA, S.A. and
THE SWATCH GROUP LTD.

                     Counterclaim-Defendants.

_____

Civil Action No.:
3:01 CV 2104 (MRK)

**DEFENDANTS' LOCAL RULE 56(a)2 STATEMENT IN OPPOSITION**
**TO OMEGA S.A.'s MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)2, defendants Omega Engineering, Inc. ("OEI"),

Omega Scientific, Inc. ("OSI") and Omega Press, Inc. ("OPI") (together, "defendants") submit

this statement in response to the Local Rule 56(a)1 statement of plaintiff Omega S.A. ("OSA"),

in opposition to OSA's motion for partial summary judgment.

By way of preliminary statement, defendants submit that numerous paragraphs of

OSA's Local Rule 56(a)1 Statement fail to comply with Local Rule 56(a)3, which requires each

statement in a party's Statement of Undisputed Facts to include "a specific citation to (1) the

affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be

admissible at trial," and which further provides that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment."  *See also* Fed. R. Civ. P. 56(e) (requiring summary judgment motions to be premised on "such facts as would be admissible in evidence" and "[s]worn or certified copies of all papers" relied upon).  It is fundamental that evidence on motion for summary judgment must be "admissible evidence." *Shumway Co. v. United Parcel Serv.*, 118 F.3d 60, 65 (2d Cir. 1997); *see also*, *e.g., Barlow v. Connecticut*, 319 F. Supp. 2d 250, 257 (D. Conn. 2004) ("The principles concerning admissibility of evidence do not change on a motion for summary judgment," and the Court should not consider "documents submitted in support of a motion for summary judgment [that] contain inadmissible hearsay or conclusory statements, are incomplete, or have not been properly authenticated.").

　　　　　As set forth more fully below, however, numerous statements in OSA's Statement of Facts lack any citation to evidence, or cite to inadmissible hearsay and other inadmissible evidence.  In addition, most of the exhibits submitted by OSA in support of its Statement of Facts are not authenticated.  For these reasons, as also set forth below, defendants object to OSA's evidentiary submissions and move to strike them from the record.

　　　　　In addition, in many instances, as described below, not only is there no support for the purported undisputed fact contained in OSA's Local Rule 56(a)1 statement, but the undisputed record evidence is flatly to the contrary.  That defendants disagree with the vast majority of the purported "undisputed" facts contained in OSA's statement does not mean, however, that there are material issues of fact in dispute that must be tried.  As explained more fully in defendants' brief in opposition to OSA's summary judgment motion, there is simply no

relevant evidence in the record that creates a factual dispute pertinent to the claims at issue in

this case. On the contrary, as shown in defendants' Local Rule 56(a)1 Statement of Undisputed

Facts submitted in support of defendants' motion for summary judgment ("Def. 56(a)1

Statement"), defendants are entitled to summary judgment on the undisputed factual record.

That defendants disagree with a factual statement on the grounds that there is utterly no record

support for the statement or on the grounds that the "undisputed" fact asserted is immaterial or

irrelevant to the claims at issue, does not create a factual dispute, but, rather, demonstrates the

lack of one.


## DEFENDANTS' RESPONSES TO OSA'S ASSERTIONS OF FACT


1.      Plaintiff, Omega, S.A. ("OSA" or "Plaintiff") is the manufacturer, seller
and distributor of the world-renowned OMEGA brand of watches, horological products, and
other specialized devices. [Ex. 2, OSA's website at www.omega.ch]

### RESPONSE TO PARAGRAPH 1:

Denied as unsupported. Defendants object to the cited exhibit on the grounds that

it constitutes hearsay. The only evidence cited by OSA for the assertions in Paragraph 1,

including the statements that OSA's OMEGA brand is "world-renowned" and that OSA sells or

is known for "horological products, and other specialized devices," is OSA's own website,

which, to the extent cited for the truth of statements found therein, constitutes inadmissible

hearsay. The cited web site does not use the terms "horological products" or "specialized

devices" and provides no evidence as to whether or to what extent OSA's OMEGA brand is

"world-renowned" as to any products.

The undisputed record evidence is that OSA currently sells in the United States under the OMEGA mark wristwatches and watch-related items like watch bands and the like, and sports timing devices, typically to athletic organizations and educational athletic departments.  (Sauser Rupp Tr. 41, 62-63, 65-67, 89-90, 163-64; Rentsch Tr. 104, 109, 111, 119-120; Gibbons Tr. 37, 138-44, 153; Kayal Tr. 142-44, 176-77; Emmons Tr. 30-32, 40; Smart 9/15/04 Dec. Exs. G, R).  It does not sell in the United States clocks or pocket watches, and sells *no* timing devices of any kind to anyone engaged in scientific or industrial activities.  (Emmons Tr. 32-34, 51-52; Kayal Tr. 244-45; Sauser Rupp Tr. 260; Gibbons Tr. 142-45, 153; Rentsch Tr. 105-06, 120-21, 124, 128-31, 133-34, 138; Sauser Rupp Tr. 251-52, 270-71).  The undisputed evidence further shows that OSA's sports timing subsidiary, Omega Electronics S.A. ("Omega Electronics"), has had limited sales in the United States, with total annual United States sales in the past several years of less than $200,000.  (Kayal Tr. 142-43; Gibbons Tr. 124, 131; Smart 9/15/04 Dec. Ex. R).  In addition, the undisputed evidence is that although Omega Electronics sells passenger information display systems and Radio Frequency Identification Devices under the OMEGA marks abroad, it does not advertise or sell such goods in the United States.  (Kayal Tr. 98-104, 106, 212, 246-47; Rentsch Tr. 111-14; Gibbons Tr. 85-86, 110, 119-20).  *See* Def. 56(a)1 Statement, ¶¶ 44, 54-55, 58, 64-69.  Although OSA has previously sold a total of five sports stadium displays to large sports organizations in the United States, the last such sale occurred in 1988, sixteen years ago.  (Gibbons Tr. 112-15; Kayal Tr. 142-44; Smart 9/15/04 Dec. Ex. R).

2.    OSA has been manufacturing watches and other timepieces since 1848, and has been using OMEGA and the Greek letter $\Omega$ in conjunction with its products since 1894. [Ex. 1, Registration No. 25,036]

**RESPONSE TO PARAGRAPH 2:**

Denied as unsupported.  Defendants object to the cited exhibit on the grounds that

is unauthenticated and constitutes hearsay.  The only evidence cited by OSA for the assertions in

Paragraph 2 is a trademark registration certificate, which is not authenticated and which, to the

extent cited for the truth of statements found therein, constitutes inadmissible hearsay.  As set

forth in the response to Paragraph 1, *supra*, the undisputed admissible evidence in the record

shows that OSA has not sold OMEGA-branded products in the United States or otherwise used

its OMEGA marks in the United States except for wristwatches and, to a limited extent, sports

timing devices.

3.      Consistently, throughout its long existence, Omega has been recognized as
a maker of precision timepieces of the highest quality.  [Ex. 2, www.omega.ch]The Omega
Speedmaster was worn by Edward White on the American astronaut's first walk in space and is
the only watch ever to be worn on the moon.  [Ex. 4, printout from www.omega.ch., visited
September 14, 2004]  The Speedmaster has accompanied every American astronaut on every
space mission since that time and remains an integral part of the astronauts' standard equipment
as it has been certified by NASA for the next 100 Space Shuttle flights.  [*Id.*]

**RESPONSE TO PARAGRAPH 3:**

Denied as unsupported.  Defendants object to the cited exhibits on the grounds

that they constitute hearsay.  The only evidence cited by OSA for the assertions in Paragraph 3 is

OSA's own website, which, to the extent cited for the truth of statements found therein,

constitutes inadmissible hearsay.  OSA has cited no admissible evidence regarding the scope,

manner or extent of its use of its OMEGA marks, or of any public recognition of those marks.

OSA has cited no admissible evidence to support its assertion that it " has been recognized as a

maker of precision timepieces of the highest quality," or any of the other statements in Paragraph

3.  Although OSA repeatedly uses the term "timepiece" to create the impression that it has

exclusive rights to all time-related products, there is no evidence in the record that OSA sells

anything called a "timepiece," and its only sales in the United States under the OMEGA marks

are wristwatches and sports timing devices. Indeed, it is undisputed that OSA does not sell, for

example, clocks or pocket watches, and that OSA has *never* sold time-related goods for use in

science and industry. (Emmons Tr. 32-34, 51-52; Kayal Tr. 244-45; Gibbons Tr. 142-45, 153;

Rentsch Tr. 105-06, 120-21, 124, 128-31, 133-34, 138; Sauser Rupp Tr. 251-52, 260, 270-71).


        4.      With the advent of new technology, Omega continued to be a pioneer. An important part of Omega's pursuit of excellence in precision timing is its long involvement in the timing of sporting events. [*Id.*] Omega's pioneering efforts in this area began with the Gordon Bennett balloon race of 1909 in Zurich. In 1932, Omega was the official timekeeper of the Olympic Games. [*Id.*] Its efforts in this area have produced a number of timing innovations: the Omega Time Recorder, an electronic quartz-driven chronograph for timing to the 1/1000 of a second; the first infrared photoelectric cell in 1945; the first Photofinish camera in 1949, and the Scan 'O' Vision computerized imaging device in 1990. [*Id.*] Omega also developed giant matrix scoreboards in 1974, now equipping numerous stadiums, and the first timing electronic data processing center and display in 1978. [Ex. 3, Dep. Tr. Gibbons at 18.] Most recently, Omega's timing devices were used in the 2004 summer Olympic games held in Greece and broadcast nationally in the United States. [Ex. 4, Press Releases from www.omegaelectronicsus.com; Ex. 3, Dep. Tr. of Gibbons, at 18.]


**RESPONSE TO PARAGRAPH 4:**

        Denied as unsupported. Defendants object to OSA Exhibit 3 on the ground that it

is unauthenticated and object to both Exhibit 3 and 4 on the grounds that they constitute hearsay.

To the extent that OSA relies, in support of the assertions in Paragraph 4, on statements on its

cited website and on press releases, those documents constitute inadmissible hearsay. The

deposition testimony of Guy Gibbons (Tr. at 18) cited in Paragraph 4 does not provide support

for the statements for which it is cited.

        OSA has cited no admissible evidence concerning the goods and activities it

describes in Paragraph 4, or the manner, scope or extent of use of its OMEGA marks in

connection with those goods and activities.  As set forth in the response to Paragraph 1, *supra*, the undisputed admissible evidence in the record shows that OSA has not sold OMEGA-branded products in the United States or otherwise used its OMEGA marks in the United States except for wristwatches and, to a limited extent, sports timing devices, and has not sold any clocks, timers or other timing devices in the United States or elsewhere for use in science and industry.

As for the assertion that "[OSA] also developed giant matrix scoreboards in 1974, now equipping numerous stadiums, and the first timing electronic data processing center and display in 1978," the cited Gibbons testimony, as noted above, does not support the statement. Moreover, the undisputed evidence is that OSA's licensee Omega Electronics S.A. has sold a total of only five scoreboards in the United States, and that those sales – which took place between 1978 and 1988 – were made to large sports facilities operated by major league sports teams and large municipalities.  (Gibbons Tr. 112-15; Kayal Tr. 142-44; Smart 9/15/04 Dec. Ex. R).  There is no evidence in the record that OSA or its licensee is offering such scoreboards for sale in the United States today.

Lastly, OSA has cited no admissible evidence to support the assertion in Paragraph 4 that "Most recently, [OSA]'s timing devices were used in the 2004 summer Olympic games held in Greece and broadcast nationally in the United States."  The cited Gibbons testimony (Tr. at 18) does not support the statement.  The cited press releases are inadmissible hearsay to the extent cited for the truth of statements therein, and also do not support the statement and provide no indication of what, if anything, was "broadcast nationally in the United States."  At best, one press release, dated October 31, 2002, merely suggests that OSA's parent company, Swatch Group Ltd., is a sponsor of certain U.S. Olympic Teams.  In fact, according to the official web site of the 2004 Olympic games (at http://www.athens2004.

com/en/OlympicPartners), "SWATCH" – not Omega S.A. – was "the Official Timekeeper of the

ATHENS 2004 Olympic Games."   (Smart 10/5/04 Dec. ¶ 18 and Ex. UU).

     5.     OSA has all right, title and interest in and to the following United States trademark registrations for the mark OMEGA:

| MARK | REG. NO. | GOODS | REG. DATE |
|---|---|---|---|
| OMEGA (& Design) [Exhibit 1] | 25,036 | Watch movement and watchcases | 07/24/1894 |
| OMEGA [Exhibit 5] | 566,370 | Watches and parts thereof and Horological instruments | 11/04/1952 |
| OMEGA (& Design) [Exhibit 6] | 578,041 | Watches | 07/28/1953 |
| OMEGA (& Design) [Exhibit 7] | 577,415 | Wrist watch bracelets, bands, and straps | 07/14/1953 |
| OMEGA (& Design) [Exhibit 8] | 660,541 | Automatic recording machines and apparatus for use in determining the results of sporting events | 04/15/1958 |
| OMEGA (& Design) [Exhibit 9] | 708,731 | Electronic time recorders for automatic precision timing in science and industry | 12/20/1960 |
| OMEGA (& Design) [Exhibit 10] | 1,290,661 | Lubricating oils for watches and clocks | 08/21/1984 |

**RESPONSE TO PARAGRAPH 5:**

Denied in part. Defendants object to the cited exhibits on the grounds that they are unauthenticated and constitute hearsay. Defendants do not dispute that OSA is the registered owner of the U.S. Trademark Registrations listed in Paragraph 5. Defendants deny that the list in Paragraph 5 is a complete list of goods identified in the cited applications, and, in particular, note that Registration No. 1,290,661 also covers "Computer Apparatus for Checking and Controlling the Measurement of Time and Distance for Sporting Events, Scientific Investigation, and Industrial Application." (Smart 9/15/04 Dec. Ex. L). As set forth more fully in Defendants' Rule 56(a)1 Statement, however, OSA's witnesses have admitted that OSA and its affiliates do not sell any OMEGA-branded goods for "science and industry" or for "scientific investigation and industrial application" in the United States as those terms are used in Registration Nos. 708,731 and 1,290,661, and did not do so at the time that OSA's renewal affidavits for those registrations were filed. (Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45; Emmons Tr. 10-12; Sauser-Rupp Tr. 252, 270-71; Gibbons Tr. 142-45, 153; Smart 9/15/04 Dec. Exs. N, O). *See* Def. 56(a)1 Statement, ¶¶ 68, 118-127. Thus, for the reasons set forth in support of OEI's Motion for Partial Summary Judgment, those registrations are invalid and should be cancelled.

6.     Omega Engineering, Inc. ("OEI" or "Defendant(s)") OEI is a Stamford, Connecticut based company formed in 1962 specializing in products used for process measurement and control in industrial and scientific settings. [Ex. Dr. Hollander Decl., 2/22/04 at 2.] Specifically, these products are for the control or measurement of temperature, humidity, pressure, strain, force, flow, level, pH and conductivity. [*Id.*]

**RESPONSE TO PARAGRAPH 6:**

Undisputed with respect to the first sentence of Paragraph 6.  Denied as incomplete with respect to the second sentence of Paragraph 6.  In particular, the parameters listed in Paragraph 6 (temperature, humidity, pressure, strain, force, flow, level, pH and conductivity) are merely illustrative of the parameters that OEI's process measurement and control products measure and control.  Thus, the declaration of Dr. Milton B. Hollander cited in Paragraph 6 provides a non-exhaustive list of parameters that includes several other such parameters, including, without limitation, load, vibration and liquid level.  (M. Hollander 2/22/02 Dec. ¶ 2; *see also* M. Hollander 9/14/04 Dec. ¶ 5).  Defendants object to the cited exhibit on the ground that it is unauthenticated.


7.     Omega Press, Inc. ("OPI") is in the business of printing and publishing books on engineering and science.  [*Id.* at 3.]

