## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA S.A.,<br><br>        Plaintiff,<br>v.<br><br>OMEGA ENGINEERING, INC.,<br>OMEGA SCIENTIFIC, INC., and<br>OMEGA PRESS, INC.,<br><br>        Defendants.<br><br>OMEGA ENGINEERING, INC.,<br><br>        Counterclaim-Plaintiff,<br><br>v.<br><br>OMEGA S.A. and<br>THE SWATCH GROUP LTD.,<br><br>        Counterclaim-Defendants. | Civil Action No.:<br>3:01 CV 2104 (MRK) |

## PLAINTIFFS' MOTION AND INCORPORATED SUPPORTING MEMORANDUM OF LAW TO STRIKE, OR IN THE ALTENATIVE, OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS COUNTERCLAIMS FOR CANCELLATION

Plaintiff, Omega S.A. ("OSA" or "Plaintiff"), hereby moves to strike or alternatively opposes Defendants Omega Engineering, Inc. ("OEI"), Omega Scientific, Inc. and Omega Press, Inc.'s (collectively "Defendants") Partial Motion for Summary Judgment on its Counterclaim for Cancellation. Plaintiff also moves for the costs of preparing this Motion and Opposition.

Defendants' Motion for Summary Judgment on their Counterclaims for Cancellation constitutes a second motion for summary judgment, along with a second brief, filed on the same day as the first motion for summary judgment, along with a first brief which exceeded the page limit imposed by Local Rule 7.1. No motion for leave to file an additional motion or brief was filed by Defendants, and the Court has not otherwise granted Defendants a modification of the Local Rules. For this reason, the second motion for summary judgment should be stricken from the record and not considered by this Court.

In the event this Court nevertheless considers the Motion, even though in excess and in violation of the Local Rules, it must fail. Defendants advance two legal theories in support of cancellation: 1) that OSA maintains the registrations at issue fraudulently; and 2) that OSA has abandoned the marks for the goods at issue. Neither is true, and, even accepting their allegations, issues of fraud and abandonment which turn on intent and state of mind are best left for the jury to decide. In any event, the claims are barred by the applicable three-year statute of limitations. The counterclaims come some 14 years after the alleged fraudulent conduct occurred – and clearly more than three years since Defendants knew or reasonably should have known of the existence of their claims.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS FOR CANCELLATION MUST BE DENIED BECAUSE OSA HAS NOT FRAUDULENTLY MAINTAINED ITS REGISTRATIONS.

For over 100 years before OEI ever sold its first product, OSA has been selling a wide range of timing devices as well as various other products related to time. OSA first

registered its OMEGA mark in the Unites States in March of 1894, U.S. Reg. No. 25,035, still in force today. On May 31, 1960, two years before OEI had ever been conceived, before it adopted the OMEGA name, before it fabricated even its first thermocouple by hand, in short, even before OEI even existed, OSA filed an application in the United States Patent and Trademark Office for what is now Registration No. 708,731 for "electronic time recorders for automatic precision timing in science and industry," (and hence was born the now famous phrase "science and industry" – originally conceived and drafted by OSA and ascribed to its goods). As its sales of different timing devices continued to grow, in 1983 OSA filed a separate application for what is now Registration No. 1,290,661, for, among other things, computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigation and industrial application. OSA, at the time of filing these applications, as well as today, markets and sells these products, or markets and sells products that are so closely related to these products that they are within the normal field of expansion, and the average consumer would likely believe that the source of such products is OSA.

A.  A Party's Intent and Issues Related to Fraud - Raise Questions of Fact That Can Only Be Decided by a Jury

A party seeking "cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by clear and convincing evidence." *PAJ, Inc. v. Barons Gold Mfg. Corp.*, 2002 WL 1792069 (S.D.N.Y. 2002). The "allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of mere error or inadvertence." *Id.* Thus, "misstatement in a registration application provides a basis for canceling the registration *only* if the misstatements (1) were made with knowledge of their falsity, and (2) were material to the

3

determination to grant the application." *Mears v. Montgomery*, 2004 WL 964093 (S.D.N.Y. 2004) (emphasis added). Defendants submit no evidence in support of either of these two elements.

It is widely held that "the issue of bad faith, 'like many intent issues, is best left in the hands of the trier of fact.'" *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 2002 WL 460065 (S.D.N.Y. 2002); quoting, *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996); McCarthy on Trademarks § 31:72 ("if there is some use, because the nature of use sufficient to form a predicate for a trademark application is so cloudy, a good faith belief is sufficient use to rebut a charge that the trademark was acquired through fraud").

