devices are sold for what they are – simply "timers." In fact, Defendants' web site even advertises that these timers may be used as a time or day clock – exactly like OSA's timing devices.

## PTC41 Series
**1/8 DIN High Performance Process Timer/Controller**
$395.00
PTC41

- 6-Digit Alphanumeric Display
- Configurable Via Front Panel Pushbuttons and/or Via RS-232 or RS-485
- 8 Built-In Time Bases
- Resolution to 0.01 Sec
- Count Up or Down Modes
- Four Isolated Open Collector Outputs
- Five Controller Output Modes
- Time or Day Clock 
- Battery Backup–Optional

[Dec. Reilly Ex. K.]

Indeed, Dr. Hollander recognized the similarity between "period timers" and Plaintiff's timing devices when he explained why a wristwatch and stopwatch are advertised and promoted immediately next to "period timers" on web pages available on Defendants' site [Dec. Reilly Ex. K; Pl. Br. Ex.14, 29.] He stated that it is logical to display a watch next to a "period timer" because both measure time. *Id.*

In addition to their similar functions, the Parties' products have similar appearances as well. Below are representative images of both Parties' products from their respective promotional materials. The likelihood of confusion is evident.



[Dec. Reilly Ex. H] Fig.A.



[Dec. Reilly Ex. H] Fig.B.



[Dec. Reilly Ex. K] Fig.C.



[Dec. Reilly Ex. K] Fig.D.

     It is undisputed that each of the above timing products are marketed and available to any person in the United States or worldwide. [Dec. Reilly Ex. H, K] In fact, OEI

11

advertises the product depicted in Fig. C, above, as a "Time or Day Clock." [Dec. Reilly Ex. K.] As individuals fully immersed in the facts and details of this case, have difficulty distinguishing between the Parties' products above, it is easy to conceive that the average consumer, or a reasonable juror would also struggle with such fine differences.

    b.    <u>Defendants' Customers are Consumers</u>

Defendants desperately contend that, "its customers are not consumers" and that this somehow negates a likelihood of confusion. [Dec. Dr. Hollander 15.] Defendants' "non-consumer" argument is flawed for several reasons. First, Defendants do not limit to whom they sell their goods. Anyone with access to a computer can purchase items from Defendants' website, which happens to be Defendants' primary trade channel. [Dec. Dr. Hollander 22.] There is no requirement at Defendants' website that one be an engineer or a scientist to purchase Defendants' timing products. Although Defendants may specifically target specific customers, they cannot control who may access their website. [Pl. Br. Ex. 14, 34] Indeed, Defendants sold watch batteries to a non-engineering consumer via their website. [Pl. Br. 31.]

In addition, even if Defendants' customers were strictly limited to scientists and engineers, these individuals are still part of the normal purchasing public. That is, Defendants cannot show that scientists and engineers do not purchase traditional consumer goods, such as clothes, food, and perhaps even timepieces.

Finally, assuming *arguendo* that there could not be confusion between a provider of consumer goods and a provider of non-consumer goods, a significant portion of Plaintiff's business consists of highly technical electronic timing equipment that does not fall into the category of traditional consumer products, such as its photo-finish cameras,

12

swimming starting blocks, passenger information systems, scoreboards, and many other wares. These goods are not sold to individual consumers, but rather to corporations or government entities.

In light of Plaintiff's undisputed seniority, the undisputed strength of Plaintiff's mark, the undisputed identical use of the OMEGA mark, and the readily-apparent visual and functional similarity between the Parties' products, there clearly exists a likelihood of confusion. At the very least, there are fact issues on which a reasonable jury might disagree.

Defendants argue that that there is no direct competition between its timing goods and Plaintiff's timing goods. However, direct competition is not necessary in a likelihood of confusion analysis, especially when, as stated above, Plaintiff's mark is strong and the Parties' marks are identical. Rather, the proper question is whether the purchasing public might believe that a single source produced both Parties' goods. *CAE v. Clean Air Engineering, Inc.*, 267 F.3d at 679-80, citing *McGraw-Edison v. Walt Disney*, 787 F.2d 1163, 1169 (7th Cir. 1986) (confusion found between maker of electronic fuses and video games even though the products and purchasers were different). Here, although the products may not be in direct competition, they are significantly related in function, appearance, and use an identical OMEGA mark such that a reasonable person would probably believe that they originated from a single source.

iv. Instances of Actual Confusion

Not only is there a *likelihood* of confusion between these Parties use of the marks, but there has also been *actual* instances of confusion. The Second Circuit considers evidence of actual confusion the most compelling factor favoring a finding of likelihood

13

of confusion. *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 141 (2d Cir. 1999) ("actual confusion is often the most telling indication that confusion is likely"). Two examples of this actual confusion involved customers contacting OSA's licensees seeking to purchase OEI products. [Dec. Smart Ex. A at 140; Dec. Reilly Ex. L]. In the first instance, OSA's former licensee, Daktronics, was contacted by a customer seeking to purchase OEI products. [Dec. Smart Ex. A. at 140].

