display boards – is the same way making thermocouples on the kitchen table led to development of 21st century circuit boards. OMEGA SA is entitled to continue protecting its mark in a way that allows it to be free of unfair competition as it pursues its natural zones of expansion. Although the Parties may not be in direct competition with most of their goods, Plaintiff maintains the exclusive right to expand its use, and most certainly retain, at minimum, the OMEGA mark on timing goods based on its established rights.[6]

ii.   Post Sale Confusion

In arguing that consumers are unlikely to be confused as to the source of goods sold by the two Parties, Defendants completely ignore the likelihood of post-sale confusion. Post-sale confusion occurs when initial purchasers may not be confused originally as to the source of a product, but where subsequent individuals' buying decisions are influenced by the performance of the product because they are confused as to source. See, *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 872-73. For example, in *CAE v. Clean Air Engineering, Inc.*, the court found evidence of post-sale confusion in a situation where the original purchasers were engineers and scientists, however, subsequent users, or those simply exposed to the products may have been confused as to the products' source. 267 F.3d at 683.

Here, Defendants testified at length that they regularly distribute products to "science departments" of universities. [Dec. Hollander at 13.] Even if these purchasers are not confused as to source, Defendants' ignore the conflict that arises if, for example,

---

[5] Notwithstanding, one clear source of direct competition is watch batteries which Defendants' offer for sale under the OMEGA mark at their website.

[6] The entire Zone of Expansion argument also supports a finding that Plaintiff satisfies the "Bridging the Gap" *Polaroid* factor in support of a finding of likelihood of confusion. See, *Polaroid*, 287 F.2d at 495.

18

students attribute the source of the Defendants' goods to Plaintiff. This is a substantial possibility considering that Plaintiff has specifically targeted young men and women through extensive advertising in widespread magazines such as Men's Health and Elle, and other advertising efforts. [Dec. Smart Ex. B at 114-115]

In addition, while Defendants try to characterize athletic departments and science departments within the same universities as different customers and target markets, it cannot be disputed that the same people within each institution may be exposed to the same mark on similar goods from different sources. Thus, significant numbers of students and university employees are exposed to both Plaintiff's and Defendants' products, which both bear the Omega marks. A likelihood of confusion exists.

iii.   There is Significant Overlap in Trade Channels

It is undisputed that both Parties' advertise extensively on the World Wide Web. For example, Defendants admit that most of their sales occur via the Internet at www.omega.com. [Dec. Hollander 22.] Plaintiff, Omega S.A. and Plaintiff's licensee, Omega Electronics, also maintain detailed websites at www.omega.ch and www.omegaelectronicsus.com. [Dec. Reilly Ex. H; Pl. Br. Ex 2, 4.] The Internet provides a valuable advertising channel to all businesses, and both Parties fully exploit their internet-based opportunities. Both companies' web-based marketing efforts are freely accessible -- that is, there is no password or account reference needed to view either party's entire site. Both Parties aggressively exploit the same trade channel.

In addition to the Internet, both Parties advertise extensively in periodicals. [Dec. Smart Ex. B 114-115, Dec. Hollander at 17-8.] Defendants allege that they advertise in

19

periodicals that are mainly read by engineers and scientists. [Dec. Hollander 17-18; Defendants Statement of Undisputed Facts at 19.] Conversely, Plaintiff advertises extensively in widely-distributed, mainstream magazines and newspapers, which even include scientific magazines such as Wired. [Dec. Smart Ex. B 114-115.] Although the listing of periodicals may be different, there is no evidence that the audiences are mutually exclusive. Undoubtedly, readers of the magazines in which Defendants' advertise also read popular periodicals where Plaintiff advertises such as The New York Times. [Dec. Smart Ex. B 114-115.]

Furthermore, although Defendants claim that the Parties have completely different trade channels, the record clearly reflects that Plaintiff not only sells to individual consumers, but also to municipalities, sovereign nations, large corporations, and universities. [Dec. Smart Ex. E. at 72, Ex. B. at 48, 50, 70, 177, Ex. D. at 154.] Plaintiff also maintains numerous corporate accounts wherein employees are given watches or jewelry as performance incentives. [Dec. Smart Ex. E. at 72, Ex. B. at 48, 50, 70, 177.]

More importantly, the Parties identified several customers that are shared by both Parties including NASA, the United States Military, General Dynamics, Johnson Engineering, Inc., Penn State University and the University of Wisconsin. [Dep. Emmons 48, 50, 70 177; Dep. Gibbons at 154.] The overlap in the Parties' businesses cannot be disputed.

