# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA S.A., </br></br> Plaintiff, </br></br> v. </br></br> OMEGA ENGINEERING, INC., </br> OMEGA SCIENTIFIC, INC., and </br> OMEGA PRESS, INC., </br></br> Defendants. </br></br> OMEGA ENGINEERING, INC., </br></br> Counterclaim-Plaintiff, </br></br> v. </br></br> OMEGA, S.A. and </br> THE SWATCH GROUP LTD., </br></br> Counterclaim-Defendants. | Civil Action No.: </br> 3:01 CV 2104 (MRK) |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Omega S.A. ("OSA") and Counterclaim Defendant, The Swatch Group Ltd. (collectively "Plaintiff") hereby submits this Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment[1].

## I.   PRELIMINARY STATEMENT

Defendants fail to not only address the allegations at issue in the case, but more importantly the undisputable wrongful nature of its conduct. There can be no reasonable defense to the bad-faith pattern and practice it has employed. Defendants are left with no choice but to present a litany of excuses, purported mistakes and defective procedural arguments that collectively do nothing more than demonstrate why Plaintiff is left with no choice but to seek relief from this Court. While OEI seems to prefer arguing that any single application, for any given product (paper or toaster oven, for instance) may not in and of itself cause any direct harm, Plaintiff's Complaint is not directed to any isolated instance or a single application. Instead, this lawsuit is premised on Defendants' unrelenting pattern and practice, to date consisting of the filing of at least 21 spurious applications for the Omega marks, and engaging in infringing uses of the mark in connection with a broad range of goods including products designed to perform the very same function as Plaintiff's goods – tell time.

Defendants' arguments that, for example application number 16 is inadmissible because it was simply a "mistake" (Def.'s Opp. at 10), or application number 12 should not be considered because although it was for jewelry, it was only for "jewelry for science and industry," (Pl. Br. Ex. 34 at 81-82) illustrate some of Defendants' awkward, arcane, and sometimes even amusing alibis. Without this Court's intervention, this conduct will continue, and most likely increase in the years to come, until finally, Defendants have eroded the intellectual property rights Plaintiff first acquired over 100 years ago, rights which they must expend incalculable resources, both legal and otherwise, defending to this day.

---

[1] Plaintiff objects to Defendants' 79-page Local Rule 56(a)(2) as it violates the letter and spirit of this Rule.

## II. DISCUSSION

### A. Plaintiff has been Harmed by Defendants' Conduct

Defendants have fabricated an artificial standard that would require a party to demonstrate actual "blocking" to demonstrate that they have been injured by acts of unfair competition.[2] Defendants deceptively argued that Plaintiff has not identified a particular occasion where one of Plaintiff's trademark applications was blocked by one of Defendants' applications; in fact Plaintiff's witness, never so stated, but rather testified that "another" OSA employee could have more knowledge on the matter. [Deposition of C. Rupp at 283, attached to the Sup. Dec. Laaraj as Exhibit A.][3] Notwithstanding Defendants' misrepresentations, harm is a broad concept under CUTPA and the Lanham Act, which is certainly not limited to where one interferes with another's ability to obtain a registration from a trademark office. *Vitarroz Corp. v. Borden, Inc.* 644 F.2d 960, 967 (2nd Cir. 1981) (the Lanham Act protects against several forms of types of injury: loss of patronage, loss of reputation, and limitation on business expansion in association with the marks at issue); *S. C. Johnson & Son, Inc. v. Johnson*, 175 F.2d 176 (2nd Cir. 1949).

For example, it is well settled that a finding of a likelihood of confusion is all that is needed to demonstrate that a party, and the public, has been injured by the unfair practices of another. *Nabisco Brands, Inc. v. Kaye*, 760 F.Supp. 25, 29 (D.Conn.1991.); *Federal Telephone & Radio Corp. v. Federal Television Corp.*, 180 F.2d 250, 251 (2nd Cir. 1950). As already outlined in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, incorporated in its entirety herein (hereinafter cited to as "Pl. br."), the likelihood of confusion between the Parties' marks is undisputed because the Parties use the same mark (OMEGA and Ω), sell the same products (timing

---

[2] Defendants also attempt to distract the court by arguing that Plaintiff's supporting evidence is inadmissible and/or hearsay. To the contrary, Plaintiff's arguments are all supported by declarations from individuals with years of experience and thorough knowledge of the history and use of Plaintiff's intellectual property rights. Plaintiffs have also submitted deposition testimony, and trademark application reports, all of which are either self-authenticating, or have been submitted with an appropriate declaration.

