## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA S.A.,<br>          Plaintiff,<br><br>          v.<br><br>OMEGA ENGINEERING, INC., et al.,<br>          Defendants.<br><br>OMEGA ENGINEERING, INC.,<br>          Counterclaim Plaintiff,<br><br>          v.<br><br>OMEGA S.A. and<br>THE SWATCH GROUP LTD.,<br>          Counterclaim Defendants. | CIVIL ACTION NO.<br>3:01cv2104 (SRU) |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Omega S.A. ("OSA"), a Swiss manufacturer of watches and timepieces, has sued

American manufacturer of thermocouples, Omega Engineering, Inc. and its affiliates, Omega

Scientific, Inc. and Omega Press, Inc. (collectively "OEI"). This case is the third in a series of

lawsuits between these parties in the District of Connecticut. Principally, OSA alleges that OEI

has engaged in trademark violations and unfair competition. OEI has asserted counterclaims

against OSA and The Swatch Group Ltd. ("Swatch"), OSA's parent company, alleging trademark

violations, unfair competition, and cybersquatting, and seeking cancellation of two OSA

trademarks. The parties have filed cross-motions for partial summary judgment.

OEI has moved for summary judgment on all five of OSA's claims as well as on its

counterclaim seeking cancellation of OSA trademarks due to abandonment and fraud. OSA has

moved for summary judgment on its claims of unfair competition under the Lanham Act and the

Connecticut Unfair Trade Practices Act (CUTPA), as well as on OEI's counterclaim of

cybersquatting.

First, because there are no genuine of issues of material fact concerning essential elements of OSA's trademark infringement, dilution, and unfair competition claims, I grant OEI's motion for summary judgment on those claims.  Second, because there is no genuine issue of material fact concerning the required bad faith intent, I grant OSA's motion for summary judgment on OEI's claim of cybersquatting.  Third, I deny OEI's motion for summary judgment on its trademark cancellation counterclaim; OEI has failed to produce evidence to support the required fraudulent intent for cancellation on grounds of fraud, and OSA has raised a genuine issue of material fact concerning the alleged abandonment of those marks.

## I.    Procedural Background

OEI and OSA have been involved in other, related litigation in this District.  In 1998, OEI sued OSA, alleging that OSA failed to abide by the terms of a contractual agreement that settled various disputes regarding the parties' trademarks.  During a court-sponsored settlement conference, the parties reached a settlement that was enforced by the District Court despite OSA's protest.  *Omega Engineering, Inc. v. Omega S.A.*, 2004 WL 2191588 (D. Conn. Aug. 12, 2004) ("*Omega I*").  OSA has appealed the District Court's order enforcing the settlement, and that appeal remains pending before the Second Circuit.

In 2000, OSA sued OEI for cybersquatting based on OEI's registration and use of the web domain names: omegawatch.com and omegatime.com.  The District Court ruled on the parties' cross-motions for summary judgment in *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 2d 112 (D. Conn. 2002) ("*Omega II*").  Following that ruling, the parties settled and stipulated to a dismissal of *Omega II* with prejudice.  As part of the *Omega II* settlement, OEI agreed to

transfer the two domain names to OSA.  Pl. L. Rule 56(a)1 Statement (doc. # 118) ¶ 26; Def. L.

Rule 56(a)2 Statement (doc. # 126) ¶ 26.

The present action has been dubbed "*Omega III.*"

## II.    Factual Background

Except where noted otherwise, the following facts are undisputed.

### A.    Omega S.A.

Omega S.A., a Swiss company and subsidiary of Swatch, manufactures and sells watches

and other horological products and timekeeping equipment, including equipment for timing

athletic competitions.  Pl. L. Rule 56(a)1 Statement ¶ 1 (doc. # 118); Def. L. Rule 56(a)1

Statement (doc. # 108) ¶ 44.

OSA products include watches that are upscale, luxury goods, and their prices correspond

to that class of product.  Emmons Tr. 61-62; Sauser Rupp Tr. 87.  Omega Electronics, a licensee

of OSA, sells Omega-branded sports timing devices in the United States.  Rentsch Tr. 109, 111,

118-19; Sauser Rupp Tr. 163-64; Gibbons Tr. 37, 153.

OSA uses word and design trademarks that incorporate the word "Omega" and the Greek

letter "Ω".  Pl. L. Rule 56(a)1 Statement ¶¶ 2, 33.  Its United States trademark registrations

include: Registration Nos. 708,731 and 1,290,661.

OSA uses the domain name www.omega.ch.  Pl. L. Rule 56(a)1 Statement ¶ 1.  On behalf

of its subsidiary, Swatch completed an application for the domain name: www.omega.us.  The

so-called Sunrise application process permitted persons or entities, including foreign entities with

a presence in the United States, to register for web domains with a .us top-level domain

("usTLD"), in advance of general registration.  To participate in the Sunrise process, applicants

were required to hold a United States federal trademark registration or application on the

Principal Register of the Patent and Trademark Office ("PTO").  Ex. E to doc. # 119-3.[1]  Because

multiple trademark owners might apply for the same .us domain name, a random selection

process assigned domain names for which there were multiple qualified applicants.  *Id.*  The

domain name, www.omega.us, was eventually assigned to Swatch.

      B.    Omega Engineering, Inc.

Omega Engineering, Inc. was founded in 1962 by Betty Ruth Hollander.  M. Hollander

Dec. ¶ 2.  Its first products were thermocouples, devices used in factories and laboratories to

measure temperatures.  *Id.*  The founder chose to name the company Omega Engineering

because of an early user of the thermocouples, a company called Alpha Molykote.  *Id.*

OEI has used a design mark consisting of juxtaposed Greek letters Omega ($\Omega$) and

Epsilon (E), the so-called "Omega bug," for nearly forty years.  *Id.* ¶ 4 and Ex. A.

In 1966, OEI first registered in the United States for an Omega trademark relating to

industrial and scientific apparatus.  Riggs Dec. ¶ 2 and Ex. A.  OEI's Omega trademark

registrations include: Registration No. 2,022,762 ("'762") ("OMEGA"), Registration No.

2,034,705 ("'705") ("ΩE"), and Registration No. 2,236,657 ("'657") ("OMEGA").  Riggs Dec.

¶¶ 4-7 and Exs. D-F.  According to OEI, Registrations '762 and '705 relate to "timers, namely

period timers . . . industrially and/or scientifically e

_____

[1] Although OSA did not refer to the process for registering a usTLD name in its original
Local Rule 56(a)1 statement, it did discuss the process in its briefs.  In its opposition, OEI did not
dispute the mechanics of early registration for a usTLD name, although OEI has moved to strike
as hearsay certain OSA exhibits relating to the Sunrise application process.  Def. Motion to
Preclude (doc. # 161) at ¶ D.14.

mployed" and "industrial and scientific clocks," and Registration '657 covers telecommunications. Riggs Dec. ¶¶ 4-6 and Exs. C-E. OSA appears to dispute the descriptions of these Registrations as set forth in OEI's Local Rule 56(a)1 statement. In its Local Rule 56(a)2 statement, OSA states simply: "Plaintiff denies the facts in [paragraphs 33-35]" and cites – without pinpoints – the voluminous file histories for Registrations '762, '705, and '675. Def. L. Rule 56(a)2 Statement ¶¶ 30-32.

