# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| OMEGA, S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMEGA ENGINEERING, INC., | ) |
| OMEGA SCIENTIFIC, INC., and | ) |
| OMEGA PRESS, INC., | ) |
| | ) Civil Action No.: |
| Defendants. | ) 3:01 CV 2104 (SRU) |
| | ) |
| OMEGA ENGINEERING, INC., | ) |
| | ) |
| Counterclaim-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMEGA, S.A. and | ) |
| THE SWATCH GROUP LTD., | ) |
| | ) |
| Counterclaim-Defendants. | ) |

_____ )

## JOINT TRIAL MEMORANDUM

Having conferred between themselves pursuant to Fed. R. Civ. P. 16, Defendant-

Counterclaim-Plaintiff Omega Engineering, Inc. ("OEI") and Plaintiff-Counterclaim-Defendant

Omega, S.A. ("OSA"), submit the following Joint Trial Memorandum:

1.    **TRIAL COUNSEL**

      a.    For Counterclaim-Plaintiffs:

           Thomas A. Smart
           Paul C. Llewellyn
           Victoria Haje
           KAYE SCHOLER LLP
           425 Park Avenue
           New York, New York  10022

Tel.:  (212) 836-8000
Fax:  (212) 836-6463

Thomas E. Minogue
MINOGUE BIRNBAUM LLP
237 Elm Street
New Canaan, CT  06840
Tel.:  (203) 966-6916
Fax:  (203) 966-6917

b.     For Counterclaim-Defendants:

Jess M. Collen
Matthew Wagner
Philip J. Miolene
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Ossining, New York  10562
Tel.:  (914) 941-5668
Fax:  (914) 941-6091

Paul A. Fattibene
Arthur T. Fattibene
FATTIBENE & FATTIBENE
2480 Post Road
Southport, CT 06490
Tel.:  (203) 255-4400
Fax:  (203) 259-0033

2.     **JURISDICTION**

This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332,

1338 and 1367.

3.    **JURY TRIAL**

*OEI Statement:*

OEI has moved the Court for an order of voluntary dismissal with prejudice of four of OEI's six remaining counterclaims in this action – Counterclaim Three, for trademark infringement under 15 U.S.C. § 1114; Counterclaim Four, for unfair competition and false designation of origin under 15 U.S.C. § 1125(a); Counterclaim Six, for federal trademark dilution under 15 U.S.C. § 1125(c); and Counterclaim Seven, for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stats. §§ 42-110a, *et seq.  See* Motion and Incorporated Memorandum of Law to Voluntarily Dismiss Certain Counterclaims and to Strike Jury Demand, filed November 7, 2005.  OSA also have waived its claims for damages and profits on its remaining counterclaims, and has moved the Court to strike the jury demand in this action on the ground that no claim remains in this action that is triable to a jury, and, therefore, that this case should be tried to the Court.  *See id.*  OEI had previously requested that OSA stipulate to the foregoing dismissal of claims and withdrawal of the jury demand, but, as of November 7, 2005 when OEI filed its Motion to Voluntarily Dismiss Certain Counterclaims and to Strike Jury Demand, OSA had not indicated whether it would consent to the dismissal of claims and withdrawal of the jury demand.

*OSA Statement:*

OSA recognizes that OEI moved to voluntarily dismiss certain claims and waive claims to damages on November 7, 2005.  OSA's response is due by December 1, 2005.  OSA is unable to consent to OEI's motion at this time.[1]

---

[1]    While OSA is not in a position to consent to OEI's voluntary dismissal, OEI has represented that it does not plan to pursue its remaining claims and also waives it claims

(continued...)

4.      **LENGTH OF TRIAL**

Counsel estimate a total of two to three days of trial.

5.      **FURTHER PROCEEDINGS**

The parties will file their objections to evidence and *in limine* motions in accordance with the September 27, 2005 Pre-Trial Order.

As set forth above, on November 7, 2005, OEI filed its Motion to Voluntarily Dismiss Certain Counterclaims and to Strike Jury Demand, which is pending.

On October 18, 2005, OSA filed its Motion for Reconsideration of the Court's Order Entered on October 3, 2005 on the Parties' Cross-Motions for Summary Judgment, which is pending.

6.      **NATURE OF THE CASE**

(a)      ***Breach of Contract***

*OEI Statement:*

OEI alleges that OSA breached Paragraph 4(b) of the parties' 1994 Agreement by maintaining, or causing to be maintained, United States registration numbers 708,731 and 1,290,661 for apparatus industrially and/or scientifically employed for measuring or controlling variable parameters, including, in particular, the following goods:

Reg. No. 1,290,661:   computer apparatus for controlling the measurement of time and distance for . . . scientific investigation, and industrial application.

computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form,

---

[1]      (...continued)
for damages, fees and costs against The Swatch Group Ltd. with respect to the counterclaims that it seeks to voluntarily dismiss.  As a result, it seems unlikely that The Swatch Group Ltd. will remain a party to this action.

Reg. No. 708,731:    electronic time recorders for automatic precision timing in science and industry

*OSA Statement:*

OSA denies that it has breached Paragraph 4 (b) of the 1994 Agreement.

(b)    ***Cancellation of United States Trademark Registrations Nos. 708,731 and 1,290,661 For Abandonment and Fraud Under 15 U.S.C. §§ 1064 and 1119***

*OEI Statement:*

OEI seeks cancellation in whole or in part of OSA's Registration Nos. 708,731 and 1,290,661, pursuant to 15 U.S.C. § 1064(3) and 15 U.S.C. §1119 on the grounds of abandonment and fraud.  OSA has abandoned the OMEGA marks in commerce in the United States for "electronic time recorders for automatic precision timing in science and industry" as recited in Registration No. 708,731.  OSA also has abandoned use of the OMEGA marks in commerce in the United States for, *inter alia*, "computer apparatus for checking and controlling the measurement of time and distance for . . . scientific investigation, and industrial application, including the acquisition, transmission, and management of information intended for transportation, publicity, and financial use; computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form," as recited in Registration No. 1,290,661.

As a separate and independent ground for cancellation, OEI will show that OSA has fraudulently maintained Registration Nos. 708,731 and 1,290,661 in whole or in part by filing renewal affidavits and maintaining registrations that falsely stated that its OMEGA mark was in use in commerce on "electronic time recorders for automatic precision timing in science and industry" (Registration No. 708,731) and on "computer apparatus for controlling the measurement of time and distance for . . . scientific investigation, and industrial application" and

"computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form."  (Registration No. 1,290,661).  OEI will show that no goods intended for use in "science or industry," or "scientific investigation and industrial application," as those terms are used in Registration Nos. 708,731 and 1,290,661, were sold in the United States under OSA's OMEGA marks at the time that OSA's renewals were filed, or are sold in the United States under OSA's OMEGA marks today.

*OSA Statement:*

OSA has not abandoned the goods described in the subject registrations, and has committed no fraud with respect to the maintenance and/or renewal of these registrations. Further OEI cannot demonstrate that OSA intended or intends to abandon its trademarks or intends or intended to perpetrate a fraud on the PTO.  Thus, OSA denies that OEI can prove the grounds for cancellation, as set forth in 15 U.S.C. § 1119, exist.

7.     **STATEMENT OF THE CASE**

*OEI Statement:*

This is an action by OEI against OSA in which OEI contends that by maintaining the foregoing registrations, OSA has breached a 1994 settlement agreement between the parties pursuant to which OSA agreed not to register or maintain any registrations for OMEGA marks covering "Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow."  OEI further contends that two of OSA's federal trademark registrations for the mark OMEGA, Registration Nos. 708,731 and 1,290,661, should be cancelled in whole or in part for fraud or the Patent and Trademark Office and for

abandonment of the OMEGA mark with respect to the goods covered by the registrations as set forth in Section 6, *supra*.

*OSA Statement:*

OSA intends to demonstrate that OEI cannot prove that OSA did not use the goods as represented in the registrations, including as represented in any renewals.  OEI cannot prove that OSA that intends or intended to commit fraud or intends or intended to abandon the marks in question. OSA denies that it has breached the 1994 Agreement and denies that any grounds for cancellation of its registrations exist.

8.    **TRIAL BY MAGISTRATE JUDGE**

The parties do not consent to trial by a Magistrate Judge.

9.    **LIST OF WITNESSES**

(a)    The lists of OEI's witnesses and potential witnesses are attached as Exhibit A.

(b)    The lists of OSA's witnesses and potential witnesses are attached as Exhibit B.

10.    **DEPOSITION TESTIMONY**

OEI's list of deposition designations is attached as Exhibit C.  OSA's list of deposition designations and OEI's counter-designations and objections to OSA's deposition designations are attached as Exhibit D.

11.    **EXHIBITS**

OEI's exhibits and potential exhibits are listed in Exhibit E.  OSA's exhibits and potential exhibits are listed in Exhibit F.

12.    **ANTICIPATED EVIDENTIARY PROBLEMS/MOTIONS IN LIMINE**

A list of anticipated evidentiary problems is attached as Exhibit G.

13.    **STIPULATIONS OF FACT AND LAW**

The parties' stipulations of fact are attached as Exhibit H.  The parties statement of contested issues of fact and law is attached as Exhibit I.

14.   **TRIAL TO COURT/JURY**

OEI's proposed findings of fact and conclusions of law are attached as Exhibits J.[2]

OSA's proposed findings of fact and conclusions of law are attached as Exhibit K.

OSA's Proposed Voir Dire Questions are attached as Exhibit L.

OSA's Proposed Jury Instructions are attached as Exhibit M.

OSA's Proposed Verdict Instructions are attached as Exhibit N.

OSA's Proposed Case Statement is attached as Exhibit O.

Dated:  November 10, 2005

Respectfully submitted,

_____

Jess M. Collen (CT 20918)
Matthew Wagner (CT 25926)
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Ossining, New York  10562
Tel.:  (914) 941-5668
Fax:  (914) 941-6091

Paul A. Fattibene
Arthur T. Fattibene
FATTIBENE & FATTIBENE
2480 Post Road

_____

Thomas A. Smart (CT 21462)
Paul C. Llewellyn (CT 25417)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Tel.:  (212) 836-8761
Fax:  (212) 836-7154

Thomas E. Minogue (CT 06845)
MINOGUE BIRNBAUM LLP
237 Elm Street
New Canaan, CT  06840

---

[2]    Because OEI has moved to strike the jury demand in this case on the ground that no issues triable to a jury remain in the case, OEI has submitted proposed findings and conclusions rather than proposed jury instructions, proposed *voir dire* questions, verdict form and case statement.

Southport, CT 06490
Tel.:  (203) 255-4400
Fax:  (203) 259-0033

*Attorneys for Plaintiff Omega, S.A.*

Tel.:  (203) 966-6916
Fax:  (203) 966-6917

*Attorneys for Omega Engineering, Inc.,*
*Omega Press, and Omega Scientific, Inc.*

**Exhibit A:  Omega Engineering's List of Witnesses**

1.    **Witnesses OEI Expects to Call at Trial**

B. Christine Riggs
Omega Engineering, Inc.
One Omega Drive
Stamford, Connecticut

*Hours of testimony*:  1 hour
*Brief summary of anticipated testimony*:  OEI may call on Ms. Riggs to testify regarding the products OEI offers under the OMEGA marks, OEI's trademark registrations in the United States and potential injury from OSA's conduct.  Ms. Riggs may also testify regarding OEI's objections to certain trademark filings of OSA, and the parties' 1994 Agreement and its applicability to the case.

Christiane Sauser Rupp
Rue du Four 4, 1400
Yverdon, Switzerland

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Ms. Rupp to testify regarding OSA's trademark filings at issue in this case and concerning products sold or anticipated to be sold by OSA and its affiliates under the OMEGA marks.

Hanspeter Rentsch
Bangertli 12
Bettlach, Switzerland

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Mr. Rentsch to testify regarding OSA's trademark filings at issue in this case and concerning products sold or anticipated to be sold by OSA and its affiliates under the OMEGA marks.

<u>Robert Emmons</u>
28 Maurice Lane
Huntington, New York.

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Mr. Emmons to testify, or may rely on excerpts from Mr. Emmons' deposition testimony, regarding products sold or anticipated to be sold by OSA and its affiliates under the OMEGA marks.

<u>Guy Gibbons</u>
GDG, Inc.
1463 SE 8th Court
Deerfield Beach, Florida

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Mr. Gibbons to testify, or may rely on excerpts from Mr. Gibbons' deposition testimony, regarding products sold or anticipated to be sold by OSA and its affiliates under the OMEGA marks.

2.     **Witnesses OEI May Call at Trial if the Need Arises**

<u>Dr. William A. Drucker</u>
32 Lower Church Hill Road
Washington, Connecticut

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Dr. Drucker to testify regarding the negotiation, drafting and execution of the 1994 Agreement between OEI and OSA.

<u>Dr. Milton B. Hollander</u>
Omega Engineering, Inc.
One Omega Drive
Stamford, Connecticut

*Hours of testimony*:  30 minutes
*Brief summary of anticipated testimony*:  OEI may call on Dr. Hollander to testify regarding the products OEI offers under the OMEGA marks, OEI's trademark registrations in the United States, and OEI's objections to certain trademark filings of OSA.

**Exhibit B:  Omega S.A.'s List of Witnesses**

**A.**    **Witnesses OSA Expects to Call at Trial**

    1)    Hamid A. Kayal
        Rue de L 'Evole 120
        Neuchatel, Switzerland

    *Brief summary of anticipated testimony:*  Mr. Kayal will testify as to OSA products sold under Registration No. 1,290,661 and Registration No. 708, 731, the Omega Alize' Wind Gauge, the OMEGA SRFID and RFID devices, and the OMEGA "Powertime" device.  Mr. Kayal will also testify as to goods sold by OSA in the United States.

    2)    Guy D. Gibbons
        GDG Inc.
        1463 SE 8th Court
        Deerfield Beach, FL  33441

    *Brief summary of anticipated testimony:*  Mr. Gibbons will testify as to OSA products sold under Registration No. 1,290,661 and Registration No. 708, 731, the Omega Alize' Wind Gauge, the OMEGA SRFID and RFID devices, and the OMEGA "Powertime" device. Mr. Gibbons will also testify as to goods sold by OSA in the United States.

    3)    Robert Emmons
        The Swatch Group (US), Inc.
        1200 Harbor Boulevard, 7th Floor
        Weehawken, New Jersey

    *Brief summary of anticipated testimony:*  Mr. Emmons will testify as to OSA products sold under Registration No. 1,290,661 and Registration No. 708, 731, the Omega Alize' Wind Gauge, the OMEGA SRFID and RFID devices, and the OMEGA "Powertime" device. Mr. Emmons will also testify as to goods sold by OSA in the United States.

    4)    Christiane Sauser Rupp
        The Swatch Group Ltd.
        PO Box 1185
        Faubourg du lac, 6, CH 2501
        Bienne, Switzerland

    *Brief summary of anticipated testimony:*  Ms. Rupp will testify regarding OSA's trademark filings at issue, including specimens, renewals and maintenance. Ms. Rupp may also testify as to Omega, S.A. products sold in the United States.  Ms. Rupp will testify as to the negotiation, drafting, execution, and purpose of the 1994 Agreement between OSA and OEI.

**B.**    **Witnesses OSA May to Call at Trial**

1)      Hanspeter Rentsch
        The Swatch Group Ltd.
        PO Box 1185
        Fauburg du lac, 6, CH 2501
        Bienne, Switzerland

Mr. Rentsch may testify regarding OSA's trademark filings at issue, including specimens, renewals and maintenance. Mr. Rentsch may also testify as to Omega, S.A. products sold in the United States. Mr. Rupp may also testify as to the negotiation, drafting, execution, and purpose of the 1994 Agreement between OSA and OEI.

2)      Silvio Chianese
        Omega Electronics, S.A.
        Mattenstrasse 149
        2503 Biel/Bienne
        Switzerland

*Brief summary of anticipated testimony:* Mr. Chianese may testify as to the purpose and use of the OSA products, including the OMEGA Alize' Wind Gauge.

**Exhibit C - OEI's Deposition Designations**

Deposition of Robert Emmons, dated 4/08/04, in
*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|-----------|----|-----------|
| 1/1       |    | 1/25      |
| 6/16      |    | 6/21      |
| 7/20      |    | 10/16     |
| 10/25     |    | 11/11     |
| 11/18     |    | 12/19     |
| 13/6      |    | 13/9      |
| 14/10     |    | 15/7      |
| 15/11     |    | 15/15     |
| 15/19     |    | 16/3      |
| 20/6      |    | 20/13     |
| 30/3      |    | 31/8      |
| 56/1      |    | 57/2      |
| 61/22     |    | 62/2      |
| 79/23     |    | 80/4      |
| 81/4      |    | 83/22     |
| 92/22     |    | 93/4      |
| 96/2      |    | 96/8      |
| 97/9      |    | 97/13     |
| 100/6     |    | 100/10    |
| 102/23    |    | 103/6     |

Deposition of Guy D. Gibbons, dated 5/05/04, in
*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|-----------|----|-----------|
| 1/1       |    | 1/25      |
| 6/15      |    | 7/3       |
| 30/4      |    | 30/7      |
| 33/7      |    | 33/14     |
| 35/14     |    | 36/5      |
| 36/16     |    | 36/19     |
| 37/8      |    | 37/23     |
| 49/8      |    | 49/20     |

| Page/Line | to | Page/Line |
|---|---|---|
| 49/22 | | 50/15 |
| 51/14 | | 51/25 |
| 54/21 | | 55/8 |
| 57/3 | | 57/16 |
| 59/15 | | 59/20 |
| 60/23 | | 61/8 |
| 71/13 | | 72/15 |
| 76/23 | | 78/11 |
| 81/5 | | 82/15 |
| 85/9 | | 85/18 |
| 86/9 | | 86/13 |
| 91/14 | | 92/8 |
| 93/23 | | 94/3 |
| 99/25 | | 100/12 |
| 109/25 | | 110/21 |
| 112/17 | | 116/11 |
| 117/1 | | 117/16 |
| 118/6 | | 118/9 |
| 118/17 | | 118/25 |
| 119/14 | | 120/21 |
| 122/18 | | 123/7 |
| 123/16 | | 126/5 |
| 126/18 | | 126/23 |
| 142/20 | | 143/21 |
| 144/19 | | 144/23 |
| 151/20 | | 152/19 |
| 153/8 | | 153/23 |
| 157/10 | | 157/16 |
| 182/11 | | 182/16 |
| 185/6 | | 185/13 |
| 195/5 | | 195/8 |
| 195/10 | | 195/20 |
| 195/22 | | 195/22 |

Deposition of Hamid A. Kayal, dated 4/06/04, in *Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|---|---|---|
| 1/1 | | 1/25 |
| 6/17 | | 6/24 |

| Page/Line | to | Page/Line |
|---|---|---|
| 9/10 | | 9/21 |
| 10/16 | | 12/25 |
| 13/10 | | 14/2 |
| 16/3 | | 16/19 |
| 17/1 | | 17/9 |
| 17/14 | | 18/23 |
| 19/4 | | 19/22 |
| 24/5 | | 25/24 |
| 38/17 | | 39/22 |
| 40/3 | | 40/9 |
| 43/18 | | 43/23 |
| 44/18 | | 47/13 |
| 55/20 | | 63/12 |
| 82/9 | | 82/16 |
| 84/16 | | 85/4 |
| 98/9 | | 98/14 |
| 99/22 | | 100/2 |
| 102/19 | | 102/24 |
| 104/1 | | 104/17 |
| 106/14 | | 107/11 |
| 111/14 | | 112/18 |
| 115/17 | | 115/25 |
| 121/7 | | 121/14 |
| 123/22 | | 125/6 |
| 128/3 | | 128/9 |
| 129/8 | | 129/17 |
| 133/11 | | 137/2 |
| 141/24 | | 144/16 |
| 154/20 | | 156/2 |
| 163/10 | | 163/16 |
| 165/11 | | 165/19 |
| 166/8 | | 166/13 |
| 171/4 | | 171/10 |
| 192/22 | | 193/21 |
| 195/15 | | 197/13 |
| 198/8 | | 198/22 |
| 221/11 | | 221/22 |
| 227/11 | | 227/24 |
| 244/21 | | 245/13 |
| 247/14 | | 249/11 |
| 249/23 | | 250/4 |
| 250/18 | | 252/14 |

Deposition of Hanspeter Rentsch, dated 4/23/04, in
*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|---|---|---|
| 1/1 | | 1/19 |
| 4/17 | | 5/7 |
| 17/3 | | 18/9 |
| 19/4 | | 21/20 |
| 60/13 | | 62/16 |
| 103/23 | | 104/10 |
| 104/23 | | 105/3 |
| 108/6 | | 108/16 |
| 109/8 | | 10915 |
| 113/14 | | 114/5 |
| 116/14 | | 116/19 |
| 117/11 | | 117/18 |
| 117/21 | | 118/8 |
| 118/20 | | 121/7 |
| 122/9 | | 123/11 |
| 124/17 | | 125/5 |
| 125/25 | | 128/6 |
| 128/16 | | 131/15 |
| 131/19 | | 131/23 |
| 132/15 | | 135/23 |
| 136/3 | | 138/25 |
| 143/7 | | 143/25 |
| 144/4 | | 144/13 |
| 149/7 | | 151/2 |
| 151/5 | | 152/11 |
| 152/13 | | 152/13 |
| 152/16 | | 152/18 |
| 158/25 | | 159/7 |
| 159/9 | | 159/9 |
| 265/25 | | 266/9 |
| 266/17 | | 266/24 |
| 268/3 | | 268/19 |

<u>Deposition of Christiane S. Rupp, dated 6/27/01, in</u>
<u>*Omega, S.A. v. Omega Eng'g, Inc.*, 300 CV 1848</u>
<u>JBA</u>

<u>Designations</u>

| <u>Page/Line</u> | to | <u>Page/Line</u> |
|---|---|---|
| 1/1 | | 1/25 |
| 2/1 | | 2/25 |
| 3/14 | | 3/25 |
| 4/13 | | 4/15 |
| 5/15 | | 6/13 |
| 6/25 | | 7/23 |
| 8/3 | | 8/7 |
| 10/3 | | 10/9 |
| 11/25 | | 12/6 |
| 12/10 | | 12/15 |
| 13/12 | | 13/18 |
| 17/22 | | 19/11 |
| 54/4 | | 56/6 |
| 57/14 | | 58/2 |
| 60/24 | | 61/7 |
| 61/21 | | 62/10 |
| 66/14 | | 68/15 |
| 69/13 | | 69/17 |
| 70/1 | | 70/6 |
| 77/9 | | 77/23 |
| 79/13 | | 81/24 |
| 82/22 | | 84/9 |
| 102/8 | | 102/24 |
| 167/17 | | 169/4 |

<u>Deposition of Christiane S. Rupp, dated 3/16/04, in</u>
<u>*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)</u>

<u>Designations</u>

| <u>Page/Line</u> | to | <u>Page/Line</u> |
|---|---|---|
| 1/1 | | 1/25 |
| 6/23 | | 7/7 |
| 10/11 | | 10/22 |
| 11/8 | | 12/3 |

Deposition of Christiane S. Rupp, dated 3/16/04, in
*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|-----------|-----|-----------|
| 12/10 | | 12/11 |
| 28/10 | | 28/17 |
| 72/19 | | 73/4 |
| 168/21 | | 169/12 |
| 248/1 | | 248/22 |
| 250/16 | | 252/9 |
| 254/10 | | 255/8 |
| 270/3 | | 271/7 |
| 287/11 | | 290/5 |
| 291/12 | | 291/23 |
| 292/8 | | 293/6 |
| 333/5 | | 333/19 |

Deposition of Christiane S. Rupp, dated 3/17/04, in
*Omega, S.A. v. Omega Eng'g, Inc.*, 3:01 CV 2:04(MRK)

Designations

| Page/Line | to | Page/Line |
|-----------|-----|-----------|
| 357/1 | | 357/25 |
| 407/8 | | 408/19 |

**Exhibit D - OSA's Deposition Designations**

Deposition of Ralph Michel, dated April 9, 2004,
Omega, S.A. v. Omega Eng'g, Inc., 3:01 CV 2:04 MRK

OSA's Designations

Page 11, Line 25 to Page 12, Line 7
Page 28, Line 25 to Page 29, Line 5

**OEI's Counterdesignations and Objections**

Deposition of Ralph Michel, dated April 9, 2004,
Omega, S.A. v. Omega Eng'g, Inc., 3:01 CV 2:04 MRK

Objections

| OSA's Designations | OEI's Objections |
|---|---|
| | |
| Page 11, Line 25 to Page 12, Line 7 | Relevance |
| Page 28, Line 25 to Page 29, Line 5 | Relevance |

Counterdesignations

OEI objects to the Ralph Michel's testimony on the grounds of relevance, as indicated

above.  However, to the extent that the Court does not sustain OEI's objection, OEI submits the

following counterdesignations:


