IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA S.A., <br><br> Plaintiff, <br><br> v. <br><br> OMEGA ENGINEERING, INC., <br> OMEGA SCIENTIFIC, INC., and <br> OMEGA PRESS, INC., <br><br> Defendants. <br><br> OMEGA ENGINEERING, INC., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> OMEGA, S.A. and <br> THE SWATCH GROUP LTD., <br><br> Counterclaim-Defendants. | Civil Action No.: <br> 3:01 CV 2104 (SRU) |

**OMEGA S.A.'S OPPOSITION TO OMEGA ENGINEERING, INC.'S MOTION IN LIMINE AND INCORPORATED MEMORANDUM OF LAW TO PRECLUDE HEARSAY AND OPINION TESTIMONY**

Omega S.A. ("OSA"), by and through its undersigned attorneys, and hereby submits this Opposition to Omega Engineering, Inc.'s ("OEI") Motion in Limine and Incorporated Memorandum of Law to Preclude Hearsay and Opinion Testimony.

I.  **PRELIMINARY STATEMENT**

OEI seeks a sweeping evidentiary ruling based only on the mere suspicion that hearsay statements will be offered by OSA at trial. OEI has not identified a single specific out of court statement that it seeks to preclude. Rather, OEI seeks to categorically

1

exclude an entire topic of testimony without any analysis of whether each particular statement is hearsay. As a practical matter, the Court cannot decide whether each statement is inadmissible hearsay or whether it falls within the ambit of the multitude of hearsay exceptions without at least being presented with the statement being offered. One such example is that found in Federal Rule of Evidence 804(a)(4) and (b), in the situation where the out of court declaration is "unavailable" due to death; such is the case with Mr. Coutts, the OSA officer negotiated the 1994 Agreement who died in 1999. Thus, at a minimum, there exists the potential for out of court statements to be offered which are exceptions to the rule against hearsay. *Rosenfeld v. Basquist*, 78 F.3d 84,89 (2d 1996). Further examples, of such exceptions applicable to this case include records of regularly conducted business activity and public records. Fed.R.Evid. 803(6), 803(8). For these reasons alone, the Court should deny OEI's motion and/or postpone a decision until such issues arise at trial.

In addition, OEI's motion mistakenly confuses and mingles several legal doctrines. OEI has cleverly tried to blend and twist authority to reach the facts present here. As but one example, OEI consistently refers to the intent of one of the negotiators of the contract, the late William Coutts, as the exclusive probative evidence of OSA's interpretation of the contract at issue, when in fact Mr. Coutts was not a party to the agreement. It is the intent of the *parties*, not the intent of the *negotiating agents* that supplies meaning to ambiguous terms of the agreement. OEI has not cited any authority for the proposition that parol evidence only consists of the intent of the negotiating agent as opposed to the intent of the party to the agreement. It is clear that OEI seeks to capitalize on the death of one of the negotiators of the contract at issue and exploit the

opportunity to submit a one-sided self-serving interpretation of the agreement. OEI's generalizations misconstrue the facts and do not reflect the state of the law, and the motion, therefore, must be denied.

## II. DISCUSSION

### A. In Order to Evaluate the Admissibility of Hearsay Statements, the Court must Consider the Statement Itself.

Hearsay is an out of court assertion, other than one made by the declarant while testifying at the trial or hearing, introduced in court to prove the truth of the matter asserted. See Fed. R. Evid. 801(c); *Riisna v. American Broadcasting Companies, Inc.*, 219 F. Supp. 2d 568, 572 (S.D.N.Y. 2002). To be admissible, alleged hearsay evidence may be defined as non-hearsay or fall within one of the accepted exceptions to the general exclusionary rule. See Fed. R. Evid. 802, 803, 804 and 807; *Steinberg v. Obstetrics-Gynecological & Infertility Group, P.C.*, 260 F. Supp. 2d 492, 495 (D. Conn. 2003).

