EXHIBIT A

## In The Matter Of:

*Omega, S.A., v.*
*Omega Engineering, Inc.*

---

*Christiane S. Rupp*
*June 27, 2001*

---

*DOYLE REPORTING INC.*
*369 Lexington Avenue*
*New York, NY  USA  10017*
*(212) 867-8220    FAX: (212) 286-1853*

Original File CR062701.ASC, 213 Pages
Min-U-Script® File ID: 3620930414

**Word Index included with this Min-U-Script®**

Case 3:01-cv-02104-SRU   Document 204-2   Filed 12/01/2005   Page 3 of 12

Omega, S.A., v.                                                              Christiane S. Rupp
Omega Engineering, Inc.                                                           June 27, 20(?)

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
OMEGA, S.A.,
                Plaintiff,
      against            300 CV
                         1848 JBA
OMEGA ENGINEERING, INC., OMEGA PRESS,
INC., and OMEGA SCIENTIFIC, INC.,
                Defendants.
                         June 27, 2001
                         9:00 a.m.

    30(b)(6) Deposition of CHRISTIANE SAUSER RUPP, taken
by Defendants, pursuant to notice, held at the
offices of Omega Engineering, One Omega Drive,
Stamford, Connecticut, before Nancy R. Sullivan, a
Shorthand Reporter and Notary Public within and for
the State of New York.
```

Page 2

Appearances:
    COLLEN LAW ASSOCIATES, P.C.
      Attorneys for Plaintiff
      80 South Highland Avenue
      Ossining, New York 10562
    BY: JESS M. COLLEN, ESQ.
      JULIAN BURKE, ESQ.
        of Counsel
    DELIO & PETERSON, LLC
      Attorneys for Defendants
      121 Whitley Avenue
      New Haven, Connecticut 06510
    BY: PETER W. PETERSON, ESQ.
        of Counsel
ALSO PRESENT:
    WILLIAM DRUCKER, M.D., Esq.
    DAVID CHMIELEWSKI, Videographer
      Geomatrix Productions

---

Page

[1]                     SAUSER RUPP
[2]    MR. PETERSON: The stipulation we
[3] have made is that the witness may sign
[4] the transcript before any notary, U.S.
[5] or foreign.
[6]    (Witness sworn by the court
[7] reporter.)
[8] CHRISTIANE SAUSER RUPP,
[9] having been first duly sworn by the
[10] Notary Public (Nancy R. Sullivan), was
[11] examined and testified as follows:
[12]           DIRECT EXAMINATION BY
[13]              MR. PETERSON:
[14]    Q: Ms. Sauser Rupp, would you state
[15] your full name for the record, please?
[16]    A: So my first name is Christiane and
[17] my family name is Sauser Rupp.
[18]    Q: And what is your home address?
[19]    A: It is Rue du Four 4, 1400, Yverdon
[20] in Switzerland.
[21]    Q: And do you work for Omega, S.A.?
[22]    A: No I am working for the Swatch
[23] Group, Ltd.
[24]    Q: And what is your work address?
[25]    A: It is Faubourg du Lac 6, 2501

Page

[1]                     SAUSER RUPP
[2] Bienne, Switzerland.
[3]    Q: Could you please add your
[4] telephone, fax and E-mail addresses if you
[5] recall them?
[6]    A: So my private or my professional?
[7]    Q: For your work, please.
[8]    A: So my direct phone number,
[9] International Code for Switzerland is 41. Then
[10] 32, 3436730, and the fax International Code 41,
[11] 32, 3436923 and my E-mail is
[12] Christiane.Sauser@Swatchgroup.com.
[13]    Q: Ms. Sauser Rupp, what is your
[14] citizenship?
[15]    A: I am Swiss.
[16]    Q: Do you have any other citizenship?
[17]    A: No.
[18]    Q: Have you ever been deposed before?
[19]    A: No.
[20]    Q: I am here to ask you some questions
[21] and you are here to answer those as best you
[22] can. If you don't hear a question, you can ask
[23] me to repeat it or the reporter will repeat the
[24] question. If you do not understand the
[25] question, you may say so and I will try to

Page 61

SAUSER RUPP

[2] generally for sports events?
[3]    A: Yes.
[4]    Q: Do you know if any of them are sold
[5] for science or industry?
[6]    A: At the moment they are not sold for
[7] science and industry.
[8]    Q: Do you know if they have ever been
[9] sold for science or industry, these timing
[10] devices that are sold under the Omega mark?
