COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

Civil Action Number:  300 CV 1848 JBA

- - - - - - - - - - - - - - - - - - - - - -

OMEGA, S.A.,

                    Plaintiff,

          vs.

OMEGA ENGINEERING, INC., OMEGA PRESS, INC.,

and OMEGA SCIENTIFIC, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF HANSPETER RENTSCH

November 6, 2001



DEFENDANT'S
EXHIBIT

CASE NO. 3:98-cv-02464

EXHIBIT NO. 413



# The Cunningham Group, Inc.

Total Litigation Management

111 Gillett Street
(Corner Asylum Ave.)
Danbury            Hartford, CT 06105            Sta
203-797-8107       860-521-3664                  203-356

Nationwide 800-842-4486
www.cunninghamreporting.com

DISK
ENCLOSED

H. RENTSCH - 11/06/01

2

1    A p p e a r a n c e s :

2         For the Plaintiff:

3              COLLEN LAW ASSOCIATES, P.C.

4              The Holyoke-Manhattan Building

5              80 South Highland Avenue

6              Ossining, New York  10562

7                   By: *JESS M. COLLEN, ESQ.

8

9         For the Defendants:

10             DELIO & PETERSON, LLC

11             121 Whitney Avenue

12             New Haven, Connecticut  06510

13                  By:  PETER W. PETERSON, ESQ.

14

15        For Omega Engineering, Inc.:

16             OMEGA ENGINEERING, INC.

17             One Omega Drive

18             Stamford, Connecticut  06907

19                  By:  B. CHRISTINE RIGGS, ESQ.

20

21             * Present by telephone

22

23

24

25

CUNNINGHAM REPORTING ASSOCIATES

1          ...The following is the

2    Deposition of HANSPETER RENTSCH of Bantertli

3    12, Bettlatt, Switzerland, taken in the

4    above-entitled cause, pending in the United

5    States District Court, for the District of

6    Connecticut, pursuant to Notice and the

7    Federal Rules of Civil Procedure, before

8    Kathleen A. Keefe, L.S.R., a Notary Public

9    duly commissioned and qualified, at the

10   offices of DeLio & Peterson, LLC, 121 Whitney

11   Avenue, New Haven, Connecticut, on

12   November 6, 2001 at 6:05 o'clock a.m., at

13   which time counsel appeared as hereinbefore

14   set forth, and also present were William A.

15   Drucker, and by telephone, Christiane

16   Sauser-Rupp, Christian Steil, and Bernd

17   Gerriets, Videographer...

18                STIPULATIONS

19          All objections, except as to

20   form, are reserved for the trial.

21          Formalities as to proof of the

22   authority of the Notary Public and

23   sufficiency of notice are waived.

24          The deposition may be signed

25   before any Notary Public.

H. RENTSCH - 11/06/01

64

1   this omega.com was already blocked by other

2   people.  And so we decided to immediately

3   register all our brands with dot com,

4   launching all our brands with dot com, and in

5   cases where we cannot do that, we decided to

6   add the word "watches" to the -- to the brand

7   or "watch" or "watches" to the brand.

8          And we also decide -- beside the

9   dot com registrations, we fixed a list with

10  key markets where we are going to register

11  local registrations with the dot UK or the

12  dot CH or whatever you have.  We also fixed

13  the number of trademarks that we want to

14  protect it like that, and we fixed the

15  territories where we are doing that.

16         And in addition, we defined all

17  that additional registrations should be the,

18  let's say, the position of the brands.  But

19  that was -- the core protection was defined

20  like that.

21     Q.   Going back to your telephone

22  conference with Dr. Drucker, do you recall if

23  the subject of omegawatches.com came up

24  during that telephone conference?

25     A.   Yeah.  As I said before, I think --

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

65

1    as I remember, we asked Mr. -- Dr. Drucker to

2    transfer that registration to Omega S.A.

3    because of the word "watch" or "watches."

4    "Watches," "watch" or "timing."

5        Q.    But at the time of the telephone

6    conference, omegawatch.com was not owned by

7    Omega S.A. or Swatch Group.   Correct?

8        A.    Omegawatch.com was registered by --

9    by Dr. Drucker, yes.

10       Q.    Do you recall if omegawatches.com

11   was owned by Omega S.A. or the Swatch Group

12   at that time?

13       A.    I don't know the dates.   No.   I

14   don't know.

15       Q.    Do you know if omegawatches.com was

16   registered after the telephone conference

17   with Dr. Drucker?

18       A.    I don't remember that.

19       Q.    Do you recall any discussion with

20   Dr. Drucker during that telephone conference

21   concerning the channels of trade through

22   which Omega Engineering and Omega S.A. sell

23   their respective products?

24       A.    What I remember is that we

25   discussed about a legal issue in Japan, but

H. RENTSCH - 11/06/01

66

1   not in general, about the distribution

2   channels of their products.

