1        A.    Yes.

2        Q.    And the same in a train station,

3   where a particular train is listed with an

4   arrival or a departure time?

5        A.    Right.  For instance, yeah.

6        Q.    Okay.  Anything -- anything else

7   that Omega Electronics sells with a timing

8   function?

9        A.    The boards in stadiums, venues,

10  sports venues, with displays, big displays.

11  They are -- also have timing functions in it.

12       Q.    Now, in paragraph 4C, at the end of

13  that paragraph there is a similar phrase that

14  starts "apparatus industrially and/or

15  scientifically employed for measuring or

16  controlling variable parameters such as," and

17  then it goes on and lists certain variable

18  parameters.  Do you see that?

19       A.    Yes.

20       Q.    Okay.  Is it your understanding

21  that the meaning of that phrase starting with

22  "apparatus industrially and/or scientifically

23  employed" is the same meaning as the phrase

24  that we've been discussing in paragraph 4B?

25       A.    Certainly not including timing,

1    yes.

2         Q.    But there's no -- in your view

3    there's no difference in the scope of what is

4    meant by "apparatus industrially and/or

5    scientifically employed," et cetera as it's

6    -- as it's in both those paragraphs?

7         A.    As I see it right now, it is the

8    same wording.

9         Q.    Now, was there any contemplation on

10   the part of Omega S.A. that Omega Engineering

11   would be permitted under this agreement to

12   sell goods with timing functions?

13        A.    Certainly not any goods with --

14   with timing functions where the timing

15   functions has a major -- it is the major

16   element.

17        Q.    Would you define what you mean by

18   "major element"?

19        A.    I think you have a lot of technical

20   products -- you have even a Handie, where you

21   will have certain timing functions in it.

22   Today in practically all products you have a

23   certain timing functions.  If this timing

24   function is secondary, as it is in a Handie,

25   for instance, then I don't see a big problem.

H. RENTSCH - 11/06/01

103

1    If it is a certain importance, then I think

2    it is coming into the field of Omega

3    Electronics.

4        Q.    What was your example of where it

5    has a secondary function?  You said "as in a"

6    something, and I didn't pick that up.

7        A.    As in a telephone, as in a mobile

8    telephone.

9        Q.    Okay.  Thank you.

10           Now, at the time the 1992 agreement

11   was signed, were you aware of any products

12   sold by Omega Engineering that had the timing

13   function?

14       A.    No.

15       Q.    Did you ever discuss this issue

16   with Mr. Coutts?

17       A.    Probably, yes, but I don't

18   remember.

19       Q.    Do you -- do you recall whether you

20   two discussed the issue of, you know, what

21   does Omega Engineering sell with respect to

22   timing function?

23       A.    We certainly did, but I do not

24   remember.

25       Q.    Do you remember what he told you?

H. RENTSCH - 11/06/01

104

1        A.    I don't remember.

2        Q.    Okay.  Do you know if Mr. Coutts

3   discussed the issue of timing with respect to

4   these two paragraphs, 4B and 4C, with Omega

5   Engineering?

6        A.    I don't know.  As far as I know

7   Mr. Coutts, I think he probably did.

8        Q.    Have you ever -- did you see

9   correspondence between Omega S.A.'s

10  representatives and Omega Engineering's

11  representatives that led up to the '92

12  agreement?

13       A.    No.

14       Q.    Now, let's go to paragraph A in

15  section 4.  It's on the previous page.

16       A.    Yes.

17       Q.    Okay.  Now, do you understand this

18  paragraph 4A to be a restriction against

19  Omega Engineering on its ability to use,

20  register or apply to register the Omega mark?

21       A.    Yes.

22       Q.    And do you understand this

23  restriction -- paragraph 4A to be the only

24  restriction listed in section 4 against Omega

25  Engineering?

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

105

1          A.    It is a restriction, yes.

2          Q.    But my question was:  Is the

3    restriction in paragraph 4A the only

4    restriction against Omega Engineering in all

5    of section 4?

6          A.    Yes, B and C is concerning Omega.

7                THE COURT REPORTER:  Again,

8    please?

9                MR. COLLEN:  I'm sorry?

10               THE COURT REPORTER:  Would you

11   repeat the answer?

12               THE WITNESS:  Yes.  4B and C

13   is just concerning Omega

14   BY MR. PETERSON:

15         Q.    Omega S.A.?

16         A.    S.A.

17         Q.    Now, paragraph 4A states that

18   "Omega Engineering Incorporated undertakes

19   not to use, register or apply to register"

20   and I'll paraphrase, the Omega marks.

21         A.    Uh-huh.

22         Q.    "In respect of computer controlled

23   measuring, timing and display apparatus,

24   unless intended for science or industry."  Do

25   you see that?

