UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| OMEGA S.A.,<br>    Plaintiff,<br><br>v.<br><br>OMEGA ENGINEERING, INC., *et al.*,<br>    Defendants.<br><br>OMEGA ENGINEERING, INC.,<br>    Counterclaim Plaintiff,<br><br>v.<br><br>OMEGA S.A. and<br>THE SWATCH GROUP LTD.,<br>    Counterclaim Defendants. | CIVIL ACTION NO.<br>3:01cv2104 (SRU) |

**RULING ON MOTION FOR RECONSIDERATION**

Omega S.A. ("OSA") filed suit against Omega Engineering, Inc. and its affiliates (collectively "OEI"), principally alleging trademark violations and unfair competition. OEI asserted counterclaims against OSA and its parent company, also alleging, *inter alia*, trademark violations and unfair competition. On September 30, 2005, I ruled on the parties' cross-motions for summary judgment. *See Omega S.A. v. Omega Engineering, Inc.*, __ F. Supp. 2d __, 2005 WL 2481536 (D. Conn. Sept. 30, 2005) ("Ruling"). On October 18, 2005, OSA filed a motion for reconsideration, requesting that I reconsider my grant of summary judgment in favor of OEI with respect to OSA's five claims: unfair competition, trademark infringement, and false designation of origin under the Lanham Act; trademark dilution under the Federal Trademark Dilution Act ("FTDA"); and unfair competition or unfair trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA").

I grant OSA's motion, but on reconsideration adhere to my initial ruling.

**I.     Discussion**

OSA raises various grounds in support of its motion. First, with respect to its FTDA claim, OSA argues that I overlooked binding authority, citing *Savin Corp. v. The Savin Group*, 391 F.3d 439, 452 (2d Cir. 2004), for the proposition that an absence of evidence of actual dilution is not fatal to an FTDA claim. Second, with respect to its Lanham Act claims, OSA argues that I misapplied the standard on summary judgment by failing to view the evidence in the light most favorable to the non-movant, *i.e.*, OSA, and failing to draw all reasonable inferences in its favor. Third, with respect to its CUTPA claim, OSA argues that I did not consider whether OEI's conduct offended public policy and did not draw all reasonable inferences in its favor.

    A.     <u>Timeliness of Motion</u>

Before addressing the arguments raised in OSA's motion for reconsideration, I note that it was untimely. Because the summary judgment ruling was filed on September 30, 2005, any motion for reconsideration was due within ten days of that date, *i.e.*, no later than October 17, 2005. *See* D. Conn. L. Civ. R. 7(e) ("Motions for reconsideration shall be filed and served within ten (10) days of the filing of the decision or order from which such relief is sought. . . ."), Fed. R. Civ. P. 6(a) ("When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.").

OSA's motion was titled "Plaintiff's Motion and Incorporated Memorandum of Law for Reconsideration of the Court's Order *Entered October 3, 2005* on the Parties' Cross-Motions for Summary Judgment." Pl. Memo. Supp. Motion for Reconsid. (doc. # 182) (emphasis added). That title appears to reflect OSA's misunderstanding with respect to the deadline for motions for reconsideration set by the local rule. Under the local rules, the ten-day period within which a

motion for reconsideration must be filed commences at the *filing* of the decision or order, not the date when the order or decision is "entered" by clerk's office personnel in the electronic docket or electronically served on the parties.  D. Conn. L. Civ. R. 7(e).

Moreover, the additional three days available under Rule 6(e) are not applicable to motions for reconsideration because their filing period commences on the date the decision is filed, not the date of service of any notice or paper.  Fed. R. Civ. P. 6(e).  *See* 1 James Wm. Moore *et al.*, Moore's Federal Practice § 6.053[3] (3d ed. 2000) ("Rule 6(e) does not apply to time periods that begin with the filing in court of a judgment or an order.").  *Cf.*, *e.g.*, *Albright v. Virture*, 273 F.3d 564 (3d Cir. 2001) ("Rule 6(e) does not apply to Rule 59(e) motions for reconsideration.").

