OSA's marks, but the word mark "OMEGA" is, in effect, identical to OSA's mark. Although OEI's brief discusses OEI's association with the United States, and OSA's identity as a Swiss company in an attempt to disassociate the marks, the parties do not genuinely dispute the marks' similarity.

Accordingly, the second *Polaroid* factor also favors OSA.

        c.        Proximity of the Marks

The evidence in the record shows that OEI and OSA operate in different areas of commerce. A reasonable fact-finder could not conclude otherwise. In the United States, OSA sells upscale watches, jewelry, related products and services, timekeeping equipment for athletic competitions, and large-scale display boards. OEI sells process measurement and control devices. Although OSA attacks OEI's use of the phrase "science and industry," to describe the market it targets, the parties have used the phrase "science and industry" to distinguish OEI's market from OSA's. Even though both companies might share customers, because OEI and OSA "are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source." *Virgin*, 335 F.3d at 150.

OSA also points to online marketing of OEI products to argue that the parties' products are proximate. First, OSA relies on two web pages that were reached as a result of searches on OEI's web site. Pl. Memo Supp. Summ. J. at 30.[7] Those two pages show products, a "large clock display" and "6-digit process timer/controller/clocks," displayed next to a wristwatch and

---

[7] Although OSA's brief mentions the web pages in the context of its motion for summary judgment on its unfair competition claim, the likelihood of confusion analysis is the same.

stopwatch, respectively. Exs. 29 (G) and (H) to doc. # 119-2. The two OEI products are not, however, marketed as Omega products; rather they are distributed by Newport Electronics – a company affiliated with OEI – and show a Newport mark, not an Omega mark. *Id.* According to the declaration of Jason Fredman, who conducted the searches of OEI's website and identified the two products advertised near the wristwatch and stopwatch, he chose to search in the databases of both Newport Electronics and Omega Engineering. Ex. 29 at ¶ 2. Although he originated the search on OEI's homepage, the web page print-outs in Exs. 29 (G) and (H) do not show the word "Omega" or the design mark "Ω." Furthermore, the URLs corresponding to those pages are under the domains: www.newportshop.com and www.newportinc.com. Exs. 29 (G) and (H). The placement of a stopwatch and wristwatch near two Newport products on a Newport domain is insufficient to raise a material issue of fact regarding the proximity of OEI's and OSA's products.

Likewise, the web page print-outs of OSA's Powertime hand-held computer and OEI's HH550, a graphic recorder/datalogger/data printer, do not raise a genuine issue of material fact concerning the third *Polaroid* factor.[8] The products are a similar shape and both contain a digital display and printing capabilities, but the Powertime computer and HH550 graphic recorder are not used in the same fields or for the same or similar purposes. According to the web pages, the PowerTime is a "hand-held timing system . . . being used for a range of sports as diverse as swimming, track, marathon . . ." whereas the HH550 is used for "datalogging for data recording,

---

[8] OSA attached the print-outs to its sur-reply memorandum in opposition to OEI's motion for summary judgment (doc. # 160) and refers to the advertised products as "similar goods." Pl. Sur-Reply Opp. Summ. J. at 3, n.3. Thus, it appears that OSA includes the exhibits as evidence of the proximity of the parties' marks.

storing and analysis . . . [and is] ideal for laboratory & process engineering."

The third *Polaroid* factor favors OEI.

        d.      Likelihood that the Prior Owner Will Bridge the Gap

The "bridge the gap" factor recognizes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (internal quotation marks and citation omitted). Because OSA has failed to produce evidence regarding its interest in entering into fields related to OEI's product lines, the fifth factor favors OEI.

OSA's briefs discuss at length the history of OSA and its predominance in the field of timepieces relating to sports and space exploration. *E.g.*, Pl. Memo Opp. Summ. J. at 15-18. OSA also emphasizes its rights to the Omega marks within its "natural zone of expansion." *See Brookfield Communications*, 174 F.3d at 1047 (9th Cir. 1999). OSA has not, however, presented evidence raising a triable issue of fact with respect to the likelihood that OSA will bridge the gap or the contention that its "natural zone of expansion" extends into OEI's market of thermocouples and other industrial and scientific apparatus.