**RESPONSE TO PARAGRAPH 7:**

Undisputed.


8.     Omega Scientific, Inc. ("OSI") is in the business of distributing scientific instruments.  [*Id.*]  OEI, OPI and OSI are collectively referred to as Defendants.

**RESPONSE TO PARAGRAPH 8:**

Undisputed.


9.     Although OPI and OSI are separate and distinct corporate entities, OEI refers to them as "trade vehicles" and neither OSI or OPI has any employees of its own.  [*Id.*; Ex. 12, 2003/2004 Corporate filings for OSI and OPI; Ex. 13, Deposition of Riggs at 15-17, 152-53; Ex. 14, Dep. Tr. of Dr. Hollander at 57-64, 68.]

**RESPONSE TO PARAGRAPH 9:**

Undisputed.  Defendants object to the cited exhibits on the ground that they are unauthenticated.


10.     All of OPI's and OSI's activities are carried out by OEI employees. [Ex. 14, Dep. Tr. of Dr. Hollander at 57-64, 68.]

**RESPONSE TO PARAGRAPH 10:**

Undisputed.


11.     Betty Ruth Hollander ("Mrs. Hollander") is the President of OEI and her husband Dr. Milton Hollander ("Dr. Hollander") is the Director of OEI and its affiliates, including Newport Electronics ("Newport").  [Ex. 13, Dep. Tr. of Riggs at 22.]

**RESPONSE TO PARAGRAPH 11:**

Denied as unsupported to the extent that Paragraph 11 asserts that Dr. Milton Hollander is "the Director of OEI and its affiliates, including Newport Electronics."  The cited deposition testimony does not support the assertion that Dr. Hollander is the sole director of OEI or any of its affiliates and does not address Newport Electronics at all.  The cited deposition testimony makes clear that both Dr. Hollander and Mrs. Betty Ruth Hollander are directors of OEI, OPI and OSI.  (Riggs Tr. 22).


12.     Christine Riggs ("Riggs") is in-house counsel for OEI, responsible in part for maintaining its trademark portfolio.  [Ex. 11, Dep. Tr. of Riggs at 7-8.]

**RESPONSE TO PARAGRAPH 12:**

Undisputed.

13.    Dr. William Drucker has served as outside trademark counsel for OEI and has managed its trademark portfolio since the company's inception in 1962.  [Ex. 14, Dep. Tr. of Dr. Hollander at 355-56.]

**RESPONSE TO PARAGRAPH 13:**

Denied in part as unsupported.  The deposition testimony cited in support of Paragraph 13 merely establishes that Dr. William Drucker has served as one of OEI's outside trademark counsel, and does not support the assertion that Dr. Drucker "has managed [OEI's] trademark portfolio since the company's inception in 1962."  (*See* M. Hollander Tr. 355-56).  As OSA correctly states in Paragraph 12, *supra*, OEI's in-house counsel, Christine Riggs, is responsible for maintaining OEI's trademark portfolio.  (Riggs Tr. 7-8).  As Dr. Drucker explained at his deposition, OEI's trademark portfolio is managed in-house, and he is merely one of several outside trademark attorneys with whom OEI consults.  (Drucker 9/2/04 Tr. 29).

14.    Newport Electronics is a corporate affiliate of OEI and under common ownership and control with OEI.  [Ex. 13 Dep. Tr. of Riggs at 73.]

**RESPONSE TO PARAGRAPH 14:**

Denied as unsupported and misleading.  The deposition testimony cited in Paragraph 14 states that Newport Electronics ("Newport") is an affiliated company of OEI and that an affiliated company is one that is under "common ownership *and/or* control."  (Riggs Tr. 73) (emphasis added).  The cited testimony does not state that Newport Electronics is under common ownership *and* control of OEI, and does not specify the precise nature of Newport's relationship to OEI.

15.    When OEI first formed in 1962, it manufactured only one product, the bare wire thermocouple.  [Ex. 15, Dep. Tr. Mrs. Hollander at 12-13.]

**RESPONSE TO PARAGRAPH 15:**

Undisputed.  Defendants object to the cited exhibit on the ground that it is unauthenticated.

16.    Since that time, OEI has greatly expanded the scope of its goods and services, now claiming to offer more than 68,000 products.  [*Id.*]

**RESPONSE TO PARAGRAPH 16:**

Denied as unsupported with respect to the assertion that OEI has expended the "scope" of its goods and services.  The testimony cited in Paragraph 16 merely states that OEI has expanded the number of its goods from thermocouples, in 1962, to over 68,000 goods today. (Mrs. B. Hollander Tr. 12-13).  The undisputed evidence is that OEI started as a company selling process control and measurement devices for scientific and industrial use, and that its products remain limited to those for scientific and industrial use.  (M. Hollander 9/14/04 Dec. ¶¶ 3, 5, 6, 13, 15-16).

17.    While in its early years, OEI and OSA amicably coexisted, the expansion of OEI's use of the Omega marks quickly closed the gap between OSA's established rights in the Omega marks, and OEI's original use of the marks in connection with the bare wire thermocouple.

**RESPONSE TO PARAGRAPH 17:**

Denied as unsupported and contrary to the undisputed evidence.  OSA cites no evidence whatsoever in support of Paragraph 17.  Moreover, there is no evidence that "the expansion of OEI's use of the Omega marks quickly closed the gap between OSA's established rights in the Omega marks, and OEI's original use of the marks in connection with the bare wire thermocouple," as asserted in Paragraph 17.  To the contrary, as set forth more fully in Defendants' Local Civil Rule 56(a)1 Statement of Undisputed Facts, the undisputed evidence is that there is no competitive overlap between the parties, that OSA's rights in its OMEGA marks in the United States are limited to consumer wristwatches and to sports timing devices, that defendants use their OMEGA marks solely in connection with goods and services for scientific and industrial application, and that there is no likelihood of confusion between the parties' marks.  *See* Def. Rule 56(a)1 Statement ¶¶ 3-9, 11-12, 44, 54, 68-74, 110-113 and evidence cited therein.

Moreover, the undisputed testimony of OSA's own witnesses is that OSA and its licensees have not made any sales of OMEGA-branded goods for scientific investigation or industrial application or for use in scientific or industrial fields, do not sell period timers, and have no plans to sell any timing devices for use in science or industry.  (Kayal Tr. 244-45; Gibbons Tr. 142-45, 153; Rentsch Tr. 108, 120-21, 124, 128-31, 133-34, 138, 271; Sauser Rupp Tr. 66, 168-69, 251-52, 270-71).  In contrast, it is undisputed that OEI's products are advertised and sold solely for use in science and industry.  (M. Hollander 9/14/04 Dec. ¶¶ 3, 5, 6, 13, 15-21).

18.    This inevitable head-on collision reached a critical stage in 1994, over 100 years after OSA first established its right to the Omega mark in connection with timing devices,

when the term timers and timing devices began frequently appearing in OEI's trademark applications.  [Ex. 16, Reg. No. 2,022,762; Ex. 17, Ser. No. 75/747,885; Ex. 18, Ser. No. 76/242,073.]

### RESPONSE TO PARAGRAPH 18:

Denied as unsupported by the citations and contrary to the undisputed facts.

Defendants object to the cited exhibits on the ground that they are unauthenticated.  The citations

do not support OSA's contention that there has been a "head-on collision" between the products

sold by OSA under its OMEGA marks and the products sold by OEI under its OMEGA marks.

The citations are to unauthenticated "TESS" reports for OEI's U.S. Registration No. 2,022,762,

U.S. Application Serial No. 75/747,885 and U.S. Application Serial No. 76/242,073, in each of

which the timing goods covered are expressly limited to timing goods for use in science and

industry. [1]  It is further undisputed that OSA has only sold wristwatches and sports timing

devices in the United States, and that at no time has OSA sold any timing devices for use in

science and industry.   (Kayal Tr. 102-04, 106-07, 142-44, 176-77, 244-45, 250-51; Gibbons Tr.

37, 54-55,142-45, 153; Rentsch Tr. 104, 109, 111, 115-21, 124, 128-31, 133-34, 138; Sauser

Rupp Tr. 41, 65-66, 89-90, 163-64, 251-52, 270-71; Emmons Tr. 30-32, 40).  OSA's citations do

not establish that OSA has made sales in science and industry, and each of OSA's 30(b)(6) and

other witnesses admitted that OSA has made no sales in science and industry.  (Kayal Tr. 244-

---

[1]    OSA's Exhibit 18, also cited in Paragraph 18, appears to be an unauthenticated copy of OEI's initial application to register a stylized design mark which was assigned Serial No. 76/242,073.  A review of that exhibit shows that the initial application did *not* refer to timers or timing devices.  (OSA Ex. 18).  Although, as amended during the PTO application examination process, the application now includes apparatus for timing variable parameters, those goods are clearly limited to "for use only in science or industry."  (Riggs 9/14/04 Dec. Ex. H).

45; Gibbons Tr. 142-45, 153; Rentsch Tr. 120-21, 124, 128-31, 133-34, 138; Sauser Rupp Tr. 251-52, 270-71).

In fact, the undisputed evidence is that OEI has been selling period timers under its OMEGA marks since approximately 1987, and that those timers are computer-controlled measuring, timing and display apparatus used in the measurement and control of variable parameters in science and industry. (M. Hollander 9/14/04 Dec. ¶¶ 6, 7). As set forth more fully in Defendants' Local Civil Rule 56(a)1 Statement of Undisputed Facts (¶¶ 75-80, 82-87), the parties have entered into at least two agreements pursuant to which OSA has expressly permitted OEI to register and use its OMEGA marks in connection with such goods, and, in one agreement, expressly released its claims with respect to such conduct by OEI.

Thus, in 1994 the parties entered into an agreement in which they expressly agreed that OEI may use and register its OMEGA marks in connection with timing apparatus for science and industry. (M. Hollander 9/14/04 Dec. ¶¶ 30-34 & Ex. T). Paragraph 4(a) of the 1994 Agreement recites that OEI will not use, register or apply to register the OMEGA or stylized omega trademarks for, among other things, computer controlled timing apparatus, *unless intended for science or industry*. OEI does in fact sell industrial and scientific computer controlled timing apparatus under the OMEGA or stylized omega trademarks to the industrial and scientific markets. (M. Hollander 9/14/04 Dec. ¶ 33 & Ex. T). The 1994 Agreement goes on to state in Paragraph 4(c) that OSA will not object to the use or registration by OEI of the OMEGA mark or stylized OMEGA trademarks for apparatus industrially and/or scientifically employed for measuring or controlling variable parameters. The term "variable parameters" as used in the 1994 Agreement, including paragraph 4(c), is illustrated by the examples of variable parameters given "such as temperature, pressure, force, load, vibration, electrical conductivity,

liquid level, acidity, humidity, strain and flow." These "variable parameters" are some of the same variable parameters that Omega Engineering's industrial and scientific products measure and control. Thus, for example, OEI's industrial and scientific period timers and clocks are used to both measure and control variable parameters such as flow and temperature in industrial and scientific settings. (M. Hollander 9/14/04 Dec. ¶ 34 & Ex. T) (See generally Def. Rule 56(a)1 Statement ¶¶ 75-80).

In addition, in 2003, the parties entered into a Settlement Agreement in another case in this district, Omega Engineering, Inc. v. Omega, S.A., 3:98 CV 2464 AVC ("Omega I"), pursuant to which, inter alia, OSA expressly consented to OEI's registration and use of its OMEGA marks in connection with timers for use in science and industry, and released its claims in this action with respect to such conduct by OEI. (Riggs 9/14/04 Dec. ¶ 15 & Ex. L). In Paragraph 3 of that Agreement, OSA agreed to "release and forever discharge" OEI and its affiliates from "any and all claims, actions and causes of action in the U.S.A. relating to the application to register, registration or use of period timers for science and industry or industrial and scientific clocks under the Omega mark or Omega design, in the Omega I Litigation, Omega III Litigation [i.e. this case] or the Cancellation Proceedings." (Riggs 9/14/04 Dec. Ex. L at ¶ 3). Pursuant to paragraph 4 of the Settlement Agreement, OSA agreed to withdraw its claims in this action relating to OEI's Registration Nos. 2,022,762 and 2,034,705 including, specifically, Paragraphs 31 and 32[2] of the complaint in this action and the request for cancellation of these registrations. OSA agreed that it "will not make any claims or assertions in Omega III relating to

---

[2]     At the time of the drafting of the Settlement Agreement, the Third Amended Complaint had not yet been filed by OSA and the Settlement Agreement referred to Paragraphs 31 and 32 of the Second Amended Complaint. The same paragraphs appear under the same numbering in the Third Amended Complaint.

application to register, registration or use by OEI of the Omega mark or Omega design on period

timers or industrial and scientific clocks."  (Riggs 9/14/04 Dec. Ex. L at ¶ 4).  The *Omega I*

Settlement Agreement is in effect and enforceable.  (Riggs 9/14/04 Dec. ¶¶ 16-17 and Exs.  M,

N, O).  (S*ee generally* Def. Rule 56(a)1 Statement ¶¶ 81-87).

       In sum, there is utterly no record evidence of any sales by OSA of any goods, let

along "timing devices," to science and industry, and there has been and is no "head-on collision"

between the goods of OSA and those of OEI.  To repeat, there is nothing in the record that

supports this statement.

       19.    By the year 2000, OEI had further expanded its trademark application
regimen concerning the Omega marks in connection with timing devices, filing, for example, a
trademark application with a description of goods that contained:  (a) two references to the term
time; (b) two references to timing; and (c) six references to timers.  Ex. 19, Ser. No. 76/052,828.

### RESPONSE TO PARAGRAPH 19:

       Denied as unsupported, incomplete and misleading.  Defendants object to the

cited exhibit on the ground that it is unauthenticated.  The only evidence cited in support of

Paragraph 19 is OSA Exhibit 19, which appears to be an unauthenticated PTO "TESS" report for

an OEI trademark application, Serial No. 76/052,828, which is not identified in the complaint as

an application at issue in this case and for that reason should not be considered.  Even if OSA

Exhibit 19 is considered, it provides no support for the assertions that any OEI "trademark

application regimen" exists or existed, or that OEI "had further expanded" any such regimen.  In

addition, a review of OSA Exhibit 19 shows that the application expressly limits the covered

goods to those intended for use in science and industry.  (OSA Ex. 19).

Moreover, as set forth more fully in response to Paragraph 18 above, OSA has at least twice expressly consented to OEI's registration and use of its OMEGA marks in connection with timers for science and industry, which have been sold by OEI since at least 1987, and agreed in the *Omega I* Settlement Agreement to drop and release such claims in this case.  (S*ee generally* Def. Rule 56(a)1 Statement ¶¶ 75-87; M. Hollander 9/14/04 Dec. ¶ 30-34; Riggs 9/14/04 Dec. ¶¶ 15-17).

20.     OSA has, therefore, been forced to police OEI and its marks around the globe in a constant expensive effort to fight back the encroachment by OEI on its rights; often times this encroachment is explained by OEI as a simple mistake, and the offending goods are deleted [see for example, Ex. 20]; frequently OSA must fight and win in tribunals around the world.  [Ex. 21 *In Re Registration No.* 1557184, July 15, 2004]

**RESPONSE TO PARAGRAPH 20:**

Denied as unsupported, misleading and incomplete.  Defendants object to the cited exhibits on the grounds that they are unauthenticated and constitute hearsay.  OSA has cited no evidence to support its assertions in Paragraph 20 that OEI has engaged in any alleged course of conduct encroaching on OSA's "rights."  OSA has cited no evidence establishing the nature, extent or scope of its claimed rights in any OMEGA marks in foreign countries.  OSA also has cited no evidence to support its assertion that OSA has "been forced to police OEI and its marks around the globe," that any such effort has been "constant" or "expensive," or that "frequently OSA must fight and win in tribunals around the world."   Nor has OSA cited any evidence regarding the applicable foreign law governing the parties' respective foreign trademark rights.