## B.  OSA Continues to Use its Marks in Science and Industry

Unlike the cases cited by Defendant, this is not a case where a party has only had sporadic use of a mark or where there is clear and convincing evidence that a party made misrepresentations about a first use date of a mark or actual use of the mark in connection with a clearly defined good. Here, there is no dispute in the record that OSA has maintained continuous use of the Omega marks that are the subject of these registrations. There is also no dispute that OSA has continuously used the marks in connection with timing devices, including certain electronic timing devices in the sports industry and watches *sci*entifically tested and employed in scientific undertakings, including by astronauts on NASA's Space Shuttle.[1]

---

[1] For example, OSA Speedmaster Watch, which is still used by NASA astronauts today was the watch used by the astronauts on Apollo 13 where an on-board explosion of an oxygen tank left the on-board computerized timing devices inoperative, and the astronauts had to rely on their Omega Speedmaster watches for both the timing and interval of thrust for critical engine burns as they rounded the moon and set a course to return to earth. To withstand these conditions, OSA's watches undergo and meet the strictest of scientific testing and standards, including vacuum, oxygen atmosphere/temperature, acceleration, vibration, electromechanical movement and humidity.

The only question raised by Defendants is whether certain timing devices sold by OSA can be classified using the highly disputed terms "science" and "industry." The terms "science" and "industry" have been disputed by the Parties for many years, and it is preposterous that Defendants believe they can not only demonstrate OSA's goods do not fall into these categories, but contend that they can establish this fact as a matter of law. This Court should find that there is a question of fact as to whether OSA submitted fraudulent statements regarding use, and a separate question of fact as to whether such statements were made with the intent to deceive the Trademark Office. These questions of fact can only be decided by a jury, and Defendants fall far short of meeting the very high standard needed to demonstrate fraud, let alone as a matter of law in the context of a summary judgment motion.

As evidenced by the attached declaration of Hamid Kayal, the general manager of Omega Electronics, OSA continues to use the mark in connection with science and industry. For example, OSA's products have been used by the University of Michigan for scientific studies of the physiology of feet during athletic activity, as well as by the European Space Research Organization. Ex. A Kayal Decl. at 2. OSA's sports products include starting blocks that measure the strain of an athlete's foot on starting blocks, which allows for the detection of false starts. *Id.* The OMEGA watches are also scientifically tested and employed by NASA astronauts in some of the most extreme conditions. *Id.* It is also undisputed that OSA sells its watches to a wide range of industries including the fashion, timing and sports industry. *Id.*

C. <u>Timing Devices in "Science" and "Industry" is a Natural Zone of Expansion for OSA</u>

Furthermore, even if OSA was found to have discontinued use of the mark in connection with such goods, it is well established that "[w]here a registrant discontinues to use a trade-mark on a certain product, he will not be held to have abandoned the mark if he continues to use the mark on related items, and if the discontinued product is one which would still be thought by the buying public to come from the same source and is one which remained in the normal field of expansion of the owner's business." *I.H.T. Corp. v. News World Comm., Inc.* 1984 WL 604 *9 (S.D.N.Y. 1984). OSA's business is time and timing products. Thus, there is also at minimum a material issue of fact as to whether timing devices for science and industry are in the normal zone of expansion for a company whose business is timing devices.

In *News World*, a party sought cancellation of its opponent's trademark because the registration was for newspapers, and the registrant was only maintaining use of the mark in connection with crossword puzzle magazines. *Id.* In refusing to cancel the registration, the court held that "[c]ertainly a question of fact remains as to whether purchasers would view the puzzle publication bearing the [trademark] as emanating from the same source as the former newspaper of that name." *Id; see also, Lucien Piccard Watch Corp. v. Crescent Corp.,* 314 F.Supp. 329, 332 (S.D.N.Y. 1970) (although plaintiff was the first to use the disputed mark on shears and scissors, defendant was held to have superior rights in the mark as applied to those particular products by virtue of its prior use thereof on such closely related goods as fingernail and toenail clippers and other personal grooming items).

Thus, similar to the question of fact presented in *News World,* a question of fact, clearly open to dispute, remains in this case as to whether OSA's timing devices are used for science and industry when the mark is indisputably used in connection with wristwatches and other timing devices, by, for example, astronauts on the space shuttle and in various industries, including the sports, fashion and jewelry industry.[2]  OEI's motion for summary judgment on this issue must fail.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR CANCELLATION MUST FAIL BECAUSE OSA HAS NOT ABANDONED ITS TRADEMARK REGISTRATIONS

A party seeking to cancel a registration for abandonment carries just as high a burden as one seeking cancellation by fraud.  Because a finding of abandonment results in a forfeiture of rights, courts are very hesitant to find abandonment. *News World*, 1984 WL at \*8; *Noah's Inc. v. Nark, Inc., 560* F.Supp. 1253, 1259 (S.D.N.Y 1983).  Part of the proof required for abandonment is "a demonstration of intent to abandon, a subjective matter of inference rarely amenable to summary judgment." *News World* at \*8.