In June of this year, a separate customer sent an order form to OSA's current licensee, Omega Electronics, requesting a quote for a list of goods sold by OEI. The confusion was evident because the confused customer placed the order using OEI part numbers. [Dec. Smart Ex. A at 140; Dec. Reilly Ex. L.] This is exactly the type of evidence that the Second Circuit has held supports a finding of actual confusion. Id, (actual confusion found where there was "evidence that consumers placed phone calls to the wrong party and mistakenly believed that plaintiff's and defendant's services were affiliated because of their similar names").

The potential for actual confusion only increases as Defendants systematically expand its use of the OMEGA mark on timing products. As there have already been instances of actual confusion, Defendants' motion for summary judgment must fail. At minimum there is an issue of fact that should be decided only by a jury, if not decided plainly in OSA's favor on it own motion for judgment.

### 2. The Remaining Polaroid Factors Favor a Finding of Infringement

i. Defendants' Use of the Omega mark has Encroached Plaintiff's Natural Zone of Expansion

Contrary to Defendants' allegations, Plaintiff's undisputed senior rights to the Omega marks are not limited to the sale of watches. Plaintiff has well-established rights in the Omega mark for a large range of goods and services marketed and sold to the sports industry, as well as with public display boards, passenger information systems and radio frequency devices, which operate similar to an "E-Z Pass" system. Some of the world's most famous scuba divers and numerous NASA astronauts have also used Plaintiff's watches in a wide-range of scientific and industrial applications including some of the most widely-publicized experiments and missions.

Plaintiff's rights to the OMEGA mark consist not only of its actual line of products and services, but also to its natural zone of expansion. It is well established that "the first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.* 174 F.3d 1036, 1047 (9th Cir. 1999) citing *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842-43 (5th Cir.1990), *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1023 (11th Cir.1989), *New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200-01 (9th Cir.1979).

Plaintiff has continually expanded its timing business throughout its history. Plaintiff's original use of the OMEGA mark was on "traditional" mechanical watches [Pl.

Br. Ex. 1.] Eventually, Plaintiff entered into the additional lines of luxury watches and jewelry. [Defendants' Statement of Undisputed Facts.]

From watches and timepieces, Plaintiff eventually expanded its business into the sports timing industry. Plaintiff sells products for use in many types of aquatic sports such as swimming, diving, and water polo. Plaintiff's sports timing business also extended its use of the OMEGA mark on track and field products including the first photo-finish camera. Plaintiff's sports timing business has also expanded into certain sports where timing is not an essential element, such as golf. [Dec. Smart Ex. B 150-153.] Due to Plaintiff's success in sports timing, it and its affiliates will be the official timekeeper of the next three Olympic Games. [Dec. Reilly Ex. J.]

From the sports timing industry, Plaintiff further expanded its business into display products and large format display boards. Plaintiff is a provider of scoreboards for use at high schools, universities and premier sports complexes. [Dec. Smart D. 112-115.] These products range from simple scoreboards to advanced apparatus which befit legendary parks such as Fenway Park, Brewers Stadium in Milwaukee, and Sun Devil Stadium in Arizona. [*Id.*]

Over the years, Plaintiff's business also has expanded into passenger information systems for use in travel hubs such as the train station in Paris and for use on public promenades.

Plaintiff also offers high performance and precision timepieces with scientific and industrial applications. Plaintiff's OMEGA SEAMASTER collection has long been utilized by scuba divers and professional free divers due to its precise underwater performance and ability to withstand demanding conditions. OSA's products undergo

rigorous scientific testing and must be built to exacting standards, upon which the user will literally trust his life. OSA's SEAMASTER is recommended as essential "scuba equipment" by many experts selling diving equipment. [Dec. Reilly Ex. G.]

Similarly, Plaintiff has expanded its business by developing the OMEGA SPEEDMASTER collection of watches. These are the official watches of NASA astronauts, and the only watches ever worn on the Moon. The watch played a significant role in the recovery of the American Apollo 13 astronauts, when due to lack of power in the spacecraft, the astronauts used an OMEGA brand product to accurately time rocket propulsion in order to return safely to Earth. [Pl. Br. Ex. 2.] Since Plaintiff's success in the space exploration industry, it has also expanded its business for military purposes, having become a choice source of timepieces for United States Air Force pilots. [Dec. Smart Ex. B at 70.] Furthermore, as discussed in Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment, Plaintiff has further used the OMEGA mark in science and industry as embodied in U.S. Trademark Registrations numbers 708,731 and 1,290,661.

Further Omega businesses have been developed and more are on the horizon. OSA's expertise in measuring and controlling time lapse has led to use of new technologies such as radio frequency devices which, for instance, can control ingress and egress from facilities. Concepts such as permitting user access to ski areas and stadiums via radio frequency devices (not unlike the common highway EZ-PASS-type systems) has led to development in general facility access system, monitoring for warehouses or secure facilities, and even to monitor comings and goings to maintain security in office environments. In the same way that expertise in timing led to scoreboards, to general