Defendants' efforts to characterize "science" and "industry," as market segments unique to their businesses and foreign to the Plaintiff are undermined by Defendants' own admissions that "industry" refers not just to a segment of manufacturers, but

describes countless "industries", including the fashion, entertainment, transportation, and telecommunications industries.

For example,

Q. Can you give us examples of certain business industries to which Omega Engineering sells its products?

A. Certain business industries? Science and business. We're in the science and industry field, both. We sell to the aircraft industry, the automotive industry, the agricultural industry, that's A. B, we sell it to the bio industry.
The C would be we sell it to the computer industry. We sell to power plants, to universities, to hospitals. We sell to the U.S. government. Omega manufactures transducers for the government's nuclear submarines, some of them Omega is its sole source. Omega sells to the space industry. Omega sells to the testing industry. Omega sells to laboratories, medical laboratories, hospital laboratories. Let's see. There's so many of them, I'm just trying to think of them in as broad a term as possible. Omega sells to the chemical
industry, the metallurgical industry, the bioengineering industry, the teaching industry, to the universities, to the testing labs, to the pharmaceutical industry, to the -- almost -- I can't think of an industry, with the exception I would have to say of the fashion industry or the jewelry business that it doesn't sell to. It sells to science and industry. And I'm sorry I'm not swift enough
to give you the other 50 or hundred or whatever it is industries that I haven't thought of. [Pl. Br. Ex. 14 at 233-35].


Q. Do you know if Omega Engineering, Inc. also sells to the hospitality industry?
A. What do you mean by "hospitality"?
Q. Such as hotels or convention centers.
A. For what purpose?
Q. For any purpose.
A. I know, for example, that McDonald's is a customer. I know that there is -- companies have bought a noncontact temperature measuring products. There was a -- I don't know, I don't want to say it was Jack in the Box or which one it was. There was a competitor to McDonald's that bought a number of sensors because they were trying to control the temperature of hamburgers.
[Pl. Br. Ex. 14 at 239-40].


Q. Omega Engineering does not sell to more than 10 universities in the United States, does it?
A. Oh, not more than 10?

21

> Q. Yes.
> A. How many universities are there in the United States?
> Q. I'm not sure.
> A. You're not sure? Well, how can you say not more than 10? I would say, I would say that I would be floored if it were less than 50, if it were less than 50. And I have a feeling there isn't one university with a strong, or not even a strong, with a science department or engineering department or technical department that hasn't got, hasn't bought a product from Omega.
> 10 universities? How could you say 10 universities? I can give you -- if you give me a list of the universities, I'll go down and have difficulty finding them, finding one that doesn't buy from Omega or use its handbooks.
> [Pl. Br. Ex. 14 at 251-52].

Accordingly, "industry," particularly in light of Defendants' admission, cannot serve as a meaningful limitation for a channel of trade. Plaintiff unquestionably sells to, among others, the jewelry, fashion, sports and timing industries.

Likewise, Defendants' repeated initiatives in attaching the term "science and industry" to a countless list of goods as a defensive measure to avoid infringement, has produced some absurd results, which clearly demonstrate the utter meaninglessness of this disclaimer. Perhaps the clearest example of this failed, transparent tactic is Defendants' attempt to register the Omega mark for jewelry, but only "jewelry for science and industry." [Pl. Br. Ex. 28.] When asked to explain this oxymoronic description, Defendants provide an almost comical response describing how it produces certain metal strips, as a "kit" that could be shaped and used as jewelry. [Pl. Br. Ex. 34 at 81-83.] Because of the abusive and manipulative efforts to employ the terms "science and industry," Defendants' detrimental reliance on it to distinguish its goods from Plaintiff's is simply ineffective, and fails to mitigate any likelihood of confusion.

22

iv.     Sophisticated Buyers can be Confused

This factor addresses the care taken by consumers when purchasing a product. *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir.1985) (the Lanham Act's prohibition of trademark infringement clearly encompasses confusion on the part of the purchasers of either or both Parties' products.) The general rule is that the more expensive the goods, the more likely that consumers will exercise greater care in selecting such goods. *Id.* Contrary to Defendants' suggestion, not all of the Parties' products are expensive. For example, both Parties sell watch batteries, which at Defendants' website, for example, only cost $3.00. [Pl. Br. Ex. 30-32.]