[3] Had Defendants deposed the witness identified by Plaintiff as one with knowledge of any actual instances of blocking, Defendants could have questioned this witness about any such instances, but instead Defendants chose not to depose her.

2

devices), sell to the same customers (Universities, NASA, Lockheed Martin), actual confusion has been documented, and there is overlap in the parties' trade channels (the Internet and numerous periodicals). Plaintiff has established the likelihood of confusion between the Parties' marks and, therefore, as a matter of law, Plaintiff has been harmed.

In addition, Plaintiff has also demonstrated harm by showing Defendants' efforts to thwart Plaintiff's expansion of its use of the OMEGA mark. This is evidenced by Defendants' trademark applications for which it seeks rights in the OMEGA mark on goods that it does not intend to sell such as fire extinguishers, cash registers, and file cabinets, as well as references to products closely related to OSA's goods, including chronometric instruments, horological apparatus, timers, display apparatus for time, video tapes in the field of timing, jewelry and precious stones. This evidence also supports a cornerstone element of CUTPA. See, *Omega Engineering v. Eastman Kodak Co.*, 30 F.Supp.2d 226, 260 (D.Conn.1998) (CUTPA balances violations of public policy or statutory law with immoral, unethical, and unscrupulous behavior in addition to issues of harm).

Defendants' conduct evidences clear violations of the Lanham Act. *See,* 15 U.S.C. § 1051(b); *Lucent Information Management, Inc., v. Lucent Technologies, Inc.*, 186 F.3d 311, FN1 (3rd Cir. 1999) ("use in commerce means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"), as well as a serious encroachment of Plaintiff's rights to its well established trademarks. *See, Architemps, Inc. v. Architemps, Ltd.* 1989 WL 80300, *2 (S.D.N.Y. 1989) (efforts to box-in a senior user's rights in a mark evidence bad faith) (*citing, Weiner King Inc. v. Wiener King Corp.*, 615 F.2d 512, 523 (C.C.P.A.1980)).

Defendants mistakenly argue that trademark infringement (not CUTPA or Unfair Competition) cannot be based on the filing of its three cited intent-to-use trademark applications. However, the mere filing of a trademark application *can be* the act upon which a CUTPA claim is based. The Supreme Court has held that petitioning a government agency for redress can provide the basis for legal action when the activities are undertaken to harm another party. *California Motor*

*Transport Co. v. Trucking Unlimited*, 404 U.S 512, 515 (1972). Moreover, Defendants testimony that there was no intent to use the OMEGA mark (or derivative thereof) on certain goods listed in Defendants' applications such as fire extinguishers, calculating machines, and vending machines, is in direct conflict with federal law. *See*, 15 U.S.C. § 1051(b) (unmistakable requirement of good faith intent to use the mark on all goods cited in an application). As a violation of statutory law and, in turn, public policy, this conduct is actionable under CUTPA. *Omega Engineering*, 30 F.Supp.2d 260.

Plaintiff's harm is also documented by the immeasurable resources which have been expended policing Defendants' conduct, which not only includes Defendants' trademark applications, but Defendants' advertising, marketing and use of the marks. [Dec. Stierli at ¶ 13-14.] As OSA's Vice President and Chief Finance Officer, Mr. Stierli highlights, thousands of hours are spent by OSA's personnel as well as its numerous distributors throughout the world, monitoring Defendants' trademark activities, initiating various world-wide judicial proceedings, responding to discovery requests, and providing instructions to outside counsel. [Dec. Stierli at ¶ 13-14.] A final measure of harm is the potential loss in value of Plaintiff's OMEGA mark. The OMEGA mark is Plaintiff's most valuable asset, and Plaintiff need not wait until its value is diminished or destroyed by Defendants' predatory conduct.