OEI holds several pending trademark applications. These applications include: Serial No. 76/337,374 (an intent-to-use application under 15 U.S.C. § 1051(b) for the design mark Ω.com); Serial No. 76/337,450 (an intent-to-use application for a design mark consisting of "Ω"); and Serial No. 76/242,073 (an intent-to-use application for the design mark OM∈GA). Riggs Dec. ¶¶ 7, 9 and Exs. F, G.

OEI markets and distributes, under its Omega marks, products that include scientific apparatus for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow. M. Hollander Dec. ¶ 5. Because the measurement of time is often critical to their applications, some of these apparatus contain a timing function. *Id.*

Since at least 1987, OEI has marketed and distributed time-related goods for science and industry under its Omega marks. *Id.* ¶ 6. Omega Press, an OEI affiliate, operates as a trade vehicle for OEI and sells scientific and technical books, computer software, and printed matter under OEI's Omega marks. *Id.* ¶ 11. Omega Scientific, also an OEI affiliate, uses Omega marks in connection with its sale of scientific and technical instruments. *Id.* ¶ 12 and Ex. G.

OEI does not offer or sell any goods or services under the Omega marks to markets or

fields other than industry and science.[2]  M. Hollander Dec. ¶¶ 13, 15-16.  OEI advertises its

goods in specialized trade publications and journals and via direct mail.  *Id.* ¶¶ 17-18 and Exs. I-

L.  OEI also advertises its products and services at scientific and industrial trade shows.  M.

Hollander Dec. ¶ 19 and Ex. M.  OEI maintains the web domain www.omega.com, and its

products are available for purchase there.

      C.      <u>1994 Worldwide Agreement</u>

      After many years of trademark disputes spanning several countries, in 1994 OEI and OSA

attempted to resolve their trademark disputes in a worldwide agreement.  M. Hollander Dec. ¶ 30

and Ex. T.  The agreement stated that both parties desired:

> an agreement for the avoidance of future interference Worldwide between
> their respective fields of commercial operation under their Rights in respect
> of Trademarks consisting of or including the word OMEGA and/or the Greek
> letter Ω or containing elements colourably resembling either of thos[e] two
> elements.

M. Hollander Dec. ¶ 31 and Ex. T ¶ F.

      In addition to settling particular contested trademark matters between the parties, the

1994 agreement provided:

> 4.      Henceforth from the signing of this Agreement and effective in all
>         countries of the World:-
>
>       a. OMEGA ENGINEERING INCORPORATED undertakes not to
>       use, register or apply to register any trademark consisting of or
>       containing the word OMEGA or the Greek letter Ω or any mark

---

[2] In its briefs and at oral argument, OSA attacked the use of the phrase "science and industry" and OEI's assertions that its products are limited to these markets or fields.  In OSA's Local Rule 56(a)2 statement, however, the plaintiff admits OEI's assertion that "Defendants do not offer or sell any goods or services under OMEGA marks for use in markets or fields outside of industry and science."  Def. L. Rule 56(a)1 Statement ¶ 13, Pl. L. Rule 56(a)2 Statement ¶ 13. Furthermore, both parties have used the phrase "science and industry" to describe OEI's market.

> containing elements colourably resembling either of those two
> elements unless intended for science or industry.
>
> ***
>
> c. OMEGA SA will not object to the use or registration by OMEGA
> ENGINEERING INCORPORATED of any trademark consisting of or
> containing the word OMEGA or the Greek letter Ω or any element
> colourably resembling either of those two elements in respect of
> apparatus industrially and/or scientifically employed for measuring or
> controlling variable parameters such as temperature, pressure, force,
> load, vibration, electrical conductivity, liquid level, acidity, humidity,
> strain and flow.

M. Hollander Dec. ¶ 31 and Ex. T.

Paragraph 4(a) of the 1994 Agreement, quoted above, refers to timing apparatus. M.

Hollander Dec. ¶ 33 and Ex. T; Def. L. Rule 56(a)1 Statement ¶ 79; Pl. L. Rule 56(a)2 Statement

¶ 79. The parties have expressly agreed that OEI may use and register Omega and Omega-

stylized marks with respect to those apparatus if intended for science and industry. M. Hollander

Dec. ¶ 33 and Ex. T. Paragraph 4(c) of the 1994 Agreement, quoted above, sets forth that OSA

will not object to certain use or registration by OEI of Omega or Omega-stylized marks. *Id.*

OSA agreed not to object to the registration or use of the marks "in respect of apparatus

industrially and/or scientifically employed for measuring or controlling variable parameters." *Id.*

OEI's industrial and scientific period timers and clocks are used to measure and control variable

parameters. *Id.*

    D.    <u>Omega I Litigation and 2003 Settlement</u>

In December 1998, OEI filed suit against OSA, alleging that OSA had breached the 1994

Agreement by filing petitions to cancel OEI's '762 and '705 registrations as well as a notice of

opposition to the application of what became OEI's '657 registration. Riggs. Dec. Ex. I, *Omega*

-7-

*I*, 3:98cv2464 (AVC), Complaint Prayer for Relief ¶ 4.

On May 19, 2003, during a court-sponsored settlement conference in the chambers of

Magistrate Judge Thomas Smith, the parties negotiated a settlement agreement. Riggs Dec. ¶ 15

and Ex. L; *Omega I*, 2004 WL 2191588. The settlement agreement provided in pertinent part:

• OEI will file amendments to trademark registrations '762 and '705 to delete and amend
certain language. ¶ B(1).

• OEI will include references to "Omega Engineering, Inc." and its location and will refrain
from future use of the wording "industrial and scientific clocks." ¶ B(2).

• If OEI complied with the terms of the settlement agreement, OSA agreed not to "bring a
lawsuit against OEI for use or registration of the Omega mark and/or Omega design on
period timers." ¶ B(2).

• Except for a breach of the settlement agreement, both parties agreed to "release and
forever discharge each other . . . from any and all claims, actions and causes of action in
the U.S.A. relating to the application to register, registration or use of period timers for
science and industry or industrial and scientific clocks under the Omega mark or Omega
design . . . in the *Omega III* Litigation." ¶ B(3).

• OSA agreed to file a third amended complaint in *Omega III* – the instant lawsuit –
dropping the allegations in paragraphs 31 and 32 and dropping references to trademark
registrations '762 and '705 from the prayer for relief. ¶ B(4).

Despite OSA's attempts to contest the validity of the agreement, Judge Smith issued a

recommended ruling enforcing it. Riggs Dec. ¶ 17 and Exs. N, O; *Omega I*, 2004 WL 2191588.