Page 11, Line 10 to 24
Page 57, Line 18 to Page 58, Line 14

D-2

**Exhibit E - OEI's Exhibits and Potential Exhibits**

**Exhibit E:  OEI's Exhibit List**

Defendant/Counter-plaintiff Omega Engineering, Inc. ("OEI") expects to offer the

following exhibits at trial:

| EXHIBIT | DESCRIPTION OF EXHIBIT |
|---|---|
| Defendant's Exhibit A | OSA's Trademark Registration Certificate for Registration No. 1,290,661 (Sauser-Rupp 3/16/04 Dep. Ex. 55) |
| Defendant's Exhibit B | OSA's Trademark Registration Certificate for Registration No. 708,731 (Sauser-Rupp 3/16/04 Dep. Ex. 61) |
| Defendant's Exhibit C | Trademark Renewal Application for Registration No. 708,731 (Sauser-Rupp 3/16/04 Dep. Ex. 68; Bates OSA 683-713) |
| Defendant's Exhibit D | Trademark Renewal Application for Registration No. 1,290,661 (Sauser-Rupp 3/16/04 Dep. Ex. 69; Bates OSA 714-764) |
| Defendant's Exhibit E | 1994 Agreement between OEI and OSA (M. Hollander 9/14/04 Dec. Ex. T, bearing numbers 2464000287-2464000289). |
| Defendant's Exhibit F | *Omega Engineering, Inc. v. Omega, S.A.*, 3:98 CV 2464 (AVC) ("*Omega I*") Settlement Agreement (Riggs 9/14/04 Dec. Ex. L) |
| Defendant's Exhibit G | Order in *Omega I*, dated August 11, 2004 (Riggs 9/14/04 Dec. Ex. N) |
| Defendant's Exhibit H | Judgment in *Omega I* (Riggs 9/14/04 Dec. Ex. O) |
| Defendant's Exhibit I | Notice of Deposition of Omega S.A. Pursuant to Fed. R. Civ. P. 30(b)(6) (Smart 9/15/04 Dec. Ex. F) |
| Defendant's Exhibit J | April 5, 2004 Letter from Collen IP to Thomas Smart re:  list of topics that Mr. Emmons and Mr. Kayal will cover at their depositions (Smart 9/15/04 Dec. Ex. Q) |
| Defendant's Exhibit K | Omega Electronics' United States sales figures and scoreboard installations (Smart 9/15/04 Dec. Ex. R & Kayal Dep. Ex. 115) |
| Defendant's Exhibit L | Omega Electronics Invoices (Smart 9/15/04 Dec. Ex. S & Kayal Dep. Ex. 116, Bates OSA 174-278) |
| Defendant's Exhibit M | Omega Electronics Invoices (Smart 9/15/04 Dec. Ex. T & Kayal Dep. Ex. 117, Bates OSA 488-682) |

| Defendant's Exhibit N | Omega Electronics Invoices (Smart 9/15/04 Dec. Ex. U & Kayal Dep. Ex. 118, Bates OSA 1162-1273) |
|---|---|
| Defendant's Exhibit O | Printouts from GDG, Inc. Website (Gibbons Dep. Ex. 252, Bates OSA 2368-2488) |
| Defendant's Exhibit P | Omega Electronics Product Brochures (Gibbons Dep. Ex. 253, Bates OSA 2328-2367) |
| Defendant's Exhibit Q | Price Lists for Omega Electronics Products Sold by GDG, Inc. (Gibbons Dep. Ex. 256, Bates OSA 2496-2499) |
| Defendant's Exhibit R | List of Major Display Board Installations (Kayal Dep. Ex. 108, Bates OSA 637-640) |
| Defendant's Exhibit S | Omega Electronics Product Brochures (Kayal Dep. Ex. 107) |
| Defendant's Exhibit T | "At the Service of Sport" Omega Electronics brochure (Kayal Dep. Ex. 104, Bates OSA 811-816) |
| Defendant's Exhibit U | "The Last Word in Sports Timing" Omega Electronics brochure (Kayal Dep. Ex. 121, Bates OSA 609-616) |
| Defendant's Exhibit V | "The Sport- Our Vocation" Omega Electronics brochure (Kayal Dep. Ex. 122, Bates OSA 617-624) |
| Defendant's Exhibit W | Omega Electronics Newsletter (Kayal Dep. Ex. 123) |
| Defendant's Exhibit X | Trademark Manual of Examination Procedures, 4th ed. |
| Defendant's Exhibit Y | Registration Certificate for OEI's Registration No. 2,022,762 (Riggs 9/14/04 Dec. Ex. C) |
| Defendant's Exhibit Z | Registration Certificate for OEI's Registration No. 2,034,705 (Riggs 9/14/04 Dec. Ex. D) |
| Defendant's Exhibit AA | List of OEI's Registered OMEGA Trademarks in the United States (Riggs 9/14/04 Dec. Ex. B) |
| Defendant's Exhibit BB | OSA's Second Supplemental Answers to Defendants' First Set of Interrogatories, dated March 15, 2004 (Sauser-Rupp 3/16/04 Dep. Ex. 22) |
| Defendant's Exhibit CC | OSA's Application for Renewal of U.S. Registration No. 1,290,661, received by the U.S. Patent & Trademark Office on February 22, 2005 |
| Defendant's Exhibit DD | PTO's Notice of Acceptance and Notice of Renewal of Registration No. 1,290,661 (mailing date 8/3/05) |

| | |
|---|---|
| Defendant's Exhibit EE | Deposition of Christiane Sauser Rupp, dated June 27, 2001, in *Omega S.A. v. Omega Engineering, Inc.*, Civil Action no. 3:00 CV 1848 JBA ("*Omega II*") |
| Defendant's Exhibit FF | Trademark File for OEI's Trademark Application No. 76-337450 (Rentsch Dep. Ex. 212) |
| Defendant's Exhibit GG | Trademark File for OEI's Trademark Application No. 76-337374 (Rentsch Dep. Ex. 213) |
| Defendant's Exhibit HH | Notice of Deposition of Omega S.A. Pursuant to Fed. R. Civ. P. 30(b)(6), in *Omega II* (Sauser-Rupp 6/27/01 Dep. Ex. 101 in *Omega II*) |
| Defendant's Exhibit II | Notice of Opposition to OEI's Trademark Application No. 74-747885 filed by OSA with the PTO, dated May 16, 2001 |
| Defendant's Exhibit JJ | Petition for Cancellation of OEI's Trademark Registration No. 2,236,657 filed by OSA with the PTO, dated April 12, 2002 |
| Defendant's Exhibit KK | Third Amended Complaint |

Defendant/Counter-plaintiff Omega Engineering, Inc. ("OEI") may offer the following exhibits at trial:

| *EXHIBIT* | *DESCRIPTION OF EXHIBIT* |
|---|---|
| Defendant's Exhibit LL | Printouts from OMEGAWATCHES.COM (Smart 9/15/04 Dec. Ex. H) |
| Defendant's Exhibit MM | "Made in USA Handbook Volume 1" (M. Hollander 9/14/04 Dec. Ex. B) |
| Defendant's Exhibit NN | "Made in USA Handbook Volume 2" (M. Hollander 9/14/04 Dec. Ex. C) |
| Defendant's Exhibit OO | 1992 Agreement between OEI and OSA |
| Defendant's Exhibit PP | The American Heritage Dictionary of the English Language, Fourth Ed. (2000), http://dictionary.reference.com/search?q=such%20as |

| Defendant's Exhibit QQ | Webster's Third New International Dictionary, pp. 1638, 2283, 2533 |
|---|---|
| Defendant's Exhibit RR | Defendants' First Set of Interrogatories and Requests for Admissions to Plaintiff-Counterclaim Defendant Omega S.A.(with attachment), dated November 21, 2003 |
| Defendant's Exhibit SS | OSA's Responses to Defendants' First Set of Interrogatories and Requests for Admissions to Plaintiff-Counterclaim Defendant Omega S.A., dated January 16, 2004 |
| Defendant's Exhibit TT | Swatch Group Annual Report 2002 (Rentsch Dep. Ex. 4) |

<u>Exhibit F - OSA's Exhibits and Potential Exhibits</u>

Plaintiff/Counter-defendant Omega S.A. (OSA) expects to offer the following exhibits at trial.

| PTX | Exhibit Description | Origin |
|-----|---------------------|--------|
| 1. | Excerpts from Omega Electronics' Website with page numbers added | Kayal Dep. **Ex 25-A** |
| 2. | Document for prospective customers regarding information display systems of Omega Electronics (documents bearing production nos. 689-708) | Kayal Dep. **Ex 106** |
| 3. | two page document referring to "Matchtime" (documents bearing production nos. 173-174) | Kayal Dep. **Ex 109** |
| 4. | One page document called "New Water Polo" (documents bearing production nos. 194) | Kayal Dep. **Ex 110** |
| 5. | "Starttime"-speaker and a flash for start of a competition (documents bearing production nos. 195-197) | Kayal Dep. **Ex 111** |
| 6. | Omega Electronics Invoices from GDG Inc. | |
| 7. | Omega Saga, by Marco Richon (1998) | |
| 8. | "Rollertime"-display containing seven segments with data collection system and other terminals like the Powertime or Datalogger RS (documents bearing production nos. 215-216) | Kayal Dep. **Ex 112** |
| 9. | Four-page Omega Electronics flap modules data sheet | Kayal Dep. **Ex 113** |
| 10. | User manual for product from Omega Electronics (documents bearing production nos. 897-1093) | Kayal Dep. **Ex 128** |
| 11. | All of OEI's written responses to interrogatories and requests to produce | |
| 12. | Event List which Omega was official watch and Official Time Keeper (Comontana golf tournament (Swiss), America's Cup (documents bearing production nos. 1020-1024) | Sauser Rup Dep. **Ex 21** |
| 13. | Publication entitled "Transactions in Measurement and Control," volume IV | Sauser Rup Dep. **Ex 36** |
| 14. | Publication entitled "Transactions in Measurement and Control," volume II | Sauser Rup Dep. **Ex 37** |
| 15. | Publication entitled "Transactions in Force-Related Measurements," volume III, second edition | Sauser Rup Dep. **Ex 38** |

| PTX | Exhibit Description | Origin |
|---|---|---|
| 16. | Temperature Handbook of Omega Engineering | Sauser Rup Dep. **Ex 45** |
| 17. | Document entitled "Chemical Engineering Buyers Guide, Mid-August 2002 | Sauser Rup Dep. **Ex 47** |
| 18. | Documents bearing production nos. OSA 2878 through OSA 2886 fax copies of Omega Electronics literature for two different types of matrix displays | Gibbons Dep. **Ex 254** |
| 19. | Documents bearing production nos.1038 through 1091 | Gibbons Dep. **Ex 255** |
| 20. | Documents bearing production nos. 2496 through 2499 Scan-O-Vision Hawk Eye Brochure | Gibbons Dep. **Ex 256** |
| 21. | Samples of an Omega Alize Wind Gauge, OMEGA "Powertime device", and OMEGA SRFID and RDID Access Systems | |
| 22. | Series of documents relating to the Alize Windgauge | Kayal Dep. **Ex 214** |
| 23. | Documents bearing production Nos. 868 through 869, fax request for information on an Alize wind gauge and powertime display printer unit | Gibbons Dep. **Ex 260** |
| 24. | Search results for clock, marked for identification | Hollander Dep. **Ex 3** |
| 25. | Display relating to passenger information displays (documents bearing production nos. 217-227) | Kayal Dep. **Ex 106** |
| 26. | Series of documents from Omega Electronics relating to the Powertime Product | Kayal Dep. **Ex 125** |
| 27. | Product and price list documents for the RFID products which was valid in 2001(documents bearing production nos. 843-862 and 228-236) | Kayal Dep. **Ex 126** |
| 28. | User manual for product from Omega Electronics (documents bearing production nos. 897-1093): | Kayl Dep. **Ex 128** |
| 29. | User manual; describes transmission protocol (documents bearing production nos. 253-267): | Kayal Dep. **Ex 129** |
| 30. | Omega Electronics price book 2001 | Sauser Rupp Dep. **Ex. 26** |
| 31. | 1992 Agreement (superseded by 1994 agreement) | |
| 32. | Letter from Halstead to SMH dated November 20, 1989 | *Omega I* **Bates 00745** |

| PTX | Exhibit Description | Origin |
|---|---|---|
| 33. | Letter from William Coutts to Dr. Hollander dated November 28, 1989 | *Omega I* **Bates 2464000300** |
| 34. | Letter from Halstead to SMH dated January 10, 1990 | *Omega I* **Bates 00742** |
| 35. | Letter from William Coutts to Halstead dated February 7, 1990 | *Omega I* **Bates 246400140** |
| 36. | Letter from William Drucker to SMH dated May 1, 1992 | *Omega I* **Bates 246400324** |
| 37. | Letter from William Drucker to SMH dated December 7, 1992 | *Omega I* **Bates 246400323** |
| 38. | Letter from William Drucker to Robic dated May 15, 1985 | *Omega I* **Bates 00797** |
| 39. | Letter from Letter from Robin Bridge & John Liu to Wilkinson & Grist dated May 30, 1989 | *Omega I* **Bates 00758** |
| 40. | Letter from Wilkinson & Grist to Robin Bridge & John Liu dated June 27, 1989 | *Omega I* **Bates 00749-00750** |
| 41. | Letter from Wilkinson & Grist (H.K.) to the H.K. Registrar dated January 2, 1992 | *Omega I* ***Joint Pre Trial Order* Ex 383** |
| 42. | Omega Electronics Los Angeles '84 Olympics sports timing brochure | *Omega I* **Bates 000651** |
| 43. | Omega Electronics PowerTime product brochure | *Omega I* **Bates 000657** |
| 44. | Omega Electronics AREAS 21 product brochure | *Omega I* **Bates 000803** |
| 45. | Omega Electronics Product brochures | *Omega I* **Bates 000811** |
| 46. | Omega Electronics Sports Timing Equipment Price Book | *Omega I* **Bates 000825** |
| 47. | Omega Electronics RFID & SRFID Product and Price list | *Omega I* **Bates 000843** |
| 48. | Omega Electronics Scan 'O' Vision Bridge Installation Manual, 3377-500, Version 1.3 Edition April 2001. | *Omega I* **Bates 001498-001546** |

| PTX | Exhibit Description | Origin |
|-----|---------------------|--------|
| 49. | Printouts of web pages from internet website hosted at Internet address www.omega-electronic.ch regarding technical information on products sold by Omega Electronics, produced in this litigation | *Omega I* **Bates 00162-00238** |
| 50. | Promotional Information on products sold by Omega Electronics produced in this litigation. | *Omega I* ***Joint Pretrial Order*** **Exhibit 291** |
| 51. | Omega Electronics promotion materials for its timing systems | *Omega I* **Bates 00631-00636** |
| 52. | Omega Electronics promotional materials for Alize Wind Gauge | *Omega I* **Bates 000539 -000540** |
| 53. | Omega Electronics promotion materials for Scan 'O' Vision Bridge. | 00541 |
| 54. | Omega Electronics promotional brochure regarding timing. | 000570-000571 |
| 55. | Brochure detailing information about Omega Electronics. | 000572-000573 |
| 56. | Omega Electronics Equipment Data  Sheet on False Start Monitoring System for Athletic Events. | 000576-000577 |
| 57. | Omega Electronics Equipment Technical Data Sheet on Scan 'O' Vision. | *Omega I* **Bates 587-588** |
| 58. | Omega Electronics brochure on passenger information systems. | *Omega I* **Bates 597-602** |
| 59. | Omega Electronics brochure on sports timing systems | *Omega I* **Bates 603-616** |
| 60. | Omega Electronics Equipment brochure on sports timing equipment | *Omega I* **Bates 625-630** |
| 61. | Omega Electronics Equipment brochure on sports timing equipment | 000625-000630 |
| 62. | Omega Electronics Equipment brochure on sports timing equipment | 000617-000624 |
| 63. | Omega Electronics Equipment brochure on ARES 21 device | *Omega I* **Bates 637-343-** |

| PTX | Exhibit Description | Origin |
|---|---|---|
| 64. | Omega Electronics Equipment data sheet on Photosprint OPS2 Accessories | *Omega I* **Bates 631-636** |
| 65. | Webster's Third New International Dictionary | |
| 66. | The NonLinear Circuits Handbook, Analog Devices, Inc. 1976 | |
| 67. | Modeling, Analysis and Control of Dynamic Systems, Palm III, William J., John Wiley & Sons (1983) | |
| 68. | NonLinear Cicuits Handbook and in Modeling Analysis and Control of Dynamic Systems | |
| 69. | Excerpts from website of www.omegaelectronics.com | |
| 70. | Demonstrative evidence in the form of a Powerpoint presentation of the chronology of the dispute | |
| 71. | Watch Your Time, Special Insert in the New York Times, October 16, 2005. | |
| 72. | Esquire Magazine, November 2004. | |
| 73. | OEI Hong Kong Application "?E under Application N" 1115A/87 in class 9 | |
| 74. | OEI applications under N's 12775 and 12776 in FDRG to register as trademarks OMEGA SOFT and OMEGA in class 9 and class 42 | |
| 75. | OEI Opposition to Application N'3221/86 | |
| 76. | OSA application N'3221/86 | |
| 77. | Agreement between OEI and OSA (UK) executed in 1984 | |
| 78. | Agreement between OEI and OSA (CAN.) executed in 1985 | |
| 79. | Trademark License Agreement between OEI and OSA executed in 1985 | |
| 80. | File History of OEI Honk Kong Trademark application 1115A of 1986 | |
| 81. | File History of OEI German trademark application nos. 12775 and 12776 | |
| 82. | File History of OEI's Canadian trademark application no. 74/480,757 | |
| 83. | Omega Engineering, Inc. Handbook of PH and Conductivity (Part only) | *Omega I* **Bates 012488-012496** |
| 84. | Purchase Agreement between OEI and Valve Technologies, Inc., dated October 1998 | *Omega I* **Bates 012613-012645** |

| PTX | Exhibit Description | Origin |
|---|---|---|
| 85. | Purchase Agreement between OEI and Danaher Controls dated October 1998 | *Omega I* **Bates 012646-012676** |
| 86. | Purchase Agreement between OEI and Computer Boards dated February 1992 | *Omega I* **Bates 012677-012692** |
| 87. | Purchase Agreement between OEI and Strawberry Tree Computers dated May 1986 | *Omega I* **Bates 012705-012747** |
| 88. | The Flow and Level Handbook  (document bearing bates stamp (001) | *Omega I* **Bates 150001** |
| 89. | The Electric Heaters Handbook (document bearing bates stamp 002) | *Omega I* **Bates 150002** |
| 90. | The Pressure Strain and Force Handbook (document bearing bates stamp 004) | *Omega I* **Bates 150004** |
| 91. | Omega Engineering invoice no. 844307 | **Omega I Bates** 400263 |
| 92. | Omega Engineering invoice no. 906741 | **Omega I Bates 400234** |
| 93. | Omega Engineering invoice no. 780616 | **Omega I Bates 400235** |
| 94. | Omega Engineering invoice no. 859005 | **Omega I Bates 400239** |
| 95. | Omega Engineering invoice no. 922293 | **Omega I Bates 400240** |
| 96. | Omega Engineering invoice no. 449156 | **Omega I Bates 400246** |
| 97. | Omega Engineering invoice no. 472446 | **Omega I Bates 400247** |
| 98. | Omega Engineering invoice no. 298394 | **Omega I Bates 400249** |
| 99. | Omega Engineering invoice no. 502779 | **Omega I Bates 400251** |
| 100. | Omega Engineering invoice no. 527437 | **Omega I Bates 400252** |
| 101. | Omega Engineering invoice no. 561473 | **Omega I Bates 400253** |
| 102. | Omega Engineering invoice no. 668686 | **Omega I Bates 400254** |
| 103. | Omega Engineering invoice no. 683458 | **Omega I Bates 400255** |

| PTX | Exhibit Description | Origin |
|---|---|---|
| 104. | Omega Engineering invoice no. 533008 | **Omega I Bates 400256** |
| 105. | Omega Engineering invoice no. 505116 | **Omega I Bates 400257** |
| 106. | Omega Engineering invoice no. 796079 | **Omega I Bates 400260** |
| 107. | Omega Engineering invoice no. 858161 | **Omega I Bates 400261** |
| 108. | Omega Scientific Publication | Riggs Dep. **Ex 4** |
| 109. | Omega advertisement | M. Hollander Dep. **Ex 4** |
| 110. | OEI Solenoid Valve Timer Advertisement | *Omega I* **Bates 2464000101** |
| 111. | OEI Industrial Timer Advertisement | *Omega I* **Bates 2464000106-2464000107** |
| 112. | OEI High Performance Process Timer/Controller Advertisement | *Omega I* **Bates 2464000112-2464000113** |
| 113. | www.omega.com website printouts with OEI Timer/Controllers | *Omega I* **Bates 409-434** |
| 114. | OEI Handbook of pH and Conductivity | *Omega I* **Bates 408-496)** |
| 115. | OEI Transactions and Vol mm Master Index (cover) | *Omega I* **Bates 405** |
| 116. | OEI Vol Complete Handbook of Science and Technical Books | *Omega I* **Bates 200-217** |
| 117. | Subject Index to OEI Handbook and Encyclopedia | *Omega I* ***Joint Pretrial Order Exhibit 233*** |

F-7

| PTX | Exhibit Description | Origin |
|-----|---------------------|--------|
| 118. | My Choice Collection Book | *Omega I* ***Joint Pretrial Order*** **Exhibit 308** |
| 119. | Omega Brochure English/Japanese | *Omega I* ***Joint Pretrial Order*** **Exhibit 306** |

**Exhibit G - Anticipated Evidentiary Problems and Motions *in Limine***

1.    OEI has filed a motion *in limine* to preclude hearsay and opinion testimony regarding the interpretation of the parties' 1994 Agreement.

2.    Each party anticipates that it will assert objections to certain exhibits listed by the other party, and that it will file and serve objections no later than seven calendar days prior to trial, pursuant to the September 27, 2005 Pre-Trial Order.

**Exhibit H:  Stipulations of Uncontroverted Facts**

Counterclaim-plaintiff Omega Engineering, Inc. ("OEI") and Counterclaim-defendant Omega, S.A. ("OSA"), solely for purposes of the trial of this action, and without waiver of any objections on the ground of relevance, hereby stipulate that the following facts are uncontroverted:

**Background Facts Regarding OEI**

1.      OEI is a Delaware corporation, with its principal place of business in Stamford, Connecticut.

2.      OEI was founded in 1962 by Mrs. Betty Ruth Hollander.  OEI's very first products were thermocouples, devices used in scientific and industrial fields (such as factories and laboratories) to measure temperatures.

3.      OEI has used a design mark consisting of juxtaposed Greek letters Omega (Ω) and Epsilon (E), the so-called "Omega bug."

4.      The products marketed, distributed and sold under OEI's OMEGA marks include scientific apparatus for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow.

5.      OEI maintains the domain name www.omega.com and its products are available for purchase there.

6.      In 1966, OEI first registered in the United States for an Omega trademark relating to industrial and scientific apparatus.  OEI's OMEGA trademark registrations include: Registration No. 2022,762 ("762") ("OMEGA") and Registration No. 2,034,705 ("705") ("ΩE").

Registrations '762 and '705 relate "timers, namely period timers . . . industrially and/or scientifically employed" and "industrial and scientific clocks."

       7.    OEI does not offer for sale watches under the mark OMEGA.

       8.    Omega Engineering, Inc. has not sold any watches under the OMEGA mark

**Background Facts Regarding OSA**

       9.    OSA is a company organized under the laws of Switzerland, with its principal place of business in Bienne, Switzerland.

       10.    OSA, a subsidiary of The Swatch Group Ltd., sells, among other things, watches, jewelry and related-watch products, such as watch bands and spare parts, under the mark OMEGA and a design mark consisting of the Greek letter Omega.

       11.    OSA uses the domain name www.omega.ch.

       12.    Swatch Group (U.S.) is the United States licensee of OSA that distributes and sells OSA's OMEGA-branded watches in the United States.

       13.    Omega Electronics, a licensee of OSA, sells OMEGA-branded goods other than watches in the United States.

       14.    Omega Electronics sells OMEGA-branded sports timing devices in the United States through its exclusive U.S. distributor, GDG Inc.

       15.    OSA uses words and design marks that incorporate the words "Omega" and the Greek letter "Ω".  Its United States trademark registrations include:  Registration Nos. 708,731 and 1,290,661.

**The 1994 Agreement Between OEI and OSA**

16.     Throughout the 1980's, Omega Engineering and OSA had a history of disputing the scope of their respective trademark rights.

17.     The two parties signed several agreements in the 1980's limited to certain countries and trademark registrations.

18.     In an effort to end such disputes in a worldwide agreement, in 1994 OEI and OSA entered into a worldwide agreement (the "1994 Agreement").

19.     The 1994 Agreement was executed for and on behalf of OSA on May 3, 1994, and was executed for and on behalf of Omega Engineering on August 2, 1994 (the "1994 Agreement").  A true and correct copy of the 1994 Agreement is marked as Defendant's Exhibit ("DX") E.

20.     The 1994 Agreement was made and executed in the English language only.

21.     The 1994 Agreement supersedes a prior 1992 Agreement between the same parties, a true and correct copy of which is marked as DX OO.

22.     The 1994 Agreement was negotiated on OSA's behalf by William R. Coutts and on OEI's behalf by Dr. William Drucker.  Mr. Coutts is deceased.