Statements that are not used to prove the truth of the matter asserted are not hearsay. *State v. Vega*, 44 Conn. App. 499, 505 (Conn. App. Ct. 1997); *State v. Cruz*, 212 Conn. 351, 356, 562 A.2d 1071 (1989). Indeed, the Federal Rules of Evidence provide for several dozen exceptions and exemption to the hearsay rule. See Fed.R.Evid. 803, 804, 807. For example, a statement that is offered to establish the state of mind of the declarant is not offered for the truth of the statement. *State v. Crafts*, 226 Conn. 237, 253 (1993).

Inherent in the hearsay rule, as well as its numerous exceptions, is the rule that only specific statements can be excluded. The hearsay rule cannot be applied in a broad-sweeping fashion as OEI seeks in the instant motion to effectively exclude categories of

testimony. Each allegedly hearsay statement must be evaluated independently to determine (1) if it is hearsay and (2) if it meets an exception to the general rule excluding hearsay. Because OEI has not identified any specific statements that it seeks to preclude—indeed it does not seeks to exclude specific statements, but an entire category of testimony—the Court cannot grant OEI's motion. Pursuant to Federal Rule of Evidence 104(b), that the Court must first be confronted with the disputed evidence before ruling on its admissibility. Here, the Court has not been confronted with the challenged evidence and therefore cannot issue an appropriate ruling. OEI's motion must be denied.

**B.      Parol Evidence is not Limited to the Intent of the Mr. Coutts**

The most fundamental aspect of the parol evidence rule is that the terms of a written contract may not be varied by extrinsic evidence. *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* 130 Conn. 12, 16, 31 A.2d 393 (1943); *Nagel* v. *Modern Investment Corporation,* 132 Conn. 698, 700, 46 A.2d 605 (1963). The rule does not forbid the presentation of parol evidence, but only prohibits the use of such evidence to vary or contradict the terms of the contract. *TIE Communications, Inc. v. Kopp*, 218 Conn. 281, 288, 589 A.2d 329 (1991). Extrinsic evidence may take several forms as long as it meets this fundamental requirement of the parol evidence rule. OEI correctly points out that evidence related to contract negotiations, the circumstances leading up to the contract, and conversations between the parties can be considered to aid in the interpretation of an agreement. Other useful tools for contract interpretation include evidence of partial performance of a contract, *Augeri v. C. F. Wooding Co.,* 173 Conn. 426, 429 (1977), and the course of dealing between the parties. *Foley v. Huntington Co.,* 42 Conn. App. 712,

734 (Conn. App. Ct. 1996) citing 2 Restatement (Second), Contracts § 212. However, all of these examples of evidence are used to show one thing: the intention of the <u>parties</u> to an agreement.

Contrary to OEI's assertions, parol evidence is not limited to the intent of individuals who negotiated the contract. Although the intentions of the late Mr. Coutts, the agent who negotiated the contract on behalf of OSA, is relevant parol evidence, it is not the exclusive source of extrinsic evidence. Moreover, since he is deceased, his statements may very well be excluded from the rule against hearsay. Fed.R.Evid. 804(a)(4), 804(b).

OEI tries to manipulate the parol evidence rule to state that extrinsic evidence can only consist of the intentions of the *negotiators* of the agreement as opposed to the parties to the agreement. However, all of the caselaw cited by OEI clearly articulates that the intention of the *parties* to the agreement, not the *negotiators* is the central inquiry. Under OEI's proffered interpretation of the parol evidence rule, only the negotiators, Dr. Drucker on behalf of OEI, and Mr. Coutts on behalf of OSA, could testify as to the parties' intentions and the spirit of the agreement. Such a result is not warranted by the law, and is completely inconsistent with OEI's conduct in this case and in other litigation in the past. For example, in support of summary judgment, OEI submitted the Declaration of Dr. Milton Hollander. (Dec. Hollander dated 9/14/2004.) Despite admitting in its brief that only Dr. Drucker negotiated the 1994 agreement on behalf of OEI, (OEI's Motion in Limine at 5, 6) OEI relied on that declaration as admissible evidence of the meaning of the 1994 agreement. (See Dec. Hollander dated 9/14/2004 ¶¶ 30-34.) Dr. Hollander discussed the agreement as applied to OEI's timing devices and the meaning of the term