[11]    A: There is a book called the "Omega
[12] Saga" which relates the history of Omega from
[13] the beginning until 1988, because it was the
[14] book which has been made for the 150th century
[15] of the company. And there you have a whole
[16] section about timekeeping, and at that time
[17] Omega, S.A. had made some timers. You can see
[18] pictures in the book and perhaps they have been
[19] sold to other companies and not just for timing
[20] purposes. I cannot tell you, but it could be.
[21]    Q: Since you have been with the
[22] company have any of these timing devices been
[23] sold under the Omega mark for science or
[24] industry?
[25]    A: No.

Page 62

SAUSER RUPP

[2]    Q: Do you know if there are any plans
[3] to sell any timing devices for science or
[4] industry under the Omega mark?
[5]    A: No, I don't know any plan.
[6]    Q: Does that include computer
[7] controlled timing apparatus, you are not selling
[8] them for science or industry?
[9]    A: We are prevented from doing that
[10] because of the '94 agreement and '92 agreement.
[11]    Q: Are you aware of Omega
[12] Engineering's business in general?
[13]    A: I don't think I know everything
[14] about Omega Engineering business. I do not have
[15] this potential, but I know a bit because I have
[16] seen in the proceedings some of the documents
[17] and I inherited from Mrs. McFarlane some big
[18] catalogs with all kind of products.
[19]    Q: Do you know in general what types
[20] of products it sells, Omega Engineering?
[21]    A: So Omega Engineering is a company
[22] which is selling some precision instruments to
[23] measure temperature, for example, and I was
[24] what I read was that the applications were used
[25] for scientific purposes, namely, for

Page 6_

SAUSER RUPP

[2] laboratories to be able to make some measures or
[3] for industries to control some of the process to
[4] see if everything was going right.
[5]    Q: Are you aware of any products that
[6] Omega Engineering sells outside of science or
[7] industry?
[8]    A: No, I don't have that kind of
[9] knowledge.
[10]    Q: Are you aware of any services that
[11] Omega Engineering offers under the Omega mark?
[12]    A: So I knew that Omega Engineering
[13] has a few affiliated companies, and if we speak
[14] about Omega Press and Omega Scientific, so Omega
[15] Press is a publisher, if I am not wrong, so
[16] these are kind of services which are provided
[17] through an affiliate of Omega Engineering.
[18]    Omega Engineering themselves, I
[19] cannot tell.
[20]    Q: But you don't know of any goods or
[21] services that Omega Engineering or the other
[22] defendants sell outside of science or industry?
[23]    A: No, I don't know.
[24]    Q: Are you aware of the trademark
[25] registrations for the Omega marks owned by Omega

Page _

SAUSER RUPP

[2] Engineering?
[3]    A: I knew a few of them. I don't know
[4] them all.
[5]    Q: The ones you know, do you recall if
[6] they are for science or industry?
[7]    A: So you know that we have a
[8] litigation on that.
[9]    Q: Yes. But are you aware of any
[10] restrictions in Omega Engineering's trademark
[11] registrations restricting the goods or services
[12] to science or industry?
[13]    A: Most of the trademark registrations
[14] I have seen there is a mention of science and
[15] industry, but it is not always clear whether it
[16] concerns all the products. It depends on the
[17] wording.
[18]    And Omega Engineering applications
[19] for trademarks contain a list of goods which are
[20] very long because they concern many kind of
[21] different apparatuses and other goods. So it is
[22] not always very clear whether all these products
[23] are for science and industry.
[24]    Q: Are you aware that Omega
[25] Engineering sells a weather station under the

Page 65

SAUSER RUPP

[2] Omega mark?

[3] A: A weather station?

[4] Q: Let me explain that further.

[5] It is a weather station that can

[6] record wind speed, wind direction, temperature,

[7] humidity, pressure?

[8] A: No, I was not aware of that, but it

[9] seems to be consistent with the kind of products

[10] Omega Engineering has.

[11] Q: Are you aware of any Omega

[12] Engineering trademark registrations that list

[13] goods for indicating wind speed or wind

[14] direction or measuring temperature or humidity

[15] or pressure?

[16] A: So temperature, yes, humidity and

[17] pressure, yes; but wind speed, I don't remember

[18] having seen a description of goods.

[19] Q: Are you aware that Omega

[20] Engineering sells radio frequency switches under

[21] the Omega mark?

[22] A: What is a radio frequency switch?

[23] I don't know.

[24] Q: I take it you are not aware of

[25] that?