3        Q.   Do you recall voicing any concern

4   that Omega Engineering and Omega S.A. were

5   selling competing products?

6        A.   I don't remember that.

7        Q.   What do you recall talking about

8   concerning the situation in Japan?

9        A.   As I remember, I think we discussed

10  about a licensing agreement where Swatch S.A.

11  should grant Omega Engineering Limited right

12  to use that trademark in Japan for their

13  products, and we have been willing at that

14  period of time to enter into such discussions

15  under the condition that we find other

16  agreements on other open issues.

17       Q.   And what were those other open

18  issues?

19       A.   One of those was certainly -- was

20  certainly that -- that -- the Internet issue.

21       Q.   Okay.  So you were not willing to

22  grant Omega Engineering a license in Japan

23  unless Omega Engineering turned over the

24  omegawatch.com and omegatime.com domain

25  names?  Correct?

H. RENTSCH - 11/06/01

67

1        A.    That have been the two issues on

2    the table, yes, between Mr. -- Dr. Drucker

3    and Mr. Coutts, and that was the content of

4    that telephone call, and also I think it was

5    an element more regarding this licensing

6    agreement. What we suggested -- if any

7    agreement would be made, we suggested to make

8    a nonexclusive licensing agreement, and I

9    think that was a problem for Dr. Drucker; he

10   wouldn't -- didn't want to accept that.. So

11   that was also one of the elements that we

12   didn't find a solution then.

13        Q.    Were there any other requirements

14   that you stated that would have to be met by

15   Omega Engineering for you to give them a

16   trademark license in Japan?

17        A.    I don't -- I -- I don't remember.

18        Q.    Now, at the time of the telephone

19   conference in 1997 with Dr. Drucker, you had

20   been aware for some time of Omega

21   Engineering's registration of the

22   omegawatch.com and omegatime.com domain

23   names. Correct?

24        A.    Correct.

25        Q.    Do you recall how you first became

1    aware of those domain name registrations?

2         A.   I don't remember in detail, but I

3    guess it was Mr. Coutts who involved me.

4         Q.   Do you recall when you were

5    informed?

6         A.   No.

7         Q.   Okay.  Now, you've mentioned

8    Mr. Coutts a couple of times now.  First of

9    all, is Mr. Coutts an employee of yours?

10        A.   He was.

11        Q.   Okay.  And what was his position?

12        A.   He was legal counsel of the SSIH

13   group before the merger, the merger I

14   described at the beginning, and after the

15   merger I think he was part of the legal

16   department.

17        Q.   And what were his responsibilities

18   in the legal department after the merger?

19        A.   Well, he had different

20   responsibilities.  I think he was -- just to

21   give you some more information, I think he

22   was -- he was not only a legal person, he was

23   also an engineer and he was also a patent

24   attorney, so he gave us a little bit also of

25   the technical background in the legal

H. RENTSCH - 11/06/01

69

1    department, and besides that, in the -- in

2    the legal field he was responsible for Omega,

3    Omega Electronics and some other companies.

4         Q.    And was he responsible for the

5    Omega S.A. trademarks from the early 1990s?

6         A.    Yes, he was.  Together -- together

7    with his assistant, yes.

8         Q.    And who was his assistant?

9         A.    Assistant was called

10   Mrs. Kielieort.

11        Q.    Could you please spell that?

12        A.    I can't recall myself.  Just a

13   second.  K-i-e-l-i-e-o-r-t.

14        Q.    Thank you.

15        A.    Strange name.

16        Q.    Now, when did Mr. Coutts leave the

17   legal department?

18        A.    He died in 1999, but he was -- he

19   was retired around '95; I don't know the

20   exact date.  But he continued to work also

21   after his retirement.

22        Q.    Was he retained on a consultant

23   basis?

24        A.    Yes.

25        Q.    So he was a consultant to Omega

H. RENTSCH - 11/06/01

1   S.A. from '95 to '99?

2       A.   He was consultant and he was -- he

3   was fully integrated in the legal department.

4   He continued his work in the legal

5   department, and he gave his work time to the

6   legal department, not directly to -- to Omega

7   or Omega Electronics.  But he -- he worked on

8   a reduced basis; I think he worked one to two

9   days per week.

10      Q.   But in the period of '95 to '99,

11  did he continue to do work on -- for Omega

12  S.A.?

13      A.   He did, and especially he was

14  responsible for that file with Omega

15  Engineering.

16      Q.   Which file are you referring to?

17      A.   All files, all open issues between

18  the two companies.

19      Q.   Now, going back to Omega S.A.'s web

20  site, are you familiar with the term

21  "metatag," m-e-t-a-t-a-g?