H. RENTSCH - 11/06/01

106

1      A.    Yes.

2      Q.    Did Omega S.A. or any of the other

3  Swatch Group companies sell any products that

4  fall within the definition of "computer

5  controlled measuring, timing and display

6  apparatus"?

7      A.    Well, I think that sports timing

8  equipment is probably falling under that

9  definition.

10     Q.    Okay.  Are you referring to the

11  products that you mentioned earlier were sold

12  by Omega Electronics?

13     A.    Which one?

14     Q.    You had mentioned sports timing,

15  airport, railroad time displays.

16     A.    Yeah, especially sports -- sports

17  equipment, sports measuring equipment.

18     Q.    Okay.  So -- so the phrase in

19  paragraph 4A "computer controlled measuring,

20  timing and display apparatus," that refers to

21  the sports timing and airport and train?

22     A.    Not only.  I didn't say it refers.

23  But it could be included.

24     Q.    It could be included, okay.  What

25  else could it include that was sold by Omega

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

107

1    S.A., Omega Electronics or any other Swatch

2    Group company?

3         A.    I don't understand your question.

4         Q.    Well, it -- it, paragraph 4A,

5    restricts Omega Engineering from using the

6    Omega mark --

7         A.    Yes.

8         Q.    -- on certain products.  Correct?

9         A.    Yes.

10        Q.    And the product there -- product or

11   products is listed as "computer controlled

12   measuring, timing, and display apparatus."

13   Correct?

14        A.    Correct.

15        Q.    Okay.  And I'm asking you, what

16   products, if any, were sold by Omega S.A. or

17   Omega Electronics or any other Swatch Group

18   company that come within the general category

19   of computer controlled measuring, timing and

20   display apparatus.  And you've told me so far

21   the sports timing.  Right?

22        A.    So for instance, every -- every

23   apparatus with a controlling measuring timing

24   system could fall under this -- under this

25   definition.

H. RENTSCH - 11/06/01

108

1      Q.  Okay.  I'd like to get from you the

2  list of products that you're aware of that

3  fall within that definition.

4      A.  I don't know.  Every -- everything

5  which is not intended for science or

6  industry.

7      Q.  Okay.  Would that include

8  wristwatches?

9      A.  Wristwatches, was never the idea to

10  give any -- any possibility to Omega

11  Engineering.

12      Q.  So what I'm asking you is:  The

13  phrase "computer controlled measuring, timing

14  and display apparatus," does that refer to

15  wristwatches?

16      A.  It could -- it could be, I think,

17  even wristwatches intended for science or

18  industry, these was not part of this

19  agreement.

20      Q.  So then under that understanding,

21  "wristwatches" would not be part of the goods

22  described as "computer controlled measuring,

23  timing and display apparatus." Correct?

24      A.  It was never the idea to give Omega

25  Engineering any right to any product in class

CUNNINGHAM REPORTING ASSOCIATES

1    14.

2        Q.    Is class 14 mentioned in paragraph

3    4?

4        A.    No, but it's not mentioned also in

5    the -- in the preamble.

6        Q.    Now, under paragraph 4A, isn't it

7    true that Omega Engineering does have the

8    right to sell computer controlled measuring,

9    timing and display apparatus that is intended

10   for science or industry?

11       A.    Yes, but not watches.  Watches are

12   not -- it's not covered by that.  It's

13   computer controlled measuring, timing and

14   display apparatus, which is connected

15   together in my -- in my reasoning.

16       Q.    Okay.  So under your reasoning

17   then, computer controlled measuring, timing

18   and display apparatus would not include

19   wristwatches?

20       A.    It's not part of the --

21   wristwatches was not part of this agreement.

22       Q.    Well, can I ask you for a yes or no

23   answer to my question?  Were wristwatches

24   covered by the phrase "computer controlled

25   measuring, timing and display apparatus" as

H. RENTSCH - 11/06/01

110

1   it's used in paragraph 4A?

2       A.   No.

3       Q.   Were -- are you familiar with Omega

4   clocks that are sold by Omega S.A.?

5       A.   Omega what?

6       Q.   Clocks.

7       A.   Clocks?

8       Q.   Yes.

9       A.   Omega clocks sold by Omega S.A.?

10      Q.   Yes.

11      A.   Yes.

12      Q.   Okay.  Are they covered by the

13  phrase "computer controlled measuring timing

14  and display apparatus"?

15      A.   They cannot be used.

16              THE COURT REPORTER:  Would you

17  please repeat that?

18              THE WITNESS:  They cannot be

19  used.

20  BY MR. PETERSON:

21      Q.   Cannot be used by whom?

22      A.   By Omega Engineering.  It was never

23  the idea of a trademark licensing or any

24  agreement to grant any rights to Omega

25  Engineering in class 14, which is the watch

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

111

1   class.