  B.  <u>Standard for Motion for Reconsideration</u>

The standard for granting a motion for reconsideration is strict.  *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir.1995).  A motion for reconsideration "is not simply a second opportunity for the movant to advance arguments already rejected." *Id.*  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Doe v. New York City Dep't of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983).  OSA appears to rely on the third ground – the need to correct a clear error or prevent manifest injustice – in moving for reconsideration.

Despite the strict standard of a motion for reconsideration and despite its untimeliness, I grant OSA's motion in order to clarify my earlier ruling and further analyze OSA's claims for relief.  On reconsideration, I adhere to my initial ruling.

-3-

C.  Summary Judgment Standard

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Because the present motion relates to claims on which I granted summary judgment against OSA, the facts here must be construed in the light most favorable to OSA and I must draw all inferences in its favor.

D.  FTDA Claim: Presumption of Dilution

OSA argues that, in granting summary judgment in favor of OEI on OSA's dilution claim, I overlooked controlling case law that a showing of actual dilution is not required when a senior user shows that a junior user's mark is identical.  I had held that because OSA failed to produce any evidence of actual dilution, its FTDA claim failed as a matter of law.  Ruling at 31.

To succeed in a claim of trademark dilution, a plaintiff must establish:

> (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

*Savin Corp.*, 391 F.3d at 449.

I held in my initial ruling that the first three elements were not genuinely in dispute but granted summary judgment in favor of OEI because OSA had failed to produce any evidence of actual dilution.[1]  Ruling at 31.  With respect to the fourth element, the Second Circuit has held

---

[1] I note that OEI has pointed out that the distinctiveness of OSA's "Omega" marks has, in fact, been contested.  Def. Memo. Opp. Motion for Reconsid. at 9.  OEI had consistently challenged that attribute and argued that OSA's "Omega" marks are not distinct in part due to the

that "where a plaintiff who owns a famous senior mark can show the commercial use of an identical junior mark, such a showing constitutes circumstantial evidence of the actual-dilution element of an FTDA claim." *Savin Corp.*, 391 F.3d at 452 (emphasis omitted). OSA seeks to take advantage of that presumption of dilution because the record contains no evidence of actual dilution and I initially granted summary judgment against it on that basis.

Accordingly, I have reconsidered whether the parties' marks are identical. The identity analysis in the infringement context – discussed below – is less exact than the identity analysis that is necessary when a party claims that the use of identical marks gives rise to *per se* dilution. *See id.* at 454. Thus, although the parties and the court had initially concluded that the "Omega" word marks were, in effect, "identical," that conclusion does not hold up in the context of OSA's dilution claim.

In *Savin Corp.*, the Second Circuit explained that "the issue of whether the marks are identical will be context- and/or media-specific and factually intensive in nature." *Id.* at 453. In fact, the Court noted that marks that are "*textually identical* may appear very different from one another." *Id.* (emphasis added). A court considering a claim that marks are identical must undertake a "careful and exacting analysis." *Id.* at 454.

The evidence in the record does not support OSA's argument that its marks and OEI's

---

large number of third-party uses of similar marks. Section 1125 sets forth criteria for use "[i]n determining whether a mark is distinctive and famous," including "the nature and extent of use of the same or similar marks by third parties." 15 U.S.C. § 1125(c)(1)(G). *See also Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 216 (2d Cir. 1999) (overruled on other grounds, *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418 (2003)) ("A mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statutes seeks to protect.").

Because they do not affect my ultimate conclusion that OSA failed to produce evidence to support the required showing of actual or *per se* dilution, I will not discuss the issues surrounding fame and distinctiveness.

marks are identical for purposes of OSA's FTDA claim.  First, as noted in my initial ruling, OEI's design mark consists of juxtaposed Greek letters Omega (Ω) and Epsilon (E), the so-called "Omega bug."  Ruling at 4.  OSA uses design marks that incorporate the Greek letter Omega (Ω) but not the Greek letter Epsilon (E).  Those marks are not identical.