OSA points to the following evidence concerning its historical product expansion: OSA's expansion from its original use of the mark on watches (Ex. 1 to doc. # 119-1) to sports timing equipment (Reilly Dec. Ex. J; Emmons Dep. at 151) to sports display boards (Gibbons Dep. at 112-15) to passenger information systems.[9] In an effort to illustrate OSA's purported expansion into OEI's market and industry, OSA argues that it "offers high performance and precision

---

[9] In its brief, OSA mentions the display boards without citing to evidence in the record. Pl. Memo. Opp. Summ. J. at 16

-21-

timepieces with scientific and industrial applications." Pl. Memo. Opp. Summ. J. at 16. The only evidence in support of this contention consists of evidence relating to two lines of watches. First, OSA points to its Seamaster collection, a collection of watches used by scuba divers and others due to its "precise underwater performance and ability to withstand demanding conditions." *Id., citing* Reilly Dec. Ex. G. Second, OSA points to its Speedmaster collection of watches, the official watches of NASA astronauts and the only watches ever worn on the moon. *Id.* at 17.

In addition, there is minimal evidence concerning the sale of "watch batteries" on OEI's website, and OSA relies on that evidence to argue that there is, in fact, no gap to bridge because "the goods are exactly the same." Pl. Memo Supp. Summ. J. at 31. A web page print-out, showing the product number PH-BATT-3 labeled "watch batteries," and a one-page "investigation report" that summarized the sale of two watch batteries are insufficient to raise a material issue of fact concerning the "bridge the gap" factor. Exs. 30-31 to doc. # 119-2.

Although OSA argues that further businesses "have been developed and are on the horizon," OSA fails to cite evidence in the record to support its contention that OSA is likely to bridge the gap between its product lines and OEI's product lines or that OSA's natural zone of expansion includes OEI's market of scientific and industrial process controls and measuring apparatus. Conceivably, OSA may seek to expand its market into the technical fields inhabited by OEI. The evidence in the record, however, tips in favor of OEI on this fourth *Polaroid* factor.

    e.  Actual Confusion

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *The Sports Authority, Inc. v.*

-22-

*Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996) (internal quotation marks and citation omitted).

There is negligible evidence regarding any actual confusion among consumers. OSA has presented only two examples of customer confusion, and that evidence does not support the contention that customers were confused with respect to the products' source. In 2000 or 2001, Daktronics, the former distributor of OSA's Omega Electronics in the United States, received an order for an OEI product. Sauser Rupp Dep. at 140. In June of 2004, a German customer sent a request to OSA or an OSA subsidiary in Switzerland, requesting a quote for a list of OEI items. Reilly Dec. Ex. L. Those two communications are the only evidence of actual consumer confusion relating to OSA and OEI. Unlike other cases in which evidence of actual confusion included not only misdirected communications but also mistaken beliefs that products or services were associated with unaffiliated companies, OSA has produced no evidence that the confused customers were mistaken with respect to the source of goods rather than, for example, merely with respect to telephone or fax numbers. *Cf. The Sports Authority*, 89 F.3d at 964 (holding that evidence of misdirected phone calls, especially the evidence that customers have believed there to be a connection between the defendant and plaintiff companies, raised triable issue of fact concerning actual confusion); *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999) (noting that evidence that consumers placed phone calls to the wrong party *and* mistakenly believed that plaintiff's and defendant's services were affiliated because of their similar names).

Unlike the plaintiffs in *Morningside* and *Sports Authority*, OSA has failed to present evidence to the court concerning "actual confusion as to sponsorship or affiliation." *Morningside*

*Group*, 183 F.3d at 142. Two misdirected communications over a five-year span with no evidence that the customers believed OEI's products were associated or affiliated with OSA do not present a triable issue of fact with respect to actual confusion. "[T]he fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118, n.8 (2d Cir. 1984).

Thus, the fifth *Polaroid* factor favors OEI.

### f.   Defendant's Good Faith in Adopting its Mark

The evidence before the court supports OEI's good faith in adopting its Omega mark despite some questionable conduct on the part of OEI.[10] "The good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d Cir. 2004) (internal quotation marks and citation omitted). Prior knowledge of a senior user's trademark is not inconsistent with good faith. *Id.*; *Arrow Fastener Co., Inc. v. The Stanley Works*, 59 F.3d 384, 397.