Exhibit 20 cited by OSA in Paragraph 20 merely shows that one time, on March 7, 2003, OEI's European Community trademark counsel, David J. Crouch, submitted letters requesting a narrowing of the goods and services listed in three OEI European Community

Trademark ("CTM") applications.  OSA has cited no evidence that the goods and services of which it complains constituted any "encroachment" on OSA's claimed rights and, no evidence setting forth the nature, scope or extent of its claimed rights in OMEGA marks in the European Community, and no evidence regarding the applicable foreign law governing the CTM applications to which OSA Exhibit 20 relates and governing parties' respective trademark rights with respect to CTM filings.

Exhibit 21 cited by OSA is merely a single decision in one foreign trademark proceeding in the United Kingdom relating to one OEI trademark registration.  Contrary to the misleading and unsupported assertion that "frequently OSA must fight and win in tribunals around the world," the undisputed evidence is that, in a number of trademark proceedings in foreign jurisdictions, OEI has prevailed against OSA and succeeded in canceling or partially canceling OSA's trademark registrations for OMEGA marks.  (*See* Riggs 4/1/04 Dec. ¶¶ 5-7 and Exs. A, B, C).

Moreover, OSA has cited no evidence to support its assertions in Paragraph 20 that the cited evidence is illustrative or "examples" of other foreign disputes.

What the undisputed evidence does show is that it is OSA itself that has engaged in the practice of filing overbroad trademark applications in foreign countries for goods for which OSA's own 30(b)(6) witness candidly acknowledged it has no intent to use and which it has never bothered to amend to reflect its true intent.  (*See* Riggs 4/1/04 Dec. ¶¶ 5-7 and Exs. A, B, C;  Smart 10/5/04 Dec. Ex. QQ at 2137-2152; Sauser Rupp Tr. 540-56).

Lastly, for the reasons set forth in Defendants' April 1, 2004 motion for, *inter alia*, an order of preclusion with respect to evidence relating to foreign trademark filings, OEI

objects to OSA's reliance on evidence relating to its claims based on alleged foreign filings by defendants, and reasserts its motion to preclude such evidence.

21.     It is now possible for any consumer with access to the Internet to purchase from OEI a timing device that measures periods of time, the time of day, and bears the Omega trademark.  Ex. 22, printout from OEI website, www.omega.com, as visited on September 14, 2004.

**RESPONSE TO PARAGRAPH 21:**

Denied as unsupported, misleading, incomplete and immaterial.  The OSA Exhibit 22 cited in Paragraph 21 displays various period timers which, on the face of the exhibit, are offered for sale for use in scientific and industrial applications for the measurement and control of industrial and scientific processes and parameters.  There is absolutely no evidence in the record that any consumer has ever purchased an OEI period timer for any purpose at all or that any consumer even would recognize an OEI timer as a timer.  OEI's period timers are designed to be purchased and used by scientists and engineers in scientific and industrial settings, and are not intended or sold to be used by consumers to tell time.  (M. Hollander 9/14/04 Dec. ¶ 15).  As is evident from the exhibits cited by OSA, period timers are not wristwatches, are not strapped on persons' wrists to tell time, and are too bulky to be used in such fashion.  Rather, they look and are used like the other scientific and industrial controllers that OEI sells.  Thus, when shown an OEI period timer and an OEI temperature controller at their depositions, each of OSA's Rule 30(b)(6) witnesses could not tell the difference between the two and did not recognize OEI's period timers as timers.  (Rentsch Tr. 272; Sauser Rupp Tr. 222-23;, 234-35; Gibbons Tr. 191-92; Kayal Tr. 229-32; Riggs 10/4/04 Dec. ¶¶ 8-10 & Exs. U, V, W).

The undisputed evidence is that defendants do not offer or sell any goods or services under OMEGA marks for use in markets or fields outside of industry and science, that at no time in the over 40-year history of OEI have defendants marketed or sold any goods or services under any OMEGA marks to consumers, and that the only time-related devices that defendants have offered to sell or sold are period-timers or scientific or industrial clocks and similar apparatus that are used to regulate scientific, research or manufacturing processes in laboratories or factories.  (M. Hollander 9/14/04 Dec. ¶¶ 3, 13, 15-16; Riggs Tr. 258).

Moreover, as set forth more fully in response to Paragraph 18 above, OSA has at least twice expressly consented to OEI's registration and use of its OMEGA marks in connection with timers for science and industry, and agreed in the *Omega I* Settlement Agreement to drop and release such claims in this case.  (S*ee generally* Def. 56(a)1 Statement ¶¶ 75-87).

22.    This is the third dispute in this Court between the Parties regarding rights to the Parties respective rights to the Omega marks.  As noted by the Court in *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 112, 114-115 (D. Conn. 2002) ("*Omega II*"):

> Throughout the 1980s, [OEI] and OSA had a history of disputing the scope of their respective trademark rights.  During that period, the two parties signed several agreements limited to certain countries and trademark registrations.  In an effort to end such disputes once and for all, in 1992, [OEI] entered into a worldwide agreement with OSA.  In 1994, the agreement was replaced by a new worldwide agreement, which was executed for and on behalf of OSA on May 3, 1994, and [OEI] on August 2, 1994 ("1994 Agreement").  *Id.* at 115, n. 12.

> The 1994 Agreement states, in part, that both parties hereto are desirous of coming to an arrangement for the avoidance of future interference Worldwide between their respective fields of commercial operation under their Rights in respect of Trademarks consisting of or including the word OMEGA and/or the Greek letter $\Omega$ or containing elements colourably resembling either of thos[e] two elements.  *Id.*

**RESPONSE TO PARAGRAPH 22:**

Undisputed.

23.    In May of 2003, in an effort to resolve the Parties' dispute in *Omega Engineering, Inc. v. Omega, S.A.*, Civ. No. 3:98CV2468 (AVC) ("Omega I"), the Parties entered into settlement discussions.

**RESPONSE TO PARAGRAPH 23:**

Denied as incomplete.  Defendants do not dispute that the parties entered into

settlement discussions in *Omega I* in May of 2003, but further state that, as found by Magistrate

Judge Smith and Judge Covello, the parties entered into a binding Settlement Agreement in

*Omega I* in May of 2003 and that judgment has been entered in *Omega I*.   (Riggs 9/14/04 Dec.

¶¶ 15-17 and Exs. L, M, N, O).

24.    Although the Omega I agreement remains disputed by OSA, Judge Covello recently ordered that the agreement should be enforced.  [Ex. 23, Order and Judgment dated 8/12/04.]

**RESPONSE TO PARAGRAPH 24:**

Undisputed.

25.    A Notice of Appeal has been filed by OSA challenging the enforcement of this agreement.  [Ex. 24, OSA's Notice of Appeal.]

**RESPONSE TO PARAGRAPH 25:**

Denied as misleading and incomplete.  A Notice of Appeal has been filed

appealing from Judge Covello's order enforcing the settlement agreement; however, OSA has

not sought a stay of enforcement of the judgment in *Omega I*.  *See Omega I* docket.

Accordingly, the judgment and Settlement Agreement in that case are binding and enforceable

notwithstanding the pendency of OSA's appeal.  *See American Town Center v. Hall*, 912 F.2d

104, 110-11 (6th Cir. 1990) (appeal does not deprive federal court of jurisdiction to enforce

judgment).


26.    On or about November 4, 2002, the Parties settled, *Omega S.A. v. Omega Engineering, Inc.*, Civ. No. 300CV1848 (JBA) ("Omega II"), when OEI transferred the marks OMEGAWATCH.COM and OMEGATIME.COM to OSA.  [Ex. 25, Docket History of Case printed from PACER (9/14/04).]


**RESPONSE TO PARAGRAPH 26:**

Denied in part as unsupported and inaccurate.  Defendants object to the cited

exhibit on the ground that it is unauthenticated.  Defendants do not dispute that *Omega II* was

settled on or about November 4, 2002, but OSA inaccurately states that OEI transferred the

marks omegawatch.com and omegatime.com to OSA.  In fact, OEI transferred the domain names

omegawatch.com and omegatime.com to OSA.


27.    The core of OSA's business is time and timing devices.  [Ex. 21, *In re Reg. No. 1557184* at 31 and 38.]


**RESPONSE TO PARAGRAPH 27:**

Denied as unsupported and misleading.  The only evidence cited in support of

Paragraph 27 is the decision in a United Kingdom trademark proceeding.  To the extent that

OSA relies on this document for the truth of matters asserted therein, the document constitutes

hearsay, and defendants object to the cited Exhibit 21 on the grounds that it is unauthenticated

and constitutes hearsay.

In addition, the record evidence does not show that the "core" of OSA's business is "time and timing devices," and defendants submit that nobody owns or can monopolize "time."  The evidence shows that the core of OSA's business is luxury wristwatches sold to consumers, and that, in the United States, OSA's licensee Omega Electronics S.A. also does a modest business in the sale of sports timing equipment for the timing of swim meets and athletic competitions.  (Sauser Rupp Tr. 41, 62-63, 65-67, 89-90, 163-64; Emmons Tr. 30-32, 40; Rentsch Tr. 104, 109, 111, 119-20; Kayal Tr. 43, 64, 78-79, 82, 134-35, 142-44; Gibbons Tr. 37, 46-47, 124, 131, 153; Smart 9/15/04 Dec. Exs. G, K, R).   There is no evidence that OSA sells pocket watches or clocks or a variety of other timekeeping instruments.  (Emmons Tr. 32-34, 51-52; Sauser Rupp Tr. 260; Rentsch Tr. 105-06).  There is no evidence that OSA has *any* business, let alone a "core" business, in selling period timers to regulate scientific and industrial processes, which is a business that OEI has indisputably been in since at least 1987.  (M. Hollander 9/14/04 Dec. ¶ 6).

28.     OSA also has exclusive rights to the Omega marks in connection with sports timing, data logging and display apparatus.  [Ex. 13, Dep. Tr. Riggs at 105; Ex. 1, Registration No. 25,036; Ex. 5, Reg. No. 566,370; Ex. 8, Reg. No. 650,541.]

**RESPONSE TO PARAGRAPH 28:**

Denied as unsupported, misleading and incomplete.

First, the Riggs testimony does not support the statement that OSA has exclusive rights in connection with "sports timing, data logging, and display apparatus."  Rather, in her testimony, which OSA has not bothered to include in the exhibits it submitted in support of its summary judgment motion, Ms. Riggs merely testified that she is aware that, in the United States, OSA sells "wristwatches" and "sports timing devices."  She did not testify to anything

regarding "data logging" or "display apparatus," and did not testify that OSA has "exclusive rights" to anything.

Second, none of the three trademark registrations cited by OSA is for "data logging" or "display apparatus."  OSA Exhibit 1 is a trademark registration covering "Watch-Movements and Watchcases."  OSA Exhibit 5 is an trademark registration covering "Watches and parts thereof."  OSA Exhibit 8 is a trademark registration covering "Automatic recording machines and apparatus for use in determining the results of sporting events."  Defendants object to the cited exhibits on the ground that they are unauthenticated.

29.     The core of OEI's business is the manufacture and sale of process measurement and control devices for science and industry.  [Ex. 11, Dr. Hollander Decl. 2/22/02 at 2.]

**RESPONSE TO PARAGRAPH 29:**

Undisputed.

30.     OSA and OEI both sell their goods to similar customers including universities, engineers, and NASA.  [Ex. 14, Dep. Tr. of Dr. Hollander, at 233-36, 258-59; Ex. 3 Dep. Tr. of Gibbons at 138; Ex. 4, printout from OSA's website at www.omega.ch, visited September 14, 2004.]

**RESPONSE TO PARAGRAPH 30:**

Denied as unsupported and misleading.  Defendants object to the cited exhibits on the ground that they are unauthenticated, and object to OSA Exhibit 4 on the ground that it constitutes hearsay.

It is not the case that OSA and OEI both sell their goods to similar customers. The testimony cited by OSA, that of Dr. Hollander at Tr. 233-36 and Mr. Gibbons at Tr. 138, does not establish that the customers are similar.

On the contrary, the undisputed testimony of every OSA witness is that OSA sells wristwatches to consumers.  In contrast, OEI sells scientific and industrial process control instruments to science and industry – in particular, to entities such as manufacturers, power plants, and laboratories, including university laboratories.  The purchasers and users of OEI's products at these entities are scientists and engineers who select and use the products for scientific and industrial purposes and not for their own personal use the way a purchaser of a wristwatch uses a wristwatch.  (M. Hollander 9/14/04 Dec. ¶¶ 13, 15).

As for OSA's sports timing device business, which has less than $200,000 in annual sales, those products are occasionally sold to colleges and universities, typically to the athletic departments at such institutions.  (Kayal Tr. 143, 168-69; Gibbons Tr. 124, 131, 138-44, 148-57; Smart 9/15/04 Dec. Exs. R, T).  However, there is no evidence that OEI sells any products to the athletic departments at colleges and universities. Rather, OEI sells its scientific and industrial process control devices to the engineering departments or laboratories at universities and colleges.  (M. Hollander 9/14/04 Dec. ¶ 13).  What is more, OSA has offered no evidence that OSA has sold a sports timing device to any college or university to which OEI has sold any of its products.

Thus, the record is clear from the testimony of OSA's own witnesses that OSA does not share any customers with OEI.  (Gibbons Tr. 143-45,193-94; Kayal Tr. 171-73, 176-78; Sauser Rupp Tr. 142-45).  Indeed, when presented with a list of OEI's top 100 customers, OSA's witnesses could not identify any shared customers with the possible exception of one university,

to the athletic department of which OSA's licensee might have sold sports timing equipment, and

a few companies who had participated in OSA's corporate program in which, for example,

OMEGA watches are awarded to employees who have worked for the company for many years.

(Gibbons Tr. 154-57; Kayal Tr. 178; Emmons Tr. 86-87,176-78; Smart 9/15/04 Dec. Ex. I; M.

Hollander 9/14/04 Dec. ¶ 13 & Ex. H).

   OSA also has cited no admissible evidence that its goods are sold to "engineers"

or to NASA, as asserted in Paragraph 30.  The OSA website cited in Paragraph 30 constitutes

inadmissible hearsay to the extent that it is cited for the truth of statements contained therein.

There is no evidence that OSA or Omega Electronics has sold any products under the OMEGA

marks to the government, the military, research laboratories, the automobile industry, steel mills

or other manufacturers in the United States – that is, the kinds of customers to which OEI sells –

and the testimony of OSA's witnesses is that they have not done so.  (Sauser Rupp Tr. 142;

Kayal Tr. 171-73, 177; Gibbons Tr. 144-45; M. Hollander 9/14/04 Dec. ¶ 13).


   31. OEI's goods are available for purchase by any individual or company with
access to the world wide web.  [Ex. 22, printout from OEI's website at www.omega.com, visited
September 14, 2004.]

   **RESPONSE TO PARAGRAPH 31:**

   Denied as unsupported, misleading and immaterial.  The only evidence cited by

OSA in Paragraph 31 is selected pages from OEI's web site.  There is absolutely no evidence in

the record that any consumer has ever purchased an OEI product for any purpose at all.  The

undisputed evidence is that defendants do not offer or sell any goods or services under OMEGA

marks for use in markets or fields outside of industry and science, that at no time in the over 40-

year history of OEI have defendants marketed or sold any goods or services under any OMEGA

marks to consumers, and that the only time-related devices that defendants have offered to sell or

sold are period-timers or scientific or industrial clocks and similar apparatus that are used to

regulate scientific, research or manufacturing processes in laboratories or factories.  (M.

Hollander 9/14/04 Dec. ¶¶ 3, 13, 15-16; Riggs Tr. 258).


      32.     OSA and OEI both sell timing devices.  [Ex. 2, printout from OSA's
website www.omega.ch, visited on September 14, 2004; Ex. 22, OEI's website at
www.omega.com, visited on September 14, 2004.]