To prevail on a claim of abandonment a party must show: (1) discontinued use of a mark; and (2) no intent by the owner to resume use in the reasonably foreseeable future. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir. 1992); *Cline v. 1-888-Plumbing Group, Inc.*, 146 F.Supp.2d 351, 364 (S.D.N.Y. 2001); *Havana Club Holding, S.A. v. Galleon*, 1998 WL 150983 (S.D.N.Y. 1998).  OEI has demonstrated neither of these two core elements.

---

[2] It is astonishing that OEI would argue otherwise, especially considering it maintains trademark applications for goods such as "jewelry for science and industry."  See Ex. 34 to Pl's Brief.

First, OEI offers no evidence supporting an intent of OSA to discontinue use of the mark in the future. Because OEI fails to even address this essential element, its claim must fail.

Second, as discussed above, OEI's allegations that OSA has already discontinued use of the mark is baseless since OSA continues to use its marks in connection with science and industry, and is always researching new products, and future business opportunities in which it can exploit its technologies. [Ex. A. Kayal Decl.].

## III. OEI'S CLAIM FOR CANCELLATION OF REGISTRATION NOS. 708,731 AND 1,290,661 IS BARRED BY THE STATUTE OF LIMITATIONS

This Court need not even consider OEI's claims for cancellation because these claims are barred by Connecticut's three-year statue of limitations. *Day v. General Elec. Credit Corp.,* 15 Conn.App. 677, 683 (1988) (stating that "[c]laims based upon fraudulent misrepresentation are governed by the three year statute of limitations of General Statutes § 52-577"); *Wedig v. Brinster,* 1 Conn.App. 123, 137 (1983) (finding that fraudulent misrepresentation claims are governed by a three year limitations period).

In *U.S. Shoe,* the plaintiff, similar to OEI in this case, brought a Lanham Act claim for cancellation of a registration based on fraudulent statements made to the PTO in procuring the registration. Applying the governing state's statute of limitations to the plaintiff's claim the court found that it was barred as untimely. *Calzaturificio Rangoni S.p.A. v. United States Shoe Corp.,* 868 F.Supp. 1414, 1420 (S.D.N.Y. 1994). As in all cases of fraud, the statute of limitations begins to run from the time the [plaintiff]

discovered the fraud, or could with reasonable diligence have discovered it. *Id; see also,*

*PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.,* 578 F.Supp.196, 198 (S.D.N.Y. 1984).

In this case, even if the court wished to find that OSA's registration was fraudulently maintained, OEI's claim must fail because it falls outside Connecticut's three-year statute of limitations period. The date of the alleged fraudulent activity occurred more than three years ago, on August 14, 1990. As this activity constituted public filing of ordinary trademark documents, all of which were readily available to OEI, and OEI was clearly monitoring OSA's trademark filings from at least as early as pre-1994, OEI's failure to challenge such activity within three years of when they either knew or with reasonable diligence should have known - after the statute of limitations has run, now bars its claims. OEI knew, or with reasonable diligence should have known, of the alleged conduct 14 years ago. These facts are beyond dispute. Not only should Defendants' motion for summary judgment be denied, but all claims for cancellation on the basis asserted in their motion must be dismissed as being barred by the statute of limitations.

## IV. **DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE STRICKEN BECAUSE IT VIOLATES THIS COURT'S 40 PAGE LIMITATION FOR BRIEFS SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT**

Defendants' entire Memorandum of Law in Support of its Motion for Partial Summary Judgment on its Counterclaim for Cancellation should be stricken as it is a blatant violation of this Court's already generous rule requiring summary judgment

memoranda to be no longer than forty pages.[3]  Defendants' thinly veiled attempt to circumvent this rule by filing two separate motions is nothing more than a blatant effort to undermine this Court's inherent authority to control its own procedures which has created unnecessary expense for both the Plaintiff and the Court.  If this Court were to endorse such a practice, the Court could be faced with briefs totaling well over 300 pages, since the Parties would file a separate forty-page brief for each claim in the action, in addition to a separate brief seeking dismissal of all of its opponent's claims.

Local Rule 7.1 in unequivocal terms states that "[e]xcept by permission of the Court, briefs or memoranda shall not exceed forty (40) 8 ½" by 11" pages of double spaced standard typographical print." L.R. 7.1(a)(2).  Defendants are not the first to try to circumvent this rule by filing more than one memorandum in support of a motion for summary judgment, and courts throughout the country, including those within the Second Circuit, consistently oppose this practice.