In addition, even if "many of the Parties' customers are sophisticated and decide to buy only after extensive negotiations, these customers' technical sophistication about their particular industry does not equate to trademark sophistication." *CAE, Inc.*, 267 F.3d 683, citing *Fuji Photo Film*, 754 F.2d at 595. As in *CAE*, where Plaintiff has already shown overlap in products, identical use of the mark, and overlap in trade channels, this factor simply cannot defeat a likelihood of confusion. *Id.*

Furthermore, *CAE* also highlights the heightened difficulty of identifying a product's source when competing users of the same mark have several divisions. Where, as here, the Parties have multiple entities that use some derivation of the OMEGA name, such as Omega Engineering, Inc., Omega Press, Omega Scientific, The Omega Group, Omega Technologies, Omega Vanzetti, Omega S.A., and Omega Electronics, the potential for mistakes as to source even among sophisticated consumers is "heightened by the difficulty of determining which entity belongs to which party without some prior knowledge of each party's corporate structure." *Id.*

The possibility of reverse confusion is also likely under these circumstances. Reverse confusion occurs when a junior user of the mark saturates the market with a similar trademark and overwhelms the senior user, thus diluting the value of the senior user's mark. *Ameritech, Inc., v. American Information Technologies Corp.*, 811 F.2d 960 (6th Cir. 1987); see, *Big O Tire Dealers, Inc., v. Goodyear* Tire & Rubber, Co., 561 F.2d 1365 (10th Cir. 1977). For example, Plaintiff does not widely advertise some of its sports timing products. Thus, even though OSA is the senior user of the OMEGA mark, particularly on complicated computer controlled timing equipment, it may be severely affected by the advertising efforts of Defendants, and suffer from reverse confusion. OSA's small advertising expenditures on its sports timing products does not decrease the likelihood of confusion; it increases it.

v.      Defendants' Good Faith - or Lack Thereof

Defendants' focus on the original adoption of the OMEGA mark, and how OEI's first thermocouple was originally born on Mrs. Hollander's kitchen table, is misplaced and completely irrelevant to this prong of the Polaroid test. The applicable test is not Defendants' intent when they originally adopted the OMEGA mark for use on thermocouples back in 1962, but rather Defendants' intent when it adopted the OMEGA mark on the disputed timing products. It is Defendants' expansion into the timing arena – an arena where Plaintiff has undisputed rights – that must be analyzed under this prong.

The element of bad faith, under the Polaroid test, is not limited to situations involving "palming off" one's products and those of another. Several courts have agreed that bad faith consists of attempts to "box in" a senior user of a trademark to cut off the prior user's natural zone of expansion. See, *Inmuno Vital, Inc. v. Golden Sun, Inc.* 49

24

F.Supp.2d 1344, 1356 (S.D.Fla.,1997) citing *Weiner King, Inc. v. Wiener King Corp.* 615 F.2d 512, 522 (Cust. & Pat.App., 1980) (stating that boxing in a senior user's territorial market would be bad faith). This form of bad faith is clearly demonstrated on the record. For example, not only have Defendants taken steps to acquire rights in connection with a wide-range of timing products and jewelry, Defendants have also attempted to limit OSA's rights by seeking rights for goods which neither party has an intent to use such as fire extinguishers and cash registers. [*See* Pl. Br.]

In addition, the record also demonstrates that Defendants were fully aware of Plaintiff's trademark when it adopted their mark back in 1962. Thus, Defendants adopted the OMEGA mark at their own risk that they would not be able to expand their use of the OMEGA marks onto time-related products.

Defendants' affirmative bad faith is well documented by this Court and others in the United States Courts and around the World. Plaintiff incorporates by reference its Memorandum in Law in Support of its Motion for Summary Judgment wherein it discusses Defendants' pattern of bad faith intellectual property practices in detail (Pl. Br. 16-24.)

Plaintiff has shown overwhelming support for the following facts: (1) its mark is a distinctive indicator of source of timing products; (2) the Parties' uses of the marks are identical; (3) the Parties' products have similar functions and appearances; (4) the Parties share customers such as certain universities, NASA, and the military; (5) Plaintiff's have continually expanded its timing business such that consumers could attribute Defendants' products to Plaintiff; (6) there is significant overlap in marketing channels on the Internet and in periodicals, (7) there is evidence of actual confusion; (8) and there is a significant

reason to doubt Defendants' good faith in using the OMEGA mark on timing products. As a matter of law, these factors substantiate claims for trademark infringement, trademark dilution, and false designation of origin. At the very least, factual questions exist which can only be decided by a jury. Accordingly, Defendants' claims on these counts must be DENIED.