B.  **Defendants' Excuses, Purported "Mistakes" and Unbelievable Coincidences Support a Finding of Bad-Faith**

The Court should see through Defendants' transparent rationalizations and explanations for their bad-faith conduct. Analysis of Defendants' arguments demonstrates the true underlying motivation for their conduct, which, even if technically lawful, lost that character when performed for an unlawful purpose. *See, Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952).

One example of such conduct is Defendants' sale of watch batteries in connection with the OMEGA mark, conduct which even Defendants do not dispute was a violation of Plaintiff's rights.[4] Instead, and as a highlight of Defendants' pattern and practice, Defendants claim "mistake" and have removed the offensive material from its advertising. Defendants claim this was a mere oversight – but cannot deny that they only rectified their improper conduct because Plaintiff filed this lawsuit seeking this Court's intervention.[5] Defendants' excuses undermine their credibility. When asked why OEI has registered for jewelry for science and industry, OEI explained that it sells strips of metal that can be used as a kit for making jewelry. [Pl. br. Ex. 34 at 82] Only a short while later, OEI recognized the utter ridiculousness of this argument and conjured up a new theory, that these applications "mistakenly" referred to jewelry. [Def. Opp Sum. Judg. at 10].

The evidence speaks for itself, Defendants have infringed Plaintiff's rights and this Court should not tolerate Defendants' excuses, purported "mistakes" and unbelievable coincidences. Plaintiff seeks an injunction to ensure these "mistakes" do not ever happen in the future.

C.     **Defendants' Foreign Filings and _Vanity Fair_.**

Defendants erroneously argue that Plaintiff is asking the Court to second-guess the decisions of foreign tribunals. The record is clear, and supported by Judge Underhill's prior ruling, Plaintiff has not ever, and is not now, asking the Court to evaluate decisions of foreign tribunals. In fact, consistent with the _Ramirez_ decision, Plaintiff has taken the opposite position, namely, the Court may assume the validity of Defendants' applications in the respective foreign countries to be valid under

---

[4] Defendants' arguments that the batteries are not sold with the OMEGA mark is simply misleading [OEI's Opp. At 36], as the watch batteries were purchased from OEI's site, and like all of OEI's products, came in packaging bearing the Omega marks. [_See_, Dec. of Brad Cole filed October 21, 2004, and exhibits thereto; Dr. Hollander Dep. Tr. at 227-229, attached to Sup. Dec. Laaraj as Exhibit D.]

[5] Defendants argue that Plaintiffs have somehow changed their position because they continue to present new evidence of OEI's infringing conduct. Plaintiff has always maintained that OEI's pattern and practice of additional bad faith conduct is on-going, and new evidence continues to emerge on a regular basis. The most recent is Defendants' use of a US astronaut on its web site [Sup. Dec. Laaraj Exhibit B]– which only further increases the likelihood of confusion, as Plaintiff has traditionally used NASA and the space industry to promote its OMEGA goods. [Pl. br. at Ex. 2; Dec. Stierli at 11; Dec. Kayal at 8; _see also_, the November 2004 issue of Esquire magazine, which discusses Plaintiff's products and its long-established connection with NASA, attached hereto as Exhibit C.]

5

each foreign country's laws. *Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F.Supp. 594 (D.C.Cal. 1956). *Ramirez,* holds that "[s]o to assume does not necessarily mean however, that exercise of this court's jurisdiction to grant the relief plaintiff seeks 'would impugn foreign law' or be an interference with the sovereignty of another nation." *Id.* at 602; *see also, Les Ballets Trocadero De Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563 (S.D.N.Y. 1996); *American Rice, Inc. v. The Arkansas Rice Growers Coop. Assoc.*, 701 F.2d 408 (5th Cir. 1983); *California Motor Transport Co.v. Trucking Unlimited*, 404 U.S 512, 515 (1972) (party may be found liable for a pattern and practice which evidences unfair conduct, despite the fact that the underlying conduct, viewed in isolation, may be lawful).

Defendants' domestic and foreign trademark applications show a pattern of escalating references to products falling within the realm of Plaintiff's right to the Omega marks, or for goods traditionally not associated with either party. These are part of the bad faith effort to block and/or unfairly restrict Plaintiff's rights to the OMEGA mark, and to wrongfully expand Defendants' own rights to the OMEGA mark. The Defendants have forced Plaintiff to divert precious resources to police Defendants' activities coordinated from Defendants' Connecticut headquarters – activities which cause Plaintiff unmistakable harm. [Dec. Stierli at ¶ 13-14.] Instead of repeatedly chanting the mantra of *Vanity Fair* to bar evidence of Defendants' foreign trademark activities, Defendants should analyze the three elements of that doctrine, which favor Plaintiff as repeatedly discussed in the context of prior motions.