Judge Covello later adopted and ratified Judge Smith's recommended ruling, and judgment was

entered in *Omega I* on August 11, 2004. *Id.* Although OSA appealed the judgment to the

Second Circuit Court of Appeals, OSA did not request a stay of the order in the District Court

until nearly two months after judgment was entered. OSA's Motion to Stay (doc. # 164)

*Omega I*, No. 3:98cv2464 (AVC). The District Court denied that motion on May 18, 2005.

Ruling on Defendant's Motion to Stay Pending Appeal (doc. # 176) in *Omega I*, No. 3:98cv2464

(AVC).

## III.  Discussion

Both OEI and OSA have moved for partial summary judgment.  OEI seeks summary judgment on all of OSA's claims, as well as on its counterclaim seeking cancellation of OSA trademark registrations based on theories of fraud and abandonment.  OSA seeks summary judgment on its claims of unfair competition under the Lanham Act and CUTPA, as well as on OEI's counterclaim of cybersquatting.

### A.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).  If reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate.  *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1995).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255.  When faced with cross-motions for summary judgment, the court must consider the evidence differently depending on which motion is being addressed.  Summary judgment should not be granted "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely in dispute."  *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).

B.    <u>Trademark Infringement and False Designation of Origin</u>

OEI has moved for summary judgment on counts one and five of OSA's complaint.  In those counts, OSA alleges trademark infringement in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114, and false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Based on facts that are not genuinely in dispute, OEI is entitled to judgment as a matter law on both of those claims.

Section 32 of the Lanham Act provides civil liability for trademark infringement:

> Any person who shall, without the consent of the registrant – (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1).

Section 43(a) of the Lanham Act provides civil liability for false designation of origin:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device . . . which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action . . . .

15 U.S.C. § 1125(a)(1).

To support its claims of infringement and false designation of origin, OSA points to the following evidence: OEI's filing of trademark applications for registration in the United States and abroad; OEI's use of trademarks that are "identical" to OSA's marks, Exs. 1, 17, 18 to doc. # 119-1; OEI's use of the word "timer" in names or descriptions of products sold through OEI's

-10-

website, Ex. K to Reilly Dec.;[3] an apparent excerpt from a page of OEI's website on which OEI advertised a function of one of its products as "day or time clock;" testimony that OEI's so-called "period timers" measure time; images from "promotional materials" that illustrate OEI and OSA products with digital displays; the sale of "watch batteries ;"[4] and images from the parties' websites that show two products (OSA's "PowerTime," advertised as a "lightweight, handheld, battery-operated timing computer" and OEI's "HH550," advertised as a "graphic recorder/datalogger/data printer").

First, with respect to conduct relating to OEI's pending trademark applications, there is no evidence that OEI has used the allegedly infringing marks in commerce. Accordingly, there is no triable issue of material fact with respect to that required element, *i.e.*, use in commerce.

Second, with respect to OEI's use of existing trademarks, OSA has consented to certain uses of Omega marks by OEI and is thereby precluded from asserting Lanham Act claims based on such use.

Finally, the evidence in support of a finding of a likelihood of confusion between OEI's products and OSA's products is insufficient to raise a genuine issue of material fact concerning

---

[3] OSA purports to rely on Reilly Dec. Ex. K, a print-out from OEI's web page, as evidence showing that: (1) OEI advertised a function of one of its products as a "day or time clock," (2) OEI's "period timers" measure time, and (3) OEI's promotional materials show products with digital displays. These allegations do not appear supported by Reilly Dec. Ex. K, although I will accept them as true for purposes of this summary judgment motion.

[4] OSA discusses the "watch batteries" in its memorandum in support of its motion for summary judgment on the Lanham Act unfair competition claim, but does not mention their sale in connection with its trademark infringement and false designation of origin claims. Because the trademark infringement, false designation of origin, and unfair competition claims are guided by the same inquiry regarding the likelihood of confusion, I will consider the evidence regarding the "watch batteries" here.

the probability of consumer confusion, the crucial inquiry in Lanham Act cases of trademark infringement and false designation of origin.

           1.     *Use in Commerce*

In order to succeed in a claim of trademark infringement or false designation of origin, OSA must show that OEI "use[s] in commerce" the allegedly infringing mark.  15 U.S.C. § 1114(1)(a); 15 U.S.C. § 1125(a).  Neither the application for a trademark registration nor the existence of a pending trademark application give rise to a claim of trademark infringement or false designation of origin.  *See* 15 U.S.C. § 1127 (defining the term "use in commerce" to mean "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark").  *See also Macia v. Microsoft Corp.*, 152 F. Supp. 2d 535, 539 (D. Vt. 2001) ("Unless and until [the defendant] uses the mark in the course of trade, to identify actual goods for sale or transport, it cannot be subject to suit for trademark infringement under section 1125(a)."); *Cognotec Services, Ltd. v. Morgan Guar. Trust Co. of New York*,  862 F. Supp. 45, 51 (S.D.N.Y. 1994) (despite bank's internal distribution of allegedly infringing materials, absent dissemination "in commerce," plaintiff failed to state a claim for a violation of section 43(a) of the Lanham Act).

OSA has presented no evidence that OEI has used in commerce the marks associated with Serial No. 76/337,374 (Ω.com), Serial No. 76/242,073 (OM∈GA) and Serial No. 76/337,450 (Ω).  Accordingly, insofar as OSA's claims of trademark infringement and false designation of origin relate to those applications, OSA has failed to raise a genuine issue of material fact with respect to the required element of use in commerce.

2.    *Consent*

In addition to the pending trademark applications, OSA argues that OEI's use of other

marks that are confusingly similar to its own constitute violations of 15 U.S.C. §§ 1114(1)(a) and

1125(a).  In its brief in opposition to summary judgment, OSA points to the use of the word mark

"OMEGA" and the design mark "Ω."  Pl. Memo. Opp. Summ. J. (doc. # 145) at 7.[5]  OEI

counters that OSA consented to the former's use of trademarks incorporating both the word

"Omega" and the letter "Ω."

OSA has consented to certain use by OEI of marks that "consist[] of or includ[e] the word

OMEGA and/or the Greek letter Ω or contain[] elements colourably resembling either of tho[e]

two elements."  *Omega I* Settlement Agreement, Riggs Dec. Ex. T. at ¶ F.  The evidence

presented to the court supports OEI's contention that in the *Omega I* settlement agreement, OSA

released OEI from liability relating to the conduct now in dispute.  OSA has not presented

evidence that would permit a reasonable fact-finder to conclude that OSA did not consent to

OEI's use of Omega marks in conjunction with apparatus designed to measure variable

parameters in science and industry.

Consent by the registrant is a defense to a claim of trademark infringement. 15 U.S.C.