23.     The 1994 Agreement states, in part, that "[b]oth parties hereto are desirous of coming to an arrangement for the avoidance of future interference Worldwide between their respective fields of commercial operation under their Rights in respect of Trademarks consisting of or including the word OMEGA and/or the Greek letter $\Omega$ or containing elements colourably resembling either or thos[e] two elements."

24.     The 1994 Agreement settled various particular contested matters around the world involving Omega Engineering's and OSA's trademarks.  Among other things, Omega Engineering agreed to withdraw certain oppositions against OSA and amend certain definitions of goods in Omega Engineering's trademark applications and OSA agreed to amend certain definitions of goods in OSA's trademark applications.

25.     Paragraph 4 of the 1994 Agreement states as follows:

Henceforth from the signing of the Agreement and effective in all contries of the World:-

a.     OMEGA ENGINEERING INCORPORATED undertakes not to use, register, or apply to register any trademark consisting of or containing the word OMEGA or the Greek Letter O or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science and industry.

b.     OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek letter $\Omega$, or any element colourably resembling either of those two elements, in respect of "Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow."

c.     OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademarks consisting of or containing the word OMEGA or the Greek Letter O or either of those two elements, in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow.

26.     The term "variable parameters" is not defined in the contract.

**OSA's Renewals of Trademark Registration Nos. 708,731 and 1,290,661**

**Registration 708,731**

27.    United States Trademark Registration No. 708,731 was registered to OSA on December 20, 1960 for the word OMEGA and the OMEGA symbol for use with "electronic time recorders for automatic precision timing in science and industry."

28.    On December 20, 2000, OSA filed a trademark renewal application for the mark OMEGA (and design) for Registration No. 708,731 and in doing so stated it was using the OMEGA mark on all of the goods listed in the registration.

29.    OSA submitted a Combined Section 8 and 9 Declaration in accordance with Sections 8 and 9 of the Lanham Act for its December 20, 2000 trademark renewal application for Registration No. 708,731.  The declaration, also filed on December 20, 2000, was signed by Hanspeter Rentsch, senior vice president and general counsel for The Swatch Group Ltd.

30.    The December 20, 2000 Combined Section 8 and 9 Declaration for Registration No. 708, 731 stated, in pertinent part, "[t]hat registrant owns Registration No. 708,731, that the mark shown therein is in use in commerce on each of the goods recited in the registration, with the attached specimen showing the mark as currently used."

31.    OSA represented that the OMEGA mark was in use in commerce as of December 20, 2000 on electronic time recorders for automatic precision timing in science and industry.

32.    In its December 20, 2000 filing with the PTO, OSA submitted a specimen in support of renewal for Registration No. 708,731 which was a brochure for an Omega Electronics aquatic starting system.

33.     No other specimens were submitted in support of the renewal for Registration No. 708,731.

34.     The PTO granted the renewal of Registration No. 708,731 following receipt of OSA's renewal application.

35.     OSA's Registration No, 708,731 for the word OMEGA and the OMEGA symbol for "electronic time recorders for automatic precision timing in science and industry" remains on the United States federal trademark registry today.

**Registration No. 1,290,661**

36.     United States Trademark Registration No. 1,290,661 was registered to OSA on August 21, 1984 and is for the word OMEGA and the OMEGA symbol for use with, among other products, "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigation, and industrial application, including the acquisition, transmission, and management of information intended for transportation, publicity, and financial use; computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form."

37.     On August 14, 1990, OSA filed a trademark renewal application for the mark OMEGA (and design) for Registration No. 1,290,661 and in doing so stated it was using the OMEGA mark on all of the goods listed in the registration.

38.     On August 14, 1990, OSA submitted a Combined Section 8 and 9 Declaration in accordance with Sections 8 and 9 of the Lanham Act for the trademark renewal application, which was signed by OSA's authorized representatives and dated July 26, 1990.

39.     The Declaration Under Sections 8 and 15 for Registration No. 1,290,661, dated July 26, 1990, stated, in part, that the OMEGA mark "has been in continuous use in commerce with the United States for five consecutive years from the date of the registration to the present, on or in connection with all of the goods of Classes 9 and 14 . . . recited in the registration."

40.     The goods in International Class 9 recited in Registration No. 1,290,661 include "computer apparatus for controlling the measurement of time and distance for sporting events, scientific investigation, and industrial application."

41.     In the declaration submitted to the PTO on August 14, 1990 in connection with Registration No. 1,290,661, OSA represented that the OMEGA mark was in use in commerce as of July 26, 1990 on "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigation, and industrial application."

42.     In accordance with Sections 8 & 15 of the Lanham Act, on August 14, 1990, OSA submitted a specimen in support of renewal of Registration No. 1,290,661 which was a computer which measures and displays the times during athletic competitions.

43.     The computer depicted in the specimen filed by OSA with the PTO on August 14, 1990, in support of renewal of Registration No. 1,290,661, is a timing system for a sporting event.

44.     No other specimens were submitted in support of the renewal for Registration No. 1,290,661.

45.     The PTO granted the renewal of Registration No. 1,290,661 following receipt of OSA's renewal application.

46.     On February 18, 2005, OSA submitted to the U.S. Patent & Trademark Office an application for renewal of Registration No. 1,290,661, which included a declaration signed by Jean-Claude Monachon and Josiane Citiso of OSA.

47.     A true and correct copy of OSA's February 18, 2005 application for renewal of Registration No. 1,290,661, with its incorporated declaration and attached specimens, is marked as DX CC.

48.     In its February 18, 2005 application for renewal of Registration No. 1,290,661, OSA requested renewal of Registration No. 1,290,661 only for the following goods:

> "computer apparatus for checking and controlling the measurement of time and distance for sporting events; computers for calculating information in respect of time and distance, storing such information, and making the same available in visual or audible form – all of which installations contain electronic elements" in International Class 9; and

> "watch cases" in International Class 14.

49.     In its February 18, 2005 application for renewal of Registration No. 1,290,661, OSA did not seek renewal of Registration No. 1,290,661 for "Computer Apparatus for Checking and Controlling the Measurement of Time and Distance for . .  Scientific Investigation, and Industrial Application, Including the Acquisition, Transmission, and Management of Information Intended for Transportation, Publicity, and Financial Use," which were previously listed in the registration.

**The Court's Prior Findings With Respect to the Parties' Consumers and Markets**

50.     The Court has previously found no likelihood of confusion between the parties' uses of the OMEGA marks.

51.     The Court has previously found no evidence of actual confusion between the parties' uses of the OMEGA marks.

52.     The Court has previously found that the parties' products are of high quality.

53.     The Court has previously found that the parties' customers are sophisticated.

54.     The Court has previously found that the parties operate in separate channels of trade.

**Authentication of Exhibits**

55.     The document marked DX A is a true and correct copy of OSA's Trademark Registration Certificate for Registration No. 1,290,661.

56.     The document marked DX B is a true and correct copy of Defendant's OSA's Trademark Registration Certificate for Registration No. 708,731.

57.     The document marked DX C is a true and correct copy of a Trademark Renewal Application for Registration No. 708,731.

58.     The document marked DX D is a true and correct copy of a Trademark Renewal Application for Registration No. 1,290,661.

59.     The document marked DX J is a true and correct copy of an April 5, 2004 Letter from Collen IP to Thomas Smart re: list of topics that Mr. Emmons and Mr. Kayal will cover at their depositions.

60.    The document marked DX BB is a true and correct copy of OSA's Second Supplemental Answers to Defendants' First Set of Interrogatories, dated March 15, 2004.

61.    The document marked DX CC is a true and correct copy of OSA's Application for Renewal of U.S. Registration No. 1,290,661, received by the U.S. Patent & Trademark Office on February 22, 2005.

62.    The document marked DX DD is a true and correct copy of the PTO's Notice of Acceptance and Notice of Renewal of Registration No. 1,290,661 (mailing date 8/3/05).

63.    The document marked DX II is a true and correct copy of a Notice of Opposition to OEI's Trademark Application No. 74-747885 filed by OSA with the PTO, dated May 16, 2001.

64.    The document marked DX JJ is a true and correct copy of a Petition for Cancellation of OEI's Trademark Registration No. 2,236,657 filed by OSA with the PTO, dated April 12, 2002.

65.    The document marked DX KK is a true and correct copy of the Third Amended Complaint.

66.    The document marked DX SS is a true and correct copy of OSA's Responses to Defendants' First Set of Interrogatories and Requests for Admissions to Plaintiff-Counterclaim Defendant Omega S.A., dated January 16, 2004.

67.    The document marked PX 31 and DX OO is a true and correct copy of the 1992 Agreement between OEI and OSA.

68.     The document marked PX 65 and DX QQ is a true and correct copy of Webster's Third New International Dictionary.

**<u>Exhibit I - Contested Issues of Law</u>**

1.    The parties dispute the correct interpretation of Paragraph 4(b) of the 1994 Agreement.

2.    The parties dispute the meaning of the phrase "science and industry."

3.    The parties dispute whether OSA uses the OMEGA mark in the United States in connection with goods intended for "science and industry" or for "scientific and industrial application."

4.    The parties dispute whether OSA has any specific intent to sell OMEGA-branded goods in the United States in "science and industry" or for "scientific and industrial application."

5.    The parties dispute whether, at the time of filing its renewal application for Registration No. 708,7310, the statement that the OMEGA mark was in use in the United States as of December 20, 2000 on "electronic time recorders for automatic precision timing in science and industry" was false or misleading.

6.    The parties dispute whether, at the time of filing its renewal application for Registration No. 708,7310, OSA knew or should have known that its statement that the OMEGA mark was in use in the United States as of December 20, 2000 on "electronic time recorders for automatic precision timing in science and industry" was false or misleading.

7.    The parties dispute whether, at the time of filing its renewal application for Registration No. 1,290,661, the statement that the OMEGA mark was in use in the United States as of August 14, 1990 on "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigation, and industrial application" was false and misleading.

8.     The parties dispute whether, at the time of filing its renewal application for Registration No. 1,290,661, OSA knew or should have known that its statement that the OMEGA mark was in use in the United States as of August 14, 1990 on "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigation, and industrial application" was false and misleading.

9.     The parties dispute whether OEI can cancel United States Trademark Registrations Nos. 708,731 and 1,290,661 on the basis of either abandonment or fraud.

10.     The parties dispute whether OSA has committed a material breach of the 1994 Agreement.

11.     The parties dispute whether OSA has infringed any of OEI's marks.  (OEI contends that this is irrelevant in light of its motion to voluntarily dismiss certain of its counterclaims.)

12.     The parties dispute whether OSA has unfairly competed or committed a false designation of origin.  (OEI contends that this is irrelevant in light of its motion to voluntarily dismiss certain of its counterclaims.)

13.     The parties dispute whether OSA (or Swatch) has violated the Federal Trademark Dilution Act.  (OEI contends that this is irrelevant in light of its motion to voluntarily dismiss certain of its counterclaims.)

14.     The parties dispute whether OSA (or Swatch) has violated the Connecticut Unfair Trade Practices Act.  (OEI contends that this is irrelevant in light of its motion to voluntarily dismiss certain of its counterclaims.)

<u>Exhibit J - OEI's Proposed Findings and Conclusions</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

OMEGA, S.A.,

                                         Plaintiff,

            v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC INC., AND
OMEGA PRESS, INC.,
                                                            Civil Action No.:
                                         Defendants.        3:01 CV 2104 (SRU)

OMEGA ENGINEERING, INC.,

                                         Counterclaim-Plaintiff,

            v.

OMEGA, S.A. and
THE SWATCH GROUP7 LTD.

                                         Counterclaim-Defendants.


**<u>DEFENDANT-COUNTERCLAIM-PLAINTIFF OMEGA ENGINEERING'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Defendant-counterclaim-plaintiff Omega Engineering, Inc. ("OEI") submits the

following proposed findings of fact and conclusions of law in support of its counterclaims for

breach of contract and for cancellation, pursuant to 15 U.S.C. § 1064, of counterclaim-defendant

Omega, S.A.'s ("OSA") federal trademark registrations Nos. 708,731 and 1,290,661 for the mark

OMEGA and design.  The evidence cited herein is to the relevant pages of the deposition

transcripts, to the names of witnesses who will testify at the hearing, to the exhibits that will be submitted at the hearing, and to findings made in the September 30, 2005 Ruling on Cross-Motions for Summary Judgment.

Dated:  November 10, 2005                    Respectfully submitted,
        New York, NY


Of counsel:                                  _____
Victoria Haje                                Thomas A. Smart (CT 21462)
                                             Paul C. Llewellyn (CT 25417)
                                             Victoria Haje
                                             KAYE SCHOLER LLP
                                             425 Park Avenue
                                             New York, NY  10022
                                             (212) 836-8000

                                             Thomas E. Minogue (CT 06845)
                                             MINOGUE BIRNBAUM LLP
                                             237 Elm Street
                                             New Canaan, CT  06840
                                             (203) 966-6916

                                             *Attorneys for Defendants and for*
                                             *Counterclaim-Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

OMEGA, S.A.,

Plaintiff,

v.

OMEGA ENGINEERING, INC.
OMEGA SCIENTIFIC INC., AND
OMEGA PRESS, INC.,

Defendants.

OMEGA ENGINEERING, INC.,

Counterclaim-Plaintiff,

v.

OMEGA, S.A. and
THE SWATCH GROUP7 LTD.,

Counterclaim-Defendants.

Civil Action No.:
3:01 CV 2104 (SRU)

---

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF OMEGA ENGINEERING'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is an action for common law breach of contract and for cancellation of trademarks

under the federal Lanham Act, 15 U.S.C. § 1051, *et. seq*., arising out of the registration and

maintenance of federal trademark registrations Nos. 708,731 and 1,290,661.  In particular,

Omega Engineering, Inc. ("OEI") alleges that Omega, S.A. ("OSA") has breached a 1994

agreement (the "1994 Agreement") between the parties pursuant to which, *inter alia*, OSA

agreed not to register or maintain any registrations for OMEGA marks covering "Apparatus

industrially and/or scientifically employed for measuring or controlling variable parameters such

as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain and flow." OEI further contends that the foregoing OSA trademark registrations should be cancelled in whole or in part as a result of OSA's abandonment of the OMEGA mark in the United States with respect to the goods covered by the registrations, and as a result of OSA's fraud before the Patent and Trademark Office ("PTO") in connection with the renewal of the registrations.

## FINDINGS OF FACT

### The Parties

1.      OEI is a Delaware corporation, with its principal place of business in Stamford, Connecticut.

2.      OSA is a Swiss corporation, with its principal place of business in Bienne, Switzerland.

### Defendants' Scientific and Industrial Goods Offered Under Their OMEGA Marks

3.      OEI was founded in 1962 by Mrs. Betty Ruth Hollander. OEI's very first products were thermocouples, devices used in scientific and industrial fields (such as factories and laboratories) to measure temperatures. (Court's September 30, 2005 Ruling on Cross-Motions for Summary Judgment, ("SJ Ruling"), p. 4; Defendants' Rule 56(a)1 Statement, ("OEI 56(a)1 Statement"), ¶ 1).

4.      Although OEI initially used the Greek letter Omega standing alone as a design mark, the company eventually stopped using that design in favor of the so-called "Omega bug," a design mark consisting of the juxtaposed Greek letters Omega ($\Omega$) and Epsilon ($\Sigma$) (the "OEI Bug"), which it has used for nearly 40 years. (SJ Ruling, p. 4; OEI 56(a)1 Statement ¶ 2).

5.    The products marketed, distributed and sold under OEI's OMEGA marks include

scientific apparatus for measuring or controlling variable parameters such as temperature,

pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity,

strain, flow and other variable parameters.  Some of these apparatus contain a timing

function.  (SJ Ruling, p. 5; OEI 56(a)1 Statement ¶ 4).

6.    OEI's earliest United States trademark registration for the OMEGA trademark for

industrial and scientific apparatus was issued in 1966.  (SJ Ruling, p. 4).  This

registration, U.S. Registration No. 818,251, is a valid, subsisting, existing and

incontestable trademark registration.  (OEI 56(a)1 Statement, ¶ 28).

7.    OEI's OMEGA trademark registrations include:  Registration No. 2022,762 ("762") (for

"OMEGA"), and Registration No. 2,034,705 ("705") (for the "Omega bug," "ΩΣ")  (DX

Y & Z; SJ Ruling, p. 4).  Registrations '762 and '705 relate "timers, namely period

timers . . . industrially and/or scientifically employed" and "industrial and scientific

clocks."  (DX Y & Z; SJ Ruling, pp. 4-5).

8.    OEI is also the owner of more than 75 other valid, subsisting and existing United States

federal trademark registrations for trademarks or service marks that include the word

OMEGA, more than 50 of which are incontestable marks.  OEI owns the following

United States federal registrations for its OMEGA marks:

| TRADEMARK | REGISTRATION DATE | REGISTRATION NO. (* = incontestable registration) |
|---|---|---|
| OMEGA | November 8, 1966 | 818,251* |
| ΩE | September 17, 1968 | 857,007* |

| TRADEMARK | REGISTRATION DATE | REGISTRATION NO. (* = incontestable registration) |
|---|---|---|
| OMEGALAQ | January 22, 1985 | 1,315,250* |
| OMEGASTIK | February 26, 1985 | 1,321,986 * |
| OMEGALINE | March 5, 1985 | 1,323,040* |
| OMEGATEMP | March 5, 1985 | 1,323,041* |
| OMEGASCOPE | March 12, 1985 | 1,324,278* |
| OMEGAPROBE | March 12, 1985 | 1,324,277* |
| OMEGALABEL | March 12, 1985 | 1,324,469* |
| OMEGABOND | March 19, 1985 | 1,325,251* |
| OMEGACLAD | March 26, 1985 | 1,326,734* |
| OMEGATHERM | April 2, 1985 | 1,327,796* |
| ΩE | June 10, 1986 | 1,396,510* |
| OMEGA | June 17, 1987 | 1,397,434* |
| OMEGA TEMPERATURE MEASUREMENT HANDBOOK AND ENCYCLOPEDIA | June 16, 1987 | 1,443,078 |
| OMEGA TEMPERATURE MEASUREMENT HANDBOOK | June 16, 1987 | 1,443,079* |
| OMEGASOFT | August 18, 1987 | 1,452,952* |
| OMEGA COMPLETE HANDBOOK OF SCIENTIFIC AND TECHNICAL BOOKS | June 14, 1988 | 1,492,163* |
| OMEGA-FLO | September 27, 1988 | 1,505,698* |
| OMEGASEZ | September 5, 1989 | 1,554,521* |
| OMEGASAYS | September 5, 1989 | 1,554,522* |

| TRADEMARK | REGISTRATION DATE | REGISTRATION NO. (* = incontestable registration) |
|---|---|---|
| OMEGA COMPLETE FLOW AND LEVEL MEASUREMENT HANDBOOK AND ENCYCLOPEDIA | February 28, 1989 | 1526812* |
| OMEGA COMPLETE PH AND CONDUCTIVITY HANDBOOK AND ENCYCLOPEDIA | February 28, 1989 | 1526811* |
| OMEGA PRESSURE AND STRAIN MEASUREMENT HANDBOOK | February 21, 1989 | 1525593 |
| OMEGA COMPLETE DATA ACQUISITION AND COMPUTER INTERFACE HANDBOOK AND ENCYCLOPEDIA | February 21, 1989 | 1525591* |
| OMEGATITE | June 19, 1990 | 1,602,295* |
| OMEGA-PAD | June 26, 1990 | 1,603,401* |
| OMEGAFLEX | June 26, 1990 | 1,603,616* |
| OMEGALOG | July 3, 1990 | 1,604,624* |
| OMEGABENCH | July 17, 1990 | 1,606,293* |
| OMEGA-N | July 17, 1990 | 1,606,294* |
| OMEGABYTE | July 17, 1990 | 1,606,296* |
| OMEGABASIC | July 17, 1990 | 1,606,295* |
| OMEGACOAT | July 24, 1990 | 1,607,059* |
| OMEGA-P | July 24, 1990 | 1,607,347* |
| OMEGAFILM | July 24, 1990 | 1,607,349* |
| OMEGABUS | August 21, 1990 | 1,610,471* |

| TRADEMARK | REGISTRATION DATE | REGISTRATION NO. (* = incontestable registration) |
|---|---|---|
| OMEGALOK | August 21, 1990 | 1,610,472* |
| OMEGAMAG | August 21, 1990 | 1,610,473* |
| OMEGALLOY | August 28, 1990 | 1,611,114* |
| OMEGALUX | November 6, 1990 | 1,621,055* |
| OMEGAETTE | November 20, 1990 | 1,623,590* |
| OMEGAMARKER | February 19, 1991 | 1,635,205* |
| OMEGAMETER | February 26, 1991 | 1,636,006* |
| OMEGAAROMETER | February 26, 1991 | 1,636,007* |
| OMEGAPHONE | February 26, 1991 | 1,636,008* |
| OMEGASNAP | February 26, 1991 | 1,636,009* |
| OMEGAPELLETS | April 16, 1991 | 1,640,985* |
| OMEGAMOUSE | September 1, 1992 | 1,711,434* |
| OMEGABASIC | September 8, 1992 | 1,713,322* |
| CHROMEGA | September 8, 1992 | 1,713,321* |
| ALOMEGA | April 20, 1993 | 1,766,569* |
| OMEGALYNX | August 10, 1993 | 1,786,608 |
| OMEGA COMPLETE TEMPERATURE MEASUREMENT HANDBOOK AND ENCYCLOPEDIA | October 26, 1993 | 1,800,903* |
| OMEGAMATIC | January 11, 1994 | 1,815,688* |
| OMEGAMAC | March 28, 1995 | 1,885,903 |
| ΩE OMEGA | November 14, 1995 | 1,934,752* |

| TRADEMARK | REGISTRATION DATE | REGISTRATION NO.<br><br>(* = incontestable registration) |
|---|---|---|
| OMEGA UNIVERSAL GUIDE TO DATA ACQUISITION AND COMPUTER INTERFACES | December 12, 1995 | 1,941,415* |
| MICROMEGA | July 30, 1996 | 1,990,317* |
| OMEGA | August 13, 1996 | 1,992,580* |
| ΩE | October 8, 1996 | 2,005,588* |
| OMEGA | December 17, 1996 | 2,022,762 |
| OMEGANET | January 28, 1997 | 2,033,369 |
| ΩE | February 4, 1997 | 2,034,705 |
| OMEGA | April, 14, 1998 | 2,150,239 |
| ΩE | December 8, 1998 | 2,208,326 |
| OMEGA environmental | January 26, 1999 | 2,219,849 |
| OMEGA | January 26, 1999 | 2,220,409 |
| 1-800-TC-OMEGA | February 16, 1999 | 2,223,516 |
| OMEGA | April 6, 1999 | 2,236,657 |
| ΩE OMEGA | September 14, 1999 | 2,276,934 |
| THERMOMEGA | January 25, 2000 | 2,312,126 |
| OMEGA-LAB | April 4, 2000 | 2,338,929 |
| OMEGA.COM | December 12, 2000 | 2412,722 |
| TC-OMEGA | July 10, 2001 | 2,467,149 |

(DX AA; OEI 56(a)1 Statement, ¶ 29).

**OSA's Wristwatches and Sports Timing Devices**

9.    OSA, a subsidiary of The Swatch Group Ltd., is a Swiss company that sells luxury

watches, jewelry and related-watch products, such as watch bands and spare parts, under

the mark OMEGA and a design mark consisting of the Greek letter Omega.  (DX TT; Emmons Tr. 14, 34-35, 40; Rentsch Tr. 104, 119; OEI 56(a)1 Statement, ¶ 44).

10.     Swatch Group (U.S.) is the United States licensee of OSA that distributes and sells OSA's OMEGA-branded watches and related goods in the United States.  (Emmons Tr. 15-16, 30; Rentsch Tr. 104; OEI 56(a)1 Statement, ¶ 45).  The majority of such sales in the United States are wristwatches, while jewelry sales consist of only a small percentage of sales.  (Rentsch Tr. 108; OEI 56(a)1 Statement ¶ 45).

11.     OSA uses words and design marks that incorporate the words "Omega" and the Greek letter "Ω".  (Plaintiff's Rule 56(a)1 Statement ("OSA 56(a)1 Statement"), ¶¶ 2, 33; SJ Ruling, p. 3).  Its United States trademark registrations include Registration Nos. 708,731 and 1,290,661.  (SJ Ruling, p. 3).

12.     Apart from wristwatches and watch-related goods, the only other goods or services sold in the United States under OSA's OMEGA marks are those of Omega Electronics, a licensee of OSA that sells sports timing devices in the United States.  (Rentsch Tr. 109, 111, 118-119; Gibbons Tr. 37, 153; OEI 56(a)1 Statement, ¶ 54).

13.     Omega Electronics sells OMEGA-branded sports timing devices in the United States through its exclusive distributor, GDG Inc. (Kayal Tr. 43; OEI 56(a)1 Statement, ¶ 55).  Omega Electronics' total United States sales in 2003 were approximately $175,000.  (Kayal Tr. 143; DX K).  In 2002, Omega Electronics' sold roughly between $100,000 to $150,000 in the United States, while sales were still lower in 2001.  (Gibbons Tr. 124; DX K; OEI 56(a)1 Statement ¶ 55).