"variable parameters." Dr. Hollander was not the president of the OEI or even the signatory of the agreement, and yet OEI used his declaration to support their interpretation of the 1994 agreement. By their own admission, therefore, other individuals within each company have an understanding of the meaning and the intention of the 1994 agreement. OEI concedes that witnesses in this action can and should be permitted to testify about the meaning of the 1994 agreement.

### C.    Other Individuals Have Personal Knowledge of the Purpose and Meaning of the 1994 Agreement

OEI incorrectly assumes that because Mr. Coutts is the only individual who actually negotiated the contract, he is the only person who understood its meaning or OSA's intent. Other people were involved reviewing the agreement and performing pursuant to the agreement. With that in mind, it is important to consider the environment in which the 1994 agreement was entered. OEI and OSA were parties to several trademark disputes in Hong Kong and Germany and the parties had already entered into at least three other agreements concerning their respective uses of the OMEGA mark. OEI has not cited any evidence indicating that Mr. Coutts was the only person with access to all of these facts. To suggest that noone else at OSA other than Mr. Coutts understood the agreement, the events leading to the agreement, or had personal knowledge of OSA's intention concerning the agreement, is simply absurd.

As stated above, one example of admissible evidence to prove the meaning of an agreement is partial performance of the agreement. OEI does not dispute that Ms. Sauser-Rupp, whose testimony OEI seeks to exclude, has been responsible for OSA's maintenance of the OMEGA brand since 1997, which is before Mr. Coutts died and before either party perceived violations of the 1994 agreement.

At her deposition in *OMEGA II*, (*Omega S.A. v. Omega Engineering, Inc.*, 00-cv-1848 (D.Conn.)), Ms. Sauser-Rupp testified that she was familiar with the 1994 agreement and she understood OSA's interpretation of the agreement, which was based in part on discussions with Mr. Coutts and Dr. Rentsch, and a review of the company records:

> "Q: Have you read all of the company's records that relate to the negotiations and signing of the 1994 agreement? Let me ask you this first: Are there any company records?
>
> A: Yes, there are, so I have read the one which were available and I also happened to discuss the agreement with Mr. Coutts."

(Sauser-Rupp 6/27/2001 at 77-78, Exhibit A.)

Following this exchange, Ms. Sauser-Rupp testified at length as to her knowledge of the agreement (Sauser-Rupp 6/27/2001 at 79-80, 87-98, Exhibit A), the events leading up to the agreement (Sauser-Rupp 6/27/2001 at 79-80, 87-98, Exhibit A), her subsequent communications with OEI and Dr. Drucker concerning OEI's references to "timers" in their trademark applications and OEI's departure from the 1994 agreement (Sauser-Rupp 6/27/2001 at 89, Exhibit A). It is clear therefore, that Ms. Sauser-Rupp has reviewed all relevant available materials and discussed the agreement with OSA's negotiator. Ms. Sauser-Rupp has personal knowledge of admissible parol evidence.

In addition, as OEI has maintained its right to seek fees and costs associated with this action, Ms. Sauser-Rupp's testimony regarding OSA's performance and interpretation of the agreement will be relevant to OSA's good faith in complying with the agreement. Her testimony will bear directly on OEI's claims for costs and fees.

7

Dr. Rentsch also has personal knowledge of the purpose and the meaning of the 1994 Agreement. Although he did not personally negotiate the agreement, he testified in the context of *OMEGA II* that that he discussed the agreement and negotiations with Mr. Coutts, and was responsible for final approval:

"Q: Now, did you discuss the course of negotiations that let to this 1994 Agreement with Mr. Coutts as the negotiations were progressing?