Page 66

SAUSER RUPP

[2] A: No, no.

[3] Q: Are you aware that Omega

[4] Engineering sells a radio telemetry system under

[5] the Omega mark?

[6] A: No.

[7] Q: Are you aware of any Omega

[8] Engineering trademark registrations that list

[9] such goods, either radio frequency switches or

[10] radio telemetry systems?

[11] A: I don't remember reading. I have

[12] read some of the registrations. I don't

[13] remember this particular product.

[14] Q: In general, considering the goods

[15] that Omega Engineering actually sells and the

[16] goods that Omega, S.A. and Omega Electronics

[17] actually sells, do you have an understanding of

[18] the type of distinction that should exist

[19] between the two companies' use of the Omega mark

[20] and what they actually sell?

[21] A: So I have discussed that with

[22] Mr. Coutts as he was still working with us, and

[23] he always told me that there was a clear

[24] distinction between the companies because Omega

[25] Engineering was having products which were

Page 6

SAUSER RUPP

[2] relating to science and industry, so that there

[3] was only rarely encroachment overlap

[4] possibilities between the products of both

[5] companies.

[6] And when I read some of the papers

[7] and so I have seen that there was a proceeding

[8] in the U.K. in a position against one of our

[9] Omega trademarks by Omega Engineering in '77,

[10] and this was the starting point for the U.K.

[11] coexistence agreement which has been signed in

[12] 19 — I don't remember the date — in the

[13] beginning of the Nineties — no, no, no, no, not

[14] the Nineties. '85. Or '84, '85 was Canada, '84

[15] was U.K.

[16] And that particular question arose

[17] because at that time Omega Engineering had a

[18] device which was measuring the temperature and

[19] which was showing the time of day and Omega,

[20] S.A. had a bit of the same, but it was mainly a

[21] display of the time of day which could also show

[22] the temperature, and the parties could find an

[23] agreement because they noticed at that time that

[24] their field of activities were different, so the

[25] coexistence was based on that fact.

Page

SAUSER RUPP

[2] Q: The difference in the markets being

[3] Omega Engineering being in science and industry?

[4] A: Um-hum. But science and industry

[5] said seeing in quite a defined field, so really

[6] industry, the manufacturing process, what is

[7] needed to see if the process is — apparatus

[8] which can control, measure what is needed to

[9] have a product which is perfect which has all

[10] the qualities which are required.

[11] Q: Is that your understanding of

[12] science and industry?

[13] A: This is my understanding of what

[14] Omega Engineering was doing and what was — what

[15] was meant by science and industry.

[16] Q: Is it your understanding that in

[17] the marketplace as it actually exists today,

[18] that Omega Engineering does stay in the area of

[19] science and industry and doesn't venture outside

[20] that area in the products it sells under the

[21] Omega marks?

[22] A: I have not had the investigations

[23] made on what Omega Engineering is really doing

[24] and to whom they sell, but I think it is still

[25] the case.

Page 69

SAUSER RUPP

[2] Q: Do you have any knowledge of any
[3] products or services that Omega Engineering
[4] sells under the Omega mark outside of science or
[5] industry?
[6] A: I have no knowledge because I made
[7] no investigations.
[8] Q: Do you know if anyone at Omega,
[9] S.A. has made such an investigation?
[10] A: No, nobody.
[11] Q: So no one has investigated that?
[12] A: No.
[13] Q: Is use for sports events considered
[14] to be for science or industry as you understand
[15] it as Omega, S.A. understands it?
[16] A: No, it is not an industry nor a
[17] science.
[18] Q: Any other reason?
[19] A: Reason for that?
[20] Q: Other than that understanding that
[21] it is not a science or industry.
[22] A: Well, you can give meanings to
[23] words which you want, but for me industry is
[24] more with respect to manufacturing process and
[25] sports does not fit within that definition.

Page 70

SAUSER RUPP

[2] Q: Does Omega, S.A. or Omega
[3] Electronics sell any goods under the Omega marks
[4] that may be used in science or industry?
[5] A: Within the definition I told you
[6] before, no.
[7] Q: Are you aware of any discussions at
[8] Omega, S.A. or Swatch Group about Omega
[9] Engineering's business?
[10] A: No.
[11] Q: Are you aware of any discussions at
[12] Omega, S.A. or Swatch Group about Omega
[13] Engineering in general?