22      A.   No.

23      Q.   Are you familiar with ways to

24  search for products or services on the

25  Internet using Internet search engines?

H. RENTSCH - 11/06/01

71

1      A.   I heard about it, but, as I say,

2  I'm not an Internet user.

3      Q.   In the course of its work, does the

4  Swatch Group legal department do any

5  searching for domain names owned by others

6  that include the word "Omega"?

7      A.   Yes, sure.  The person responsible

8  for this -- for this Internet registration is

9  doing that on a regular basis, but not only

10  for Omega, for all the brands.

11      Q.   And that was Mr. Hernandez?

12      A.   Yes.

13      Q.   Can you describe what Omega S.A. or

14  the Swatch Group legal department does to

15  search for domain names owned by others that

16  include the word "Omega"?

17      A.   Yeah, probably I think he looked

18  into the Internet and looks -- tries to get

19  all this information on people using the word

20  in their domain name.  I think he probably

21  made lists of all these -- of all these

22  registrations, which are thousands.

23      Q.   Does he do this periodically?

24      A.   As I said, for all the brands, yes.

25      Q.   Do you know how -- how often he

H. RENTSCH - 11/06/01

72

1    does this search?

2        A.    No.  It's up to him to do it, to

3    organize it himself.

4        Q.    Now, in addition to the domain

5    names owned by Swatch Group or -- or its

6    companies that contain the word "Omega," are

7    you aware of domain names that contain the

8    word "Swatch" that are owned by the Swatch

9    Group?

10            MR. COLLEN:  Can you repeat

11    the question back, please, or have it read

12    back?

13            MR. PETERSON:  Let me just

14    rephrase it.

15    BY MR. PETERSON:

16        Q.    Are you aware of domain names

17    containing the word "Swatch" that are owned

18    by the Swatch Group?

19        A.    I know that there are certain --

20    such certain domain names.  I'm not sure if I

21    know every area of these registrations.

22        Q.    And there are quite a few of them,

23    are there not?

24        A.    Yes.

25        Q.    Perhaps over 40?

H. RENTSCH - 11/06/01

73

1        A.    Possible.

2        Q.    And there are several domain names

3   owned by Swatch Group or its companies that

4   contain the word "Omega." Correct?

5        A.    Uh-huh.

6        Q.    What is the reason for obtaining

7   multiple domain names that contain the word

8   "Omega" or contain the word "Swatch"?

9        A.    I think it was a question of the

10  protection.  I think if we add to the Swatch

11  brand also a soft brand also with

12  omegacmaster, it's an additional protection

13  also with the soft brand.

14                    (Pause.)

15  BY MR. PETERSON:

16        Q.    Could you please repeat that?  The

17  reporter was not getting that.

18        A.    It's additional protection if you

19  add to the main brand, to the Swatch brand,

20  for instance as soft brand, or as in the case

21  of Omega -- not only Omega but omegacmaster,

22  which is a secondary brand to the Omega

23  product.

24        Q.    But why isn't one domain name good

25  enough?

H. RENTSCH - 11/06/01

74

1          A.    Because we use also -- for all our

2   products, we need additional -- additional

3   brands.

4          Q.    Is that for marketing purposes?

5          A.    Yes.

6          Q.    And what -- would that give some

7   type of marketing advantage to have more than

8   one domain name containing "Omega" or

9   containing "Swatch"?

10          A.    It gives the possibility of the

11   consumer to get access to -- to some other

12   door into the Internet world if necessary.

13          Q.    And why would that be necessary, to

14   use something other than just one domain name

15   that has "Omega" in it or one domain name

16   that has "Swatch" in it?

17          A.    It could help for the access.  If

18   somebody is looking for a Swatch -- access

19   Swatch and then it's just printing on the

20   computer, the Swatch access is -- should be

21   leading to the same web site as to Swatch.

22   It's another entry to the Internet world.

23          Q.    So it's to the Swatch Group's

24   advantage to have multiple domain names

25   containing the word "Omega" or containing the

1   word "Swatch"?

2         A.    It's helpful, yeah.

3         Q.    Are you aware of other companies

4   that have multiple domain names containing

5   their company name?

6         A.    Yes.

7         Q.    Okay.  And is this to your

8   understanding a standard practice for a

9   company, to have multiple domain names

10  containing their company name?

11        A.    Yes.  For instance, yours.

12        Q.    Precisely.  Omega Engineering has

13  multiple domain names containing the word

14  "Omega."  Correct?

15        A.    Yes, yes.

16        Q.    And that's standard practice.

17  Correct?

18        A.    That is a certain -- can be a

19  certain practice, yes.

20        Q.    When was the first time you became

21  aware of Omega Engineering?