2        Q.   And what's your understanding of

3   the scope of class 14?

4        A.   It is what the definition is of

5   that class.  That is the watch class, watch

6   and other products.

7        Q.   Does that class include any

8   products for science or industry?

9        A.   If it is watches, yes, could be.

10       Q.   Are you aware of an official

11  definition of class 14 to cover watches for

12  science or industry?

13       A.   I'm not aware.  Probably it is

14  existing.

15            THE COURT REPORTER:  Say that

16  again?

17            MR. COLLEN:  "Probably it is

18  existing."

19            THE COURT REPORTER:  Thank

20  you.

21  BY MR. PETERSON:

22       Q.   So if, under paragraph 4A, Omega

23  Engineering may not use the Omega mark on

24  clocks intended for science or industry,

25  would you agree that the phrase "computer

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

112

1    controlled measuring, timing and display

2    apparatus" does not include clocks?

3                    MR. COLLEN:  Could I hear that

4    question again, please?

5                    MR. PETERSON:  I'll ask the

6    reporter to repeat it.

7                    (Record read by the Court

8    Reporter.)

9         A.    Yes.

10   BY MR. PETERSON:

11        Q.    Okay.  So -- so your testimony is

12   that the phrase "computer controlled

13   measuring, timing and display apparatus" as

14   used in paragraph 4A does not include

15   wristwatches, does not include clocks.  What

16   else doesn't it include that is sold by Omega

17   S.A. or Omega Electronics under the Omega

18   mark?

19                   MR. COLLEN:  Objection.  I

20   think that's vague.  It's like asking the

21   witness to prove a negative.

22                   MR. PETERSON:  Well, I don't

23   -- I asked the witness to answer with the

24   complete list of what's covered, and he said

25   "everything" without being able to be

CUNNINGHAM REPORTING ASSOCIATES

1  specific.  So I'm trying to approach this

2  from the other end:  What doesn't it -- what

3  it does not include.

4  BY MR. PETERSON:

5      Q.   So you said it includes sports

6  timing apparatus but it does not include

7  wristwatches and clocks.  So what else does

8  this phrase cover that's sold by Omega S.A.

9  or Omega Electronics?

10             MR. COLLEN:  Well, just --

11  just because there's an implied fact in that

12  question I think it isn't of record, and that

13  is maybe the implication that the witness'

14  testimony was that it includes everything of

15  Omega S.A., and that's not what the witness

16  said.  The witness said, well, that that

17  phrase could include everything.  And so then

18  to come back and say what else of Omega S.A.

19  does it include, I think is inferring

20  something that wasn't in the original answer.

21             MR. PETERSON:  Well, the

22  witness can -- can explain his answer.

23  BY MR. PETERSON:

24      Q.   Dr. Rentsch, what else does this

25  phrase, "computer controlled measuring,

H. RENTSCH - 11/06/01

114

1  timing and display apparatus" cover that's

2  sold by Omega S.A. or Omega Electronics under

3  the Omega mark?

4      A.   For me it is limited to the -- to

5  the products which have a certain timing

6  function, but it was never questioned that

7  clocks and watches would be include --

8  included to that, neither for science or

9  industry or elsewhere.

10          And my understanding of that

11  sentence was that we find a solution for

12  equipment which are on the one side used in

13  the industry and in the science having a

14  certain timing function at the maximum, on

15  the other side, products of Omega

16  Electronics, which are mainly used in the

17  sports equipment and timing field as I

18  described before.  That is my understanding

19  of that sentence.

20      Q.   Okay.  So -- so we're talking about

21  the Omega Electronics' products that you

22  previously described?

23      A.   Yes.

24      Q.   Now, besides wristwatches and

25  clocks, what other products does Omega S.A.

CUNNINGHAM REPORTING ASSOCIATES

H.` RENTSCH - 11/06/01

115

1    sell that have a timing function?

2        A.    They don't say anything else.

3                    THE COURT REPORTER:  Would you

4    repeat that, please?

5                    MR. COLLEN:  Can I ask -- I

6    think there may be confusion about the

7    question.  Can you read back the prior

8    question?

9                    (Record read by the Court

10   Reporter.)

11       A.    Omega S.A.?

12                   MR. COLLEN:  I think that's a

13   question to you, Mr. Peterson.  Can you

14   clarify?  When you say "Omega" there, do you

15   mean Omega S.A.?

16                   MR. PETERSON:  I said "Omega

17   S.A."

18       A.    Yes.  They only sell watches and

19   clocks.

20   BY MR. PETERSON:

21       Q.    So in paragraph 4A, the phrase

22   "computer controlled measuring, timing and

23   display apparatus" doesn't cover anything

24   that Omega S.A. sells.  Correct?