Both parties use marks that incorporate the word "Omega," and those marks are similar. Even a "close similarity," however, does not suffice to establish evidence of *per se* dilution. *Savin Corp.*, 391 F.3d at 453.  The evidence in the record shows that the marks are not identical. OSA's word marks consist of a thin typeset or font with the outside legs of the letter "M" angled, a circular "O," and a nearly circular "G."  *See, e.g.*, Pl. Ex. 2 (doc. # 119-1) (print-offs from website showing Omega Speedmater watch).[2]  OEI's word marks consist of a different typeset or font, one that is thick and bold and includes an oval or rectangular "O" and an "M" with outside legs that are not angled.  *See, e.g.*, Ex. R. to Riggs Decl. (doc. # 128).

Viewing the evidence in the light most favorable to OSA and recognizing the similarity of the parties' marks, I nevertheless conclude that OSA has failed to produce evidence that would permit a reasonable jury to find in its favor on the dilution claim.  As noted in my initial summary judgment ruling, OSA has failed to produce any evidence of actual dilution.  With respect to OSA's argument that it should benefit from the presumption of dilution under the standard set forth in *Savin Corp.*, the evidence would not permit a reasonable fact-finder to conclude that OEI uses marks that are identical to OSA's marks.

---

[2] OSA's exhibits include the trademark applications of both companies.  The applications are insufficient to raise a triable issue of fact with respect to dilution because under *Savin Corp.*, it is the *use* of an identical junior mark – not its mere registration – that gives rise to the presumption of dilution.  *See Savin Corp.*, 391 F.3d at 452.

E.  Lanham Act Claims of Unfair Competition, Trademark Infringement, and False Designation of Origin: Likelihood of Confusion

With respect to its Lanham Act claims of unfair competition, trademark infringement, and false designation of origin, OSA argues that I overlooked certain evidence and improperly weighed the evidence rather than viewing it in the light most favorable to OSA. I note that a motion for reconsideration is not an opportunity for a party to advance for a second time, arguments already rejected, *Shrader*, 70 F.3d at 257, but will take up OSA's arguments in order to elaborate my initial analysis of the likelihood of confusion between OSA's and OEI's products.

A two-part test guides courts in considering claims of trademark infringement and false designation of origin: (1) whether the plaintiff's mark is entitled to protection, and (2) whether the defendant's use of the mark is likely to cause consumers confusion concerning the origin or sponsorship of the defendant's goods. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "The likelihood-of-confusion inquiry turns on whether numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citations omitted). It is only that second prong that is at issue here.

When determining whether there is a likelihood of confusion, courts in the Second Circuit are guided by the so-called *Polaroid* factors, a non-exhaustive list that includes: (1) the strength of the mark, (2) the degree of similarity between the marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge the gap, (5) actual confusion, (6) the

defendant's good faith in adopting its own mark, (7) the quality of defendant's product, and (8) the sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). "Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Playtex Products*, 390 F.3d at 162. District courts generally should not treat any one factor as dispositive; nor should the courts use a mechanical process by which the party with the greater number of factors prevails. *Id.* Instead, courts should focus on the ultimate inquiry of consumer confusion. *Id.*

In moving for reconsideration, OSA challenges my analysis of the following *Polaroid* factors: (1) the strength of OSA's marks, (2) the proximity of the plaintiff's and defendant's products, (3) the likelihood that OSA will bridge the gap between their products, and (4) actual confusion.

      1.    *Strength of Mark*

In my initial ruling, I recognized that the plaintiff's "Omega" marks were strong and concluded that the first *Polaroid* factor favored OSA. I reiterate that conclusion and acknowledge the evidence that OSA produced with respect to the strength of its mark, specifically the declaration of Peter Stierli (doc. # 155). As OEI points out, however, the Stierli declaration only provides figures relating to worldwide sales and advertising, not data specific to sales and advertising in the United States.