The plaintiff has failed to raise a genuine issue of fact regarding OEI's alleged bad faith. There is a wealth of evidence concerning trademark disputes between OSA and OEI over the past decade, but that evidence does not support the inference that OEI intended to capitalize on OSA's reputation and goodwill or on any confusion between OEI's and OSA's products. Furthermore, the only conduct relevant to the *Polaroid* analysis relates to existing registrations

---

[10] For example, as acknowledged during oral arguments, OEI has attempted to register the Omega mark for "jewelry for use in science and industry."

-24-

and products in commerce -- not pending trademark applications. There is no evidence to support bad faith, *i.e.*, adopting a mark with the intention of capitalizing on OSA's reputation and goodwill and on any confusion between OEI's and OSA's products.

OSA's briefs discuss OEI's bad faith "boxing in," describing the filing of certain trademark applications as conduct that might prevent OSA, the senior user, from using Omega marks within its natural zone of expansion. The pending applications are not relevant to the *Polaroid* analysis, however, because OEI has not used those marks in commerce. Thus, even if those filings do illustrate a kind of bad faith on the part of OEI, they do not constitute bad faith in the likelihood of confusion analysis for claims of trademark infringement and false designation of origin.

The sixth *Polaroid* factor weighs in favor of OEI.

### g.     Quality of the Defendant's Product

Generally, quality is weighed against the defendant only "when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993). There is no evidence in the record supporting the suggestion that OEI's products are of low quality.

The seventh *Polaroid* factor weighs in favor of OEI.

### h.     Sophistication of the Buyers

When considering the buyers' sophistication, the trial court must consider the "general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc.*

*v. VanDam, Inc.*, 159 F.3d 739, 746 (2d Cir. 1998). OSA has failed to raise a triable issue of material fact concerning buyers' sophistication. The evidence in the record supports OEI's contention that buyers of OSA's watches, sports timing devices, and display boards as well as buyers of OEI's scientific instruments would generally exercise significant attention when purchasing such products. The only evidence arguably supporting OSA's contention is that OEI's products are available to anyone with access to the Internet.

Accordingly, the eighth *Polaroid* factor also weighs in favor of OEI.

### i. Conclusion

As noted above, the proper balancing of the *Polaroid* factors is a question of law when the predicate facts are beyond dispute. *Playtex Products*, 390 F.3d at 162. Despite the strength of OSA's mark and the similarities between OEI's and OSA's marks, OSA has failed to raise a triable issue of fact regarding the ultimate question whether customers are likely to be confused. The products are not similar; the parties do not operate in the same areas of commerce; there is negligible evidence that OEI is likely to bridge the gap between the two lines of products and negligible evidence of actual confusion; OEI has not attempted to capitalize on OSA's reputation and goodwill; OEI's products are not of low quality; purchasers of both OEI and OSA products are sophisticated.

Based on OSA's consent to OEI's use of the Omega marks and the absence of evidence raising a material issue of fact concerning the likelihood of consumer confusion, I grant OEI's motion for summary judgment on counts one and five: trademark infringement and false designation of origin.

C.     Unfair Competition Claims

In addition to its trademark infringement and false designation of origin claims, OSA has asserted a claim of unfair competition under the Lanham Act, 15 U.S.C. § 1225(a). OSA has also raised a state law claim of unfair competition under CUTPA. Both parties have moved for summary judgment on OSA's claims of unfair competition.

OSA contends that the following conduct constitutes unfair competition in violation of the Lanham Act and CUTPA: (1) pursuit of Omega trademark registrations in the United States and Europe on products with which it has no business connection in order to "block" OSA from filing similar registrations; (2) pursuit of trademark registrations on products that are similar to OSA's products; (3) Benelux trademark registrations of omegawatch.com and omegatime.com without the intent to use those marks or domain names in the Benelux (Belgium, Netherlands, and Luxembourg);[11] (4) efforts to register so-called "period timers" and "industrial clocks" under the Omega mark; and (5) advertising and marketing practices that show OEI products displayed next to a watch or stopwatch.