**RESPONSE TO PARAGRAPH 32:**

Denied as unsupported, misleading and immaterial.  The only evidence cited in

support of Paragraph 32 are selected pages from OSA's and OEI's websites.  The cited web sites

do not themselves use the vague and general term "timing devices," and do not establish that any

likely purchasers of OSA's goods or OEI's goods use or understand that term or classify goods

according to that term.  In addition, defendants object to OSA Exhibit 2 on the ground that it

constitutes hearsay.

In fact, the goods offered on the two cited websites – luxury wristwatches on

OSA's site, and period timers for scientific and industrial use on OEI's site – are very different

products with very different uses and users.  Thus, as set forth more fully in Paragraphs 1, 6, 17-

18 and 31 above and in Defendants' Rule 56(a)1 Statement of Undisputed Facts, the undisputed

evidence is that the parties sell different products in different markets to different purchasers.

OSA sells luxury wristwatches to consumers and sports timing equipment for athletic

competitions.  OEI sells scientific and industrial process measurement and control instruments to

industry and the scientific community for manufacturing and research.  OSA's own witnesses

testified that OSA and its licensees have not made any sales of OMEGA-branded goods for

scientific investigation or industrial application or for use in scientific or industrial fields, do not

sell period timers, and have no plans to sell any timing devices for use in science or industry.

(Kayal Tr. 244-45; Gibbons Tr. 142-45, 153; Rentsch Tr. 108, 120-21, 124, 128-31, 133-34, 138,

271; Sauser Rupp Tr. 66, 168-69, 251-52, 270-71).  In contrast, it is undisputed that OEI's

products are advertised and sold solely for use in science and industry, that defendants do not

offer or sell any goods or services under OMEGA marks for use in markets or fields outside of

industry and science, that at no time in the over 40-year history of OEI have defendants marketed

or sold any goods or services under any OMEGA marks to consumers, that defendants do not

sell goods for timing athletic competitions or sports events, and that the only time-related devices

that defendants have offered to sell or sold are period-timers or scientific or industrial clocks and

similar apparatus that are used to regulate scientific, research or manufacturing processes in

laboratories or factories.  (M. Hollander 9/14/04 Dec. ¶¶  3, 6, 13, 15-16; Riggs Tr. 258).

Moreover, as set forth more fully in response to Paragraph 18 above, OSA has at

least twice expressly consented to OEI's registration and use of its OMEGA marks in connection

with timers for science and industry, and agreed in the *Omega I* Settlement Agreement to drop

and release such claims in this case.  (S*ee generally* Def. Rule 56(a)1 Statement ¶¶ 75-87).


33.    More than a century before OEI was even formed, OSA had been using
the Omega mark in connection with timing devices worldwide and first used the mark in the
United States more than 68 years prior to OEI's existence.  [Ex. 1, Reg. No. 25,036; Ex. 5, Reg.
No. 566,370.]


**RESPONSE TO PARAGRAPH 33:**

Denied as unsupported.  The only evidence cited by OSA for the assertions in

Paragraph 33 are two trademark registration certificates, which are not authenticated and which,

to the extent cited for the truth of statements found therein, constitute inadmissible hearsay.

Defendants object to OSA Exhibits 1 and 5 on the foregoing grounds.  OSA has cited no

admissible evidence regarding the scope, nature or extent of its use of its OMEGA marks in the

United States.  The only record evidence regarding OSA's sales in the United States under

OMEGA marks is with respect to sales of luxury wristwatches and sports timing equipment.

There is no evidence in the record that OSA sells any product called a "timing device"; indeed,

OSA does not even sell clocks or pocket watches in the United States.  (Emmons Tr. 32-34;

Rentsch Tr. 105-06; Sauser Rupp Tr. 260).

 

      34.     OEI has filed numerous trademark applications in the United States and abroad (including, for example, Ex. 26, Ser. No. 76/337,450; Ex. 27, Ser. No. 76/337,374; Ex. 18, Ser. No. 76/242,073; Ex. 28, Ser. No. 002180834 (CTM)) for use of the Omega marks in connection with goods that are the same or confusingly similar to OSA's core business, such as the following:

- Timers;
- Period timers;
- Precious metals;
- Jewelry;
- Horological and chronometric instruments;
- Precious stones;
- Apparatus for timing variable chemical and physical parameters such as timing;
- Dataloggers;
- Data storing, registering and recording apparatus;
- Industrial and scientific clocks; and
- Apparatus for display timing.

### RESPONSE TO PARAGRAPH 34:

      Denied as unsupported, incomplete, misleading and immaterial.  Defendants

object to the cited exhibits on the ground that they are unauthenticated.  The evidence cited in

support of Paragraph 34 relates to three United States applications and a single CTM application,

and appears to consist of unauthenticated copies of PTO "TESS" reports for two of OEI's United

States trademark applications (OSA Exhibits 26 and 27), an unauthenticated copy of a database

report for one of OEI's CTM trademark applications (OSA Exhibit 28), and unauthenticated

copies of OEI's initial applications that were assigned Serial No. 76/337.450 (OSA Exhibit 26),

Serial No. 76/337,374 (OSA Exhibit 27) and Serial No. 76/242,073 (OSA Exhibit 18).  The cited

evidence does not support OSA's assertions and are selectively quoted and their contents

distorted by OSA in Paragraph 34.

   First, all of the four cited applications do not contain all of the goods and services

listed by OSA.  To the extent each application contains any of the listed goods, all such goods

about which OSA complains are expressly limited to "science and industry," which comports

with the parties' 1994 Agreement (*see* ¶ 18, *supra*).  Thus, the United States applications in OSA

Exhibits 26 and 27 are expressly limited to "science and industry."  (OSA Exs. 26, 27).  As for

the application in OSA Exhibit 18, the initial application did *not* refer to timers or timing devices

or to *any* of the other specific goods listed in Paragraph 34.  (OSA Ex. 18).  Although the

application was amended during the PTO examination process to include a reference to

"apparatus for metering, gauging, counting, . . . timing, testing, data logging, sensing and

controlling variable chemical and physical parameters," the application now is clearly limited to

goods for "science or industry."  (Riggs 9/14/04 Dec. Ex. H).  All of the goods and services

listed in the cited OEI CTM application also are expressly limited to "science and industry."

(OSA Ex. 28).

   Second, most of the goods identified by OSA in Paragraph 34 are not contained in

the cited United States applications, either in the initial applications as filed with the PTO or in

the applications as narrowed during the examination process and reported on the PTO's TESS

database.  (*See* OSA Exhibits 26, 27 and 18; Riggs 9/14/04 Dec. Ex. H).  Thus, none of the three

cited United States applications contain "period timers," "precious metals," "jewelry," "horological and chronometric instruments," "precious stones" or "industrial and scientific clocks" among their listed goods, either as originally filed or as modified during PTO examination.  (*See* OSA Exhibits 26, 27 and 18; Riggs 9/14/04 Dec. Ex. H)**.**

        In light of the foregoing, and given the clear lack of overlap between the parties' fields of trade (*see* ¶¶ 1, 6, 17-18, 31, 32, *supra*), the cited evidence does not support the assertion that the goods cited "are the same as or confusingly similar to OSA's core business." Indeed, OSA has provided no admissible evidence that any of the goods listed in Paragraph 34 constitute "OSA's core business."  Nor has OSA cited any admissible evidence regarding the scope, nature or extent of its use of its OMEGA marks in connection with the goods listed in Paragraph 34, any admissible evidence regarding the scope of its claimed rights in the OMEGA marks in any foreign jurisdictions, or any admissible evidence regarding the applicable foreign trademark law governing the parties' respective foreign trademark rights.

        Third, the assertions of Paragraph 34 are immaterial because the undisputed evidence is that the cited United States applications are intent to use applications that have been suspended as a result of this litigation and with respect to which the PTO has not yet taken any final action, and defendants have not made any use in commerce of the marks applied for in those applications.  (Riggs 9/14/04 Dec. ¶¶ 8, 10, 12 & Exs. F-H; M. Hollander 9/14/04 Dec. ¶ 29).  Thus, for the reasons set forth in defendants' accompanying memorandum of law, the Court lacks jurisdiction over these applications.

        Fourth, the assertions of Paragraph 34 also are immaterial because OSA has submitted no admissible evidence that it has suffered any injury or loss as a result of any trademark applications filed by OEI.  To the contrary, OSA's Rule 30(b)(6) witness conceded

that no OSA trademark applications have been "blocked" or otherwise impeded by any of OEI's

United States trademark filings, that OSA has not suffered any injury to its business or reputation

as a result of any OEI trademark filings, and that she could not identify any actual or potential

OSA customers who even are aware of the existence of OEI's trademark applications or

registrations about which OSA complains in this action.  (Sauser Rupp Tr. 313, 363-64, 367,

388-89, 391-92, 416-17).

Fifth, for the reasons set forth in Defendants' April 1, 2004 motion for, *inter alia*,

an order of preclusion with respect to evidence relating to foreign trademark filings, OEI objects

to OSA's reliance on evidence relating to its claims based on alleged foreign filings by

defendants, and reasserts its motion to preclude such evidence.


35.    OEI has also filed numerous trademark applications in the United States
and abroad (including, for example, Ex. 26, Ser. No. 76/337,450; Ex. 27, Ser. No. 76/337,374;
Ex. 18, Ser. No. 76/242,073; Ex. 28, Ser. No. 002180834 (CTM)) for use of the Omega marks in
connection with goods and services clearly unconnected with OEI's business and for which, in
some instances, it has admitted no intent to use (Ex. 14, Dep. Tr. of Dr. Hollander at 362-365):

- Typewriters;
- Fire extinguishing apparatus;
- Cardboard;
- Artists' materials;
- Playing cards;
- Advertising services;
- Photographs;
- Stationery;
- Business administration;
- Office functions; and
- Paper.


**RESPONSE TO PARAGRAPH 35:**

Denied as unsupported, incomplete, misleading and immaterial.  The evidence

cited in support of Paragraph 35 relates to three United States applications and a single CTM

application, and appears to consist of unauthenticated copies of PTO "TESS" reports for two of

OEI's United States trademark applications (OSA Exhibits 26 and 27), an unauthenticated copy

of a database report for one of OEI's CTM trademark applications (OSA Exhibit 28),

unauthenticated copies of OEI's initial applications that were assigned Serial No. 76/337,450

(OSA Exhibit 26), Serial No. 76/337,374 (OSA Exhibit 27) and Serial No. 76.242,073 (OSA

Exhibit 18). OSA also cites excerpts of Dr. Hollander's deposition testimony. Defendants

object to the cited exhibits on the ground that they are unauthenticated.

        The evidence cited by OSA does not support OSA's assertions and is selectively

quoted and its contents distorted by OSA in Paragraph 35. With respect to the cited United

States applications, a number of the goods identified by OSA in Paragraph 34 are not contained

in the applications as narrowed during the examination process and reported on the PTO's

"TESS" database. (*See* OSA Exhibits 26, 27; Riggs 9/14/04 Dec. Ex. H). Thus, none of the three

cited United States applications as narrowed during the examination process and currently

reported on the TESS database contain the goods "Typewriters," "Fire extinguishing apparatus,"

"Cardboard," "Artists' materials" or "Paper." (*See* OSA Exhibits 26, 27; Riggs 9/14/04 Dec. Ex.

H).

        As for the other cited goods and services about which OSA complains in the cited

United States applications in Paragraph 35, the evidence does not support OSA's assertions that

the goods and services are "clearly unconnected with OEI's business" or that OEI "has admitted

no intent use" its OMEGA marks in connection with those goods and services. The cited

deposition testimony of Dr. Hollander merely states to Dr. Hollander's knowledge, OEI does not

currently plan to offer fire-extinguishing apparatus, typewriters or automatic vending machines –

which, as explained above, were included inadvertently and have been removed from the

applications.  As for the remaining goods and services, the undisputed record evidence is that

OEI does provide such goods and services.  Thus, OEI does distribute "deck cards," some of

which have games on them and therefore constitute "playing cards" as set forth in the

applications.  (Riggs 10/4/04 Dec. ¶ 3 & Ex. R).  It is undisputed that in its field of trade, OEI

also distributes "photographs," as well as stationery.  (M. Hollander Tr. 368).   In addition, OEI

provides "advertising services" and various office administration services to some of its affiliated

companies.  (M. Hollander 9/14/04 Dec. ¶ 29).

Moreover, to the extent each application contains any of the goods and services

about which OSA complains in Paragraph 35, those goods are expressly limited to "science and

industry," which comports with the parties' 1994 Agreement (*see* ¶ 18, *supra*).  Thus, the United

States applications in OSA Exhibits 26 and 27 are expressly limited to "science and industry."

(OSA Exs. 26, 27).  As for the application OSA Exhibit 18, as amended during the PTO

examination process, the application now is clearly limited to goods for "science or industry."

(Riggs 9/14/04 Dec. Ex. H).  All of the goods and services listed in the cited CTM application

also are expressly limited to "science and industry."  (OSA Ex. 28).

In addition, OSA's assertions in Paragraph 35 are immaterial because there is

absolutely no evidence that OSA offers any of the goods or services complained of or has any

rights in the OMEGA marks in connection with such goods or services.  OSA has not cited any

admissible evidence regarding the scope, nature or extent of its use of it OMEGA marks in

connection with the goods or services listed in Paragraph 35, any admissible evidence regarding

the scope of its claimed rights in the OMEGA marks in any foreign jurisdictions, or any

admissible evidence regarding the applicable foreign trademark law governing the parties'

respective foreign trademark rights.  Moreover, in its interrogatory responses on this issue, OSA

did not identify any of the complained of goods and services as goods or services in which it

claimed trademark rights that were infringed or violated by OEI's conduct.  Consistent with this

evidence, the only goods with respect to which OSA, in its interrogatory responses, even claimed

rights that are infringed in the United States are watches and sports timing devices.  Thus, in

response to Defendants' Interrogatory No. 2, OSA identified watches and sports timing devices

almost exclusively as the goods that are allegedly infringed by defendants' conduct,[3] and clearly

did *not* list any of the goods or services cited by OSA in Paragraph 35.  (*See* OSA's Second

Supp. Answers to Interrog. No. 2 (Smart 10/5/04 Dec. Ex. RR); Kayal Tr. 144-54).

      The assertions of Paragraph 35 are immaterial because the undisputed evidence is

that the cited United States applications are intent to use applications that have been suspended

as a result of this litigation and with respect to which the PTO has not yet taken any final action,

and defendants have not made any use in commerce of the marks applied for in those

applications.  (Riggs 9/14/04 Dec. ¶¶ 8, 10, 12 & Exs. F-H; M. Hollander 9/14/04 Dec. ¶ 29).

Thus, for the reasons set forth in defendants' accompanying memorandum of law, the Court

lacks jurisdiction over these applications.

      Moreover, OSA has cited no admissible evidence that it has suffered any injury as

a result of the listed goods and services in the cited applications, and, again, the undisputed

evidence is to the contrary.  Thus, OSA has submitted no admissible evidence that it has suffered

any injury or loss as a result of any trademark applications filed by OEI.  To the contrary, OSA's

Rule 30(b)(6) witness conceded that no OSA trademark applications have been "blocked" or

---

[3]    Although the interrogatory response made a few references to RFID components and
passenger information systems, the testimony is clear that those goods are not advertised
or sold in the United States.  (Kayal Tr. 98-102, 212-13, 246-47; Rentsch Tr. 111-14;
Gibbons Tr. 85, 110, 119-20).

otherwise impeded by any of OEI's United States trademark filings, that OSA has not suffered

any injury to its business or reputation as a result of any OEI trademark filings, and that she

could not identify any actual or potential OSA customers who even are aware of the existence of

OEI's trademark applications or registrations about which OSA complains in this action.  (Sauser

Rupp Tr. 313, 363-64, 367, 388-89, 391-92, 416-17).

Furthermore, for the reasons set forth in Defendants' April 1, 2004 motion for,

*inter alia*, an order of preclusion with respect to evidence relating to foreign trademark filings,

OEI objects to OSA's reliance on evidence relating to its claims based on alleged foreign filings

by defendants, and reasserts its motion to preclude such evidence.