In very similar circumstances, the district court in *Phelps*, aptly noted that "[t]he court's forty-page limitation on summary judgment memoranda would be a hollow rule if it could be circumvented  by the filing of separate summary judgment memoranda. . . [t]he court views its page-limitation as more than a mere guideline or target.  Forty pages is a generous limitation that exceeds many used in other district courts."  *Phelps v. Hamilton*, 1994 WL 377071 *2 (D. Kan. 1994).  The *Phelps* court also noted that simply because a case may have multiple or complex issues, does not allow a party to circumvent the prescribed page limitation by submitting multiple motions for summary judgment.  *Id* at *1 ("Many are the cases filed in federal court that involve multiple claims and varied legal theories.  This case is not an exception").

---

[3] Defendants' other 41-page brief also exceeded the Court's page limit.

In *Gamb v. Hilton Hotels*, the defendant filed two motions for partial summary judgment on the same date with separate memoranda of law. *Gamb v. Hilton Hotels Corp.*, 1997 WL 893874 (M.D. Fla. 1997). Although the *Gamb* defendant argued that none of its individual motions independently exceeded the prescribed page limit, and that FRCP 56 does not limit the number of summary judgment motions that may be filed, the court sharply stuck down these frivolous arguments holding that "under [d]efendant's theory, it could have filed seven motions for summary judgment (one for each count of [p]laintiff's complaint) with seven separate memoranda of law totaling 280 pages and still have been in compliance with the Rules of this Court." *Id* at *5. The court went on to find that although defendant "may not have violated the letter of [the local rule], it violated the spirit of the Rule." *Id*

Numerous other courts have similarly discouraged such egregious practice. In *Montell*, the court found that "defendants' multiplicity of motions have effectively eviscerated the Court's rules regarding the length of memoranda. . . [finding that] this conduct . . . is an affront to this Court's inherent authority to control it own procedures." *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 427 (S.D.N.Y. 1998); see also, *Rochlin v. Cincinnati Ins. Co.*, 2003 WL 21852341 *8 (S.D. Ind. 2003) ("rather than actually edit a 60-page brief down to 40 pages, defendant chose simply to remove large portions of the argument and to label them as 'exhibits' and 'appendix' in an attempt to comply with the letter of the court's order. . . . the court has not read, nor will it read or consider any other part of the reply brief. Their preparation was a waste of time and money"); *Lucente v. Int'l Bus. Mach. Corp.*, 117 F.Supp.2d 336, 34-41 (S.D.N.Y. 2000) ("IBM has taken the tack of filing four additional separate motions for partial summary

judgment to resolve various legal issues in the case. This was a blatant attempt by IBM to circumvent this Court's rules on page-limits for motion papers and briefs.").[4]

Defendants, like countless other litigants similarly situated, consciously chose not to include the arguments as to its counterclaims for cancellation into its "principal" brief, instead using its "principal" brief to detail its other arguments. Defendants should not be rewarded for this (at best) inability to edit, or (at worst) deceptive practice. In either event, Defendants have failed to comply with the letter and spirit of the Rules. The forty-page limit is essential to maintain not only judicial economy, but a fair and even playing field for those parties who actually comply with the Rules.

As Defendants' conduct clearly violates this Court's Rules, and because Plaintiff has incurred unnecessary cost in having not only to prepare this Motion to Strike but also the opposition arguments found below, Defendants should be ordered to cover such costs, pursuant to this Court's inherent authority and 28 U.S.C. § 1927 which holds that: "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Because Defendants' willful conduct clearly meets this standard, its second motion for summary judgment should be stricken, and Defendants should bear the burden of Plaintiff's costs in preparing this response.

---

[4] In another instance, the Southern District of New York found that a defendants' practice of filing multiple briefs that exceeded the court's page limits "stirs nostalgia for the rigors of the common law" where one court not only imprisoned the pleader of a 120-page brief, but also ordered the warden to "cut a hole in the midst of the same engrossed [brief] and put the said pleader's head through the same hole, and so let the same [brief] hang about his shoulder with the written side outward . . . lead the said pleader bareheaded and barefaced round about Westminster Hall whilst the Courts are sitting and show him at the Bar of every of the three Courts within the Hall." *Silivanch v. Celebrity Cruises, Inc.*, 2000 WL 1585076 (S.D.N.Y. 2000).

## V.    **CONCLUSION**

For all the foregoing reasons, Defendants' Motion for Summary Judgment on their counterclaims for cancellation should be STRICKEN or DENIED.

Respectfully submitted
for Plaintiff,

By: _____

Jess M. Collen
Matthew C. Wagner
COLLEN *IP*
THE HOLYOKE-MANHATAN BUILDING
80 South Highland Avenue
Ossining, New York 10562
(914) 941-5668
(914) 941-6091 (facsimile)

Dated:  October 6, 2004

EXHIBIT
A