### B. Defendants' Motion for Summary Judgment on Plaintiff's CUTPA and Unfair Competition Claims Must Be Denied.

In support of its opposition to Defendants' motion for summary judgment on Plaintiff's claims under CUTPA and the Lanham Act, Plaintiff hereby incorporates by reference its Memorandum of Law in Support of Its Motion for Summary Judgment filed September 15, 2004 and its Supplemental Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings, filed July 27, 2004.

#### 1. This Court has Subject Matter Jurisdiction to Consider Plaintiff's Claims

Despite controlling case law to the contrary, Defendants continue to argue that the "statutes at issue do not extend to the filing of trademark applications with foreign government authorities." [Defendants' Mot. for S.J.at 37]. To the contrary, every case cited by OSA in its Supplemental Brief in Opposition to OEI's Motion for Judgment on the Pleadings supports this argument. OEI cannot dispute that it has filed over 20 applications for the OMEGA marks in foreign jurisdictions in connection with timing devices. It is these specific acts that constitute unfair competition. Every one of the

26

cases cited by OSA speaks to the application of domestic law, including the Lanham Act, to govern the "acts" of the U.S. companies in foreign jurisdictions.

OEI, without any legal authority, misleads the Court by asserting that these "acts" must be limited to "use" of a mark. [Defendants' Suppl. Mem. at 1]. Nowhere in any of the cases cited by OSA, and more importantly by OEI, does a court hold that the extraterritorial application of the Lanham Act is only appropriate in instances where there has been an improper "use" of a mark. In fact, to the contrary, *Ramirez*, specifically holds the Lanham Act may be applied precisely towards the facts now before this court, namely, where the unfair competition derives from the bad-faith filing of foreign trademark applications. *Ramirez & Feraud Chili Co. v. Las Plamas Food Co.*, 146 F.Supp. 594, 602 (S.D. Cal. 1956) (affirmed, 245 F.2d 874 (9th Cir. 1957)).

Quoting directly from the Supreme Court in *Bulova*, "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States. *Steel v. Bulova*, 344 U.S. 280, 288 (1952) *See also, A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F.Supp.2d 328, 336 (S.D.N.Y. 2001) (It is well-established that United States courts have jurisdiction to apply the Lanham Act to allegedly infringing conduct occurring outside the United States when necessary to prevent harm to United States commerce' (emphasis added)). Putting a finer point on it the Supreme Court stated "acts in themselves legal lose that character when they become part of an unlawful scheme." *Id.* at 287.

In fact, even considering the three-part test set forth in *Vanity Fair*, which the Defendants continue to rely, the relevant prong states: "defendant's *conduct* had a

substantial effect on United States commerce." *Vanity Fair Mills, Inc. v. The T. Eaton Co., Ltd.*, 234 F.2d 633, 642 (2nd Cir. 1956) (emphasis added). Noticeably absent from *Vanity Fair*, or any case cited by OEI, is the requirement that such infringing conduct be limited solely to "use" of a mark and may not also include other acts or conduct such as bad-faith trademark filings.

Not only has OEI failed to demonstrate that the Lanham Act and CUTPA may not be applied extraterritorially to bad-faith trademark filings, but the *Ramirez* case cited by OSA, specifically holds that they can.[7]

### 2.    Defendants' Have Misapplied the *Noerr-Pennington* Doctrine

Defendants' muddled argument does not make clear whether they are claiming the *Noerr Pennington* immunity as a defense to the litigation or whether they are attempting to claim immunity for the act of filing foreign and domestic trademark applications.

In either case, Defendants' arguments are misplaced. Defendant's trademark filings do not constitute protected petitioning activity. The *Noerr-Pennington* doctrine ("*Noerr*") is a defense to an allegation of an antitrust violation brought under the Sherman Act and as such is completely inapplicable to the facts of this case. While, *Noerr* grants immunity to numerous types of government filings, trademark filings has never been, included in such protection. No case law cited by OEI holds that its protection has been extended to include a private party's filing of trademark applications.