**D.    The *Noerr-Pennington* Doctrine Does Not Apply**

Defendants' reliance on *Professional Real Estate Investors v. Columbia Pictures, Indus., Inc.*, 508 U.S. 49 (1993) and the Noerr-Pennington Doctrine is misplaced. The "*Noerr-Pennington* doctrine provides immunity from **anti-trust** liability to those who petition the government for redress, so long as the activities undertaken are not considered sham activities." *Id. Jarrow Formulas, Inc., v. International Nutrition Company*, 175 F.Supp.2d 296, 309 (2nd Cir. 2001)

6

(emphasis added); see also, *Ball Corp. v. Xidex Corp.* 705 F.Supp. 1470, 1472 (D. Colo. 1988) (noting that courts confronting PTO filings have refrained from applying *Noerr* to common law claims of unfair competition) (citing *T.N. Dickinson v. LL Corp.*, 227 U.S.P.Q. 145, 149 (D.Conn.1985.))

Even if this Court were to apply *Noerr-Pennington*, the "objectively baseless" test would not be the appropriate consideration for the sham litigation exception to that doctrine. The objectively baseless test, as discussed in *Professional Real Estate*, applies to cases involving allegations that <u>a single</u> lawsuit or petitioning activity constitutes unfair competition and not an undisputed <u>pattern of dozens</u> of proceedings, as we have here. As noted by the Supreme Court:

> "One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the fact finder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result... If the end result is unlawful, it matters not that the means used in violation may be lawful"

*California Motor*, 404 U.S 512, 515. The proper question is not whether any one of the petitioning activities - in this case the filing of trademark applications - has merit, but whether as a whole, they are designed to harm a competitor. *USS- Posco Industires, v. Contra Costa County*, et al, 31 F.3d 800, 811 (9th Cir. 1994) (holding that a pattern of conduct requires a test distinct from the objectively baseless test). Here, Plaintiff has demonstrated that Defendants' trademark activities have targeted Plaintiff's line of business and its most valuable intellectual property, and this conduct is wholly improper.

E. **The 1994 and Omega-I Agreements, and the ACPA Settlement Pertaining to the Domain Names "Omegawatch.com" and "Omegatime.com" in Omega II Do Not Bar the Claims in this Suit**

Another oft-repeated misconception is Defendants' argument that the Parties' 1994 Agreement somehow granted them the right to use the OMEGA mark on timing devices. As is plain from the face of the Agreement, Defendants agreed <u>not to use</u> the OMEGA mark on "computer

controlled measuring timing and display apparatus" unless intended for science and industry. Defendants, however, market its timing devices as "day or time clocks." The Agreement also does not address the other evidence submitted by Plaintiff, which includes Defendants' applications for jewelry, fire extinguishers, etc.

The language of the Agreement does not contain a license or assignment of Plaintiff's rights to the OMEGA mark, nor does it restrict Plaintiff from challenging Defendants' use. Accordingly, Plaintiff remains free to bring this action. Furthermore, no judicial decision exists which interprets the Agreement or binds this Court or otherwise supports any *estoppel* theory based on the 1994 Agreement. Finally, if Defendants maintain that the 1994 Agreement is violated by way of the present action, then their appropriate remedy is to pursue their counterclaim for breach of contract; a count upon which Defendants have not moved for summary judgment.