§ 1114(1) ("any person who shall, without the consent of the registrant – (a) use in commerce

any reproduction, counterfeit, copy or colorable imitation of a registered mark . . . shall be liable

in a civil action by the registrant).  Section 1125(a) provides broader protection to trademark

owners and others: statutory remedies are available whether or not the plaintiff's mark was

_____

[5] The evidence OSA cites does not show use of a design mark consisting of "Ω."  In fact, there appears to be no evidence that OEI has used the "Ω" design mark, in contrast with its use of the "Omega bug" or "ΩE" design mark.

federally registered, remedies are available for false advertising and product disparagement, and

claims may be brought by "any person who believes that he or she is or is likely to be damaged"

by the conduct. 15 U.S.C. § 1125(a). Nevertheless, the analysis under both sections is often

identical. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036,

1047, n.8 (9th Cir. 1999). Thus, consent is also a defense to a claim of false designation of origin

when that claim is brought by the registrant or senior user. Because OSA consented to OEI's use

in certain contexts, its claims of trademark infringement and false designation of origin based on

that use fail as a matter of law.

a.      Effect of 1994 Worldwide Agreement

In the 1994 Worldwide Agreement, OSA agreed that it would not object to OEI's

registration or use of "Omega" or "Ω" trademarks "in respect of apparatus industrially and/or

scientifically employed for measuring or controlling variable parameters such as temperature,

pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and

flow." M. Hollander Dec. ¶ 31 and Ex. T. Although OSA has argued that the so-called "period

timers" are not covered by the 1994 agreement, there is no evidence in the record supporting that

contention, and both parties have acknowledged that the preceding description referred to

"timing apparatus." Def. 56(a)1 Statement ¶ 79; Pl. 56(a)2 Statement ¶ 79.

Thus, with respect to timing apparatus industrially and/or scientifically employed, OSA

has consented to OEI's use of trademarks consisting of "Omega" or "Ω," and insofar as its claims

of trademark infringement and false designation of origin relate to such conduct, they fail as a

matter of law.

b.    Effect of *Omega I* Settlement Agreement

In addition to the 1994 Agreement, OSA and OEI reached an agreement relating to the

parties' use of trademarks in *Omega I.* As discussed above, in that case, the District Court

enforced the settlement agreement that the parties had reached. The settlement agreement

provided:

> OSA will not make claims or assertions in *Omega III* relating to the
> application to register, registration or use by OEI of the Omega mark or
> Omega design on period timers or industrial and scientific clocks.

Riggs Dec. ¶ 15 and Ex. L ¶ B(4).

> Additionally, both parties agreed to "release and forever discharge each other" from:

> any and all claims, actions and causes of action in the U.S.A. relating to the
> application to register, registration or use of period timers for science and
> industry or industrial and scientific clocks under the Omega mark or Omega
> design, in the *Omega I* Litigation, *Omega III* Litigation or the Cancellation
> Proceedings.

Riggs Dec. ¶ 15 and Ex. L ¶ B(3).

OSA points to OEI's use of Omega trademarks on products that contain a timing feature

as infringing conduct. Pl. Memo. Opp. Summ. J. at 10-11. OSA argues that the OEI products

are not advertised as "period timers;" rather they are marketed simply as "timers." *Id.* In the

settlement agreement, however, OSA specifically agreed that it would not make any claims in

this case relating to OEI's "application to register, registration or use by OEI of the Omega mark

or Omega design on period timers or industrial and scientific clocks." Settlement Agreement ¶

B.4. Although OSA challenges the accuracy of the term "period timers" in its briefs, OSA points

to no evidence raising a triable issue of material fact concerning whether those products

associated with OEI's Omega trademarks are not "period timers" or "industrial and scientific

clocks." In other words, the settlement agreement's references to "period timers or industrial and scientific clocks" are – based on the evidence before the court, such as the deposition testimony of M. Hollander – descriptions of the products challenged by OSA. There is no evidence to support a finding that the products that contain a timing function and cited by OSA as infringing or falsely designated are not covered by the settlement agreement. OSA focused its arguments on disputing the validity of the agreement, but apparently, does not dispute that the agreement covers the principal products at issue in this litigation.

The Court enforced the settlement in *Omega I* despite OSA's claims that counsel and the company representative did not have authority to agree to it. *Omega I*, 2004 WL 2191588. That decision is on appeal to the Second Circuit Court of Appeals, but because the District Court's ruling was never stayed, it is in force and precludes OSA's claims of trademark infringement and false designation insofar as they are based on conduct covered by the *Omega I* settlement agreement.

3. *Likelihood of Confusion*

Even if the Second Circuit vacates Judge Covello's order enforcing the settlement agreement in *Omega I* or otherwise holds that OSA did not consent to OEI's use of Omega trademarks in the fields of science and industry, the plaintiff has failed to raise a triable issue of material fact concerning the central question of its trademark infringement and false designation of origin claims: the likelihood of confusion. Likewise, with respect to OEI products that might not be covered by the agreement, *e.g.*, the watch batteries, OEI has failed to raise a genuine issue of material fact concerning the likelihood of confusion.

Claims of trademark infringement and false designation of origin are guided by the same

inquiry: "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.'" *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985), *citing Mushroom Makers, Inc. v. R.G. Barry Corp.*, 560 F.2d 44, 47 (2d Cir. 1978). "To support a finding of infringement, there must be a probability of confusion, not a mere possibility." *Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citation omitted).

When determining whether there is a likelihood of confusion, courts in the Second Circuit are guided by the so-called *Polaroid* factors, a non-exhaustive list that includes: (1) the strength of the mark, (2) the degree of similarity between the marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge the gap, (5) actual confusion, (6) the defendant's good faith in adopting its own mark, (7) the quality of defendant's product, and (8) the sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). "Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Playtex Products*, 390 F.3d at 162. District courts generally should not treat any one factor as dispositive; nor should the courts use a mechanical process by which the party with the greater number of factors prevails. *Id.* Instead, courts should focus on the ultimate inquiry of consumer confusion. *Id.*

Although some of the *Polaroid* factors do favor OSA, the overall analysis and ultimate inquiry lead to the conclusion that a reasonable fact-finder could not find that OSA has

established a probability of consumer confusion.[6]  Because OSA has failed to raise a genuine

issue of material fact concerning consumer confusion, summary judgment is properly granted to

OEI on those claims even if OSA has not consented to OEI's use of the Omega marks.

a.       Strength of the Mark

The strength of OSA's marks (encompassing both the word "Omega" and the Greek

letter) is indisputable, and they enjoy both inherent and acquired distinctiveness.  "Omega" is not

a generic or descriptive mark, but an inherently distinctive mark best qualified as "arbitrary or

fanciful in relation to the products (or services) on which [it] is used."  *Virgin Enterprises Ltd. v.*

*Nawab*, 335 F.3d 141, 147 (2d Cir. 2003); *see Omega II*, 228 F. Supp. 2d at 123 (holding that for

purposes of anti-cybersquatting act, OSA's Omega marks used in connection with manufacture

and sale of watches, clocks, and electronic timing equipment are inherently distinctive).