14.  OMEGA-branded products sold by Omega Electronics include touch pads used in swimming events, starting blocks for use in running events and time display devices for waterpolo matches.  (Kayal Tr. 64, 78-79, 82, 134-35; DX O-W; OEI 56(a)1 Statement ¶ 56).  An example of an Omega Electronics' sports timing product is the Scan-O-Vision camera, which is used for timing athletic races.  (Gibbons Tr. 59, 76-77).

15.  Advertising of Omega Electronics' products in the United States targets the sports timing market.  (Gibbons Tr. 182; OEI 56(a)1 Statement ¶ 63).  Omega Electronics advertises its sports timing devices only through promotional brochures, posters, newsletters and trade journals intended for sport stadiums and sports organizations.  (Kayal Tr. 115-16, 119, 198; Gibbons Tr. 82; OEI 56(a)1 Statement ¶ 63).

16.  In addition to sports timing equipment, Omega Electronics also has sold in the United States, under the OMEGA mark, a small number of large display boards intended for large sports facilities such as baseball stadiums.  Omega Electronics has only sold and installed five such scoreboards within the United States, the most recent of which was in 1988.  All five scoreboards were sold to large sports organizations.  (DX K; Gibbons Tr. 112-15; Kayal Tr. 142-44; OEI 56(a)1 Statement ¶ 64).

17.  Other Omega Electronics' products that are sold abroad are not sold in the United States. For example, Omega Electronics has sold passenger information display systems which are used in railways, bus stations and airports to display travel-related information, such as arrival and departure times.  (OEI 56(a)1 Statement ¶ 66).  However, they are not available for sale in the United States and none have been sold within the United States. (Kayal Tr. 98-100, 246-47; Rentsch Tr. 111-14; OEI 56(a)1 Statement ¶¶ 65-66).  Nor are

they advertised or marketed in the United States. (Gibbons Tr. 85, 110, 119-20; OEI 56(a)1 Statement ¶ 66).

18.    In some countries, OSA also sells RFIDs, which are devices that can be used for access control as a security measure and for other purposes. (OEI 56(a)1 Statement ¶¶ 65-67). For example, an RFID can be used for access control to a building. (OEI 56(a)1 Statement ¶ 67). OSA's OMEGA-branded RFIDs are only advertised and marketed abroad; they are not offered for sale in the United States. (Gibbons Tr. 119-20; OEI 56(a)1 Statement ¶ 67). The only transaction involving an OMEGA RFID system in the United States occurred sometime in 2002 when Omega Electronics provided an RFID system to its affiliated company, Swatch Group (U.S.), for control of access to its office building. (Kayal Tr. 102-104, 106; OEI 56(a)1 Statement ¶ 67).

**The 1994 Agreement Between OEI and OSA**

19.    Throughout the 1980's, Omega Engineering and OSA had a history of disputing the scope of their respective trademark rights. (OEI 56(a)1 Statement, ¶ 75).

20.    The two parties signed several agreements in the 1980's limited to certain countries and trademark registrations. (OEI 56(a)1 Statement, ¶ 75).

21.    In an effort to end such disputes in a worldwide agreement, in 1994 OEI and OSA entered into a worldwide agreement (the "1994 Agreement"). (SJ Ruling, p. 6, OEI 56(a)1 Statement, ¶ 75).

22.    The 1994 Agreement was executed for and on behalf of OSA on May 3, 1994, and was executed for and on behalf of Omega Engineering on August 2, 1994 (the "1994 Agreement"). (OEI 56(a)1 Statement, ¶ 75; DX E).

23.    The 1994 Agreement was made and executed in the English language only.

24.    The 1994 Agreement supersedes a prior 1992 Agreement between the same parties.  (OEI

       56(a)1 Statement ¶ 75).

25.    The 1994 Agreement was negotiated on OSA's behalf by William R. Coutts and on OEI's

       behalf by Dr. William Drucker.  Mr. Coutts is deceased.  (Sauser Rupp Tr. 407-08;

       Rentsch Tr. 127).

26.    The 1994 Agreement states, in part, that "[b]oth parties hereto are desirous of coming to

       an arrangement for the avoidance of future interference Worldwide between their

       respective fields of commercial operation under their Rights in respect of Trademarks

       consisting of or including the word OMEGA and/or the Greek letter Ω or containing

       elements colourably resembling either or thos[e] two elements."  (OEI 56(a)1 Statement,

       ¶ 75; DX E at ¶ (F)).

27.    The 1994 Agreement settled various particular contested matters around the world

       involving Omega Engineering's and OSA's trademarks.  Among other things, Omega

       Engineering agreed to withdraw certain oppositions against OSA and amend certain

       definitions of goods in Omega Engineering's trademark applications and OSA agreed to

       amend certain definitions of goods in OSA's trademark applications.  (OEI 56(a)1

       Statement, ¶ 75; DX E at ¶ (F)).

28.    The 1994 Agreement further provides in Paragraph 4 that:

                     Henceforth from the signing of this Agreement and
                     effective in all countries of the World:
                     . . .
                     b.  OMEGA SA undertakes not to use, register or apply to
                     register any trademark consisting of or containing the word
                     OMEGA or the Greek letter Ω, or any element colourably

resembling either of those two elements, in respect of
"Apparatus industrially and/or scientifically employed for
measuring or controlling variable parameters such as
temperature, pressure, force, load, vibration, electrical
conductivity, liquid level, acidity, humidity, strain and
flow."

(DX E).

## OSA's Renewals of Trademark Registration Nos. 708,731 and 1,290,661

### *OSA's Registration No. 708,731*

29.    United States Trademark Registration No. 708,731 was registered to OSA on December

20, 1960 for the word OMEGA and the OMEGA symbol for use with "electronic time

recorders for automatic precision timing in science and industry," in International Class 9.

(DX B; OEI 56(a)1 Statement, ¶ 118).

30.    On December 20, 2000, OSA filed a trademark renewal application for the mark

OMEGA (and design) for Registration No. 708,731 and in doing so claimed it was using

the OMEGA mark on all of the goods listed in the registration, including "electronic time

recorders for automatic precision timing in science and industry."  (DX C; OEI 56(a)1

Statement ¶ 120).

31.    OSA submitted a Combined Section 8 and 9 Declaration in accordance with Sections 8

and 9 of the Lanham Act for its December 20, 2000 trademark renewal application for

Registration No. 708,731.  The declaration, also filed on December 20, 2000, was signed

by Hanspeter Rentsch, senior vice president and general counsel for The Swatch Group

Ltd.  (DX C; OEI 56(a)1 Statement, ¶ 120).

32.    The December 20, 2000 Combined Section 8 and 9 Declaration for Registration

No. 708,731 stated, in pertinent part, "[t]hat registrant owns Registration No. 708,731,

that the mark shown therein is in use in commerce on each of the goods recited in the registration, with the attached specimen showing the mark as currently used." (DX C; OEI 56(a)1 Statement, ¶ 120).

33.   Thus, OSA represented that the OMEGA mark was in use in the United States as of December 20, 2000 on electronic time recorders for automatic precision timing in science and industry. (Rentsch Tr. 134-38; OEI 56(a)1 Statement, ¶ 120; DX B & C).

34.   In its December 20, 2000 filing with the PTO, OSA submitted a specimen in support of renewal for Registration No. 708,731 which was a brochure for an Omega Electronics aquatic starting system – that is, a system used to signal and time the start of swimming competitions. (*See* Kayal Tr. 251-52; Sauser Rupp Tr. 288-89; OEI 56(a)1 Statement, ¶ 121; DX C).

35.   No other specimens were submitted in support of the renewal for Registration No. 708,731. (DX C).

36.   Mr. Rentsch, who signed the renewal application relating to Registration No. 708,731, admitted at his deposition in this case that he knew of no sales in the United States of electronic time recorders for automatic precision timing in science and industry. (Rentsch Tr. 138).

37.   The PTO granted the renewal of Registration No. 708,731 following receipt of OSA's renewal application and OSA's Registration No. 708,731 for the word OMEGA and the OMEGA symbol for "electronic time recorders for automatic precision timing in science and industry" remains on the United States federal trademark registry today. (Sauser Rupp Tr. 270).

### OSA's *Registration No. 1,290,661*

38.    United States Trademark Registration No. 1,290,661 was registered to OSA on August

21, 1984 and is for the word OMEGA and the OMEGA symbol for use with, among other

products, "computer apparatus for checking and controlling the measurement of time and

distance for sporting events, scientific investigation, and industrial application, including

the acquisition, transmission, and management of information intended for transportation,

publicity, and financial use; computers for calculating information in respect of time and

distance, storing such information, and making the same available in visual or audible

form," in International Class 9.  (OEI 56(a)1 Statement, ¶ 118; DX A).

39.    On August 14, 1990, OSA filed a trademark renewal application for the mark OMEGA

(and design) for Registration No. 1,290,661 and in doing so claimed it was using the

OMEGA mark on all of the goods listed in the registration.  (OEI 56(a)1 Statement,

¶ 122; DX D).

40.    On August 14, 1990, OSA submitted a Combined Section 8 and 9 Declaration in

accordance with Sections 8 and 9 of the Lanham Act for the trademark renewal

application, which was signed by OSA's authorized representatives and dated July 26,

1990.  (OEI 56(a)1 Statement, ¶ 122; DX D).

41.    The Declaration Under Sections 8 and 15 for Registration No. 1,290,661, dated July 26,

1990, stated, in part, that the OMEGA mark "has been in continuous use in commerce

with the United States for five consecutive years from the date of the registration to the

present, on or in connection with all of the goods of Classes 9 and 14 . . . recited in the

registration."  (OEI 56(a)1 Statement, ¶ 122; DX D).

42.     The goods in International Class 9 recited in Registration No. 1,290,661 include
        "computer apparatus for controlling the measurement of time and distance for sporting
        events, scientific investigation, and industrial application."  (OEI 56(a)1 Statement,
        ¶ 122; DX A & D).

43.     Accordingly, in the declaration submitted to the PTO on August 14, 1990 in connection
        with Registration No. 1,290,661, OSA represented that the OMEGA mark was in use in
        the United States as of July 26, 1990 on "computer apparatus for checking and controlling
        the measurement of time and distance for sporting events, scientific investigation, and
        industrial application."  (DX D).

44.     In accordance with Sections 8 & 15 of the Lanham Act, on August 14, 1990, OSA
        submitted a specimen in support of renewal of Registration No. 1,290,661 which was a
        computer which measures and displays the times during athletic competitions.  (Rentsch
        Tr. 126-31; Sauser Rupp Tr. 292-93; Kayal Tr. 249-50; OEI 56(a)1 Statement, ¶ 123; DX
        D).

45.     No other specimens were submitted in support of the renewal for Registration
        No. 1,290,661.  (DX D).

46.     OSA's witnesses concede that the computer depicted in the specimen filed by OSA with
        the PTO on August 14, 1990, in support of renewal of Registration No. 1,290,661, is a
        timing system for a sporting event.  (Rentsch Tr. 126-31; Sauser Rupp Tr. 292-93; OEI
        56(a)1 Statement, ¶ 123; DX D).

47.  Moreover, OSA's Dr. Rentsch conceded that he knew of no goods sold by OSA in the

United States for "scientific investigation" or "industrial application" as recited in

Registration No. 1,290,661.  (Rentsch Tr. 129).

48.  The PTO granted the renewal of Registration No. 1,290,661 following receipt of OSA's

renewal application.  (DX D).

49.  On February 18, 2005, OSA submitted to the U.S. Patent & Trademark Office an

application for renewal of Registration No. 1,290,661, which included a declaration

signed by Jean-Claude Monachon and Josiane Citiso of OSA.  (DX CC).

50.  In its February 18, 2005 application for renewal of Registration No. 1,290,661, OSA

requested renewal of Registration No. 1,290,661 only for the following goods:

> "computer apparatus for checking and controlling the
> measurement of time and distance for sporting events;
> computers for calculating information in respect of time
> and distance, storing such information, and making the
> same available in visual or audible form – all of which
> installations contain electronic elements" in International
> Class 9; and
>
> "watch cases" in International Class 14.

(DX CC).

51.  In its February 18, 2005 application for renewal of Registration No. 1,290,661, OSA did

not seek renewal of Registration No. 1,290,661 for "Computer Apparatus for Checking

and Controlling the Measurement of Time and Distance for . . . Scientific Investigation,

and Industrial Application, Including the Acquisition, Transmission, and Management of

Information Intended for Transportation, Publicity, and Financial Use," which were

previously listed in the registration.  (DX CC).

52.     OSA's February 18, 2005 application for renewal of Registration No. 1,290,661 does not

        contain any declaration that OSA continues to use the marked covered by that registration

        in connection with any goods or services in the United States.  (DX CC).

53.     Despite the fact that OSA's February 18, 2005 application for renewal of Registration

        No. 1,290,661 was limited to only certain goods and classes in the original registration,

        the PTO has erroneously renewed the registration for all of the goods listed in the covered

        application.  (DX DD).

**OSA Does Not Sell or Intend to Sell Any Goods for Scientific or Industrial Application in the United States**

54.     There is no evidence in the record that OSA was making sales in science and industry at

        the time of its renewals of both marks nor is there any evidence that OSA has made any

        such sales in the last three years.

55.     By its own admission, OSA and its affiliates do not sell any OMEGA-branded goods for

        "science and industry" or for "scientific investigation and industrial application" in the

        United States and did not do so at the time the above-referenced Section 8 and 9

        Declarations for Registration No. 708,731 and Registration No. 1,290,661 were filed.

        (Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45; Emmons Tr. 10-12;

        Sauser Rupp Tr. 252, 270-71; Gibbons Tr. 142-45, 153).  Indeed, OSA's 30(b)(6)

        designees, Ms. Sauser Rupp, Mr. Hamid Kayal and Mr. Robert Emmons, could not

        substantiate any such use and had no knowledge of the goods at issue in OSA's

        registrations.  (Kayal Tr. 244-45; Emmons Tr. 10-12; Sauser Rupp Tr. 252, 270-71;

        Gibbons Tr. 142-45, 153).

56.     Mr. Kayal, general manager of Omega Electronics, testified at deposition that "in the last

        four years" he could not point to a single customer who had purchased a single product

        from Omega Electronics for use in science and industry.  (Kayal Tr. 244-45).

57.     There is no evidence in the record from OSA or any of its witnesses that any goods

        intended for use in science or industry or scientific or industrial use, as those terms are

        used in Registration Nos. 708,731 and 1,290,661, are sold in the United States under

        OSA's OMEGA marks.  (Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45;

        Emmons Tr. 10-12; Sauser Rupp Tr. 252, 270-71; Gibbons Tr. 142-43, 153).  The

        evidence also shows that OSA and its affiliates do not market or promote any goods for

        use in "science and industry" or for "scientific investigation, and industrial application"

        within the meaning of OSA's registration Nos. 708,731 and 1,290,661.  (Kayal Tr. 84,

        221, 244; Gibbons Tr. 182, 185-86).

58.     OSA's 30(b)(6) witness testified at deposition that OSA has no current plans to offer

        OMEGA-branded goods for scientific or industrial use in the United States.  (Sauser

        Rupp Tr. 168-69; Sauser Rupp 6/27/01 Tr. 62).

**OSA Has Relied on its Fraudulent Trademark Registration Nos. 708,731 and 1,290,661 in
this Lawsuit and in Oppositions and Cancellations against OEI's Trademark Applications
and Registrations**

59.     In its complaint against OEI in this action, OSA cited its Registration No. 1,290,661 in

        support of its claims against OEI.  (DX KK).

60.     OSA also has cited its registration Nos. 708,731 and 1,290,661 in oppositions and

        cancellations that it has filed against various OEI applications and registrations for

        OMEGA marks.  (DX II & JJ).

## CONCLUSIONS OF LAW

1.      The express purpose of the 1994 Agreement was to "avoid[ ] [ ] future interference

Worldwide between [the parties'] respective fields of commercial operation" under the

OMEGA marks.  (DX E).  Despite the clear purpose of this binding agreement, OSA has

breached its terms and conditions by maintenance of registrations for the OMEGA marks

at the PTO for apparatus scientifically and/or industrially employed for measuring or

controlling variable parameters.

2.      Moreover, I find that OSA's two federal trademark Registrations Nos. 708,731 and

1,290,661 for its OMEGA & design mark were procured as a result of false and

fraudulent statements made by OSA's authorized representative to the PTO, and that

OSA has abandoned the OMEGA mark in connection with the goods covered by those

registrations.  Thus, the registrations are invalid and subject to cancellation.

**OSA Breached Paragraph 4(b) of the 1994 Agreement by Maintaining, or Causing to be Maintained, United States Registration Nos. 708,731 and 1,290,661 For All or Some of the Products Contained Therein**

3.      The elements of a breach of contract action are "(1) the formation of an agreement; (2)

performance by one party; (3) breach of the agreement; and (4) damages."  *Maloney v.*

*Conn. Orthopedics, P.C.*, 47 F. Supp. 2d 244, 249 (D. Conn. 1999).  These elements must

be proven by a preponderance of the evidence.  *Underkofler v. Cmty. Health Care Plan,*

*Inc.*, 1999 U.S. Dist. LEXIS 10515, at *10 (D. Conn. June 17, 1999).

4.      In order to determine if a party has breached the contract, the court must first interpret the

contract and resolve any ambiguities.  *See Tallmadge Bros. v. Iroquois Gas Transmission*

*Sys., L.P.*, 252 Conn. 479, 498, 746 A.2d 1277, 1288 (2000); *HLO Land Ownership*

*Assoc. Ltd. Pshp. v. City of Hartford*, 248 Conn. 350, 356-57, 727 A.2d 1260, 1264-5

(1999); *Barnard v. Barnard*, 214 Conn. 99, 110, 570 A.2d 690, 696 (1990). If the

contract is unambiguous, "the contract is to be given effect according to its terms."

*Tallmadge Bros.,* 252 Conn. at 498; *HLO Land Ownership Ltd. Pshp.,* 248 Conn. at 357;

*Barnard,* 214 Conn. at 110; *see also Omni Quartz, Ltd. v. CVS Corp*., 287 F.3d 61, 64 (2d

Cir. 2002). As the Connecticut Supreme Court instructs, the trial court must construe a

contract according to the intent of the parties as expressed in the contract:

> "A contract must be construed to effectuate the intent of the
> parties, which is determined from the language used interpreted in
> the light of the situation of the parties and the circumstances
> connected with the transaction. . . .  The intent of the parties is to
> be ascertained by a fair and reasonable construction of the written
> words and . . . the language used must be accorded its common,
> natural, and ordinary meaning and usage where it can be sensibly
> applied to the subject matter of the contract. . . .  Where the
> language of the contract is clear and unambiguous, the contract is
> to be given effect according to its terms.  A court will not torture
> words to import ambiguity where the ordinary meaning leaves no
> room for ambiguity. . . .  Similarly, any ambiguity in a contract
> must emanate from the language used in the contract rather than
> from one party's subjective perception of the terms. . . ."

*Tallmadge*, 252 Conn. at 498, 746 A.2d at 1288 (quoting *Pesino v. Atlantic Bank of
New York*, 244 Conn. 85, 91-92, 709 A.2d 540, 545 (1998)).

5.    As I already found in the Summary Judgment order, dated September 30, 2005, and as the

parties do not dispute, the 1994 Agreement is a binding agreement between the parties

and their subsidiaries, affiliates and licensees.  (SJ Ruling, p. 8; *see also* Rentsch

4/23/2004 Tr. 266; Sauser Rupp 3/17/2004 Tr. 407).

6.    OEI has performed its duties, responsibilities and undertakings under the 1994

Agreement.

7.      The clear and unambiguous purpose of the 1994 Agreement is to permit OEI to register

        any trademark containing the word OMEGA or the Greek letter Ω for goods or services

        intended for the measurement and control of variable parameters in science and industry,

        and to bar OSA from doing the same.

8.      Indeed, the clear meaning of Paragraph 4(b) is that OSA is prevented from registering or

        maintaining any OMEGA marks (including the Greek letter Ω) in connection with

        "[a]pparatus industrially and/or scientifically employed for measuring or controlling

        variable parameters."  (Findings ¶ 28).

9.      Even if paragraph 4(b) was found to be ambiguous – which, as explained herein, it is not

        – there is no extrinsic evidence that takes away from the provision's natural interpretation

        as barring OSA from registering the OMEGA marks in science and industry.

10.     To begin with, the traditional extrinsic evidence used in interpreting ambiguous contracts

        is not present here.  There are no drafts particularly directed to the 1994 Agreement, and

        there is no pre-execution correspondence between the parties concerning the 1994

        Agreement that shows the parties' intent as to the terms in the 1994 Agreement (let alone

        correspondence in which one party expresses its interpretation of 4(b) of the 1994

        Agreement to the other party).  *See Wards Co., Inc. v. Stamford Ridgeway Assoc.*, 761

        F.2d 117, 122 (2d Cir. 1985) (discussing evidence probative of the parties' intent).

11.     There was an agreement between the parties which was executed in 1992, governing

        worldwide use and registration of the OMEGA marks, in which paragraphs 4(a), 4(b) and

        4(c) of that 1992 agreement are virtually mirrored in paragraphs 4(a), 4(b) and 4(c) of the

        1994 Agreement.  (DX OO).

12.    OSA breached paragraph 4(b) of the 1994 Agreement by maintaining, or causing to be maintained, United States Registration Nos. 708,731 and 1,290,661 for some of the products that fall under International Class 9.

13.    United States Trademark Registration No. 708,731 was registered to OSA on December 20, 1960 for the word OMEGA and the OMEGA symbol for use with "electronic time recorders for automatic precision timing in science and industry."  (DX B) (Findings ¶ 29).  Registration No. 1,290,661 was registered to OSA on August 21, 1984 and is for the word OMEGA and the OMEGA symbol for use with, among other products, "computer apparatus for checking and controlling the measurement of *time* and *distance* for sporting events, *scientific investigation*, and *industrial application*, including the acquisition, transmission, and management of information intended for transportation, publicity, and financial use; computers for calculating information in respect of *time* and *distance*, storing such information, and making the same available in visual or audible form."  (OEI 56(a)1 Statement, ¶ 118; DX A; Findings ¶ 38) (emphasis added).

14.    OSA renewed both registrations and in doing so claimed they were using OMEGA on the goods listed in each registration for "science and industry" and "scientific investigation and industrial application" in the United States.  (DX C & D; Rentsch Tr. 126-38).

15.    By filing for goods listed for "science and industry" and "scientific investigation and industrial application" in the United States, OSA's conduct falls squarely within the prohibition of Section 4(b) of the Settlement Agreement.  (*See* DX A & B).

16.    OSA's challenged registrations are plainly covered by paragraph 4(b) because they are for goods for use in science and industry to measure distance and time, which are clearly

"parameters" that can be "variable" within the meaning of paragraph 4(b).  Webster's

Dictionary defines "parameter" as:

> an independent variable through functions of which other functions
> may be expressed [e.g,] four [parameter]s are necessary to
> determine an event, namely the three which determine its position
> *and the one which determines its time.* . . .

Webster's Third New International Dictionary (1964) ("Webster's") (DX QQ), p. 1638
(emphasis added).

Webster's defines "variable" as "something subject to change," and expressly defines

"parameter" as including "the one which determines [an event's] time."  *Id.* at 1638, 2533.  The

term "variable parameters," therefore, includes distance and time because distance and time are

parameters, and are subject to change.  Moreover, the 1994 Agreement contains nothing that

would exclude distance or time as being understood to be a "variable parameter."  Thus, the

terms in OSA's registrations are squarely encompassed by paragraph 4(b).

17.     The term "variable parameters" as used in the 1994 Agreement, including paragraph 4(b),

is illustrated by, but not limited to, the examples of variable parameters given "such as

temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity,

humidity, strain and flow."  (DX E).  The fact that distance and time are not included in

the list of other variable parameters in paragraph 4(b) does not detract from the clear

meaning of "variable parameter" as including distance and time, because the use of "such

as" means that the list "is clearly not an exhaustive list, but is merely a list of clarifying

examples."  *Hertz Corp. v. Pap*, 923 F. Supp. 914, 920 (N.D. Tex. 1995), *aff'd without*

*opinion,* 98 F.3d 1339 (5th Cir. 1996);  DX PP & QQ;  *see Ethicon, Inc. v. United States*

*Surgical Corp.*, 135 F.3d 1456, 1466 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 923 (1998)

(in interpreting a patent license, the court held that "the 'including' phrase is a phrase of

addition, not a limitation on the scope of [the licensed invention]"); *see also, State v.*

*DeFrancesco*, 235 Conn. 426, 436, 668 A.2d 348, 354 (1995); *Reliance Nat'l Ins. Co. v.*

*Vitale*, 183 F. Supp. 2d 506, 511 (D. Conn. 2001).

18.     Indeed, Omega S.A.'s own exhibit contains numerous statements demonstrating that time

and distance are "variable parameters."  The Scan-O-Vision manual states:  (1) "[t]he

parameters to be set for each standard race requiring the measuring of the wind speed are"

"duration," and "waiting time" in seconds, (000966; PX- 10); (2) the camera setting

parameters include "exposure time" in milliseconds, (000971; PX-10); and (3) the race

parameters include "Length of the track or of the race according to the selected unit

(meters, miles, yards or feet)" (001052, PX-10).