A: Certainly he called me from time to time and yes, during the negotiations."

(Rentsch 11/26/2001 at 119, Exhibit B.)

In fact, Dr. Rentsch supervised all of Mr. Coutts's negotiations with OEI. Mr. Coutts reported to him on the progress of negotiations with OEI. (Rentsch 11/26/2001 at 68, 78, 81 Exhibit B). Mr. Coutts would simply make suggestions, which Dr. Rentsch would consider in order to make final decisions. (Rentsch 11/26/2001 at 79, Exhibit B). At times, Dr. Rentsch actually reviewed the correspondence between Mr. Coutts and Dr. Drucker. At other times, Mr. Coutts would report to Dr. Rentsch directly. (Rentsch 11/26/2001 at 80-81, Exhibit B). Mr. Coutts and Dr. Rentsch even discussed the meaning of the term "variable parameters" and the application of paragraph 4(b), perhaps the most heavily contested terms in the 1994 agreement, which is central to OEI's current claim for breach of contract. (Rentsch 11/26/2001 at 99-100, Exhibit B.) Based on his experience, Dr. Rentsch is also certain of others items that Mr. Coutts would have discussed during negotiations. (Rentsch 11/26/2001 at 104, Exhibit B). Indeed, during his deposition, Dr. Rentsch testified extensively regarding the meaning of agreement, the other contracts leading up to the 1994 Agreement. See Exhibit B.

Dr. Rentsch's general responsibilities as General Counsel of The Swatch Group Ltd., the parent company of OSA, in which he monitors all litigation and many intellectual property matters concerning the OMEGA Mark, also provide him with personal knowledge of this dispute. Dr. Renstch has been in-house legal counsel to OSA and its predecessors since 1983. He has been involved with maintenance of OSA's OMEGA mark for many years. Dr. Renstch also has personal knowledge of the purpose of the 1994 Agreement, the events leading up to the agreement, and OSA's intent regarding the meaning of the agreement. All of these facts provide the foundation for his personal knowledge of the meaning, intention and purpose of the 1994 Agreement.

Most notably, however, is the fact that Dr. Rentsch is a signatory to the 1994 agreement. He approved the agreement. Thus, OEI seeks to exclude the testimony of the person who signed the 1994 Agreement as well as the executive who supervised negotiations and approved the contract. In sharp contrast, OEI's signatory, Mr. Ralph Michel, is not even included in their witness list because he is no longer employed by OEI after having plead guilty of violations of the Export Control Act 50 U.S.C. § 2410. Nor is Betty Ruth Hollander, the President of OEI, who purportedly manages all day-to-day activities of the corporation, included in their exhibit list.

### III. CONCLUSION

As no statements have been identified by OEI as alleged hearsay, OEI's motion to preclude evidence in that regard must be denied. The Court simply cannot evaluate the hearsay rules without being confronted with the statements themselves. Further, there are many examples of exceptions which could apply to any proffered hearsay evidence, such

as records of regularly conducted business activity or statements of a deceased person under Federal Rules of Evidence 803 and 804.

To the extent OEI seeks preclusion under Fed.R.Evid. 602 for lack of personal knowledge, there can be no question that both Dr. Rentsch and Ms. Sauser-Rupp have personal knowledge of the details of the 1994 agreement. Their experience at OSA and involvement with many trademark issues involving the OMEGA mark qualifies them to testify as lay witnesses as to the purpose of the agreement, and OSA's intent concerning the agreement, and additionally, OSA's good faith in performing the agreement.

OEI's motion should be denied.

          Respectfully submitted for
          Counterclaim-Defendant,

By: _____
Jess M. Collen
Matthew C. Wagner
Philip J. Miolene
COLLEN *IP*
The Holyoke-Manhattan Building
80 South Highland Ave
Ossining, NY 10562
(914) 941-5668
(914) 941-6091

*Attorneys for Omega S.A.*

December 1, 2005