[14] A: Can you be precise what you mean by
[15] discussions?
[16] Q: Conversations between two people,
[17] two or more people.
[18] A: So, yes, I have spoken about Omega
[19] Engineering with Mr. Coutts and sometimes with
[20] Dr. Rentsch and with my colleague, Mr.
[21] Hernandez, and I phoned Mr. Perret at Omega,
[22] S.A. about the questions of Internet. There are
[23] some topics which relates to Omega Engineering,
[24] not only the question of the omega.com domain
[25] name.

Page 7

SAUSER RUPP

[2] Q: What discussions were made about
[3] that?
[4] A: I know that Mr. Perret of Omega,
[5] S.A. has contacted the — or telephoned or
[6] E-mail, I don't know, a person at Omega
[7] Engineering to see whether there could be a
[8] solution with respect to omega.com so that this
[9] domain name could lead to both companies.
[10] Q: How do you spell Mr. Perret's name?
[11] A: P-e-r-r-e-t.
[12] Q: What is his position?
[13] A: He is marketing controller.
[14] Q: Is that a Swatch Group or Omega,
[15] S.A.?
[16] A: Omega, S.A.
[17] Q: What are his responsibilities?
[18] A: So he is the person who controls
[19] the project for marketing purposes, so he is in
[20] contact with all affiliated companies with
[21] respect to what they spend for marketing and
[22] promotion.
[23] He is also the one who is
[24] coordinating within Omega all the agreements
[25] which can have an impact on the marketing

Page

SAUSER RUPP

[2] project and also with the agreements regarding,
[3] for example, the conception of the Internet
[4] domain name — Internet website, sorry — or,
[5] for example, the hosting of the Internet website
[6] of Omega.
[7] Q: You mentioned there was a something
[8] about — I forgot your exact term. Was it
[9] sharing the omega.com domain name?
[10] A: I don't know much about it, but
[11] apparently you can have, under a particular
[12] domain name you can go two ways. And I know
[13] that he contacted the person at Omega
[14] Engineering to see whether that solution was
[15] considerable because Omega, S.A. was not the
[16] first, of course, but they think that the
[17] omega.com domain name would be also interesting
[18] for them.
[19] Q: What was the proposal concerning
[20] the omega.com domain name, do you recall?
[21] A: So I know that there was a contact
[22] between Mr. Perret and somebody at Omega
[23] Engineering whom I don't know, and if I am not
[24] wrong, the person at Omega Engineering said that
[25] because there were legal problems, they could

Page 73

SAUSER RUPP

not be any further discussions.

Q: Did Omega, S.A. contact Omega Engineering about using or sharing the omega.com domain name prior to this litigation being started?

A: To my knowledge, no.

Q: By "this litigation," I mean the litigation in which Omega, S.A. is the plaintiff?

A: You mean the omegawatch.com and omegatime.com cyber squatting case?

Q: Yes.

A: To my knowledge, no.

Q: And could you describe what Omega, S.A. was proposing for sharing the name, how it would be linked to both Omega, S.A. and Omega Engineering?

A: I think there are some technical means to do that and there is a reason why Mr. Perret contacted the person at Omega Engineering to see whether there was a possibility, but I don't know — I don't know which kind of proposal could have been made because no proposal at all has been made. It was a first

Page 74

SAUSER RUPP

contact without follow-up.

Q: Does Mr. Perret work in Bienne?

A: Yes.

Q: And who is his supervisor?

A: The supervisor of Mr. Perret?

Q: Yes.

A: It is Mr. Urquhrart.

Q: How do you spell that name?

A: U-r-q-h-r-a-r-t.

Q: What is Mr. Urquhrart?

A: He is the managing director of Omega, S.A.

Q: Would you say that Omega, S.A. is in the same business as Omega Engineering?

A: If the business of Omega Engineering is science and industry as I defined before, no.

Q: So is it your understanding that currently Omega, S.A. and Omega Engineering are not in the same business?

A: If you think of the progress of their activities, no. If you tell about the products which they propose or the kind of general activities they could be, yes, and

Page __

SAUSER RUPP

that's the reason why we started all this litigation which is not the part of — which we talk in this particular proceeding, but in the other one what relates to time and timing and timers.

Q: But considering your understanding of what Omega Engineering currently sells in the marketplace, not setting aside what might be in a trademark registration but what Omega Engineering currently sells in the marketplace, you did say they didn't sell anything outside of science or industry, correct?