22        A.    I don't remember.

23              MR. PETERSON:  I'd like

24  Mr. Steil to hand to the witness what's been

25  previously marked as Defendants' Exhibit 103,

1    and in accordance with our practice announced

2    yesterday, we'll mark it with -- with another

3    exhibit number for this deposition and that

4    will be Exhibit Number 125.  And I'll ask the

5    Court Reporter to mark that.

6                     (Defendants' Exhibit 125:

7    Marked for identification.)

8                     MR. PETERSON:  Mr. Steil, have

9    you located that document?

10                    MR. COLLEN:  That's a -- this

11   is Jess Collen.  That's a letter, dated

12   January 10, 1991, signed by Dr. Rentsch?

13                    MR. PETERSON:  Yes.

14                    MR. COLLEN:  Okay.

15                    MR. PETERSON:  I'd like

16   Dr. Rentsch to review that document and when

17   he's done to let me know.

18                    (Pause.)

19        A.    Yes.

20   BY MR. PETERSON:

21        Q.    Okay.  Do you recall this document?

22        A.    Not so much.

23        Q.    Well, is that -- is that your

24   signature at the bottom?

25        A.    Yes.

H. RENTSCH - 11/06/01

77

1      Q.    And the date on this document is

2    January 10, 1991.    Correct?

3      A.    Correct.

4      Q.    You were aware of Omega Engineering

5    long before January 10, 1991.    Correct?

6      A.    Yes, yes.    It's mentioned in the

7    contract, in the letter, yes.

8      Q.    And do you recall that prior to

9    1991, there was at least one agreement

10   between Omega S.A. and Omega Engineering

11   concerning the use of the Omega trademark?

12     A.    Before '91?

13     Q.    Yes.

14     A.    I don't remember.    I don't

15   remember.

16     Q.    Now, in the fourth paragraph of

17   this letter --

18     A.    Uh-huh.

19     Q.    -- it says, "Since Omega S.A. is in

20   the process of trying to settle a

21   long-standing trademark dispute with Omega

22   Engineering."

23     A.    Uh-huh.

24     Q.    Do you recall what that trademark

25   dispute was?

1      A.    Not -- not in detail, but I know

2    that Mr. Coutts had treated more than one

3    issues with Omega Engineering at that time,

4    and as I remember, it was something -- had

5    something to do with Hong Kong and another

6    one I think with -- with Germany.   Probably

7    you -- you mean that one.

8      Q.    Now, was Mr. Coutts in charge of

9    negotiating with Omega Engineering?

10      A.    Yes, he was.

11      Q.    Did he report to you on the

12    progress of those negotiations in general?

13      A.    Yes.

14            MR. COLLEN:   Hello?

15            THE WITNESS:   Hello?

16            MR. PETERSON:   Yes.

17            MR. COLLEN:   Okay.

18    BY MR. PETERSON:

19      Q.    Did you make the ultimate decision

20    as to what Omega S.A. would accept in the

21    course of its negotiations with Omega

22    Engineering?

23      A.    In what kind of negotiations?

24      Q.    Well, let's say the -- the disputes

25    that you just mentioned that were

1    referenced --

2        A.    Yes.

3        Q.    -- in the '91 letter, Hong Kong and

4    Germany.

5        A.    Yes.  In this case it's yes.

6        Q.    So Mr. Coutts would negotiate, but

7    you would make the ultimate decision for

8    Omega S.A. on its position?

9        A.    He would suggest to me and give me

10   his opinion, and then I would decide, yes.

11       Q.    And was this your practice for

12   later negotiations with Omega Engineering?

13       A.    Yes.  But in all cases I think it's

14   up to the legal counsel handling a matter to

15   make his proposals, come to me, to give me

16   his reasoning, and then I think it's decided.

17       Q.    Now, in the course of determining

18   Omega S.A.'s position, did you also consult

19   with the management of Omega S.A.?

20       A.    Yes, depending -- depending on the

21   matters.  In pure, let's say, trademark

22   protection matters, oppositions and things

23   like that, Omega management have been

24   informed, but normally I think they never --

25   they don't have in theory, the right.

H. RENTSCH - 11/06/01

80

1                MR. PETERSON:  I would like to

2    have Mr. Steil hand to the witness what's

3    been previously marked as Defendants'

4    Exhibit 104 and we will mark this with

5    today's deposition number 126.

6                (Defendants' Exhibit 126:

7    Marked for identification.)

8        A.    Yes.

9    BY MR. PETERSON:

10       Q.    Dr. Rentsch, have you reviewed this

11   document?

12       A.    Yes.

13       Q.    Okay.  Do you recall this document?

14       A.    No.

15       Q.    It's signed by Mr. Coutts.

16   Correct?

17       A.    Correct, yes.

18       Q.    And it's addressed to Mr. Drucker?

19       A.    Yes.

20       Q.    Now, this is dated May 27, 1993.

21   First of all, was it the practice for you to

22   receive copies of correspondence from

23   Mr. Coutts to Omega Engineering's

24   representatives?