25       A.    Yes.

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

116

1      Q.    It covers only what Omega
2   Electronics sells.  Correct?
3      A.    In my opinion, yes.
4      Q.    Now, I'd like to have Mr. Steil
5   hand you what was marked yesterday as
6   Defendants' Exhibit 119.
7      A.    Yes.
8      Q.    Okay.  And I'd also like to have
9   Mr. Steil hand you what's been previously
10  marked as Defendants' Exhibit 105, which
11  we'll mark today as Exhibit 127.
12                  (Defendants' Exhibit 127:
13  Marked for identification.)
14                  MR. STEIL:  What was the
15  previous exhibit number?
16                  MR. PETERSON:  105.  It's a
17  letter to William A. Drucker.  It's a letter
18  dated May 9, 1984.
19      A.    Yes.
20  BY MR. PETERSON:
21      Q.    Dr. Rentsch, are you familiar with
22  the document that's marked Exhibit 119?
23      A.    I see it now, yes.
24      Q.    Is that your signature on the last
25  page?

H. RENTSCH - 11/06/01

117

1        A.    Yes, correct.

2        Q.    Okay.  And that's next to

3   Mr. Kurth's signature?

4        A.    Right.

5        Q.    Okay.  And do you recall if that

6   signature date of May 3, 1994 is correct?

7        A.    I don't know, but probably yes,

8   yeah.

9        Q.    Okay.  Now, the letter that's

10  marked as Exhibit 127, are you familiar with

11  that letter?

12       A.    No.

13       Q.    Have you seen it before?

14       A.    Yeah, probably in '94.  I don't

15  know.

16       Q.    Okay.  Is that Mr. Coutts'

17  signature at the bottom?

18       A.    Yes.

19       Q.    And the letter is to Mr. William A.

20  Drucker?

21       A.    Yes.

22       Q.    Okay.  And it references that he

23  has finally obtained a signature of the Omega

24  S.A. management to the agreement and hastens

25  to send you two originals thereof.  Do you

CUNNINGHAM REPORTING ASSOCIATES

H. RENTSCH - 11/06/01

118

1    see that?

2         A.    I see that, yes.

3         Q.    Do you know if this '94 letter,

4    Exhibit 127, refers to the agreement that's

5    Exhibit 119?

6         A.    Probably, yes.  I don't know.

7         Q.    Now, Exhibit 119, I'm going to

8    refer to that as the 1994 agreement.

9         A.    Uh-huh.

10        Q.    And in paragraph 9 on the last page

11   it says "Each of the parties hereto agrees

12   that for all intents and purposes, this

13   agreement supersedes the former Agreement

14   made by the parties hereto and dated on 6th

15   March 1992 by Omega Engineering Incorporated

16   and 22nd April 1992 by Omega S.A." Do you see

17   that?

18        A.    I see that, yes.

19        Q.    Do you understand that to refer to

20   what we've previously reviewed as the 1992

21   agreement, Exhibit 118?

22        A.    Yes.

23        Q.    Now, do you recall, what was the

24   purpose of entering into this 1994 agreement?

25        A.    No.  I don't remember any details.

CUNNINGHAM REPORTING ASSOCIATES

1      Q.    Do you recall discussing this 1994
2  agreement with Mr. Coutts?
3      A.    Certainly.  I think before signing
4  I certainly would have it discussed, yup.
5      Q.    And did Mr. Coutts handle the
6  negotiations on behalf of Omega S.A. with
7  Omega Engineering's representative?
8      A.    Yes.
9      Q.    And as before, did you have the
10  ultimate authority on whether to approve the
11  Omega -- whether to approve this 1994
12  agreement on behalf of Omega S.A.?
13      A.    Yes.
14      Q.    Did you discuss this 1994 agreement
15  with Dr. Kurth before he signed it?
16      A.    Yes, certainly.
17      Q.    Do you recall what you discussed?
18      A.    No.  No details.
19      Q.    Now, did you discuss the course of
20  negotiations that led to this 1994 agreement
21  with Mr. Coutts as the negotiations were
22  progressing?
23      A.    Certainly he called me from time to
24  time, yes, during the negotiations.
25      Q.    And we had seen before a letter,

1    Exhibit 126, it's dated 1993, that references

2    that Mr. Coutts was unable to obtain consent

3    of Omega management to the proposed general

4    agreement.  Do you recall that or -- you can

5    pick up that exhibit again.

6                    MR. COLLEN:  That was 126?

7                    MR. PETERSON:  Yes.

8                    MR. COLLEN:  I'm handing it to

9    the witness.