      2.    *Proximity of the Products*

The proximity factor focuses on whether the parties' products compete with each other. *See Savin Corp.*, 391 F.3d at 458. In my initial ruling, I held that OSA's and OEI's products were not proximate, and that this factor favored OEI. I adhere to that conclusion on

reconsideration.

          a.    "Watch Batteries"

OSA largely relies on the sale of so-called "watch batteries" via OEI's website, marshaling the evidence in Bradford Cole's declaration (doc. # 153) and Hilda Burke's declaration (doc. # 127), to argue that the *Polaroid* factor regarding proximity of the products must favor OSA. On the contrary, despite the evidence that at one time, OEI advertised a product on its website as a "watch battery" and sold that product in a wrapper with an "Omega bug" mark and the word "Omega," the evidence established that the label was a misnomer and the product was not, in fact, a battery for use in watches. The products labeled "watch batteries" were a power source for a digital water velocity meter that a third-party manufacturer described as "internal watch-type battery powers." *See* Ex. B to Burke Decl. The evidence would not permit a reasonable fact-finder to conclude otherwise. Construing the evidence in the light most favorable to OSA, OEI may have intentionally mislabeled a product, but such purported bad faith does not create a triable issue of fact with respect to the proximity of the products.

          b.    Period Timers

The parties do not dispute that certain of OEI's apparatus contain a timing feature. Def. L. Rule 56(a)1 Statement ¶ 79; Pl. L. Rule 56(a)2 Statement ¶ 79 (acknowledging that paragraph 4(a) of the parties' 1994 worldwide agreement specifically covered OEI's period timers). Such a function does not render OEI's and OSA's products proximate.

Additionally, the fact that OEI has used a stopwatch in a depiction of a period timer, alongside the heading "No Time Out for This Programmable Timer/Controller," does not make the period timer proximate to OSA's horological products and timekeeping equipment. Drawing

all inferences in favor of OSA, I recognize that the depiction and choice of language may be a "goading reference" aimed at antagonizing OSA. *See* Pl. Memo Supp. Motion for Reconsid. at 18, n.8. Such an intent does not raise a triable issue of fact with respect to whether the parties' products are proximate, *i.e.*, whether they compete with each other.

As discussed in detail in my initial ruling, OEI and OSA operate in different spheres of commerce. *See Virgin Enterprises*, 335 F.3d at 150. Based on the evidence in the record construed in the light most favorable to OSA, the parties' products are not proximate. This *Polaroid* factor, thus, favors OEI.[3]

3. *Likelihood the Prior Owner Will Bridge the Gap*

OSA has challenged my analysis of the *Polaroid* factor that addresses the likelihood that OSA will bridge the gap between its market and OEI's. I initially concluded that because OSA failed to produce evidence regarding the likelihood that it would enter OEI's market, this factor favored OEI. I adhere to that conclusion.

In its motion for reconsideration, OSA proposes a test for the "bridge the gap" factor that was not previously argued or addressed. OSA cites a Second Circuit decision, *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996), for the proposition that the proper inquiry is not a plaintiff's present intent to expand its market but whether "consumers might find it plausible that OSA would expand its business to include [OEI's] products." Pl. Memo. Supp. Motion for Reconsid. at 18.

*Cadbury Beverages* does not, in fact, stand for that proposition. Rather, in that case the

---

[3] I have not reconsidered my ruling with respect to OSA's consent of OEI's use of "Omega" marks, and note that with respect to period timers, the discussion of the products' proximity and any likelihood of confusion is an alternative holding.

Second Circuit noted that a "present intent to bridge the gap is not determinative" and that "the assumptions of the typical consumer . . . must be taken into account." *Cadbury Beverages*, 73 F.3d at 482 (ellipsis in original, internal citations omitted).

Moreover, in its more recent cases, the Second Circuit has repeatedly described the "bridge the gap" factor as one focused on the question of the likelihood that a plaintiff will enter a defendant's market. *E.g.*, *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 141 (2d Cir. 1999) ("This factor inquires whether a plaintiff is likely to enter defendant's market, or 'bridge the gap.'"). That inquiry is one that I undertook in my initial ruling and will not repeat here.

Furthermore, with respect to any assumptions of the typical consumer, there is no evidence that consumers would relate OSA to the market inhabited by OEI. *See Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (concluding that because plaintiff failed to show any intention of entering defendant's field and no evidence that consumers would relate it to such an enterprise, the "bridge the gap" factor favored the defendant).[4]

    4.    *Actual Confusion*

With respect to the *Polaroid* factor of actual confusion, OSA contends that I did not draw all reasonable inferences in its favor. "For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *The

---

[4] I do note my mistaken choice of language in writing that the the evidence "tips in favor of OEI" with respect to this *Polaroid* factor. Ruling at 22. OSA argues that I failed to properly apply the correct summary judgment standard. OSA had failed to produce any evidence to support any inference of a likelihood that it would expand into OEI's market. It was on that absence of evidence that I concluded that the "bridge the gap" factor favored OEI.

*Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996). I did note that the two instances of actual confusion were not necessarily examples of confusion with respect to product sources, rather than, for example, telephone or fax numbers.[5] Ruling at 24. Such an inference is not favorable to OSA, the non-moving party. Nevertheless, I adhere to my conclusion that the actual confusion factor also favors OEI because the only evidence of actual confusion that OSA produced consisted of these two misdirected communications. There was no evidence that the consumers were confused with respect to source. *Cf. The Sports Authority*, 89 F.3d at 964 (holding that evidence of misdirected phone calls, especially the evidence that customers have believed there to be a connection between the defendant and plaintiff companies, raised triable issue of fact concerning actual confusion); *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999) (noting that evidence that consumers placed phone calls to the wrong party *and* mistakenly believed that plaintiff's and defendant's services were affiliated because of their similar names).

Furthermore, construing the evidence in the light most favorable to OSA and inferring that both consumers were, in fact, confused with respect to source, "the fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper." *Universal City Studies, Inc v. Nintendo Co., Ltd.*, 746 F.2d 112, 118, n.8 (2d Cir. 1984). Given the number of years that OSA and OEI have both used "Omega" marks and the fact that OSA can point to only two of

---

[5] In 2000 or 2001, Daktronics, the former distributor of OSA's Omega Electronics in the United States, received an order for an OEI product. Sauser Rupp Dep. at 140. In June of 2004, a German customer sent a request to OSA or an OSA subsidiary in Switzerland, requesting a quote for a list of OEI items. Reilly Decl. Ex. L.

actual confusion, the actual confusion factor favors OEI.

     5.     Polaroid *Balancing*

Finally, it is important to remember that in balancing the *Polaroid* factors, the overall inquiry is: "whether *numerous* ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex Products*, 390 F.3d at 161 (emphasis added). I must focus on that inquiry rather than on any particular factor or on a determination of which party "wins" the greater number of factors. *See id.* at 162. The Second Circuit has affirmed a district court's grant of summary judgment even when five of the eight factors – including the strength of its mark – favored the party opposing summary judgment. *See id.* at 167, n.5.

Here I adhere to my initial conclusion that OSA has failed to raise a genuine issue of material fact concerning the likelihood that numerous ordinarily prudent purchasers will be confused with respect to the source of OEI's goods. *See* Ruling at 26.

    F.    <u>CUTPA Claim: Trademark Applications and Domain Name Registrations</u>

OSA argues that, after concluding that it had failed to raise a triable issue of fact with respect to the likelihood of confusion under the Lanham Act, I granted summary judgment on its CUTPA claim without considering whether OEI's conduct offended public policy. OSA also claims that I did not draw all reasonable inferences in its favor.

The Connecticut Unfair Trade Practices Act proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property,

tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110b(a)(4).

The Connecticut Supreme Court has adopted the so-called cigarette rule, which encompasses the following criteria, for determining whether a practice violates CUTPA:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355 (1987) (internal citation omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Votto v. American Car Rental, Inc.*, 273 Conn. 478, 484 (2005) (internal citation omitted).

In its briefs, OSA has argued that OEI's conduct constitutes unfair competition under CUTPA because: (1) OEI's trademark applications and domain name registrations offend public policy and violate the law, and (2) OEI's advertising and marketing practices create a likelihood of confusion in the marketplace. OSA noted in its motion for reconsideration that my analysis of OSA's CUTPA claim appeared to rely solely on the second category of conduct and my conclusion that the plaintiff failed to produce evidence of likelihood of confusion, a requirement for a claim of unfair competition under the Lanham Act. Although that basis was emphasized in the parties' briefs, OSA did put forth evidence with respect to its CUTPA claim independent of the purported likelihood of confusion between OEI's and OSA's products.