1.     *Lanham Act*

As with its claims for trademark infringement and false designation of origin, to establish a violation of the Lanham Act for unfair competition, OSA must show a likelihood of confusion between its products and OEI's products. Additionally, OSA must show a substantial effect on

---

[11] OSA's briefs refer to the "Benelux trademark registrations" for omegawatch.com and omegatime.com. *E.g.*, Pl. Memo Supp. Summ. J. at 17; Exs. 33-34 to Doc. # 119-2. OSA also, however, discusses Judge Arteron's decision in *Omega II*, the anti-cybersquatting suit relating to the omegawatch.com and omegatime.com *domain names. Omega II*, 228 F. Supp. 2d at 116-18. There is no evidence in the record regarding the use of those domain names as a basis for consumer confusion, nor does OSA argue that the registration of those domain names or their use constitutes conduct in violation of the Lanham Act.

United States commerce in order to establish a violation of the Lanham Act based on unfair competition. As discussed above, OSA has not raised a triable issue of fact with respect to consumer confusion. Furthermore OSA has failed to point to evidence of any effect on U.S. commerce resulting from OEI's conduct.

OSA has failed to raise a genuine issue of material fact with respect to whether the attempts to register trademarks in the United States, U.S. trademark registrations, and online advertising and marketing, cause a likelihood of consumer confusion, a necessary element of a Lanham Act claim of unfair competition. "Where marks are too dissimilar to support a claim for trademark infringement, they are likewise too dissimilar to support [a claim] for unfair competition." *Playtex Products*, 390 F.3d at 167.

OSA also points to OEI's conduct abroad relating to foreign trademark applications and registrations to argue that OEI has engaged in unfair competition abroad in violation of the Lanham Act. Because OSA has failed to raise a triable issue of fact regarding any effect of that conduct on United States commerce, the Lanham Act does not apply and OSA's claim fails as a matter of law.

      a.    Foreign Filings

Generally, in order to apply the Lanham Act extraterritorially, the plaintiff must show that the defendant's conduct abroad has had "substantial effect on United States commerce," one of the three so-called "*Vanity Fair* factors."[12] *See Atlantic Richfield Co.*, 150 F.3d at 192, n.4 (2d

---

[12] The other two *Vanity Fair* factors are: "whether the defendant is a United States citizen . . . [and] whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law." *Atlantic Richfield Co. v. Arco Globus Int'l Co., Inc.*, 150 F.3d 189, 192 (2d Cir. 1998); *see also Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956).

Cir. 1998) (discussing the three factors and noting that the Court has "never applied the Lanham Act to extraterritorial conduct absent a substantial effect on United States commerce").

The two cases on which OSA relies do not support its argument in favor of applying the Lanham Act to OEI's foreign conduct. In *Ramirez & Feraud Chili Co. v. Las Palmas Food Co., Inc.*, 146 F. Supp. 594, 598 (S.D. Cal. 1956), the conduct at issue was not the mere filing of Mexican trademarks, but involved the use of a deliberate counterfeit of the plaintiff's label that embodied not only the identical trademark but also the exact colors, format, and style of printing and a similar layout and design. The Court discussed the effect on commerce in the United States, including harm to the plaintiff's reputation and good will and drastic decreases in purchases of its products in the United States. *Id.* at 599. In addressing the reach of the Lanham Act, the Court noted that "national sovereignty is the power to impose, even upon foreigners owing no allegiance, liability for acts done abroad *which proximately cause damage within the territorial limits of the sovereign.*" *Id.* at 600 (emphasis added). In particular, the Court emphasized that the *Ramirez* case involved "not only unfair trade practices committed by an American citizen in Mexico 'which radiate unlawful consequences here,' but also acts committed in the United States which clearly violate the Lanham Act." *Id.* at 601-02.

OSA also relies on *A.V. by Versace v. Gianni Versace*, 126 F. Supp. 2d 328 (S.D.N.Y. 2001). In *Versace*, the Court applied the Lanham Act extraterritorially to enjoin infringing actions that occurred outside the United States, emphasizing that all three *Vanity Fair* factors supported the extraterritorial application of the Lanham Act. *Id.* at 341. The Court noted that foreign imports used to further the allegedly infringing scheme, the orchestration of foreign activities from the United States, and the high probability of consumer confusion in the United

-29-

States and abroad "clearly establish a substantial effect on U.S. commerce." *Id.*

OSA has failed to point to any evidence in the record showing that OEI's foreign filings have had any effect whatsoever on United States commerce.

2.   *CUTPA*

The Connecticut Unfair Trade Practices Act proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110b(a)(4).

The Connecticut Supreme Court has established the following criteria to be employed when determining whether a practice violates CUTPA:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355 (1987) (internal citation omitted).

Courts in Connecticut have held that a finding of likelihood of confusion under the Lanham Act establishes a violation of CUTPA based on unfair competition. *E.g., Nabisco Brands, Inc. v. Kaye*, 760 F. Supp. 25, 29 (D. Conn. 1991). OSA has not, however, raised a triable issue of material fact with respect to the likelihood of confusion. In addition, OSA has

not pointed to conduct that could be classified as "immoral, unethical, oppressive, or unscrupulous" and has only pointed to its own efforts to defend its trademarks as evidence of injury.[13] That is insufficient to establish "substantial injury to consumers, competitors or other businessmen." Accordingly, OSA's CUTPA claim fails as a matter of law.

D.   Dilution

OEI has also moved for summary judgment on OSA's count six, trademark dilution under the Lanham Act. To succeed in a claim of trademark dilution, a plaintiff must establish:

> (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.

*Savin Corp.*, 391 F.3d at 449. The first three elements are not genuinely in dispute. OSA has failed, however, to produce any evidence of the fourth element, *i.e.*, actual dilution. It is an essential element of a federal trademark dilution claim that the plaintiff show "actual dilution, rather than a likelihood of dilution." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003); *see also Savin Corp.*, 391 F.3d at 449.

Because OSA has failed to produce any evidence that OEI's use of Omega marks actually diluted OSA's marks, OSA's claim of dilution fails as a matter of law.

E.   Cancellation of OSA's Trademark Registration Due to Abandonment and Fraud

OEI has moved for summary judgment on its second counterclaim, seeking cancellation of certain OSA registered trademarks. OEI argues that trademark Registration Nos. 708,731 and

---

[13] OSA has also argued that the potential dilution of its trademark satisfies the required showing of injury but has failed to produce any evidence of dilution or potential dilution. Pl. Reply Memo. Supp. Summ. J. (doc. # 151) at 4.

1,290,661 should be cancelled due to fraud on the PTO and abandonment.

### 1. *Fraud on the PTO*

"A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'" *Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988). "Fraud in procuring a . . . mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999) (citation omitted).

OEI has not produced evidence in support of the required element of fraudulent intent. Rather, OEI merely relies on the testimony of OSA's witnesses who testified, in general, that they had "no knowledge" concerning the sale of goods intended for use in science and industry. Emmons Tr. 10-12; Kayal Tr. 224-45; Gibbons Tr. 142-45, 153; Sauser Rupp Tr. 252, 270-72.

To contest OEI's allegations, OSA has submitted minimal evidence. At summary judgment, however, I must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in OSA's favor. OSA provided a supplemental declaration of Hamid Kayal, General Manager of OSA's Omega Electronics, who stated simply: "Omega Electronics's devices have scientific and industrial applications," and referred to one example, a University of Michigan study that used a Scan-O-Vision camera in or around 1997, as well as scientific applications that are "well documented in the book *Omega Saga*," of which excerpts in French were attached to the declaration.

A reasonable fact-finder could conclude that OEI has not met the burden of establishing by "clear and convincing evidence" that OSA knowingly made false, material representations of

facts on its trademark applications and renewals. Accordingly, summary judgment in favor of OEI based on OSA's alleged fraud on the PTO is not appropriate.

2. *Abandonment*

"To determine that a trademark or trade name is abandoned, two elements must be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future." *Stetson v. Howard D. Wolf and Associates*, 955 F.2d 847, 850 (2d Cir. 1992). "Two years of non-use creates a rebuttable presumption of abandonment." *Id.* (citation omitted). Again, although OSA has offered minimal evidence, that evidence is sufficient to withstand summary judgment. First, with respect to Registration No. '661, there appears to be no question that OSA has continued to use '661 in sporting events, but OEI appears to seek cancellation of that registered trademark in its entirety.[14] Second, although sparse, there is evidence on which a fact-finder could conclude that OSA has not abandoned the two registered trademarks at all, including those aspects related to "science and industry." The language relating to "science and industry" in '731 and to "scientific investigation and industrial application" in '661 is vague, but a reasonable fact-finder could conclude that they cover OSA's space-related activities. Thus, based on the evidence in the record, a reasonable fact-finder could conclude that OSA's '731 and '661 marks have continued to be used. Summary judgment based on abandonment is not appropriate.

---

[14] A registration may be canceled "in whole" or "in part." 15 U.S.C. § 1119. *See also Levi Strauss & Co. v. GTFM, Inc.*, 196 F. Supp. 2d 971, 975 (N.D. Cal. 2002). OEI has not moved for cancellation in part.

-33-

F.   OEI's Cybersquatting Counterclaim

OSA and Swatch[15] have moved for summary judgment on OEI's cybersquatting counterclaim relating to the registration of the domain name omega.us. Federal law imposes civil liability for "cyberpiracy," in cases of "bad faith intent to profit" from another's mark. 15 U.S.C. § 1125(d)(1)(A)(i). The statute provides that "bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1225(d)(1)(B)(ii).

The evidence in the record sets forth the process for registering a domain name with a .us top-level domain ("usTLD"). Exs. E-F to doc. # 119-3.[16] The so-called Sunrise application process permitted persons or entities, including foreign entities with a presence in the United States, to register for a usTLD, in advance of general registration, if they held a U.S. federal trademark registration or application on the PTO's Principal Register. Ex. E to doc. # 119-3. Because multiple trademark owners might apply for the same usTLD domain name, a random selection process assigned domain names for which there were multiple qualified applicants. *Id.*

The only evidence OEI has presented in support of the necessary element of bad faith intent relates to the application by Swatch, rather than OSA, for omega.us. Because Swatch,

---

[15] Although the original motion appeared to be filed only on behalf of OSA, at oral argument counsel for third-party defendants OSA and Swatch confirmed that Swatch joined in the motion for summary judgment on OEI's counterclaim of cybersquatting.

[16] As noted above, OEI has moved to strike those exhibits as hearsay. Because the exhibits gather publicly available information that would be admissible at trial and OEI does not dispute the details of the application process, I have considered the exhibits.

OSA's parent company, was not the owner of record of the Omega trademarks, OEI asserts that Swatch's application for <u>omega.us</u> constitutes bad faith. The application, however, indicates that Swatch's application was on behalf of OSA, the holder of Omega trademarks in the United States and Swatch's subsidiary. Ex. G to doc. # 119-3. OEI also argues that the foreign identity of the defendants supports OEI's claim of bad faith intent in registering for a usTLD domain name. Swatch and OSA's identities as Swiss – not American – companies in no way supports OEI's allegations of bad faith intent. The Sunrise application process permitted owners of United States trademark registrations or applications to apply for a usTLD. The applicants did not need to be domestic entities. Finally, OEI points out that Swatch has not yet made use of <u>omega.us</u>; that evidence alone is not sufficient for a fact-finder to conclude that Swatch applied for the domain name with a bad faith intent to profit from OEI's mark.

In short, OEI has presented no evidence that would permit a reasonable fact-finder to conclude that Swatch did not have reasonable grounds to believe that "the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1225(d)(1)(B)(ii). Accordingly, OSA's motion for summary judgment on OEI's counterclaim of cybersquatting is granted.

## IV. Conclusion

OSA's motion for partial summary judgment (doc. # 116) is DENIED with respect to counts one and five, trademark infringement and false designation of origin. OSA's motion (doc. # 116) is GRANTED with respect to OEI's counterclaim of cybersquatting.

OEI's motion for summary judgment on OSA's five claims (doc. # 101) is GRANTED. OEI's motion for partial summary judgment on its counterclaim seeking cancellation of OSA' trademark registration (doc. # 102) is DENIED. OSA's motion to strike OEI's partial motion for

summary judgment (doc. # 130) is DENIED.

OEI's motion to preclude the supplemental statement of facts and affidavits (doc. # 161) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this __30th__ day of September 2005.

/s/_____
Stefan R. Underhill
United States District Judge