36.    Although it has admitted that that many of the goods listed in certain
registrations [see e.g. Ex. 16, Reg. No. 2,022,762] were not even invented in 1962, OEI
maintains a first use date of 1962 in these registrations for such goods including, for example:

- Period timers;
- Dataloggers;
- Computer software;
- Digital controllers; and
- All goods listed with a microprocessor.

[Ex. 14, Dep. Tr. of Dr. Hollander at 280-89].


### RESPONSE TO PARAGRAPH 36:

Denied as unsupported, misleading, incomplete and immaterial.  Defendants

object to OSA Exhibit 16 on the ground that it is unauthenticated.  The evidence cited in

Paragraph 36 does not support OSA's false and misleading assertion that OEI maintains a first

use date of 1962 for the listed goods or for *all* of the goods in the single cited OEI trademark

registration, United States Reg. No. 2,022,762.  The cited Exhibit 16, which appears to be an

unauthenticated copy of the registration certificate for OEI's United States Reg. No. 2,022,762, merely indicates that the first use date listed for class 9 in that registration is September 1962. However, the first use date listed by the PTO is the earliest first use date for any goods in the particular class, and not necessarily all goods in the class. (*See* Trademark Manual of Examining Procedure ("TMEP") Section 903.09; Drucker 9/3/04 Tr. 70-71). The fact that the PTO's TESS database (OSA Ex. 16) only lists a September 1962 first use date merely indicates that the earliest first use date provided by OEI with respect to any goods in the class was September 1962.

Moreover, OSA's assertions in Paragraph 36 are immaterial because there are no allegations in the Complaint or in OSA's discovery responses regarding first use dates, and date of first use is not an issue in this case. In addition, there is no evidence that OSA has suffered any injury as a result of the listed goods and services in the cited registration or has any standing to complain of the first use dates in this registration. Thus, OSA has submitted no admissible evidence that it has suffered any injury or loss as a result of any trademark filings by OEI. To the contrary, OSA's Rule 30(b)(6) witness conceded that no OSA trademark applications have been "blocked" or otherwise impeded by any of OEI's United States trademark filings, that OSA has not suffered any injury to its business or reputation as a result of any OEI trademark filings, and that she could not identify any actual or potential OSA customers who even are aware of the existence of OEI's trademark applications or registrations about which OSA complains in this action. (Sauser Rupp Tr. 313, 363-64, 367, 388-89, 391-92, 416-17).

Finally, as set forth more fully in response to OSA's Paragraph 18, *supra*, OSA agreed in the Settlement Agreement in *Omega I* to withdraw its claims in this action relating to OEI's Registration Nos. 2,022,762 and 2,034,705 including, specifically, Paragraphs 31 and 32

of the complaint in this action regarding those registrations, and the request for cancellation of

those registrations.  OSA further agreed that it "will not make any claims or assertions in Omega

III relating to application to register, registration or use by OEI of the Omega mark or Omega

design on period timers or industrial and scientific clocks."  (Riggs 9/14/04 Dec. Ex. L at ¶ 4).

The *Omega I* Settlement Agreement is in effect and enforceable.  (Riggs 9/14/04 Dec. ¶¶ 16-17

and Exs.  M, N, O).


      37.     Anticipating the unavoidable consequences of applying for registration of
the Omega mark in connection with timing devices, OEI unsuccessfully attempts to cure this
encroachment by including the following incoherent statement at the end of a long list of goods
in International Class 9 in many of its Omega applications:

> The foregoing products are used for industrial and/or scientific purposes, but not
> including temperature measuring instruments and apparatus incorporating a time
> of day display, unless intended for sciences or industry and not including
> computer controlled measuring timing and display apparatus unless intended for
> use in science or industry; all the foregoing being for science and industry.
> [Ex. 26, Application No. 76/337,450].

**RESPONSE TO PARAGRAPH 37:**

     Denied as unsupported and misleading.

     First, OSA quotes part of a single OEI trademark application in support of its

assertion that this language appears in "many" of OEI's applications.  In fact, many of OEI's

applications state, at the end of the list of goods, "all of the foregoing goods and wares for

science and/or industry," or similar language.  (*See* Riggs 9/14/04 Dec. Exs. F, G, H).

     Second, the final phrase of the single trademark application that OSA does quote

in support of Paragraph 37 also expressly says "all of the foregoing being for science and

industry."  Thus, the statement clearly limits all of the goods preceding it to "science and

industry," which is wholly consistent with the parties' 1994 Agreement.  (*See* ¶ 18, *supra*).

Moreover, the phrase "not including computer controlled measuring timing and display apparatus unless intended for use in science or industry" clearly is copied almost verbatim from Paragraph 4(a) of the 1994 Agreement, pursuant to which OSA agreed that OEI could register and use OMEGA marks in connection with, among other things, "computer controlled measuring, timing and display apparatus. . . . intended for science or industry."  (M. Hollander 9/14/04 Dec. ¶¶ 32-33 & Ex. T; *see also* ¶ 18, *supra*).  It also is wholly consistent with Paragraph 4(c) of the 1994 Agreement, pursuant to which OSA agreed that it "will not object to the use or registration" by OEI of any OMEGA marks "in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters."   The goods in the cited application clearly are limited to such apparatus for science and industry.

Nor is there any support in Paragraph 37 for the assertion that OEI's registrations for its OMEGA marks constitute an "encroachment."  As discussed above with respect to this Paragraph 37 and as shown in response to Paragraphs 18 and 20, *supra*, OSA has consented to OEI's use of OMEGA marks in connection with goods for science and industry, and there is no evidence supporting the assertion that OEI has engaged in any alleged course of conduct encroaching on OSA's claimed rights.  Moreover, as shown in response to Paragraph 17, *supra*, there is no competitive overlap between the parties; OEI and OSA sell different products to different customers through different channels of trade.

38.    Available for purchase through OEI's website are timing devices.  [Ex. 29, printout from OEI's website at www.omega.com, visited on April 15, 2004.]

**RESPONSE TO PARAGRAPH 38:**

Denied as unsupported, misleading and immaterial.  The only evidence cited in support of Paragraph 38 is selected pages from OEI's website and from the websites of OEI's affiliate Newport Electronics, none of which use the term "timing device."  The products advertised in OSA Exhibit 29 are NEWPORT-branded period timers and controllers that are offered to scientific and industrial users to measure elapsed time and to measure and control scientific and industrial processes.  (*See* OSA Ex. 29 Exs. G, H).  In addition, the cited evidence does not establish that any likely purchasers use the broad, general and vague term "timing devices" or classify goods using that term.

39.     Timing devices sold on OEI's website are marketed as day clocks, stop watches and timers.

**RESPONSE TO PARAGRAPH 39:**

Denied as unsupported, misleading and immaterial.  OSA has cited no evidence at all in support of its assertion in Paragraph 39.  To the extent that OSA relies, in support of this assertion, on the evidence cited in Paragraph 40, the evidence does not support the assertion and the assertion is misleading for reasons set forth below and in response to Paragraph 40, *infra*, which is incorporated herein by reference.

OSA's assertion that timing devices "sold on OEI's website are marketed as day clocks, stop watches and timers" is unsupported and misleading.  First, the only timing devices in OSA Exhibit 29 (which OSA cited in support of its Paragraph 40, *infra*) are NEWPORT-branded timing devices that are sold by OEI's affiliate Newport Electronics on Newport's web sites at www.newportshop.com and www.newportinc.com and that do not bear any OMEGA marks.  (OSA Ex. 29 Exs. G, H).  There is no evidence that these NEWPORT-branded products are

marketed or sold to consumers for use as "day clocks, stop watches and timers," as OSA asserts. Nor is there any evidence that these products cited by OSA have ever been sold under the OMEGA marks. To the contrary, no OMEGA marks appear anywhere on the web pages for these products at OSA Ex. 29 Exs. G & H, and the cited web pages clearly indicate that the source of the products at issue is Newport. (*See* OSA Ex. 29 Exs. F, G, H). OSA has cited no evidence that OEI markets or sells any OMEGA-branded timing devices as "day clocks, stop watches and timers."

Moreover, although both OEI's and Newport's timing devices indeed have timing capabilities, it is undisputed that they are sold only for scientific investigation and industrial application. Thus, the only time-related devices that OEI has offered to sell or sold are used to regulate scientific, research or manufacturing processes in laboratories or factories, and there is no evidence that any consumer has ever purchased or used an OEI device to use as a clock or watch or to tell the time of day. (M. Hollander 9/14/04 Dec. ¶¶ 6, 13, 15-16; Riggs Tr. 258). Similarly, the Newport products in OSA Exhibit 29 that is cited to in Paragraph 40, *infra*, are also sold for use in science and industry. Thus, as set forth in OSA Ex. 29, the NEWPORT-branded "L2C" and "L4C Series Large Clock Display[s]" are designed to "be configured for real-time or elapsed time indication" for use in science and industry, while the NEWPORT-branded "6-Digit Process Timer/Controller/Clock" is used to control industrial processes. (*See* OSA Ex. 29 Exs. G, H).


40.     Some of the timing devices available through OEI's website are advertised and depicted along with a wrist watch, in one instance, and a stop watch in another. [Ex. 29, printout from search engine results from www.omega.com, visited on April 15, 2004.]

**RESPONSE TO PARAGRAPH 40:**

Denied as unsupported, misleading, irrelevant and incomplete.  Although OSA carefully and misleadingly asserts that the cited products are available "through" OEI's web site, the cited evidence clearly shows that the products at issue are NEWPORT-branded products that are sold by OEI's affiliate Newport Electronics on Newport's web sites at www.newportshop.com and www.newportinc.com, and that that the products do not bear any OMEGA marks.  (OSA Ex. 29 Exs. G, H).  Indeed, no OMEGA marks appear anywhere on the product pages for these products at OSA Ex. 29 Exs. G & H, and the cited web pages clearly indicate that the source of the products at issue is Newport.  (*See* OSA Ex. 29 Exs. F, G, H).  OSA has cited no evidence that any OMEGA-branded devices are marketed or depicted by OEI alongside watches or stop watches.

41.    Dr. Hollander testified that these timing devices are displayed with a wristwatch so that a customer can determine the size of the timing device, stating:

> "Since the wristwatch tells time, this tells time.  But looking at the picture you have no idea how big the product is, so it would make a lot more sense to use a wristwatch or a pocket watch than to use a cup or a saucer."  [Ex. 14, Dep. Tr. of Dr. Hollander at 328-29].

**RESPONSE TO PARAGRAPH 41:**

Denied as unsupported, incomplete and misleading.  As set forth more fully in response to Paragraph 40, the one timing device in OSA Ex. 29 (at Ex. G) that is displayed with a wristwatch is a NEWPORT-branded product that is sold by Newport on its web site and that does not bear any OMEGA marks.  Similarly, the timing device in OSA Ex. 29 (at Ex. H) that is displayed with a pocket watch is a NEWPORT-branded product that is sold by Newport on its web site and that does not bear any OMEGA marks.  (OSA Ex. 29, Exs. G, H).

42.    OEI also offers for sale through its website, goods that it describes as watch batteries.

**RESPONSE TO PARAGRAPH 42:**

Denied as unsupported and misleading.  OSA has cited no evidence at all in support of its assertion in Paragraph 42.  To the extent that OSA relies, in support of this assertion, on the evidence cited in Paragraph 43, the evidence does not support the assertion and the assertion is misleading for reasons set in defendants' response to Paragraph 43, *infra*, which is incorporated herein by reference.

43.    The watch batteries sold on OEI's website are sold in connection with the Omega marks.  [Ex. 30, printout from search results from www.omega.com, visited on 31; Report of Brad Cole.]

**RESPONSE TO PARAGRAPH 43:**

Denied as unsupported, misleading and incomplete.  Defendants object to the cited exhibits on the grounds that they are unauthenticated and constitute hearsay.

There is no allegation in OSA's Complaint concerning watch batteries, and in its interrogatory answers and deposition testimony, OSA never identified watch batteries as an allegedly infringing good of OEI.  (*See* OSA's 2/13/04 Supp. Answers to Interrog. No. 2 (Smart 9/15/04 Dec. Ex. X); OSA's 3/15/04 Second Supp. Answers to Interrog. No. 2 (Smart 10/5/04 Dec. Ex. RR); Sauser Rupp. Tr. 157-59).  Moreover, there is no evidence that OSA sells watch batteries under the OMEGA brand, and none of the OSA trademark registrations cited by OSA cover "watch batteries."

OSA cites two exhibits for the statement in Paragraph 43.  First, it cites OSA Exhibit 30, which is an undated, unauthenticated web page printout that, as set forth below, does not support the assertions in Paragraph 43.  Second, it cites OSA Exhibit 31, which is an unsigned, unsworn, unauthenticated purported "Report of Investigation" that does not even identify the name of OSA's purported investigator.  This document is clearly unauthenticated and consists of hearsay and is not admissible for any purpose.  Moreover, on its face, the document is incomplete because it is missing attachments and exhibits referred to in the report (including, for example, the batteries allegedly purchased by the investigator, and the packaging and invoice accompanying those batteries).  Even if it were authentic and truthful and complete, the report provides no information regarding the actual content of the web page described in the report.  (*See* OSA Ex. 31)

Even putting aside OSA's failure to raise prior to summary judgment its claim relating to the phrase "watch batteries," as well as the critical flaws in the evidence cited by OSA, the undisputed evidence shows that OSA's statement is without support and highly misleading.  First, to the extent that the web page cited by OSA and identified in OSA Exhibit 31 (*i.e.* www.omega.com/pptst/FPG101_201.html) ever referred to "watch batteries," it no longer does so.  The undisputed evidence is that this web page was modified in June, 2004, in the ordinary course of business and for reasons having nothing to do with this litigation, to replace the phrase "watch batteries" with "Battery 1.55 V, SILVER OXIDE."  (Burke 10/1/04 Dec. ¶ 3 & Ex. A).  Thus, the cited web page has not referred to "watch batteries" for over three months.

Second, there is no evidence that the batteries offered for sale in OSA Exhibit 30 are branded with any OMEGA marks, and, in fact, they are not and never were.  (Burke 10/1/04 Dec. ¶ 4 & Ex. A).

Third, as is apparent on the face of OSA Exhibit 30, the unbranded batteries at issue are offered to OEI's customers on the cited web page because they are the power source for and are sold in connection with OEI's "Digital Open Channel Water Velocity Meter," which is a "flow meter" that measures "water velocity . . . in open channels and partially filled pipes such as sewers," and that also is sold on the same web page.  (OSA Ex. 30; Burke 10/1//04 Dec. ¶¶ 2, 4). This flow meter is manufactured by a third party on behalf of OEI and then branded with OEI's OMEGA mark.  As described by the third party manufacturer's specifications sheet, the flow meter's power source is "watch-type batteries," a phrase sometimes used to describe the small batteries of the type that the flow meter uses.  (Burke 10/1/04 Dec. ¶ 5 & Ex. B;  Drucker 9/2/04 Tr. 84-85).  It is for this reason – the third party manufacturer's use of the phrase "watch-type batteries" – that the OEI web page at issue might at one time have referred to "watch batteries." (Burke 10/1/04 Dec. ¶ 5 & Ex. B).  In all events, as noted above, the phrase is no longer on the web site.

Fourth, there is no evidence that anyone has ever bought these batteries from OEI for use with any product other than the Digital Open Channel Water Velocity Meter with which they are sold, and, in particular, there is no evidence that these batteries have ever been purchased by anyone for use with a watch.  Nor is there any evidence that any consumer ever saw the web page that is attached as OSA Exhibit 30 or the reference to "watch batteries" in that exhibit.

Fifth, the undisputed evidence shows that the battery at issue – which, as shown above, is sold merely as an accessory to a product that measures flow – is but *one* of over 68,000 products sold by OEI for use in science and industry.  (M. Hollander 9/14/04 Dec. ¶ 3).  OSA has

presented no evidence that this item is anything but an insignificant and *de minimis* product among OEI's extensive offerings of apparatus for science and industry.

44.     Thus, not only is OEI selling timing devices in connection with the Omega marks, it is also selling parts for watches with the Omega mark.

**RESPONSE TO PARAGRAPH 44:**

Denied as unsupported, misleading and incomplete.  OSA has cited no evidence at all in support of its assertion in Paragraph 44.  To the extent that OSA relies, in support of this assertion, on the evidence cited in Paragraph 43, the evidence is inadmissible and does not support the assertion, and the assertion is misleading for reasons set in defendants' response to Paragraph 43, *supra*, which is incorporated herein by reference.  As set forth in defendants' response to Paragraph 43, there is no evidence in the record that the unbranded batteries at issue are marketed, sold or used as "parts for watches," no evidence that they are branded with the OMEGA marks, and no evidence that any consumer has ever even seen the web page that is OSA Exhibit 30.  Moreover, as set forth in response to Paragraph 43, there is no evidence that OSA sells watch batteries under the OMEGA brand, none of the OSA trademark registrations cited by OSA cover "watch batteries," there is no allegation in OSA's Complaint concerning watch batteries, and OSA has never previously identified watch batteries as an allegedly infringing good of OEI.

45.     OEI applied for registration of the trademarks OMEGAWATCH.COM, OMEGATIME.COM and OMEGATIME.NET.  [Ex. 33, 32.]

**RESPONSE TO PARAGRAPH 45:**

Denied as unsupported, incomplete and immaterial.  Defendants object to the cited exhibits on the grounds that they are unauthenticated and constitute hearsay.  The only evidence cited in support of OSA's assertions in Paragraph 45 are what appear to be unauthenticated copies and unauthenticated translations of foreign trademark registrations for the marks omegatime.com and omegawatch.com in the Benelux nations.  OSA has submitted no evidence that OEI or any of its affiliates ever registered omegatime.net as a trademark anywhere in the world.

As for the alleged registrations of omegatime.com and omegawatch.com in the Benelux nations, those allegations are immaterial for several reasons.  First, for the reasons set forth in Defendants' accompanying Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, claims based on these foreign registrations are barred by the judgment in *Omega II* under principles of *res judicata*.  Even assuming the accuracy of the cited Exhibits, it is evident on their face that they were in existence as early as June 4, 1996.  (OSA Exs. 32, 33).  As OSA admits in Paragraph 26, *supra*, the *Omega II* case remained pending until on or about November 4, 2002.  In addition, a review of Judge Arterton's decision in that case confirms that the case involved the parties' respective rights to the domain names omegatime.com and omegawatch.com, which are identical to the alleged Benelux registrations for omegatime.com and omegawatch.com cited in Paragraph 45, and that the lawfulness of the alleged Benelux registrations and the reasons for their registration were issues of dispute in *Omega II* and an integral part of  OSA's claim in that case.  *See Omega S.A. v. Omega Engineering, Inc.,* 228 F. Supp. 2d at 132.  Given these undisputed facts, it is clear that the alleged Benelux registrations and the domain names at issue in *Omega II*  arise from a common

nucleus of operative facts, and that, as a result, OSA's claims relating to those trademark registrations are barred by *res judicata*.

Moreover, OSA has dropped from this case its claims relating to the cited Benelux registrations. Thus, on March 8, 2004, pursuant to an order of this Court, counsel for OSA provided defendants with a list of 25 pending OEI trademark applications in the European Community, Israel, Canada and the United Kingdom, as well as one United Kingdom registration owned by OEI, which were foreign filings that OSA contended were filed in bad faith by OEI. (Riggs 9/14/04 Dec. ¶ 18 & Ex. P). That list did not include any reference to the alleged Benelux trademark registrations in OSA Exs. 32 and 33. (*See* Riggs 9/14/04 Dec. Ex. P). And, at a hearing before the Court in this case on July 20, 2004, counsel for OSA expressly represented that these Benelux registrations were not at issue in this case. (7/20/04 Tr. at 48).

In addition, OSA has conceded that the alleged Benelux trademark registrations for omegatime.com and omegawatch.com cited in Paragraph 45 were lawful under applicable Benelux law. Thus, OSA states in its memorandum of law in support of its motion for partial summary judgment that "use of goods in commerce or even an intent to use goods in commerce is not necessary for a trademark registration in Benelux." (OSA Mem. at 19).

Furthermore, it is undisputed that even after OEI transferred the domain names omegawatch.com and omegatime.com to OSA, OSA never bothered to use the domain names. Thus, as Mrs. Sauser-Rupp admitted at her deposition, OSA does not use the domain names, and the sites were inoperative at the time of her deposition and are inoperative today. (Sauser Rupp Tr. 457-59, 463-64; Smart 10/5/04 Dec. ¶¶ 19-20 & Exs. NN, OO, VV, WW). The purpose of registering and using a domain name as a trademark is to advertise the domain name and related web site. Not surprisingly, then, since OSA does not use the domain names, it has never

attempted to register or use the trademarks omegawatch.com or omegatime.com, and, thus has

suffered no injury from registration by another. (Sauser Rupp Tr. 465). It is presumably for

these numerous reasons that OSA has submitted no evidence that it has made any attempt to

challenge the alleged Benelux trademark registrations for omegatime.com and omegawatch.com

cited in Paragraph 45, or to register those trademarks in any jurisdictions.

Lastly, for the reasons set forth in Defendants' April 1, 2004 motion for, *inter*

*alia*, an order of preclusion with respect to evidence relating to foreign trademark filings, OEI

objects to OSA's reliance on evidence relating to its claims based on alleged foreign filings by

defendants, and reasserts its motion to preclude such evidence.

46.    OEI's expansion of its use of the Omega mark in connection with timing
devices, has prompted European judicial tribunals to find:

- OSA has "a reputation in relation to both watches and sophisticated timing apparatus for sporting activities. The reputation is not for timing apparatus for industrial or scientific purposes but is a reputation which, in my view, will accrue to any timing equipment; and period timers are timing equipment." Ex. 21, *In re Registration No. 1557184*, July 15, 2004 at 31.

- "No doubt [OSA] feels more than a frission of concern that one of its rivals could purchase this trade mark or part of it, through division, and have rights in the word OMEGA for period timers for scientific and/or industrial purposes. The measurement and recording of time is the very core of the business of [OSA]." *Id.* at 38.

**RESPONSE TO PARAGRAPH 46:**

Denied as unsupported, incomplete and immaterial. In support for its assertions

in Paragraph 46, OSA has cited what appears to be an unauthenticated copy of a single decision

in one foreign trademark proceeding in the United Kingdom relating to one OEI trademark

registration. To the extent that OSA relies on this document for the truth of matters asserted

therein, the document constitutes hearsay.  Defendants object to the cited exhibit on the grounds

that it is unauthenticated and constitutes hearsay.

In addition, OSA has cited no admissible evidence that there has been any

"expansion," as OSA alleges, in OEI's use of its OMEGA marks in connection with timing

devices.  To the contrary, the undisputed evidence is that OEI has been selling period timers

under its OMEGA marks since approximately 1987, and that those timers are computer-

controlled measuring, timing and display apparatus used in the measurement and control of

variable parameters in science and industry.  (M. Hollander 9/14/04 Dec. ¶¶ 6, 7).

Moreover, as set forth more fully in response to Paragraph 18, *supra*, it is

undisputed that OSA has at least twice expressly consented to OEI's registration and use of its

OMEGA marks in connection with timers for science and industry, and agreed in the *Omega I*

Settlement Agreement to drop and release such claims in this case.  (S*ee generally* Def. Rule

56(a)1 Statement ¶¶ 75-87).

In addition, contrary to the misleading and unsupported assertion that multiple

"European judicial tribunals" have found against OEI in trademark disputes with OSA, the

undisputed evidence is that, in a number of trademark proceedings in foreign jurisdictions, OEI

has prevailed against OSA and succeeded in canceling or partially canceling OSA's trademark

registrations for OMEGA marks.   (*See* Riggs 4/1/04 Dec. ¶¶ 5-7 and Exs. A, B, C).  Similarly,

the undisputed evidence is that OSA has engaged in the practice of filing overbroad trademark

applications in foreign jurisdictions.  Thus, OSA has registered OMEGA marks on the World

Intellectual Property Organization's International Register for a broad spectrum of goods and

services that, as OSA's Ms. Sauser Rupp admits, OSA does not offer and has no intent to offer.

(*See* Riggs 4/1/04 Dec. ¶¶ 5-7 and Exs. A, B, C; Sauser Rupp Tr. 540-56; Smart 10/5/04 Dec. Ex. QQ).

Lastly, for the reasons set forth in Defendants' April 1, 2004 motion for, *inter alia*, an order of preclusion with respect to evidence relating to foreign trademark filings, OEI objects to OSA's reliance on evidence relating to its claims based on alleged foreign filings by defendants, and reasserts its motion to preclude such evidence.

47.     From its early beginnings as solely a manufacturer of thermocouples, OEI's trademark filing practices have expanded greatly to the point where now applications are drafted using the very broad "Niece" [*sic*] classifications, and anything that is not rejected by the examiner remains as part of OEI's application.  [Ex. 34, Dep. Tr. of Dr. Drucker at 15-20, 38-41.]

## RESPONSE TO PARAGRAPH 47:

Denied as unsupported, misleading and incomplete.  Defendants object to the cited exhibit on the ground that it is unauthenticated.  The cited testimony of Dr. Drucker states that Dr. Drucker sometimes uses the wording of goods and services from the Nice Convention list of trademark classes as a starting point for the wording of goods and services in trademark applications.  As Dr. Drucker explained, "Based on the wording of that [*i.e.* the Nice Convention wording], I have tried to make an application of the Nice goods to the client's actual goods as described to me or explained to me over many years."  (Drucker 9/3/04 Tr. 16-17).  Dr. Drucker's undisputed testimony is that this is a "usual practice that I follow and that many other people follow in my profession."  (*Id.* at 16).  Nor does the cited deposition testimony support that assertion that "anything that is not rejected by the examiner remains as part of OEI's application."  Rather, Dr. Drucker merely testified that he "expect[s] the trademark examiner to

review the goods with me during prosecution" and to arrive "at a satisfactory ultimate registered list of goods." (*Id.* at 17).

48.    Dr. Drucker has described this pattern and practice of OEI as a "lottery." [*Id.* at 113.]

**RESPONSE TO PARAGRAPH 48:**

Denied as unsupported, incomplete and misleading.  Contrary to OSA's assertion, the cited deposition testimony – which OSA has failed to attach to its submission to the Court – does not even relate to the selection of the specific goods to list in trademark applications. Rather, the testimony related to the issue of which *classes* of goods and services to file in, and Dr. Drucker testified that his practice in the CTM was to file in the three classes that best fit the client's business.  Thus, Dr. Drucker testified that it is a "normal situation" for a CTM application to cover three classes of goods or services, because in such an application, a fee is paid for each class, "except the first three classes are all included in one fee.  So economically it was better to put three classes in  and pick out the three most likely." (Drucker 9/3/04 Tr. 112-13).  Dr. Drucker went on to testify as follows:

> Q.    Okay.  With regard to the three classes that you mentioned, I am not sure I heard you correctly, did you say they picked the three that were most likely?
>
> A.    Well, you know, it's a bit like the lottery.  If you pick the right numbers you win and that's seemed to fit it best.  That's the best  way I can put it to you.  They seemed likely. They seemed the numbers that were going to fit the business of the client.
>
> Q.    But presumably the three classes selected were the three most appropriate classes to the business?
>
> A.    That's the same as likely to me.  That's what I meant to say.  If you want to use a different word...

Q.    That's fine.  It's just not the same as lottery to me.  It's a different concept.  But if we agree on that, that's fine.  (Drucker 9/3/04 Dep Tr. 113-14).

49.    Individuals drafting and signing applications on behalf of OEI do not even conduct an independent investigation as to OEI's use or bona fide intent to use the mark in connection for the goods and services specified in the applications filed with the trademark office.  [Ex. 34, Dep. Tr. of Dr. Drucker at 25-31.]

**RESPONSE TO PARAGRAPH 49:**

Denied as unsupported, incomplete and misleading.  The only evidence cited by OSA in support of Paragraph 49, selected testimony of Dr. Drucker, does not support OSA's sweeping generalization regarding the persons drafting and signing OEI's trademark applications, or even Dr. Drucker's practices in that respect.  Thus, as an initial matter, Dr. Drucker testified that he is only one of numerous people who file trademark applications on behalf of OEI.  (Drucker 9/3/04 Tr. 47-49).  Indeed, a review of the trademark database reports relating to various OEI applications and registrations that OSA has submitted reveals that Dr. Drucker did not file and is not the attorney of record with respect to the vast majority of OEI's trademark filings at issue in this case.  (*See, e.g.,* OSA Exs. 16, 28, 37-50, A, B).  Accordingly, Dr. Drucker's undisputed testimony is that David Crouch, a United Kingdom trademark agent, was responsible for preparing the U.K. and CTM applications that Dr. Drucker was asked about at his deposition, and that Dr. Drucker is not the only attorney responsible for preparing applications for OEI in the United States.  (Drucker 9/3/04 Tr. 47-48, 54-55, 58-59, 61, 80-81, 110).

As for trademark applications in which he was involved, Dr. Drucker testified that he arrived at that the goods and services in applications based information "from the client,"

based on "years of experience in this particular area," from having "worked for the client for a long time" and  based on "a long history of my association with the client and the client's goods and the nature of the market my client serve[s]."  (Drucker 9/3/04 Tr. 19, 27, 28).  He further testified that in putting together applications "I have to look things up occasionally in a book." (*Id.* at 26-27).  And, his undisputed testimony is that when he filed that application that was the subject of his testimony cited by OSA, he had a "good faith belief" that OEI had a "bona fide intention to use" the applied for mark in connection with the goods at issue.  (*Id.* at 31).

Similarly, Ms. Riggs, In-House Counsel for OEI, unequivocally testified that when she is involved in filing a trademark application for OEI, she reviews the list of goods covered by the application with appropriate OEI engineers to be sure that the list is accurate. (Riggs Tr. 29-30, 224-25).


50.     OEI readily admits selling jewelry, but alleges that such jewelry is only for science and industry.  [Ex. 34, Dep. Tr. of Dr. Drucker at 81-83.]  When asked how jewelry can be manufactured and sold only to science and industry, Dr. Hollander explained that:

> OEI sells "precious metal wire in strips or lengths which are suitable, for example, to form a piece of jewelry that if the owner barely twists it around his finger it becomes a ring or a larger length might become a necklace.  There is nothing you need to do about it.  It is jewelry.  It's just an expanded form.  It's like a kit."  [*Id.*]

**RESPONSE TO PARAGRAPH 50:**

Denied as unsupported, incomplete and misleading.  To begin, the testimony cited by OSA in Paragraph 50 is that of Dr. Drucker, not of Dr. Hollander, as OSA erroneously asserts.

In addition, contrary to OSA's assertion, Dr. Drucker did not "admit" that OEI sells jewelry; rather, as the quoted testimony shows, he testified that OEI sells precious metal

wire – which, it is undisputed, OEI does sell and has sold for many years, in the form of very

high purity, special alloy, metal wire (containing, for example, platinum, rhodium and tungsten)

in diameter from approximately .001" (finer than a human hair) to approximately .062" diameter.

(*See, e.g.,* M. Hollander 9/14/04 Dec. Ex. B at page H11-H11A (showing platinum wire sold by

OEI for use in science and industry).  Although Dr. Drucker theorized that this wire could be

used to form jewelry, he went on to testify that he did *not* have any "firsthand knowledge of

anybody having used such precious metal to form jewelry," and stated, "I am not familiar with

anyone who used it at all for anything in particular.  I don't know what customers use them for."

(Drucker 9/3/04 Tr. 82).  OSA has cited no evidence, and there is no evidence in the record, that

OEI has ever advertised its metal wire as jewelry or sold it to consumers for use as jewelry.

Furthermore, Dr. Drucker testified that he did not prepare or file the CTM

application that was the subject of his quoted testimony regarding jewelry.  (Drucker 9/3/04 Tr.

80-81).  And, although this CTM application by OEI (but *no* United States applications)

contained jewelry (limited to science and industry) in the description of goods, OSA itself

concedes that references to jewelry have been voluntarily removed by OEI's CTM counsel

David Crouch, who explained to the CTM authority that they were included in error.  (*See* OSA

Ex. 20 at 1285; Paragraph 20, *supra*).

Moreover, although OSA now raises jewelry in a few CTM applications as an

issue, there are no allegations regarding jewelry in the Complaint, and, in answer to defendants'

interrogatories concerning the OEI goods that allegedly infringe OSA's rights, OSA did not

identify jewelry as an allegedly infringing good of OEI, or as a good in which OSA claimed

rights in the OMEGA marks that allegedly were infringed by OEI.  (*See* OSA's 2/13/04 Supp.

Answers to Interrog. No. 2 (Smart 9/15/04 Dec. Ex. X); OSA's 3/15/04 Second Supp. Answers

to Interrog. No. 2 (Smart 10/5/04 Dec. Ex. RR)).

OSA also has provided no evidence of its apparent claim that it has exclusive

rights to the OMEGA marks for jewelry in Europe, where the OEI application at issue was filed,

and the evidence is to the contrary.  Thus, OSA cannot dispute that in a decision last year, OEI

successfully challenged an OSA United Kingdom registration for OMEGA for goods including

jewelry.  OEI's challenge resulted in a revocation of "jewelry" from the covered goods in OSA's

registration, and a limitation of the goods, in pertinent part, to "jewel watches," because OSA

had not proved that it sold jewelry under the mark.  (*See* Riggs 10/4/04 Dec. ¶ 6 and Ex. S).

Lastly, it is undisputed that Dr. Drucker is not an employee of OEI and did not

testify at his deposition on behalf of OEI, but as a third party witness.  (Drucker 9/2/04 Tr. 29-

31).  Thus, Dr. Drucker's speculation regarding possible uses of precious metal wire does not

constitute an "admission" that OEI sells jewelry.

51.    The above-captioned matter does not represent the first time that this
Court has been asked to address OEI's infringing activities.  This Court, on more than one
occasion, has already found OEI and its affiliates guilty of bad faith and cybersquatting:

- *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F. 3d 489, 497-98 (2d Cir. 2000) (OEI's found to have acted in bad faith in violation of APCA [*sic*]);
- *Newport Electronics, Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 214 (D. Conn. 2001) (Acts of Dr. Hollander's company and OEI affiliate to found to most likely be in bad faith); and
- *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 2d 112 (D. Conn. 2002)  OEI's acts are found suspect and indicative of bad faith use and registration of OMEGAWATCH.com and OMEGATIME.com).

**RESPONSE TO PARAGRAPH 51:**

Denied as unsupported, misleading, incomplete and immaterial. To begin, any evidence of alleged prior "bad acts" by defendants or their affiliates is highly prejudicial under Fed. R. Evid. 403 and clearly is irrelevant and inadmissible under Fed. R. Evid. 404(b), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Moreover, this case does not even involve any claim of cybersquatting, because such claims were dismissed by Judge Underhill in prior proceedings in this action. Thus, there is no basis for admitting the allegations in Paragraph 51 into evidence, even if they were true.

Moreover, the allegations in Paragraph 51 are misleading, blatantly false and contradicted by the public record. Thus, OSA asserts in Paragraph 51 that in *Newport Electronics, Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 214 (D. Conn. 2001), acts of OEI's affiliate Newport were "found to most likely be in bad faith." In reality, in the cited decision, the District Court merely held that there were "material questions of fact as to whether Newport Electronics acted in bad faith" in connection with the plaintiff's claim under the Anti-cybersquatting Consumer Protection Act ("ACPA"). 157 F. Supp. 2d at 216. OSA astonishingly *omits* from Paragraph 51 the fact that after a trial in that case, the jury *found in favor of Newport* on the ACPA claim. (Riggs 10/4/04 Dec. ¶ 5).

Similarly, OSA misleadingly asserts that in *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 2d 112, 131 (D. Conn. 2002) (*i.e.*, the *Omega II* litigation), "OEI's acts [were] found suspect and indicative of bad faith use and registration of OMEGAWATCH.com and OMEGATIME.com." However, there was no "finding" of bad faith in *Omega II*; Judge Arterton simply denied summary judgment on the ground that, on the facts of that case, determination of defendants' bad faith intent under the ACPA "[was] properly left to a jury." 228 F. Supp. 2d at

131.  As OSA concedes, that case later settled with the transfer of two domain names to OSA. (OSA 56(a)1 Statement ¶ 26).

Finally, directly contrary to what OSA asserts, OEI was *not* found to have acted in bad faith in violation of ACPA in *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F. 3d 489, 497-98 (2d Cir. 2000).  As the Second Circuit clearly stated, OEI "*prevailed* on *all* the claims made against it by Sportsman's," and the Court *affirmed* the district court's judgment "in *all* particulars."  *Id.* at 495 n.8, 502 (emphasis added).  The entity that was found to have violated the ACPA, and to have acted in bad faith, was Sporty's Farm, *not* OEI.  *Id.* at 498-99.

52.     OEI and its Chief Financial Officer were found guilty of violating the Export Control Act, Title 50 of the United States Code, § 2410 for their sale of potentially sensitive nuclear secrets to Pakistan.

### RESPONSE TO PARAGRAPH 52:

Denied as unsupported, false and immaterial.  To begin, OSA cites no evidence in support of the assertions in Paragraph 52.  To the extent that OSA relies on the evidence cited in Paragraph 53, *infra,* OEI objects to the evidence (OSA Exhibits 35 and 36) on the ground that the exhibits are unauthenticated and incomplete.  In addition, to the extent that OSA relies on the evidence cited in Paragraph 53, *infra,* the assertion is absolutely false, unsupported and immaterial for the following reasons.

First, the evidence cited in Paragraph 53 provides no basis for OSA's assertion that OEI and its Chief Financial Officer were found guilty of selling "potentially sensitive nuclear secrets to Pakistan."  In fact, the evidence cited shows that the violation did not involve "nuclear secrets" or "secrets" of any type, but, rather, products that were "uncontrolled standard

items right from [OEI's] catalog" that, as the Assistant United States Attorney on the case acknowledged, were "not on a prohibited list."  (*See* OSA Ex. 36 at 20, 22).

Second, there is no basis for the admission into evidence of this assertion, which is highly prejudicial under Fed. R. Evid. 403 and is an obvious attempt to smear OEI in this proceeding.  Even assuming *, arguendo*, any truth in the assertion in Paragraph 52, such evidence is barred by Fed. R. Evid. 404(b), which prohibits the admission of  "[e]vidence of other crimes, wrongs, or acts"  "to prove the character of a person in order to show action in conformity therewith."

Third, the assertion is wholly irrelevant to OSA's claims of trademark infringement and unfair competition under the Lanham Act and CUTPA.  To the extent OSA contends that it is relevant to alleged "tarnishment" of OSA, the assertion also is irrelevant, because, *inter alia*, OSA has not moved for summary judgment on its dilution claim, and, moreover, there is no evidence that there has been any tarnishment of OSA's OMEGA marks or that any alleged tarnishment is in any way related to OEI's use of OMEGA marks.  Nor is there any evidence in the record that any consumers are in any way aware of the facts alleged in Paragraph 52 or in any way associate OSA with those alleged facts.

OSA's assertions in Paragraph 52 are no more material than is the fact that OSA's affiliates have been alleged in the public press to have engaged in unlawful conduct.  Thus, it has been reported in the public press in the United States and abroad, including in major newspapers in New York and London, that The Swatch Group Ltd., OSA's parent corporation and a counterclaim defendant in this action, has been alleged to have engaged in unlawful tax evasion.  (*See* Smart 10/5/04 Dec. ¶¶ 16-17 & Exs. SS, TT).  The articles include references to OSA's OMEGA marks, and, by OSA's logic, defendants could argue that this negative publicity

tarnishes OEI.  *Id.*  OSA, however, would no doubt object strenuously to any efforts to put these allegations into evidence in this case, and the fact is that both OSA's assertions and the news stories about Swatch's wrongful conduct are irrelevant.

53.     Such goods were sold in connection with the Omega mark that is at the core of the dispute in this action and thereby negatively impacts and tarnishes the goodwill and associations made with the Omega mark.  [Ex. 35, Hearing Tr. dated 9/23/03 in *United States v. Omega Engineering, Inc.*, Civ. No. 3:03CR116 (DJS); Ex. 36, Hearing Tr. dated April 29, 2003 in *United States v. Michel*, Civ. No. 3:03CR116 (DJS).

**RESPONSE TO PARAGRAPH 53:**

Denied as unsupported and immaterial.  Defendants object to the cited exhibits on the ground that they are unauthenticated and incomplete.  Defendants incorporate by reference their response to Paragraph 52, *supra*.

54.     Listed below, and incorporated into this Undisputed Statement of Facts is a representative sample of trademark applications filed by OEI and its affiliates in the United States and abroad:

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
| --- | --- |
| OMEGA 1/4/1996 Community Trademark | Apparatus and instruments for measuring time; apparatus and instruments for metering in so far as they relate to time/timing; scientific and industrial research service and/or making models and designs in the field of equipment for measuring, controlling and/or regulating time.  (000.174.458) (Ex. 37) |
| OMEGA 3/21/2001 Community Trademark | Clocking devices; apparatus for checking and measuring time and distance; computer controlled apparatus for checking and controlling the measurement of time and distance.  (001.567.684) (Ex. 38) |
| OM€GA 4/17/2001 Community Trademark | All goods claimed, namely precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes jewellery, precious stones horological and chronometric instruments; timers; period timers; all of the foregoing for use in science and industry.  (002.180.834) (Ex. 28) |

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
| --- | --- |
| Ω 5/21/2001 Community Trademark | Measuring, signaling, apparatus and instruments insofar as they relate to timing; horological and chronometric instruments; timers; period timers; all of the foregoing for use in science and industry. (002.229.169) (Ex. 169) |
| OMEGA ΩE 6/30/1997 Canada | Clocks, timers.  (849.631)  (Ex. 40) |
| ΩE 6/30/1997 Canada | Clocks, timers.  (849.629) (Ex. 41) |
| OMEGA 6/30/1997 Canada | Clocks, timers.  (849.630) (Ex. 42) |
| OMEGAMETER 8/10/1998 United Kingdom | Period timers.  (2.179.158) (Ex. 43) |
| OMEGA ΩE 6/5/2002 United Kingdom | Period timers.  (1.517.303) (Ex. 44) |
| OMEGA 12/16/1993 United Kingdom | Period timers.  (1.557.184) (Ex. 45) |
| OMЄGA 4/18/2001 USPTO | Paper goods, cardboard, paintbrushes, typewriters.  (76-242,073) (Ex. 18) |
| Ω.COM 11/14/2001 USPTO | Fire extinguishing apparatus; apparatus and instruments for metering . . . timing.  (76-337,374) (Ex. 27) |
| Ω 11/14/2004 USPTO | Apparatus and instruments for metering . . . timing.  (76-337,450) (Ex. 26) |
| OMEGAWATCH.COM 6/4/1996 Benelux | Paper, cardboard, newspapers, stationary, artists' materials.  (595077) (Ex. 33) |
| OMEGATIME.COM 6/4/1996 Benelux | Photographic cinematographic, optical and weighing apparatus.  (872097) (Ex. 32) |
| OMEGA 5/21/2000 USPTO | Computers; chronometric and horological apparatus for science and industry; industrial and scientific timers; period timers; period timers used in industrial or scientific apparatus to measure and/or control other variable parameters for science or industry; clocking devices and apparatus for measurement or control of time or distance in science or industry.  (76-052,828) (Ex. 19) |

| Mark Date Filed Application Number Trademark Office | GOODS (Application Number) |
|---|---|
| **OMEGA** 7/2/1996 USPTO | Timers, namely period timers; industrial and scientific clocks. (2,022,762) (Ex. 16) |
| **EUROMEGA** 9/30/2000 Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of timing. (001.330.13) (Ex. 46) |
| **OMEGA.COM** 4/1/1996 Community Trademark | Apparatus and instruments for measuring time; apparatus and instruments for metering (in so far as they relate to time/timing) time; electronic time indicators; transducers for time. (000.174.367) (Ex. 47) |
| **OMEGA.CO.UK** 9/3/2002 Community Trademark | Scientific apparatus for the measurement of time; clocking devices apparatus for checking and measuring time and distance; chronometric and horological products for science and industry; period timers. (002.246.718) (Ex. 48) |
| **Ω.ORG** 5/21/2001 Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing. (002.226.454) (Ex. 49) |
| **Ω.NET** 5/21/2001 Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing. (002.225.0126) (Ex. 50) |
| **Ω.COM** 5/21/2001 Community Trademark | Apparatus and instruments for timing or relation to timing; timers; electronic indicators; jewelry, precious stones, horological and chronometric instruments; industrial and scientific clocks. (002.232.270) (Ex. A) |
| **OMEGA** 1/21/1994 USPTO | Timers, namely period timers; industrial and scientific clocks. (74-480,756) (Ex. B) |
| **ΩE** 1/21/1994 USPTO | Timers, namely period timers. (74-480,755) (Ex. C) |

**RESPONSE TO PARAGRAPH 54:**

Denied as unsupported, misleading and incomplete.  Defendants object to OSA Exhibits 37-50 and Exhibits A, B and C referred to in the chart in Paragraph 54 on the grounds that they are unauthenticated and, to the extent cited for the truth of statements found therein, constitute hearsay.  Notwithstanding those objections, defendants cite to them merely to show that they do not support plaintiff's assertions, without conceding their admissibility.

OSA cites no evidence in support of its assertion that the chart provided in Paragraph 54 constitutes a "representative sample" of trademark filings by OEI.

As set forth below, in numerous instances the goods listed in the chart provided by OSA in Paragraph 54 are inaccurate, misleading or incomplete.  For example, in many instances OSA fails to disclose that the listed goods are expressly limited to science and industry.  In other instances, the listed goods are not present in the current application at issue, either because they were never included in the application or because they were removed from the application during the course of the examination process.

Moreover, with respect to each of the applications and registrations in the chart, the goods and services listed by OSA – to the extent they even are in the application or registration – are only a portion of the goods and services in the application.  Thus, it appears that with respect to each application and registration, OSA has listed only those goods and services to which OSA objects.

As also set forth below in defendants' responsive chart, OSA's chart fails to disclose that virtually every application or registration listed in the chart provided by OSA in Paragraph 54 is the subject of a pending opposition or cancellation proceeding before the appropriate foreign or United States trademark authority.

Lastly, for the reasons set forth in support of defendants' April 1, 2004 motion

for, *inter alia,* an order of preclusion with respect to evidence relating to foreign trademark

filings [Docket # 69], OEI objects to OSA's reliance on evidence relating to its claims based on

alleged foreign filings by defendants, and reasserts its motion to preclude such evidence.

### Defendants' Response to the Chart Provided in OSA's Paragraph 54

*Note: For ease of identification, foreign applications and registrations are presented with a white background, and United States applications and registrations are presented with a light gray background.*

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to by OSA that are Alleged to be Listed in Application or Registration | Defendants' Response Regarding Goods Identified by OSA | Defendants' Response Regarding Status of Filing, and Other Responses |
|---|---|---|---|---|
| 1 | **OMEGA**<br>1/4/1996<br>Community Trademark<br>000.174.458 | • apparatus and instruments for measuring time<br>• apparatus and instruments for metering in so far as they relate to time/timing<br>• scientific and industrial research services and/or making models and designs in the field of equipment for measuring, controlling and/or regulating time | The application does not include the phrase "in so far as they relate to time/timing"<br><br>Moreover, the application expressly limits the identified goods to science and industry by stating, "all the above for use only in science and/or industry and none destined for household or kitchen use."<br>(OSA Ex. 37) | Opposition pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 37) |
| 2 | **OMEGA**<br>3/21/2001<br>Community Trademark<br>001.567.684 | • clocking devices<br>• apparatus for checking and measuring time and distance<br>• computer controlled apparatus for checking and controlling the measurement of time and distance | The application expressly limits the identified goods to science and industry by stating "all the foregoing goods being for science and/or industry."<br>(OSA Ex. 38) | Opposition pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 38). |

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 3 | OM€GA<br>4/17/2001<br>Community Trademark<br>002.180.834 | • All goods claimed, namely precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes jewellery, precious stones horological and chronometric instruments; timers; period timers; all the foregoing being for science or industry. | The application does not include the phrase "all goods claimed, namely."<br><br>Moreover, as OSA's chart indicates, the identified goods are expressly limited to science and industry. (OSA Ex. 28) | Opposition pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 28) |
| 4 | Ω<br>5/21/2001<br>Community Trademark<br>002.229.169 | • measuring, signaling, apparatus and instruments insofar and they relate to timing<br>• horological and chronometric instruments<br>• timers<br>• period timers<br>• all of the foregoing for use in science and industry | The application does not include the phrase "insofar and they relate to timing."<br><br>Moreover, as OSA's chart indicates, the identified goods are expressly limited to science and industry. (OSA Ex. 39) | Opposition pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 39) |
| 5 | OMEGA ΩE<br>6/30/97<br>Canada<br>849.631 | • clocks<br>• timers | | Opposition pending in Canadian Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 40) |
| 6 | ΩE<br>6/30/97<br>Canada<br>849.629 | • clocks<br>• timers | | Opposition pending in Canadian Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 41) |
| 7 | OMEGA<br>6/30/97<br>Canada<br>849.630 | • clocks<br>• timers | | Opposition pending in Canadian Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 42) |

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 8 | **OMEGAMETER**<br>8/10/1998<br>United Kingdom<br>2.179.158 | • Period timers | The registration contains no reference to timers or period timers.<br><br>Moreover, the registration expressly limits its identified goods to science and industry by stating "all for industrial and/or scientific purposes." (OSA Ex. 43) | Registered. (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 43) |
| 9 | **OMEGA ΩE**<br>6/5/2002<br>United Kingdom<br>1.571.303 | • Period timers | The application expressly limits the identified goods to science and industry by stating "all for industrial and/or scientific purposes." (OSA Ex. 44) | Opposition pending in United Kingdom Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 44) |
| 10 | **OMEGA**<br>12/16/2003<br>United Kingdom<br>1.557.184 | • Period timers | The application expressly limits the identified goods to science and industry by stating "all for industrial and/or scientific purposes." (OSA Ex. 45) | Registered; invalidation action filed by OSA. (Smart 3/31/04 Dec. ¶ 10 & Ex. H at p. 17; OSA Ex. 45) |
| 11 | **OMЄGA**<br>4/18/2001<br>USPTO<br>76/242,073 | • Paper Goods<br>• cardboard<br>• paintbrushes<br>• typewriters | The current application does not contain any reference to any of the goods listed on OSA's chart.<br><br>Moreover, the application expressly limits its identified goods to science and industry by stating "relating only to science and industry." (Riggs 9/14/04 Dec. Ex. H) | Intent to use application; suspended as a result of this lawsuit; defendants have made no use in commerce of the mark covered by the application. (Riggs 9/14/04 Dec. ¶12 & Ex. H) |

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 12 | Ω.COM<br>11/14/2001<br>USPTO<br>76/337,374 | • Fire extinguishing apparatus<br><br>• apparatus and instruments for metering . . . timing | The current application contains no reference to "fire extinguishing apparatus." Moreover, the application expressly limits its identified goods to science and industry by stating "the foregoing products are used for scientific and/or industrial purposes." (Riggs 9/14/04 Dec. Ex. F) | Intent to use application; suspended as a result of this lawsuit; defendants have made no use in commerce of the mark covered by the application. (Riggs 9/14/04 Dec. ¶8 & Ex. F) |
| 13 | Ω<br>11/14/2001<br>USPTO<br>76/337,450 | • apparatus and instruments for metering . . . timing | The application expressly limits the goods at issue to science and industry by stating "the foregoing products are used for scientific and/or industrial purposes." (Riggs 9/14/04 Dec. Ex. G) | Intent to use application; suspended as a result of this lawsuit; defendants have made no use in commerce of the mark covered by the application. (Riggs 9/14/04 Dec. ¶10 & Ex. G) |
| 14 | OMEGAWATCH.COM<br>6/4/1996<br>Benelux<br>Reg No. 595077<br>App. No. 872096 | • paper, cardboard, newspapers, stationary, artists' materials | The only evidence of the goods listed in this registration is an unauthenticated translation of an unauthenticated copy of what appears to be a Benelux trademark registration certificate. (OSA Ex. 33) | Registered; no evidence that cancellation proceeding or other challenge has ever been filed by OSA. (*See ¶ 45 supra*)<br><br>Claims relating to this registration are barred, under principles of *res judicata*, by the judgment in the *Omega II* litigation. |

|  | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 15 | OMEGATIME.COM<br>6/4/1996<br>Benelux<br>Reg No. 595078<br>App. No. 872097 | • Photographic cinematographic, optical and weighing apparatus | The only evidence of the goods listed in this registration is an unauthenticated translation of an unauthenticated copy of what appears to be a Benelux trademark registration certificate.<br>(OSA Ex. 32) | Registered; no cancellation proceeding or other challenge has ever been filed by OSA. (*See ¶ 45 supra*)<br><br>Claims relating to this registration are barred, under principles of *res judicata*, by the judgment in the *Omega II* litigation. |
| 16 | OMEGA<br>5/21/2000<br>USPTO<br>76/052,828 | • Computers<br>• Chronometric and horological apparatus for science and industry<br>• industrial and scientific timers<br>• period timers<br>• period timers used in industrial or scientific apparatus to measure and/or control other variable parameters for science and industry<br>• clocking devices and apparatus for measurement or control of time or distance in science and industry | The application does not include the phrase "period timers used in industrial or scientific apparatus . . .," but, rather, states, "timers used in industrial or scientific apparatus to measure and/or control other variable parameters for science and industry."<br><br>Moreover, the application expressly limits the identified goods to science and industry by stating "all of the above for use in science and industry."<br>(Riggs 10/4/04 Dec. ¶ 2 & Ex. Q). | Application suspended as a result of this lawsuit. (Riggs 10/4/04 Dec. ¶ 2 & Ex. Q)<br><br>This application was not alleged in the complaint or identified in discovery responses as an application to which OSA objected. |

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 17 | **OMEGA**<br>7/2/1996<br>USPTO<br>Reg. No. 2,022,762 | • Timers, namely period timers<br>• industrial and scientific clocks | The registration expressly limits the identified goods to science and industry by stating "industrially or scientifically employed."<br>(Riggs 9/14/04 Dec. Ex. C) | Cancellation action pending in PTO; proceeding suspended as a result of this lawsuit. (Riggs 9/14/04 Dec. ¶¶13-14 & Ex. J)<br><br>Claims with respect to this registration were released and are required to be dropped pursuant to the *Omega I* Settlement Agreement. |
| 18 | **EUROMEGA**<br>9/30/2000<br>Community Trademark<br>001.330.133 | • Apparatus and instruments for timing or relation to timing<br>• timers<br>• electronic indicators<br>• video tapes in the field of timing | The application expressly limits the identified goods to science and industry by stating "the foregoing products are used for industrial and/or scientific purposes."<br>(OSA Ex. 46) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 46) |
| 19 | **OMEGA.COM**<br>4/1/1996<br>Community Trademark<br>000.174.367 | • Apparatus and instruments for measuring time<br>• apparatus and instrument for metering (in so far as they relate to timing) time<br>• electronic time indicators<br>• transducers for time | The application expressly limits the identified goods to science and industry by stating "the foregoing products are used for industrial and/or scientific purposes."<br>(OSA Ex. 47) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 47) |
| 20 | **OMEGA.CO.UK**<br>9/3/2002<br>Community Trademark<br>002.246.718 | • Scientific apparatus for the measurement of time<br>• clocking devices<br>• apparatus for checking and measuring time and distance<br>• chronometric and horological products for science and industry<br>• period timers | The application expressly limits the identified goods to science and industry by stating "all for science and/or industry."<br>(OSA Ex. 48) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 48) |

| | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 21 | Ω.ORG<br>5/21/2001<br>Community Trademark<br>002.226.454 | • Apparatus and instruments for timing or relation to timing<br>• timers<br>• electronic indicators<br>• video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing | The application expressly limits the identified goods to science and industry by stating "all the foregoing being for science or industry." (OSA Ex. 49) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 49) |
| 22 | Ω.NET<br>5/21/2001<br>Community Trademark<br>002.225.126 | • Apparatus and instruments for timing or relation to timing<br>• timers<br>• electronic indicators<br>• video tapes in the field of displaying, measuring, controlling, recording, variable parameters such as timing | The application expressly limits the identified goods to science and industry by stating "all the foregoing being for science or industry." (OSA Ex. 50) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. 50) |
| 23 | Ω.COM<br>5/21/2001<br>Community Trademark<br>002.232.270 | • Apparatus and instruments for timing or relation to timing<br>• timers<br>• electronic indicators<br>• Jewelry<br>• precious stones<br>• horological and chronometric instruments<br>• industrial and scientific clocks | The current application does not include any reference to "jewelry" or "precious stones."<br><br>Moreover, the application expressly limits the identified goods to science and industry by stating "all the foregoing being for science or industry." (OSA Ex. A) | Opposition Pending in European Community Trademark Office (Smart 3/31/04 Dec. ¶ 10 & Ex. H at pp. 12-17; OSA Ex. A) |

|  | Mark<br>Date Filed<br>Trademark Office<br>App. or Reg. Number | Goods Objected to<br>by OSA that are<br>Alleged to be Listed<br>in Application or<br>Registration | Defendants'<br>Response<br>Regarding Goods<br>Identified by OSA | Defendants'<br>Response<br>Regarding Status<br>of Filing, and<br>Other Responses |
|---|---|---|---|---|
| 24 | **OMEGA**<br>1/21/1994<br>USPTO<br>74/480,756<br>[Registration No. 2,022,762] | • Timers, namely period timers<br>• industrial and scientific clocks | The registration expressly limits the identified goods to science and industry by stating "industrially or scientifically employed."<br>(Riggs 9/14/04 Dec. Ex. C) | This is the same filing as Registration No. 2,022,762 for the mark OMEGA, listed above in row 17.<br><br>Cancellation pending at PTO; proceeding suspended as a result of this lawsuit. (Riggs 9/14/04 Dec. ¶¶13-14 & Ex. J)<br><br>Claims with respect to this registration were released and are required to be dropped pursuant to the *Omega I* Settlement Agreement. |
| 25 | ΩE<br>1/21/1994<br>USPTO<br>74/480,755<br>[Registration No. 2,034,705] | • Timers, namely period timers | The registration expressly limits the identified goods to science and industry by stating "industrially or scientifically employed."<br>(Riggs 9/14/04 Dec. Ex. D) | Cancellation action pending at PTO; proceeding suspended as a result of this lawsuit. (Riggs 9/14/04 Dec. ¶¶13-14 & Ex. K)<br><br>Claims with respect to this registration were released and are required to be dropped pursuant to the *Omega I* Settlement Agreement. |

**SUPPLEMENTAL STATEMENT OF FACTS RELATING TO OSA'S
MOTION FOR PARTIAL SUMMARY JUDGMENT WITH
RESPECT TO OEI'S COUNTERCLAIM FOR CYBERSQUATTING.**

None of the assertions of fact made by OSA in support of its motion for summary

judgment on OEI's counterclaim under the Anti-Cybersquatting Consumer Protection Act

("ACPA") are set forth in OSA's Local Rule 56(a)1 Statement with citation to admissible evidence, as required by the Local Rule, and the exhibits that OSA submitted in connection with these assertions are – like most of OSA's exhibits – unauthenticated and largely hearsay.[4] Nonetheless, out of an abundance of caution, we include below additional facts which will show that OSA is not entitled to partial summary judgment on OEI's counterclaim for cybersquatting.

1.    OSA concedes that during the Sunrise Period for ".US" domain names, from March 4, 2002 through April 24, 2002, only "owners of existing or pending trademarks valid in the United States were allowed to submit a claim form for each domain name."  (OSA SJ Mem. at 32).

2.    Swatch Group does not own any OMEGA marks anywhere in the world. (Sauser Rupp. Tr. 466-67, 472-74).

3.    Swatch Group applied for and registered OMEGA.US in its own name. (Sauser Rupp. Tr. 473; Smart 10/5/04 Dec. Ex. PP).

4.    The evidence shows that Swatch Group and OSA submitted multiple applications for the domain OMEGA.US during the ".US" Sunrise Period in order to increase the chances of winning the OMEGA.US domain name in the Sunrise Period lottery. (Sauser Rupp Tr. 473).

5.    Neither OSA nor Swatch Group holds itself out as an American company or promote its products as "Made in the U.S."  (Sauser Rupp Tr. 468-71).

---

[4]   Of the OSA exhibits cited in connection with OEI's ACPA counterclaim, Exhibits E, F, G and I are unauthenticated, and a number of the exhibits, including OSA Exs. E, F, and G contain hearsay.  Defendants object to OSA's reliance on these unauthenticated documents and hearsay on this motion.

6.    Swatch Group does not conduct *any* business or sell any products in the United States, or under any OMEGA marks.  (Sauser Rupp Tr. 467).

7.    OSA has never registered the mark OMEGA.US or used it in advertising. (Sauser Rupp Tr. 475).

8.    Neither OSA nor Swatch Group operates a website at the domain name OMEGA.US, nor has made any use of the domain name since its registration in 2002.  (Sauser Rupp Tr. 474-75).  According to OSA and Swatch Group's Rule 30(b)(6) witness, there are no plans by OSA or Swatch Group to develop or post a site on OMEGA.US.  (Sauser Rupp Tr. 476-77).

9.    OEI is a United States company, that most of OEI's products are manufactured in the United States, and OEI's marketing and advertising materials routinely, repeatedly, consistently and prominently emphasize these facts.  (M. Hollander 9/14/04 Dec. ¶ 22 & Exs. B, C, D, Q).

10. OEI's primary handbooks of products are called the "Made in the USA Handbook Volume 1" and the "Made in the USA Handbook Volume 2."  The covers of these handbooks, and OEI's other handbooks, bear variations of paintings by the famous Americana painter Norman Rockwell.  OEI specifically sought and obtained a license from the Rockwell Foundation and Curtis Publishing in order to use these Norman Rockwell paintings to emphasize the Made in the USA message of OEI and the fact that OEI is itself an American company that continues to sell as many  "Made in the USA" products as possible.  Also, a "Made in the USA" red, white and blue logo or an American flag appears on almost every single page inside the handbooks. (M. Hollander 9/14/2004 Dec. ¶ 22 & Exs. B, C, D).

11. Other OEI advertising materials repeatedly emphasize "US" and OEI's status as a United States company.  (M. Hollander 9/14/2004 Dec. ¶ 22 & Ex. Q).

12. OEI has registered a number of domain names that contain "OMEGA" and "US."  (Riggs 10/4/04 Dec. ¶ 7 & Ex. T).

Dated: October 6, 2004                    Respectfully submitted,
      New York, NY


         / Thomas A. Smart /
        Thomas A. Smart  (CT 21462)
Of counsel:                               Paul C. Llewellyn   (CT 25417)
        KAYE SCHOLER LLP
Victoria Haje                             425 Park Avenue
Michelle R. Tepper                        New York, NY 10022
        (212) 836-8000

        Thomas E. Minogue (CT 06845)
        MINOGUE BIRNBAUM LLP
        237 Elm Street
        New Canaan, CT  06840
        (203) 966-6916

        *Attorneys for Defendants and for*
        *Counterclaim-Plaintiff*