---

[7] OEI's efforts to hide the *Ramirez* case at the bottom of its lengthy footnote number 4 in its Supplemental Brief, tells the entire story. While OEI is correct that this decision was decided in 1956, it should be noted that it was affirmed in its entirety by the Ninth Circuit in 1957 – one year after the *Vanity Fair* decision relied on by OEI, and is still good law today. In contrast, the Second Circuit, 40 years after *Vanity Fair*, in *Sterling*, has cautioned against reliance on *Vanity Fair* when a case is not on "all fours" with *Vanity Fairs'* facts.

OEI's reliance on *Professional Real Estate Investors* is flawed, as it also involves antitrust claims. *Ball Corp. v. Xidex Corp.* 705 F.Supp. 1470, citing *T.N. Dickinson V. LL Corp.*, 1985 WL 14175 (D. Conn. 1985).

### 3. Defendants' Trademark Filings Cause Harm to Plaintiff

OEI has unfairly sought to control rights in the OMEGA mark for reasons unrelated to its own business needs, with the intention of preventing access to registration by OSA, and to multiply the cost and difficulty in pursuing registrations to a point where OSA would be discouraged (i.e., unfairly and competitively disadvantaged) from maintaining that to which it is entitled. As found in Omega II, the timing of these acts, this strategy and campaign, is so clear that it cannot be interpreted in any other way.

OSA has, therefore, been forced to police OEI and its marks around the globe in a constant expensive effort to fight continuous infringement by OEI on its rights; oftentimes this encroachment is explained by OEI as a simple mistake, and the offending goods are deleted. [ See, for example Pl. Br. Ex. 20] Frequently, OSA must fight and win in tribunals around the world. [Pl. Br. Ex. 21, *In Re Registration No.* 1557184, July 15, 2004].

It is now possible for any consumer with access to the Internet to purchase directly from OEI a timing device that measures periods of time, the time of day, and bears the Omega trademark. This is confusing to consumers and plainly encroaches OSA's rights. The injury to OSA is self-evident and is perhaps best summarized by the European judicial tribunal that found:

- o  OSA has "a reputation in relation to both watches and sophisticated timing apparatus for sporting activities. The reputation is not for timing

29

apparatus for industrial or scientific purposes but is a reputation which, in my view, will accrue to any timing equipment; and period timers are timing equipment." Pl. Br. Ex. 21, *In re Registration No. 1557184*, July 15, 2004 at 31.
- "No doubt [OSA] feels more than a frission of concern that one of its rivals could purchase this trade mark or part of it, through division, and have rights in the word OMEGA for period timers for scientific and/or industrial purposes. The measurement and recording of time is the very core of the business of [OSA]." *Id.* at 38.

Defendants' motion for summary judgment on Plaintiffs' CUTPA and Unfair Competition claims should be denied.

### C. Summary Judgment is not Appropriate Based on Estoppel.

Defendants also rely on two estoppel theories in support of their motion for summary judgment, allegedly based on the 1994 Agreement and the disputed Omega I settlement. The 1994 agreement, however, was not the result of any claims brought by either party. The 2003 agreement was the result of a one-count breach of contract claim, brought by OEI against OSA, that clearly differs from the unfair competition claims now before this Court.

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action. *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). It is well settled, however, that a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2nd Cir. 2002). Whether a claim that was not raised in the previous action could have been raised therein "depends *in part* on whether the same

30

transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2nd Cir.1992) (internal quotations omitted) (emphasis added).

To determine whether two actions arise from the same transaction or claim, the Second Circuit considers whether the underlying facts are "related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Pike*, 266 F.3d at 91 (internal quotations omitted). However, "[t]hat both suits involved essentially the same course of wrongful conduct is not decisive." *Lawlor*, 349 U.S. at 327, 75 S.Ct. 865 (internal quotations omitted). For a single course of conduct may give rise to more than a single cause of action for res judicata purposes. *See id.* at 327- 28, 75 S.Ct. 865.

Because no court has ever entered judgment pertaining to the issues now before this Court, Plaintiff's claims, as a matter of law, cannot be barred. Moreover, as the pattern and practice that form the basis of the claims all first developed after the filing of Omega I, Plaintiff's claims cannot be barred. If Defendants believe that Plaintiff has breached the prior agreements by bringing this suit, Defendants' correct course of conduct is to bring a claim for breach of contract – which they have done.[8]

Defendants argue that because the '94 agreement and Omega I settlement address certain rights to "period timers" and "scientific clocks," Plaintiff's claims are now barred. As set forth in Plaintiff's Motion for Summary Judgment, Defendants wrongful conduct goes beyond just their registrations and use of "period timers" and "scientific clocks," it also includes, for example, the following goods:

---

[8] Notably, Defendants' have not moved for summary judgment on this claim.

31

- Timers;
- Precious metals;
- Jewelry;
- Horological and chronometric instruments;
- Precious stones;
- Apparatus for timing variable chemical and physical parameters such as timing;
- Dataloggers;
- Data storing, registering and recording apparatus;
- Apparatus for display timing
- Typewriters;
- Fire extinguishing apparatus;
- Cardboard;
- Artists' materials;
- Playing cards;
- Advertising services;
- Photographs;
- Stationary;
- Business administration;
- Office functions; and
- Paper [*See* Pl. Br.]

Moreover the 1994 Agreement contains several ambiguous terms which have been disputed, including "variable parameters." This is a term that, similar to "period timers," was coined by Defendants, and used by them in numerous trademark applications. Indeed, the elusive definition of this term, among others was a central issue in Omega I. However, no court has ever interpreted the 1994 Agreement, and, therefore, it cannot provide an appropriate basis to dispose of any issues in this case.

Defendants' arguments based on the Omega I settlement should likewise be denied because: (1) although final judgment was recently entered in that case, the actual terms of the agreement have not been interpreted; (2) the claims brought by OEI in Omega I are different from the claims brought by OSA in the current dispute; (3) Plaintiff has never executed the agreement and has filed an appeal challenging the enforceability of the agreement; (4) Plaintiff has filed a motion seeking a stay of the terms of the

32

agreement pending the appeal; and the Parties have not performed under the terms of the agreement. For all the foregoing reasons, and because Defendants have utterly failed to meet their burden of establishing the necessary elements needed to support a valid *res judicata* or *collateral estoppel* defense, Plaintiff's claims are not barred by the 1994 or 2003 agreements.

### IV.     <u>CONCLUSION</u>

Defendants' motion for summary judgment on Plaintiff's causes of action should DENIED by the Court.

As shown above, Plaintiff's CUTPA and Unfair Competition claims are fully supported by the record. Several of Defendants' arguments have already been rejected by this Court - twice. Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, even though some of the acts are performed by that U.S. citizen outside the territorial limits of the Untied States. Plaintiff's claims in this regard are further supported not only by such foreign acts, but also by Defendants acts and conduct in the United States, directed from the United States headquarters located in this Judicial District and on the world wide web, which is administered by the Connecticut Defendants and used by U.S. citizens in the United States to transact business with Defendants in Connecticut. In summary, Defendants' reliance on the Noerr-Pennington doctrine and *Professional Real Estate*, are completely misplaced, and a reasonable juror could easily find that Plaintiff will be damaged by Defendants' attempts to expand their rights in the Omega marks to goods unquestionably sold by Plaintiff, including timing devices and jewelry.

With respect to Plaintiff's claims relating to trademark infringement, dilution, and false designation of origin claims, the following four facts raise material issues of fact which not only defeat Defendants' motion but in fact, securely anchor the Plaintiff's claims.

**(1) The Parties use identical marks - Omega and "Ω";**

**(2) The Parties sell the same goods - timing devices;**

**(3) The Parties sell to the same customers -including the government and universities; and**

**(4) Actual consumers have been confused believing that goods sold by one Party was actually sold by the other.**

Defendants gloss over these and many other indisputable facts, not to mention those facts which are hotly contested between the parties, all of which clearly reveal genuine issues of material fact which prevent summary judgment in Defendants' favor. Defendants' arguments that the Parties are in completely different markets is inapposite to the record which shows that the Parties share many customers, including NASA, the United States Military, Penn State University and the University of Wisconsin. The evidence also shows that there is significant overlap in marketing efforts, clientele, and the Parties' products such that, when combined with Plaintiff's senior rights to the OMEGA mark, the strength of Plaintiff's mark, and the similarity between the Parties' marks, create a very strong likelihood of confusion.

                                          Respectfully submitted
                                          for Plaintiff,

By: _____
      Jess M. Collen (CT20918)
      Matthew C. Wagner (CT25926)
      COLLEN *IP*
      THE HOLYOKE-MANHATAN BUILDING
      80 South Highland Avenue
      Ossining, New York 10562
      (914) 941-5668
      (914) 941-6091 (facsimile)
      jcollen@collenlaw.com (email)

Dated: October 6, 2004