Defendants additionally rely on the disposition of OMEGA I to assert that Plaintiff's claims related to "period timers" and "industrial clocks" are barred. Even if this agreement was enforceable (an issue presently on appeal (Second Cir., No. 04-5084)), Defendants marketing, sale and applications for "timers," "clocks" and other goods, clearly fall outside the terms of the agreement. While the agreement allows Defendants, under certain conditions, to use the mark in connection with "period timers" and "industrial clocks" the claims in this action are not based on these two goods. Instead, Defendants improper use and conduct includes a wide-range of goods including timers that, as Defendants advertise, may be used, not only as a "period timer", but also as a "day or time clock."[6] [*See*, Pl. Br. at 10.] Plaintiff sells period timers. [Pl. Br. Ex. 6]

Defendants cannot rely on its self-coined designations "period timer" or "industrial clock," to defeat Plaintiff's claims, when it is clear that its products function in a manner clearly outside the scope of the agreement. Under Defendants' interpretation of the agreement, they could advertise

---

[6] It should also be noted that Defendants do not advertise or sell these goods to the public as "period timers" or "industrial clocks," but simply as timers. OSA has never agreed to relinquish its exclusive right to the OMEGA marks in connection with timers – such rights are the core of OSA's business. [See, Dec. Laaraj filed October 6, 2004; [Pl. Br. Ex. 21].

8

"wristwatches" or "stopwatches" under the OMEGA mark, so long as they contend that such watches are in fact "period timers."

Plaintiff's claims regarding Defendants' bad faith filing of trademark applications for OMEGAWATCH.COM and OMEGATIME.COM are not barred by *res judicata*. It is well-established that the doctrine of *res judicata* applies only when the current issue was either litigated in a prior case, or should have been litigated in the prior case. *Pike v. Freeman*, 266 F.3d 78, 91 (2nd Cir. 2001). Plaintiff's claims in *Omega S.A. v. Omega Engineering, Inc.* 228 F.Supp.2d 112 (D.Conn. 2002) ("OMEGA II") were brought under the Anticybersquatting Protection Act ("ACPA"), and were based solely on Defendants' acquisition of certain Internet domain names. In contrast, the claims in this case are based on Defendants' pattern and practice of bad-faith foreign trademark applications, and is supported, in part, by Defendants' trademark applications in the Benelux for the marks OMEGAWATCH.COM and OMEGATIME.COM. Moreover, Plaintiff's current claims could not have been brought at the time of OMEGA II because Defendants' pattern of bad faith trademark filings was still developing and not yet evident.

Similarly, *collateral estoppel* does not apply. This defense requires that "the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-289 (2nd Cir. 2002.) Defendants note that OMEGA II settled out of court. Thus, even if the issue was litigated, there was no final judgment on the merits. *Id.* citing *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327 (1955) ("where a stipulation of settlement is unaccompanied by findings, it does not bind the parties on any issues, which might arise in connection with another cause of action.") The Benelux registrations do not support the defense of *collateral estoppel* or *res judicata*.

Defendants' deliberate pattern and practice of encroaching Plaintiff's rights goes beyond the specific conduct addressed in the 1994 Agreement, Omega I and Omega II.

F.  **Plaintiff Properly Acquired Omega.us**

Defendants have failed as a matter of law to demonstrate that Plaintiff's application for omega.us was improper. Defendants cite no law to support its argument that The Swatch Group may not, for administrative purposes, apply for registration for one of its subsidiary companies.[7] As evidenced by the sunrise application, The Swatch Group properly listed OSA on the domain name application as the owner of the OMEGA trademark. [*See*, Pl. Br. Ex. G] Defendants also mischaracterize Plaintiff's testimony. Plaintiff never claims to have filed multiple applications for the omega.us mark. The Swatch Group filed one application on behalf of many of its subsidiaries.

Defendants' outlandish claims to exclusive rights to the Omega marks in connection with "U.S.," as well as its claims that the top level domain ".US" should be considered part of the mark, have already been addressed in Plaintiff's previously filed papers and require no additional comment.

Respectfully submitted
for Plaintiff and Counterclaim Defendant,

By: _____
Jess M. Collen (CT20918)
Matthew C. Wagner (CT25926)
COLLEN *IP*
THE HOLYOKE-MANHATAN BUILDING
80 South Highland Avenue
Ossining, New York 10562
(914) 941-5668
(914) 941-6091 (facsimile)
jcollen@collenlaw.com (email)

Dated: October 21, 2004

---

[7] Instead Defendants' again attempt to distract the Court by challenging the admissibility of Plaintiff's statements. To remove any doubt, Plaintiff hereby submits a Supplemental Rule 56(a)(1) Statement as well as the Supplemental Declaration of Amy Laaraj in support thereof.

10