Additionally, OSA's Omega marks have acquired distinctiveness.  Although OSA produced

minimal evidence on this point, "Omega" is widely recognized among consumers as a mark

associated with OSA's timekeeping products.  *See Virgin*, 335 F.3d at 148.

The first *Polaroid* factor favors OSA.

b.       Degree of Similarity Between the Marks

OEI's existing marks are: '705 (ΩE, the "Omega bug"), '762 (OMEGA) (covering

industrial and scientific products, including so-called period timers), and '657 (OMEGA)

(covering telecommunications and computer transmissions).  The Omega bug differs from

---

[6] As discussed above, applying to register a trademark cannot give rise to a claim of trademark infringement or a claim of false designation of origin; accordingly, pending applications '374 (Ω.com), '450 (Ω), and '073 (OM€GA) need not be considered in the *Polaroid* analysis.

OSA's marks, but the word mark "OMEGA" is, in effect, identical to OSA's mark. Although

OEI's brief discusses OEI's association with the United States, and OSA's identity as a Swiss

company in an attempt to disassociate the marks, the parties do not genuinely dispute the marks'

similarity.

Accordingly, the second *Polaroid* factor also favors OSA.

c.     Proximity of the Marks

The evidence in the record shows that OEI and OSA operate in different areas of

commerce. A reasonable fact-finder could not conclude otherwise. In the United States, OSA

sells upscale watches, jewelry, related products and services, timekeeping equipment for athletic

competitions, and large-scale display boards. OEI sells process measurement and control

devices. Although OSA attacks OEI's use of the phrase "science and industry," to describe the

market it targets, the parties have used the phrase "science and industry" to distinguish OEI's

market from OSA's. Even though both companies might share customers, because OEI and

OSA "are operating in completely different areas of commerce, consumers are less likely to

assume that their similarly branded products come from the same source." *Virgin*, 335 F.3d at

150.

OSA also points to online marketing of OEI products to argue that the parties' products

are proximate. First, OSA relies on two web pages that were reached as a result of searches on

OEI's web site. Pl. Memo Supp. Summ. J. at 30.[7] Those two pages show products, a "large

clock display" and "6-digit process timer/controller/clocks," displayed next to a wristwatch and

---

[7] Although OSA's brief mentions the web pages in the context of its motion for summary
judgment on its unfair competition claim, the likelihood of confusion analysis is the same.

stopwatch, respectively.  Exs. 29 (G) and (H) to doc. # 119-2.  The two OEI products are not,

however, marketed as Omega products; rather they are distributed by Newport Electronics – a

company affiliated with OEI – and show a Newport mark, not an Omega mark.  *Id.*  According to

the declaration of Jason Fredman, who conducted the searches of OEI's website and identified

the two products advertised near the wristwatch and stopwatch, he chose to search in the

databases of both Newport Electronics and Omega Engineering.  Ex. 29 at ¶ 2.  Although he

originated the search on OEI's homepage, the web page print-outs in Exs. 29 (G) and (H) do not

show the word "Omega" or the design mark "Ω."  Furthermore, the URLs corresponding to those

pages are under the domains: www.newportshop.com and www.newportinc.com.  Exs. 29 (G)

and (H).  The placement of a stopwatch and wristwatch near two Newport products on a Newport

domain is insufficient to raise a material issue of fact regarding the proximity of OEI's and

OSA's products.

Likewise, the web page print-outs of OSA's Powertime hand-held computer and OEI's

HH550, a graphic recorder/datalogger/data printer, do not raise a genuine issue of material fact

concerning the third *Polaroid* factor.[8]  The products are a similar shape and both contain a digital

display and printing capabilities, but the Powertime computer and HH550 graphic recorder are

not used in the same fields or for the same or similar purposes.  According to the web pages, the

PowerTime is a "hand-held timing system  . . . being used for a range of sports as diverse as

swimming, track, marathon . . ." whereas the HH550 is used for "datalogging for data recording,

---

[8] OSA attached the print-outs to its sur-reply memorandum in opposition to OEI's motion
for summary judgment (doc. # 160) and refers to the advertised products as "similar goods."  Pl.
Sur-Reply Opp. Summ. J. at 3, n.3.  Thus, it appears that OSA includes the exhibits as evidence
of the proximity of the parties' marks.

storing and analysis . . . [and is] ideal for laboratory & process engineering."

  The third *Polaroid* factor favors OEI.

    d.   Likelihood that the Prior Owner Will Bridge the Gap

  The "bridge the gap" factor recognizes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (internal quotation marks and citation omitted). Because OSA has failed to produce evidence regarding its interest in entering into fields related to OEI's product lines, the fifth factor favors OEI.

  OSA's briefs discuss at length the history of OSA and its predominance in the field of timepieces relating to sports and space exploration. *E.g.*, Pl. Memo Opp. Summ. J. at 15-18. OSA also emphasizes its rights to the Omega marks within its "natural zone of expansion." *See Brookfield Communications*, 174 F.3d at 1047 (9th Cir. 1999). OSA has not, however, presented evidence raising a triable issue of fact with respect to the likelihood that OSA will bridge the gap or the contention that its "natural zone of expansion" extends into OEI's market of thermocouples and other industrial and scientific apparatus.

  OSA points to the following evidence concerning its historical product expansion: OSA's expansion from its original use of the mark on watches (Ex. 1 to doc. # 119-1) to sports timing equipment (Reilly Dec. Ex. J; Emmons Dep. at 151) to sports display boards (Gibbons Dep. at 112-15) to passenger information systems.[9] In an effort to illustrate OSA's purported expansion into OEI's market and industry, OSA argues that it "offers high performance and precision

---

  [9] In its brief, OSA mentions the display boards without citing to evidence in the record. Pl. Memo. Opp. Summ. J. at 16

timepieces with scientific and industrial applications." Pl. Memo. Opp. Summ. J. at 16. The only evidence in support of this contention consists of evidence relating to two lines of watches. First, OSA points to its Seamaster collection, a collection of watches used by scuba divers and others due to its "precise underwater performance and ability to withstand demanding conditions." *Id.*, *citing* Reilly Dec. Ex. G. Second, OSA points to its Speedmaster collection of watches, the official watches of NASA astronauts and the only watches ever worn on the moon. *Id.* at 17.

In addition, there is minimal evidence concerning the sale of "watch batteries" on OEI's website, and OSA relies on that evidence to argue that there is, in fact, no gap to bridge because "the goods are exactly the same." Pl. Memo Supp. Summ. J. at 31. A web page print-out, showing the product number PH-BATT-3 labeled "watch batteries," and a one-page "investigation report" that summarized the sale of two watch batteries are insufficient to raise a material issue of fact concerning the "bridge the gap" factor. Exs. 30-31 to doc. # 119-2.

Although OSA argues that further businesses "have been developed and are on the horizon," OSA fails to cite evidence in the record to support its contention that OSA is likely to bridge the gap between its product lines and OEI's product lines or that OSA's natural zone of expansion includes OEI's market of scientific and industrial process controls and measuring apparatus. Conceivably, OSA may seek to expand its market into the technical fields inhabited by OEI. The evidence in the record, however, tips in favor of OEI on this fourth *Polaroid* factor.

e.    Actual Confusion

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *The Sports Authority, Inc. v.*

*Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996) (internal quotation marks and citation omitted).

There is negligible evidence regarding any actual confusion among consumers. OSA has presented only two examples of customer confusion, and that evidence does not support the contention that customers were confused with respect to the products' source. In 2000 or 2001, Daktronics, the former distributor of OSA's Omega Electronics in the United States, received an order for an OEI product. Sauser Rupp Dep. at 140. In June of 2004, a German customer sent a request to OSA or an OSA subsidiary in Switzerland, requesting a quote for a list of OEI items. Reilly Dec. Ex. L. Those two communications are the only evidence of actual consumer confusion relating to OSA and OEI. Unlike other cases in which evidence of actual confusion included not only misdirected communications but also mistaken beliefs that products or services were associated with unaffiliated companies, OSA has produced no evidence that the confused customers were mistaken with respect to the source of goods rather than, for example, merely with respect to telephone or fax numbers. *Cf. The Sports Authority*, 89 F.3d at 964 (holding that evidence of misdirected phone calls, especially the evidence that customers have believed there to be a connection between the defendant and plaintiff companies, raised triable issue of fact concerning actual confusion); *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999) (noting that evidence that consumers placed phone calls to the wrong party *and* mistakenly believed that plaintiff's and defendant's services were affiliated because of their similar names).

Unlike the plaintiffs in *Morningside* and *Sports Authority*, OSA has failed to present evidence to the court concerning "actual confusion as to sponsorship or affiliation." *Morningside*

*Group*, 183 F.3d at 142.  Two misdirected communications over a five-year span with no evidence that the customers believed OEI's products were associated or affiliated with OSA do not present a triable issue of fact with respect to actual confusion.  "[T]he fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper."  *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118, n.8 (2d Cir. 1984).

Thus, the fifth *Polaroid* factor favors OEI.

### f.     Defendant's Good Faith in Adopting its Mark

The evidence before the court supports OEI's good faith in adopting its Omega mark despite some questionable conduct on the part of OEI.[10]  "The good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product."  *Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d Cir. 2004) (internal quotation marks and citation omitted).  Prior knowledge of a senior user's trademark is not inconsistent with good faith.  *Id.*; *Arrow Fastener Co., Inc. v. The Stanley Works*, 59 F.3d 384, 397.

The plaintiff has failed to raise a genuine issue of fact regarding OEI's alleged bad faith. There is a wealth of evidence concerning trademark disputes between OSA and OEI over the past decade, but that evidence does not support the inference that OEI intended to capitalize on OSA's reputation and goodwill or on any confusion between OEI's and OSA's products. Furthermore, the only conduct relevant to the *Polaroid* analysis relates to existing registrations

---

[10] For example, as acknowledged during oral arguments, OEI has attempted to register the Omega mark for "jewelry for use in science and industry."

-24-

and products in commerce – not pending trademark applications.  There is no evidence to support

bad faith, *i.e.*, adopting a mark with the intention of capitalizing on OSA's reputation and

goodwill and on any confusion between OEI's and OSA's products.

OSA's briefs discuss OEI's bad faith "boxing in," describing the filing of certain

trademark applications as conduct that might prevent OSA, the senior user, from using Omega

marks within its natural zone of expansion.  The pending applications are not relevant to the

*Polaroid* analysis, however, because OEI has not used those marks in commerce.  Thus, even if

those filings do illustrate a kind of bad faith on the part of OEI, they do not constitute bad faith in

the likelihood of confusion analysis for claims of trademark infringement and false designation

of origin.

The sixth *Polaroid* factor weighs in favor of OEI.

### g.     Quality of the Defendant's Product

Generally, quality is weighed against the defendant only "when there is an allegation that

a low quality product is taking unfair advantage of the public good will earned by a

well-established high quality product."  *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991

F.2d 1072, 1079 (2d Cir. 1993).   There is no evidence in the record supporting the suggestion

that OEI's products are of low quality.

The seventh *Polaroid* factor weighs in favor of OEI.

### h.     Sophistication of the Buyers

When considering the buyers' sophistication, the trial court must consider the "general

impression of the ordinary consumer, buying under normal market conditions and giving the

attention such purchasers usually give in purchasing the product at issue."  *Streetwise Maps, Inc.*

*v. VanDam, Inc.*, 159 F.3d 739, 746 (2d Cir. 1998).  OSA has failed to raise a triable issue of material fact concerning buyers' sophistication.  The evidence in the record supports OEI's contention that buyers of OSA's watches, sports timing devices, and display boards as well as buyers of OEI's scientific instruments would generally exercise significant attention when purchasing such products.  The only evidence arguably supporting OSA's contention is that OEI's products are available to anyone with access to the Internet.

Accordingly, the eighth *Polaroid* factor also weighs in favor of OEI.

### i.     Conclusion

As noted above, the proper balancing of the *Polaroid* factors is a question of law when the predicate facts are beyond dispute.  *Playtex Products*, 390 F.3d at 162.  Despite the strength of OSA's mark and the similarities between OEI's and OSA's marks, OSA has failed to raise a triable issue of fact regarding the ultimate question whether customers are likely to be confused. The products are not similar; the parties do not operate in the same areas of commerce; there is negligible evidence that OEI is likely to bridge the gap between the two lines of products and negligible evidence of actual confusion; OEI has not attempted to capitalize on OSA's reputation and goodwill; OEI's products are not of low quality; purchasers of both OEI and OSA products are sophisticated.

Based on OSA's consent to OEI's use of the Omega marks and the absence of evidence raising a material issue of fact concerning the likelihood of consumer confusion, I grant OEI's motion for summary judgment on counts one and five: trademark infringement and false designation of origin.

C.    Unfair Competition Claims

In addition to its trademark infringement and false designation of origin claims, OSA has asserted a claim of unfair competition under the Lanham Act, 15 U.S.C. § 1225(a).  OSA has also raised a state law claim of unfair competition under CUTPA.  Both parties have moved for summary judgment on OSA's claims of unfair competition.

OSA contends that the following conduct constitutes unfair competition in violation of the Lanham Act and CUTPA: (1) pursuit of Omega trademark registrations in the United States and Europe on products with which it has no business connection in order to "block" OSA from filing similar registrations; (2) pursuit of trademark registrations on products that are similar to OSA's products; (3) Benelux trademark registrations of omegawatch.com and omegatime.com without the intent to use those marks or domain names in the Benelux (Belgium, Netherlands, and Luxembourg);[11] (4) efforts to register so-called "period timers" and "industrial clocks" under the Omega mark; and (5) advertising and marketing practices that show OEI products displayed next to a watch or stopwatch.

1.    *Lanham Act*

As with its claims for trademark infringement and false designation of origin, to establish a violation of the Lanham Act for unfair competition, OSA must show a likelihood of confusion between its products and OEI's products.  Additionally, OSA must show a substantial effect on

_____

[11] OSA's briefs refer to the "Benelux trademark registrations" for omegawatch.com and omegatime.com.  *E.g.*, Pl. Memo Supp. Summ. J. at 17; Exs. 33-34 to Doc. # 119-2.  OSA also, however, discusses Judge Arteron's decision in *Omega II*, the anti-cybersquatting suit relating to the omegawatch.com and omegatime.com *domain names*.  *Omega II*, 228 F. Supp. 2d at 116-18.  There is no evidence in the record regarding the use of those domain names as a basis for consumer confusion, nor does OSA argue that the registration of those domain names or their use constitutes conduct in violation of the Lanham Act.

United States commerce in order to establish a violation of the Lanham Act based on unfair competition. As discussed above, OSA has not raised a triable issue of fact with respect to consumer confusion. Furthermore OSA has failed to point to evidence of any effect on U.S. commerce resulting from OEI's conduct.

OSA has failed to raise a genuine issue of material fact with respect to whether the attempts to register trademarks in the United States, U.S. trademark registrations, and online advertising and marketing, cause a likelihood of consumer confusion, a necessary element of a Lanham Act claim of unfair competition. "Where marks are too dissimilar to support a claim for trademark infringement, they are likewise too dissimilar to support [a claim] for unfair competition." *Playtex Products*, 390 F.3d at 167.

OSA also points to OEI's conduct abroad relating to foreign trademark applications and registrations to argue that OEI has engaged in unfair competition abroad in violation of the Lanham Act. Because OSA has failed to raise a triable issue of fact regarding any effect of that conduct on United States commerce, the Lanham Act does not apply and OSA's claim fails as a matter of law.

### a.     Foreign Filings

Generally, in order to apply the Lanham Act extraterritorially, the plaintiff must show that the defendant's conduct abroad has had "substantial effect on United States commerce," one of the three so-called "*Vanity Fair* factors."[12]  *See Atlantic Richfield Co.*, 150 F.3d at 192, n.4 (2d

---

[12] The other two *Vanity Fair* factors are: "whether the defendant is a United States citizen . . . [and] whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law." *Atlantic Richfield Co. v. Arco Globus Int'l Co., Inc.*, 150 F.3d 189, 192 (2d Cir. 1998); *see also Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956).

Cir. 1998) (discussing the three factors and noting that the Court has "never applied the Lanham Act to extraterritorial conduct absent a substantial effect on United States commerce").

The two cases on which OSA relies do not support its argument in favor of applying the Lanham Act to OEI's foreign conduct.  In *Ramirez & Feraud Chili Co. v. Las Palmas Food Co., Inc.*, 146 F. Supp. 594, 598 (S.D. Cal. 1956), the conduct at issue was not the mere filing of Mexican trademarks, but involved the use of a deliberate counterfeit of the plaintiff's label that embodied not only the identical trademark but also the exact colors, format, and style of printing and a similar layout and design.  The Court discussed the effect on commerce in the United States, including harm to the plaintiff's reputation and good will and drastic decreases in purchases of its products in the United States.  *Id.* at 599.  In addressing the reach of the Lanham Act, the Court noted that "national sovereignty is the power to impose, even upon foreigners owing no allegiance, liability for acts done abroad *which proximately cause damage within the territorial limits of the sovereign*."  *Id.* at 600 (emphasis added).  In particular, the Court emphasized that the *Ramirez* case involved "not only unfair trade practices committed by an American citizen in Mexico 'which radiate unlawful consequences here,' but also acts committed in the United States which clearly violate the Lanham Act." *Id.* at 601-02.

OSA also relies on *A.V. by Versace v. Gianni Versace*, 126 F. Supp. 2d 328 (S.D.N.Y. 2001).  In *Versace*, the Court applied the Lanham Act extraterritorially to enjoin infringing actions that occurred outside the United States, emphasizing that all three *Vanity Fair* factors supported the extraterritorial application of the Lanham Act.  *Id.* at 341.  The Court noted that foreign imports used to further the allegedly infringing scheme, the orchestration of foreign activities from the United States, and the high probability of consumer confusion in the United

States and abroad "clearly establish a substantial effect on U.S. commerce." *Id.*

OSA has failed to point to any evidence in the record showing that OEI's foreign filings

have had any effect whatsoever on United States commerce.

2.     *CUTPA*

The Connecticut Unfair Trade Practices Act proscribes "unfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.

Stat. § 42-110b(a). The statute defines "trade or commerce" as "the advertising, the sale or rent

or lease, the offering for sale or rent or lease, or the distribution of any services and any property,

tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of

value in this state." Conn. Gen. Stat. § 42-110b(a)(4).

The Connecticut Supreme Court has established the following criteria to be employed

when determining whether a practice violates CUTPA:

> (1) Whether the practice, without necessarily having been previously
> considered unlawful, offends public policy as it has been established by
> statutes, the common law, or otherwise – whether, in other words, it is within
> at least the penumbra of some common law, statutory, or other established
> concept of unfairness; (2) whether it is immoral, unethical, oppressive, or
> unscrupulous; (3) whether it causes substantial injury to consumers,
> competitors or other businessmen.

*Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355 (1987) (internal

citation omitted).

Courts in Connecticut have held that a finding of likelihood of confusion under the

Lanham Act establishes a violation of CUTPA based on unfair competition. *E.g.*, *Nabisco*

*Brands, Inc. v. Kaye*, 760 F. Supp. 25, 29 (D. Conn. 1991). OSA has not, however, raised a

triable issue of material fact with respect to the likelihood of confusion. In addition, OSA has

not pointed to conduct that could be classified as "immoral, unethical, oppressive, or unscrupulous" and has only pointed to its own efforts to defend its trademarks as evidence of injury.[13]  That is insufficient to establish "substantial injury to consumers, competitors or other businessmen."  Accordingly, OSA's CUTPA claim fails as a matter of law.

      D.    <u>Dilution</u>

OEI has also moved for summary judgment on OSA's count six, trademark dilution under the Lanham Act.  To succeed in a claim of trademark dilution, a plaintiff must establish:

> (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

*Savin Corp.*, 391 F.3d at 449.  The first three elements are not genuinely in dispute.  OSA has failed, however, to produce any evidence of the fourth element, *i.e.*, actual dilution.  It is an essential element of a federal trademark dilution claim that the plaintiff show "actual dilution, rather than a likelihood of dilution."  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003); *see also Savin Corp.*, 391 F.3d at 449.

Because OSA has failed to produce any evidence that OEI's use of Omega marks actually diluted OSA's marks, OSA's claim of dilution fails as a matter of law.

      E.    <u>Cancellation of OSA's Trademark Registration Due to Abandonment and Fraud</u>

OEI has moved for summary judgment on its second counterclaim, seeking cancellation of certain OSA registered trademarks.  OEI argues that trademark Registration Nos. 708,731 and

---

[13] OSA has also argued that the potential dilution of its trademark satisfies the required showing of injury but has failed to produce any evidence of dilution or potential dilution.  Pl. Reply Memo. Supp. Summ. J. (doc. # 151) at 4.

1,290,661 should be cancelled due to fraud on the PTO and abandonment.

        1.     *Fraud on the PTO*

       "A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'" *Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988). "Fraud in procuring a . . . mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999) (citation omitted).

       OEI has not produced evidence in support of the required element of fraudulent intent. Rather, OEI merely relies on the testimony of OSA's witnesses who testified, in general, that they had "no knowledge" concerning the sale of goods intended for use in science and industry. Emmons Tr. 10-12; Kayal Tr. 224-45; Gibbons Tr. 142-45, 153; Sauser Rupp Tr. 252, 270-72.

       To contest OEI's allegations, OSA has submitted minimal evidence. At summary judgment, however, I must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in OSA's favor. OSA provided a supplemental declaration of Hamid Kayal, General Manager of OSA's Omega Electronics, who stated simply: "Omega Electronics's devices have scientific and industrial applications," and referred to one example, a University of Michigan study that used a Scan-O-Vision camera in or around 1997, as well as scientific applications that are "well documented in the book *Omega Saga*," of which excerpts in French were attached to the declaration.

       A reasonable fact-finder could conclude that OEI has not met the burden of establishing by "clear and convincing evidence" that OSA knowingly made false, material representations of

facts on its trademark applications and renewals.  Accordingly, summary judgment in favor of

OEI based on OSA's alleged fraud on the PTO is not appropriate.

2.     *Abandonment*

"To determine that a trademark or trade name is abandoned, two elements must be

satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume

use in the reasonably foreseeable future."  *Stetson v. Howard D. Wolf and Associates*, 955 F.2d

847, 850 (2d Cir. 1992).  "Two years of non-use creates a rebuttable presumption of

abandonment."  *Id.* (citation omitted).  Again, although OSA has offered minimal evidence, that

evidence is sufficient to withstand summary judgment.  First, with respect to Registration No.

'661, there appears to be no question that OSA has continued to use '661 in sporting events, but

OEI appears to seek cancellation of that registered trademark in its entirety.[14]  Second, although

sparse, there is evidence on which a fact-finder could conclude that OSA has not abandoned the

two registered trademarks at all, including those aspects related to "science and industry."  The

language relating to "science and industry" in '731 and to "scientific investigation and industrial

application" in '661 is vague, but a reasonable fact-finder could conclude that they cover OSA's

space-related activities.  Thus, based on the evidence in the record, a reasonable fact-finder could

conclude that OSA's '731 and '661 marks have continued to be used.  Summary judgment based

on abandonment is not appropriate.

---

[14] A registration may be canceled "in whole" or "in part."  15 U.S.C.  § 1119.  *See
also Levi Strauss & Co. v. GTFM, Inc.*, 196 F. Supp. 2d 971, 975 (N.D. Cal. 2002).  OEI has not
moved for cancellation in part.

F.      OEI's Cybersquatting Counterclaim

OSA and Swatch[15] have moved for summary judgment on OEI's cybersquatting

counterclaim relating to the registration of the domain name omega.us.  Federal law imposes

civil liability for "cyberpiracy," in cases of "bad faith intent to profit" from another's mark.  15

U.S.C. § 1125(d)(1)(A)(i).  The statute provides that "bad faith intent  . . . shall not be found in

any case in which the court determines that the person believed and had reasonable grounds to

believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. §

1225(d)(1)(B)(ii).

The evidence in the record sets forth the process for registering a domain name with a .us

top-level domain ("usTLD").  Exs. E-F to doc. # 119-3.[16]  The so-called Sunrise application

process permitted persons or entities, including foreign entities with a presence in the United

States, to register for a usTLD, in advance of general registration, if they held a U.S. federal

trademark registration or application on the PTO's Principal Register.  Ex. E to doc. # 119-3.

Because multiple trademark owners might apply for the same usTLD domain name, a random

selection process assigned domain names for which there were multiple qualified applicants.  *Id.*


The only evidence OEI has presented in support of the necessary element of bad faith

intent relates to the application by Swatch, rather than OSA, for omega.us.  Because Swatch,

---

[15] Although the original motion appeared to be filed only on behalf of OSA, at oral
argument counsel for third-party defendants OSA and Swatch confirmed that Swatch joined in
the motion for summary judgment on OEI's counterclaim of cybersquatting.

[16] As noted above, OEI has moved to strike those exhibits as hearsay.  Because the
exhibits gather publicly available information that would be admissible at trial and OEI does not
dispute the details of the application process, I have considered the exhibits.

OSA's parent company, was not the owner of record of the Omega trademarks, OEI asserts that

Swatch's application for <u>omega.us</u> constitutes bad faith.  The application, however, indicates that

Swatch's application was on behalf of OSA, the holder of Omega trademarks in the United States

and Swatch's subsidiary.  Ex. G to doc. # 119-3.  OEI also argues that the foreign identity of the

defendants supports OEI's claim of bad faith intent in registering for a usTLD domain name.

Swatch and OSA's identities as Swiss – not American – companies in no way supports OEI's

allegations of bad faith intent.  The Sunrise application process permitted owners of United

States trademark registrations or applications to apply for a usTLD.  The applicants did not need

to be domestic entities.  Finally, OEI points out that Swatch has not yet made use of <u>omega.us</u>;

that evidence alone is not sufficient for a fact-finder to conclude that Swatch applied for the

domain name with a bad faith intent to profit from OEI's mark.

In short, OEI has presented no evidence that would permit a reasonable fact-finder to

conclude that Swatch did not have reasonable grounds to believe that "the use of the domain

name was a fair use or otherwise lawful." 15 U.S.C. § 1225(d)(1)(B)(ii).  Accordingly, OSA's

motion for summary judgment on OEI's counterclaim of cybersquatting is granted.

## IV.    Conclusion

OSA's motion for partial summary judgment (doc. # 116) is DENIED with respect to

counts one and five, trademark infringement and false designation of origin.  OSA's motion (doc.

# 116) is GRANTED with respect to OEI's counterclaim of cybersquatting.

OEI's motion for summary judgment on OSA's five claims (doc. # 101) is GRANTED.

OEI's motion for partial summary judgment on its counterclaim seeking cancellation of OSA'

trademark registration (doc. # 102) is DENIED.  OSA's motion to strike OEI's partial motion for

summary judgment (doc. # 130) is DENIED.

OEI's motion to preclude the supplemental statement of facts and affidavits (doc. # 161) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this  30th  day of September 2005.

/s/_____
                    Stefan R. Underhill
                    United States District Judge