19.     Moreover, in my ruling on Cross-Motions for Summary Judgment in which I found that

OSA's trademark infringement and false designation of origin claims failed as a matter of

law, I held that OEI's period timers were covered by the 1994 Agreement as a device for

use in controlling variable parameters.  (SJ Ruling, p. 14).  Specifically, I found that OSA

has consented to OEI's "registration or use of 'Omega' or 'Ω' trademarks 'in respect of

apparatus industrially and/or scientifically employed for measuring or controlling variable

parameters.'"  (*Id.*).  Thus, the same logic would apply to devices described in OSA's

registrations and I find that time and distance are variable parameters.

20.     Thus, OSA breached Paragraph 4(b) of 1994 Agreement by renewing and maintaining (1)

Registration No. 1,290,661 for "computer apparatus for checking and controlling the

measurement of time and distance for . . . scientific investigation and industrial

application"; and (2) Registration No. 708,731 for "electronic time recorders for automatic precision timing in science and industry."

21.    Pursuant to 15 U.S.C. § 1119, "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  Here, OSA's registration and maintenance of Registration Nos. 708,731 and 1,290,661 constitutes a breach of the 1994 Agreement, and the Court may grant the appropriate relief under 15 U.S.C. § 1119, including cancellation of the registrations at issue in whole or in part.

**OSA Has Abandoned the Marks at Issue With Respect to the Goods at Issue**

22.    Registration Nos. 708,731 and 1,290,661 should be cancelled pursuant to 15 U.S.C. §§ 1064 and 1119, because, by OSA's own admission, it does not use its OMEGA marks in the United States on goods for scientific or industrial application, and has no specific intent to do so.

23.    Where a mark has been abandoned with respect to the goods covered by a federal registration, that registration is not valid and is subject to cancellation.  *See* 15 U.S.C. § 1064(3); *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir. 1989) (reversing bench trial finding of no abandonment and remanding for cancellation of trademark registration); *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579, 1583 (Fed. Cir. 1990) (cancellation appropriate because appellant had abandoned mark).

24.    A party has standing to seek cancellation of a federally registered trademark if it has a real commercial interest in its own marks and a reasonable basis for its belief that it would be

damaged in the absence of cancellation." *Citigroup Inc. v. City Holding Co.*, 2003 U.S. Dist. LEXIS 1845, at *37 (S.D.N.Y. Feb. 10, 2003). This standard is met where (1) the trademark for which cancellation is sought has been cited against the applications of plaintiff's own trademarks; or (2) plaintiff is using the same or a similar mark for the same or similar goods. *Id.* at *37-38.

25. OEI has standing to seek cancellation of OSA's Registrations Nos. 708,731 and 1,290,661 because these registrations have been cited against OEI's application Serial No. 75/747885 in support of OSA's Notice of Opposition and against OEI's trademark Registration No. 2,236,657 in support of OSA's Petition for Cancellation. (Findings ¶ 60). Additionally, in its complaint against OEI in this action, OSA cited its Registration No. 1,290,661 in support of its claims against OEI. (DX KK) (Findings ¶ 59).

26. Under 15 U.S.C. § 1127, non-use of a mark for three years constitutes *prima facie* evidence of abandonment, shifting the burden to the registrant to demonstrate "reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." *Silverman*, 870 F.2d at 47; *Citigroup Inc.*, 2003 U.S. Dist. LEXIS 1845, at *44-45; *accord*, *Imperial Tobacco*, 899 F.2d at 1579, 1581.

27. The requisite use of a trademark to avoid abandonment is actual bona fide use in commerce. *See Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000); *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 100 (5th Cir. 1983).

28. "A bare assertion of possible future use is not enough" to prove an intent to resume use sufficient to rebut a presumption of abandonment. *Silverman*, 870 F.2d at 47; *Citigroup*

*Inc.*, 2003 U.S. Dist. LEXIS 1845, at *47 (marks cancelled where presumption applied and mark holder "failed to present any 'concrete plans to resume use'") (quoting *Silverman*, 870 F.2d at 46).

29.   Here, as set forth above, there is no evidence that OSA or its licensees have ever used OSA's OMEGA & design mark in the United States in connection with "electronic time recorders for automatic precision timing in science and industry," or on "computer apparatus for checking and controlling the measurement of time and distance for . . . scientific investigation, and industrial application, including the acquisition, transmission, and management of information intended for transportation, publicity, and financial use." (Findings ¶¶ 54-58).  In all events, OSA has not shown any use within the past three years.

30.   Indeed, OSA's witnesses have conceded no such use.   (Rentsch Tr. 120-24, 129, 131, 134-35, 138; Kayal Tr. 244-45; Emmons Tr. 10-12; Sauser Rupp Tr. 252, 270-71; Gibbons Tr. 142-45, 153) (Findings ¶ 57).  Mr. Kayal, the Rule 30(b)(6) designee with respect to Omega Electronics' products, could not at his deposition identify a single customer who had purchased any OMEGA goods for use in scientific or industrial applications, and conceded that Omega Electronics' products had not been advertised for such uses in the United States.  (Kayal Tr. 244-45) (Findings ¶ 56).

31.   As one court has stated in the face of such evidence, "no proof could be more persuasive than appellant's admission of nonuse."  *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1031 (C.C.P.A. 1982) (affirming grant of petition to cancel registration).

32.     Furthermore, OSA, once again, admitted that it does not use its OMEGA marks on "Computer Apparatus for Checking and Controlling the Measurement of Time and Distance for . . . Scientific Investigation, and Industrial Application, Including the Acquisition, Transmission, and Management of Information Intended for Transportation, Publicity, and Financial Use," when OSA applied to renew Registration No. 1,290,661 and dropped any reference to those goods which were previously listed in the registration. (Findings ¶ 50).  This, in effect, serves as an admission that OSA is not using the OMEGA mark in connection with scientific and industrial applications in the United States.

33.     In support of its argument that OSA has not abandoned the above two registered trademarks because OSA uses its marks in science and industry, OSA relies on testimony that OMEGA brand watches have been the official watches worn by astronauts, which, OSA asserts, establishes use of OMEGA mark on goods for scientific and industrial use. Such alleged use, however, does not constitute use in science and industry within the meaning of OSA's trademark registrations at issue, for at least two reasons.

34.     First, although one of the watches that OSA sells, the Omega Speedmaster, is authorized by NASA and used by astronauts, the watch is nonetheless a wristwatch and is used as such.  Indeed, the Speedmaster is offered and sold to consumers in the general public, and is available at a price ($3,400) that is comparatively low for OMEGA watches, which can sell for as much as $79,000.  OSA's Speedmaster wristwatch is not a good for "scientific" or "industrial" use, regardless of who might wear it.

35.     Second, OSA's wristwatches cannot as a matter of law constitute goods of the type

covered by the registrations at issue.  The International Class at issue in both registrations

is Class 9, which covers "scientific and electrical apparatus."  *See* 37 C.F.R. § 6.1.  The

Trademark Manual of Examining Procedure, which governs registration of United States

trademarks, expressly states in an explanatory note that Class 9 does *not* include watches.

*See* Trademark Manual of Examining Procedure § 1401.02(a) (4th ed. 2005).  Watches,

rather, fall squarely within Class 14 as "horological and chronometric instruments."  *Id.*

Thus, by very definition, it is impossible for watches to constitute the Class 9 goods at

issue and OSA's reliance on its sales of "moon watches" to show use in science and

industry therefore fails.

36.     OSA also relies on testimony that Omega Electronics' products have scientific and

industrial applications because at least one customer, the University of Michigan, used a

Scan-O-Vision camera "in or around 1997" "for a scientific study of the physiology of

feet during athletic activity."  Such testimony, however, is inconsistent with prior

deposition testimony and is not credible.  *See* Kayal Tr. 244-45.  *Mullins v. Pfizer, Inc.*,

147 F. Supp. 2d 95, 104 (D. Conn. 2001) (where testimony at trial differed from

deposition testimony, Court found the "recent clarity of recollection problematic");

*Miller v. Time-Warner Communs., Inc.*, 1999 U.S. Dist. LEXIS 14512, at *4 (S.D.N.Y.

Sept. 22, 1999) ("plaintiff's lack of credibility was [evidenced by] the fact that parts of her

hearing testimony contradicted prior deposition testimony");  *see also Mack v. United

States*, 814 F.2d 120, 124 (2d Cir. 1987) ("a party's affidavit which contradicts his own

prior deposition testimony should be disregarded on a motion for summary judgment").

37.     Even if Mr. Kayal's testimony is credited, moreover, *de minimis* use of one product in a physiology study is not sufficient to amount to use in science and industry.  It is too far a stretch to suggest, as OSA proposes, that a sale to a university to study the physiology of feet during athletic activity is even remotely connected to science and industry as that term is used in Registration Nos. 708,731 and 1,290,661.  Rather, it is plain that this is a sports-related study using an Omega Electronics' sports timing device.

38.     In addition, one sale in 1997 does not rebut the evidence described above that OSA has abandoned the OMEGA marks with respect to the goods at issue.  *See, e.g., Emergency One, Inc.*, 228 F.3d at 537 ("One [product] with an AMERICAN EAGLE nameplate over the course of three years is no more than a token use which, standing alone, is legally insufficient to disprove abandonment").

39.     Nor has OSA shown any specific plans to resume use that could rebut the  presumption of abandonment.  OSA has provided no evidence of concrete plans to sell, in the foreseeable future, goods under the OMEGA mark for use in science and industry in the United States.  OSA's bare conclusory assertions are legally insufficient under the Second Circuit's decision in *Silverman v. CBS, Inc.*, *supra*, 870 F.2d at 47.

40.     Moreover, OSA's alleged uses of its OMEGA marks on goods outside the United States are legally irrelevant to whether OSA has made the requisite trademark in United States commerce.  *ITC Ltd. v. Punchgini, Inc.*, 373 F. Supp. 2d 275, 279 (S.D.N.Y. 2005) ("'Intent to resume use' must be for use in the United States") (quoting *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 (Fed. Cir. 1990)).  "The focus of the abandonment inquiry is on abandonment within the United States, for foreign use cannot

preserve a parties' rights to its mark." *P&G v. Colgate-Palmolive Co.*, 1998 U.S. Dist.

LEXIS 17773, at *201 (S.D.N.Y. Nov. 9, 1998) (disregarding plaintiff's foreign use of its

mark; finding mark to have been abandoned).

41.    Nor is there any merit to OSA's argument that it has not abandoned the registrations at

issue because timing devices for science and industry are a natural area of expansion for

sales of watches or sports timing devices that it is currently making in the United States.

(OSA's Opposition to Defendants' Motion for Summary Judgment ("OSA Opp. to SJ"),

p. 6).  There is no evidence that timing devices for science and industry are a natural area

of expansion from wristwatches or sports timing devices.

42.    In light of the foregoing, it is clear that, even if OSA had ever used the mark in

connection with such goods in the United States, it has now abandoned the mark with

respect to such goods, and its Registrations Nos. 708,731 and 1,290,661 should be

cancelled.

**OSA's Federal Trademark Registrations Were Procured Through Fraud on the PTO**

43.    Registration Nos. 708,731 and 1,290,661 should be cancelled pursuant to 15 U.S.C. §§

1064 and 1119 for the separate and independent reason that OSA made false statements

in its affidavits that led the PTO to renew OSA's registrations which amounts to fraud on

the PTO.

44.    Fraud in securing the registration or renewal of a federal trademark constitutes a ground

for the cancellation of that registration.  *See* 15 U.S.C. § 1064(3); *Orient Express Trading

Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) (affirming

judgment granting counterclaim for cancellation of plaintiff's trademark registrations

based on fraudulent renewal affidavits); *Medinol Ltd. v. Neuro Vasx, Inc.*, Cancellation

No. 92040535, 2003 TTAB LEXIS 227, at *11-12 (TTAB May 13, 2003); *Robi v. Five*

*Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990); *T.A.D. Avanti, Inc. v. Phone-Mate,*

*Inc.*, 1978 U.S. Dist. LEXIS 19572, at *21 (C.D. Cal. 1978).

45.    "A party seeking cancellation of a registered trademark on grounds of fraud must

demonstrate the alleged fraud by 'clear and convincing evidence.'" *Orient Express,* 842

F.2d at 653.  "A trademark applicant commits fraud . . . when it makes material

representations of fact in its declaration which it knows or should know to be false or

misleading." *Medinol*, 2003 TTAB LEXIS 227, at *12-13, 15-17 (where the statement of

use was not "lengthy, highly technical, or otherwise confusing, and the President/CEO

who signed the document was clearly in a position to know (or to inquire) as to the truth

of the statements therein," fraudulent intent was found) (emphasis added); *see also Torres*

*v. Cantine Torresella S.r.l.,* 808 F.2d 46, 48 (Fed. Cir. 1986); *First Int'l Servs. Corp. v.*

*Chuckles, Inc.,* 1987 TTAB LEXIS 5, at *29-30, 5 U.S.P.Q.2D (BNA) 1628 (TTAB Dec.

11, 1987).

46.    "[P]roof of specific intent to commit fraud is not required, rather, fraud occurs when an

applicant or registrant makes a false material misrepresentation that the applicant or

registrant knew or should have known was false." *General Car and Truck Leasing*

*Systems, Inc. v. General Rent-A-Car,* 1990 U.S. Dist. LEXIS 12749, at *6 (S.D. Fla. July

11, 1990).

47.    Courts routinely cancel trademark registrations where, contrary to the affidavit of use

submitted in support of registration or renewal, an applicant does not use the mark on all

of the goods or services set forth in the affidavit. *Orient Express*, 842 F.2d at 653. *See also, e.g.*, *General Car*, 1990 U.S. Dist. LEXIS 12749, at *7-8; *Torres*, 808 F.2d at 49; *see also Medinol*, 2003 TTAB LEXIS 227, at *11-13, *16-18; *First Int'l Servs. Corp., Inc.*, 1987 TTAB LEXIS 5, at *29-32.

48.     Where a registration covers goods and services that are not offered under registrant's mark, the proper remedy is to void the entire registration, even if the mark exists on some items accurately identified in the statement of use. *See, e.g., Medinol*, 2003 TTAB LEXIS 227, at *10-12 (canceling registration where Statement of Use asserted use on "medical devices, namely, neurological stents and catheters" but mark had never been used on stents; "[i]f fraud can be shown in the procurement of a registration, the entire resulting registration is void."); *General Car*, 1990 U.S. Dist. LEXIS 12749, at *2-3 (affirming summary judgment canceling plaintiff's registration where mark was not used in connection with aircraft and boat leasing as claimed in Statement of Use, but only with automobile, truck, tractor, trailer and agricultural, industrial and commercial equipment leasing); *Torres*, 808 F.2d at 49 (affirming summary judgment canceling plaintiff's registration where plaintiff claimed use on wine, vermouth, and champagne but mark was in use only on wine). "[D]eletion of the goods upon which the mark has not yet been used does not remedy an alleged fraud upon the Office." *Medinol*, 2003 TTAB LEXIS 227, at *12.

49.     Cancellation pursuant to 15 U.S.C. § 1064(3) is appropriate where, for example, the plaintiff's Section 8 & 15 affidavit has "exaggerated" the scope of its use of the marks at issue, and plaintiff's use of the marks on the goods at issue is "sporadic, at best." *Orient*

*Express*, 842 F.2d at 653.  *See also*, *e.g.*, *General Car*, 1990 U.S. Dist. LEXIS 12749, at

*7-8; *Torres,* 808 F.2d at 49; *see also Medinol*, 2003 TTAB LEXIS 227, at *11-13,

*16-18; *First Int'l Servs. Corp.*, 1987 TTAB LEXIS 5, at *29-32.

50.    I find that OSA's statements in obtaining renewal of Registrations Nos. 708,731 and

1,290,661 constituted fraud on the PTO within the meaning of 15 U.S.C. § 1064.

51.    As set forth above, Dr. Rentsch – who signed one of the renewal affidavits – concedes

that he is unaware of any use by OSA of its OMEGA marks in the United States in

connection with scientific or industrial apparatus, and there is no evidence that OSA ever

used its OMEGA marks in connection with such goods in the United States.  (Rentsch

Tr. 120-21, 124, 129, 131, 134-35, 138) (Findings ¶¶ 36, 47, 54-58).  OSA's other

witnesses also could not identify any uses for goods in science or industry in the United

States.  (Findings ¶¶ 56-58).

52.    As discussed above in connection with abandonment, OSA cannot rely on alleged uses

outside the United States to support a showing of use in commerce in the United States.

(Conclusions ¶ 40).  *See La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,

495 F.2d 1265, 1271 n.4 (2d Cir. 1974) *(*"It is well settled that foreign use is ineffectual to

create trademark rights in the United States"); 1 Gilson Trademark Prot. and Prac., § 3.02

at 3-24 (2001) ("Trademark use outside the United States creates no priority rights or no

rights to protection in the United States").

53.    Nor do OSA's watches constitute goods offered for use in science and industry despite

OSA's reliance on testimony that OMEGA brand watches have been the official watches

worn by astronauts.   This argument fails for the two reasons mentioned above.

(Conclusions, ¶¶ 34-35).  First, this type of use is still not related to science and industry because a watch is still a watch, no matter who might wear it.  Second, OEI asserts in its counterclaim for abandonment that OSA does not use its registered mark in connection with the goods at issue in International Class 9, which covers scientific and electrical apparatus.  *See* 37 C.F.R. § 6.1.  The Trademark Manual of Examination Procedures expressly says in an explanatory note that Class 9 does not include watches.  *See* Trademark Manual of Examining Procedure § 1401.02(a) (4th ed. 2005).  Because watches fall squarely within Class 14 as "horological and chronometric instruments," it is impossible for watches to constitute the Class 9 goods at issue.  *Id.*

54.     As set forth above, OSA also has argued that Omega Electronics' devices have scientific and industrial application, based on one alleged example – the purported purchase of a Scan-O-Vision camera by a university "for a scientific study of the physiology of feet during athletic activity."  (Conclusions ¶ 36).  For the reasons discussed above, this evidence does not suffice to show use in scientific and industrial applications.

55.     The false statements in OSA's affidavits that the mark was in use in connection with such goods led the PTO to renew OSA's registrations, because a failure to file the affidavits with respect to the goods at issue would have resulted in cancellation of the registrations as to those goods.  *See* 15 U.S.C. § 1058; Trademark Manual of Examining Procedure § 1604.09(c) (4th ed. 2005); *see also Medinol*, 2003 TTAB LEXIS 227, at *11.

56.     Furthermore, the requisite fraudulent intent is present because there can be no doubt that OSA "knew or should have known" that the mark was not being used in connection with

the covered goods.  *Medinol*, 2003 TTAB LEXIS 227, at *16;  *General Car,* 1990 U.S.

Dist. LEXIS 12749, at *6.

## <u>CONCLUSION</u>

In sum, I hold that OEI has proven that OSA breached the terms of the 1994 Agreement

by maintaining and renewing registrations for OMEGA marks at the PTO for apparatus

scientifically and/or industrially employed for measuring or controlling variable parameters.  I

further hold that OSA has abandoned the mark in connection with the goods covered by OSA's

two federal trademark Registrations Nos. 708,731 and 1,290,661 for its OMEGA & design mark

and that the two registrations were procured as a result of false and fraudulent statements made

by OSA's authorized representative to the PTO.  Thus, the registrations are invalid and subject to

cancellation.  Accordingly, judgment in favor of OEI on its counterclaims for breach of contract

and cancellation should be granted.


SO ORDERED:

December __, 2005


_____
Stefan R. Underhill
United States District Judge

## Exhibit K - OSA's Proposed Findings and Conclusions

## PROPOSED CONCLUSIONS OF LAW

A.  Trademark Defined

1.        A trademark may be any word, name, symbol, or device, or any combination thereof, used by a person to identify and distinguish his or her goods from those manufactured and sold by others and to indicate the source of the goods, even if that source is unknown. 15 U.S.C.S. § 1127 (2005). *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 125 S. Ct. 542 (U.S. 2004).

2.        The Trademark Act of 1946, known for its principal proponent as the Lanham Act, 15 U.S.C.S. § 1051 et seq., provides the user of a trade or service mark with the opportunity to register it with the U.S. Patent and Trademark Office. 15 U.S.C.S. §§ 1051, 1053. If the registrant then satisfies further conditions including continuous use for five consecutive years, the right to use such registered mark in commerce to designate the origin of the goods specified in the registration shall be incontestable outside certain listed exceptions. *KP Permanent Make-Up*, 125 S. Ct. 542 (2004).

3.        The holder of a registered mark (incontestable or not) has a civil action against anyone employing an imitation of it in commerce when such use is likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C.S. § 1114(1). Although an incontestable registration is conclusive evidence of the registrant's exclusive right to use the mark in commerce, 15 U.S.C.S. § 1115(b), the plaintiff's success is still subject to proof of infringement as defined in 15 U.S.C.S. § 1114. 15 U.S.C.S. § 1115(b). And that requires a showing that the defendant's actual practice is

likely to produce confusion in the minds of consumers about the origin of the goods or services in question. *KP Permanent Make-Up*, 125 S. Ct. 542 (2004).

4.        The inherent distinctive quality of a mark has long been an important standard in trademark law. The law has always disfavored marks that lack distinctiveness and either denied them protection outright or grudgingly granted protection under special conditions. Distinctiveness is traditionally measured on a scale memorably described by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976). The scale, progressing from least to most distinctive, is described in terms of marks that are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Judge Friendly noted that the ascending order reflected not only "eligibility to trademark status," but also "the degree of protection accorded." Id. at 9. *TCPIP Holding Co. v. Haar Communs., Inc.*, 244 F.3d 88  (2nd Cir. 2001) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976))

5.        The core purpose of trademark law is to prevent competitors from copying those aspects of a product or its trade dress that identify the source of the product to prospective consumers. *See Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 854 n. 14, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309-10, 175 U.S.P.Q. (BNA) 385 (2d Cir. 1972).

6.        Federal registration of a trademark is prima facie evidence of the mark's validity, the registrant's ownership of the mark, and its exclusive right to use the mark in commerce. The Lanham Act provides that the filing of an application to register a mark shall confer a right of priority, nationwide in effect, against any other person except for a person who, prior to such filing, has used the mark. 15 U.S.C.S. § 1057(c).

7.        It is true that "under section 7(b) of the Lanham Act, a certificate of registration . . . is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce on the goods or services specified therein." 4A R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 25.05, at 20 (4th ed. 1987). *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848  (2nd Cir. 1988) (citing 4A R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 25.05, at 20 (4th ed. 1987)).

**B.  Trademark Infringement**

11.        In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that  (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) "in connection with the sale . . . or advertising of goods or services," 15 U.S.C. § 1114(1)(a), (5) without the plaintiff's consent. *1-800 Contacts, Inc. v. WhenU.com, Inc.,* 414 F.3d 400, 406-407 (2d Cir. 2005)

12.        To determine whether there is a likelihood of confusion, we apply the eight-factor Polaroid balancing test introduced in *Polaroid Corp. v. Polarad Electronics Corp*., 287 F.2d 492 (2d Cir. 1961). The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

13.      The analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001).

14.      None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004).

15.      If one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements. Particularly where the public does not encounter the marks together, it is inappropriate to focus on minor stylistic differences in determining the likelihood of confusion caused by the defendant's use of the allegedly infringing name. *International Kennel Club*, 846 F.2d 1079 (1988).

### C.  False Designation of Origin Under 15 USC § 1125(a)

16.      Any person who uses a false designation or origin in connection with any goods or any container for goods is liable to any person who is or may be damaged by such false representation. 15 USC § 1125(a)(1)(A) (2005).

17.      "Origin" means the producer of the tangible product sold in the marketplace. *Bretford Mfg.*, 2005 U.S. App. LEXIS 16432 (2005).

18.      Under § 1125(a), a plaintiff making a claim of false designation of origin must show that the mark is entitled to protection as a trademark, and that the false designation of origin creates a likelihood of confusion. 15 U.S.C.S. § 1125(a)(1).

19.    Claims of trademark infringement and false designation of origin are guided by the same inquiry: "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.'" *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985), *citing Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1985). "To support a finding of infringement, there must be a probability of confusion, not a mere possibility." *Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citation omitted).

**D.  Trademark Dilution**

20.　　　　To establish a violation of the FTDA, a plaintiff must show that: (1) its mark is

famous; (2) the defendant is making commercial use of the mark in commerce; (3) the

defendant's use began after the mark became famous; and (4) the defendant's use of the mark

dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish

goods and services. *Savin Corp. v. Savin Group*, 391 F.3d 439, 448-449 (2d Cir. 2004).

21.　　　　In this Circuit, to sustain a claim under the FTDA, in addition to actual dilution, a

plaintiff must show that the senior mark possesses both a "significant degree of inherent

distinctiveness" and, to qualify as famous, "a high degree of . . . acquired distinctiveness."

Although a plaintiff must show a preponderance of evidence on each element of a claimed

violation of the FTDA in order ultimately to prevail on such a claim, the element of fame is the

key ingredient. This is because, among the various prerequisites to an FTDA claim, the one that

most narrows the universe of potentially successful claims is the requirement that the senior mark

be truly famous before a court will afford the owner of the mark the vast protections of the

FTDA. *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004).

**E.  CUTPA**

22.	The Connecticut Unfair Trade Practices Act proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4).

23.      The Connecticut Supreme Court has established the following criteria to be employed when determining whether a practice violates CUTPA:  (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen. *Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57 (1987) (internal citation omitted).

### F.  Damages for Trademark Infringement

24.      Under the Lanham Act, damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. 15 U.S.C. § 1117.

25.      A violation of the Lanham Act can be remedied in a variety of ways. A plaintiff who seeks to recover damages must prove a violation, that the violation caused actual confusion among the consumers of the product, and that the plaintiff suffered actual injury. To recover damages, a plaintiff must demonstrate actual confusion. However, where a plaintiff fails to make this showing, other avenues of relief are still available. A plaintiff can recover the defendant's profits, an award of costs, and, in some exceptional cases, an award of attorney's fees. See id. These remedies are awarded under a different rationale, including unjust enrichment, deterrence, and compensation. A plaintiff can recover the defendant's profits without proving actual confusion. In other words, to recover monetary damages, a plaintiff must prove actual confusion; however, to recover a monetary award of the defendant's profits, a plaintiff  need not prove actual

confusion. *Teaching Co. Ltd. Pshp. v. Unapix Entertainment, Inc.,* 87 F. Supp. 2d 567, 588-589

(E. D. Va. 2000).

26.     The Lanham Act also provides for the recovery of attorneys' fees by the prevailing

party in "exceptional cases." 15 U.S.C. § 1117(a). The Lanham Act authorizes the award of

attorney's fees to prevailing parties in "exceptional cases," 15 U.S.C. § 1117(a), which we have

understood to mean instances of "fraud or bad faith," *Twin Peaks Productions v. Publications*

*International, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993) (*quoting Transgo, Inc. v. Ajac*

*Transmission Parts Corp.*, 768 F.2d 1001, 1004 (9th Cir. 1985)), or "willful infringement,"

*Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *Patsy's Brand, Inc. v.*

*I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003)

### G.  Cancellation of a Trademark

27.     A party seeking "cancellation of a registered mark on grounds of fraud must

demonstrate the alleged fraud by clear and convincing evidence." *PAJ, Inc.* v. *Barons Gold Mfg.*

*Corp.,* 2002 WL 1792069 (S.D.N.Y. 2002).

28.     The "allegedly fraudulent statements must show a deliberate attempt to mislead

the Patent and Trademark Office and may not be the product of mere error or inadvertence." *Id*.

Thus, "misstatement in a registration application provides a bias for canceling the registration

only if the misstatements (1) were made with knowledge of their falsity, and (2) were material to

the determination to grant the application." *Mears v. Montgomery*, 2004 WL 964093 (S.D.N.Y.

2004) (*emphasis added*.)

29.      If there is some use, because the nature of use sufficient to form a predicate for a

trademark application is so cloudy, a good faith belief is sufficient use to rebut a charge that the

trademark was acquired through fraud". McCarthy on Trademarks § 31:72

30.      Furthermore, even if OSA was found to have discontinued use of the mark  in

connection with such goods, it is well established that "[w]here a registrant discontinues to use a

trade-mark on a certain product, he will not be held to have abandoned the mark if he continues

to use the mark on related items, and if the discontinued product is one which would still be

though by the buying public to come from the same source and is one which remained in the

normal field of expansion of the owner's business." *I.H.T. Corp*. v. *News World Comm., Inc*.

1984 WL 604 *9 (S.D.N.Y. 1984).

31.      A party seeking to cancel a registration for abandonment must prove abandonment

by clear and convincing evidence. *Citigroup Inc. v. City Holding Co.*, 2003 U.S. Dist. LEXIS

1845 (S.D.N.Y. 2003) (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d

Cir. 1980)).

32.      Clear and convincing evidence is a quantum of proof lying at an intermediate

point between the "preponderance of the evidence" standard appropriate to most civil cases and

the "beyond a reasonable doubt" standard employed in criminal prosecutions. *Addington* v.

*Texas*, 441 U.S. 418, 423-25, 99 S. Ct. 1804, 1808-09, 60 L. Ed. 2d 323 (1979).

33.      Although not capable of precise definition, clear and convincing evidence has

been "described as evidence which produces in the mind of the trier of fact an abiding conviction

that the truth of a factual contention is 'highly probable.'" *Buildex, Inc*. v. *Kason Indus., Inc*., 849

F.2d 1461, 1463 (Fed. Cir. 1988) quoting Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.

Ct. 2433, 2437, 81 L. Ed. 2d 247 (1983), reh'g denied, 468 U.S. 1224, 105 S. Ct. 19, 82 L. Ed. 2d 915 (1984).

34.        Because a finding of abandonment results in a forfeiture of rights, Courts are hesitant to find abandonment.  *News World*, 1984 WL at *8; *Noah's Inc*. v. *Nark, Inc*., 560 F.Supp. 1253, 1259 (S.D.N.Y 1983).

35.        Part of the proof required for abandonment is "a demonstration of intent to abandon.  *News World* at *8.

36.        To prevail on a claim of abandonment a party must show: (1) discontinued use of mark; (2) and no intent by the owner to resume use in the reasonably foreseeable future.  *Stetson* v. *Howard D. Wolf & Assoc*., 955 F.2d 847, 850 (2d Cir. 1992); *Cline* v. *1-888-Plumbing Group, Inc*., 146 F.Supp.2d 351, 364 (S.D.N.Y. 2001); *Havana Club Holding, S.A.* v. *Galleon*, 1998 WL 150983 (S.D.N.Y. 1998).  OEI has demonstrated neither of these two core elements.

37.        Under Connecticut law, common law claims for fraud are subject to the  three-year limitations period found in Conn. Gen. Stat. § 52-577.  *Day* v. *General Elec. Credit Corp*., 15 Conn. App. 677, 683 (1988); *Wedig* v. *Brinster*, 1 Conn.App. 123, 137 (1983) (fraudulent misrepresentation claims are governed by a three year limitations period).

38.        In analyzing whether OEI's cancellation claim based upon fraud is barred  by a statute of limitations, the Court must apply Connecticut state law. *See., e.g., Calzaturificio Rangoni S.P.A.* v. *United States Shoe Corp*., 868 F.Supp. 1414, 1420 (S.D.N.Y. 1994) (applying state statute of limitations to federal cancellation claim) see also *Marshak v. Treadwell*, 240 F.3d 184, 195 (3d Cir. 2001) (because the Lanham Act does not list a statute of limitations for 15 U.S.C. § 1120, courts must apply the state statute of limitations.)

39.     The statute of limitations period began to run from the time OSA discovered the fraud or with reasonable diligence should have discovered the fraud. *Id. See also PepsiCo, Inc.* v. *Dunlop Tire & Rubber Corp.*, 578 F.Supp.196, 198 (S.D.N.Y. 1984).

40.     Attorneys fees are not recoverable for claims of cancellation. The statutes upon which these claims rely do not expressly allow such recoveries. 15 U.S.C. §§ 1119; 1120.

## II.    **Breach of Contract**

### **A. Contract Formation**

1.     In order to form a binding and enforceable contract, there must be an offer and an acceptance based on a similar understanding by the parties as to the essential terms of the contract. *Steinberg* v. *Reding*, 24 Conn. App. 212, 214 (1991).

2.     There must be mutual assent or a meeting of the minds at the time the contract was formed. *Bridgeport Pipe Engineering Co*. v. *DeMattec Construction Co*., 159 Conn. 242, 249 (1970); *Hoffman* v. *Fidelity & Casualty Co*., 125 Conn. 440, 443- 44 (1939).

### **B. Contract Breach**

3.     The elements of a breach of contract claim are: (1) the existence of a contract or an agreement; (2) a breach of that contract or agreement; and (3) damages resulting from the breach. The plaintiff has the burden to prove each element by a preponderance of the evidence. *Underkofker* v. *Community Health Care Plan Inc*., 1999 U.S. Dist. LEXIS 10515 (D. Conn. June 17, 1999).

4.     Breach of contract requires proof that a defendant received a benefit, which results from an uncured material failure of performance. *Bernstein* v. *Nemeyer*, 213 Conn. 665, 672-73, 570 A.2d 164 (1990).

### C.  Contract Terms

5.      To be enforceable, an agreement must be definite and certain as to its essential

terms and requirements. If the essential terms of an agreement are omitted or phrased in too

indefinite a manner, the agreement will be unenforceable. Terms are reasonably certain when

they provide a basis for determining the existence of a breach and giving the appropriate remedy.

*L.G. Defelice, Inc*. v. *Firemans Ins. Co*., 41 F. Supp. 2d 152, 161 (D.Conn. 1998); *Presidential

Capital Corp*. v. *Reale*, 231 Conn. 500, 506-07 (1994); *1 A. Corbin, Contracts (Rev. Ed. 1996*) §

4.1, p. 525; *Restatement (Second) of Contracts § 33*

6.      If the parties have a dispute as to whether the contract provides for a certain term,

the plaintiff must prove by a preponderance of the evidence that the contract contained the terms

that the plaintiff seeks to enforce. If the parties have a dispute as to the meaning of the language

of the contract, the plaintiff must prove by a preponderance of the evidence what the disputed

terms meant. *Southern New England Contracting Co*. v. *Norwich Roman Catholic Diocesan

Corp*., 175 Conn. 197, 199 (1978).

### D.  Contract Interpretation

7.      A contract is unambiguous if has "a definite and precise meaning, unattended by

danger of misconception." Conversely, "contract language is ambiguous if it is reasonably

susceptible of more than one interpretation."  *Chambers* v. *Manning*, 169 F.R.D. 5, 7 (D. Conn.

1996) (*citing Goodheart Clothing Co*.v. *Laura Goodman Enters, Inc*., 962 F.2d 268, 272 (2d Cir.

1992)).

8.      Contracts are to be construed against the drafter of the ambiguous language when

a term of the contract cannot be determined from the intent of the parties, the language, and the

surrounding circumstances. *Sturman* v. *Socha*, 191 Conn. 1, 9, 463 A.2d. 527, 531 (1993);

*Ravitch* v. *Stollman Poultry Farms, Inc*., 165 Conn. 135, 145-46 (1973).

       9.      Ambiguity of a contract term or phrase is to be considered from the viewpoint  of

one cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business. *Kerin* v. *United States Postal Serv*., 116 F.3d 988, 992 n.2 (2d Cir.

1997).

       10.     A written contract is considered integrated when the parties intend it to  constitute

the complete and final expression of their agreement. *Bourne* v. *Walt Disney Co*., 68 F.3d 621,

627-628 (2d Cir. 1995); *E. Allan Farnsworth*, *Contracts § 7.3* (2d ed. 1990).

###     E.  Contract Evidence

       11.     The parol evidence rule is a rule of substantive law, which states that when two

parties have made a contract and have expressed it in a writing to which they have both assented

as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of

antecedent understandings and negotiations will not be admitted for the purpose of varying or

contradicting the writing. *Mill Creek Group, Inc*., v *FDIC*, 136 F. Supp. 2d. 36, 49 (D. Conn.

2001).

       12.     When the parties intended the writing be a complete contract, parol evidence may

only be considered for the purpose of determining the parties' intentions with regard to an

ambiguous term. Evidence of earlier oral or written understandings for the purpose of varying or

contradicting the terms of that contract may not be considered. *Mill Creek Group, Inc*., v. *FDIC*,

136 F. Supp. 2d. 36 (D. Conn. 2001); *HLO Land Ownership Assocs. Ltd. Partnership* v.

*Hartford*, 248 Conn. 350, 357-60 (1999); *TIE Communications, Inc*. v. *Kopp*, 218 Conn. 281,

288 (1991); *Security Equities* v. *Gimaba*, 210 Conn. 71,78 (1989); *Vezina* v. *Nautilus Pools, Inc.*, 27 Conn. App. 810, 813-14 (1992).

### F.  Intent of the Parties

13.    All relevant provisions of the contract should be considered when determining the intention of the parties. All language of the contract is assumed necessary, unless this would be unfair or unreasonable. *White* v. *Kampner*, 229 Conn. 465, 473 (1994); *Barnard* v. *Barnard*, 214 Conn. 99, 109 (1990); *Lar-Rob Bus Corp.* v *Fairfield*, 170 Conn. 397, 407 (1976).

14.    To determine the intent of the parties, the contract language may be interpreted in light of the situation of the parties and the circumstances surrounding the making of the contract. The motives of the parties and the ends that they sought to accomplish by their contract may also be considered. *United Technologies Corp.* v. *Groppo*, 238 Conn. 761, 772-73 (1996); *Zullo* v. *Smith*, 179 Conn. 596, 601 (1980).

15.    The parties' intent is to be determined from the terms of the contract read in light of the circumstances attending the making of the contract, including the motives and the purposes of the parties. *Delacroix* v. *Lublin Graphics*, 993 F. Supp. 74, 83 (D. Conn. 1997).

16.    The circumstances surrounding the making of a contract or the purposes that the parties sought to accomplish and their motives cannot prove an intention contrary to the plain meaning of the language. *Fairfield* v. *D'Addario*, 149 Conn. 358, 362 (1962); *Colonial Discount Co.* v *Avon Motors, Inc.*, 137 Conn. 196, 200 (1950).

### G.  Contract Construction

17.    The Court should not remake the contract or to change the terms of the contract. The terms of the contract that the parties in fact made must be applied and this can be determined

from the intent of the parties. *Bank of Boston, Connecticut* v. *Schlesinger,* 220 Conn. 152, 159 (1991); *Barnard* v. *Barnard*, 214 Conn. 99, 110 (1990); *Jay Realty Inc*. v. *Ahearn Development Corp*. 189 Conn., 52, 55 (1983).

18.    When specific terms and general terms both apply to the same subject in the contract, the specific terms should be favored over the general terms. *Miller Bros Construction Co*. v. *Maryland Casualty Co*., 113 Conn. 504, 514 (1931); 2 Williston, Contracts § 619.

19.    To establish that there is a term implied in the contract, plaintiff has the burden to prove by a preponderance of the evidence: (1) that the term was a custom in the industry or trade; (2) that each party knew or had reason to know of the custom or usage; and (3) that neither party knew or had reason to know that the other party had intentions inconsistent with that custom or usage. *Presidential Capital Corp*. v. *Reale*, 231 Conn. 500, 511(1994); *L.F. Pace & Sons, Inc.* v *Travelers Indemnity Co*., 9 Conn. App. 30, 38, *cert. denied*, 201 Conn. 811 (1986); *Restatement (Second) of Contracts §§ 203, 220-222.*

**H.   Good Faith**

20.    Every contract contains an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other party to receive benefits of the contract. The concept is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. *Els* v. *Meyer*, 213 Conn. 29, 36 (1989); *Warner* v. *Konover*, 210 Conn. 150, 154 (1989). It is not a separate contractual claim and the covenant cannot be applied to achieve a result contrary to the clearly expressed terms of the contract between the parties. *Verrastro* v. *Middlesex Insurance Co*., 207 Conn. 179, 190 (1988); *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 567 (1984).

21.     Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. Good faith and fair dealing mean an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. It means being faithful to one's duty and obligation under the contract. *Habetz* v *Condon*, 224 Conn. 231, 238 (1992); *Buckman* v. *People Express, Inc*., 205 Conn. 166, 171-72 (1987).

22.     Good faith is defined as the opposite of bad faith. A party engaged in bad faith did not fulfill the covenant. Bad faith generally implies a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. *Habetz* v *Condon*, 224 Conn. 231, 238 (1992); *Buckman* v. *People Express, Inc*., 205 Conn. 166, 171-72 (1987); *Foley* v. *Huntington Co*., 42 Conn. App. 712, 727 n.6 (1996)

## <u>PROPOSED FINDINGS OF FACT</u>

**<u>Omega S.A. and its Affilitates</u>**

1.      Omega SA ("OSA") manufactures and sells watches and other horological products and timekeeping equipment, including equipment for timing athletic competitions.

2.      In association with its business, OSA uses word and design trademarks that incorporate the word "Omega" and the Greek letter "Ω."

3.      Through its predecessors, OSA has been using the OMEGA marks since as early as 1860. OSA obtained its first U.S. trademark registration in 1894. OSA has used the OMEGA marks in the U.S. since that time.

4.      OSA is a worldwide company with its headquarters in Switzerland.

5.      OSA products include watches that are sophisticated products, which are built to exacting standards.

6.      While OSA's watches are often purchased by ordinary consumers, they are also purchased for use in various industries such as the space and aviation industries and by various professionals, such as astronauts, pilots, and sea divers.

7.      For a period of its history, OSA also sold and marketed tools for use in the watch-making industry. Such tools included the necessary mechanical apparatus to create by hand very precise timing-keeping instruments. These were not products intended for ordinary consumer use.

8.      OSA has also used its OMEGA mark in connection with other timing devices, including electronic devices in the sports industry and watches tested and employed in scientific applications.

9.      One such undertaking was the use of the Omega Speedmaster watch by the Apollo 13 astronauts (after the on-board computerized timing devices were rendered inoperative) to time the thrust of critical engine burns as Apollo 13 rounded the moon and set a course to return to Earth.

10.     The events aboard Apollo 13 was a very important point in OSA's history, as from that moment, its watches were known to be extremely reliable and precise. Since that time, OSA has been the subject of numerous forms of unsolicited media coverage regarding the scientific applications of the watch.

11.     Since a time even before the Apollo 13 mission, OSA marketed its goods, including watches for applications apart from the ordinary consumer use of the goods. The Apollo 13 mission only evidences the success OSA has realized in this regard.

12.     The Omega Speedmaster was worn by Edward White on the American astronaut's first walk in space and is the only watch ever to be worn on the moon. The Omega Speedmaster has accompanied every American astronaut on every space mission since and remains an integral part of the astronauts' standard equipment as it has been certified by NASA for the next 100 Space Shuttle flights.

13.     In fact most Omega Speedmaster watches contain a tachnometer, an instrument which measures the revolutions per minute or the angular speed of a rotating shaft.

14.     In addition, OSA has created a subdivision called Omega Electronics S.A., a licensee of the OMEGA mark.

15.     Omega Electronics offers a product line which is distinct from the watches sold by OSA, except that the timing function within such products are built using the same exacting standards and precision.

16.     Omega Electronics's goods include electronic apparatus for use in athletic competitions, scoreboards, passenger information systems, and RFID (Radio Frequency Identification) devices.

17.     Passenger information systems include the large public display boards that are used by the transportation industry (such as airports and railroad stations) which can display, for example, arrival and departure times and status of flights and trains. Such goods include CRT monitors, LCD display boards, flap boards, computer systems, qne software.

18.     RFID devices use radio signals similar to announce the presence of a particular person or badge in a particular place (similar to the EZ Pass toll system). An RFID solution is an assembly of a tag, a reader and some sort of data processing equipment, such as a computer or a terminal. The reader sends a request for identification information to the tag. The tag responds with the respective information, which the reader then forwards to the data processing device. The tag and reader communicate with one another over an RF channel. The computer or terminal can access to the Internet for your specific application. These devices can be used as security passes for access to buildings, parks, and ski resorts (in lieu of lift tickets), used for access to the Internet, and used as electronic debit account (precisely as used by the EZPass system).

19.     OSA and Omega Electronics also provide support services under the OMEGA mark in connection with their goods.

20.     Omega Electronics's athletic goods include finish line cameras, electronic time and data recorders, touch blocks for use in swimming competitions, scoreboards, computer

software, timing displays, and parts therefore. On at least one occasion, Omega Electronics

provided goods such as a photo finish camera to a major U.S. university in association with a

study on the physiology.

21.     Omega Electronics's goods are highly sophisticated items, which are not intended

to be used as ordinary consumer products. Instead they are offered to universities, corporations,

municipalities, sporting arenas, and athletic organizations, such as the Olympics. In fact, OSA,

through Omega Electronics, will be the official timekeeper for the next three Olympic Games in

2006, 2008, and 2010. Such an honor is testament to the quality and precision of OSA's

electronic timing devices.

22.     This association with the Olympic Games led to well over half a century of

pioneering developments in the field of electrical timekeeping.

23.     One of the first innovations by the OSA was the world's first independent,

portable and water-resistant photoelectric cell (1945). This was later followed by the world's first

photofinish camera, the Racend OMEGA Timer (1949), which was a major innovation that

solved the problem of grouped arrivals in track events. At the Helsinki 1952 Olympic Games,

OMEGA became the first company ever to use electronic timing in sport, with the OMEGA

Time Recorder (OTR), which was homologated by the International Amateur Athletics

Federation on the basis of a rating certificate that proved it was accurate to within 0.05 seconds

in 24 hours.

24.     At the same Olympic Games in 1952, OMEGA was also awarded the Olympic

Cross of Merit for "exceptional services to the world of sport". In 1961, OMEGA invented the

Omegascope, which allowed the time of each competitor followed by the TV camera to be

superimposed on the TV screen. The 1966 European Athletics Championships in Budapest

marked a turning point in timekeeping, since they were the first European Championships at which the electronically recorded times were taken as the official times. It was the OTR and the Omegascope that recorded this unique moment. One year later, OMEGA introduced its "contact pads" for swimming competitions.

25.     This simple new technology reacted only to the touch of the swimmers and was not affected by water splashes. Such contact pads have ever since been used at all the world's major swimming events. In 1990, the brand opened up sports timekeeping to the mass market with the launch of the Scan'O'Vision - a low-cost and popular version of the photofinish camera. OSA's most recent development in timing technology was to bring timekeeping into the Internet age with live timing of swimming events, which allows anyone with Internet access to view swimming and diving competition results in real time on the OMEGA Timing Internet site, www.omegatiming.com.

26.     Due to the activities of Omega Electronics and GDG, Inc., OSA is distinct among major watch manufacturers of the world because it has significantly expanded its business beyond watches for consumer use. This is a major aspect of OSA's business plan and marketing strategy, and has been since OSA was the first company entrusted to official keep time of the Olympic Games in Los Angeles in 1932.

27.     Omega Electronics has sold its goods in the U.S., Europe, Asia and Africa. Due to the sophistication of Omega Electronics goods, and the limited market for such goods, the products are often sold after substantial consultation.

28.     Omega Electronics uses an exclusive distributor GDG, Inc. for its U.S. market. Although GDG, Inc. has sold mainly goods for athletic competitions and displays for public arenas, other Omega Electronics goods can be sold in the U.S.

29.     In connection with its business, OSA has obtained the following U.S. trademark registrations:

| MARK | REG. NO. | GOODS | REG. DATE |
|---|---|---|---|
| OMEGA (& Design) | 25,036 | Watch movement and watchcases | 07/24/1894 |
| OMEGA | 566,370 | Watches and parts thereof and Horological instruments | 11/04/1952 |
| OMEGA (& Design) | 578,041 | Watches | 07/28/1953 |
| OMEGA (& Design) | 577,415 | Wrist watch bracelets, bands, and straps | 07/14/1953 |
| OMEGA | 660,541 | Automatic recording machines and apparatus for use in determining the results of sporting events | 04/15/1958 |
| OMEGA | 708,731 | Electronic time recorders for automatic precision timing in science and industry | 12/20/1960 |
| OMEGA (& Design) | 1,290,661 | Lubricating oils for watches and clocks | 08/21/1984 |

30.     OSA also owns over 1000 trademarks registration in over 100 countries around the world.

**Omega Engineering, Inc.**

31.     Omega Engineering,  ("OEI") was founded in 1962 by Betty Ruth Hollander.  Its first products were thermocouples, devices used in factories and laboratories to measure temperatures.

32.    At the time of its creation, the founders of OEI were aware of OSA and its OMEGA watches.

33.    In 1966, OEI first registered in the OMEGA trademark in the United States relating to industrial and scientific apparatus.

34.    OEI's products are not meant for ordinary consumer use. Indeed, OEI has used the phrase "science and industry" to define its market. In particular, OEI markets and distribute scientific and industrial apparatus for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow.

35.    OEI advertises its goods in specialized trade publications and journals via direct mail. OEI also advertises its products and services at scientific and industrial trade shows

36.    OEI is engaged in a very specific business which is directed to a very specific market segment.

37.    OEI maintains the domain name www.omega.com and its products are available for purchase there.

38.    Around 1984, OEI introduced a new products it called a period timers and industrial clocks. According to OEI, period timers are devices that are used to control industrial processes based upon a measure of time. OEI is the first company to use such a product. Indeed, OEI considers itself to be a pioneer in the development of period timers and industrial clocks.

39.    Although OEI originally only sold thermocouples, it now offers over 68,000 product numbers under the OMEGA mark.

40.    With the OEI's expanded use of the OMEGA mark, and OSA long prior rights to the same mark, the parties engaged in several trademark conflicts around the world.

**The 1994 Agreement**

41.     After many years of trademark disputes spanning several countries, the parties entered into several agreements regarding their trademark rights. The parties entered into a trademark license in 1985, an agreement in 1992, and an agreement in 1994.

42.     The 1994 Agreement was meant to resolve certain conflicts between the parties around the world and to help avoid future disputes. The parties meant to delineate certain markets where the other would not enter. Although the parties hoped to reduce future conflicts regarding the use of the OMEGA marks, there were some disputes that could not be covered by the agreement. The agreement also sought to resolve certain problems related to specific registrations or applications that existed at that time.

43.     In particular, the agreement referred to an opposition proceeding in Hong Kong, an additional trademark application in Hong Kong, and a trademark application in Germany. Aside from those three specific proceedings, the agreement does not reach pre-existing trademark registrations and applications. Indeed there were many applications and registrations owned by both parties at the time of the agreement.

44.     Paragraph 4 of the 1994 Agreement states as follows:

Henceforth from the signing of the Agreement and effective in all contries of the World:-

    a.    OMEGA ENGEINEERING INCORPORATED undertakes not to use, register, or apply to register any trademark consisting of or containing the word OMEGA or the Greek Letter Ù or any mark containing elements colourably resembling either of those two elements in respect of computer controlled measuring, timing and display apparatus, unless intended for science and industry.

    b.    OMEGA SA undertakes not to use, register or apply to register any trademark consisting of or containing the word OMEGA or the Greek Letter Ù or either of those two elements, in respect of.

"Apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow"

    c.        OMEGA SA will not object to the use or registration by OMEGA ENGINEERING INCORPORATED of any trademarks consisting of or containing the word OMEGA or the Greek Letter Ù or either of those two elements, in respect of apparatus industrially and/or scientifically employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow.

45.     The term "variable parameters" is not defined in the contract.

46.     Although the term "timing" is used in paragraph 4(a), that term is not listed as an illustrative example of a variable parameter in paragraphs 4(b) and 4(c).

47.     Time is not a variable parameter. Time has never been described by OEI as a variable parameter in any of OEI's trademark registrations.

48.     OSA would not have agreed to the 1994 Agreement contract if time was considered a variable parameter.

49.     The contract does not limit the parties' ability to maintain and renew existing registrations. The only exceptions to this general rule are the specific foreign proceedings that were discussed elsewhere in the contract.

50.     The 1994 Agreement does not prevent OSA from registering the OMEGA mark for use in "science and industry." The operative paragraph (4(b)) uses quotation marks to describe the precise language that OSA could not use in its registration. OSA is only barred from using the precise language from the quotation in paragraph 4(b).

51.     OSA is not barred from using the OMEGA mark for goods in science and industry.  Rather OSA is only barred from using "Apparatus industrially and/or scientifically

employed for measuring or controlling variable parameters such as temperature, pressure, force, load, vibration, electrical conductivity, liquid level, acidity, humidity, strain, and flow."

52.    The quotation marks in paragraph 4(b) must be given meaning as they are noticeably absent from the next paragraph, which employs similar language.

53.    Attorneys fees are not recoverable for actions under the 1994 Agreement as there is no fee shifting clause in the contract.

54.    Maintenance and renewal of trademarks that existed prior to the 1994 are not covered by the 1994 Agreement. Indeed, paragraph 4 states "Henceforth," meaning from that point forward. Moreover, the terms renewal and maintenance are not found in the contract.

### The '661 and '731 Registrations

55.    For over 100 years before OEI sold any product, OSA has been selling timing devices and other products related to time.

56.    On May 31, 1960, two years before OEI even existed or adopted the name OMEGA in any form, or made its first thermocouple, OSA filed an application in the United States Patent and Trademark Office for what is now Registration No. 708, 731, (the "'731 Registration") for "electronic time recorders for precision timing in science and industry."

57.    Thereafter, in 1983, OSA filed application for what is now Registration No. 1,290,661 (the "'661 Registrations"), for "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigations and industrial application."

58.    Although OEI claims a date of first use of 1962 for all of its products, OEI did not begin marketing or selling period timers or industrial clocks until 1984 at the very earliest.

OSA's '661 Registration for timing devices in science and industry predates OEI's first use of the OMEGA mark on timing products.

59.     OSA has maintained continuous use of the OMEGA Marks that are the subject of these registrations.

60.     OSA has no intention to abandon the '661 and '731 Registrations.

61.     OSA's business is substantially more expansive than that of other watch manufacturers. OSA's products, including its watches, can be used and have a strong association with science and industry.

62.     OSA used the phrase "science and industry" in its '731 and '661 Registrations long before OEI ever used those terms to describe its business.

63.     There are many different industries and sciences, including the transportation industry, fashion industry, and entertainment industry. Sports timing is an industry. Sports is an industry. Watchmaking is a science.

64.     OEI's understanding of "science and industry" was developed after OSA obtained the '731 and '661 Registrations within which the same terms are used.

65.     The meaning of "science and industry" as used in the '661 and '731 Registrations is not synonymous with OEI's use of that phrase to describe its business.

66.     OSA's products have been used by the University of Michigan for scientific studies of the physiology of feet during athletic activity.

67.     OSA's products have been used by the European Space Research Organization.

68.     OSA's sports products include starting blocks that measure the strain of an athlete's foot on starting blocks, which allows for detection of false starts.

69.    OSA sells its watches to the industries of fashion, sports, entertainment, transportation, and timing.

70.    Since OSA's business is time and timing products, timing devices for science and industry are in its normal zone of expansion.

71.    OEI maintains trademark applications for goods such as "jewelry for science and industry."

72.    OSA continues to use its marks in connection with goods used in science and industry, and consistently researches new products and future business opportunities in which it can exploit its technologies.

73.    There is no evidence that OSA abandoned registration 708,731 or registration 1,290,661.

74.    By a standard of clear and convincing evidence, OEI has failed to show that OSA discontinued use of its mark.

75.    OEI has failed to provide any evidence that OSA discontinued use of its mark.

76.    By a standard of clear and convincing evidence, OEI has failed to show that OSA had no intent to resume use of its mark in the reasonably foreseeable future.

77.    OEI has failed to provide any evidence that OSA had no intent to resume use of its mark.

78.    Conn. Gen. Stat. § 52-577, which contains a three year statute of limitations period for fraud actions, applies to OEI's claims for cancellation of registration 708,731.

79.    The date of the alleged fraudulent activity (the declaration filed on August 14, 1990 in connection with the maintenance of 1,290,661), occurred more than three years to the date that OEI brought its counterclaim seeking cancellation of registration 708, 731.

80.    The declaration filed on August 14, 1990 was a public document that should have been discovered by OEI in the exercise of reasonable diligence.

81.    OEI is barred by the limitations period set forth Conn. Gen. Stat. § 52-577 from seeking to cancel registration OEI bases its trademark infringement claim upon the OSA sale of the following goods in United States commerce:

a.        "apparatus industrially and/or scientifically employed for measuring or controlling variable parameters."  Specifically, the OMEGA Alize' wind gauge, under the OMEGA marks.

b.        Handheld temperature and time data recorders and printers including the OMEGA "Powertime" device.

c.        Secured radio frequency devices, including the OMEGA SRFID and RFID access systems.

82.    OSA has never sold an OMEGA Alize' wind gauge alone.

83.    An OMEGA Alize' Wind Gauge, if sold, would only be used for timing in the sporting industry.

84.    Any and all RFIDs (Radio Frequency Identification Devices) sold were sold outside of the United States.

85.    There is no evidence that an OMEGA Alize' Wind Gauge or any RFID devices have been used in United States commerce.

86.    Regardless, RFIDs are devices used for the security industry, or to provide access to a computer system.

87.    The Alize' wind gauge was designed and used for measuring wind speeds in athletic competitions.

88.     There is no evidence that OSA intended to perpetrate a fraud on the PTO by renewing the '731 and '661 Registrations.

**Confusion Among Consumers**

89.     The Court has previously found no likelihood of confusion between the parties' uses of the OMEGA marks.

90.     The Court has previously found no evidence of actual confusion between the parties' uses of the OMEGA marks.

91.     The Court has previously found that the parties' products are of high quality.

92.     The Court has previously found that the parties' customers are sophisticated.

93.     The Court has previously found that the parties operate in separate channels of trade.

## <u>Exhibit L - OSA's Proposed Voir Dire Questions</u>

1. What are your hobbies or interests outside of work?

2. Do you know any member of the Collen IP, Fattibene & Fattibene, Kaye Scholer or Minogue Birnbaum LLP law firms?

3. Have you, or any close friend or relative, ever had an experience that you would describe as "bad" with the legal system?

4. Have you ever been involved in the negotiation or drafting of a contract?

5. Have you, or any close friend or relative, ever been involved in a contract dispute as a plaintiff, defendant, witness, or otherwise?

6. Do you have an understanding of what a trademark is?

7. Do you understand the difference between intellectual property and real property?

8. Have you or anyone close to you at any time in your life had any involvement in trademark, patent or copyrights or intellectual property matters?

9. Have you, your spouse, a relative, or close friend ever developed a trademark, brand, patent or copyright for a product or service?

10. Do you now or have you ever owned a trademark?

11. Have you ever applied for a registration of a trademark either at the state or federal level?

12. Have you, or any close friend or relative, ever been involved in a trademark, patent or copyright dispute as a plaintiff, defendant, witness, or otherwise?

13. Have you, your spouse, a relative, or close friend ever studied law?

14. Do you have any predisposition against non-United States corporations?  If so, please describe.

15. Do you believe that a foreign corporation, for example a Swiss corporation, deserves the same legal rights and protections provided to United States corporations by our legal system?

16. Do you have any preconceived notions regarding one corporation suing another corporation?

17. Do you believe corporations suing each other are clogging the legal system?

18. Have you ever heard of Omega SA? In what context?

19. Have you ever heard of Omega Engineering Inc.? In what context?

20. Are you familiar with any Omega SA's products?

21. Are you familiar with any Omega Engineering's products?

22. Are you, or any close friend or relative, associated with, or employed now or in the past with any of the parties to this litigation?

23. Do you know any of the following persons? **Final Witness List of the Plaintiff and Defendant.**

24. Are you, or any close friend or relative, associated with, or employed now or in the past with anyone or company in the jewelry industry?

25. Are you, or any close friend or relative, associated with, or employed now or in the past with anyone or company in the watch industry?

26. Are you, or any close friend or relative, associated with, or employed now or in the past with any company that manufactures timing devices?

27. Do you think there is a difference between watches and timing devices?

28. Do you believe that one is encompassed within the other?

29. Have you ever purchased watches or timing devices?  If yes, what brand(s)? For what purpose (i.e. personal gifts or industrial/commercial use.)

30. Do you purchase expensive/luxury jewelry? How often? For yourself or as a gift?

31. Have you ever purchased a product from Swatch or Omega?

32. Have you ever had an unsatisfactory experience with a purchase from Swatch or Omega?

33. Have you ever had to return a purchase from Swatch or Omega?

34. Have you ever purchased a product from Omega Engineering?

## Exhibit M - OSA's Proposed Jury Instructions

## 1. GENERAL INSTRUCTIONS

You have now heard all the evidence and arguments of counsel in this matter.  It is now my duty to give you instructions as to the law applicable to this case.  It is the duty of the jurors to follow the law as stated in these instructions and to apply that law to the facts as you find them from the evidence in this case.  You may not single out any one instruction that I give as stating the only law applicable to the case.  You must consider and decide this case on the instructions as a whole.

You should understand your key role and ultimate responsibility for the decision in this case.  The essential purpose of this trial is to resolve issues of fact.  The jury in a case decides the issues of fact.  You are the exclusive judges of the facts the parties have disputed by the evidence and argument before you.  In judging those facts, you should do so reasonably and fairly considering all the evidence put before you.  You should use your own good judgment and common sense.

I will now review with you the issues to be decided and outline the rules of law which you will apply to the facts as you find them.  These rules state the principles to be applied by you to resolve the issues in this case and to conduct your deliberations.  You have an important and solemn responsibility as impartial judges of the facts.  We count on you with confidence to follow you oath to decide objectively, without passion or sympathy, with cool and rational detachment.

You will realize the importance in our system of equality before the law.  All parties come to court as equals in the sense of being entitled to the same benefits, and being held to the same responsibilities, under the law.  The nature of the parties is of no consequence to your deliberations, one way or the other.  All of the parties have a right to have this case decided fairly under the law.

Similarly, preferences or sympathies in relation to counsel should have no place in your decision and you must not be prejudiced by such.  This is a search for truth.  In making objections and arguments, however the rulings may have gone, these lawyers were doing their assigned jobs throughout.  Any preferences among counsel are to be put aside for your purposes in determining the facts.

You must also ignore your personal preferences or sympathies for the witnesses who have testified before you.  Whether you personally like or dislike a particular witness is irrelevant.  You should only consider whether the testimony he or she gave was believable.

**1.1 EVIDENCE IN THIS CASE**

When making findings of facts, you may only rely on the evidence.  The evidence consists of the sworn testimony of the witnesses you have heard, whether in person or through the reading of their depositions, and the exhibits that are now part of this record.  Oral or written stipulations of counsel constitute evidence of that which was stipulated.  The pleadings including the complaint and answer are not normally evidence, since they only allege the claims of the parties.  You are the judges as to whether the evidence supports these claims.

You may find facts based on 2 types of evidence.  The first is direct evidence. Direct evidence includes testimony of an eyewitness or participant of a person who was there or heard something.  The other type of evidence you should consider is indirect evidence.  Indirect evidence is proof of a chain of events or circumstances pointing to the existence or nonexistence of certain facts.  The law does not make distinction between direct and indirect evidence.  You must find the facts in accordance with a fair preponderance of all the evidence you find credible in the case, both direct and indirect evidence.

Indirect evidence means that from some proven facts, there is a reasonable inference that may be drawn that some other fact is true.  You draw inferences all the time in your daily lives, and you are entitled to do so now.  Whether or not you draw a particular inference from the facts you find to have been established is a judgment left up to you.  You can draw inferences wherever you think it is reasonable to draw them.  You may not speculate.  Once having drawn inferences you find reasonable, you can consider direct and indirect evidence in deciding every issue of this case.

Evidence that a person expressed an intention to do something is evidence from which you are permitted to draw the inference that the person did what he said he intended to do.  Frequently, but not always, people do what they say they intend to do.  Whether that inference is reasonable as to any particular expressed intention is a determination left up to you.  Another example: if you see a person walk into the courtroom carrying a wet coat, you may infer that it is raining outside the courthouse, even though other possible explanations exist.

## 1.2 STATEMENTS OF THE JUDGE OR COUNSEL

Statements made by counsel in their opening and closing remarks, or when questioning witnesses are not evidence in this case. These statements should be disregarded as to the proof of any facts. You may not carry weight to inferences from the questions, apart from the sense and meaning of the answers. It is the duty and right of counsel to address the jury and explain the testimony so that you can better understand the questions you are about to decide. The evidence detailed by the witnesses and shown in the documents introduced are the evidence to be considered not the statements of counsel.

However, you do not have to disregard the statements of counsel. If a statement made by counsel is helpful in refreshing your memory or evaluating the evidence, you may consider them. The accuracy and appropriateness of counsel's statements are for you to judge.

## 1.3 WITNESS CREDIBILITY

As jurors in this case, you must determine the credibility of the witnesses and the weight you feel the testimony deserves. There may be important conflicts between the testimony of the Plaintiff's and Defendants's witnesses. You must resolve these conflicts to determine the facts on which you will make your verdict.

You determine which witnesses to believe and whether the evidence should be accepted or rejected. It is up to you to determine the reasonable and persuasive inferences to be drawn from the testimony of witnesses. You had an opportunity to appraise several witness and make judgments regarding their credibility. You will want to consider in each instance how the witness impressed you. Did he or she appear to know what they were talking about? Did he or she seem truthful, candid and forthright? You will determine whether the witness was reliable in the ability to recall the facts accurately and to tell accurately the contents of what was recalled. You can also consider the extent to which the witness's testimony was supported or contradicted by other evidence you find credible.

A witness can be discredited by contradictory evidence by showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness said, did, or failed to say or do something, which was inconsistent with the witness's present testimony.

If you believe a witness has been discredited, then it is for you to give the weight of the witness's testimony the weight you feel it deserves. You may consider whether the testimony was deliberately false or if it was an innocent misrepresentation.

Inconsistencies or discrepancies in the testimony of a witness or between the testimonies of different witnesses may or may not cause you to discredit the testimony. Different witnesses may perceive a transaction or incident in a different way. Innocent mis-recollection like failure of recollection is not uncommon. In weighing the discrepancy, always consider whether it is a matter of importance or not and whether the discrepancy is a result of innocent error or deliberate falsehood.

The interest or lack of interest of a witness in the outcome of the case can be taken into consideration when considering that witness's testimony. The parties have an obvious interest in the outcome of the case. Employees, officers and principals of the parties have an obvious interest in the outcome of the case. You should consider these interests among all the factors in determining the weight you give to the testimony of a witness. You can accept or reject the testimony of a witness in whole or in part.

The weight of evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

The law does not require any party to call as witnesses all person who may have been present at any time or place involved in this case, or who may appear to have some knowledge of the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in evidence in the case.  However, the jury may consider the failure to call other witnesses to produce other evidence shown by the evidence in the case to be in existence and available.

The weight to be accorded to the testimony of an expert witness depends upon your conclusion as to the proof and completeness of the facts considered by him or her in drawing his conclusion.  You will determine whether the information given to him or her was true and also whether all of the facts you find were made available to him or her.  You are to apply the same rules you apply to any other witness, insofar as it relates to the interest, bias or candor and so forth.  You are to determine whether these witnesses possessed a peculiar and exclusive knowledge and experience in a specialized field.  The value attached to their testimony and the weight to be accorded also depends on many other things, such as the actual skill possessed by the expert, the experience he or she has had, and the training he or she has had.  Has his or her training been practical or theoretical; has it been under circumstances where reasonably and logically he or she has acquired a skill peculiar and greater than that of others?

During the trial some of the testimony has been read to you by way of deposition, consisting of sworn recorded answers to questions asked of the witness in advance of the trial by one or more of the attorney for the parties to the case.  The testimony of a witness who, for some reason, cannot be present to testify form the witness stand may be presented in writing under oath, in the form of a deposition.  Such testimony is entitled to the same consideration, and is to be judged as to credibility, and weighed, and otherwise considered by the jury, insofar as possible, in the same way as if the witness had been present, and had testified from the witness stand.

**1.4 BURDEN OF PROOF**

The matter before you is one of a civil nature. Accordingly, the Counter-Claim Plaintiff ("OEI" or "Plaintiff") bears the burden of establishing all material allegations of its counterclaims by a preponderance of the credible evidence. Credible evidence is that which you accept as true.

In order for Plaintiff to recover against the Defendant on any of its claims, it must prove by a fair preponderance of the credible evidence each of the elements of the particular claim. What those elements are, and what Plaintiff must prove on each claim, will be explained as we discuss the various claims. Plaintiff must prove its case by a fair preponderance of the credible evidence. This means that Plaintiff must prove all of the essential elements of each particular claim by the greater weight of all of the evidence which you accept as relevant and true, if Plaintiff is to recover on that particular claim. The term "preponderance" means that when you take certain evidence and compare it with evidence opposed to it, you find it more persuasive. Evidence which produces in your mind a belief that what is sought to be proved is more likely true than not true. This is not determined by the number of witnesses or documents, but depends on the nature and quality of the evidence, and the extent to which you find that evidence relevant and credible.

The standard of preponderance of the evidence draws a comparison to a pair of balance scales. Imagine that on one side of the scale of evidence that you find credible, relevant and supportive of the Plaintiff on a particular issue, and place on the other side of the scale credible and relevant evidence to the contrary. If the scales tip in favor of the defendants, or if the scales are evenly balanced, the Plaintiff has not sustained its burden of proof on that issue. It is not enough for Plaintiff to introduce evidence which leaves it as a matter of speculation as to whether or not it has proved its case. Plaintiff must remove the case from the field of speculation. If it fails to do so, it is not entitled to recover. If Plaintiff's case leaves you in a position where you cannot determine whether it has or has not proved all of the essential elements of its particular claim, then you must find for the Defendant on that particular claim.

The Defendant has offered evidence during this trial. However, the fact that it has chosen to offer evidence to refute what Plaintiff has said does not mean that Plaintiff has met its burden of proof. You should not assume that Plaintiff has met its burden merely because the defendant has chosen to do more than merely cross-examine Plaintiff's witnesses. Having heard evidence submitted by the defendants, you should consider it together with the Plaintiff's cross-examination of the defendants' witnesses.

The Defendant has also interposed in their answer several special defenses against the Plaintiff. With respect to these defenses, the burden of proof is on the Defendants to satisfy you by a preponderance of the evidence that the Plaintiff was at fault in one or more of the ways alleged in the Defendants' answer.

You must decide this case, not on the basis or fragments of the evidence, but upon the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, except as you may have been instructed to disregard any specific evidence.

I now turn to the specific aspects of this case where you must determine the facts.

## 2.1 PRELIMINARY STATEMENT PRIOR TO THE INSTRUCTIONS ON THE COUNTS

In this case, the counterclaim- Plaintiff, OEI, is seeking an injunction and money damages from the Defendants, Omega, because the Plaintiff alleges unfair competition in the use of the term "OMEGA" and the symbol Ù for the counterclaim-Defendant's use in relation to timing products.  The applicable legal principles to be discussed in these instructions on the law of unfair competition have evolved from attempts to achieve three different policy objectives which are in conflict.

(1)  There is a need to protect the public from being misled or deceived as to the nature and the source of the products they purchase.

(2)  There is a need to protect the property rights of a business so that it may identify itself and its products to the public.

(3)  These objectives should be reached without injury to competition among products and businesses.

The third objective conflicts with the first and second objectives.

Where these policies conflict, cases of this type are fact specific and the outcome is determinative on these facts.  It is the duty of the jury, as the judges of fact, to determine these cases based on their facts.

**3. TRADEMARK LAW**
**3.1 The Theories of Trademark Liability**

You will be considering four counts that the Plaintiff OEI has alleged against the Defendants. There are four theories of liability presented by OEI—trademark infringement, trademark dilution, false designation of origin and breach of contract. You will be instructed as to the elements of each of the four counts as well as the damages determination on the applicable counts.

### 3.1.1 TRADEMARK DEFINED

A trademark is a word, name, symbol or device or any combination thereof—

      (1) used by a business

      (2) to identify their goods  &

      (3) to distinguish their goods from the goods sold by other businesses

OR

      (4) to indicate the source of the goods even if the source business may not be recognized by name.  In other words, the brand name will indicate to the consumer the quality and standards associated with the goods, even if the manufacturer is not recognized by the public.

The quality and association with the goods can be maintained through its trademark and not its manufacturer.

A trademark is also a merchandising shortcut which induces a prospective consumer to choose what he or she wants or what he or she has been led to believe they want.  There is a public interest in avoiding confusion in the use of trademarks.

The right to protect a trademark comes from its use to identify the product.

Trademarks can consist of a variety of words and symbols, including a designs, product shapes, numbers, slogans, or sounds.

**3.1.2 TRADEMARK RIGHTS**

When a business has established a trademark right by use on or in connection with a product *before* anyone else, the right to use the trademark becomes an *exclusive right* and the trademark is their property.  No other person can use the *same or similar* words in *any manner* which would be *likely to cause confusion*.

## 3.1.2.1 REGISTRATION OF A TRADEMARK

Trademark rights in the United States are grounded in public use not registration.  Although rights in a mark depend on use and not registration, there are a number of advantages to registering a mark.

During the course of this trial, witnesses have mentioned the registration of trademarks with the United States Patent and Trademark Office.  In evidence is an exhibit which shows that "OMEGA" was a registered trademark of the Defendants for electronic time recorders for precision timing in science and industry, on May 31, 1960.  In 1983, Defendants filed an application for what is now Registration No. 1,290,661, for "computer apparatus for checking and controlling the measurement of time and distance for sporting events, scientific investigations and industrial application.

The effect of these registrations by the Defendant is to create a presumption that Omega established a valid trademark for their products at the time of its first use with the product and that it has been and is in continuous use with that product.

From this exhibit, it is presumed that Omega established "OMEGA" and "Ω" as a trademark for precision timing in science, sporting events and industry and that it has continuously used this trademark for precision timing in science, sporting events and industry and has the exclusive right to do so.

This presumption can be rebutted by the evidence to the contrary and the jury is free to find that a registered trademark is not a valid trademark.  From the evidence presented to you at this trial you may find that Omega did not have a valid trademark before Plaintiff adopted its use of the name.

Now I will present the Plaintiff's allegations from the counts of its Counterclaim against Defendants.

### 3.2 TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114

The Plaintiff's claim to recover on the theory of trademark infringement is based on 15 U.S.C. § 1114 and provides liability when any person without the consent of the registered trademark holder

    (a) uses in commerce any colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive OR

    (b) colorably imitates a registered mark and apply such colorable imitation to labels, signs, prints, packages, wrappers, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.[3]

To establish this claim you must decide whether the Plaintiff has proved the following elements based on a preponderance of the evidence:

    (1)    That "OMEGA" and/or "Ω"has been registered as a trademark on the principal register in the United States Patent and Trademark Office

    (2)    Plaintiff is the registrant of that trademark

    AND

    (3)    Defendant used "OMEGA"/ "Ω" in a manner likely to cause confusion among persons using ordinary care and prudence in the purchase of wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment. [alternatively: Defendants used "OMEGA"/ "Ω" without the consent of the Plaintiff in a manner that is likely to cause confusion among ordinary purchasers as to the source of the goods/services.

---

[3] 15 U.S.C. § 1114.

### 3.2.1 LIKELIHOOD OF CONFUSION

In determining whether or not there is a likelihood of confusion caused by the use of "OMEGA"/ "Ω" by both Plaintiff and Defendants in connection with their products you may draw on your common experience as citizens of the community.  You may also consider the following factors:

> (1) The strength of the Plaintiff's "OMEGA"/ "Ω" mark;
> (2) the degree of similarity between OEI's "OMEGA"/ "Ω" mark and Defendants' "OMEGA"/ "Ω" mark;
> (3) the proximity of Plaintiff's scientific products and Defendants' sports timing products;
> (4) the likelihood that Defendants will bridge the gap;
> (5) evidence of actual confusion;
> (6) Defendants' good faith in adopting the mark;
> (7) the quality of Defendants' sports timing products; &
> (8) the sophistication of the buyers.

No one factor is determinative and this is not an exclusive list as you may take other variables into account.[4]  The test is not actual confusion but a likelihood of confusion.

---

[4] *Polaroid Corp. v. Palarad Elects. Corp.*, 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820 (1961).

### 3.2.3 TRADEMARK INFRINGEMENT DAMAGES

If you find that Defendants are liable for part (b) for colorably imitating a registered mark and apply such colorable imitation to labels, signs, prints, packages, wrappers, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive and that such action was committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake or to deceive than you may determine an award for Defendants' profits *or* any damages sustained by the Plaintiff OEI.[5]

In determining the Defendants' profits, OEI must establish Defendants' sales.  It is the burden of the Defendants to prove elements of any cost or deductions claimed.[6]

---

[5] 15 U.S.C. § 1114.
[6] 15 U.S.C. § 1117(a).

**4. FALSE DESIGNATION OF ORIGIN UNDER 15 USC § 1125(a)(1)(A)**

The Plaintiff's claim to recover on the theory of false designation of origin is based on 15 U.S.C. § 1125(a)(1)(A) and provides that any person who shall use a false designation or origin in connection with any goods or any container for goods shall be liable to any person who is or may be damaged by such false representation. This act is frequently referred to as "passing off."

To establish this claim you must decide whether the Plaintiff has proved the following elements:

1. That the Plaintiff's use of "OMEGA"/ "Ω" on or in connection with "OMEGA"/ "Ω" scientific equipment has rendered the term "OMEGA"/ "Ω"an indication of the source or origin of the scientific equipment.

2. That Defendants' use of "OMEGA"/ "Ω" in connection with wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment constituted a false representation with respect to the origin of the equipment sold by Defendants.

    AND

3. That there is a likelihood of confusion among ordinarily prudent purchasers as to whether Defendants' wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment came from some other source.

## 4.2 LIKELIHOOD OF CONFUSION

In determining whether there is a likelihood of confusion caused by the use of "OMEGA"/ "Ω" by both Plaintiff and Defendants in connection with their products you may draw on your common experience as citizens of the community.  You may also consider the following factors:

        (1) The strength of the Plaintiff's mark;

        (2) the degree of similarity between plaintiff's and defendants' marks;

        (3) the proximity of the products or services;

        (4) the likelihood that plaintiff will bridge the gap;

        (5) evidence of actual confusion;

        (6) defendants' good faith in adopting the mark;

        (7) the quality of defendants' product or service; &

        (8) the sophistication of the buyers.

No one factor is determinative and this is not an exclusive list as you may take other variables into account.[7] The test is not actual confusion but a likelihood of confusion.

---

[7] *Polaroid Corp. v. Palarad Elects. Corp.*, 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820 (1961).

## 4.3 FALSE DESIGNATION OF ORIGIN DAMAGES

If you decide that Defendants has made false or misleading representations that were likely to cause confusion, mistake or deception as to the affiliation, connection and association of Plaintiff's "OMEGA"/ "Ω" product with Defendants' "OMEGA"/ "Ω" product, you must now decide what damages to award the Plaintiff.  The Plaintiff is entitled to recover (1) Defendants' profits, (2) any damages sustained by the Plaintiff, *and* (3) the costs of the action.[8]

In determining the Defendants' profits, Plaintiff must show Defendants' sales.  It is the burden of the Defendants to prove elements of the cost or deductions claimed.[9]

If you find that the amount of recovery based on profits is inadequate, you may, in your discretion, enter an amount that you find to be just, according to the circumstances of the case.[10]

You may also assess damages, according to the circumstances of the case, for any sum above the amount found as actual damages, and up to three times such amount.[11]

You may also, if you find exceptional circumstances, award reasonable attorneys fees.[12]

---

[8] 15 U.S.C. § 1117(a).

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

**5. BREACH OF CONTRACT**

The Plaintiff's claim to recover on the theory of breach of contract is based on Connecticut state law.[13]

To prove a breach of contract under Connecticut law, Plaintiff must show:

(1) The existence of a valid agreement between the parties.[14]

(2) That Plaintiff performed under the agreement.[15]

AND

(3) That Defendants failed to materially perform under the agreement, thereby breaching the agreement.[16]

---

[13] "We apply state law concerning the validity, revocability, and enforceability of contracts generally…" *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997) (internal quotations omitted). "In interpreting an…agreement we apply the principles of state law that govern the formation of ordinary contracts." *Sec. Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 326 (2d Cir. 2004). See also *Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 27 (2d Cir. 2002) ("…a court should generally apply state-law principles to the issue of contract formation.")

[14] *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 333 (Conn. 2005)

[15] *Id.*

[16] *Id.*

## 5.1 CONTRACT FORMATION

In order to form a binding and enforceable contract, there must be an offer and an acceptance based on a similar understanding by the parties as to the essential terms of the contract. There must be mutual assent or a meeting of the minds at the time the contract was formed.

## 5.2.  CONTRACT TERMS

To be enforceable, an agreement must be definite and certain as to its essential terms and requirements. If the essential terms of an agreement are omitted or phrased in too indefinite a manner, the agreement will be unenforceable. Terms are reasonably certain when they provide a basis for determining the existence of a breach and giving the appropriate remedy.

If the parties have a dispute as to whether the contract provides for a certain term, the plaintiff must prove by a preponderance of the evidence that the contract contained the terms that the plaintiff seeks to enforce. If the parties have a dispute as to the meaning of the language of the contract, the plaintiff must prove by a preponderance of the evidence what the disputed terms meant.

## 5.3 CONTRACT INTERPRETATION

A contract is unambiguous if has "a definite and precise meaning, unattended by danger of misconception." Conversely, "contract language is ambiguous if it is reasonably susceptible of more than one interpretation."

Contracts are to be construed against the drafter of the ambiguous language when a term of the contract cannot be determined from the intent of the parties, the language, and the surrounding circumstances.

Ambiguity of a contract term or phrase is to be considered from the viewpoint of one cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement.

## 5.4. INTENT OF THE PARTIES

All relevant provisions of the contract should be considered when determining the intention of the parties. All language of the contract is assumed necessary, unless this would be unfair or unreasonable.

To determine the intent of the parties, the contract language may be interpreted in light of the situation of the parties and the circumstances surrounding the making of the contract. The motives of the parties and the ends that they sought to accomplish by their contract may also be considered.

The parties' intent is to be determined from the terms of the contract read in light of the circumstances attending the making of the contract, including the motives and the purposes of the parties.

The circumstances surrounding the making of a contract or the purposes that the parties sought to accomplish and their motives cannot prove an intention contrary to the plain meaning of the language.

## 5.5  CONTRACT CONSTRUCTION

The Court should not remake the contract or to change the terms of the contract. The terms of the contract that the parties in fact made must be applied and this can be determined from the intent of the parties.

When specific terms and general terms both apply to the same subject in the contract, the specific terms should be favored over the general terms.

To establish that there is a term implied in the contract, plaintiff has the burden to prove by a preponderance of the evidence: (1) that the term was a custom in the industry or trade; (2) that each party knew or had reason to know of the custom or usage; and (3) that neither party knew or had reason to know that the other party had intentions inconsistent with that custom or usage.

## 5.6 CONTRACT DAMAGES

If you find that Defendants breached a valid contract, you may award damages.  However, Plaintiff must establish that it has incurred damages and that these damages were caused by the breach and did not result from some other source.[17]

---

[17] *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 333 (Conn. 2005)

## 6. DILUTION UNDER THE LANHAM ACT

The Plaintiff's claim to recover on the theory of trademark dilution is based on 15 U.S.C. § 1125(c) and provides that the owner of a famous mark shall be entitled to an injunction against another persons' commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

To prove a claim for dilution the Plaintiff must show:

    (1) "OMEGA"/ "Ω" is a famous mark for OEI;

    (2) Defendants are making commercial use of the "OMEGA"/ "Ω" mark in commerce;

    (3) Defendants' use of the "OMEGA"/ "Ω" mark started after Plaintiff's "OMEGA"/ "Ω" mark became famous; &

    (4) Defendants' use of the "OMEGA"/ "Ω" mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish the Plaintiff's "OMEGA"/ "Ω" mark.[18]

To determine whether OEI's mark is famous you may consider the following factors:

    (1) The degree of inherent or acquired distinctiveness of Plaintiff's "OMEGA"/ "Ω" mark.

    (2) The duration and extent of Plaintiff's use of "OMEGA"/ "Ω" in connection with the scientific equipment with which "OMEGA"/ "Ω" is used

    (3) The duration and extent of advertising and publicity for Plaintiff's "OMEGA"/ "Ω" mark

    (4) The geographical extent of the trading area where "OMEGA"/ "Ω" is used

    (5) The channels of trade where "OMEGA"/ "Ω" is used

    (6) The degree of recognition of "OMEGA"/ "Ω" in the trade areas and channels of trade used by both Plaintiff and Defendants;

    (7) The nature and extent of use of the same or similar marks by third parties; &

    (8) Whether Plaintiff's mark is on the principal register.[19]

Once again no factor is determinative and you may consider other factors than the ones listed.

To determine whether or not Plaintiff's mark was actually diluted, you may consider circumstantial evidence including that dilution took place because the Plaintiff and Defendants' "OMEGA"/ "Ω" marks are identical.[20]  You may also consider that the financial evidence provided is reflective of a reduction in the Plaintiff's selling power.[21]

---

[18] *Savin Corporation v. The Savin Group*, 391 F.3d 439 (2d. Cir. 2004).
[19] 15 U.S.C. § 1125(c).
[20] *Savin*, 391 F.3d 439 (2d. Cir. 2004).
[21] *Id.*

## 6.1 DILUTION DAMAGES

If you determine that Defendants has diluted the Plaintiff's "OMEGA"/ "Ω" mark, you may award damages if you find that the Defendants willfully intended to trade on the Plaintiff's reputation or to cause dilution of the Plaintiff's famous "OMEGA"/ "Ω" mark.[22]

You may award damages for Plaintiff to recover

> (1) Defendants' profits
> (2) Plaintiff's sustained damages

AND

> (3) Costs of the action.[23]

In determining the Defendants' profits, Plaintiff must show Defendants' sales.  It is the burden of the Defendants to prove elements of the cost or deductions claimed.[24]

If you find that the amount of recovery based on profits is inadequate, you may, in your discretion, enter an amount that you find to be just, according to the circumstances of the case.[25]

You may also assess damages, according to the circumstances of the case, for any sum above the amount found as actual damages, and up to three times such amount.[26]

You may also, if you find exceptional circumstances, award reasonable attorneys fees.[27]

---

[22] 15 U.S.C. §1125(c)(2).
[23] 15 U.S.C. § 1117(a).
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

## 7.  CANCELLATION OF A TRADEMARK

OEI is seeking to cancel two trademarks that OSA has registered with the United States.  OEI is seeking to cancel these trademarks on two grounds.  The first ground I will charge you on is the ground of fraud and the second ground I will charge you on is the ground of the ground of abandonment.

## 7.1 HEIGHTENED BURDEN OF PROOF FOR CANCELLATION: CLEAR AND CONVINCING EVIDENCE

To cancel a federally registered trademark for fraud, OEI must "demonstrate the alleged fraud by clear and convincing evidence." *PAJ, Inc.* v. *Barons Gold Mfg. Corp.*, 2002 WL 1792069 (S.D.N.Y. 2002).

Clear and convincing evidence is a quantum of proof lying at an intermediate point between the "preponderance of the evidence" standard appropriate to most civil cases and the "beyond a reasonable doubt" standard employed in criminal prosecutions. *Addington* v. *Texas*, 441 U.S. 418, 423-25, 99 S. Ct. 1804, 1808-09, 60 L. Ed. 2d 323 (1979).

Although not capable of precise definition, clear and convincing evidence has been "described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Buildex, Inc.* v. *Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) quoting Colorado v. New Mexico, 467 U.S. 310, 316, 104 S. Ct. 2433, 2437, 81 L. Ed. 2d 247 (1983), reh'g denied, 468 U.S. 1224, 105 S. Ct. 19, 82 L. Ed. 2d 915 (1984).

## 7.2 CANCELLATION BY FRAUD

To find any OSA statement (i.e., the renewals filed with the United States Patent & Trademark Office by OSA), fraudulent, the burden is on OEI to show "a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of mere error or inadvertence." *Id*. Consequently, just a "misstatement in a registration application provides a bias for canceling the registration *only if* the misstatements (1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application." *Mears* v. *Montgomery*, 2004 WL 964093 (S.D.N.Y. 2004) (*emphasis added*.)

Because the nature of use sufficient to form a predicate for a trademark application is cloudy, a good faith belief is sufficient use to rebut a charge that the trademark was acquired through fraud". *McCarthy on Trademarks* § 31:72.  Therefore, if OSA had a good faith belief of use, OSA cannot be found guilty of abandonment for non-use.

## 7.3 CANCELLATION BY ABANDONMENT

To prevail on a claim of abandonment, OEI must show: (1) discontinued use of a mark; (2) and no intent by the owner to resume use in the reasonably foreseeable future. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir. 1992); *Cline* v. *1-888-Plumbing Group, Inc.*, 146 F.Supp.2d 351, 364 (S.D.N.Y. 2001); *Havana Club Holding, S.A.* v. *Galleon*, 1998 WL 150983 (S.D.N.Y. 1998).

OEI is again held to proving, by a standard of "clear and convincing evidence" (as I just described in relation to the fraud ground) that OSA abandoned its mark in order to cancel a mark based upon abandonment. *Citigroup Inc.* v. *City Holding Co.*, 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. 2003) (*citing Saratoga Vichy Spring Co.* v. *Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)). Because a finding of abandonment results in a forfeiture of rights, you, as the trier of fact, should be hesitant to find abandonment. *See, e.g., News World*, 1984 WL at *8; *Noah's Inc.* v. *Nark, Inc*, 560 F.Supp. 1253, 1259 (S.D.N.Y 1983) (*cautioning hesitancy to Courts in making this finding*). Part of the proof required for abandonment is "a demonstration of intent to abandon. *News World* at *8.

Even if OSA was found to have discontinued use of the mark in connection with such goods, OEI must show that OSA did not continue to use its marks in related industries. This is because "[w]here a registrant discontinues to use a trade-mark on a certain product, he will not be held to have abandoned the mark if he continues to use the mark on related items, and if the discontinued product is one which would still be though by the buying public to come from the same source and is one which remained in the normal field of expansion of the owner's business." *I.H.T. Corp*. v. *News World Comm., Inc.*, 1984 WL 604 *9 (S.D.N.Y. 1984).

## 8. VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

The Connecticut Unfair Trade Practices Act proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat. § 42-110b (a)*.  The statute defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *Conn. Gen. Stat. § 42-110b (a )(4)*.

The Connecticut Supreme Court has established the following criteria to be employed when determining whether a practice violates CUTPA:

> (1)    Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established, concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Web Press Services Corp*. v. *New London Motors, Inc*., 203 Conn. 342, 355 (1987) (*internal citations omitted*).

Courts in Connecticut have held that a finding of likelihood of confusion under the Lanham Act establishes a violation of CUTPA based on unfair competition. *See, e.g., Nabisco Brands, Inc*. v. *Kaye*, 760 F. Supp. 25, 29 (D. Conn. 1991).  If you find that such a likelihood of confusion exists in this case, then you can find a basis for a CUTPA violation.  Alternatively, if you find that OSA has done anything "immoral, unethical, oppressive, or unscrupulous", then you can find that OSA has violated the CUTPA.

## 9. CONCLUSION

As you proceed to the jury room to begin deliberations, determine the facts on the basis of evidence, as you have heard it, and apply the law as I have outlined for you. Render your verdicts fairly, uprightly and without a scintilla of prejudice.

Your verdicts must be unanimous. In other words, all jurors must agree before a verdict can be rendered. Prior to rendering a verdict, it is the duty of each juror to discuss and consider the evidence and opinions of the other jurors. If in the course of deliberations, you become convinced that the views you held are in error, do not hesitate to reexamine your views and change your opinion, if appropriate. Ultimately, however, you must decide the case for yourself. Do not surrender your beliefs as to the proper weight of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of rendering a verdict.

When making decisions in this case, you will be asked questions that are at issue in this case. You are to provide the answers to these questions. A set of these questions will be distributed when you retire to begin your deliberations. At the end of deliberations, fill out only one set and return it to the court.

Several of the questions asked only need to be answered if a certain answer or answers have been given to a previous question or questions. You should not answer any question one way to avoid answering a later question, but it may turn out that you do not have to answer every question. Each question you answer should be given individual consideration.

Do not assume from the wording of any question or from the fact that a question is asked that there is any particular answer you are supposed to give. Your answer should be given solely on the basis of your assessment of the evidence and the application of these instructions of law.

You may now retire to the jury room. Elect on of the members of the jury as a foreperson. The foreperson is in no way more important in your deliberations. His or her sole function is to pass any requests for clarification of these instructions or to have testimony re-read or something of that nature on to me, and to announce your verdict.

If you do have such requests, please give them to the Marshal, in writing, and the Marshal will bring them to me. I must caution you to be careful to give us no indication of the status of your deliberations when you make such requests; we are not permitted to know anything about how fast or slow you are proceeding, or whether you are divided in your positions, or any other information about what is taking place in the jury room.

**Exhibit N - OSA's Proposed General Verdict Form**

**1.1 TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114**

Do you find, by a preponderance of the evidence, that:

1. That "OMEGA" and/or "Ω"has been registered as a trademark on the principal register in the United States Patent and Trademark Office?
2. Plaintiff is the registrant of that trademark?

AND

3. Defendant used "OMEGA"/ "Ω" in a manner likely to cause confusion among persons using ordinary care and prudence in the purchase of wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment?

YES/NO

If you answered no to the above interrogatory, then you must enter a verdict in favor of OSA on this count.

If you answered yes to the above interrogatory, you may answer the following interrogatory.

Do you find that OSA engaged in the above conduct with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake or to deceive?

YES/NO

If no, then please skip do not answer the next interrogatory.

If yes, please you may enter an award of lost profits, which you should enter below:

OEI Loss of Profits: _____

## 2.1 <u>TRADEMARK INFRINGEMENT UNDER § 1125(a)(1)(A)</u>

Do you find that Plaintiff has proven, by a preponderance of the evidence:

1. That the Plaintiff's use of "OMEGA"/ "Ω" on or in connection with "OMEGA"/ "Ω" scientific equipment has rendered the term "OMEGA"/ "Ω"an indication of the source or origin of the scientific equipment?
2. That Defendants' use of "OMEGA"/ "Ω" in connection with wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment constituted a false representation with respect to the origin of the equipment sold by Defendants?

AND

3. That there is a likelihood of confusion among ordinarily prudent purchasers as to whether Defendants' wind gauges, automatic weather stations, wind speed instrumentation, wind direction instrumentation, air temperature instrumentation, barometric pressure instrumentation, density altitude compensation instrumentation, and sports timing equipment came from some other source?

YES/NO

If you answered yes to the above interrogatory, then you may enter an award of lost profits to the Plaintiff.  If you find that Plaintiff is entitled to an award of lost profits, please enter the amount below.

Loss of Profits:_____

**3.1 <u>BREACH OF CONTRACT</u>**

Do you find that OEI has proven, by a preponderance of the evidence:

1. The existence of a valid agreement between the parties?

2. That Plaintiff performed under the agreement?

   AND

3. That Defendant failed to materially perform under the agreement, thereby breaching the agreement?

   YES/NO

If you answered no to the above interrogatory, then please do not answer the following interrogatory.

If you answered yes to the above interrogatory, then you may award OEI damages.

If you find that OEI has proved damages resulting from the breach of contract, please enter the amount below.

Damages: _____

**4.1 <u>DILUTION UNDER THE LANHAM ACT</u>**

Do you find that OEI has proven, by a preponderance of the evidence, that :

1. "OMEGA"/ "Ω" is a famous mark for OEI;
2. Defendants are making commercial use of the "OMEGA"/ "Ω" mark in commerce;
3. Defendants' use of the "OMEGA"/ "Ω" mark started after Plaintiff's "OMEGA"/ "Ω" mark became famous; &
4. Defendants' use of the "OMEGA"/ "Ω" mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish the Plaintiff's "OMEGA"/ "Ω" mark?

YES/NO

If you answered no to the above interrogatory, please do not answer the following interrogatory. If you answered yes to the above interrogatory, and you found that Defendant has diluted the Plaintiff's "OMEGA"/ "Ω" mark, you may award damages for Plaintiff to recover Defendants' profits, Plaintiff's sustained damages, and costs of the action.

N-4

**5.1  CANCELLATION OF A TRADEMARK**

Do you find, by clear and convincing evidence, that OSA made a a deliberate attempt to mislead the Patent and Trademark Office, and that OSA's misstatements in the renewals of the registrations (1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application, then you may cancel the registrations on the ground of fraud.

   CANCEL/NOT CANCEL

Do you find, by clear and convincing evidence, that OSA (1) discontinued use of a mark; (2) and had no intent to resume use in the reasonably foreseeable future?  If so, then you may cancel the registration on the ground of abandonment.

   CANCEL/NOT CANCEL

**6.1 <u>VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT</u>**

Do you find that OSA committed a practice, which without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established, concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

YES/NO

If you answered no the above interrogatory, then please do not answer the following interrogatory.  If you answered yes, you may award OEI damages.  If you find that OEI is entitled to damages, enter that amount below.

Damages:_____

**Exhibit O -OSA's Statement of the Case to the Jury**

This case involves a series of claims brought by Omega Engineering, Inc. ("OEI"), which is a company that manufactures and sells scientific and industrial devices, against Omega, S.A., ("OSA") a company that sells a variety of products. While OSA is most famously known for its watches, OSA also manufactures tools for making watches, very sophisticated time-keeping apparatus for the Olympics and other sporting events, transportation systems such as arrival and departure displays that travelers view in airports and rail stations, scoreboards and displays for public concourses, and Radio Frequency Identification Devices –similar to EZ Pass—which can be used to gain entry buildings and parks, ride ski lifts, and access the Internet.

These two companies have had a long history of disputes with each other concerning their respective uses of the OMEGA trademarks. That history is the reason why OSA and OEI entered into an Agreement in 1994.

OEI asks you to decide upon seven claims pending against OSA. The claims are as follows: (1) a claim to cancel two of OSA's federally registered trademarks; (2) a claim for breach of the August 1994 Agreement; (3) trademark infringement; (4) unfair competition; (5) false designation of origin; (6) trademark dilution; and (7) breach of the Connecticut Unfair Trade Practices Act.

OEI would like to cancel two different registrations. OEI would like to cancel a registration that was filed by OSA with the United States Patent & Trademark Office on May 31, 1960, otherwise known as Registration Number 708,731, or simply the '731 Registration. OEI would also like to cancel a registration that was obtained by OSA with the United States Patent & Trademark Office in 1984. OEI claims the right to cancel these United States Trademark registrations based upon its assertion that OSA has not used the registered marks on certain goods in United States commerce and it's a claim that OSA committed fraud in maintaining this registration.

OSA will show you that OEI's claims are unsupported by the facts; that in fact, OSA has continually used the marks on the goods described in each registration and that every statement made during renewals of the registrations was true and not false.

OEI also has federally registered trademarks. OEI's trademark infringement claim, unfair competition claim, and dilution claim are based largely on the allegation that certain OSA goods, which bear OSA's trademarks, infringe the OEI trademarks. OSA denies these allegations, asserting that its marks, which date back to 1894, are superior in right due to priority in time and that there is no confusion between the trademarks.

OEI also claims that OSA has breached ¶4 (b) of an Agreement that had been previously reached between the parties in 1994. OEI claims that OSA's maintenance of the 731 and 661 registrations is a breach of contract. OEI also claims that OSA has breached the 1994 Agreement because it has sold its goods to "science and industry."

OSA denies that it has breached this Agreement.  The purpose of the Agreement was simply to keep the parties from selling their goods in the markets of the other party and to resolve specific disputes between the parties that existed at the time. The agreement did not mention and did not apply to renewals of previously existing registrations. Moreover, since the agreement, OSA has not sold or offered for sale goods of the type or in the manner that it agreed not to sell or offer for sale in the 1994 Agreement.