A: I say that, but I say that because I don't know. I didn't say that because I have proof that they don't sell to other people; so there a distinction shall be made.

Q: But you are not —

A: Potentially there is a conflict which is possible.

Q: But you don't know that there is any conflict in the marketplace right now?

A: No.

Q: So based on what you know right now, not what you don't know, but what you know

Page __

SAUSER RUPP

right now, would you say that Omega, S.A. is in the same business as Omega Engineering?

MR. COLLEN: Objection. I think she has already answered that question.

THE WITNESS: So what should I say?

Q: Just your understanding.

A: It depends. It depends whether you speak about the products themselves or the field of activities.

Q: I am asking about what the companies sell right now.

A: So you mean about the products?

Q: Yes.

A: So we are of the opinion that everything which relates to products which concern time and timing, independently of what kind of use can be made or for which purposes, we think that there is a possibility of confusion with the business of Omega, S.A. and it is the reason why we do not accept that Omega Engineering put on the market for whatever purposes, timers with the trademark Omega.

Q: But you are only talking about possibilities, not actual knowledge of being in

Page 77

SAUSER RUPP

the same business, correct?

A: Correct.

MR. PETERSON: Why don't we stop right here.

(Recess taken from 11:19 a.m. to 11:40 a.m.)

BY MR. PETERSON:

Q: Ms. Sauser Rupp, I want to show you what was previously marked as Plaintiff's Exhibit 1, and this was introduced by your counsel.

I ask you if you can identify that document?

A: So this is an agreement which has been concluded in '94 by Omega Engineering and Omega, S.A.

Q: Just for shorthand, we will refer to this as the 1994 agreement?

A: Okay.

Q: Now, you weren't at the company when this '94 agreement was signed, correct?

A: Correct.

Q: Have you read all of the company's records that relate to the negotiations and

Page 78

SAUSER RUPP

signing of the 1994 agreement?

Let me ask you this first: Are there any company records?

A: Yes, there are, so I have read the ones which were available and I also happened to discuss the agreement with Mr. Coutts.

Q: Have all of the documents that you have reviewed relating to the '94 agreement, have they been produced to us, do you know?

A: I cannot tell you with certainty.

Q: Do you know if any of those documents have been withheld as being privileged as attorney-client or attorney work product privilege?

A: It could be, but I don't know.

MR. PETERSON: Mr. Collen, I know that there has been an issue in the past about privilege and a privilege log. Do you know if there has been any documents withheld as privileged and have you supplied a privileged log to that effect?

MR. COLLEN: I believe I would have to go back and check, but I believe the

Page :

SAUSER RUPP

answer to both of those is, yes, there are documents which have not been produced because they are privileged documents. And I believe that we have produced a log but I don't have those with me this morning.

BY MR. PETERSON:

Q: Ms. Sauser Rupp, are you familiar with the documents that have been withheld as being privileged?

A: No.

Q: Who is charged with negotiating the 1994 agreement for Omega, S.A.?

A: So it was Mr. Coutts, but I shall say the following: The whole issue with respect to this particular agreement arose when Omega Engineering opposed the trademark of Omega, S.A. in Hong Kong, and the negotiations of the agreement, first the '92 agreement and then the '94 agreement, were led, to my knowledge, not directly between the companies but through the Hong Kong trademark attorneys. So on our side it was Wilkenson & Grist and on Omega Engineering it was Robin and something and John

Page

SAUSER RUPP

Liu.

So I think the first — so Omega had this trademark, there was opposition by Omega Engineering this was a trademark which had been filed in Class 9, as were the previous cases which relate to U.K. and Canada, although in U.K. and Canada they didn't have the international classification; but if you see the products, they were relating to products which we considered to be in Class 9 according to the Nice agreement convention.

So when this opposition was made, Wilkerson and Grist asked us whether we could find an amicable solution with Omega Engineering and we said yes, we already have two agreements which relate to U.K. and Canada; so why do not propose a similar agreement to Omega Engineering with respect to Hong Kong.

So that was the starting point, and the negotiations were led through these Hong Kong trademark attorneys.

Q: Who at Omega, S.A. was involved in directing the Hong Kong attorneys?

A: It was Mr. Coutts.

Page 81

SAUSER RUPP

Q: Did he work for Omega, S.A.? Was he — strike that.
Was he an employee of Omega, S.A.?
A: So he had been an employee of Omega, S.A. because he had started to work for Omega, S.A. in 1970, and at that time he was working for Omega, S.A. And afterwards, I think when the merger between Asuag and SMH took place, all trademark and other legal things were concentrating within the new entity, SMH; so Mr. Coutts was then working for SMH. So at that time when this particular Hong Kong case arose, he was already at SMH.
Q: And how long did Mr. Coutts stay at SMH after the 1994 agreement was concluded?
A: So Mr. Coutts retired because he was, I think, 65 in 1990, but he continued working for us, for SMH on a certain basis until his death in 1999. And he was coming to our offices at least — I don't know beforehand, but in '97 when I started, he was coming every Monday and we could have also contacts with him on the phone or per fax during the week.
Q: So at the time of the 1994

Page 82

SAUSER RUPP

agreement he was retired but still working as a consultant for Omega, S.A.?
A: So when the whole story began was at the end of the Eighties because until the parties got to the '92 agreement three or four years had gone out; so Mr. Coutts, during that period had passed from the status of employee to consultant. So let's say at the beginning he was an employee and afterwards he was a consultant, but he was always taking care of everything which related to Omega Engineering.
Q: Did he report to anyone at SMH or Omega, S.A. regarding the, what led to the 1994 agreement?
A: I have not found any notice to anybody on the negotiations.
Q: So you haven't found any documents?
A: Exactly, I haven't found any documents. And while he was still living, I never asked him the question, so I don't know.
Q: Have you asked anyone at Omega, S.A. or Swatch Group or SMH about their involvement with Mr. Coutts in connection with what became the 1994 agreement?

Page 8

SAUSER RUPP

A: I think that Mr. Coutts did that on his own. Did that on his own. But then just at the end, because he had no signature power for the company, he had to give the agreement to some persons who could sign it because they were empowered to sign on behalf of Omega, S.A.
Q: I was just about to ask you that.
So on the last page of Plaintiff's Exhibit 1 there is a signature of Hans Kurth and Hans Peter Rentsch, correct?
A: Exactly.
Q: And do you know what involvement they had other than signing the agreement in connection with negotiating the '94 agreement?
A: I think none.
Q: Have you ever spoken with either one of them about what their role was in the '94 agreement other than signing it?
A: So I am sure that for Mr. Coutts there was nothing else signing the agreement.
For Mr. Rentsch, he was also working at SMH. He was, he had the status as I explained beforehand. So, technically speaking, Mr. Coutts, he was employee within the Legal

Page

SAUSER RUPP

Department; so perhaps they could have been once saying I am negotiating an agreement with Omega Engineering, but as far as I know Dr. Rentsch has never really been involved in the negotiations.
Q: Have you asked him whether he was?
A: Yes, I have asked him and he said no.
Q: Have you asked Mr. Kurth?
A: Yes, I told you when we were — when Mr. Collen gave me these depositions — no, how you say.
Q: Declarations?
A: Declarations, of course, I asked the question and Mr. Coutts, you know, when you are the boss of the company you receive every day a hundred pages to sign.
Q: Looking at Section 4 of the agreement —
A: Yes.
Q: — and in particular looking at paragraph 4 A, do you see at the end of that paragraph there is the words "science or industry"?

Page 85

SAUSER RUPP

A: Yes.

Q: What is Omega, S.A.'s understanding of what that term means as it is used in that paragraph?

A: So I think it is what I already told you before.

Q: Would you repeat that, repeat your explanation?

A: So while the companies were negotiating the U.K. agreement in 1983, 1984, the solution which has been taken to try to distinct the field of activities of both companies were saying that Omega Engineering was working in the science and industry field. And for us, science and industry with respect to the products, which at that time we knew about were these temperature and pressure controlling apparatuses which were meant to be used in laboratories, so scientific laboratories and in the industrial processes to elaborate different products.

Q: Does the term there that is used in paragraph 4 A refer to the type of advertising that might be employed by Omega Engineering?

Page 86

SAUSER RUPP

A: What I know is that Mr. Coutts at one point said that he had been through all the catalogs of Omega Engineering and that was his conclusion that the application of the products was that one at that time.

Q: So is it your understanding that the term "science or industry" at least partially refers to the type of advertising for the goods that Omega Engineering could use with the Omega marks?

A: Yes, most probably it is.

Q: Do you have any understanding on whether —

MR. COLLEN: I'm sorry, can I ask to have that last question read back?

MR. PETERSON: Sure.

(Record read)

BY MR. PETERSON:

Q: Now, that term "science or industry," is it your understanding that it is partially a limitation on a class of customers to whom those goods could be sold?

A: Yes. Consumers active in a certain field of activity.

Page [87]

SAUSER RUPP

Q: Is that term "science and industry" as used in that paragraph a limitation on the inherent use that might be made of the goods?

A: No.

Q: Now, you mentioned that at one point you were aware of Omega Engineering selling pressure and temperature goods, related goods, correct?

A: Yes, because — well, in the '84 U.K. agreement and '85 U.K. agreement for Canada at that particular time, Omega Engineering — what is written in the agreement is only temperature controlling devices. So the activity of Omega Engineering was on that particular point, on that particular — yes, element which is temperature, and then I found out a letter of Dr. Drucker of '85 writing to Robic, this is our Canadian trademark attorney, who says that Omega Engineering is not only active in temperature but also in pressure strain and flow, and that if we were to conclude further agreements this should be taken into account.

Q: At some point after that and before

Page [88]

SAUSER RUPP

the '94 agreement was signed Omega, S.A. became aware that Omega Engineering was selling some timing related apparatus, correct?

A: Well, the question of timers arose as I was already working in the Legal Department. It arose — the fact that in their trademark applications Omega Engineering had started to introduce timers or industrial timers or period timers. This came out, I think, mid or end of '97, and in that respect I just want to add something.

When I started working within Swatch Group Legal Department, I was starting to take care of the Omega trademark litigations, of course, but as I have told you before, I have a lot of other activities and Mr. Coutts was still here. He died in December 1999, so two years afterwards. So at the beginning he was the one who was handling all Omega Engineering cases and he was the one who has read the Omega Engineering trademark applications and he was the one who found out that timers were in and he was the one who said that this was not acceptable.

Page 89

SAUSER RUPP

And it is the reason why, as I rose in the department all the time, because I am working 100 percent, that's the reason why I started to have contact with Dr. Drucker and say that Omega, S.A. considers that filing trademark applications concerning timers was not acceptable, because everything which relates to timing is one of the activities of Omega, S.A., an activity which has started at the beginning of the Century in 1909, there was already timing by Omega, S.A. in England of balloon competition or something else. And during all these years, all the Century, Omega has continued in that field.

So when Mr. Coutts found out that there were timers, he thought that there was something which was not correct, and that's the reason why I wrote to Mr. — to Dr. Drucker saying that we consider that it was not covered by the agreement and we asked them to withdraw these products.

Q: Didn't you testify previously, though, that there was an issue over Omega Engineering selling of a product that displayed

Page 90

SAUSER RUPP

both temperature and time?

A: Yes.

Q: Was that prior to the 1994 agreement?

A: Oh, yes, that is what led to the '84 U.K. agreement.

Q: So Omega, S.A. was aware that Omega Engineering was selling some timing-related apparatus at that time?

A: Yeah, but the difference is that it is not only a timing device. The purpose of the apparatus is something which falls within the normal activities of Omega Engineering, and within that device there is a timer or there is a time display and, of course, we understand that if you have to measure temperature, perhaps in the laboratory they will test something during one hour and you have to have something like in your microwave which says, okay, I do that for two minutes. And that was accepted, of course.

Q: And it was accepted because Omega Engineering was selling to science and industry?

A: No, it was accepted because of that

Page 9

SAUSER RUPP

and mainly because this was a part of some other product. That is what is important. The main purpose of the apparatus is not timing, it is something else, and timing or timer or product which measured the elapsed time or sets a preset time or have a mechanism for that is doing something else, it is measuring something else and that was what we could accept.

And I think it is very clear in the '91 license agreement for Japan there is a clause which says that we accept that we accept a timing device which is ancillary to a product which has another purpose.

Q: In the 1994 agreement, though, looking at paragraph 4.A, would you agree that Omega Engineering was permitted to use the Omega marks or other types of timing apparatus as set forth in paragraph 4.A?

A: Not at all.

Q: But would you agree that it was Omega Engineering was permitted to use register or apply to register the Omega marks in respect of computer-controlled measuring, timing and display apparatus intended for science or

Page 

SAUSER RUPP

industry?

A: Yes, if I read that, yes.

Q: Let's go to paragraph 4 B and 4 C, and I put those two together because both paragraphs use similar language.

And I want to look specifically at the phrase "industrially and/or scientifically employed" in both of those. And I will ask you what does the term "employed" mean in that phrase or as part of the broader language of those two paragraphs, 4 B and 4 C?

A: You are asking me to give you a synonym.

Q: Synonym or definition.

A: "Employed" means for me apparatus and industrially and/or scientifically applied for or used for.

Q: By whom are you talking about the end user?

A: No, no, not by the end user. What is the purpose of the apparatus.

Q: So the term "employed" there means — strike that.

By whom is — who is to employ the

Page 93

SAUSER RUPP

[1]
[2] apparatus scientific, industrially and/or
[3] scientifically, is that the end user or is it
[4] Omega Engineering or Omega, S.A. or who?
[5]    A: But we are speaking here, I'm
[6] sorry, about a trademark application and this is
[7] wording for a trademark application, so the
[8] agreement is not supposed to answer your
[9] question.
[10]    The agreement is supposed to say
[11] what will be done with respect to a trademark
[12] application.
[13]    Q: But aren't these paragraphs also
[14] supposed to control the use of an Omega mark
[15] aside from a trademark application?
[16]    A: Yes, that's true, to use.
[17]    Q: So just considering the use aspect
[18] of paragraph 4 B and 4 C, by whom are the — is
[19] the apparatus industrially and/or scientifically
[20] employed, is that — my question is employed by
[21] whom? Is that employed by the customer or the
[22] end user? Is it employed by Omega Engineering
[23] or Omega, S.A. or by whom is that employed?
[24]    A: So in the first case in 4 B it is
[25] what Omega, S.A. will not do.

Page 94

SAUSER RUPP

[1]
[2]    Q: Yes.
[3]    A: What kind of products they will not
[4] have within their range of products, so this is
[5] a limitation of what Omega, S.A. is allowed to
[6] do. So 4 B, I cannot answer your question
[7] because it cannot be.
[8]    For 4 C it means that Omega
[9] Engineering can have within its range of
[10] products an apparatus industrially and/or
[11] scientifically employed for measuring or
[12] controlling variable parameters such as
[13] temperature, et cetera. And I think
[14] industrially and/or scientifically means the
[15] kind of applications.
[16]    Q: Is that a limitation on the class
[17] of customers to whom the products are sold?
[18]    A: Not the class of customer, but
[19] the — it is an apparatus which is scientific or
[20] industrial, so it goes with the purpose of the
[21] device to be more industry or science.
[22]    Q: So its purpose is intended by Omega
[23] Engineering?
[24]    A: Yes.
[25]    Q: Not necessarily what the customer

Page 9[ ]

SAUSER RUPP

[1]
[2] does with it?
[3]    A: No. But of course, Omega
[4] Engineering knows their customer and they know
[5] what they are doing.
[6]    Q: Just looking at paragraph 4 C and
[7] then looking at the registration aspect of that
[8] paragraph, not the use, the registration, does
[9] paragraph 4 C require Omega Engineering to place
[10] in its description of goods in a trademark
[11] application the phrase "industrially and/or
[12] scientifically employed"?
[13]    A: Only for that kind of product which
[14] are covered by this particular definition. You
[15] know, the agreement is not supposed — in Omega,
[16] S.A.'s use is not supposed to prevent Omega
[17] Engineering for doing anything which they can
[18] have in mind.
[19]    There are possibilities of overlap
[20] between the activities of the companies. You
[21] know that Omega, S.A. has a different
[22] activities, much business also, and this is not
[23] at all covered by this agreement in our opinion.
[24] We speak about very particular products which
[25] fall under Class 9.

Page [ ]

SAUSER RUPP

[1]
[2]    Q: Speaking of those particular
[3] products that are covered by the language of
[4] paragraph 4 C, my question to you is: Does this
[5] paragraph require Omega Engineering to place in
[6] the description of those goods, those particular
[7] goods, the term "industrially and/or
[8] scientifically employed"?
[9]    A: Yes. Because it is here in
[10] paragraph 4 C.
[11]    Q: Now, in Omega, S.A.'s
[12] understanding, does that relate — strike that.
[13]    In Omega, S.A.'s understanding,
[14] does the requirement for Omega Engineering to
[15] put in the phrase "industrially and/or
[16] scientifically employed" into its trademark
[17] registration, did that apply only to
[18] registrations obtained after this agreement was
[19] signed in 1994 or did that also have a
[20] requirement that it be introduced into
[21] previously obtained registrations?
[22]    A: If you see the first sentence of
[23] paragraph 4, it says, "Henceforth, from the
[24] signing of this agreement and effective in all
[25] countries of the world." So for me, henceforth