25       A.    Not in all cases.  I think we had a

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

81

1   direct relationship and communication.  From

2   time to time he also reported directly.

3        Q.   Okay.  So you're not indicated on

4   this letter as having received a copy.

5   Correct?

6        A.   Right.

7        Q.   But in general Mr. Coutts would

8   keep you informed as to the progress of the

9   negotiations?

10       A.   Correct.

11       Q.   Now, do you recall what was being

12  negotiated as referenced in this letter of

13  May 27, 1993?

14       A.   No.  A general agreement.  I don't

15  remember.

16       Q.   Okay.

17       A.   But several existing agreements --

18  I remember supplements of several existing

19  agreements, but I don't remember that he came

20  with a proposal of a general agreement.

21       Q.   Do you recall what the existing

22  agreements were that are referenced here in

23  this letter?

24       A.   Yeah.  I think there was some --

25  some agreement regarding one or two cases in

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

82

1    several countries which opposition was filed

2    and where the parties intended to settle the

3    matter.

4         Q.    Okay.  Dr. Rentsch, before

5    appearing for your deposition today, did you

6    review any documents?

7         A.    I just had a short discussion with

8    Mrs. Sauser where she indicates to me a

9    little bit where this legal proceeding in

10   general is.

11        Q.    Okay.  Did she show you any

12   documents?

13        A.    Not at -- no.

14        Q.    Did you look through your own files

15   in the course of preparing for this

16   deposition?

17        A.    No.  That's the reason why I don't

18   remember today what you ask for.

19        Q.    Okay.

20             MR. PETERSON:  I'm going to

21   ask Mr. Steil to hand you what was marked

22   yesterday as Exhibit Number 117, and I'll ask

23   you to review that, and when you're done,

24   please let me know.

25        A.    Yes, I've seen it.

H. RENTSCH - 11/06/01

83

1    BY MR. PETERSON:

2        Q.    Okay.  Do you recall seeing this

3    document before?

4        A.    Well, I signed it.  Yeah, probably

5    I have seen it before.

6        Q.    Well, that was going to be my next

7    question.  That is your signature on the

8    third page?

9        A.    Yes.

10       Q.    But do you -- do you recall signing

11   this document?

12       A.    Not in detail.  I think it's ten

13   years ago.  But, yes.  I have signed it, yes.

14       Q.    Okay.  And do you understand this

15   document to be a trademark license concerning

16   the Omega mark in Japan?

17       A.    I have not read it, no, in all the

18   details, but the title is "Trademark License

19   Agreement," yes.

20       Q.    Okay.  And do you see in the first

21   page "whereas" paragraph A, that it

22   references Japanese trademark registration?

23       A.    In the "whereas" clause?

24       Q.    Yes.

25       A.    Uh-huh.

H. RENTSCH - 11/06/01

84

1       Q.   And do you see in the "whereas"

2   paragraph B, there's a reference to the Japan

3   trademark office?

4       A.   Yes.

5       Q.   Okay.  Now, you had mentioned that

6   in your 1997 conversation with Dr. Drucker,

7   the subject of a trademark license in Japan

8   came up.  Correct?

9       A.   Yes.

10      Q.   Do you recall what the subject

11  matter of the license that you were

12  discussing was; that is, how did it relate to

13  the trademark license agreement that you have

14  as Exhibit 117?

15      A.   I don't remember.

16      Q.   Now, on the last page of

17  Exhibit 117, there's another signature next

18  to yours. Do you see that?

19      A.   Yes.

20      Q.   Do you understand that to be

21  Dr. Kurth's signature?

22      A.   Yes.

23      Q.   And he was at that time the

24  president of Omega S.A.?

25      A.   Correct.

H. RENTSCH - 11/06/01

85

1       Q.    Did you discuss this agreement with
2   Dr. Kurth prior to his signing the agreement?
3       A.    Yeah.  I would say yes.  In such
4   cases we have certainly discussed together,
5   yes.
6       Q.    Do you recall what was discussed?
7       A.    No.
8       Q.    Do you recall discussing this
9   trademark license agreement, Exhibit 117,
10  with Mr. Kurth since the time that it was
11  signed by both you and him?
12      A.    No, I don't think so.  I don't
13  remember.
14      Q.    Now, in the -- on page 2 of the
15  agreement there is the first paragraph there
16  and there's a reference to Omega S.A.
17  granting to Omega EI, that's Omega
18  Engineering --
19      A.    Uh-huh.
20      Q.    -- a license under a Japanese
21  trademark registration, and it references
22  "goods employed for measuring or controlling
23  variable parameters such as temperature,
24  pressure, force, load, vibration, electrical
25  conductivity, liquid level, acidity,

H. RENTSCH - 11/06/01

86

1    humidity, strain and flow." Do you see that?

2        A.    I see that, yes.

3        Q.    What is your understanding of the

4    meaning of the term "variable parameters" in

5    that paragraph?

6        A.    My understanding is that these

7    goods that have been sold under that

8    agreement by Omega Engineering would have

9    employed one of these different parameters,

10   of that list of parameters.

11       Q.    Are you referring to the terms

12   after the phrase "such as"?

13       A.    Yes.

14       Q.    Now, do you understand the meaning

15   of the term "such as"?

16       A.    I understand that, yes.

17       Q.    Okay.  And what is your

18   understanding of the meaning of that term?

19       A.    It means that this list -- it could

20   mean other parameters other than --

21            THE COURT REPORTER:  Would you

22   repeat that, please?

23            MR. COLLEN:  "It could mean

24   other parameters other than."

25       A.    Than the ones mentioned, but I -- I

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

87

1    think -- I see it's a very, very long list.

2    I think it should be more or less -- I

3    couldn't imagine another one.

4                    (Pause.)

5    BY MR. PETERSON:

6        Q.    Dr. Rentsch, could you just repeat

7    those last two sentences?

8        A.    No.   I don't know what I said in

9    detail, but I think -- I think it's a long

10   list of parameters, and I think in theory it

11   could be other ones, but I couldn't see which

12   ones.   I think it's -- it's really covering

13   everything.

14       Q.    Did you discuss with Mr. Coutts the

15   understanding of the phrase "variable

16   parameters" as used in this agreement?

17       A.    I don't remember what I discussed

18   when Mr. Coutts presented that agreement to

19   me.   We certainly -- we had certainly a

20   discussion, but I really do not know any

21   details.

22       Q.    Do you know if Mr. Coutts discussed

23   with a representative of Omega Engineering

24   the meaning of the term "variable

25   parameters"?

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

88

1      A.   I don't know.

2      Q.   Are you aware of any standard

3   industry definition of the term "variable

4   parameters"?

5      A.   No.  I'm not a technician.

6      Q.   Okay.  Either in the watch industry

7   or any other industry?

8      A.   No.

9      Q.   That was the question.  Are you

10   aware of any standard definition in the watch

11   industry or any other industry?

12      A.   The answer was no.

13            MR. COLLEN:  The witness

14   answered the question.  Maybe he just cut

15   out.

16            MR. PETERSON:  All right.  I'm

17   sorry.

18            MR. COLLEN:  That's all right.

19   BY MR. PETERSON:

20      Q.   Now, the agreement that's in

21   Defendants' Exhibit 117, is that one of the

22   existing agreements that was referenced in

23   Mr. Coutts' letter of '93, Exhibit 126?

24      A.   I don't have the letter anymore.

25      Q.   Okay.  Well, perhaps you can get

H. RENTSCH - 11/06/01

89

1       Defendants' Exhibit 126 again.

2                       (Pause.)

3                       MR. COLLEN:   The witness has

4       that exhibit now.

5            A.    Yeah.

6       BY MR. PETERSON:

7            Q.    Okay.  So one of the existing

8       agreements referenced in the '93 letter was

9       this trademark license agreement between

10      Omega S.A. and Omega Engineering?

11           A.    I don't know if this is referencing

12      to that one.  I don't know.

13           Q.    Okay.  But the trademark license

14      agreement, Exhibit 117, that's indicated as

15      being signed on behalf of Omega S.A. on

16      January 24, 1992 and on behalf of Omega

17      Engineering on September 5, 1991.  Correct?

18           A.    Correct, yes.

19           Q.    And do you believe those dates to

20      be correct?

21           A.    There's no indication why it should

22      not be.

23           Q.    So that this -- this trademark

24      license agreement was in effect as of the

25      May 27, 1993 date of the Exhibit 126?

H. RENTSCH - 11/06/01

90

1          A.    I don't know.

2          Q.    Okay.  Do you know if the trademark

3    license agreement, Exhibit 117, was ever

4    revoked or terminated?

5          A.    I don't know.

6          Q.    Okay.

7                MR. STEIL:  Mr. Peterson, the

8    tape cartridge is running out soon.  Do you

9    propose to --

10                MR. PETERSON:  Okay.  This

11    would be a good time for another break then.

12                MR. STEIL:  Yes.  Okay.  We

13    are going off the record at eight minutes

14    after 8:00 a.m., eastern standard time, eight

15    minutes after 2:00 p.m., Swiss time, on

16    November 5, 2001.  This is the end of

17    videotape number 2.

18                (Whereupon, a recess was taken

19    from 8:08 o'clock a.m. until 8:20 o'clock

20    a.m.)

21                MR. STEIL:  Back on the record

22    at 20 minutes past 8:00 a.m., eastern

23    standard time, 20 minutes past 2:00 p.m.,

24    Swiss time, on November 6th, 2001.  This is

25    the beginning of videotape number 3 in the

1    video deposition of Dr. Rentsch.

2    BY MR. PETERSON:

3         Q.    Dr. Rentsch, going back to

4    Exhibit 117, the Japanese trademark

5    license --

6         A.    Yes.

7         Q.    -- at the time this agreement was

8    executed, were you aware of the goods and

9    services sold by Omega Engineering under the

10   Omega mark?

11        A.    Mr. Coutts certainly said to me a

12   little bit about the background, but I don't

13   remember in detail.

14        Q.    Do you remember what you knew at

15   the time about Omega Engineering's goods and

16   services?

17        A.    No.

18        Q.    I'm sorry.  Was that a no?

19        A.    No.  Yes.  Yes, it was a no.

20        Q.    Do you recall if you asked

21   Mr. Coutts about whether Omega Engineering

22   sold any goods with timing functions?

23        A.    I don't remember.

24        Q.    Okay.  Do you recall if Mr. Coutts

25   told you about Omega Engineering selling any

H. RENTSCH - 11/06/01

92

1    goods with timing functions?

2        A.    I don't remember.

3        Q.    Would that have made a difference

4    to you at the time you signed the Japanese

5    trademark license?

6        A.    Depends on the -- on the -- on the

7    timing equipment, which would be part of such

8    overall equipment, certainly, yes.

9        Q.    What would -- what would have been

10   acceptable to you at the time you signed the

11   Japanese trademark license?

12       A.    Yeah, I think if you have a timer

13   in computer equipment or in a big industrial

14   equipment, a small timer which is telling you

15   the time and which you can use as a timer, I

16   think then it is really a secondary product,

17   then probably I wouldn't have had any

18   problem.

19               THE COURT REPORTER:  Sorry.

20   "Which you can use as a timer, I think" is

21   what?

22               MR. COLLEN:  A secondary

23   product.

24               THE WITNESS:  A secondary

25   product.

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

93

1          THE COURT REPORTER:  Thank
2    you.
3    BY MR. PETERSON:
4         Q.    Now, I'm going to ask Mr. Steil to
5    hand you what was marked yesterday as
6    Defendants' Exhibit 118, and I'll ask you to
7    review that and let me know when you're
8    finished reviewing that document.
9               (Pause.)
10        A.    Yes.
11   BY MR. PETERSON:
12        Q.    Okay.  Do you recall this document?
13        A.    Not in detail, but I -- I recall
14   that this document has been presented to me
15   by Mr. Coutts, yes.
16        Q.    Okay.  And is that your signature
17   on the last page?
18        A.    It is.
19        Q.    Okay.  Is that also Mr. --
20   Mr. Kurth's signature above yours?
21        A.    Yes.
22        Q.    And do you recall if that signature
23   date is accurate?
24        A.    I don't have any indication not to
25   do it.

H. RENTSCH - 11/06/01

94

1      Q.    Do you recall the circumstances

2  that led to this agreement?  I'm going to

3  call it the 1992 agreement.

4      A.    Yes.  I think it -- in accordance

5  to the "whereas" clause, that we had some

6  problems with Omega Engineering, yes, and

7  this was to resolve these matters.

8      Q.    And was this agreement also

9  intended to resolve matters worldwide in

10  addition to the specific matters in Hong Kong

11  and Germany?  I'll just direct your attention

12  to "whereas" paragraph F on page 2.

13      A.    The main -- the main purpose was

14  certainly to settle the matters in Hong Kong

15  and in Germany, but I think according to it,

16  the parties didn't want to have similar

17  problems elsewhere.

18      Q.    Now I'm going to direct your

19  attention to section 4 of the '92 agreement,

20  Exhibit 118.

21      A.    Yes.

22      Q.    And just ask you to review it in

23  general, and I'll -- I'll have some specific

24  questions on the langauge therein.

25      A.    Uh-huh.

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

95

1      Q.    Now, do you understand paragraph 4B

2  to be a restriction on Omega S.A.?

3      A.    Yes.

4      Q.    Okay.  And the last part of that

5  paragraph, in quotations "apparatus

6  industrially and/or scientifically employed

7  for measuring or controlling variable

8  parameters such as temperature, pressure,

9  force, load, vibration, electrical

10  conductivity, liquid level, acidity,

11  humidity, strain and flow," do you see that?

12     A.    Yes.

13     Q.    Okay.  And do you understand that

14  paragraph to prohibit Omega S.A. from using,

15  registering or applying to register the Omega

16  mark with respect to those goods?

17     A.    Uh-huh, yes.

18     Q.    Now, in the -- in that paragraph 4B

19  that I just recited, there's a term "variable

20  parameters."  Do you see that?

21     A.    I see that, yes.

22     Q.    Do you have any understanding of

23  the term "variable parameters" in this

24  paragraph that differs from your

25  understanding of the term "variable

CUNNINGHAM REPORTING ASSOCIATES

1  parameters" in the Japanese trademark license

2  agreement?

3      A.   No.

4      Q.   Do you recall if you discussed with

5  -- well, first of all, was this 1992

6  agreement one that was negotiated by

7  Mr. Coutts on behalf of Omega S.A.?

8      A.   Yes, correct.

9      Q.   Okay.  And did he consult with you

10  concerning the terms of this agreement?

11      A.   Before signing he came to me and

12  reported, made his suggestion to sign it,

13  yes.

14      Q.   Okay.  And did you have the

15  ultimate responsibility of deciding whether

16  the agreement was acceptable to Omega S.A.?

17      A.   Yes.

18      Q.   Okay.  And you -- and you

19  determined that it was acceptable to Omega

20  S.A.  Correct?

21      A.   I was of that opinion, yes.

22      Q.   Did you discuss with Mr. Coutts the

23  meaning of the term "variable parameters" in

24  this paragraph, 4B?

25      A.   He certainly explained.  I don't

1    remember, but he certainly explained to me.

2       Q.    And what did he explain to you?

3       A.    I don't remember.  It was ten years

4    ago.

5       Q.    Do you recall discussing that

6    phrase in particular, "variable parameters"?

7       A.    I don't remember.

8       Q.    Well, what's your understanding of

9    -- strike that.

10           In the line above it --

11              MR. COLLEN:  Above what?

12    BY MR. PETERSON:

13       Q.    In the line above "variable

14    parameters" in paragraph 4B, there is a term

15    "industrially and/or scientifically

16    employed." Do you see that phrase?

17       A.    I see that, yes.

18       Q.    Do you have an understanding of

19    what that phrase means in the context of that

20    paragraph?

21       A.    The limitation of their apparatus.

22    It's just limiting it to apparatuses which

23    are used in an industrial or scientific

24    environment.

25       Q.    And at the time you signed the '92

1  agreement, were you aware of the product line

2  of Omega Engineering?

3       A.   Not in detail, no.

4       Q.   Did you understand Omega

5  Engineering's products to be for science or

6  industry?

7       A.   Yes.  I think it's what -- it's

8  what I have been told, that they are used in

9  that field, yes.

10      Q.   Okay.  And did you understand Omega

11 Engineering's products to be limited to

12 science and industry?

13      A.   They're only used in that part of

14 the business, yeah.

15      Q.   Now, the term there "apparatus

16 industrially and/or scientifically employed,"

17 is -- is it your understanding that that is a

18 limitation on the way the goods can be

19 advertised?

20      A.   Yes.  And used.  And used.  I think

21 it should only -- it's only focused on

22 apparatus that are used for that purpose, for

23 industrial purpose and for scientific

24 purpose.

25      Q.   Okay.  So is it also a limitation

H. RENTSCH - 11/06/01

99

1    on the class of customers to whom the goods

2    may be sold?

3        A.    I don't understand the question.

4        Q.    Well, for example, if -- if a

5    product is advertised as industrial or

6    scientifically employed and may be used for

7    industrial and scientific purposes, would

8    that phrase in paragraph 4B also limit the

9    customers to whom that product sold, for

10    example, limit it to customers within science

11    and industry?

12        A.    Yes.    If it is only used there, I

13    think it's -- it doesn't make sense to sell

14    it to other people.

15        Q.    Now, in connection with that entire

16    phrase at the end of paragraph 4B starting

17    with "apparatus industrially and/or

18    scientifically employed," is it your

19    understanding that that phrase includes --

20    "apparatus industrially and/or scientifically

21    employed," that includes a timing function?

22        A.    No.

23        Q.    Did you discuss that issue with

24    Mr. Coutts?

25        A.    Yes, sure.    I think that we didn't

H. RENTSCH - 11/06/01

100

1  want to be limited in any way to any such

2  agreements, and timing was -- was the main

3  issue and the main function of Omega

4  Electronics.

5       Q.   All right.  What -- what products

6  or services did Omega Electronics sell that

7  included timing functions?

8       A.   Can you repeat the question?  I

9  think we -- Omega Electronics is supplying

10 timing equipment.

11      Q.   And could you be more specific?

12      A.   Our producing, developing and

13 selling equipment for all kinds of timing,

14 sports timing, but they are also supplying

15 equipment for railroad -- railroad, bus

16 stations and airports which are also normally

17 equipped with a timer.

18      Q.   And what type of equipment is that?

19      A.   They are these -- you probably know

20 these big boards in bus stations, in

21 airports, et cetera, where you have the

22 indications of destinations.

23      Q.   Okay.  So you -- in an airport, for

24 example, where the flight is listed and the

25 arrival or departure time?