10        A.    Yes.

11   BY MR. PETERSON:

12        Q.    Okay.  And do you know whether the

13   reference in Exhibit 126 to the proposed

14   general agreement was the discussions that

15   ultimately led to the 1994 agreement,

16   Exhibit 119?

17        A.    I cannot imagine, no.  I think that

18   the '94 agreement and the '92 agreements are

19   more or less the same.  Here it is speaking

20   about a general agreement.  I think that is

21   certainly not the general agreement.

22        Q.    Do you understand the 1994

23   agreement to have terms in there that are of

24   worldwide scope?  And I'll just refer you to

25   "whereas" paragraph 4.

1      A.   Yeah.  It's more like the same as

2    '92 as I see now.

3      Q.   Now, in the '94 agreement, section

4    4 uses langauge that's essentially the same,

5    if not identical, to section 4 of the '92

6    agreement.  Is that your understanding?  I'm

7    not trying to trick you here.  It's --

8                MR. COLLEN:  Let me just

9    interrupt, Mr. Peterson, but for your benefit

10    the witness has the '92 agreement in front of

11    of him right now, so he's -- he's making a

12    comparison.

13                MR. PETERSON:  Okay.

14                MR. COLLEN:  Obviously you

15    can't see that.

16                MR. PETERSON:  Thank you.

17      A.   Yeah.  So for me it's more or less

18    the same.  I don't see a big difference.

19    BY MR. PETERSON:

20      Q.   Now, with respect to the '94

21    agreement in paragraph 4B, the phrase

22    "apparatus industrially and/or scientifically

23    employed" there.

24      A.   Yes.

25      Q.   Again the term "variable

1    parameters" shows up.  Do you see that?

2         A.    I see that, yes.

3         Q.    Now, do you recall discussing this

4    phrase with Mr. Coutts with respect to this

5    agreement in 1994?

6         A.    I don't remember.  Probably we did.

7         Q.    Do you recall if there was any

8    understanding that the term "variable

9    parameters" in paragraph 4B of the 1994

10   agreement meant anything different from the

11   same term in paragraph 4B of the 1992

12   agreement?

13        A.    If it is the same wording, probably

14   not.

15        Q.    Okay.  Do you recall having any

16   discussions on whether the meaning had

17   changed?

18        A.    No, I don't.  I don't remember.

19        Q.    Okay.  Do you know if Mr. Coutts

20   had any discussions with Omega Engineering's

21   representatives about the meaning of

22   "variable parameters" in 4B --

23        A.    Don't know.

24        Q.    -- in the '94 agreement?

25        A.    I don't know.

H. RENTSCH - 11/06/01

123

1    Q.    And what about 4C?  The term
2    "variable parameters" shows up there again.
3    Do you recall whether there was any
4    discussion of whether that phrase meant
5    anything different?
6    A.    The same, it's I didn't see a
7    difference between the two texts.  I'm sorry.
8    Q.    Yeah.  I don't see it either.  I
9    certainly looked at them enough, as
10   Mr. Collen probably has as well.
11   A.    Yup.
12   Q.    Now, going to paragraph 4A, again
13   this appears to be similar, if not identical,
14   to paragraph 4A in the '92 agreement.  Do you
15   agree?
16   A.    I agree.
17   Q.    Now, again without going through
18   the litany of products, does the phrase,
19   "computer controlled measuring, timing and
20   display apparatus" mean anything different in
21   terms of Omega S.A. or Omega Electronics'
22   products that then we discussed in connection
23   with the '92 agreement?
24   A.    No.  It was to try between
25   Dr. Drucker and Mr. Coutts to find the co-ax

1    systems between Omega Electronics and Omega

2    Engineering.  I mean, that is what I

3    understood from that text.

4        Q.   And the phrase "computer controlled

5    measuring, timing and display apparatus"

6    means the same thing in the '94 agreement as

7    it meant in the '92 agreement?

8        A.   As the text is identical, I see no

9    difference here.

10       Q.   Now, in 1994 when this agreement

11   was signed, did that phrase cover any other

12   products sold by Omega S.A. or Omega

13   Electronics than it did in connection with

14   the '92 agreement?

15       A.   I don't think that the product

16   range of Omega S.A. and Omega Electronics

17   changed during that period of time, from '92

18   to '94.

19       Q.   Now, both paragraphs -- strike

20   that.

21            The products that you had mentioned

22   in paragraph 4A that were covered by

23   "computer controlled measuring, timing and

24   display apparatus" -- and I'm referring to

25   the Omega Electronics products.

1          A.    Uh-huh.

2          Q.    Why wasn't Omega Electronics

3    included as a party to this agreement if

4    their products were -- were referenced by

5    that phrase?

6          A.    Yeah, because Omega S.A. is the

7    trademark also of that products used by Omega

8    Electronics in class 9, international class

9    9.

10          Q.    Okay.  So in the context of this

11    agreement, Omega S.A. was protecting the

12    Omega brand products that were sold by Omega

13    Electronics?

14          A.    Yes.

15          Q.    Now, in -- paragraph 4A refers --

16    refers to Omega Engineering undertaking not

17    to use an Omega trademark.  Correct?

18          A.    Yes.

19          Q.    Okay.  I'm just -- I'm just

20    focusing on the term "use" in connection with

21    the trademark identified there.

22          A.    Uh-huh.

23          Q.    What does that mean?

24          A.    The word "use"?

25          Q.    Yes.

H. RENTSCH - 11/06/01

126

1      A.    "Use" -- "use" is --

2                THE COURT REPORTER:  Would you

3    repeat the answer, please?

4                MR. COLLEN:  Use the logo or

5    the trademark in commercial business.

6      A.    Business, in commercial business,

7    on letterheads, on products, et cetera.

8    BY MR. PETERSON:

9      Q.    Does that include the Internet?

10     A.    Internet for me is like publicity.

11   Yes.

12     Q.    Okay.  So in terms of this

13   agreement, the Internet is no different from

14   any other way of publicizing the mark.

15   Correct?

16     A.    It's for me more or less similar,

17   yes.

18     Q.    Does that also cover domain names?

19     A.    No.

20     Q.    But domain names are -- are used on

21   the Internet.  Correct?

22     A.    Yeah, but they're as -- not as

23   content of the Internet for me.

24                MR. PETERSON:  Dr. Rentsch,

25   could you hold on?

CUNNINGHAM REPORTING ASSOCIATES

1          THE COURT REPORTER:  Could you

2    repeat the entire answer?  They're not --

3          THE WITNESS:  Could you say

4    what you have?

5          MR. PETERSON:  She doesn't

6    have anything.

7          MR. COLLEN:  Perhaps it's best

8    to read back the question.

9          (Record read by the Court

10   Reporter.)

11        A.  So please rephrase your question.

12   BY MR. PETERSON:

13        Q.  Okay.  Does the restriction against

14   -- in paragraph 4A, does -- the restriction

15   against Omega Engineering using the Omega

16   mark, is that a restriction against Omega

17   Engineering using a domain name containing

18   the word, "Omega"?

19        A.  Yes, yes.

20        Q.  Okay.  So it's your understanding

21   that under paragraph 4A, Omega Engineering is

22   restricted from using a domain name

23   containing the word "Omega" in connection

24   with "computer controlled measuring, timing

25   and display apparatus unless intended for

1   science or industry"?

2       A.    Right, with the exceptions of the

3   word "use" could also include the Internet

4   use, yes.

5       Q.    Okay.  Including domain names

6   containing the word "Omega"?

7       A.    Yes.

8       Q.    Okay.  Now, in paragraph 4C, where

9   it says "Omega S.A. will not object to the

10  use...  by Omega Engineering" -- I'll skip

11  over registration for now.  Let's just focus

12  on the word "use."

13      A.    Uh-huh.

14      Q.    Omega Engineering -- Omega S.A.

15  will not object to the use by Omega

16  Engineering of the Omega trademarks. Does

17  that also cover the use by Omega Engineering

18  of a domain name containing the word "Omega"?

19      A.    In principle, yes.  We never -- we

20  never, I think, objected to your use of the

21  Omega domain name, just the Omega one,

22  omega.com.  We attacked other ones.

23      Q.    Okay.  But you're saying the use

24  that's referred to in paragraph 4C, that also

25  covers domain names.  Correct?

H. RENTSCH - 11/06/01

1        A.    Yes.

2        Q.    Okay.  Now, when the 1994 agreement

3    was executed, were there any other

4    outstanding disputes between Omega

5    Engineering and Omega S.A. concerning the

6    Omega trademark?

7        A.    Not to my knowledge.

8        Q.    Did you understand that this '94

9    agreement settled all outstanding disputes

10   regarding the Omega trademark between the two

11   companies at -- at the time of signing?

12       A.    I don't recall it otherwise.

13       Q.    Are you familiar with consents

14   given to register a trademark?

15       A.    No.

16       Q.    All right.  Are you -- are you

17   familiar with trademark registration practice

18   in general?

19       A.    You mean -- you mean in that case

20   or in general, in general?

21       Q.    Just in general.

22       A.    Yes, I am.

23       Q.    Okay.  And what's your

24   understanding of that?  I'm sorry.  Strike

25   that.

1          Are you familiar with situations in

2     which a trademark application may be rejected

3     on the basis of a third-party registration

4     but the third party may give a consent to the

5     trademark applicant?

6          A.    Absolutely, yes.

7          Q.    Okay.  And are you -- are you aware

8     of -- subsequent to the 1994 agreement, are

9     you aware of whether Omega Engineering has

10    given any consents to register an Omega mark

11    to Omega S.A.?

12         A.    Not to my knowledge.  Maybe.  I

13    think we have also such agreements, but I

14    don't know in that case.

15         Q.    Are you aware of any consents given

16    by Omega S.A. to Omega Engineering so that

17    Omega Engineering may register a trademark?

18         A.    No, I'm not.

19         Q.    So no one in the Swatch legal group

20    has discussed with you any consents to

21    register between Omega Engineering and Omega

22    S.A.?

23         A.    Probably they did, but I don't

24    remember.  I think we have -- that's a

25    standard proceeding.  I think we have a lot

H. RENTSCH - 11/06/01

131

1    of such consents.

2         Q.    Okay.  And is it your understanding

3    that in the past there have been consents

4    given both ways, that is, Omega S.A. has

5    given consents to Omega Engineering and vice

6    versa, Omega Engineering has given consents

7    to Omega S.A.?

8         A.    Not to my knowledge.  As I said, I

9    don't know.  But it's standard.  I don't say

10   that I have been informed.  If there have

11   been such consents, then the people came to

12   me, but I don't remember that we made such

13   agreements with Omega Engineering.

14              MR. STEIL:  Mr. Peterson, the

15   tape is running out soon.

16              MR. PETERSON:  Okay.  This

17   would be a good time to break.

18              MR. STEIL:  This is the end of

19   videotape number 3.  We're going off the

20   record at 18 minutes past 9:00 a.m., eastern

21   standard time, 18 minutes past 3:00 p.m.,

22   Swiss time, November 6, 2001.

23              MR. PETERSON:  Okay.  Thank

24   you.

25              (Whereupon, a recess was taken

CUNNINGHAM REPORTING ASSOCIATES

H.  RENTSCH - 11/06/01

132

1    from 9:18 o'clock a.m. until 9:32 o'clock

2    a.m.)

3                    MR. STEIL:  We are back on the

4    record at 32 minutes past 9:00 a.m., eastern

5    standard time, 32 minutes past 3:00 p.m.,

6    Swiss time, on November 6, 2001.  This is the

7    beginning of videotape number 4 in the video

8    deposition of Dr. Rentsch.

9    BY MR. PETERSON:

10        Q.    Dr. Rentsch, continuing --

11   continuing again with the 1994 agreement,

12   Exhibit 119 --

13        A.    Yes.

14        Q.    -- could you turn to the last page.

15   I'd like to ask -- I'd like to ask you about

16   paragraph 8.  If you'd just --

17        A.    Eight

18        Q.    -- take a moment to review that?

19        A.    Yes.

20        Q.    Okay.  The first part of that

21   paragraph says, "Each of the parties hereto

22   agrees that the above terms are to be binding

23   upon themselves, their assigns and licensees

24   and are to be communicated to their

25   Registered and Permitted Users, if any." Do

H. RENTSCH - 11/06/01

133

1   you see that?

2          A.    Yes.

3          Q.    Now, I think you had said that

4   Omega Electronics is a licensee of Omega S.A.

5   Correct?

6          A.    Correct, yes.

7          Q.    So that -- would you agree that

8   under this section of paragraph 8, all the

9   terms of the 1994 agreement are binding upon

10  Omega Electronics as well as Omega S.A.?

11         A.    Yes.

12         Q.    Okay.  Now, it refers to

13  "Registered and Permitted Users" here.  Do

14  you know if Omega Electronics is a registered

15  or permitted user of any -- any marks owned

16  by Omega S.A.?

17         A.    I don't think so.  It's -- it's a

18  licensee.

19         Q.    Okay.  And at the same -- at the

20  same time, the same section of paragraph 8 is

21  binding upon any licensees of Omega

22  Engineering under the Omega mark.  Correct?

23         A.    Correct.

24         Q.    Now, the last part of paragraph 8,

25  it continues on, "and are to inure to the

CUNNINGHAM REPORTING ASSOCIATES

1    benefit of the other party's assigns,

2    licensees and Registered and Permitted

3    Users." Would you agree that this means the

4    agreement is also to the benefit of Omega

5    Electronics --

6         A.    Yes.

7         Q.    -- since they're a licensee of

8    Omega S.A.?

9         A.    Yes.

10        Q.    Okay.  And it also likewise would

11   be to the benefit of any licensee of Omega

12   Engineering under the Omega marks.

13        A.    That is what it is saying, yup.

14                  THE COURT REPORTER:  Could you

15   repeat that, please?

16   BY MR. PETERSON:

17        Q.    Yes, that is what it is saying?  Is

18   that what you said?

19                  MR. COLLEN:  I agree that

20   that's what he said, yes.

21                  THE WITNESS:  Yes.

22   BY MR. PETERSON:

23        Q.    Okay.  Now, at the time of the 1994

24   agreement did you discuss with Mr. Coutts the

25   types of products sold by Omega Engineering

1    under the Omega mark?

2        A.    As I said, probably he told me.

3    Certainly we discussed it, but I don't

4    remember.

5        Q.    Okay.  So -- so you weren't -- you

6    weren't aware -- you don't recall being aware

7    in 1994 of any products of Omega Engineering

8    that were different from what you were aware

9    of in 1992?

10       A.    Correct.

11       Q.    And, again, it was your

12   understanding that Omega Engineering's

13   products in 1994 were limited to those for

14   science and industry?

15       A.    Yes.

16       Q.    Was it the practice in 1994 at the

17   time this agreement was signed for Omega S.A.

18   or Swatch Group legal department to monitor

19   other trademark applications and

20   registrations that contained the word

21   "Omega"?

22       A.    Yes.

23       Q.    Okay.  And did that include -- at

24   that time in '94 when this agreement was

25   signed, did the Swatch Group legal department

H. RENTSCH - 11/06/01

136

1    monitor Omega Engineering's trademark

2    applications and registrations containing the

3    mark Omega?

4        A.    It is the standard proceeding

5    concerning all the brands that we own, all

6    the key brands that we own.

7        Q.    And how is that monitoring done?

8        A.    It's done several ways.  I think we

9    have mandates with specialized companies

10   supervising registrations and giving us

11   reports, and we have in addition also, let's

12   say, our agents worldwide and our

13   subsidiaries worldwide having a view on the

14   market.

15               THE COURT REPORTER:  Having a

16   what on the market?

17               THE WITNESS:  A view.

18   BY MR. PETERSON:

19       Q.    Okay.  So you monitor both the

20   applications in the respective trademark

21   offices, as well as the products actually

22   sold on the market?

23       A.    Correct.

24       Q.    Okay.  Now, when the Swatch Group

25   legal department was monitoring the trademark

H. RENTSCH - 11/06/01

137

1  applications, did they depend on the
2  application being published for opposition to
3  become aware of the application?
4       A.   Yes, it must be.  Otherwise I think
5  it's not public.
6       Q.   Okay.  Were you aware of any -- any
7  monitoring done of applications that
8  contained the word "Omega" that had been
9  filed but not yet published, published for
10 opposition?
11      A.   No.  I think -- no.  In my opinion
12 it's always published and then it's
13 transmitted to us.
14      Q.   Okay.  So -- so you're not aware of
15 any, let's say, computer searches done on
16 filed but unpublished applications at that
17 time in 1994?
18      A.   I think it's done on published
19 applications.
20      Q.   Now, in 1994 at the time you signed
21 this agreement, were you aware of whether
22 Omega Engineering sold any timers?
23      A.   No.
24      Q.   Were you aware of whether they sold
25 any clocks for science or industry?

1        A.    No.

2        Q.    Would it have surprised you --

3        A.    Yes.

4        Q.    -- in 1994 that they sold any such

5    products?

6        A.    Right, yes, sure.

7        Q.    And did -- did you simply assume

8    that Omega Engineering did not sell any

9    timers or clocks for science or industry, or

10   did someone tell you that?

11       A.    Yeah, I think that was certainly a

12   point made by Mr. Coutts, and Mr. Coutts at

13   that time also had some advertising materials

14   of some of the products of -- of Omega

15   Engineering.

16       Q.    Do you recall what type of

17   advertising materials?

18       A.    Prospectus material, as I -- as I

19   remind.  I think I've seen certain booklets.

20       Q.    Are you referring to Omega

21   catalogs?

22       A.    Probably, yes, yes.

23       Q.    And are you aware that Omega

24   publishes quite an extensive catalog?

25       A.    No.  I'm not -- I'm not aware at

1    all, but -- I have seen some materials, but I

2    don't know what -- in detail, what kind of

3    materials.  According to my knowledge it was

4    -- it was -- it was some prospectus material.

5         Q.    Could you define what you mean by

6    the term "prospectus material"?

7         A.    Advertising material describing the

8    different products.

9         Q.    Okay.  Do you know if anyone at

10   Swatch Group specifically sought to

11   investigate what products Omega Engineering

12   was selling at the time the '94 agreement was

13   signed?

14        A.    In my opinion the only one doing

15   that would be Mr. Coutts.

16        Q.    So you -- you relied on Mr. Coutts

17   to determine what products Omega Engineering

18   was selling under the mark Omega?

19        A.    Yes.  He was over in Geneva, yes.

20        Q.    And do you know if Mr. Coutts was

21   aware at the time the '94 agreement was

22   signed whether Omega Engineering was selling

23   any timers or clocks for science or industry?

24        A.    No.  Otherwise, he would certainly

25   have mentioned it.