In addition to its arguments based on the likelihood of confusion between OEI's and OSA's products, OSA has pointed to the following conduct as additional bases for its CUTPA claim: (1) registration of the domain name omegatime.net for improper and illegitimate purposes; (2) registration of "Omega" trademarks in the United States in order to block OSA from obtaining those same trademarks; (3) registration of "Omega" trademarks abroad, including Benelux registrations for omegawatch.com and omegatime.com for illegitimate purposes; (4) false representations to the Patent and Trademark Office, including three intent-to-use applications (Nos. 76/242,073; 76/337,450; and 76/337,374) for "Omega" marks that OEI had no bona fide intent to use; and (5) the filing of Application No. '374 for trademark Ω.com.

Courts in Connecticut have addressed whether a business transaction by a commercial entity must be within that entity's main business in order to be fall within the scope of CUTPA. Many have applied the "primary line of business" test and have held that conduct outside that scope cannot be deemed a violation of CUTPA. *E.g.*, *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 113 (D. Conn. 1998) (dismissing CUTPA claim based on principle that a CUTPA violation may not arise out of conduct that is merely incidental to the performance of entity's trade or commerce); *Mars Electric, LLC v. Wooster Par, LLC*, 2005 WL 469327, *3 (Conn. Super. Jan. 28, 2005) (same). Others have held that the activities need not be within the primary line of business to fall within the scope of CUTPA. *E.g.*, *Holeva v. M & Z Associates, Inc.*, 1998 WL 956359, *4 (Conn. Super. Nov. 9, 1998) (although defendant's activities need not be within its primary line of business, in order to violate CUTPA, they must nevertheless constitute "trade or commerce" as that term is defined by the statute).

OSA argues that "CUTPA expressly provides protection to consumers, competitors and

other business people from the violation of statutes and public policies, including United States and trademark laws as [they pertain] to domestic and foreign filings." OSA Memo. Supp. Summ. J. at 16.  None of the above conduct, however, violates CUTPA because the acts relating to trademark applications and domain name registrations do not occur "in the conduct of any trade or commerce," as those terms are defined by the statute.  Filing a trademark application or registering a domain name does not constitute: "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4).  *Cf. Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 85 (1990) (licensing of a trademark by one not involved in the sale, renting, leasing or distribution of defective product does not constitute "trade or commerce" under CUTPA).

The parties have cited no cases, nor have I identified any, that extend the scope of "trade or commerce" under CUTPA to the filing of applications with the Patent and Trademark Office or registrations for domain names that are never used to promote or sell any products or services.[6] The trademark applications and domain name registrations suggest that the user may eventually

---

[6] Although conduct may occur outside Connecticut and still constitute a violation of CUTPA, in order to violate the state statute, it must be "be tied to a form of trade or commerce intimately associated with Connecticut." *Titan Sports, Inc. v. Turner Broadcasting Systems, Inc.*, 981 F. Supp. 65, 71 (D. Conn. 1997) (citations omitted).  *See also Richmond Fredericksburg & Potomac Railroad Corp. v. Aetna Cas. & Sur. Co.*, 1997 WL 205783, *2 (D. Conn. April 11, 1997).

The foreign trademark filings were generated by OEI, a Connecticut corporation, but they are not tied to a form of "trade or commerce intimately associated with Connecticut," *i.e.*, they are not connected with "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value" in Connecticut.  Conn. Gen. Stat. § 42-110b(a)(4).  Accordingly, the foreign filings cannot constitute a violation of CUTPA.

advertise, sell, offer, lease, or distribute articles under those marks or on the web via those domain names. Without evidence of such conduct in the course of trade or commerce, such preliminary acts – even if accompanied by a bad faith intent that is "unfair" to OSA – do not give rise to a CUTPA claim. No reasonable inferences drawn in favor of OSA affect this legal conclusion.

G. <u>Alternative Relief</u>

OSA moved in the alternative for the court to dismiss OEI's Lanham Act counterclaims of trademark infringement, unfair competition, and false designation of origin. Because I have granted OEI's motion to voluntarily withdraw those claims with prejudice, the request for alternative relief is moot.

The only causes of action that will proceed to trial are OEI's counterclaims against OSA for trademark cancellation and breach of contract.

OSA's motion for reconsideration (doc. # 182) is granted. The relief requested therein is denied.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th day of December 2005.

    /s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge